# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOHN R. ZIMMERMAN,** | : Civil Action No.: |
| **Plaintiff,** | : |
| | : District Judge: |
| **v.** | : |
| | : |
| **THOMAS W. CORBETT,** | : **CIVIL ACTION – LAW** |
| **LINDA L. KELLY,** | : |
| **FRANK G. FINA,** | : |
| **K. KENNETH BROWN, II,** | : **JURY TRIAL DEMANDED** |
| **MICHAEL A. SPROW,** | : |
| **ANTHONY J. FIORE, and** | : |
| **GARY E. SPEAKS,** | : **(Electronically Filed)** |
| **Defendants.** | : |

## COMPLAINT

**AND NOW** comes the Plaintiff, John R. Zimmerman, by and through his undersigned counsel, Devon M. Jacob, Esquire, and the law firm of Jacob Litigation, and avers as follows:

## JURISDICTION AND VENUE

1.     This action is brought pursuant to 42 U.S.C. § 1983.

2.     Jurisdiction is founded upon 28 U.S.C. § § 1331, 1343, and 1367.

3.     Venue is proper in this Court, as all parties are located within the Middle District of Pennsylvania, and the cause of action arose in the Middle District of Pennsylvania.

1

## **PARTIES**

4.      Plaintiff is John R. Zimmerman, an adult individual who lives in Dauphin County, Pennsylvania.

5.      Defendant, Thomas W. Corbett, is an adult individual, who during all relevant times, served as either the Attorney General in the Office of Attorney General or Governor of the Commonwealth of Pennsylvania. All of Defendant Corbett's actions or inactions were taken under color of state law. He is sued in his individual capacity.

6.      Defendant, Linda L. Kelly, is an adult individual, who during all relevant times, served as the Attorney General in the Office of Attorney General of the Commonwealth of Pennsylvania. All of Defendant Kelly's actions or inactions were taken under color of state law. She is sued in her individual capacity.

7.      Defendant, Frank G. Fina, is an adult individual, who during all relevant times, served as the Chief Deputy Attorney General in the Office of Attorney General of the Commonwealth of Pennsylvania. All of Defendant Fina's actions or inactions were taken under color of state law. He is sued in his individual capacity.

8.      Defendant, K. Kenneth Brown, II, is an adult individual, who during all relevant times, served as Senior Deputy Attorney General in the Office of Attorney

General of the Commonwealth of Pennsylvania. All of Defendant Brown's actions or inactions were taken under color of state law. He is sued in his individual capacity.

9.     Defendant, Michael A. Sprow, is an adult individual, who during all relevant times, served as a Senior Deputy Attorney General in the Office of Attorney General of the Commonwealth of Pennsylvania. All of Defendant Sprow's actions or inactions were taken under color of state law. He is sued in his individual capacity.

10.     Defendant, Anthony J. Fiore, is an adult individual, who during all relevant times, served as a Special Agent in the Office of Attorney General for the Commonwealth of Pennsylvania or as the Director of the Bureau of Investigations for the Office of Inspector General for the Commonwealth of Pennsylvania. All of Defendant Fiore's actions or inactions were taken under color of state law. He is sued in his individual capacity.

11.     Defendant, Gary E. Speaks, is an adult individual, who during all relevant times, served as a Special Agent in the Office of Attorney General of the Commonwealth of Pennsylvania. All of Defendant Speak's actions or inactions were taken under color of state law. He is sued in his individual capacity.

## Background

12.     John M. Perzel ("Perzel"), a member of the Republican Party, represented northeast Philadelphia (172nd Legislative District) in the Pennsylvania

3

House of Representatives.

13.     In 2000, Democratic challenger Mark Chilutti ("Chilutti") came within 92 votes of unseating Perzel, which many believe caused Perzel to devise a plan to make sure that he remained on a trajectory to the Governor's mansion.

14.     In 2003, following the death of the then Speaker of the House, Representative Matthew J. Ryan, Perzel became the Speaker of the House; a position which he would hold until the Republicans lost control of the House in the 2006 election.

15.     In 2007, The Patriot News reported that members of the Democratic caucus received bonuses for campaign related work performed on state time.

16.     As a result, then Attorney General Tom Corbett was forced to conduct an investigation into the actions of the Legislature.

17.     In September of 2007, Perzel asked Zimmerman to arrange a meeting with Corbett.

18.     Zimmerman arranged the meeting for mid-afternoon on October 2, 2007, at Raspberry's, which is located in the Hilton Harrisburg, on Second Street, in Harrisburg, Pennsylvania.

19.     Those in attendance at the meeting were Perzel; Towhey; Brian Preski, Perzel's former Chief of Staff; Corbett; and Brian Nutt, Corbett's Chief of Staff and

4

Campaign Manager.

20. At the time, both Corbett and Perzel intended to run for Governor in 2010.

21. Perzel had been weakened by the Chilutti challenge, 2005 pay raise scandal, and the 2006 shift in power in the House.

22. Corbett wanted Perzel to back him for Governor in 2010.

23. Perzel, however, believed that if the Republican Caucus won back the majority in the house in 2008, he had a chance at becoming Governor in 2010.

24. Perzel refused to back Corbett for Governor.

25. Preski, however, agreed to host a fundraiser for Corbett on December 11, 2007, in Philadelphia.

26. In July of 2008, Corbett announced the filing of criminal charges against 12 ranking Democrats in what would become known as "Bonusgate."

27. After three years of investigation and only capturing Democrats in an investigation that had been forced upon him, "Bonusgate" became an Achilles heel for Corbett.

28. Corbett was accused of targeting Democrats in partisan politics, which threatened his aspirations of becoming Governor.

29. Corbett's Public Corruption Unit turned its sights to the Republican

5

caucus, specifically to Perzel.

30.     The Perzel investigation centered on the alleged use of caucus employees for campaign work; alleged unlawful contracts with consultants GCR; Washington, D.C. based Aristotle Inc.; and Washington state-based Labels & Lists Inc.; and an alleged attempt to falsify evidence to mislead investigators about the prospective defendants' involvement in criminal activity.

31.     On September 15, 2009, Corbett announced that he was running for Governor.

32.     On November 12, 2009, Corbett announced the grand jury presentments and the filing of criminal charges against 10 ranking Republicans, including Perzel, and Perzel's staff, including Zimmerman.

33.     The elimination of Perzel's entire team in a single set of arrests cleared the path for Corbett's run for Governor and addressed the claims that Corbett was engaging in partisan politics.

34.     Zimmerman was criminally charged with two counts of conspiracy, and one count each of hindering apprehension and obstruction.

35.     Zimmerman's charges were related solely to the alleged cover up, regarding the movement of boxes that allegedly contained campaign material from the Capital, and telephone calls related to same.

6

36.     Essentially, Zimmerman was charged with conspiring to cover up a crime that he did not know had even occurred.

37.     On November 17, 2011, all criminal charges against Zimmerman were voluntarily dismissed by the Commonwealth, giving Zimmerman legal standing to seek a civil remedy for the clear violations of his civil rights.

38.     The only surprising fact about the dismissal of the criminal charges lodged against Zimmerman is that it took so long for the dismissal to occur.

39.     Ultimately, a total of 26 lawmakers and staffers from both caucuses were prosecuted as a result of a multiyear public corruption investigation that nearly cost Corbett his run for Governor.

40.     Ironically, Corbett's public corruption probe is now the subject of an investigation being conducted by Pennsylvania Attorney General Kathleen G. Kane to determine whether Corbett shifted public resources away from the Jerry Sandusky criminal investigation, to the public corruption probe, in the hope of obtaining convictions, to prevent his campaign for Governor from being derailed.

**The Alleged Cover Up and Related Investigation**

41.     The Pennsylvania State Capitol Complex ("Complex"), located in downtown Harrisburg, Pennsylvania, is the administrative hub of the government of the Commonwealth of Pennsylvania.

7

42.     The State Capitol Building ("Capital") sits at the center of the Complex, which is comprised of numerous state buildings that house government officials and agencies.

43.     In February of 2008, Room 414 of the Capital was commonly referred to as "Perzel's Office."

44.     Despite being referred to as "Perzel's Office," or a "Room," Room 414 actually consisted of a cluster of eight rooms and the woman's restroom.

45.     Both Perzel's and Representative Sandra J. Major's offices were located in Room 414.

46.     During business hours, the door to Room 414 stood wide open.

47.     Essentially, anyone in the Capital could walk into Room 414.

48.     When a visitor enters Room 414, they would be entering a room containing a large conference room to their left, an open doorway in the wall directly in front of them, and a receptionist's desk off to their right.

49.     If the visitor walked through the doorway directly in front of them, they would enter a second room where they would see Zimmerman's desk to their left and Lochetto's desk to their right; both desks facing the wall containing the doorway that they had just walked through.

50.     To the visitor's right, in a location behind Lochetto's desk, the visitor

8

would see the door to Perzel's private office.

51.     When Zimmerman sat at his desk and looked up, he could see the wall in front of him, and to his left he could see the receptionist's desk through the doorway; however, he could not see the front door to Room 414 or the conference room.

52.     One of the state buildings in the Complex is the K. Leroy Irvis Office Building ("Irvis Office Building").

53.     In February of 2008, Room B-2 of the Irvis Office Building served as a storage room for both the Democratic and Republican caucuses.

54.     On Monday, February 25, 2008, Perzel's former secretary, Lori Lochetto, acting on orders from Perzel's former Chief of Staff, Paul Towhey, moved approximately nine boxes from Room B-2 to Room 414.

55.     Lochetto told the Defendants that she accompanied the boxes to Perzel's office.

56.     Nathan Fineman, the messenger who moved the boxes, told the Defendants that he placed the boxes outside of Perzel's office.

57.     Since the entirety of Room 414 (which housed eight offices and the woman's room) was generally known and referred to as "Perzel's Office," Lochetto's and Fineman's statements regarding where they placed the boxes had

9

many possible meanings.

58.     During the course of the criminal investigation and prosecution of the criminal Defendants, neither Lochetto nor Fineman ever informed the Defendants, or other investigators or prosecutors, that they saw Zimmerman on February 25, 2008; nor could they have, as Zimmerman was not present when the boxes were moved, and at the time, had no knowledge of same.

59.     On Tuesday, February 26, 2008, Lochetto, again acting on orders from Towhey, moved additional boxes from Room B-2 to Room 414.

60.     Lochetto claims that the second set of boxes contained campaign material.

61.     The "campaign material" in question would later be discovered to be blank three year old letterhead and blank envelopes.

62.     Charles Snyder was the messenger who moved the second set of boxes.

63.     Snyder admits that Lochetto accompanied him while he placed the boxes in an unidentified inner office in Room 414.

64.     Since Room 414 housed eight offices, Snyder's statement could have been interpreted eight different ways.

65.     Lochetto claims that the second set of boxes were placed in Perzel's private office.

66.     During the course of the criminal investigation and prosecution of the criminal Defendants, neither Lochetto nor Snyder ever informed the Defendants, or other investigators or prosecutors that they saw Zimmerman on February 26, 2008; nor could they have, as Zimmerman was not present when the boxes were moved, and had no knowledge of same.

67.     On Wednesday, February 27, 2008, Lochetto, again acting on orders from Towhey, moved four boxes of campaign material from Room 414 to the House Republican Campaign Committee ("HRCC") office, which is located on Third Street, in Harrisburg, Pennsylvania.

68.     Lochetto claims that the boxes were in Perzel's private office.

69.     Jared Graybill, however, the messenger who moved the third set of boxes, claims that Lochetto directed him to an unidentified room in Room 414 to obtain the boxes, which he was never asked by the Defendants to identify.

70.     During the course of the criminal investigation and prosecution of the criminal Defendants, neither Lochetto nor Graybill ever informed the Defendants or other investigators or prosecutors that they saw Zimmerman on February 27, 2008; nor could they have, as Zimmerman was not present when the boxes were moved, and had no knowledge of same.

71.     On February 29, 2008, at around mid-morning, Lochetto, despite being scheduled off of work, appeared in Room 414 with a messenger, and moved eight boxes into Towhey's office and six boxes into Perzel's private office.

72.     This is the first time that Zimmerman became aware that any of the boxes in question were in Room 414.

73.     Lochetto never spoke with Zimmerman, and left within minutes of her arrival.

74.     At around 3:00 PM, on the same date, Jill Seaman, from the Republican Caucus Legal Office, called Zimmerman and asked if he saw any boxes.

75.     Zimmerman advised Seaman that Lochetto had moved boxes earlier that date.

76.     At around 3:15 PM the same date, Brett Feese, Chief Counsel for the Republican Caucus, called Zimmerman and asked him to secure the boxes in one room because agents from the Pennsylvania Office of Attorney General wanted to inspect the boxes.

77.     At around 4:00 on the same date, Seaman called Zimmerman to advise him that if the agents decided to inspect the boxes that night, he might be called back to the Capitol.

78.     On February 29, 2008, two attorneys from a private law firm representing the House Republican Caucus; an unknown Capitol Police Officer; Seaman; Towhey, who arrived later in the evening; and Zimmerman, observed as Chief Deputy Attorney General Frank Fina and Special Agent Gary Speaks inspected the boxes.

79.     Unbelievably, despite the importance of the matter to the criminal investigation, neither Fina nor Speaks videotaped the inspection or obtained written or recorded statements from the persons who observed the inspection of the boxes.

80.     On March 25, 2008, Fiore and Special Agent Tim Shaffer, interviewed Mark D. Miller, the Director of Messenger Services.

81.     Miller explained that only special messenger requests, outside of the regularly scheduled pick-ups and deliveries, were recorded in the messenger log.

82.     This fact is very significant because if Lochetto asked a messenger to move boxes when the messenger arrived during his/her regular schedule, there would be no record of the movement of the boxes in the messenger log.

83.     The messenger log contained a notation indicating that on February 25, 2008, Miller went to Room 414, for an apparent special messenger request.

84.     However, during an interview on January 29, 2009, Miller advised Fiore that he did not recall going to Room B-2, Room 414, and the HRCC, during the week of February 25, 2008.

## The Grand Jury Process Generally

85.     To understand how the Defendants manipulated the Perzel Grand Jury, an understanding of the Grand Jury Process in Pennsylvania is required.

86.     In Pennsylvania, the Attorney General often uses a multicounty investigating grand jury to investigate suspected drug trafficking, insurance fraud, Medicaid fraud, organized crime or public corruption.

87.     A grand jury convened under Pennsylvania law is comprised of a group of 23 citizens charged with investigating suspected unlawful conduct.

88.     The grand jury has the power to issue subpoenas to compel persons to appear before it to answer questions.

89.     A person served with a subpoena who refuses to appear or to testify may be held in contempt and jailed.

90.     If a prosecutor believes that a subpoenaed witness is likely to make a legitimate claim that his/her testimony would be self-incriminating, the prosecutor may apply to the supervising judge of the grand jury for an order of immunity.

14

91.     If granted, a witness must present and testify or face being found in contempt and jailed.

92.     A grand jury also has the power to subpoena documents.

93.     Prosecutors who present evidence to a grand jury swear not to disclose matters occurring before the grand jury.

94.     The only lawful means through which grand jury proceedings can be made public is through a testifying witness, who has the right to disclose his/her testimony to anyone.

95.     The prosecutor begins the grand jury session by posing questions to the witness.

96.     When the prosecutor finishes asking questions, individual jurors may, and often do, question the witness.

97.     When a prosecutor has no further evidence, the jurors are asked to consider a "presentment" recommending that specific persons be charged with specific crimes.

98.     After considering this request, the grand jury may ask to hear more evidence or may question the content of the presentment.

99.     If the grand jury agrees to consider a presentment, prosecutors prepare a draft document that summarizes the evidence the grand jury heard, and sets out specific, recommended charges.

100.    If twelve or more of the 23 jurors agree, the presentment is "returned" and submitted to the supervising judge for approval.

101.    After the judge's review, the presentment is typically sealed until the prosecutor is ready to file criminal charges.

102.    Under Pennsylvania law, a prosecutor is not required to follow the grand jury's recommendation that criminal charges be filed.

103.    Essentially, unlike other states, Pennsylvania does not have grand juries that have the authority to issue indictments.

### The Perzel Grand Jury

104.    The "Computergate" investigation was presented to a grand jury, overseen by Judge Barry F. Feudale, the then supervising grand jury judge in Harrisburg, Pennsylvania.

   a.   In 2013, the Supreme Court of Pennsylvania sided with Attorney General Kathleen Kane in her request to have Judge Feudale removed from his position as the supervising grand jury judge.

   b.   It is believed that the removal was requested in part because Judge Feudale sent an Email to Fina demeaning Kane and Kelly, and calling Kane's investigation into how the Attorney General's Office (run by

16

Corbett) pursued the Sandusky investigation "patent in its political
intent."

    c.  It is troubling to say the least that the supervising grand jury judge, who
is supposed to preside over the grand jury in an independent judicial
capacity, is exchanging *ex parte* email communication with a
prosecutor who appears before the grand jury, regarding an
investigation that could be presented to the grand jury.

105.  The Defendants wore two hats: criminal investigators and prosecutors.

    a.  By way of example, Fina served both as a criminal investigator on the
night of February 29, 2008, and as a prosecutor before the grand jury
on numerous occasions in 2008 and 2009.

    b.  It is believed that discovery will reveal and therefore averred that all of
the Defendants either participated directly in or directed the criminal
investigation related to Zimmerman.

106.  The Defendants manipulated and threatened prospective grand jury
witnesses to ensure that witnesses testified in a manner that would result in the
Defendants obtaining a specific desired presentment from the grand jury.

    a.  Specifically, witnesses were threatened with criminal prosecution if
they did not cooperate with the Defendants, and offered immunity if
they agreed to cooperate.

    b.  Of the approximately 200 witnesses involved in the underlying
incidents, a majority of the witnesses were offered immunity in
exchange for their testimony.

    c.  One specific witness was called into the Attorney General's office eight
times to discuss his anticipated grand jury testimony.

    d. During a proffer session with Zimmerman, Deputy Attorney General Patrick J. Blessington screamed at Zimmerman, repeatedly used the word "fuck," and accused Zimmerman falsely of participating in a cover up without any factual basis for same.

    e. It is believed and therefore averred that the threatening of witnesses to obtain cooperation was commonplace at the Attorney General's Office and occurred in this case.

    f. It is believed and therefore averred by way of example only that in a related criminal investigations, a chair was thrown by an investigator, and a pregnant lady was threatened that her baby would be taken from her.

107.   The Office of Attorney General, and not Judge Feudale or jurors, ran the grand jury.

    a. By way of example, on September 30, 2009, Fina and Blessington abruptly cut off the grand jury's questioning of Fiore about who had access to Room 414 at the Capital, and ended the session, despite the jury's right to question the witness.

    b. Ultimately, the grand jury had to wait until October 29, 2009, to discover the answer to their question, i.e., that video footage that would have told the entire story from the security camera outside of Room 414 was curiously not available due to the apparent misdirection of the camera.

108.   The Defendants either destroyed, caused to be destroyed, or permitted to be destroyed, exculpatory evidence in the form of original investigation notes.

a. The investigation notes were destroyed, many without even summaries of the notes having been prepared.

    i. The destruction of exculpatory evidence in the form of original investigation notes is a clear violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

    ii. As a result of this <u>Brady</u> violation, the Defendants testified before the grand jury from summaries of investigation notes and/or from memory.

b. By way of example, on September 30, 2009, Blessington questioned Fineman, the messenger on February 25, 2008, before the grand jury in the presence of Fina and Brown.

    i. When Fineman could not remember where within Room 414 he delivered the boxes, Blessington referred to a previous meeting with Fineman and reminded Fineman that he delivered the boxes to a location outside of Perzel's Office.

    ii. There are no investigation notes, summaries, or other record of the referenced prior meeting.

    iii. Moreover, Blessington knew or should have known that simply referring to "Perzel's Office" without clarification is misleading.

c. By way of further example, on October 30, 2009, during Lochetto's grand jury testimony, Fina referenced a previous meeting for which there are no investigation notes or summaries.

d. On May 25, 2010, during Zimmerman's preliminary hearing, Brown questioned Fiore about a phone call received by the HRCC sometime during February 25-27, 2008, from an unknown male regarding boxes that would arrive (as reported by HRCC employee, George Matthews).

     i. Fiore testified that Matthews had received a call but could not identify the caller.

     ii. Fiore's testimony is curious to say the least, since there are no investigation notes or summaries related to an interview of Matthews, and on October 29, 2011, Fiore testified before the grand jury that he was not present during Matthews' grand jury testimony.

109. The Defendants knowingly presented false information, failed to correct the record, or knowingly failed to present exculpatory evidence in their possession to the grand jury:

    a. The Defendants knew that the messenger log book contained a notation indicating that on February 25, 2008, Miller went to Room 414 of the Capital but never presented this evidence to the grand jury.

    b. On October 2, 2009, Fina advised the grand jury that on February 29, 2008, Speaks and he had to wait for Towhey to arrive to open his office (in Room 414 of the Capital) for investigators, giving the impression that Towhey and Zimmerman were not cooperating with investigators, when in fact Fina knew that the delay was caused by Fina's late after hours request to inspect the boxes and the resulting need for Towhey to travel from Philadelphia to Harrisburg in a snowstorm.

    c. The allegations in part against Zimmerman were that the unlawful conspiracy was hatched or furthered during four phone calls between the two men on the night of February 29, 2008.

    i.  On June 27, 2008, Fina correctly admitted before the grand jury that on February 29, 2008, Zimmerman was present with investigators when numerous rooms were inspected in the Irvis Office Building, which undermined the conspiracy related charge.

    ii.  On October 2, 2009, however, Fina incorrectly stated before the grand jury that on February 29, 2008, Zimmerman did not join investigators until around 8:00 PM, when the investigation team arrived at Room 414; thereby giving the misimpression that Zimmerman had time to conspire with Towhey.

    iii.  Upon hearing Fina's false statement, Speaks confirmed the false statement instead of correcting it.

    iv.  Neither Speaks nor Fina ever corrected their false statements before the grand jury and never advised the grand jury that they were with Zimmerman on February 29, 2008, witnessed the four telephone calls in question, and knew that the telephone calls were solely related to the following:

    **6:32 PM** (4 minutes) Towhey called Zimmerman to inform him of his trip to the Capitol.

    **6:42 PM** (2 minutes) Towhey called Zimmerman to inform him of the snow, and asked that the agents be informed that he would be late. He wanted the inspectors to wait for him.

    **8:17 PM** (2 minutes) Zimmerman called Towhey to ask where he was in his travels. Towhey also informed Zimmerman that he forgot his security badge and would need assistance in obtaining entry to the Capital.

    **8:36 PM** (2 minutes) Towhey called Zimmerman to tell him he was approaching the Capitol and would need to be let into the building.

d.  On October 29, 2009, Brown led the questioning of Fiore before the grand jury.

    i. The questioning occurred after Zimmerman had already testified before the grand jury about what he had observed on February 29, 2008, when Lochetto appeared in Room 414 and moved the 14 boxes.

    ii. In response to a juror's question, Fiore responded that the movement of boxes on February 29, 2008, was not recorded in the messenger log.

    iii. Neither Brown nor Fiore, however, explained to the grand jury that per Miller, such matters would not have been recorded in the messenger log.

    iv. Moreover, there is no record that the Defendants ever presented Snyder as a witness to the grand jury.

e. On October 30, 2009, Lochetto appeared (with immunity) before the grand jury.

    i. Fina asked Lochetto if she had worked a full day on February 29, 2008.

    ii. Lochetto answered no.

    iii. Fina asked Lochetto if she had worked a half day on February 29, 2008.

    iv. Lochetto answered no, and explained that she was off of work that day.

    v. Unbelievably, Fina purposefully never asked Lochetto, if despite being off from work on February 29, 2008, if she had gone to Room 414 at any time on February 29, 2008, to move the 14 boxes.

f. The Defendants presented a theory to the grand jury that since the unknown male caller who advised the HRCC that a delivery would be

22

arriving made the call using Zimmerman's telephone line, the caller must have been Zimmerman.

i. The Defendants withheld from the grand jury the fact that Zimmerman's telephone line could be accessed on the receptionist's and Towhey's telephones, and likely on other telephones in Room 414.

ii. The Defendants withheld from the grand jury the fact that literally anyone in the Capital building (including but not limited to, capital police, the cleaning crew, Sandra Majors' staff of three, and a receptionist), had unfettered access to Room 414 and could have placed the call to the HRCC from multiple phones using Zimmerman's telephone line, and could have moved the boxes in question.

iii. The Defendants withheld from the grand jury the fact that the call was likely placed by Miller during his special trip to Room 414 as noted in the messenger log.

iv. The Defendants withheld from the grand jury the fact that multiple witnesses contradicted Lochetto's version of the events, i.e., that the boxes in question were placed in Perzel's private office on a date prior to February 29, 2008, the date that she actually moved the boxes into Perzel's private office.

v. The Defendants withheld from the grand jury the fact that if Zimmerman was sitting at his desk, he could not see the front door to Room 414 or the conference room (where the boxes were likely located until Lochetto moved them on February 29, 2008).

vi. The Defendants withheld from the grand jury the fact that Lochetto's and Zimmerman's presence or absence from the Capital could have been tracked, at least in part, through the access card system for the parking garage.

    vii.  On October 29, 2009, despite the fact that no evidence existed to support the claim, Fiore testified that the boxes in question were next to Zimmerman's desk.

## The Presentment, Criminal Charges, and Arraignment

110.  On November 12, 2009, Corbett announced the Grand Jury presentments and filing of criminal charges against 10 Republicans, including Zimmerman.

111.  Zimmerman was criminally charged with (1) Hindering Apprehension or Prosecution (18 Pa.C.S. § 5105), a felony of the third degree, (2) Obstructing Administration of Law or Other Governmental Function (18 Pa.C.S. § 5101), a misdemeanor of the second degree, (3) Criminal Conspiracy (Hindering Apprehension or Prosecution) (18 Pa.C.S. § 903), a felony of the third degree, and (4) Criminal Conspiracy (Obstructing Administration of Law or Other Governmental Function) (18 Pa.C.S. § 903), a misdemeanor of the second degree.

112.  As a result of the criminal charges filed against him, Zimmerman faced a maximum sentence of 18 years of incarceration, and $40,000 in fines.

113.  The Criminal Complaint contains the following false statements purportedly meant to explain the nature of the criminal charges:

On or about diverse dates between February 25-29, 2008, in Dauphin County, Pennsylvania, the above named defendant, while employed by the Commonwealth of Pennsylvania, intentionally hindered prosecution by concealing or destroying evidence of a crime by having

24

boxes which were the subject of at least one statewide investigating grand jury subpoena moved from their original location to the Speaker Emeritus office area in the State Capital, then having those boxes moved to the House Republican Campaign Committee offices or otherwise hidden from discovery by the grand jury, thereby committing the offence of Hindering Apprehension or prosecution.

On or about diverse dates between February 25-29, 2008, in Dauphin County, Pennsylvania, the above named defendant, while employed by the Commonwealth of Pennsylvania, intentionally hindered prosecution by concealing or destroying evidence of a crime by having boxes which were the subject of at least one statewide investigating grand jury subpoena moved from their original location to the Speaker Emeritus office area in the State Capital, then having those boxes moved to the House Republican Campaign Committee offices or otherwise hidden from discovery by the grand jury, thereby committing the offence of Obstructing administration of law or other governmental function.

On or about diverse dates between February 25-29, 2008, in Dauphin County, Pennsylvania, the above named defendant agreed with Brett O. Feese and/or John M. Perzel and/or Paul E. Towhey and/or other individuals to intentionally hindered prosecution by concealing or destroying evidence of a crime by having boxes which were the subject of at least one statewide investigating grand jury subpoena moved from their original location to the Speaker Emeritus office area in the State Capital, then having those boxes moved to the House Republican Campaign Committee offices or otherwise hidden from discovery by the grand jury, thereby committing the offence of Criminal conspiracy.

114.   The Affidavit of Probable Cause is woefully deficient in that it fails to

identify the elements of the various crimes charged, fails to identify facts to support

the elements of crimes charged, merely refers the reader to the attached Presentment

with assurances from the affiant that probable cause exists to support the crimes

charged:

> Your Affiant has been conducting an investigation of allegations of public corruption within the Pennsylvania Legislature. The OAG's investigation has utilized Statewide Investigating Grand Juries and as a result: the Twenty-Eighth Statewide Investigating Grand Jury has issued Presentment No. 7, which was accepted by Order of the Honorable Barry F. Feudale, Jr., Grand Jury Supervising Judge. This Presentment, which is attached to this affidavit and incorporated by reference, recommends charges be filed by the Attorney General or his designee against the defendant.

> Your Affiant has reviewed the above cited Presentment and finds that the factual findings described therein correspond to the OAG investigative findings. Your Affiant has reviewed the sworn testimony given by the witnesses before the Grand Jury and finds that the testimony is consistent with the information contained within the Presentment. Your Affiant has reviewed the evidence presented to the Grand Jury and find [sic] that it comports with the results of the OAG investigative efforts and findings as to the allegations contained in this Police Criminal Complaint.

> Your Affiant believes and therefore avers, based upon the above facts, that there is probable cause to believe that the defendant, John R. Zimmerman, committed the acts detailed in this Police Criminal Complaint and all attachments in violation of Pennsylvania law and that warrants should issue for the arrest of the Defendant.

115. The 186 page Presentment fails to identify or explain Zimmerman's

purported criminal conduct and in fact only mentions his name three times.

116. On November 12, 2009, Fiore signed and swore to the Criminal

Complaint and Affidavit of Probable Cause.

26

117. Upon receipt of the Criminal Complaint and Affidavit of Probable Cause, District Justice William C. Wenner issued a warrant for Zimmerman's arrest.

118. The Affidavit of Probable Cause was further defective in that it failed to contain any of the exculpatory evidence discussed herein and possessed by the affiant and Defendants when the Affidavit was signed and presented.

119. Any member of the bar of the Commonwealth of Pennsylvania or properly trained law enforcement officer should have known that the Criminal Complaint and Affidavit of Probable Cause did not state the requisite probable cause for the crimes charged, and that the warrant that issued pursuant to same could not be relied upon in good faith.

120. The Defendants knew or should have known that probable cause did not exist to criminally charge Zimmerman with any crimes.

121. Zimmerman was given a time to show up for his arraignment.

122. After voluntarily presenting at the Lower Paxton Police Station to be fingerprinted and photographed, Zimmerman was handcuffed and placed in the backseat of a police cruiser with a police officer next to him.

123. Zimmerman was then transported to District Justice Wenner's office for his arraignment.

124.   The Defendants staged the arraignment process to provide a photo opportunity for the Corbett administration.

125.   The media was positioned in front of District Justice Wenner's office and each criminal Defendant, including Zimmerman, was paraded handcuffed in front of the cameras.

126.   Plaintiff was arraigned and bail was set at $1,000 unsecured bail.

127.   Plaintiff was forced to surrender his passport, which was not returned until the criminal charges were voluntarily dismissed two years later.

128.   On February 3, 2010, Plaintiff discovered that the press office for the Office of Attorney General had purposefully placed his arraignment photo on its website in place of the photograph of a criminal drug defendant in a 2007 press release.

129.   Plaintiff's then attorney sent a letter to the Office of Attorney General requesting that Zimmerman's photograph be removed and asking for an explanation and an apology.

130.   While the letter did not receive the courtesy of a response, the photograph was removed and replaced with the original photograph.

**Preliminary Hearing**

131.   On May 25, 2010, Plaintiff's Preliminary Hearing was conducted before District Justice Wenner.

132.   Brown and Sprow were the prosecutors.

133.   Both Speaks and Fina knowingly failed to testify that on February 29, 2008, Zimmerman was with them for approximately three hours during the entire inspection.

134.   Speaks and Fina also knowingly failed to testify that the phone calls in question occurred while Zimmerman was in their presence on February 29, 2008, and that the calls related to the arrangements for the inspection of the boxes.

135.   Sprow presented Lochetto as a witness.

136.   Lochetto testified that the boxes were placed in Perzel's private office and that Zimmerman was usually at his desk.

137.   The Commonwealth possessed evidence that vitiated probable cause but failed to present the evidence at the preliminary hearing as required.

      a.   Specifically, the Commonwealth, through Sprow and Brown, failed to present the testimony of the three messengers who moved the boxes for Lochetto and whose testimony would have contradicted her testimony.

b. Sprow and Brown failed to present evidence regarding the floor plan for Room 414 or explaining what persons who frequent the Capital meant by "Perzel's Office."

c. Sprow and Brown failed to present evidence regarding the multitude of telephones that had Zimmerman's telephone line installed on them.

d. Sprow and Brown failed to present evidence regarding Miller's special trip to Room 414 during the relevant period of time as indicated in the messenger log.

138. As a result of Sprow's and Brown's selective presentation of evidence during the preliminary hearing and the withholding of exculpatory evidence, Zimmerman's criminal charges were bound over for trial.

## The Destruction of Investigation Notes and Related Sanction

139. On May 23, 2011, Linda L. Kelly became the Attorney General for the Commonwealth of Pennsylvania, and became the highest ranking Pennsylvania official with policymaking and decision-making authority to oversee the criminal case against Zimmerman.

140. It is believed and therefore averred that discovery will reveal that Kelly had full knowledge of, and personal involvement in directing, all aspects of the Zimmerman case.

30

141.   On June 13, 2011, at a pre-trial hearing in the Perzel criminal matter, Fina informed Common Pleas President Judge Richard Lewis and 10 defense attorneys that the Office of Attorney General had destroyed witness and proffer notes.

142.   The destruction of these notes violated Office of Attorney General policy, Judge Lewis's Order to produce the documents, and federal case law.

143.   As a result, Judge Lewis dropped all criminal charges against Perzel, Feese and Towhey, related to the alleged movement of the boxes.

144.   Defendant Zimmerman's criminal case, however, had been previously severed.

145.   Therefore, the box related criminal charges against Zimmerman were not dismissed.

## The Dismissal and Vindication

146.   As a result of this malicious criminal prosecution, Zimmerman was portrayed by the Defendants as a criminal in the media across the entire Commonwealth.

147.   He was ostracized from the community and lost numerous friends.

148.   Once indicted, the Defendants continued to maliciously prosecute Zimmerman.

149.     Since Zimmerman maintained his innocence, unlike co-defendants who had been criminally charged, the Defendants showed him no leniency or mercy.

150.     For over two years, the Defendants refused to dismiss the criminal charges against Zimmerman, even after Judge Lewis dismissed the related conspiracy charges involving co-defendants.

151.     Essentially, for an additional 72 days, Zimmerman sat criminally charged in a conspiracy of one.

152.     On November 17, 2011, after destroying his career and reputation, without comment, the Defendants voluntarily dismissed the criminal charges against Zimmerman.

## COUNT I

### Plaintiff v. Defendants
### Fourth and Fourteenth Amendments – Malicious Prosecution
### Pursuant to 42 U.S.C. § 1983

153.     Paragraphs 1-152 are incorporated herein by reference.

154.     The Defendants orchestrated the procurement of a Grand Jury Presentment and filed criminal charges against Zimmerman not for the purpose of bringing him to justice for violations of Pennsylvania criminal law, but rather to prevent him from being a witness on behalf of other criminal Defendants, to retaliate against him for his political affiliation and loyalty to Perzel, to retaliate against him

32

for refusing to commit perjury, and to help bring balance to the number of Republicans and Defendants who were criminally charged.

155. To achieve this end, the Defendants coached and threatened witnesses, selectively presented evidence to the Grand Jury, and withheld exculpatory evidence from the Grand Jury.

156. Likewise, the Defendants filed a Criminal Complaint and Affidavit of Probable Cause that failed to identify the elements of the crimes charged, failed to identify facts in support of the crimes charged, failed to identify exculpatory evidence possessed by the Defendants, and contained false statements.

157. Essentially, the grand jury presentment and warrant for Zimmerman's arrest were obtained by deceit, fraud, perjury, and other corrupt means.

158. The Defendants waited until the eve of Zimmerman's trial to voluntarily dismiss the criminal charges against him because they knew that a trial would expose their malicious prosecution of Zimmerman and result in an acquittal.

159. The Defendants' prosecutorial duties do not include the conducting of criminal investigations or the prosecution of persons for political or personal means.

160. In the course of being maliciously prosecuted, Zimmerman was taken into physical custody and suffered an ongoing deprivation of liberty consistent with

the concept of seizure as a consequence of being subject to bail conditions and having his passport confiscated.

161. Ultimately, and not surprisingly, the criminal proceedings were terminated in Zimmerman's favor.

162. The Defendants' conduct violated Zimmerman's rights pursuant to the Fourth and Fourteenth Amendments to the Federal Constitution.

163. As a direct and proximate result of the malicious prosecution, Zimmerman suffered and will continue to suffer embarrassment, humiliation, financial harm, physical and psychological harm, and pain and suffering, some or all of which may be permanent.

164. As a direct and proximate result of the malicious prosecution of Zimmerman, he has incurred attorneys' fees and other costs associated with his defense.

## COUNT II

**Plaintiff v. Defendants**
**State Law Claim – Malicious Prosecution**

165. Paragraphs 1-164 are incorporated herein by reference.

166. The Defendants' conduct violated Zimmerman's rights pursuant to Pennsylvania state law prohibiting malicious prosecution.

34

167. As a direct and proximate result of the malicious prosecution, Zimmerman suffered and will continue to suffer embarrassment, humiliation, financial harm, physical and psychological harm, and pain and suffering, some or all of which may be permanent.

168. As a direct and proximate result of the malicious prosecution, Zimmerman has incurred attorneys' fees and other costs associated with his defense.

**WHEREFORE**, Zimmerman, respectfully requests the following relief:

A.    That the Court provide him with a federal jury trial;

B.    That judgment be entered in his favor and against the Defendants;

C.    That the Court declare that the Defendants' actions violated his constitutional rights;

D.    That the Court award him compensatory damages;

E.    That the Court award him punitive damages;

F.    That the Court award him his attorney's fees, costs and interest; and

G.    That the Court award such other financial or equitable relief as is reasonable and just.

RESPECTFULLY SUBMITTED,


s/*Devon M. Jacob*
**DEVON M. JACOB, ESQUIRE**
Pa. Supreme Court I.D. 89182

Jacob Litigation
P.O. Box 837
Mechanicsburg, Pa. 17055-0837
717.796.7733
djacob@jacoblitigation.com


Dated: November 14, 2013          Counsel for Plaintiff John R. Zimmerman