ATTACHMENT A

1  COMMONWEALTH OF PENNSYLVANIA     : IN THE COURT OF COMMON PLEAS
                                              OF
2                                   : DAUPHIN COUNTY, PENNSYLVANIA
           v.
3                                   :

4  ELMER L. BOWMAN                  : No. 63 MD 2010

5  BRETT O. FEESE                   : No. 65 MD 2010

6  DONALD H. McCLINTOCK             : No. 66 MD 2010

7  JOHN M. PERZEL                   : No. 64 MD 2010

8  BRIAN J. PRESKI                  : No. 62 MD 2010

9  ERIC S. RUTH                     : No. 69 MD 2010

10 JILL A. SEAMAN                   : No. 68 MD 2010

11 SAMUEL C. "BUZZ" STOKES          : No. 67 MD 2010

12 PAUL E. TOWHEY                   : No. 70 MD 2010

13 JOHN R. ZIMMERMAN                : No. 61 MD 2010

14

15                 TRANSCRIPT OF PROCEEDINGS

16                   PRELIMINARY HEARING

17                       VOLUME I

18     BEFORE:    HONORABLE WILLIAM C. WENNER

19     DATE:      TUESDAY, MAY 25, 2010

20     PLACE:     COURTROOM NO. 1
                  DAUPHIN COUNTY COURTHOUSE
21                HARRISBURG, PENNSYLVANIA

22 APPEARANCES:

23     K. KENNETH BROWN, II, ESQUIRE
       MICHAEL A. SPROW, ESQUIRE
24     *Office of Attorney General*

25        For - Commonwealth

 1 | APPEARANCES CONTINUED:

 2

 3 |     DONNA J. McCLELLAND, ESQUIRE

 4 |          For - Defendant Bowman

 5 |     JOSHUA D. LOCK, ESQUIRE
   |     GOLDBERG KATZMAN, P.C.

 6

 7 |          For - Defendant Feese

   |     SCOTT P. SIGMAN, ESQUIRE

 8

 9 |          For - Defendant McClintock

10 |     BRIAN J. McMONAGLE, ESQUIRE
   |     FORTUNATO N. PERRI, JR., ESQUIRE
   |     McMONAGLE, PERRI, McHUGH & MISCHAK, P.C.

11

12 |          For - Defendant Perzel

13 |     WILLIAM J. WINNING, ESQUIRE
   |     MEGAN S. SCHEIB, ESQUIRE
   |     COZEN O'CONNOR

14

15 |          For - Defendant Preski

16 |     EVAN J. KELLY, ESQUIRE
   |     Goldberg, Meanix & Muth

17 |          For - Defendant Ruth

18 |     WILLIAM FETTERHOFF, ESQUIRE

19 |          For - Defendant Seaman

20 |     ROBERT DONATONI, ESQUIRE

21 |          For - Defendant Stokes

22 |     TIMOTHY WOODWARD, ESQUIRE
   |     LAW OFFICE OF TIMOTHY WOODWARD

23

24 |          For - Defendant Towhey

   |     THOMAS A. BERGSTROM, ESQUIRE

25

   |          For - Defendant Zimmerman

1                    INDEX TO WITNESSES

2    FOR THE COMMONWEALTH    DIRECT    CROSS    REDIRECT    RECROSS

3    Lori Lochetto

4      By Mr. Sprow:          6

5      By Mr. McMonagle:                15

6      By Mr. Winning:                  23

7      By Mr. Lock:                     24

8      By Mr. Woodward:                 27

9      By Mr. Bergstrom:                29

10

11   Sheila Flickinger

12     By Mr. Brown:          30

13     By Mr. McMonagle:                49

14     By Mr. Winning:                  55

15     By Mr. Lock:                     58

16     By Ms. McClelland:               79

17     By Mr. Kelly:                    87

18     By Mr. Sigman:                   88

19     By Mr. Fetterhoff:               90

20

21   Gary Speaks

22     By Mr. Sprow:          114

23     By Mr. McMonagle:                119

24     By Mr. Woodward:                 128

25     By Mr. Bergstrom:                131

1                   INDEX TO EXHIBITS

2

3    FOR THE COMMONWEALTH          IDENTIFIED        ADMITTED

4

5    Exhibit No. 33 - report          47

6    Exhibit No. 34 - e-mail          48

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (On Tuesday, May 25, 2010, the following
 2     proceedings occurred, beginning at 9 a.m.:)
 3
 4              THE COURT:  Everybody ready to go?  We'll
 5     get started.
 6              I guess just as a preface, I was warned
 7     that the air conditioning for this courtroom
 8     might be trouble today, so I'll tell the
 9     attorneys, if anybody wants to take their jackets
10     off, please relax.
11              If the Commonwealth is ready, you can
12     call your first witness.
13              MR. SPROW:  Thank you, Your Honor.  The
14     Commonwealth calls Lori Lochetto.
15
16                    LORI LOCHETTO,
17     called as a witness, being duly sworn, testified
18     as follows:
19
20              THE COURT:  Ma'am, I'll need you to pull
21     that microphone toward you and you'll have to
22     stay relatively close to it.  Keep your voice up
23     so the attorneys in the back can hear you.
24
25
```

1                DIRECT EXAMINATION

2  BY MR. SPROW:

3     Q    Good morning, Ms. Lochetto.  Could you

4  please tell your name for the record and spell

5  both your first and last name?

6     A    Lori Lochetto.

7          THE COURT:  Pull that microphone closer

8  to you.  Get close to it.

9          THE WITNESS:  L-O-R-I, L-O-C-H-E-T-T-O.

10 BY MR. SPROW:

11    Q    Going back to the time frame of 1995

12 through 2008, where were you employed at that

13 time?

14    A    In the House of Representatives, the

15 Republican Caucus.

16    Q    Who did you work for?

17    A    John Perzel.

18    Q    In what capacity?

19    A    I started out as a secretary and

20 progressed up.

21         MR. FETTERHOFF:  Ms. Lochetto, that

22 microphone is flexible and you can bend it toward

23 you.  Together with that, I would be grateful if

24 you kept your voice up, because back here it's

25 difficult to hear.

1  BY MR. SPROW:

2      Q    You said you started out as an

3  administrative assistant?

4      A    Yes.

5      Q    And moved on to what position?

6      A    I did the floor coordination, so I did a

7  lot of legislative -- I don't know how to explain

8  it.  Things related to the floor.

9      Q    Your ultimate boss during that time frame

10 was Representative Perzel, correct?

11     A    Yes.

12     Q    And who else did you work for?

13     A    I worked for the Chief of Staff

14 basically, Tom McCormick was the first and then

15 Brian Preski came in and then Paul Towhey.

16     Q    Going to the time frame of 2008, who was

17 Chief of Staff for Representative Perzel at that

18 time?

19     A    Paul Towhey.

20     Q    And where were you located?  Where was

21 your office located?

22     A    Room 414, Main Capitol.

23     Q    Who all was in that office at that time,

24 if you could tell us?

25     A    We had a receptionist and then it was

1  myself, John Zimmerman, Paul Towhey and John

2  Perzel.

3      Q    So --

4

5          (Noise outside the courtroom.)

6

7          MR. FETTERHOFF:  This is not going to

8  work.

9

10         (There was a pause.)

11

12  BY MR. SPROW:

13     Q    Room 414 in the Main Capitol, you said

14  it's John Perzel, yourself, Paul Towhey and who

15  else?

16     A    John Zimmerman and we had a receptionist.

17     Q    And what was the receptionist's name?

18     A    Mozey Popp (phonetic).

19     Q    That's a female?

20     A    Yes.

21     Q    Anybody else in the office at that time,

22  2008, February 2008 specifically?

23     A    No.

24     Q    During the week of February 25th to the

25  29th of 2008, during that time frame did you have

1  occasion to go to Room B-2 in the Irvis Office
2  Building?

3      A    Yes.

4      Q    And is the Irvis Building part of the
5  Capitol complex?

6      A    The complex, yes.

7      Q    But not the Main Capitol, it's just part
8  of the complex?

9      A    Correct.

10     Q    Now, what was the purpose?  Talk us
11 through that.  Why did you go to B-2 during that
12 week?

13     A    Jason Weiser, who worked for our caucus
14 administrator, had come to our office to let us
15 know that there was construction being done in
16 that room and they were moving -- they had to
17 move items out of the room.

18          And when he was in the room with the
19 Democratic counterparts, that they were going
20 through some boxes, and he had come to tell us
21 that there were -- they were going through some
22 of the boxes and found some campaign material.

23     Q    And why was that important?

24     A    Because it shouldn't be in the Capitol.

25     Q    The campaign material?

1     A    Correct.

2     Q    And just to stop the progression of that

3 story for a second, Room B-2 is what?  What is it

4 used for?

5     A    It's a storage room.

6     Q    And did you have access to that room?

7     A    Yes.

8     Q    Was it kept as a secure room or could

9 anybody go in it at any time?

10     A    It was locked.

11     Q    And how was it that you had access to it?

12     A    I had a key.

13     Q    Now, Jason Weiser advises you that there

14 are some boxes in that room with campaign

15 material.  What do you do upon learning that?

16     A    I called Paul Towhey to tell him of the

17 conversation.

18     Q    And Paul Towhey, you indicated, was John

19 Perzel's Chief of Staff at the time?

20     A    Correct.

21     Q    What was the conversation with Paul

22 Towhey?

23     A    I just told him what Jason had told me.

24     Q    And what did Mr. Towhey say?

25     A    He asked me to go down to the room to see

1  exactly what was there, because we weren't sure

2  what he was talking about as to what was there.

3     Q    Did you do that?

4     A    Yes.

5     Q    And what did you find?

6     A    I went through and there was a stack of

7  boxes that did have campaign stationery in it.

8     Q    What did you do at that point?

9     A    I came back to the office and I called

10  Paul to tell him what exactly was there.

11     Q    Okay.  And when you say what exactly was

12  there, you told him that you found campaign

13  materials?

14     A    Yes.

15     Q    What did Mr. Towhey tell you at that

16  time?

17     A    He just said that we should have the

18  items brought up to the office and to go through

19  it just to see -- because there was a lot of

20  boxes.  And we just kind of went through the

21  first top boxes to see what was in each of the

22  boxes.

23          So we had the boxes brought up to the

24  office, and then I went through them and sorted

25  out what was the stationery and what was not


1    going on regarding the Legislature at that time?

2        A    Yes.

3        Q    How were you aware?

4        A    It was in the news, just that the -- and

5    it was basically the Democratic Caucus that was

6    in the news.

7        Q    Describe for us the layout of the office

8    there in Room 414.  You told us a little while

9    ago who worked in there, and I'm talking still

10   about February 2008.  How is the office laid out?

11       A    When you come into the complex, there's a

12   large reception area and then you would go

13   through a doorway and it came into an office

14   where John Zimmerman and I sat.

15            And then off to the left was another

16   office where Paul Towhey sat.  And then off to

17   the right was John Perzel's office.

18       Q    Okay.  So when you come in the door,

19   there's an initial area where the receptionist

20   is.  You go through another door to a second

21   room?

22       A    Yes.

23       Q    That's where you and John Zimmerman are?

24       A    Yes.

25       Q    And then there are two private offices

1    for John Perzel and Paul Towhey past there?

2        A    Yes.

3        Q    When you had the messengers bring the
4    boxes in, did you take them right through those
5    doorways?

6        A    I believe, yes.

7        Q    And ultimately where were those boxes
8    put, the ones that were not taken to the HRCC?

9        A    In John's office.

10       Q    John Perzel?

11       A    Yes.

12       Q    Was there anything that would have
13   obstructed the view from John Zimmerman's desk to
14   where the boxes would have come through when the
15   messengers brought them in?

16       A    No.

17       Q    What was John Zimmerman's job at that
18   time?

19       A    He was the scheduler.

20       Q    For Representative Perzel?

21       A    Yes.

22       Q    And did that job require him to be up and
23   about on a regular basis or was he mostly at his
24   desk?

25       A    Mostly at his desk.

```
 1      Q    That Friday of that week that we've been
 2   talking about, the 29th, were you at work on that
 3   day?
 4      A    No, I was on vacation.
 5      Q    Do you see Paul Towhey in the courtroom?
 6           MR. WOODWARD:  I'll stipulate.
 7           THE WITNESS:  Yes.
 8           THE COURT:  Thank you.
 9   BY MR. SPROW:
10      Q    And what about John Zimmerman?
11      A    Yes.
12      Q    Can you just point him out for the Judge?
13      A    Sitting (indicating).
14      Q    What's he wearing?
15      A    John Zimmerman has a red shirt on and
16   tall.
17           THE COURT:  Thank you.
18           MR. SPROW:  Those are all the questions I
19   have, Your Honor.
20           MR. McMONAGLE:  May I?
21           THE COURT:  Yes.
22
23                   CROSS EXAMINATION
24   BY MR. McMONAGLE:
25      Q    Hi, Ms. Lochetto.
```

1    A    Hi.

2    Q    I'm Brian McMonagle.  I represent John

3  Perzel.  Just a couple of questions.

4        Let me focus really on the issue at hand.

5  You tell us that at some point in time, I think

6  it's -- do you know the date?  Was it February

7  the 25th?

8    A    Monday.

9    Q    And you get a call from somebody, a guy

10 named Jason Weiser?

11   A    Correct.

12   Q    Who is Jason Weiser?

13   A    He works for Representative Phillips.

14   Q    He works for who?

15   A    Representative Phillips.

16   Q    So Jason Weiser, who works for

17 Representative Phillips, calls you and he says

18 what to you?

19   A    He told me that he -- they were moving

20 items from B-2 because they were doing

21 construction in the room.

22   Q    All right.  Let me stop you there.

23 They're moving items from B-2 because they're

24 doing construction, correct?

25   A    Yes.

1    Q    And the they is who?  Who is doing the

2  construction?  You don't know?

3    A    I don't know.

4    Q    So he tells you there's construction

5  being done and they're going to remove some

6  boxes.  And what else does he tell you?

7    A    In the process of them being in the room,

8  his Democratic counterpart was there as well as

9  someone from the Chief Clerk's office, and that

10  his Democratic counterpart was looking through

11  some of the boxes and found campaign-related

12  items.

13    Q    Do you know who the Democratic

14  counterpart was?

15    A    Julie.

16    Q    Somebody named Julie?

17    A    Yes.

18    Q    So Julie from the Democrats and this

19  other fellow is down there, and they're moving

20  boxes because of construction; and according to

21  Mr. Weiser anyway, they find some campaign

22  material, correct?

23    A    Yes.

24    Q    And when he tells you that, what do you

25  say?

1     A   I wasn't aware of it.

2     Q   Right.  You didn't know it was there,

3 correct?

4     A   No.

5     Q   You had a key to the location, correct?

6     A   Right.

7     Q   Describe the room for me.  Is it a big

8 room?

9     A   Yes, relatively.

10    Q   Pretty big room, lots of boxes?

11    A   Yes.

12    Q   Boxes closed up?

13    A   Um-hmm.

14    Q   So I take it you've been in that room

15 before?

16    A   Yes.

17    Q   Completely unaware that the campaign

18 material was in there, correct?

19    A   Yes.

20    Q   And when he tells you that, you know,

21 we're getting this stuff ready because we're

22 going to relocate some stuff because of

23 construction, we found some campaign material,

24 what's the next thing that happens?

25    A   I called Mr. Towhey to tell him that --

```
 1  of the conversation.

 2     Q   And what's Mr. Towhey say?

 3     A   He asked me to go see what was in the

 4  room.

 5     Q   Okay.  So you tell Mr. Towhey about the

 6  conversation and Mr. Towhey says -- he obviously

 7  doesn't know anything about it, correct?

 8     A   That's correct.

 9     Q   So he's as surprised as you are, correct?

10     A   Yes.

11     Q   And he says, hey, go ahead down there and

12  check it out?

13     A   Yes.

14     Q   And you do that?

15     A   Yes.

16     Q   And when you go down there and check it

17  out, what do you find?

18     A   There are some boxes of campaign

19  stationery there.

20     Q   Stationery?

21     A   Yes.

22     Q   Can you be more specific?

23     A   It was -- describe it or just --

24     Q   Was it stationery?

25     A   Well, it was Victory.  It was Victory '04
```

1  stationery.

2    Q   '04?

3    A   Yes.

4    Q   And we're now in 2008 when this happens,

5  right?

6    A   Correct.

7    Q   Okay.  So there's some old stationery

8  down there and what do you do?

9    A   I came back up to tell -- call Paul to

10  tell him what it was.

11    Q   You have to now tell Paul what it is,

12  because he's obviously telling you he doesn't

13  know what it is?

14    A   Correct.

15    Q   What happens when you tell Paul that

16  there's 2004 stationery down there?

17    A   He just asked me to have the boxes

18  brought up to the office, and then I sorted

19  through them because --

20    Q   Bring them up and sort them out?

21    A   Right.

22    Q   And you do that, correct?

23    A   Right.

24    Q   And when you brought them up and sorted

25  them out, how did you get them up there?

1    A    Called the messengers.

2    Q    Called a messenger.  So you call a

3  messenger, bring them up, right?  Let's sort it

4  out.  You're not sneaking around with boxes or

5  anything, right?

6    A    No.

7    Q    You brought them upstairs as you were

8  told to do and you sorted them out?

9    A    Yes.

10    Q    Tell me about the sorting.  What was in

11  the boxes?

12    A    Well, there was campaign -- the

13  stationery, envelopes.  There were some items

14  that weren't campaign-related.

15    Q    Like what?

16    A    There were some cards that we had had

17  printed that just had the House seal on them.

18    Q    Okay.

19    A    Those are the only things that I can

20  specifically remember.

21    Q    Okay.  And then you sort the materials, I

22  take it, and you mentioned that some of the boxes

23  were then removed and placed somewhere else?

24    A    Yes.

25    Q    Tell me what happened.

1        A    I called Paul to tell him what exactly

2  was there, sorted it; what was campaign, what was

3  not campaign.

4        Q    Okay.

5        A    And he just said, well, the campaign

6  stuff shouldn't be here, just send it over to

7  HRCC.

8        Q    He tells you the campaign stuff shouldn't

9  be here, because he told you he didn't know it

10  was even there?

11        A    Right.

12        Q    Send it over to the HRCC?

13        A    Right.

14        Q    And do you do that?

15        A    Yes.

16        Q    Now, my colleague asked you whether or

17  not you had been aware at that point in time that

18  there was some kind of investigation going on.

19  You had said you heard about it in the news,

20  correct?

21        A    Yes.

22        Q    An investigation into the Democratic --

23  some activity of some kind, correct?

24        A    Yes.

25        Q    That had nothing to do with you moving

1  those boxes, did it?

2      A    No.

3          MR. McMONAGLE:   I have nothing further --

4  one last question -- thank you.

5

6                    <u>CROSS EXAMINATION</u>

7  BY MR. WINNING:

8      Q    Ms. Lochetto, I represent Brian Preski.

9  I just have a few questions.

10         Your attention was directed to February

11  of 2008, and you were asked a lot of questions

12  about this brief period of time, February of

13  2008.  At that point in time, correct me if I'm

14  wrong, but Brian Preski was no longer employed in

15  any capacity by the caucus, correct?

16     A    That's correct.

17     Q    He had left the caucus, he had left the

18  employ of the caucus in early January of 2007?

19     A    Correct.

20     Q    All right.  So he was not in the caucus,

21  he was not in Harrisburg, he had -- he was not in

22  any way connected to what you described in

23  February of 2008?

24     A    Correct.

25         MR. WINNING:   Thank you.

1                    CROSS EXAMINATION

2  BY MR. LOCK:

3      Q    Ms. Lochetto, my name is Joshua Lock.  I

4  represent Brett Feese.

5          Do you recall, ma'am, how many boxes

6  which contained campaign materials were brought

7  to you from the basement of the Irvis Building?

8      A    How many boxes actually had campaign

9  material?

10     Q    Yes, ma'am.

11     A    There were several.  I don't know the

12 specific count.  I know there was a handcart that

13 they had them on so there were --

14     Q    Regardless of the number of boxes, the

15 contents of each was as you described it when you

16 responded to Mr. McMonagle's questions about the

17 nature of the political material contained in

18 those boxes; isn't that right?

19     A    Yes.

20     Q    Did you provide instructions, ma'am, to

21 anyone to shred any of the so-called campaign

22 materials contained in the boxes brought up to

23 your office?

24     A    No.

25     Q    Was it you who called for the messengers

1  on February 27th, 2008, to remove the boxes
2  containing the ostensible campaign materials to
3  HRCC?

4      A    Yes.

5      Q    When you put in a request for messenger
6  services, do you speak to somebody directly or do
7  you submit that request in writing?

8      A    I just called the messenger office.

9      Q    I noticed that in the log that the
10  messenger service keeps, there's a column for --
11  that is captioned rush.  You can put yes or no.

12         You indicated that there was no rush with
13  respect to the transmittal of those boxes from
14  one side of Third Street to the other side; isn't
15  that right?

16     A    I don't recall saying it was a rush.

17     Q    Were you present when the messengers
18  arrived to pick up the boxes for delivery to
19  HRCC?

20     A    Yes.

21     Q    Did you see how many boxes they took
22  across the street?

23     A    I showed them which boxes needed to go,
24  so yes.

25     Q    All right.  Earlier -- to some extent

1 this is sort of the same question, but earlier I

2 asked you if you knew how many boxes were brought

3 up from B-2 to your office containing campaign

4 materials, and you said there were -- I think

5 there were several or something. Do you know how

6 many boxes went across the street to HRCC?

7    A    I don't know specifically. I know they

8 were -- he filled a handcart to take them.

9    Q    Did you personally go through all of the

10 boxes?

11    A    Yes.

12    Q    And there was nothing more in the

13 materials sent to HRCC than Victory '04

14 stationery, envelopes, and some cards bearing

15 that seal of the House of Representatives; is

16 that it?

17    A    The stationery and envelopes were sent to

18 HRCC, but the cards we kept in the office.

19    Q    Did the stationery have anything on it?

20    A    It said -- I know it said --

21    Q    No, no, typed on it?

22    A    No, no, no. It was blank.

23        MR. LOCK: Thank you very much, ma'am. I

24 have no further questions.

25        MR. DONATONI: Good morning, ma'am.

1        I have no questions, Your Honor.

2        MS. McCLELLAND:  No questions.

3        MS. KELLY:  No questions from Mr. Ruth,

4  Your Honor.

5

6                  CROSS EXAMINATION

7  BY MR. WOODWARD:

8    Q    Ms. Lochetto, when was Mr. Tomaselli

9  Chief of Staff?

10   A    I don't know that he ever held that

11  title.  I mean, he came to the office when we

12  moved upstairs after John lost the speakership.

13   Q    Did he pretty much run the show or act as

14  the Chief of Staff for a period of time?

15   A    Yes, I guess so, yes.

16   Q    Now, ma'am, when you found this material

17  in B-2, you called Mr. Towhey, correct?

18   A    Yes.

19   Q    To alert him of what you had found?

20   A    Yes.

21   Q    And he seemed surprised, didn't he?

22   A    Yes.

23   Q    And he told you to get that material over

24  to HRCC, true?

25   A    Yes.

1     Q    He never told you to keep your mouth

2  shut, did he?

3     A    No.

4     Q    He never told you to shred the material,

5  did he?

6     A    No.

7     Q    He never told you to hide material, did

8  he?

9     A    No.

10    Q    He never told you to lie about the

11 material, did he?

12    A    No.

13    Q    By the way, Mr. Towhey that entire week

14 was in Philadelphia, wasn't he?

15    A    Correct.

16    Q    So he never saw what was in the boxes,

17 did he?

18    A    No.

19         MR. WOODWARD:  Nothing further.

20         MR. SIGMAN:  No questions, Your Honor.

21         THE COURT:  Thank you.

22         MR. FETTERHOFF:  No questions.

23         MR. BERGSTROM:  Your Honor, I just have

24 maybe two.

25

<div align="center">CROSS EXAMINATION</div>

1                CROSS EXAMINATION

2 BY MR. BERGSTROM:

3    Q   Ms. Lochetto, can you tell us exactly the

4 day during the week of February 25th that these

5 boxes were moved?

6    A   I believe it was Wednesday.

7    Q   Which would be what date?

8    A   You mean moved to HRCC?

9    Q  Yes.

10    A   I believe it was Wednesday.

11    Q   And you testified, I believe, that you

12 were not working on the 29th, correct?

13    A   On that Friday, yes.

14        MR. BERGSTROM:  That's all I have.

15        THE COURT:  Thank you.

16        Any redirect?

17        MR. SPROW:  No, Your Honor.

18        THE COURT:  You may step down.  Thank you

19 very much.

20

21        (Witness excused.)

22

23        MR. BROWN:  Sheila Flickinger is next.

24 There will be a brief delay while she comes in.

25

```
1             (There was a pause.)
2
3                  SHEILA FLICKINGER,
4    called as a witness, being duly sworn, testified
5    as follows:
6
7         THE COURT:  Ma'am, for the sake of the
8    attorneys that sit at the back of the room,
9    you've got to speak loudly into that microphone
10   so stay close to it.
11        THE WITNESS:  Okay.
12        THE COURT:  Thank you.
13
14                DIRECT EXAMINATION
15   BY MR. BROWN:
16   Q    Good morning, ma'am.  Could you state
17   your name for the Judge and the record and spell
18   your last name, please.
19   A    Sheila Flickinger, F-L-I-C-K-I-N-G-E-R.
20   Q    Ms. Flickinger, did you have or do you
21   have any affiliation with something called the
22   House Republican Campaign Committee or HRCC?
23   A    Yes.  I'm the finance director.
24   Q    How long have you been affiliated with
25   HRCC?
```

1    A    Since 1987.

2    Q    What sorts of things does your current

3  job title include or your job responsibilities

4  include for the HRCC?

5    A    I set up fundraisers and I do the

6  bookkeeping.

7    Q    I want to turn your attention back to the

8  time frame between the end of 2000 through at

9  least the end of 2007.  Were your job titles --

10 or were your job duties the same or different

11 during that period of time?

12   A    Basically the same.

13   Q    Did your job duties include working with,

14 say, a budget for the HRCC?

15   A    Yes.

16   Q    Did your job duties include recording

17 income and expenditures done by the HRCC?

18   A    Yes.

19   Q    The expenditures of the HRCC, is that

20 something that pursuant to law has to be reported

21 somewhere?

22   A    Yes, it needs to be reported to the

23 Department of State periodically throughout the

24 year.

25   Q    And there are set schedules that

1 determine what has to be reported and what period

2 of time?

3     A    Correct.

4     Q    Are you familiar with the term or the

5 phrase in-kind contribution?

6     A    Yes.

7     Q    And just generically or generally what is

8 an in-kind contribution?

9     A    It's a service that's provided for a

10 candidate in lieu -- instead of a direct

11 contribution.

12     Q    Can you give the Judge an example of what

13 an in-kind contribution would be?

14     A    If someone would host a fundraiser at

15 their home for someone, they would do it for the

16 person and you would -- the candidate would then

17 list on their campaign expense report how much

18 that was worth.

19     Q    So even if they didn't pay for it, it

20 cost about this much so --

21     A    Right.

22     Q    -- it has to be reported?

23     A    They would pay for the food and the

24 beverages, and they would let you know how much

25 it cost and you would report that on your

1  campaign finance report.

2      Q    And are in-kind contributions something

3  that the HRCC would have to report to the

4  Department of State?

5      A    Yes.

6      Q    Now, Ms. Flickinger, are you familiar

7  with a company or a vendor called GCR?

8      A    Yes.

9      Q    And at some point, I believe it was early

10 2003, GCR enters into a contract with the HRCC;

11 is that right?

12     A    Correct.

13     Q    How did that come about?

14     A    They provide data services.  It was -- I

15 believe they had a contract on the Hill, and we

16 started using their data services.

17     Q    What was the amount of the contract

18 between GCR and the HRCC when it's first

19 implemented in 2003?

20     A    It was a thousand dollars a month.

21     Q    And how was that amount of money per

22 month determined?

23     A    I'm sorry, what's that?

24     Q    How was that thousand dollars a month

25 determined, that that's what the HRCC was going

1  to pay?

2      A    It was decided that we should pay a

3  certain amount per month as a retainer, and that

4  was the amount that was come up with.

5      Q    All right.  Let's talk about some of this

6  in a little more detail.  Did GCR provide any

7  services to HRCC before the contract was entered

8  into in the beginning of 2003?

9      A    I don't recall.

10     Q    When the contract is entered into or, I

11 guess, the discussions leading up to the contract

12 for a thousand dollars a month, when did you

13 first hear about the fact that there is or was

14 going to be a contract between GCR and the HRCC?

15     A    It came up at one of our regularly

16 scheduled meetings that we held at HRCC, either a

17 Monday or a Tuesday morning, usually weekly or

18 biweekly.

19     Q    And who were the people that would

20 usually attend these weekly updates during that

21 period of time?

22     A    It was me, John Hanley, Brett Feese,

23 Steve Dull, Jill Seaman, Al Bowman, John Perzel,

24 Brian Preski.  Sometimes when John Perzel or

25 Brian couldn't attend, they would call in

1  conference.

2     Q   And I'm going to ask you -- I know you're

3  doing a good job so far, but to get over the saw

4  you may have to keep your voice up while that's

5  going on.  Okay?

6     A   Okay.

7        THE COURT:  Mr. Fetterhoff, do you need

8  anything repeated prior to the saw?

9        MR. FETTERHOFF:  Thank you.

10 BY MR. BROWN:

11    Q   Now, this amount of a thousand dollars a

12 month based on the discussions that you heard at

13 these meetings, was that something -- was that

14 amount coming from GCR or was that something that

15 was determined by the HRCC that they had to pay?

16 How did this come up?

17    A   I'm not exactly sure who brought it up.

18 It could have been John Hanley or Brett.  I don't

19 remember, but it was at one of the meetings it

20 was decided that we needed to start paying them

21 something.

22    Q   Are you familiar with a GCR product

23 called Candidate Connect?

24    A   Yes.

25    Q   And was Candidate Connect a program that

1  was used by the HRCC?

2      A    Yes.

3      Q    And what -- in what way or ways was

4  Candidate Connect used by the HRCC?

5      A    It was a program that was given out to

6  candidates and some members that were running for

7  reelection for them to have databases and do

8  their campaign expense reports.

9          It was -- they could use their street

10 lists.  They could do communications through it.

11 It was a really good program.

12     Q    To the best of your knowledge, was the

13 development of Candidate Connect paid for under

14 the thousand dollars a month contract with GCR or

15 under another contract?

16         MR. FETTERHOFF:  Objection.  It's beyond

17 the knowledge of this witness unless there's a

18 foundation.  If there's a foundation, it might be

19 proper, but it's hard to tell at this moment.

20 But I think the question to this witness in the

21 present context has insufficient groundwork.

22         MR. BROWN:  Your Honor, I've indicated

23 that it's based on her knowledge and experience.

24 If she knows, she knows.  If she doesn't know,

25 she doesn't know.

1          THE COURT:  I'll allow her to answer.

2          THE WITNESS:  I'm really not sure how it

3    was started.

4    BY MR. BROWN:

5      Q    At some point during your tenure, and I

6    believe it's mid-2002 or thereabouts, Brett Feese

7    becomes the member in charge of the HRCC?

8      A    That's correct.

9      Q    What sort of management style did Mr.

10   Feese have when he was in charge of the HRCC?

11     A    He was a hands-on person.  He wanted to

12   know exactly where things -- you know, how we

13   were spending our money.  Was very involved with

14   how we -- you know, our budgets and what was

15   going on.

16     Q    Would you have discussions with Mr. Feese

17   about particular vendors or budget items as to

18   how much particular vendors were being paid?

19     A    Yes.  He knew what we were spending.  I

20   would periodically make up an accounts payable

21   listing showing exactly what vendors we needed to

22   pay and the amount.  A lot of times when I would

23   do it, it would be a signal to show.

24          I would also show what our cash balance

25   was at that time, so it would kind of be a signal

1 to tell them we need to raise some money.

2    Q   Now, let's stick with the contract

3 between GCR and the HRCC. You testified that it

4 began at a thousand dollars a month?

5    A   Yes.

6    Q   Does that amount ever change?

7    A   It did change. I'm not exactly sure of

8 the date, but at some point it was discussed at

9 one of our meetings that because of the amount of

10 time -- the amount that -- that we were using

11 GCR, that we probably needed to start paying them

12 an additional -- additional money.

13    Q   To the best you can recall, who was

14 present for that meeting where the talk that we

15 have to up the amount we're paying GCR was

16 discussed?

17    A   It was Brett Feese, Jill, me, John

18 Hanley, Steve Dull and Al Bowman. I can't

19 remember if Brian Preski or John was there or not

20 or if they had called in.

21    Q   If you recall, who broached the subject

22 of we have to start paying GCR more?

23    A   It was either John Hanley or Brett.

24    Q   And based on your knowledge of the fact

25 we have to pay them more based on those

1  conversations that you heard and participated in,

2  was this coming from GCR, that GCR was asking for

3  more money, or was this change in amount coming

4  from another source?

5      A    I thought it was brought up -- it was

6  brought up at the meeting.  It was something that

7  was decided among the group, that that was what

8  we needed to do.

9      Q    So based on your -- on the discussions at

10 the meeting, it didn't come from GCR?

11     A    I don't believe so.

12     Q    The person that you've been discussing as

13 Brett Feese, do you see him in the courtroom

14 today?

15     A    There he is, yes.

16          MR. BROWN:  I ask the record reflect the

17 witness has identified the Defendant.

18 BY MR. BROWN:

19     Q    Do you see Jill Seaman in the courtroom

20 today?

21          MR. FETTERHOFF:  Stipulated.

22          THE WITNESS:  Yes.

23          MR. BROWN:  Thank you, Mr. Fetterhoff.

24 BY MR. BROWN:

25     Q    The person you identified as John Perzel,

1   do you see him in the courtroom today?

2       A    I don't have my glasses on.

3            MR. McMONAGLE:   He's right here.

4            THE WITNESS:   Okay.  Yes.

5   BY MR. BROWN:

6       Q    Same question for Brian Preski?

7       A    Yes.

8       Q    Now, Ms. Flickinger, I also want to ask

9   you about another company or another vendor

10  called Aristotle International.  Are you familiar

11  with that vendor?

12      A    I know the vendor.

13      Q    During the period from 2001 through the

14  end of 2007, did Aristotle International have a

15  contract with the HRCC?

16      A    No.

17      Q    As the head of the HRCC for a portion of

18  that time, would Feese have been aware that the

19  HRCC isn't paying Aristotle any money?

20      A    Yes.

21      Q    Are you familiar, Ms. Flickinger, with

22  another vendor, another company called Labels &

23  Lists?

24      A    Yes.

25      Q    For the time period we're talking about

41

1  here from 2001 through the end of 2007, did the
2  HRCC have a contract with Labels & Lists?
3      A    We did not.
4      Q    During that same period of time, even if
5  there wasn't a contract, were there purchases
6  made from Labels & Lists by HRCC?
7      A    We made several purchases for data just
8  for separate house races.
9      Q    If you recall, what type of money are we
10 talking about for these discrete purchases of
11 data from Labels & Lists?
12     A    A thousand, maybe two thousand dollars.
13     Q    And the thousand or two thousand dollars,
14 is that the floor or the ceiling as to what you
15 recall paying out?
16     A    I think that was the ceiling.
17     Q    Are you familiar with another company or
18 vendor that went by various names, including
19 Artists Forum, Constituents Direct and
20 iConstituents?
21     A    Yes.
22     Q    Did -- again, for the time frame that
23 we're talking about here, did Constituents Direct
24 or any other name in that regard have a contract
25 with the HRCC?

1    A    In 2003 and 2005, we had a contract with
2  Constituents Direct.

3    Q    And that contract, if you know, was to
4  provide what kind of services?

5    A    E-mail services.

6    Q    What was the price for that contract, if
7  you recall, or how was it paid?

8    A    It was paid monthly.  It was $1890 a
9  month.

10    Q    Did the $1890 change at any point?

11    A    At one point it went up 48 cents.  I
12  remember them joking about it, you know, I wonder
13  why they raised the price.

14    Q    For the period of time that Constituents
15  Direct had a contract with the HRCC, did the
16  amount of work that Constituents Direct performed
17  stay the same, increase or decrease?

18    A    I'm really not sure because I didn't
19  really deal with it.

20    Q    Who did?

21    A    Mainly it was Al Bowman.

22    Q    Now, Ms. Flickinger, I want to jump ahead
23  in the time line to the last week of February of
24  2008, specifically the time period between
25  February 25th and 29th of 2008.

1      A      Okay.

2      Q      You're still employed by the HRCC at that

3   time?

4      A      Yes.

5      Q      At some point in that week, to cut to the

6   chase a little bit here, do you get a call about

7   whether a delivery was received?

8      A      Yes.

9      Q      And from whom do you get a call like

10  that?

11     A      I had a call from Brett Feese, and he

12  asked me if there was a delivery made from the

13  Hill.  And I said I didn't know, that I would

14  have to check.

15          I went out to check with George Matthews,

16  who was sitting at the front desk, and I asked

17  him if a delivery had been made from the Hill.

18  He said yes.  And he pointed to -- he said, yeah,

19  it's over there, and he pointed to some boxes.

20          So I went over and looked in it and it

21  was campaign stationery.  It was John Perzel

22  Victory stationery.  It was blank stationery and

23  envelopes.

24          And then I went back to the phone and I

25  told Brett what was in it.  And he said not to do

1  anything -- he said, don't touch them, just leave
2  them where they are, and we did.
3      Q    Let me ask you a couple more questions
4  about that.  When Mr. Feese calls you, he just
5  says, is there a delivery or did you get a
6  delivery from the Hill essentially?
7      A    Well, I mean, he said, Sheila, this is
8  Brett, I mean, and then he asked me.
9      Q    Okay.  And did you recognize Mr. Feese's
10 voice when he said, hey, this is Brett?
11     A    Well, yeah.
12     Q    So he says essentially, Sheila, this is
13 Brett, did you get a delivery; you meaning HRCC,
14 I guess?
15     A    Yes.
16     Q    Get a delivery from the Hill?
17     A    Yes.
18     Q    And that's when you go out and talk to
19 this George Matthews?
20     A    Correct.
21     Q    Who is George Matthews and how does he
22 figure into this?
23     A    George was the office -- he helped us in
24 the office and he was at the front desk, so he
25 accepted deliveries that were made to the office.

1    Q    And based on what Mr. Matthews tells you,

2  he points you to a bunch of boxes and says,

3  that's the stuff that came over?

4    A    Correct.

5    Q    How many boxes are we talking about?

6    A    There were a couple big brown boxes and

7  then some white envelope boxes.  I'm not exactly

8  sure how many.  Four maybe, five.

9    Q    And the four or five, that includes both

10  the brown boxes --

11    A    Yes.

12    Q    -- and the smaller envelope boxes?

13    A    Yes.

14    Q    And I guess while Feese is either on hold

15  or you put the phone down, you actually check to

16  see what's in the boxes?

17    A    Correct.

18    Q    You said it was John Perzel's campaign

19  stationery.  Do you remember anything more

20  specific about it?

21    A    It was John Perzel Victory stationery

22  that was used for the Speaker's Ball, the Victory

23  portion of it.

24    Q    And what about the envelopes?

25    A    The same.

1     Q    Victory envelopes?

2     A    Yes.

3     Q    Then you go back and report to Feese what

4  you found?

5     A    Yes.

6     Q    What exactly did you tell Mr. Feese when

7  you go back?  What do you say?

8     A    I just told him that it was blank

9  stationery from the -- from John's Victory fund

10 and also blank envelopes, unused envelopes.

11    Q    And he says in essence?

12    A    Not to touch them, just to leave them

13 right where they were, which I did.

14    Q    Now, Ms. Flickinger, I want to ask you

15 about another computer program, I guess called

16 Landslide.  Are you familiar with that?

17    A    Yes.

18    Q    What is Landslide?

19    A'   That's the data management program that

20 I've used since 1995 that -- that's where I enter

21 the contributions that are made to HRCC and all

22 expenditures that are made, and that's -- then I

23 run the report from that for the Department of

24 State.

25    Q    Were you asked by Agent Fiore to check

1    Landslide records for expenditures to particular

2    individuals or companies?

3        A    Yes.

4        Q    And did you prepare a short letter of

5    your findings for that?

6        A    Yes.

7        Q    And would you recognize that letter if

8    you saw it again?

9        A    Sure.

10       Q    Ms. Flickinger, you should be able to see

11   it on the screen in front of you.  That's been

12   marked as Commonwealth's Exhibit No. 33 for

13   identification.  Do you recognize that?

14       A    Yes.

15       Q    And is that a true and accurate copy of

16   the report that you prepared?

17       A    Yes.

18       Q    And, in essence, according to the records

19   that you prepared -- and that's stuff that you do

20   in the ordinary course of business, right?

21   That's part and parcel of what you do?

22       A    Yes.

23       Q    All of the people on that list, including

24   John Perzel and Eric Ruth and Don McClintock on

25   the first line, there were no expenditures for

1  the following individuals?

2      A    That's correct.

3      Q    That you recorded?

4      A    That's right.

5      Q    And it also includes, for example, the --

6  it also includes, for example, Weiss

7  Micromarketing, right?

8      A    Correct.

9      Q    Ms. Flickinger, I'm also showing you

10  what's been marked as Commonwealth Exhibit 34 for

11  identification.  This is an e-mail dated May 5th,

12  2004, which is a Wednesday.  Do you recognize

13  this e-mail?

14      A    Yes.

15      Q    And this is an e-mail from Paul Towhey at

16  his House GOP e-mail account to an

17  SFlick3116@aol.com?

18      A    Yes.

19      Q    And do you recognize the e-mail address

20  to whom this was sent?

21      A    Yes.

22      Q    And whose is it?

23      A    Mine.  Well, it used to be mine.

24      Q    Used to be.  The subject is Perzel

25  request, and Towhey in this e-mail asks you for

1 what?

2     A   He asked me for a list of the HRCC

3 $50,000 donors.  They were -- John was getting

4 ready to do a fundraiser and he wanted to invite

5 them.

6           MR. BROWN:  Thank you, ma'am.

7           The Court's indulgence for a moment,

8 please.

9           THE COURT:  Um-hmm.

10

11           (There was a pause.)

12

13           MR. BROWN:  Thank you.  Tender for cross.

14

15                  CROSS EXAMINATION

16 BY MR. McMONAGLE

17     Q   Hi, Ms. Flickinger.

18     A   Hi.

19     Q   I'm Brian McMonagle.  I represent John

20 Perzel.  Just a couple questions.

21     A   Okay.

22     Q   As I understand your testimony, you were

23 Finance Director for the HRCC?

24     A   Yes.

25     Q   And how long were you in that position?

1      A    I never really had a title --

2      Q    Okay.

3      A    -- until actually I think it was Brett

4  Feese who finally said, you know, with everything

5  that you do, you should be Finance Director.

6      Q    A well-earned title.

7          Who exactly did you report to if you, in

8  fact, reported specifically to anybody?

9      A    Well, I reported to the Campaign

10  Chairman, the Executive Director -- actually, I

11  reported to all the members.  I answered to all

12  of them.  But the primary person was obviously

13  the Campaign Chairman or John Perzel.

14      Q    Okay.  And you briefly spoke about some

15  of your duties with the HRCC.  You're certainly

16  well aware that Mr. Perzel raised an enormous

17  amount of money for the HRCC?

18      A    He sure did.

19      Q    Can you estimate how much?

20      A    Many millions.

21      Q    Many millions?

22      A    Yeah.

23      Q    And the money that was raised and

24  provided to the HRCC was certainly spent?

25      A    Absolutely.

```
 1      Q    And it was spent on many, many, many good
 2  things; is that fair?
 3      A    Yes.
 4      Q    Questions have been asked of you about
 5  some of these computer vendors, for lack of a
 6  better description.
 7      A    Okay.
 8      Q    And you have fairly told us that at some
 9  point in time the HRCC began to pay for some
10  technology?
11      A    Yes.
12      Q    You told us that there was a meeting that
13  occurred, and I'm sure it's a little vague since
14  it happened years ago?
15      A    Yeah.
16      Q    Fair?
17      A    Yes.
18      Q    But you do remember a meeting and you do
19  remember it was discussed at that meeting that
20  the HRCC wanted to pay for technology
21  specifically with GCR, correct?
22      A    Yes.
23      Q    And you did that, correct?
24      A    Yes.
25      Q    So here was a situation where money that
```

1  had been raised, provided to the HRCC, was now

2  being used to pay, as best you remember it, GCR,

3  correct?

4      A    Yes.

5      Q    You mentioned Candidate Connect, I

6  believe.  And would the same hold true with that,

7  HRCC paying Candidate Connect?

8      A    Well, it was supplied by GCR.

9      Q    Okay.  Then I want to be clear for the

10  record.  Since you were receiving Candidate

11  Connect, it was supplied by GCR, it was decided

12  that that technology was going to be paid for,

13  correct?

14      A    Yes.

15      Q    Did you tell us that, in fact, at some

16  point in time the HRCC also began paying for

17  Labels & Lists?

18      A    No.  Labels & Lists, as I recall, and I

19  don't have the data right here in front of me,

20  but I think we just paid -- we requested for

21  several -- I'm going to say one or two House

22  districts needed data.

23          And I don't know if it was for polling or

24  for a mailing, but for whatever reason, we went

25  directly to them to get the data and we paid for

1   it.  It was not a contract.  It was just like a
2   once and done -- actually, it was two or three
3   times that we did that.
4       Q    Gotcha.  So since you were going to them
5   for the data, you paid them for the data,
6   correct?
7       A    Yes.
8       Q    And did you also mention, was it
9   Constituents Direct?
10      A    Yes.
11      Q    And was there a contract entered into
12  with them?
13      A    Yes.
14      Q    And the HRCC certainly paid them for the
15  use of that technology, correct?
16      A    Yes.
17      Q    All right.  Now, let me shift gears a
18  little bit, and I am going to wrap up because I
19  don't know if anybody else has got some
20  questions.  They certainly may.
21          You told us about this situation with the
22  boxes?
23      A    Yes.
24      Q    You got a call from -- was it Mr. Feese?
25      A    Yes.

1     Q    And he had said to you the words that you

2  have told us he used.  And you looked in the

3  boxes and you found, as I understand your

4  testimony, stationery and envelopes?

5     A    Correct.

6     Q    And you mentioned the Speaker's Ball?

7     A    Yes.

8     Q    What is the Speaker's Ball?

9     A    The Speaker's Ball was set up in -- we

10  did the first Speaker's Ball in 2004, but the

11  stationery, that was set up -- that was a

12  foundation that was set up.  That was separate

13  from Victory.

14          Victory, the John Perzel Victory Fund was

15  totally political.  And that's why the stationery

16  -- that's what the stationery was used for, just

17  for political contributions for this.

18     Q    Gotcha.

19     A    There were separate things going on at

20  the time of the Speaker's Ball.  One was

21  political and one was for a foundation.

22     Q    Gotcha.  And when you checked the boxes,

23  you find stationery and envelopes.  Mr. Feese

24  fairly tells you to just leave them where they

25  are?

1    A    Correct.

2         MR. McMONAGLE:   And that's your

3    testimony.   Have a nice day.

4         MR. WINNING:   Just a few questions, Your

5    Honor, if I may.

6         THE COURT:   Yes, sir.

7

8              CROSS EXAMINATION

9    BY MR. WINNING:

10    Q    Ms. Flickinger, my name is Bill Winning.

11   I represent Brian Preski in this matter.   I just

12   have a few questions for you this morning.

13    A    Okay.

14         MR. DONATONI:   Bill, speak up.   We can't

15   hear you.

16         MR. WINNING:   Sure.

17   BY MR. WINNING:

18    Q    My first question is, it's very fair to

19   say here that John Perzel was able to raise an

20   enormous amount of money from donors during the

21   2000 to 2007, 2008 time period?

22    A    Yes.

23    Q    And we're talking here about millions and

24   millions of dollars, are we not?

25    A    Yes.

1    Q    And this is not just a one time effort or

2  a one time contribution.  This was a consistent

3  pattern, a consistent ability to raise millions

4  of dollars from his supporters, correct?

5    A    It was never ending.

6    Q    It was never ending.  And a fair amount

7  -- when I say a fair amount, I mean millions of

8  dollars -- was provided by Mr. Perzel to the HRCC

9  to fund the expenses and costs of the operation

10 of HRCC?

11   A    Correct.

12   Q    And that also extended over the -- almost

13 the entire period of time that we're talking

14 about here this morning?

15   A    Yes.

16   Q    Okay.  And there was absolutely no secret

17 about Mr. Perzel's ability to raise that kind of

18 money?

19   A    None.

20   Q    And there was no secret about the fact

21 that millions and millions of dollars on an

22 annual basis was given to the HRCC by the Friends

23 of John Perzel?

24   A    Absolutely.

25   Q    All right.  And there's absolutely no

1  question in your mind that Brian Preski, as

2  Mr. Perzel's Chief of Staff, would have known

3  exactly that fact?

4      A    Yes.

5      Q    There was no secret about that, was

6  there?

7      A    No.

8      Q    It was open and notorious, and HRCC was

9  extremely grateful for the willingness of

10  Mr. Perzel to raise that money and contribute

11  that money?

12      A    Yes.

13      Q    Okay.  And you know from your

14  relationship with Brian Preski as Mr. Perzel's

15  Chief of Staff that he was thoroughly familiar

16  with the contributions made by the Friends of

17  John Perzel to the HRCC?

18      A    Yes.

19      Q    Okay.  And you also went through a list

20  of contracts and purchases that the HRCC had with

21  Constituents Direct and Labels & Lists and GCR

22  and the thousands of dollars that GC -- I'm

23  sorry, the thousands of dollars that the HRCC had

24  paid to those vendors, correct?

25      A    Yes.

1    Q    Okay.  And certainly Brian Preski, as

2 John Perzel's Chief of Staff, was aware of those

3 contracts and aware of those expenditures; isn't

4 that correct?

5    A    Yes.

6        MR. WINNING:  Thank you very much.

7        THE COURT:  Thank you.

8        Mr. Lock.

9

10                CROSS EXAMINATION

11 BY MR. LOCK:

12    Q    Ms. Flickinger, my name is Joshua Lock.

13 I represent Brett Feese.

14        You were asked about the attention, among

15 other things, the attention that Mr. Feese paid

16 to the HRCC budget, the payment of bills and the

17 like after he became Chairman.  Do you recall

18 that?

19    A    Yes.

20    Q    It's true, is it not, that there were

21 other people who paid attention to those same

22 matters?

23    A    Absolutely.

24    Q    Indeed, it's true, is it not, that

25 Mr. Hanley prepared the budget for HRCC on an

1  annual basis after he became the Executive

2  Director?

3      A    He and I worked on it.

4      Q    And as the Executive Director, Mr. Hanley

5  assumed the greatest responsibility among HRCC

6  participants in managing the budget and

7  overseeing expenditures; isn't that right?

8      A    Yes.

9      Q    You've been asked questions about

10 Mr. Perzel's -- Representative Perzel's

11 generosity to HRCC on a couple of occasions

12 already.  Do you recall those questions?

13     A    Yes.

14     Q    Indeed, that generosity would become

15 apparent, manifest itself, in a variety of ways;

16 such as, for example, direct contributions to

17 candidates, direct contributions to HRCC,

18 reimbursement to HRCC for expenses paid on behalf

19 of candidates or expenditures in campaigns, just

20 a wide variety of matters; isn't that right?

21     A    Okay.  I'm not exactly sure what you're

22 saying.

23     Q    Well, you talked about Mr. Perzel's

24 generosity.  He didn't just write checks out from

25 time to time.  Do you know who Mr. Karp is, a

1  very wealthy benefactor from Philadelphia?

2      A    Yes.

3      Q    Mr. Perzel from time to time would have

4  Mr. Karp make substantial contributions to HRCC;

5  isn't that right?

6          MR. BROWN:  Objection, relevance.

7          MR. LOCK:  Well, this is going to become

8  relevant in a moment, Your Honor, because I have

9  a document that I would like to discuss.

10          THE COURT:  All right.  Let's try to get

11  through this.

12  BY MR. LOCK:

13      Q    So Mr. Karp, whom I assume you knew to be

14  an extraordinarily wealthy man from Philadelphia?

15      A    Yes.

16      Q    Would be requested to make contributions

17  in his name to HRCC; is that right?

18      A    Yes.

19      Q    Mr. Perzel made those requests; isn't

20  that right?

21      A    Yes.

22      Q    Mr. Perzel had a campaign -- among

23  Mr. Perzel's campaign committees was a committee

24  called Friends of John Perzel; isn't that right?

25      A    Yes.

1     Q    It's true, is it not, that money was paid

2  to reimburse HRCC for campaign expenditures by

3  the Friends of John Perzel?

4     A    Yes.

5     Q    And, indeed, I want to show you an e-mail

6  in just a moment, an example of instructions that

7  you receive to make a payment with the

8  understanding that Friends of John Perzel would

9  reimburse HRCC.

10    A    Okay.

11    Q    So can you take a look at that top piece

12  of paper that I've just presented you with,

13  please.

14    A    (Document provided to the witness.)

15  Okay.

16    Q    Have you had a chance to look at that?

17    A    Yeah.

18    Q    All right.  Can we agree that this

19  document is essentially an e-mail exchange in

20  which you raise a question about your capacity as

21  Finance Director to make a fairly substantial, a

22  five figure contribution or payment for a

23  campaign; and the response that you received back

24  was, don't worry about it, go ahead and make the

25  payment, I'll get you the money from Friends?

1       A    Right.

2       Q    Which you understood to be Friends of

3  John Perzel; is that right?

4       A    Yes.

5       Q    And that didn't come to you from Brett

6  Feese, that came to you, the e-mail we're

7  discussing right now, that came to you from a

8  third party; isn't that right?

9       A    Yes.

10      Q    And in a similar fashion, bills would

11 often be reviewed and paid at HRCC by people --

12 they would be reviewed by people other than Brett

13 Feese and authorization instructions to pay those

14 bills would come from those other people; isn't

15 that right?

16      A    Yes.  It's like I said, I got

17 instructions from a lot of people.

18      Q    And more often than not, the person

19 providing those instructions was John Hanley;

20 isn't that right?

21      A    Yes.

22      Q    Now --

23      A    But, but he got the instructions from

24 other people.  He didn't make the decision on his

25 own.

1      Q    Well, since you brought that up, let me

2    ask you this.  And you tell me if you recall

3    having received -- you may not.  I realize this

4    was a while ago.

5           But do you recall receiving invoices

6    from, for example, radio stations for air time or

7    production companies for ads that would have run

8    on radio stations on specific dates that required

9    immediate payment?

10          MR. BROWN:  Again, Your Honor, I'm going

11    to object to this as irrelevant and way beyond

12    the scope of direct.

13          MR. LOCK:  It's not irrelevant because it

14    demonstrates --

15          THE COURT:  Ma'am, can you answer that

16    question?

17          THE WITNESS:  Yes.

18    BY MR. LOCK:

19      Q    And those types of requests, particularly

20    during the campaign or a campaign season, would

21    not be unusual, would they?

22      A    No.

23      Q    They required virtually immediate

24    turnaround, didn't they?

25      A    Yes.

1    Q    Because if the payment was not made, the

2  time would not be provided for the

3  advertisements; isn't that right?

4    A    Yes.

5    Q    And many times Mr. Hanley told you to

6  make substantial payments to radio stations or

7  to, for example, the Muellner Group for air buys

8  on an immediate basis; isn't that right?

9    A    Yes.

10    Q    And on those occasions, at least, there

11  was no time to discuss matters with anybody, they

12  just had to be taken care of at once; isn't that

13  true?

14    A    That's true.  However, this was all based

15  on budgets that were set up ahead of time, how

16  much we were going to be spending on different

17  races and how the money would be allocated.

18        So we knew how much was going to be spent

19  on a race and we knew how much could be spent,

20  and that's what he was basing the decisions on

21  and telling me how to do it.

22    Q    Now, when you talk about budgets in this

23  instance, you're referring to budgets for

24  individual campaigns?

25    A    Yes.

1    Q    As opposed to the entire HRCC budget; is
2  that right?
3    A    Yes.
4    Q    But as with the HRCC budget, it was
5  Mr. Hanley who was primarily involved in
6  establishing the budgets for such individual
7  campaigns; isn't that true?
8    A    Yes.
9    Q    Did Mr. Hanley ever tell you to send
10  large sums of money -- excuse me, to make
11  payments in excess of invoice amounts?  Do you
12  have a recollection of that having occurred?
13    A    Would you ask -- can I hear that again?
14    Q    Yes.  I'll make it a little bit easier
15  for you because I'm going to show you something.
16  It may refresh your recollection.
17    A    Okay.
18    Q    Just take a look at this piece of paper
19  if you would, please.
20    A    (Witness complies.)
21    Q    Excuse me.  Just that portion.  You can
22  read however much that is included on that
23  document that you believe necessary to place that
24  written, handwritten note into context.  But
25  that's what I'm directing your attention to, the

1 handwritten portion.

2    A    Okay.

3    Q    Do you have any recollection of this

4 specific transaction?

5    A    No.

6    Q    Do you have any recollection of receiving

7 invoices in the amount of either $4398 or $7920,

8 as the case may be, but being told to send a

9 check for $20,000 by Mr. Hanley?

10    A    I don't recall specific things and I

11 don't even recall it, but my note was on there.

12    Q    And your note says send 20,000 per

13 Hanley?

14    A    Right.

15    Q    And that would not be unusual, untoward,

16 or otherwise suspicious, would it?

17    A    No.

18    Q    Because you would have inferred that that

19 payment was in conformity with the campaign

20 budget to which you made reference earlier?

21    A    Yes.

22    Q    Related to this particular campaign?

23    A    Yes.

24    Q    Did you ever see GCR contracts with HRCC,

25 ma'am?

1      A    Did I ever see the actual contracts?

2      Q    Yes, ma'am.

3      A    Yes.  I keep them on file there at

4   headquarters.

5      Q    And, therefore, we can agree, can we

6   not -- I'm reading from a section of the first

7   contract, May 2003 contract, and if you would

8   like to see it, please just ask and I'll show it

9   to you.

10          But we can agree, can we not, that the

11   service which GCR agreed to pay pursuant to its

12   first contract with HRCC was to maintain, update

13   and continually enhance the utility of an

14   integrated voter database?

15          MR. BROWN:  Objection.  This is way

16   beyond the scope of direct.  There was no

17   discussion of the actual terms of the contract.

18          MR. LOCK:  There was a suggestion --

19   there was at a minimum an implication necessary

20   to support the allegation contained in the

21   Criminal Complaint and the Affidavit of Probable

22   Cause that the contract was nothing but a cover

23   contract, that it was a pittance, that it barely

24   covered anything, let alone the actual service it

25   provided; when if you look at the contract --

1        THE COURT:  Mr. Lock, formulate the

2  question and let's see if this witness can answer

3  the question.

4  BY MR. LOCK:

5     Q    Do you remember, ma'am, the language of

6  the contract?  Would you like me to reread it?

7     A    No.  Trust me.  I don't remember it,

8  because I kind of glaze over when it comes to

9  contracts regarding data, because that's not my

10  thing.  I do fundraisers.  I don't recall.

11        THE COURT:  I think you answered it.

12  BY MR. LOCK:

13     Q    Did you type any transmittal letters from

14  Mr. Feese to Mr. Rigamer, who was the owner of or

15  at least president of GCR?

16     A    I don't recall.

17     Q    Let me show you a particular letter and

18  ask if that refreshes your recollection.

19     A    (Document provided to the witness.)

20  Okay.

21     Q    Having read the April 15th, 2003 letter

22  from Mr. Feese to Mr. Rigamer, does that refresh

23  your recollection?

24     A    Yeah.

25     Q    About whether or not you typed it?

1     A    I assume that I typed that.  It looks
2  like I typed it.
3     Q.   All right.  And so you understood and
4  believed, did you not, that sometime around April
5  15th, 2003, Mr. Feese had recently learned that
6  HRCC did not have a contract with GCR?
7          MR. BROWN:  Objection.  That calls for
8  speculation as to what Mr. Feese knew or whether
9  Mr. Feese was lying in there or telling the
10 truth.
11         MR. LOCK:  She learned it when she typed
12 this letter.  There's nothing to lie about.
13         THE COURT:  She can answer it.
14         THE WITNESS:  What was the question
15 again?
16 BY MR. LOCK:
17    Q    So at or about the time this letter was
18 typed, April 15th -- I mean, it could have been
19 dictated a day before, I get that.  But you
20 learned that Mr. Feese had said that he recently
21 learned that HRCC did not have a contract with
22 GCR?
23    A    Okay.
24    Q    Is that right?
25    A    Yes.

1    Q    Now, I assume that -- I don't mean this

2 like in a derogatory way, but your lack of

3 familiarity with the second contract was similar

4 to the lack -- I mean, it was technical mumbo

5 jumbo as far as you were concerned?

6    A    Yes.

7    Q    Okay.  But you did receive bills from

8 GCR, invoices, for payment; isn't that right?

9    A    Yes.

10    Q    And I'm going to show you an example of

11 one of those bills and ask you, after you've had

12 a chance to take a look at it, whether or not

13 that was representative of the monthly invoices

14 that you received from them?

15    A    Yes.

16    Q    That particular invoice that I showed

17 you, which is dated May the 12th, 2005, was dated

18 -- excuse me.  Was addressed to Mr. Hanley; isn't

19 that right?

20    A    Yes.

21    Q    As were all of the invoices from GCR to

22 HRCC; isn't that right?

23    A    Yes.

24    Q    And the invoice said -- I know you only

25 had a moment to look at it, so if you want to see

1  it again, that's fine -- that the charge was for

2  voter database maintenance/enhancements; is that

3  right?

4      A    Yes.

5      Q    Did I understand you to say, Ms.

6  Flickinger, that GCR was the subject that would

7  be addressed at HRCC meetings from time to time?

8      A    Occasionally.  I mean, it wasn't like it

9  was discussed all the time.

10     Q    And, indeed, only very occasionally;

11 isn't that right?

12     A    Yes.

13     Q    HRCC meetings were designed for a

14 particular purpose and that was to elect

15 Republican -- or reelect Republican candidates to

16 the House; isn't that right?

17     A    Yes.

18     Q    And so it was polling, it was budgeting,

19 it was fundraising, those types of things; isn't

20 that right?

21     A    Correct.

22     Q    Mr. Hanley prepared the agendas for those

23 meetings; isn't that right?

24     A    Yes.  He would ask my input if it had to

25 do with the fundraising end of it.  I would

1  supply that information to him.

2      Q    Ms. Seaman would take minutes, notes at

3  the meeting; is that right?

4      A    Yes.

5      Q    And when those handwritten notes were

6  typed up in the form of minutes, they were

7  distributed to the attendees and perhaps others

8  as well, I don't really recall to tell you the

9  truth.  That's substantially accurate, isn't it?

10     A    Yes.

11     Q    You would receive those minutes; isn't

12 that true?

13     A    Um-hmm.

14     Q    And to the extent that GCR would be

15 discussed at any of the HRCC meetings conducted

16 in the manner we just were talking about, they

17 would -- those discussions, the discussions about

18 GCR, would be reflected in Ms. Seaman's notes or

19 minutes; isn't that right?

20     A    I guess so, yes.

21     Q    Well, you never --

22     A    I mean, I don't remember.  I don't

23 remember the -- what I got from her, quite

24 honestly.  I mean, I was at the meeting.

25     Q    No, that's fine.  Let me just ask you

1  this.  And it's fine, whether the answer is yes

2  or no.  Did you read the minutes?

3      A    Probably not.

4      Q    When it was -- the minutes -- since you

5  didn't read them, let me ask you this:  There

6  would be times at HRCC meetings where problems

7  with candidates would be identified; isn't that

8  right?

9      A    That's right.

10     Q    And at a minimum as a general

11  proposition, when problems with candidates were

12  identified, Mr. Feese was asked to address those

13  issues with the individuals involved; isn't that

14  right?

15     A    Yes.

16     Q    So you would have a House member speaking

17  to either a candidate for the House or another

18  House member who was standing for reelection; is

19  that right?

20     A    Yes.

21     Q    And that was the protocol that you all

22  adopted?

23     A    Pretty much.

24     Q    That was the primary responsibility that

25  Mr. Feese had, isn't that right, dealing with the

1  members, acting as a liaison between House

2  membership and new candidates and HRCC?

3    A    And also as the Chairman, it also

4  enhanced his ability to raise money for HRCC,

5  which he did.

6    Q    Did you ever learn at any time who it was

7  that arranged to have the boxes with Victory '04

8  stationery and accompanying envelopes sent to

9  HRCC?

10   A    Would you repeat that, please?

11   Q    Yes.  Do you know who shipped them over?

12 We know who got them.  You told us Mr. Matthews

13 received them.

14   A    I have no idea.

15   Q    Do you know -- well, were you ever told

16 by anybody to shred the material that was sent

17 over?

18   A    No.

19   Q    Not by Mr. Matthews conveying a message

20 from some third party?

21   A    No.

22   Q    Or anybody else?

23   A    No.

24   Q    Now, in the phone call that you've told

25 us about, do you remember Mr. Feese inquiring

1 whether or not you were aware of the search in
2 B-2?

3    A    No.

4    Q    Do you remember Mr. Feese making a
5 reference to a newspaper article that disclosed
6 the search?

7    A    I do not remember that.

8    Q    Do you remember at any time driving from
9 your home during non-work hours to HRCC in
10 relation to the boxes that you've told us about?

11    A    What?

12    Q    Were you ever called at home and asked to
13 go in to HRCC to meet with other people about the
14 boxes that you've described?

15    A    I don't remember that, if I was.

16    Q    Do you remember a meeting conducted on
17 April the 2nd, 2008, in Representative Smith's
18 office?

19        MR. BROWN:  Objection, irrelevant, beyond
20 the scope of direct.

21        MR. LOCK:  Your Honor, I'm attempting to
22 identify what I believe to be the time at which
23 the boxes were delivered to HRCC.  I understand
24 Ms. Flickinger's testimony on that subject.  I
25 have a different understanding about it, and this

 1  question is related to my understanding.

 2        THE COURT:  Continue.  Ask the question.

 3  BY MR. LOCK:

 4    Q    Do you remember having a meeting in

 5  Representative Smith's office on April the 2nd,

 6  2008?

 7    A    No.

 8    Q    Do you remember ever attending a meeting

 9  in Representative Smith's office with Mr. Feese

10  in attendance?

11    A    Yes.

12    Q    Do you remember -- was that once or more

13  than once?

14    A    More than once.

15    Q    You are -- I'm a lot older than you are,

16  okay?

17    A    I don't know about that.

18    Q    But you're a long tenured employee -- I'm

19  trying to be --

20    A    That's okay.

21    Q    A long tenured employee on the Hill,

22  right?

23    A    Geez.

24        MR. McMONAGLE:  He didn't mean that.

25        THE WITNESS:  Yeah, he did.  Geez.  What

1  is this?

2        MR. McMONAGLE:  He's almost done.

3        THE COURT:  Thank you.  Thank you.

4        MR. LOCK:  And these guys are no good.

5        THE WITNESS:  I'm old.  Okay.  Next.

6        MR. LOCK:  Well --

7        THE COURT:  Sheila, but he's really old.

8  He's really old.

9  BY MR. LOCK:

10     Q   Since I'm deeply ashamed now, but since

11  we know you've been up there for a while, it's

12  true, is it not, that you worked for

13  Representative Barley who held a prominent

14  leadership position in the Republican Caucus?

15     A   I've worked for several members of

16  leadership.  I've worked for Representative

17  Perzel.  I've worked for Barley.  I've worked for

18  Sam Smith.

19     Q   All among the most powerful men in the

20  State Legislature; isn't that right?

21     A   Yes.

22     Q   And at no time did you see or engage in

23  any activity which you found troubling in a way

24  that made you go to those gentlemen and report to

25  them about suspected or possible irregularities

1  or worse; isn't that true?

2        MR. BROWN:  Objection.  It's irrelevant

3  and beyond the scope of direct at a minimum.

4        THE COURT:  Sustained.

5  BY MR. LOCK:

6     Q   With respect to the payment of the bills,

7  for example, you never raised any questions about

8  the propriety, whether it was right or not right,

9  for you to pay a bill as directed by Mr. Feese or

10 others, did you?

11    A   I may have questioned the amount that

12 they were paying something but, you know.

13    Q   To yourself or to a third party?

14    A   To myself a lot, not necessarily to them.

15    Q   But with respect to the gentlemen that

16 you referred to as being in leadership, you were

17 friendly with those men, you were not a mere

18 employee by any means, were you?

19    A   I would like to think they're my friends.

20 Well, they were my friends.

21    Q   And so you had access to them if you had

22 certainly work-related problems or other issues?

23    A   Yes.

24    Q   And now to get back to the question I

25 asked a short time ago, you never did go to

1   Representative Barley, Representative Perzel or

2   Representative Smith with respect to any concerns

3   you had about any activities that you saw or

4   engaged in at HRCC; isn't that right?

5         MR. BROWN:  Objection.

6         THE COURT:  Sustained.

7         MR. LOCK:  If I may have just a moment,

8   Your Honor.

9

10         (There was a pause.)

11

12         MR. LOCK:  Thank you very much, ma'am.  I

13   have nothing further.

14         MR. DONATONI:  Your Honor, on behalf of

15   Mr. Stokes, I have no questions.

16         THE COURT:  Thank you.

17

18              CROSS EXAMINATION

19   BY MS. McCLELLAND:

20     Q   Hi.  I am Donna McClelland.  I represent

21   Al Bowman, and I'm going to stand up because I'm

22   short.  If you have any trouble hearing me, let

23   me know and I can repeat the question, too.

24     A   Okay.

25     Q   With regard to Al Bowman, in these GCR

1  contracts, to the best of your knowledge, did he

2  have any role in negotiating the contracts with

3  GCR?

4      A   I don't think he had any role in it.

5  Neither did I in negotiating it.

6      Q   And the signatures that were on the

7  contract, can we agree Al Bowman's signature was

8  not on that contract?

9      A   It was not.

10     Q   But certainly these contracts were

11 discussed at these meetings, correct, the

12 existence of the contract?

13     A   Yes.

14     Q   Al Bowman knew that there was, in fact, a

15 contract between the HRCC and GCR?

16     A   Yes.

17     Q   And he knew, in fact, that there was a

18 contract for GCR to do work for campaigns for the

19 Republican candidates?

20     A   Yes.

21     Q   And as part of those contracts, it was

22 Candidate Connect, correct?

23     A   Yes.

24     Q   And Candidate Connect began its

25 development after the May 2003 contract was

1  signed; is that correct?

2     A    I don't recall when it started.

3     Q    Do you remember authorizing or anybody

4  authorizing or making any payments to GCR for

5  Candidate Connect before the May 2003 contract

6  was signed?

7     A    I do not.  I don't recall that.

8     Q    Let me ask you this.  The invoices that

9  came from GCR, were they that specific where it

10 would have said an invoice for Candidate Connect?

11    A    No, it was just a generic -- it was just

12 the same, just -- it was the same statement in

13 each one.  It was all generic.

14    Q    So each invoice that came in was

15 essentially as was read, for maintenance of data

16 information?

17    A    And enhancement, yes, that's it.

18    Q    So any work that was done pursuant to

19 that contract was paid under that invoice,

20 correct?

21    A    Yes.

22    Q    And that included Candidate Connect,

23 correct?

24    A    Yes.

25    Q    At some point the payments to GCR went

1  from one thousand a month to, I believe, was it

2  two thousand a month?

3      A    Yes.

4      Q    And as part of that discussion,

5  Mr. Bowman was present during those meetings,

6  right?

7      A    Yes.

8      Q    And the discussion was GCR is doing more

9  work for us so we need to pay them more, correct?

10      A    Yes.

11      Q    Was it in any way, you know, we're under

12  investigation, we've got to make it look good,

13  we've got to pay GCR more, anything like that?

14      A    I mean, it certainly wasn't that we were

15  under investigation.  They just felt it was

16  better, it was -- it helped to cover more.

17      Q    I'm sorry?

18      A    It helped to cover more.

19      Q    Helped to cover, what do you mean, more?

20      A    More of the work that was being done.

21      Q    More of the work.  When you say cover, I

22  was afraid you were saying cover as in cover-up.

23  That's not what it was, right?

24      A    I think it was understood there that it

25  was not -- we were getting a good deal.

1    Q    But GCR was doing more work than a

2  thousand dollars a month worth?

3    A    Yes.

4    Q    So the discussion was, we should pay them

5  more because they're doing more for us?

6    A    Yes.

7    Q    And to kind of balance out, because GCR

8  also had a contract with the Legislature,

9  correct?

10    A    They did.

11    Q    And so it was to kind of balance out what

12  was being paid to GCR; they were doing more

13  campaign work so GCR needed to be paid more,

14  correct?

15    A    Okay.

16    Q    I'm asking.  Is that what the discussion

17  was?

18    A    It was more that they felt it wasn't

19  nearly enough, we weren't paying nearly enough to

20  justify the services that were being provided,

21  that we needed to do -- to pay more.  And I don't

22  know if they ever thought that two thousand was

23  enough either, but it went to two thousand.

24    Q    When you say they, who do you mean?

25    A    Brett, John, John; I mean, everyone.  I

1  mean, I think it was pretty well understood that

2  it was more or less a cover contract.  And I have

3  to tell you, I never knew until recently how much

4  the contract on the Hill was for.  I had no idea.

5  It was for an awful lot of money and I didn't

6  know that.

7      Q    Do you know whether Al Bowman, to the

8  extent he participated in these discussions, did

9  he demonstrate any understanding of how much was

10  being paid by the Hill versus how much was being

11  paid by --

12      A    I don't know that he would know that.  I

13  don't know that he would have known that.  I

14  don't know how he would have known that.

15      Q    He never said anything to you that

16  indicated to you that he knew that?

17      A    No.

18      Q    To the extent these discussions were

19  going on, he wasn't a primary participant, was

20  he?

21      A    No.

22      Q    So he kind of participated to the same

23  extent you did, as in he sat there and listened

24  to them, correct?

25      A    Right, although he did deal with GCR more

1 than I did.  I mean, I really did not deal with

2 them much at all, just to pay the bills.

3     Q   You paid the bills and he did the work in

4 terms of developing Candidate Connect, correct?

5     A   Correct.

6     Q   But really the payments were authorized

7 by Hanley, Feese, Perzel, and others, correct?

8     A   Yes.

9     Q   And that's who negotiated those

10 contracts, correct?

11     A   Yes.

12     Q   It wasn't Al Bowman, was it?

13     A   No.

14     Q   And Constituents Direct, Al Bowman used

15 that service as well primarily, correct?

16     A   Yes.

17     Q   And that also was paid for by HRCC in a

18 separate contract?

19     A   Yes.

20     Q   And Al knew that HRCC was paying for the

21 Constituents Direct?

22     A   Yes.

23     Q   Now, I noticed on Exhibit 33, if you

24 could, that's the exhibit where you listed the

25 people that there had been no payments for or

1    expenditures on behalf of.  We can agree Al

2    Bowman's name is not in that list, right?

3        A    Correct.

4        Q    That's because you did make expenditures

5    on behalf of Al Bowman, correct?

6        A    Yes, and I reimbursed him for expenses,

7    yes.

8        Q    Whatever Al Bowman did that was campaign

9    related, he submitted to the campaign committee?

10       A    Correct.

11       Q    Al Bowman submitted cell phone bills to

12   the campaign committee, correct?

13       A    Yes.

14       Q    He submitted expenditures like travel

15   expenses to the campaign committee, correct?

16       A    Yes.

17       Q    And as a matter of fact, when he started

18   doing more campaign work, he actually went off

19   the legislative payroll and came over to the

20   campaign table, correct?

21       A    Yes.

22       Q    So whenever it started to encroach on the

23   legislative duties, he became a full-time

24   campaign employee?

25       A    Yes.

1    Q    And --

2    A    In increments.

3    Q    In increments?

4    A    Yes.

5    Q    In the middle of April, it may have been

6  10 percent or 25 percent, but by November he was

7  a hundred percent on the campaign payroll,

8  correct?

9    A    I believe, yes.

10    Q    And the campaign paid him for his

11  campaign work?

12    A    Yes.

13    Q    Not the Legislature?

14    A    Correct.

15         MS. McCLELLAND:  I have no other

16  questions.

17         THE COURT:  Mr. Kelly?

18         MS. KELLY:  Three quick questions, Judge.

19  It will be very, very quick.

20

21              CROSS EXAMINATION

22  BY MR. KELLY:

23    Q    Just in an abundance of caution, ma'am,

24  for Commonwealth Exhibit 33, it references HRCC

25  payments and that Eric Ruth didn't receive any

1 HRCC payments?

2    A    Correct.

3    Q    The Friends of John Perzel, that's a

4 separate pack, correct?

5    A    Yes.

6    Q    You have no idea what that pack was

7 paying?

8    A    No.  I mean, I don't know.  I didn't

9 follow that.  That wasn't my responsibility.

10        MR. KELLY:  That's fine.  I just wanted

11 to make that clear.

12        Thank you, ma'am.  I have nothing

13 further.

14        MR. WOODWARD:  No questions, Your Honor.

15        MR. SIGMAN:  Just a couple questions.

16

17               CROSS EXAMINATION

18 BY MR. SIGMAN:

19    Q    Back to that 33 you were looking at, I

20 notice you see on there Don McClintock did not

21 receive any money from HRCC, that's accurate,

22 right?

23    A    That's correct.

24    Q    All the time you were there, McClintock

25 got no money from HRCC?

```
 1      A    I don't know Don McClintock.

 2      Q    You don't even know him, right?

 3      A    No.  I wouldn't know him if I fell over

 4 him.

 5      Q    Understood.

 6      A    And I can't see him now because I don't

 7 have my glasses on.

 8      Q    Understood.  And you've been in the

 9 Legislature quite a while now, right, as Mr. Lock

10 mentioned earlier?

11          THE COURT:  We can stipulate to that.  We

12 can stipulate to that.

13 BY MR. SIGMAN:

14      Q    In all your experience in the

15 Legislature, in all your time in the Legislature,

16 you've never seen or heard or had any knowledge

17 that Don McClintock ever worked for the

18 Commonwealth of Pennsylvania or the House of

19 Representatives at any time; isn't that a fact?

20      A    I don't know him.

21          THE COURT:  She doesn't know him.

22 BY MR. SIGMAN:

23      Q    You don't know him?

24      A    I don't know him.

25          MR. SIGMAN:  I have nothing further, Your
```

1  Honor.

2       THE COURT:  Thank you.

3       Mr. Fetterhoff?

4

5                CROSS EXAMINATION

6  BY MR. FETTERHOFF:

7    Q   Ms. Flickinger, prior to the first

8  contract that HRCC had with GCR, prior to that

9  time, let's say between 2001 and 2003, what was

10 GCR doing for HRCC?  What services were being

11 provided?

12   A   I don't know.  I mean, I don't know that

13 I -- if it was data services, I wasn't really

14 aware of it because that's not what I do.  And I

15 tried not to get involved with it, because I have

16 enough to do.

17   Q   How many people worked at HRCC in the

18 office on Third Street between 2001 and 2003?

19   A   Three or four.

20   Q   Okay.  Now, the contract with GCR, the

21 first contract started sometime in 2003 was your

22 testimony; is that correct?

23   A   Yes.

24   Q   How about then?  Let's forget the first

25 two years.  Beginning in 2003, what services were

1  being rendered by GCR for HRCC?

2      A    Providing data for mailings and for

3  polling.

4      Q    What sort of data?

5      A    Voter data.

6      Q    Was it names and addresses?

7      A    Names, addresses, phone numbers, vote

8  history.

9      Q    And what would be done with that

10  information?

11      A    That's how lists were compiled for

12  mailings, for campaign mailings or for phoning

13  during campaigns.

14      Q    All right.  Now, is that all or was there

15  anything else?

16      A    I don't know.  That's all I can think of.

17      Q    Okay.  Now, when the discussion occurred

18  in connection with that initial one thousand

19  dollar a month contract --

20      A    Okay.

21      Q    -- you, I believe, testified that you

22  didn't recall whether it was Mr. Hanley or Mr.

23  Feese who first mentioned the amount?

24      A    Right.  I don't recall.

25      Q    And are you sure that it was one of them?

1       A    I mean, that's what I recollect.

2       Q    Let me ask you this.  Do you recall that

3  very meeting where that very discussion occurred

4  or is this a general recollection?

5       A    General recollection.

6       Q    All right.  So if I asked you who else

7  were the attendees at that specific meeting, am I

8  correct --

9       A    It was usually the same people.

10      Q    Well, although not always.  Mr. Perzel

11 would be there sometimes and often not though; is

12 that right?

13      A    And he would call.  Sometimes if it was

14 on a Monday morning, he would be on his way to

15 Harrisburg so he would call in on a conference

16 call or Brian.

17      Q    Now, you were asked by the prosecution

18 whether a thousand dollars a month was adequate

19 and you answered that you didn't know; is that

20 right?

21      A    Right.  I don't know.

22      Q    All right.  Do you recall any discussion

23 at the time -- not what you may have learned

24 since or what somebody told you, but what you

25 understood at the time, was there a discussion

```
 1  about whether a thousand dollars a month was
 2  adequate to reimburse GCR for the services then
 3  being rendered?
 4          MR. BROWN:  Your Honor, at this point I'm
 5  going to object.  That's been asked and answered.
 6  Ms. McClelland elicited that it was a cover
 7  contract and that the amounts being paid were
 8  nowhere near what was required.
 9          MR. FETTERHOFF:  No, I'm asking a
10  different question.  I'm asking the question,
11  first of all --
12          THE COURT:  I'm going to allow her to
13  answer that question.
14  BY MR. FETTERHOFF:
15      Q   Ma'am, did you understand or do you
16  recall the question?
17      A   I forget.  Can you repeat it?
18      Q   The question is this:  You have been
19  asked other questions on this general subject.
20  I'm asking you a very specific question and that
21  is:  Was there a discussion among whoever was
22  involved in discussing that first GCR contract
23  and specifically the amount of it as to whether
24  or not that was an adequate price for the
25  services then being rendered?
```

1    A   I have always -- I just thought it was to

2  pay them something.  I didn't -- I don't think

3  anyone thought it was paying for the actual

4  services.

5    Q   Well, that's what you think.  There's a

6  lot of water under the bridge between then and

7  now.  My question is:  What did you think then

8  based on what somebody said?

9    A   I don't remember.

10   Q   Was there something said that led you to

11 that belief or is that belief later acquired?

12       MR. BROWN:  Objection, asked and

13 answered.

14       MR. McMONAGLE:  It's a fair question.

15       THE COURT:  She can answer it.

16 BY MR. FETTERHOFF:

17   Q   Do you understand what the question is?

18   A   I -- I don't remember.  I mean, I had --

19 I don't know.  I can't differentiate between how

20 I felt -- what I thought then and what I know

21 now.  I can't.  I can't.

22   Q   I understand.  That's the problem.  So

23 when you testified, as Mr. Brown just said, when

24 you testified a few minutes ago that it was your

25 impression that it was a cover contract, was that

1  an impression that you now have or developed over

2  time; or did you sit there when that subject

3  first came up in 2003 and you sat there thinking,

4  my God, this is a cover contract?

5      A    I don't know that I thought -- I don't

6  remember what I thought then.  I honestly -- it's

7  an honest answer.  I cannot differentiate between

8  what I thought then and what I think now with

9  what I know.

10     Q    I understand.  Now, how about two years

11  later, when did Candidate Connect come into

12  usage, was it between the first --

13     A    I don't remember.

14     Q    Well, let me finish the question.  I'm

15  trying to help you a little bit.  Did Candidate

16  Connect come into usage by HRCC between the first

17  contract and the second contract or at some other

18  time?

19     A    I don't remember when it started.

20     Q    Can you remember for certain that as of

21  2005 and the second contract, that as of that

22  time, Candidate Connect was in use by HRCC?

23     A    Yes.

24     Q    Okay.  Now, do you recall the specific

25  meeting with specific people in attendance where

1 that second contract was discussed or is that a

2 general recollection?

3    A    No.  It was John Hanley and Brett.  I

4 don't know if it was one or the other or

5 simultaneously saying it was discussed that we

6 needed to up the amount that we were paying GCR.

7    Q    Your testimony earlier was that the

8 discussion at that time, not later but at that

9 time, was that there were additional services

10 being provided?

11    A    Right.  And that's why they needed to

12 increase the contract.

13    Q    Now, was there any discussion at all at

14 that time among the people there present that one

15 thousand was no longer adequate but two thousand

16 would be adequate?

17    A    One thousand was not adequate and they

18 needed to raise it, and they would let me know

19 what it would be because I had to pay the bill,

20 whatever that would be and --

21    Q    Did anyone say anything?

22    A    I believe, I believe it was Brett who

23 said to me, and then he later on got back to me

24 and told me how much the contract was to be for.

25    Q    All right.  Did anyone say anything to

1  the plain effect that this is a cover contract to
2  make things look good?
3     A    Did they say that per se?  No.
4   . Q    Did they say that?
5     A    No.
6     Q    Now, were you aware either in 2001 at --
7  2003 at the time of the first contract or later
8  in 2005 of the second contract whether Friends of
9  John Perzel was paying anything to GCR?
10    A    Was I aware of it?
11    Q    Yes.
12    A    I was not.
13    Q    All right.  Now, you did know over time
14 that besides Friends of John Perzel making direct
15 contributions to HRCC, Friends of John Perzel
16 would also reimburse HRCC vendors directly from
17 time to time; is that correct?
18    A    Yes.
19    Q    Now, you just said you didn't know
20 whether Friends was paying GCR as late as 2005,
21 right?
22    A    I didn't check his reports.  I don't know
23 what he paid.
24    Q    You're not being faulted, ma'am.  You're
25 just being asked.

1          You're familiar with the three Victory

2   Funds, Victory 2004, 2005 and 2006, in general?

3      A    In general.

4      Q    Do you know or did you know at that time,

5   2003 to 2005, whether any one of those Victory

6   Funds was making payments to GCR?  Did you know

7   that then?

8      A    No.

9      Q    You're familiar with another pack none as

10  the 1776 Committee by Mr. Perzel?

11     A    Okay.  I know the 1776 Committee.

12     Q    Okay.  Did you know then whether or not

13  the 1776 Committee was making any payments to

14  GCR?

15     A    I did not.

16     Q    Did you know whether the Citizens for

17  Government Reform then was making any payments to

18  GCR?

19     A    I did not.

20     Q    Did you know then whether the PA

21  Leadership Pack was making any payments to GCR?

22     A    I did not.

23     Q    Even today, ma'am, do you know, yes or

24  no, whether any of those packs or campaign

25  committees that I listed was then making payments

1  to GCR?

2      A    I have no idea.

3      Q    Now, how many vendors during the campaign

4  cycle, how many vendors in a typical campaign

5  cycle would HRCC have?

6      A    Overall, any vendor?

7      Q    Yes.

8      A    I have no idea.  Fifty -- I don't know.

9  It's a guess.  I don't know.

10     Q    Between fifty and a hundred, some of them

11  very small, some of them very big?

12     A    Yeah.

13     Q    Now, when you said that Mr. Feese was

14  very involved in budget, you mean the overall

15  campaign budget that was prepared by Mr. Hanley,

16  is that what you mean?

17     A    Yes, and also paying of the bills.  And

18  his attention to it, I think, dwindled as it went

19  along.  I think when he first started as campaign

20  chairman, he was really very attentive and he was

21  -- he was in charge.  He wanted to show that he

22  was in charge, so he paid attention to those

23  details.

24     Q    When you received a bill, what was the

25  process?  Would you mail a copy of it or fax a

1    copy or scan and e-mail a copy to Mr. Feese?

2       A    No.  Usually I would make an accounts

3    payable listing every week or every two weeks,

4    whatever the case may be, to show whatever bills

5    were ready to be -- should be paid with the name

6    of the company, whatever it was -- the

7    description of it and the amount, and then with

8    the total listing and also showing how much cash

9    we had on hand.

10      Q    And how often would that occur?

11      A    What's that?

12      Q    How often would that occur?

13      A    It was different.  During the campaign

14   cycle, if we were in the heat of a campaign, like

15   September, October, probably weekly.

16      Q    How would that --

17      A    I would e-mail it.

18      Q    With an attachment?

19      A    Yes.  I would e-mail it to Brett, to John

20   Perzel, Brian, whoever was involved, you know.

21      Q    Representative Smith?

22      A    Yeah, or -- and when Barley was there, to

23   Barley.

24      Q    Representative Arnold?

25      A    Yes.

1    Q    Now, so how many people roughly would be

2 on that list, six or eight?

3    A    About.

4    Q    Do you retain copies of those e-mails?

5         MR. BROWN:  Objection, irrelevant, beyond

6 the scope of direct.

7 BY MR. FETTERHOFF:

8    Q    Let me ask you what the rest of the

9 process was?

10   A    I would ask for them -- you know, if

11 there was a problem with anything or -- and also

12 by virtue of the fact how much money we had on

13 hand, it was kind of like -- a lot of times on

14 the subject line, I would just put help because I

15 needed them to help raise money so we could pay

16 the bills.

17   Q    Would I be correct to suppose that

18 normally you did not get a response from

19 everybody on the transmittal list?

20   A    Right.  It was more or less an FYI.  And

21 if there was a problem with any of them, they

22 would let me know.

23   Q    All right.  So am I correct, therefore,

24 that Mr. Feese as a normal rule would not e-mail

25 you back and say, yes, pay bills 1 through 10 but

1  do not pay bills 11 and 12?

2      A    Right.  Correct.

3      Q    I'm correct that he would not do that?

4      A    That's correct, but, you know, there were

5  some things like cell phone bills he had -- at

6  first he had a problem with the amount of the

7  cell phone bills but -- and some of the -- if

8  there were legal bills or on our lines of credit

9  when we had to -- when we were paying that down.

10     Q    All right.  So your testimony here today

11 is that Mr. Feese was very involved in the

12 budget.  That means two things, No. 1, he was

13 familiar with the overarching budget of HRCC and

14 what the allocations of the money would be to

15 different campaigns, right?

16     A    Correct.

17     Q    And No. 2, No. 2, you really are basing

18 that he was familiar with the expenditures, the

19 detailed expenditures from bill to bill based on

20 the fact that you sent these notices out to half

21 a dozen or eight people?

22     A    When I first --

23     Q    And sometime he responded?

24     A    Can I explain something?

25     Q    Sure.

1      A    When I -- when Brett took over as HRCC

2   Chairman in 2002 or -- 2002, he -- I sat down and

3   talked to him, because I had worked previously

4   for John Barley and he and John did not get

5   along.  And I was considered Barley's person.

6           And I knew that, you know, coming into

7   this it was -- it was going to be difficult -- it

8   would be strained relations probably between

9   Brett and I.

10          So I sat down with him right when he --

11  shortly after he took over and I said, you know,

12  that I was loyal to whoever was in charge, that I

13  would be honest with him and, you know, what's

14  done is done.

15          And from that point on, I mean, he -- as

16  we went on, Jill would tell me, you know, he's --

17  he trusts you, you know.  And so it took a while

18  to develop that relationship but we did, and as

19  time went on he was less -- he would -- he

20  wouldn't be as -- he wouldn't check things out as

21  hard as he did at first.

22      Q    When you say at first, when was that?

23      A    In 2000 -- when he became Chairman again

24  in 2002, I think it was.  And it took a while.

25  It took a couple months but, you know, as time

1   went on he realized that he could trust me and

2   that, you know, I worked for the caucus.  I mean,

3   I worked for all of them.  I wanted them to get

4   reelected.

5       Q    So most of the bills, a very small sample

6   of which Mr. Lock discussed with you and a much

7   larger sample as you know we have here, most of

8   those bills were paid promptly by you in the

9   ordinary course of business without receiving

10  specific approval by any member of the

11  Legislature?

12      A    I didn't think it was necessary.  I mean,

13  if we got a monthly bill for coffee, I didn't

14  think it was necessary to get approval on that.

15  I didn't think it was necessary to get approval

16  on a payment every month for a copier, that every

17  month it was the same amount, $221.  So some of

18  those things were paid automatically.

19      Q    Right.

20      A    It was things that came up that were not

21  done monthly.

22      Q    And some of these vendors, even the

23  larger ones, Susquehanna Polling, Cherry

24  Communications, those were contracts or those

25  were standing relationships, so those bills were

1 paid without the specific approval of a member of

2 the Legislature?

3     A   No.  They usually were looked at by

4 someone because they were not -- that was not a

5 set monthly bill. That would vary a lot. Some

6 of those bills were --

7     Q   I thought you said Constituents Direct

8 was the same monthly bill?

9     A   Yes.

10     Q   So if it was a set monthly amount, did

11 you expect specific approval each month from a

12 member of legislation?

13     A   No.

14     Q   Likewise, HRCC made scores, literally

15 scores of payments in large amounts to

16 Susquehanna Polling. Is it your testimony here

17 today that every single bill was reviewed and

18 approved to you by a member of the Legislature

19 prior to the payment being made?

20     A   Oh, yes, on polling.

21     Q   All right.

22     A   Steve Dull and -- primarily Steve Dull

23 would look at them, because he was overseeing the

24 polling.

25     Q   Okay.

1    A    Because I had no idea.

2    Q    Well, all right.  So it was Mr. Dull and

3  not Mr. Feese in that case?

4    A    Yeah.  And we would discuss that at some

5  of the meetings, if there were large -- and some

6  of the bills were very large for polling.

7    Q    Well, but I'm looking at a hundred bills

8  here.  It's not your testimony that there was a

9  discussion of every single bill by Susquehanna

10  Polling?

11    A    No, there was not a discussion of every

12  single bill.

13    Q    Did you have a signature stamp to stamp

14  the checks --

15    A    Yes.

16    Q    -- to make vendor payments?  Did you have

17  a stamp for Mr. Barley when he was treasurer?

18    A    Yes.

19        MR. BROWN:  Objection, irrelevant.

20        MR. FETTERHOFF:  Well, the question is

21  ultimately whether Mr. Feese ever had signature

22  authority for expenditures by HRCC.

23        THE COURT:  Did he?

24        THE WITNESS:  I don't think so.

25  BY MR. FETTERHOFF:

1    Q    The signature authority was restricted to

2   treasurers; is that right?

3    A    It was whoever the head of the caucus.

4   Like at one point it was Matt Ryan and John

5   Perzel.  It was John Perzel and -- whoever, Dave

6   Arnold or Sam Smith, but it was not Brett.

7    Q    In other words, the general chairman and

8   the treasurer would have signature authority --

9    A    Yes.

10    Q    -- to pay the vendors; is that right?

11    A    Yes.

12    Q    Mr. Feese was the members chairman, he

13   had no authority to sign checks?

14    A    It wasn't a matter of signing the checks.

15   I --

16    Q    I'm just asking you --

17        MR. BROWN:  I would ask to let her

18   finish.

19        MR. FETTERHOFF:  She can finish, but the

20   question is not in general who was involved in

21   the discussions.  The question at this point, to

22   avoid the accusation that there's repetition

23   involved, is simply to say who had the authority

24   to sign the bloody checks.

25   BY MR. FETTERHOFF:

108

1    Q   Is it correct that it was the treasurer

2  and the general chairman?

3    A   Well, actually I stamped the checks.

4  They didn't sign them.  I stamped them.

5    Q   Right.

6    A   Can I explain this?

7         MR. BROWN:  Again, I'm going to ask that

8  the witness be allowed to finish her answer.

9         THE COURT:  She wants to explain it.

10 BY MR. FETTERHOFF:

11   Q   Go ahead.

12   A   The process, I had a voucher system set

13 up where I would have a voucher set up and attach

14 it to the bill.  That was the point where the

15 decision was made.  After I would receive a bill,

16 I would write up the voucher stating the date I

17 got it, the amount of it, the name and address

18 and everything.

19        And then at that point was where I would

20 ask for -- if there was a bill in question, I

21 would ask for permission to pay it; or if it was

22 just an ordinary course of, you know, a payment

23 on a copier or whatever it was, a monthly

24 payment, but each invoice, there is a voucher

25 system attached to that.  And at that point is

1  where the question and answer or approval would

2  come from.

3       After I got the approval, I would just

4  enter the data in my system and run the check

5  through and stamp it.  So no one really signed

6  it.  I stamped the signatures on the checks.

7    Q    You had a stamp for Mr. Barley; is that

8  right?

9    A    And whoever -- it's two signatures.  It's

10  two signatures on the check.  I had one stamp

11  with both signatures on.

12    Q    Matt Ryan and John Barley, right?  You

13  had a stamp at that time with those two names on

14  it?

15    A    Right, or Matt Ryan and John Perzel.

16    Q    Right.  But you never had a stamp that

17  included the name of Brett Feese?

18    A    Correct.

19    Q    It ended up being simple.

20       You testified about a phone call.  This

21  is in connection with the boxes now.  You

22  testified about receiving a phone call from Mr.

23  Feese?

24    A    Yes.

25    Q    Was that the one and only discussion

1  about these boxes that you ever had with Mr.

2  Feese in that time period?

3      A    Yes, that I recall.  Can -- there seems

4  to be -- during that time period --

5          THE COURT:  Take a deep breath.

6          THE WITNESS:  When the box -- what

7  everyone refers to as the night of the thousand

8  boxes, during that time period, my mother -- I

9  took care of my mom for six years.

10          The last week of February, I had Hospice

11  come in and help me.  I was in and out of the

12  office very seldom.  My total focus was on my

13  mother.

14          She died March 2nd.  And you have to

15  believe me.  I do not recall anything really

16  regarding -- if people made calls to me about

17  these boxes, other than that one that I do

18  remember from Brett, I don't remember them

19  because my mind was on my mother.

20  BY MR. FETTERHOFF:

21      Q    I understand that, ma'am.  Take another

22  minute if you need it.

23          THE COURT:  Are you okay?

24          THE WITNESS:  Um-hmm.

25  BY MR. FETTERHOFF:

1    Q    As close as you can recall, and I do
2  understand it's difficult in any way, and as you
3  just explained I certainly understand it's
4  particularly difficult for you; but is it
5  consistent with your recollection that Mr. Feese
6  called you on or about April 1st, 2008, about
7  those boxes?
8    A    I don't recall what date it was.  I know
9  I got a call from him.
10   Q    Would it have been after the death of
11 your mother?
12   A    I assume so.
13   Q    Now, you testified that there were two
14 big brown boxes and two standard envelope boxes;
15 is that right?
16   A    There were several boxes, several brown
17 boxes and several -- I think there were two large
18 brown boxes and several white envelope boxes.  I
19 don't know the exact count.
20   Q    I don't mean to be overly petty about
21 this, but you see this box on the table, the
22 second table here in front of you?
23   A    Actually, I can't see that.
24   Q    It's right behind Mr. Brown, between
25 Mr. Brown --

```
 1    A    Okay.

 2    Q    Is that about the size?

 3         THE COURT:  Ma'am, it's similar to this

 4  box (indicating).

 5         THE WITNESS:  Yes, it's like that.

 6  BY MR. FETTERHOFF:

 7    Q    A standard banker's box as they call

 8  them?

 9    A    Yep.

10         MR. FETTERHOFF:  Thank you, ma'am.

11         THE COURT:  Mr. Bergstrom?

12         MR. BERGSTROM:  No, sir.

13         THE COURT:  Any redirect?

14         MR. BROWN:  No, Your Honor.

15         THE COURT:  You can step down.

16         MR. LOCK:  Your Honor, I have a brief

17  series of questions based on cross examination by

18  other defense counsel.  I see somebody shaking

19  their head.

20         That's entirely appropriate since they

21  all, my colleagues, represent whom they represent

22  and I represent a discrete interest; and I would

23  like an opportunity to exercise my right to cross

24  examination based on those questions.

25         MR. BROWN:  Your Honor, at this point I'm
```

1  going to object to that.  Each Defendant has had

2  the opportunity to cross-examine based on what

3  happened on direct.  This is completely

4  inappropriate.  I'm asking that this witness

5  be excused.

6         MR. LOCK:  That's a novel notion.  That's

7  just made up.  That's simply untrue.

8         THE COURT:  Mr. Lock, I think the cross

9  examination for this witness is finished.  So I'm

10  going to dismiss the witness.

11         Thank you very much, ma'am.

12         THE WITNESS:  Thank you.

13

14         (Witness excused.)

15

16         THE COURT:  Let's take a 15-minute break,

17  recess.

18

19         (Court was held in recess at 11:05 a.m.)

20

21         (Recess.)

22

23         (The following proceedings occurred,

24  beginning at 11:20 a.m.:)

25

```
 1          THE COURT:  All right.  Is the
 2  Commonwealth ready to go?
 3          MR. SPROW:  Yes, Your Honor.
 4          THE COURT:  Call your next witness.
 5          MR. SPROW:  The Commonwealth calls Agent
 6  Speaks.
 7
 8                      GARY SPEAKS,
 9  called as a witness, being duly sworn, testified
10  as follows:
11
12                  DIRECT EXAMINATION
13  BY MR. SPROW:
14      Q    Would you please state your name and
15  spell both your first and last names for the
16  record?
17      A    Gary Speaks, G-A-R-Y, S-P-E-A-K-S.
18      Q    Where are you employed?
19      A    The Pennsylvania Office of Attorney
20  General as a special agent in the Bureau of
21  Criminal Investigation.
22      Q    And is that the position you held on
23  February 29th of 2008?
24      A    Yes.
25      Q    Talking specifically about that date, did
```

1  you go to the State Capitol building on that

2  date?

3      A    Yes.

4      Q    And what was the purpose of going over

5  there?

6      A    I accompanied Chief Deputy Attorney

7  General Frank Fina to the Capitol building

8  because of a subpoena that was issued, I believe,

9  that day to look at a number of boxes in

10  different areas of the Capitol.

11         We proceeded to the basement of the

12  Capitol complex to a room which was called B-2.

13  We were met there by Jack Krill, George Bibikos

14  and Jill Seamans.  The door was subsequently

15  opened to B-2.  It was a storage area in the back

16  of some offices.

17         Me and Frank Fina examined 35 boxes.

18  What were in the boxes; budget information, grant

19  information, economic development information.

20  It was determined there was no campaign material

21  in those boxes.

22      Q    Okay.  And the basic -- you were familiar

23  with the basic purpose of the subpoena?

24      A    Yes.

25      Q    And that was for campaign materials that

1 you were looking for; is that right?

2     A    Correct.

3     Q    So you go to B-2, you search the boxes

4 there, you don't find campaign materials?

5     A    That's correct.

6     Q    Then what do you do?

7     A    We then proceeded up -- the group

8 proceeded up to the Main Capitol building, Room

9 414.  We were met there by John Zimmerman.  We

10 then waited a period of time for Mr. Towhey to

11 come in from the -- I believe the eastern part of

12 the state.

13         After approximately, I think it was, 45

14 minutes or so, he arrived and opened up his

15 office door.  The gentleman then removed

16 approximately -- well, it was 14 boxes of

17 materials.

18         We examined the materials.  They were

19 materials related to the Speaker, more like what

20 I would describe as promotional items, things you

21 may give away, things like that; at which point,

22 I believe it was after 9 p.m., this was a Friday

23 evening.

24         I then asked the gentleman if this was

25 all the material.  Mr. Towhey, Mr. Zimmerman and

1  Mr. Krill at that point indicated yes, that was

2  it.  I recall Frank Fina asking if there was

3  anything that had been taken out or hidden, and

4  those gentlemen indicated negatively.

5          At that point it was sometime after 9

6  p.m., we then exited the Capitol.

7      Q    All right.  Now, you indicated that

8  Mr. Fina asked whether any materials had been

9  taken out or hidden.  Who did he ask that to?

10     A    The group of gentlemen that was there.

11  At that point I recall Jack Krill, Mr. Towhey and

12  Mr. Zimmerman.

13     Q    And who answered him?

14     A    I indicated in my report that they all

15  answered negatively.

16     Q    All of them did?

17     A    Yes.

18     Q    That would include the three individuals

19  you just named?

20     A    Yes.

21     Q    The boxes that you looked through, how

22  did you come into possession of those?  I'm

23  talking about Room 414 now.

24     A    We were in the -- I guess you describe as

25  a reception area in the office area of Room 414.

```
 1  We did not enter any of the offices.  The
 2  gentlemen brought them out to us, so we stayed in
 3  the reception area inside of the office.
 4          MR. SPROW:  Those are all the questions
 5  -- hold on.
 6
 7          (There was a pause.)
 8
 9  BY MR. SPROW:
10      Q    You mentioned the name Jack Krill.  Do
11  you know who that is?
12      A    Yes.
13      Q    Who is that?
14      A    He's an attorney, I believe, working at
15  the Capitol.
16      Q    You also mentioned an individual named
17  Bibikos.  Is he also an attorney?
18      A    Yes.
19      Q    The gentlemen that you were talking
20  about, Paul Towhey and John Zimmerman, I'm going
21  to take them one at a time and ask if you see
22  them in the courtroom.  Do you see Paul Towhey?
23      A    Yes, I do.
24      Q    Can you identify him for the Judge?
25          MR. WOODWARD:  I'll stipulate Mr. Towhey
```

```
 1  is here.
 2         THE COURT:  Thank you.
 3  BY MR. SPROW:
 4     Q    And John Zimmerman?
 5     A    Yes, I do.  In the back corner there.
 6     Q    You also mentioned the name Jill Seaman.
 7  Do you see her in the courtroom?
 8     A    Yes, I do, in the back row next to her
 9  attorney.
10         MR. FETTERHOFF:  We would stipulate.
11         THE COURT:  Thank you.
12         THE WITNESS:  Thank you.
13         MR. SPROW:  Thank you.  That's all.
14
15              CROSS EXAMINATION
16  BY MR. McMONAGLE:
17     Q    Just briefly, Agent.  Good morning.
18     A    Good morning.
19     Q    As I understand it, I think you told us
20  that the subpoena was issued on February 29th; is
21  that correct?
22     A    I believe it was.  I think it dealt with
23  two different subpoenas.  One had been issued
24  earlier that day.  I did not issue it.  I was
25  simply called to accompany Chief Deputy Frank
```

1  Fina.

2    Q    Okay.  But this is actually the 29th?

3    A    The Friday, yes.

4    Q    Okay.  Had you issued any subpoenas,

5  similar subpoenas, prior to the 29th?

6    A    I did not.

7    Q    Did anybody, any of your colleagues?

8    A    Not that I'm aware of.

9    Q    Okay.  So the subpoena was specific as to

10 what?

11   A    My -- I didn't issue the subpoena.  I

12 didn't read the subpoena or see the subpoena.  I

13 was told to accompany Frank Fina.  We were

14 looking for campaign-related documents.

15   Q    So Mr. Fina had the -- I didn't mean to

16 walk on your words.  What were you about to say?

17   A    That's it.

18   Q    Okay.  Mr. Fina actually had a copy of

19 the subpoena with him?

20   A    I don't recall if he did or not.

21   Q    Have you ever seen the subpoena?

22   A    Not that I recall.

23   Q    Okay.  But you do remember going with

24 Mr. Fina?

25   A    Yes.

1    Q    And who else?

2    A    Just the two of us from the Attorney

3  General's Office.

4    Q    And where exactly do you go on the 29th

5  and what time?

6    A    It was after 6:00.  We went to the

7  Capitol complex.  B-2 is, I believe, in the

8  Southern Office Building.  I'm not sure.  The

9  names have changed.  It was in the basement.

10   Q    Okay.  Is that when you go directly to

11 the basement?

12   A    I believe at some point we met up with

13 Jill Seamans.  I can't recall -- I mean, this was

14 two years ago -- exactly where we met up, but we

15 were taken there.  I prior did not know where B-2

16 was.

17   Q    Had you had contact with Ms. Seaman

18 before going to the basement?

19   A    I did not, no.

20   Q    You didn't?

21   A    No.

22   Q    Did anybody else in your presence?

23   A    Not that I know of.

24   Q    So you go to the Capitol.  It's after

25 6:00?

1      A    Correct.

2      Q    And you go down to B-2?

3      A    Yes.

4      Q    And there are some other individuals down
5  there, Ms. Seaman among them?

6      A    Yes.

7      Q    I take it they're cooperating with you?

8      A    Yes.

9      Q    Facilitating whatever requests you had?

10     A    Correct.

11     Q    And you go into this area and you go
12  through 35 boxes?

13     A    Yes, yes, we did.

14     Q    And you look through those 35 boxes and
15  you satisfy yourself that there was no campaign
16  material?

17     A    Correct.

18     Q    And then at some point in time you tell
19  us you go to Room 414?

20     A    Correct.

21     Q    Do you go directly there?

22     A    From B-2, yes, we walked as a group.  We
23  walked up there.

24     Q    Why?

25     A    I believe there were more boxes that we

1  were going to look at.

2      Q   Well, who provided that information to

3  you?

4      A   I don't recall that.

5      Q   Was there a conversation in the basement

6  between you and any of the people that were there

7  that suggested there were more boxes upstairs?

8      A   No, I don't remember that conversation.

9      Q   Did the subpoena in any way direct the

10 search of any other offices?

11     A   I think I answered I hadn't read the

12 subpoena.

13     Q   All right.  You go up to 414 and I think

14 you told us that Mr. Zimmerman was there?

15     A   Yes.

16     Q   And what do you do once you get up there?

17     A   At that point we were in -- we had access

18 to the lobby area but not access to any of the

19 offices.  Someone had been on the phone.  I don't

20 recall exactly if it was Mr. Towhey.  I believe

21 he lived in the eastern part of the state and the

22 weather was very poor that night, so we waited

23 for him to arrive to unlock the office where

24 these boxes that we eventually looked at were.

25     Q   How long did you wait for?

1       A    I believe it was 45 minutes to an hour.

2   It was a significant amount of time.

3       Q    All right.  So Mr. Towhey comes through

4   the snow to the Capitol, correct?

5       A    Yes.

6       Q    And then opens his office?

7       A    Yes, I believe it was his office.

8       Q    Were there any other offices open?

9       A    Not that I recall.

10      Q    So Mr. Towhey lets you into his office

11  and --

12      A    Well, we didn't enter his office.

13      Q    You didn't?

14      A    No.  I testified that we stayed in the

15  lobby area.

16      Q    I'm sorry?

17      A    I testified that we stayed in the lobby

18  reception area of 414.

19      Q    Okay.  And then what happens?

20      A    Then the boxes, the 14 boxes were brought

21  out to us.  The same as we did downstairs, we

22  examined them for campaign material and

23  subsequently left the building.

24      Q    All right.  Now, who was there when you

25  examined those boxes?

1    A    As I testified before, Mr. Bibikos, Jack

2  Krill, Jill Seamans, Mr. Towhey, Mr. Zimmerman,

3  myself, Chief Deputy Attorney General Frank Fina.

4    Q    All right.  And you told us that in those

5  boxes you mentioned promotional items?

6    A    Yes.

7    Q    Could you be more specific?

8    A    I believe there was wallets, some type of

9  briefcase, they all had Speaker name on them.

10  There were bags, you could almost say like a

11  shopping bag, that had Speaker of the House on

12  them, that type of thing.

13    Q    Did you provide or receive information at

14  that point in time that it had something to do

15  with the Speaker's Ball?

16    A    I recall something about the Speaker's

17  Ball, yes.  I believe I recorded that in my

18  notes, too, yes.

19    Q    Do you have your notes with you?

20    A    No, I do not.

21    Q    And it's your recollection that Mr. Fina

22  said something before leaving about whether

23  anything had been taken or hidden?

24    A    Taken or hidden, that's correct.

25    Q    And do you -- did you write down his

```
 1  exact words?

 2     A   Yes, I believe I did.

 3     Q   You did.  Were you writing as he was

 4  speaking?

 5     A   No, I think I wrote -- I don't recall if

 6  I wrote exactly when he was speaking.  It was my

 7  recollection that was in my notes.

 8     Q   I'm sorry?

 9     A   That was my recollection of what he said,

10  yes.

11     Q   Let me be more clear, because I think my

12  question was confusing.  Were you writing down

13  what Mr. Fina was saying when he was saying it?

14     A   I believe I was.  I was taking notes the

15  entire time I was there.

16     Q   Gotcha.  And your recollection of your

17  notes that we don't have here today is he said

18  something to the effect, was there anything taken

19  or hidden?

20     A   Correct.

21     Q   And the response across the board was

22  that, you know, nothing was taken or hidden?

23     A   Correct.

24     Q   At no point in time does he ask any

25  questions, he being Mr. Fina, about whether
```

1  anybody had found or removed any worthless

2  stationery from 2004?  He didn't ask that

3  question, did he?

4     A   I don't recall that specific question,

5  no, sir.

6     Q   He didn't ask any questions about

7  stationery from 2004, did he?

8     A   I don't recall questions about

9  stationery.

10    Q   Okay.  And at that point in time you guys

11 left?

12    A   Correct.

13        MR. McMONAGLE:  Agent, thank you.

14        THE COURT:  Mr. Winning?

15        MR. WINNING:  No questions, Your Honor.

16 Thank you.

17        THE COURT:  Mr. Lock?

18        MR. LOCK:  Hello, good-bye.  No

19 questions.

20        THE WITNESS:  Thank you.

21        MR. DONATONI:  Thank you, sir.  No

22 questions.

23        MS. McCLELLAND:  No questions.

24        MS. KELLY:  No questions.

25        MR. WOODWARD:  I have a few, if I may.

```
 1            THE WITNESS:  Um-hmm.

 2

 3               CROSS EXAMINATION

 4  BY MR. WOODWARD:

 5     Q    Agent, you testified that on the 29th

 6  you, Mr. Fina and two lawyers, Krill and this

 7  other fellow, they're lawyers, correct?

 8     A    Correct.

 9     Q    Towhey is not a lawyer?

10     A    Not to my knowledge, no, he's not.

11     Q    Zimmerman is not a lawyer, true?

12     A    No.

13     Q    You go down to B-02 pursuant to a

14  subpoena that was issued that day, true?

15     A    Yeah, I believe it was issued that day.

16     Q    Are you aware, sir, that that subpoena

17  was for the documents and/or boxes that were

18  removed from that area on February 26th?

19     A    As I testified before, I had not read

20  that subpoena, no.

21     Q    So when you went down there, you didn't

22  know that the subpoena was for material that was

23  allegedly removed on the 26th?

24     A    No.  Like I testified, I had not read

25  that subpoena.
```

1    Q    So you just followed Mr. Fina's lead; is

2  that accurate?

3    A    That's correct.

4    Q    So now you get up to Mr. Perzel's office,

5  true?

6    A    Yes, sir.

7    Q    And you testified to Mr. McMonagle who

8  cross-examined you with respect to what Mr. Fina

9  asked?

10   A    Correct.

11   Q    As I remember your testimony, you can

12 certainly correct me if I'm wrong, you said that

13 Mr. Krill, Mr. Towhey and Mr. Zimmerman all

14 answered negatively.  True?

15   A    Yes.

16   Q    Now, you certainly knew the importance of

17 what you were looking for, true?  You knew the

18 importance of campaign material?

19   A    Yes.

20   Q    And you knew that that was a very

21 important question that Mr. Fina had asked, true?

22   A    I assumed it was.  I didn't know the

23 importance at the time.

24   Q    Well, you were taking notes

25 contemporaneously, were you not?

1      A    Right.

2      Q    By the way, sir, how long have you been

3  an agent?

4      A    Approximately 18 years.

5      Q    So you've been in law enforcement 18

6  years or longer?

7      A    Right.

8      Q    You certainly know the importance of

9  statements made by people that are relevant to

10 that which you're looking for?

11     A    Yes.

12     Q    You understand that, right?

13     A    Yes.

14     Q    At any time, sir, when you heard these

15 three reply negative, did you ever write that

16 down and say, Mr. Towhey, would you just sign

17 this?

18     A    No, I did not.

19     Q    You didn't?

20     A    No.

21     Q    Did you ever ask Mr. Towhey to give you a

22 statement reflecting his answer?

23     A    No, I did not.

24     Q    By the way, you don't have any knowledge

25 as you sit here today that Mr. Towhey did a

1   blessed thing in this case, do you?

2       A    Other than what I've testified to right

3   now, that's my testimony.

4           MR. WOODWARD:   I have nothing further,

5   Your Honor.

6           MR. SIGMAN:   No questions, Your Honor.

7           THE COURT:   Mr. Fetterhoff?

8           MR. FETTERHOFF:   No, sir.

9           MR. BERGSTROM:   I do, sir.

10          THE COURT:   Yes, sir.

11

12                  CROSS EXAMINATION

13  BY MR. BERGSTROM:

14      Q    Agent Speaks, when you and the group that

15  you were with that evening arrived down at Room

16  414, you were able to get into the main room of

17  414, were you not, sir?

18      A    Yes, I believe we were.

19      Q    But you were unable to get into the room

20  that ultimately you found held the boxes,

21  correct?

22      A    Correct.

23      Q    That room was locked?

24      A    Yes.

25      Q    Was it not?  And how long was it, sir,

1  that you and this group of people waited outside

2  of that particular room where the boxes

3  ultimately were found before that door was

4  actually opened?

5      A    As I testified, it was anywhere from 45

6  minutes to an hour, sir.

7      Q    Okay.  And the reason that you were

8  waiting outside that locked room was because you

9  were waiting for Mr. Towhey to arrive?

10      A    That's correct.

11      Q    And when Mr. Towhey arrived, who then

12  unlocked that room?

13      A    Mr. Towhey, I believe.

14      Q    And prior to that, nobody had been in

15  that room that was in your presence?

16      A    No, not to my knowledge.

17      MR. BERGSTROM:  That's all I have, sir.

18      THE COURT:  Any redirect?

19      MR. SPROW:  No, Your Honor.

20      THE COURT:  You may step down.  Thank you

21  very much.

22      THE WITNESS:  Thank you.

23

24      (Witness excused.)

25

1        THE COURT:  Mr. Brown, what did you have
2   additional-wise that you had planned to have
3   another one before noon?
4        MR. BROWN:  We have another one, Your
5   Honor.  In all candor, I might be able to get the
6   direct done before lunch, but I think it would
7   spill over to the afternoon.  It's a matter now
8   whether you want to start or break for lunch
9   early.  We're good either way.
10       THE COURT:  Why don't we break for lunch
11  now.  We'll be back here then at quarter to one.
12  We'll start at quarter to one.
13       MR. BERGSTROM:  I'm sorry.  Who is the
14  next witness?  I didn't catch that.
15       MR. BROWN:  Agent Fiore.
16
17       (Court was held in recess at 11:40 a.m.)
18
19
20
21
22
23
24
25

1
2
3
4
5
6                      CERTIFICATION
7
8
9          I hereby certify that the proceedings and
10   evidence are contained fully and accurately in
11   the notes taken by me on the hearing of the above
12   cause, and that this is a correct transcript of
13   the same.
14
15
16   6/9/10
17   Date                      Brenda S. Shaffer, RMR
18                             Official Court Reporter
19
20
21
22
23
24
25

**$**

**$1890** [2] - 42:8, 42:10
**$20,000** [1] - 66:9
**$221** [1] - 104:17
**$4398** [1] - 66:7
**$50,000** [1] - 49:3
**$7920** [1] - 66:7

**'**

**'04** [4] - 19:25, 20:2, 26:13, 74:7

**1**

**1** [3] - 1:20, 101:25, 102:12
**10** [2] - 87:6, 101:25
**11** [1] - 102:1
**114** [1] - 3:16
**119** [1] - 3:17
**11:05** [1] - 113:19
**11:20** [1] - 113:24
**11:40** [1] - 133:17
**12** [1] - 102:1
**128** [1] - 3:17
**12th** [1] - 70:17
**131** [1] - 3:18
**14** [2] - 116:16, 124:20
**15** [1] - 3:6
**15-minute** [1] - 113:16
**15th** [3] - 68:21, 69:5, 69:18
**1776** [3] - 98:10, 98:11, 98:13
**18** [2] - 130:4, 130:5
**1987** [1] - 31:1
**1995** [2] - 6:11, 46:20
**1st** [1] - 111:6

**2**

**2** [2] - 102:17
**20,000** [1] - 66:12
**2000** [3] - 31:8, 55:21, 103:23
**2001** [5] - 40:13, 41:1, 90:9, 90:18, 97:6
**2002** [3] - 103:2, 103:24
**2003** [16] - 33:10, 33:19, 34:8, 42:1, 67:7, 68:21, 69:5, 80:25, 81:5, 90:9, 90:18, 90:21, 90:25, 95:3, 97:7, 98:5

**2004** [6] - 20:16, 48:12, 54:10, 98:2, 127:2, 127:7
**2005** [7] - 42:1, 70:17, 95:21, 97:8, 97:20, 98:2, 98:5
**2006** [1] - 98:2
**2007** [5] - 23:18, 31:9, 40:14, 41:1, 55:21
**2008** [19] - 6:12, 7:16, 8:22, 8:25, 12:24, 13:10, 20:4, 23:11, 23:13, 23:23, 25:1, 42:24, 42:25, 55:21, 75:17, 76:6, 111:6, 114:23
**2010** [12] - 1:4, 1:5, 1:6, 1:7, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:19, 5:1
**23** [1] - 3:6
**24** [1] - 3:7
**25** [3] - 1:19, 5:1, 87:6
**25th** [5] - 8:24, 12:24, 16:7, 29:4, 42:25
**26th** [2] - 128:18, 128:23
**27** [1] - 3:7
**27th** [1] - 25:1
**29** [1] - 3:8
**29th** [11] - 8:25, 12:24, 15:2, 29:12, 42:25, 114:23, 119:20, 120:2, 120:5, 121:4, 128:5
**2nd** [3] - 75:17, 76:5, 110:14

**3**

**30** [1] - 3:10
**33** [5] - 4:5, 47:12, 85:23, 87:24, 88:19
**34** [2] - 4:6, 48:10
**35** [3] - 115:17, 122:12, 122:14

**4**

**414** [12] - 7:22, 8:13, 12:6, 13:8, 116:9, 117:23, 117:25, 122:19, 123:13, 124:18, 131:16, 131:17
**45** [3] - 116:13, 124:1, 132:5
**47** [1] - 4:5

**48** [2] - 4:6, 42:11
**49** [1] - 3:11

**5**

**55** [1] - 3:11
**58** [1] - 3:12
**5th** [1] - 48:11

**6**

**6** [1] - 3:5
**61** [1] - 1:13
**62** [1] - 1:8
**63** [1] - 1:4
**64** [1] - 1:7
**65** [1] - 1:5
**66** [1] - 1:6
**67** [1] - 1:11
**68** [1] - 1:10
**69** [1] - 1:9
**6:00** [2] - 121:6, 121:25

**7**

**70** [1] - 1:12
**79** [1] - 3:12

**8**

**87** [1] - 3:13
**88** [1] - 3:13

**9**

**9** [3] - 5:2, 116:22, 117:5
**90** [1] - 3:14

**A**

**a.m** [4] - 5:2, 113:19, 113:24, 133:17
**ability** [5] - 56:3, 56:17, 74:4
**able** [4] - 47:10, 55:19, 131:16, 133:5
**absolutely** [5] - 50:25, 56:16, 56:24, 56:25, 58:23
**abundance** [1] - 87:23
**accepted** [1] - 44:25
**access** [5] - 10:6, 10:11, 78:21, 123:17, 123:18
**accompanied** [1] - 115:6
**accompany** [2] - 119:25, 120:13
**accompanying** [1] -

**74:8
**according** [2] - 17:20, 47:18
**account** [1] - 48:16
**accounts** [2] - 37:20, 100:2
**accurate** [4] - 47:15, 72:9, 88:21, 129:2
**accurately** [1] - 134:10
**accusation** [1] - 107:22
**acquired** [1] - 94:11
**act** [1] - 27:13
**acting** [1] - 74:1
**activities** [1] - 79:3
**activity** [2] - 22:23, 77:23
**actual** [4] - 67:1, 67:17, 67:24, 94:3
**additional** [4] - 38:12, 96:9, 133:2
**additional-wise** [1] - 133:2
**address** [3] - 48:19, 73:12, 108:17
**addressed** [2] - 70:18, 71:7
**addresses** [2] - 91:6, 91:7
**adequate** [6] - 92:18, 93:2, 93:24, 96:15, 96:16, 96:17
**administrative** [1] - 7:3
**administrator** [1] - 9:14
**ADMITTED** [1] - 4:3
**adopted** [1] - 73:22
**ads** [1] - 63:7
**advertisements** [1] - 64:3
**advises** [1] - 10:13
**Affidavit** [1] - 67:21
**affiliated** [1] - 30:24
**affiliation** [1] - 30:21
**afraid** [1] - 82:22
**afternoon** [1] - 133:7
**agendas** [1] - 71:22
**agent** [5] - 114:20, 128:5, 130:3, 131:14, 133:15
**Agent** [4] - 46:25, 114:5, 119:17, 127:13
**ago** [6] - 13:9, 51:14, 63:4, 78:25, 94:24, 121:14
**agree** [5] - 61:18, 67:5, 67:10, 80:7, 86:1

**agreed** [1] - 67:11
**ahead** [5] - 19:11, 42:22, 61:24, 64:15, 108:11
**air** [3] - 5:7, 63:6, 64:7
**AI** [15] - 34:23, 38:18, 42:21, 79:21, 79:25, 80:7, 80:14, 84:7, 85:12, 85:14, 85:20, 86:1, 86:5, 86:8, 86:11
**alert** [1] - 27:19
**allegation** [1] - 67:20
**allegedly** [1] - 128:23
**allocated** [1] - 64:17
**allocations** [1] - 102:14
**allow** [2] - 37:1, 93:12
**allowed** [1] - 108:8
**almost** [2] - 56:12, 77:2, 125:10
**alone** [1] - 67:24
**amount** [28] - 33:17, 33:21, 34:3, 34:4, 35:11, 35:14, 37:22, 38:6, 38:9, 38:10, 38:15, 39:3, 42:16, 50:17, 55:20, 56:6, 56:7, 66:7, 78:11, 91:23, 93:23, 96:6, 100:7, 102:6, 104:17, 105:10, 108:17, 124:2
**amounts** [2] - 65:11, 93:7, 105:15
**annual** [2] - 56:22, 59:1
**answer** [11] - 37:1, 63:15, 68:2, 69:13, 73:1, 93:13, 94:15, 95:7, 108:8, 109:1, 130:22
**answered** [9] - 50:11, 68:11, 92:19, 93:5, 94:13, 117:13, 117:15, 123:11, 129:14
**anyway** [1] - 17:21
**apparent** [1] - 59:15
**APPEARANCES** [2] - 1:22, 2:1
**appropriate** [1] - 112:20
**approval** [7] - 104:10, 104:14, 104:15, 105:1, 105:11, 109:1, 109:3
**approved** [1] -

105:18
**April** [7] - 68:21, 69:4, 69:18, 75:17, 76:5, 87:5, 111:6
**area** [11] - 13:12, 13:19, 115:15, 117:25, 118:3, 122:11, 123:18, 124:15, 124:18, 128:18
**areas** [1] - 115:10
**Aristotle** [3] - 40:10, 40:14, 40:19
**Arnold** [2] - 100:24, 107:6
**arrange** [1] - 12:17
**arranged** [1] - 74:7
**arrive** [2] - 123:23, 132:9
**arrived** [4] - 25:18, 116:14, 131:15, 132:11
**article** [1] - 75:5
**Artists** [1] - 41:19
**ashamed** [1] - 77:10
**assistant** [1] - 7:3
**assume** [4] - 60:13, 69:1, 70:1, 111:12
**assumed** [2] - 59:5, 129:22
**attach** [1] - 108:13
**attached** [1] - 108:25
**attachment** [1] - 100:18
**attempting** [1] - 75:21
**attend** [2] - 34:20, 34:25
**attendance** [2] - 76:10, 95:25
**attendees** [2] - 72:7, 92:7
**attending** [1] - 76:8
**attention** [8] - 23:10, 31:7, 58:14, 58:15, 58:21, 65:25, 99:18, 99:22
**attentive** [1] - 99:20
**Attorney** [6] - 1:24, 12:25, 114:19, 115:6, 121:2, 125:3
**attorney** [3] - 118:14, 118:17, 119:9
**attorneys** [3] - 5:9, 5:23, 30:8
**authority** [5] - 106:22, 107:1, 107:8, 107:13, 107:23
**authorization** [1] - 62:13

**authorized** [1] - 85:6
**authorizing** [2] - 81:3, 81:4
**automatically** [1] - 104:18
**avoid** [1] - 107:22
**aware** [14] - 12:24, 13:3, 18:1, 22:17, 40:18, 50:16, 58:2, 58:3, 75:1, 90:14, 97:6, 97:10, 120:8, 128:16
**awful** [1] - 84:5

# B

**B-02** [1] - 128:13
**B-2** [15] - 9:1, 9:11, 10:3, 16:20, 16:23, 26:3, 27:17, 75:2, 115:12, 115:15, 116:3, 121:7, 121:15, 122:2, 122:22
**bag** [1] - 125:11
**bags** [1] - 125:10
**balance** [3] - 37:24, 83:7, 83:11
**Ball** [8] - 45:22, 54:6, 54:8, 54:9, 54:10, 54:20, 125:15, 125:17
**banker's** [1] - 112:7
**barely** [1] - 67:23
**Barley** [9] - 77:13, 77:17, 79:1, 100:22, 100:23, 103:4, 106:17, 109:7, 109:12
**Barley's** [1] - 103:5
**based** [12] - 35:12, 36:23, 38:24, 38:25, 39:9, 45:1, 64:14, 94:8, 102:19, 112:17, 112:24, 113:2
**basement** [6] - 24:7, 115:11, 121:9, 121:11, 121:18, 123:5
**basic** [2] - 115:22, 115:23
**basing** [2] - 64:20, 102:17
**basis** [4] - 14:23, 56:22, 59:1, 64:8
**bearing** [1] - 26:14
**became** [4] - 58:17, 59:1, 86:23, 103:23
**become** [2] - 59:14, 60:7
**becomes** [1] - 37:7
**BEFORE** [1] - 1:18
**began** [4] - 38:4, 51:9, 52:16, 80:24

**beginning** [4] - 5:2, 34:8, 90:25, 113:24
**behalf** [4] - 59:18, 79:14, 86:1, 86:5
**behind** [1] - 111:24
**belief** [2] - 94:11
**bend** [1] - 6:22
**benefactor** [1] - 60:1
**Bergrstom** [1] - 3:8
**BERGSTROM** [9] - 2:24, 28:23, 29:2, 29:14, 112:12, 131:9, 131:13, 132:17, 133:13
**Bergstrom** [2] - 3:18, 112:11
**best** [4] - 36:12, 38:13, 52:2, 80:1
**better** [2] - 51:6, 82:16
**between** [18] - 31:8, 33:18, 34:14, 38:3, 42:24, 74:1, 80:15, 90:9, 90:18, 94:6, 94:19, 95:7, 95:12, 95:16, 99:10, 103:8, 111:24, 123:6
**beverages** [1] - 32:24
**beyond** [6] - 36:16, 63:11, 67:16, 75:19, 78:3, 101:5
**Bibikos** [3] - 115:13, 118:17, 125:1
**big** [5] - 18:7, 18:10, 45:6, 99:11, 111:14
**Bill** [1] - 55:10
**bill** [15] - 55:14, 78:9, 96:19, 99:24, 102:19, 104:13, 105:5, 105:8, 105:17, 106:9, 106:12, 108:14, 108:15, 108:20
**bills** [23] - 58:16, 62:10, 62:14, 70:7, 70:11, 78:6, 85:2, 85:3, 86:11, 99:17, 100:4, 101:16, 101:25, 102:1, 102:5, 102:7, 102:8, 104:5, 104:8, 104:25, 105:6, 106:6, 106:7
**bit** [4] - 43:6, 53:18, 65:14, 95:15
**biweekly** [1] - 34:18
**blank** [4] - 26:22, 43:22, 46:8, 46:10
**blessed** [1] - 131:1
**bloody** [1] - 107:24
**board** [1] - 126:21

**bookkeeping** [1] - 31:6
**boss** [1] - 7:9
**Bowman** [14] - 2:4, 34:23, 38:18, 42:21, 79:21, 79:25, 80:14, 82:5, 84:7, 85:12, 85:14, 86:5, 86:8, 86:11
**BOWMAN** [1] - 1:4
**Bowman's** [2] - 80:7, 86:2
**box** [4] - 110:6, 111:21, 112:4, 112:7
**boxes** [82] - 9:20, 9:22, 10:14, 11:7, 11:20, 11:21, 11:22, 11:23, 14:4, 14:7, 14:14, 17:6, 17:11, 17:20, 18:10, 18:12, 19:18, 20:17, 21:4, 21:11, 21:22, 23:1, 24:5, 24:8, 24:14, 24:18, 24:22, 25:1, 25:13, 25:18, 25:21, 25:23, 26:2, 26:6, 26:10, 28:16, 29:5, 43:19, 45:2, 45:5, 45:6, 45:7, 45:10, 45:12, 45:16, 53:22, 54:3, 54:22, 74:7, 75:10, 75:14, 75:23, 109:21, 110:1, 110:8, 110:17, 111:7, 111:14, 111:16, 111:17, 111:18, 115:9, 115:17, 115:18, 115:21, 116:3, 116:16, 117:21, 122:12, 122:14, 122:25, 123:7, 123:24, 124:20, 124:25, 125:5, 128:17, 131:20, 132:2
**break** [3] - 113:16, 133:8, 133:10
**breath** [1] - 110:5
**Brenda** [1] - 134:17
**Brett** [25] - 24:4, 34:22, 35:18, 37:6, 38:17, 38:23, 39:13, 43:11, 43:25, 44:8, 44:10, 44:13, 50:3, 58:13, 62:5, 62:12, 83:25, 96:3, 96:22, 100:19, 103:1, 103:9, 107:6, 109:17, 110:18
**BRETT** [1] - 1:5
**Brian** [15] - 7:15,

16:2, 23:8, 23:14, 34:24, 34:25, 38:19, 40:6, 49:19, 55:11, 57:1, 57:14, 58:1, 92:16, 100:20
**bRIAN** [1] - 1:8
**BRIAN** [1] - 2:9
**bridge** [1] - 94:6
**brief** [3] - 23:12, 29:24, 112:16
**briefcase** [1] - 125:9
**briefly** [2] - 50:14, 119:17
**bring** [3] - 14:3, 20:20, 21:3
**broached** [1] - 38:21
**brought** [16] - 11:18, 11:23, 12:5, 14:15, 20:18, 20:24, 21:7, 24:6, 24:22, 26:2, 35:17, 39:5, 39:6, 63:1, 118:2, 124:20
**Brown** [1] - 3:10
**BROWN** [30] - 1:23, 29:23, 30:15, 35:10, 36:22, 37:4, 39:16, 39:18, 39:23, 39:24, 40:5, 49:6, 49:13, 60:6, 63:10, 67:15, 69:7, 75:19, 78:2, 79:5, 93:4, 94:12, 101:5, 106:19, 107:17, 108:7, 112:14, 112:25, 133:4, 133:15
**brown** [9] - 45:6, 45:10, 94:23, 111:14, 111:16, 111:18, 111:24, 111:25, 133:1
**budget** [13] - 31:14, 37:17, 58:16, 58:25, 59:6, 65:1, 65:4, 66:20, 99:14, 99:15, 102:12, 102:13, 115:18
**budgeting** [1] - 71:18
**budgets** [5] - 37:14, 64:15, 64:22, 64:23, 65:6
**building** [4] - 115:1, 115:7, 116:8, 124:23
**Building** [4] - 9:2, 9:4, 24:7, 121:8
**bunch** [1] - 45:2
**Bureau** [1] - 114:20
**business** [2] - 47:20, 104:9
**buys** [1] - 64:7
**BUZZ** [1] - 1:11

BY [37] - 6:2, 7:1, 8:12, 15:24, 27:7, 29:2, 30:15, 35:10, 39:18, 39:24, 40:5, 55:9, 58:11, 60:12, 63:18, 68:4, 68:12, 69:16, 76:3, 78:5, 79:19, 87:22, 88:18, 89:13, 89:22, 90:6, 93:14, 94:16, 101:7, 106:25, 108:10, 110:20, 114:13, 118:9, 119:3, 128:4, 131:13
bye [1] - 127:18

# C

Campaign [3] - 30:22, 50:9, 50:13
campaign [65] - 9:22, 9:25, 10:14, 11:7, 11:12, 12:1, 12:10, 12:16, 12:20, 17:11, 17:21, 18:17, 18:23, 19:18, 21:12, 21:14, 22:2, 22:3, 22:5, 22:8, 24:6, 24:8, 24:21, 25:2, 26:3, 32:17, 33:1, 36:8, 43:21, 45:18, 60:22, 60:23, 61:2, 61:23, 63:20, 66:19, 66:22, 83:13, 86:8, 86:9, 86:12, 86:15, 86:18, 86:20, 86:24, 87:7, 87:10, 87:11, 91:12, 98:24, 99:3, 99:4, 99:15, 99:19, 100:13, 100:14, 115:20, 115:25, 116:4, 120:14, 122:15, 124:22, 129:18
campaign-related [3] - 17:11, 21:14, 120:14
campaigns [6] - 59:19, 64:24, 65:7, 80:18, 91:13, 102:15
Candidate [16] - 35:23, 35:25, 36:4, 36:13, 52:5, 52:7, 52:10, 80:22, 80:24, 81:5, 81:10, 81:22, 85:4, 95:11, 95:15, 95:22
candidate [3] - 32:10, 32:16, 73:17
candidates [8] - 36:6, 59:17, 59:19, 71:15, 73:7, 73:11,

74:2, 80:19
candor [1] - 133:5
cannot [1] - 95:7
capacity [3] - 6:18, 23:15, 61:20
Capitol [16] - 7:22, 8:13, 9:5, 9:7, 9:24, 12:7, 115:1, 115:7, 115:10, 115:12, 116:8, 117:6, 118:15, 121:7, 121:24, 124:4
captioned [1] - 25:11
cards [3] - 21:16, 26:14, 26:18
care [2] - 64:12, 110:9
case [4] - 66:8, 100:4, 106:3, 131:1
cash [2] - 37:24, 100:8
catch [1] - 133:14
caucus [7] - 9:13, 23:15, 23:17, 23:18, 23:20, 104:2, 107:3
Caucus [3] - 6:15, 13:5, 77:14
caution [1] - 87:23
ceiling [2] - 41:14, 41:16
cell [3] - 86:11, 102:5, 102:7
cents [1] - 42:11
certain [2] - 34:3, 95:20
certainly [12] - 50:15, 50:24, 53:14, 53:20, 58:1, 78:22, 80:10, 82:14, 111:3, 129:12, 129:16, 130:8
CERTIFICATION [1] - 134:6
certify [1] - 134:9
chairman [4] - 99:20, 107:7, 107:12, 108:2
Chairman [6] - 50:10, 50:13, 58:17, 74:3, 103:2, 103:23
chance [2] - 61:16, 70:12
change [4] - 38:6, 38:7, 39:3, 42:10
changed [1] - 121:9
charge [6] - 37:7, 37:10, 71:1, 99:21, 99:22, 103:12
chase [1] - 43:6
check [11] - 19:12, 19:16, 43:14, 43:15, 45:15, 46:25, 66:9, 97:22, 103:20, 109:4,

109:10
checked [1] - 54:22
checks [7] - 59:24, 106:14, 107:13, 107:14, 107:24, 108:3, 109:6
Cherry [1] - 104:23
Chief [12] - 7:13, 7:17, 10:19, 17:9, 27:9, 27:14, 57:2, 57:15, 58:2, 115:6, 119:25, 125:3
Citizens [1] - 98:16
clear [3] - 52:9, 88:11, 126:11
Clerk's [1] - 17:9
close [4] - 5:22, 6:8, 30:10, 111:1
closed [1] - 18:12
closer [1] - 6:7
coffee [1] - 104:13
colleague [1] - 22:16
colleagues [2] - 112:21, 120:7
column [1] - 25:10
coming [4] - 35:14, 39:2, 39:3, 103:6
Committee [4] - 30:22, 98:10, 98:11, 98:13
committee [4] - 60:23, 86:9, 86:12, 86:15
committees [2] - 60:23, 98:25
COMMON [1] - 1:1
Commonwealth [8] - 1:25, 5:11, 55:14, 48:10, 87:24, 89:18, 114:2, 114:5
cOMMONWEALTH [1] - 1:1
COMMONWEALTH [2] - 3:3, 4:3
Commonwealth's [1] - 47:12
Communications [1] - 104:24
communications [1] - 36:10
companies [2] - 47:2, 63:7
company [5] - 33:7, 40:9, 40:22, 41:17, 100:6
compiled [1] - 91:11
Complaint [1] - 67:21
completely [2] - 18:17, 113:3

complex [6] - 9:5, 9:6, 9:8, 13:11, 115:12, 121:7
complies [1] - 65:20
computer [2] - 46:15, 51:5
concerned [1] - 70:5
concerns [1] - 79:2
conditioning [1] - 5:7
conducted [2] - 72:15, 75:16
conference [2] - 35:1, 92:15
conformity [1] - 66:19
confusing [1] - 126:12
Connect [16] - 35:23, 35:25, 36:4, 36:13, 52:5, 52:7, 52:11, 80:22, 80:24, 81:5, 81:10, 81:22, 85:4, 95:11, 95:16, 95:22
connected [1] - 23:22
connection [2] - 91:18, 109:21
considered [1] - 103:5
consistent [3] - 56:2, 56:3, 111:5
Constituents [10] - 41:19, 41:23, 42:2, 42:14, 42:16, 53:9, 57:21, 85:14, 85:21, 105:7
construction [7] - 9:15, 16:21, 16:24, 17:2, 17:4, 17:20, 18:23
contact [1] - 121:17
contained [5] - 24:6, 24:17, 24:22, 67:20, 134:10
containing [2] - 25:2, 26:3
contemporaneously [1] - 129:25
contents [1] - 24:15
context [2] - 36:21, 65:24
continually [1] - 67:13
continue [1] - 76:2
CONTINUED [1] - 2:1
contract [60] - 33:10, 33:15, 33:17, 34:7, 34:10, 34:11, 34:14,

36:14, 36:15, 38:2, 40:15, 41:2, 41:5, 41:24, 42:1, 42:3, 42:6, 42:15, 53:1, 53:11, 67:7, 67:12, 67:17, 67:22, 67:23, 67:25, 68:6, 69:6, 69:21, 70:3, 80:7, 80:8, 80:12, 80:15, 80:18, 80:25, 81:5, 81:19, 83:8, 84:2, 84:4, 85:18, 90:8, 90:20, 90:21, 91:19, 93:7, 93:22, 94:25, 95:4, 95:17, 95:21, 96:1, 96:12, 96:24, 97:1, 97:7, 97:8
contracts [11] - 57:20, 58:3, 66:24, 67:1, 68:9, 80:1, 80:2, 80:10, 80:21, 85:10, 104:24
contribute [1] - 57:10
contribution [6] - 32:5, 32:8, 32:11, 32:13, 56:2, 61:22
contributions [9] - 33:2, 46:21, 54:17, 57:16, 59:16, 59:17, 60:4, 60:16, 97:15
conversation [6] - 10:17, 10:21, 19:1, 19:6, 123:5, 123:8
conversations [1] - 39:1
conveying [1] - 74:19
cooperating [1] - 122:7
coordination [1] - 7:6
copier [2] - 104:16, 108:23
copies [1] - 101:4
copy [5] - 47:15, 99:25, 100:1, 120:18
corner [1] - 119:5
correct [104] - 7:10, 9:9, 10:1, 10:20, 16:11, 16:24, 17:22, 18:3, 18:5, 18:18, 19:7, 19:8, 19:9, 20:6, 20:14, 20:22, 22:20, 22:23, 23:13, 23:15, 23:16, 23:19, 23:24, 27:17, 28:15, 29:12, 32:3, 33:12, 37:8, 44:20, 45:4, 45:17, 48:2, 48:8, 51:21,

51:23, 52:3, 52:13,
53:6, 53:15, 54:5,
55:1, 56:4, 56:11,
57:24, 58:4, 71:21,
80:11, 80:22, 81:1,
81:20, 81:23, 82:9,
83:9, 83:14, 84:24,
85:4, 85:5, 85:7,
85:10, 85:15, 86:3,
86:5, 86:10, 86:12,
86:15, 86:20, 87:8,
87:14, 88:2, 88:4,
88:23, 90:22, 92:8,
97:17, 101:17,
101:23, 102:2, 102:3,
102:4, 102:16, 108:1,
109:18, 116:2, 116:5,
119:21, 122:1,
122:10, 122:17,
122:20, 124:4,
125:24, 126:20,
126:23, 127:12,
128:7, 128:8, 129:3,
129:10, 129:12,
131:21, 131:22,
132:10, 134:12
  cost [2] - 32:20,
32:25
  costs [1] - 56:9
  counsel [1] - 112:18
  count [2] - 24:12,
111:19
  counterpart [3] -
17:8, 17:10, 17:14
  counterparts [1] -
9:19
  COUNTY [2] - 1:2,
1:20
  couple [7] - 16:3,
44:3, 45:6, 49:20,
59:11, 88:15, 103:25
  course [3] - 47:20,
104:9, 108:22
  Court [3] - 113:19,
133:17, 134:18
  COURT [56] - 1:1,
5:4, 5:20, 6:7, 15:8,
15:17, 15:21, 28:21,
29:15, 29:18, 30:7,
30:12, 35:7, 37:1,
49:9, 55:6, 58:7,
60:10, 63:15, 68:1,
68:11, 69:13, 76:2,
77:3, 77:7, 78:4, 79:6,
79:16, 87:17, 89:11,
89:21, 90:2, 93:12,
94:15, 106:23, 108:9,
110:5, 110:23, 112:3,
112:11, 112:13,
112:15, 113:8,

113:16, 114:1, 114:4,
119:2, 119:11,
127:14, 127:17,
131:7, 131:10,
132:18, 132:20,
133:1, 133:10
  Court's [1] - 49:7
  COURTHOUSE [1] -
1:20
  courtroom [8] - 5:7,
8:5, 15:5, 39:13,
39:19, 40:1, 118:22,
119:7
  COURTROOM [1] -
1:20
  cover [12] - 67:22,
82:16, 82:18, 82:19,
82:21, 82:22, 84:2,
93:6, 94:25, 95:4,
97:1
  cover-up [1] - 82:22
  covered [1] - 67:24
  COZEN [1] - 2:13
  credit [1] - 102:8
  Criminal [2] - 67:21,
114:21
  CROSS [14] - 3:3,
15:23, 23:6, 24:1,
27:6, 29:1, 49:15,
55:8, 58:10, 79:18,
88:17, 90:5, 119:15,
131:12
  cross [8] - 49:13,
87:21, 112:17,
112:23, 113:2, 113:8,
128:3, 129:8
  cross-examine [1] -
113:2
  cross-examined [1]
- 129:8
  current [1] - 31:2
  cut [1] - 43:5
  cycle [3] - 99:4, 99:5,
100:14

---

## D

  data [17] - 33:14,
33:16, 41:7, 41:11,
46:19, 52:19, 52:22,
52:25, 53:5, 68:9,
81:15, 90:13, 91:2,
91:4, 91:5, 109:4
  database [2] - 67:14,
71:2
  databases [1] - 36:7
  Date [1] - 134:17
  DATE [1] - 1:19
  date [7] - 16:6, 29:7,
38:8, 108:16, 111:8,

114:25, 115:2
  dated [3] - 48:11,
70:17
  dates [1] - 63:8
  DAUPHIN [2] - 1:2,
1:20
  Dave [1] - 107:5
  deal [4] - 42:19,
82:25, 84:25, 85:1
  dealing [1] - 73:25
  dealt [1] - 119:22
  death [1] - 111:10
  decided [4] - 34:2,
35:20, 39:7, 52:11
  decision [2] - 62:24,
108:15
  decisions [1] - 64:20
  decrease [1] - 42:17
  deep [1] - 110:5
  deeply [1] - 77:10
  Defendant [12] - 2:4,
2:6, 2:8, 2:11, 2:14,
2:17, 2:19, 2:21, 2:23,
2:25, 39:17, 113:1
  defense [1] - 112:18
  delay [1] - 29:24
  delivered [1] - 75:23
  deliveries [1] - 44:25
  delivery [8] - 25:18,
43:7, 43:12, 43:17,
44:5, 44:6, 44:13,
44:16
  Democratic [6] -
9:19, 13:5, 17:8,
17:10, 17:13, 22:22
  Democrats [1] -
17:18
  demonstrate [1] -
84:9
  demonstrates [1] -
63:14
  Department [3] -
31:23, 33:4, 46:23
  Deputy [3] - 115:6,
119:25, 125:3
  derogatory [1] - 70:2
  describe [5] - 13:7,
18:7, 19:23, 116:20,
117:24
  described [3] -
23:22, 24:15, 75:14
  description [2] -
51:6, 100:7
  designed [1] - 71:13
  desk [5] - 14:13,
14:24, 14:25, 43:16,
44:24
  detail [1] - 34:6
  detailed [1] - 102:19
  details [1] - 99:23

  determine [1] - 32:1
  determined [4] -
33:22, 33:25, 35:15,
115:20
  develop [1] - 103:18
  developed [1] - 95:1
  developing [1] - 85:4
  development [3] -
36:13, 80:25, 115:19
  dictated [1] - 69:19
  died [1] - 110:14
  different [8] - 31:10,
64:16, 75:25, 93:10,
100:13, 102:15,
115:10, 119:23
  differentiate [2] -
94:19, 95:7
  difficult [4] - 6:25,
103:7, 111:2, 111:4
  DIRECT [4] - 3:3,
6:1, 30:14, 114:12
  direct [12] - 32:10,
59:16, 59:17, 63:12,
67:16, 75:20, 78:3,
97:14, 101:6, 113:3,
123:9, 133:6
  Direct [10] - 41:19,
41:23, 42:2, 42:15,
42:16, 53:9, 57:21,
85:14, 85:21, 105:7
  directed [2] - 23:10,
78:9
  directing [1] - 65:25
  directly [5] - 25:6,
52:25, 97:16, 121:10,
122:21
  Director [8] - 49:23,
50:5, 50:10, 59:2,
59:4, 61:21
  director [1] - 30:23
  disclosed [1] - 75:5
  discrete [2] - 41:10,
112:22
  discuss [3] - 60:9,
64:11, 106:4
  discussed [9] - 38:8,
38:16, 51:19, 71:9,
72:15, 80:11, 96:1,
96:5, 104:6
  discussing [3] -
39:12, 62:7, 93:22
  discussion [15] -
67:17, 82:4, 82:8,
83:4, 83:16, 91:17,
92:3, 92:22, 92:25,
93:21, 96:8, 96:13,
106:9, 106:11, 109:25
  discussions [9] -
34:11, 35:12, 37:16,
39:9, 72:17, 84:8,

84:18, 107:21
  dismiss [1] - 113:10
  distributed [1] - 72:7
  districts [1] - 52:22
  document [4] - 60:9,
61:14, 61:19, 65:23
  Document [1] -
68:19
  documents [2] -
120:14, 128:17
  dollar [1] - 91:19
  dollars [17] - 33:20,
33:24, 34:12, 35:11,
36:14, 38:4, 41:12,
41:13, 55:24, 56:4,
56:8, 56:21, 57:22,
57:23, 83:2, 92:18,
93:1
  Don [4] - 47:24,
88:20, 89:1, 89:17
  dONALD [1] - 1:6
  DONATONI [5] -
2:20, 26:25, 55:14,
79:14, 127:21
  done [12] - 9:15,
17:5, 31:17, 53:2,
77:2, 81:18, 82:20,
91:9, 103:14, 104:21,
133:6
  Donna [1] - 79:20
  DONNA [1] - 2:3
  donors [2] - 49:3,
55:20
  door [5] - 13:18,
13:20, 115:14,
116:15, 132:3
  doorway [1] - 13:13
  doorways [1] - 14:5
  down [21] - 10:25,
17:19, 19:11, 19:16,
20:8, 20:16, 29:18,
45:15, 102:9, 103:2,
103:10, 112:15,
122:2, 122:4, 125:25,
126:12, 128:13,
128:21, 130:16,
131:15, 132:20
  downstairs [1] -
124:21
  dozen [1] - 102:21
  driving [1] - 75:8
  Dull [4] - 34:23,
38:18, 105:22
  dull [1] - 106:2
  duly [3] - 5:17, 30:4,
114:9
  during [20] - 7:9,
8:24, 8:25, 9:11,
12:23, 29:4, 31:11,
34:20, 37:5, 40:13,

41:4, 55:20, 63:20,
75:9, 82:5, 91:13,
99:3, 100:13, 110:4,
110:8
**duties** [5] - 31:10,
31:13, 31:16, 50:15,
86:23
**dwindled** [1] - 99:18

## E

**e-mail** [15] - 4:6,
42:5, 48:11, 48:13,
48:15, 48:16, 48:19,
48:25, 61:5, 61:19,
62:6, 100:1, 100:17,
100:19, 101:24
**e-mails** [1] - 101:4
**early** [3] - 23:18,
33:9, 133:9
**earned** [1] - 50:6
**easier** [1] - 65:14
**eastern** [2] - 116:11,
123:21
**economic** [1] -
115:19
**effect** [2] - 97:1,
126:18
**effort** [1] - 56:1
**eight** [2] - 101:2,
102:21
**either** [8] - 34:16,
38:23, 45:14, 66:7,
73:17, 83:23, 97:6,
133:9
**elect** [1] - 71:14
**elicited** [1] - 93:6
**eLMER** [1] - 1:4
**employ** [1] - 23:18
**employed** [4] - 6:12,
23:14, 43:2, 114:18
**employee** [4] -
76:18, 76:21, 78:18,
86:24
**encroach** [1] - 86:22
**end** [5] - 31:8, 31:9,
40:14, 41:1, 71:25
**ended** [1] - 109:19
**ending** [2] - 56:5,
56:6
**enforcement** [1] -
130:5
**engage** [1] - 77:22
**engaged** [1] - 79:4
**enhance** [1] - 67:13
**enhanced** [1] - 74:4
**enhancement** [1] -
81:17
**enormous** [2] -
50:16, 55:20

**enter** [4] - 46:20,
109:4, 118:1, 124:12
**entered** [3] - 34:7,
34:10, 53:11
**enters** [1] - 33:10
**entire** [4] - 28:13,
56:13, 65:1, 126:15
**entirely** [1] - 112:20
**envelope** [4] - 45:7,
45:12, 111:14, 111:18
**envelopes** [11] -
21:13, 26:14, 26:17,
43:23, 45:24, 46:1,
46:10, 54:4, 54:23,
74:8
**Eric** [2] - 47:24,
87:25
**eRIC** [1] - 1:9
**ESQUIRE** [14] - 1:23,
1:23, 2:3, 2:5, 2:7,
2:9, 2:10, 2:12, 2:13,
2:15, 2:18, 2:20, 2:22,
2:24
**essence** [2] - 46:11,
47:18
**essentially** [4] -
44:6, 44:12, 61:19,
81:15
**establishing** [1] -
65:6
**estimate** [1] - 50:19
**EVAN** [1] - 2:15
**evening** [2] - 116:23,
131:15
**eventually** [1] -
123:24
**evidence** [1] -
134:10
**exact** [2] - 111:19,
126:1
**exactly** [19] - 11:1,
11:10, 11:11, 12:13,
22:1, 29:3, 35:17,
37:12, 37:21, 38:7,
45:7, 46:6, 50:7, 57:3,
59:21, 121:4, 121:14,
123:20, 126:6
**EXAMINATION** [18] -
6:1, 15:23, 23:6, 24:1,
27:6, 29:1, 30:14,
49:15, 55:8, 58:10,
79:18, 87:21, 88:17,
90:5, 114:12, 119:15,
128:3, 131:12
**examination** [3] -
112:17, 112:24, 113:9
**examine** [1] - 113:2
**examined** [5] -
115:17, 116:18,
124:22, 124:25, 129:8

**example** [9] - 32:12,
48:5, 48:6, 59:16,
61:6, 63:6, 64:7,
70:10, 78:7
**excess** [1] - 65:11
**exchange** [1] - 61:19
**excuse** [3] - 65:10,
65:21, 70:18
**excused** [4] - 29:21,
113:5, 113:14, 132:24
**Executive** [3] -
50:10, 59:1, 59:4
**exercise** [1] - 112:23
**Exhibit** [6] - 4:5, 4:6,
47:12, 48:10, 85:23,
87:24
**exhibit** [1] - 85:24
**EXHIBITS** [1] - 4:1
**existence** [1] - 80:12
**exited** [1] - 117:6
**expect** [1] - 105:11
**expenditures** [15] -
31:17, 31:19, 46:22,
47:1, 47:25, 58:3,
59:7, 59:19, 61:2,
86:1, 86:4, 86:14,
102:18, 102:19,
106:22
**expense** [2] - 32:17,
36:8
**expenses** [4] - 56:9,
59:18, 86:6, 86:15
**experience** [2] -
36:23, 89:14
**explain** [4] - 7:7,
102:24, 108:6, 108:9
**explained** [1] - 111:3
**extended** [1] - 56:12
**extent** [5] - 25:25,
72:14, 84:8, 84:18,
84:23
**extraordinarily** [1] -
60:14
**extremely** [1] - 57:9

## F

**F-L-I-C-K-I-N-G-E-R**
[1] - 30:19
**facilitating** [1] -
122:9
**fact** [12] - 34:13,
38:24, 50:8, 52:15,
56:20, 57:3, 80:14,
80:17, 86:17, 89:19,
101:12, 102:20
**fair** [6] - 51:2, 51:16,
55:18, 56:6, 56:7,
94:14
**fairly** [3] - 51:8,

54:24, 61:21
**familiar** [13] - 32:4,
33:6, 35:22, 40:10,
40:21, 41:17, 46:16,
57:15, 98:1, 98:9,
102:13, 102:18,
115:22
**familiarity** [1] - 70:3
**far** [2] - 35:3, 70:5
**fashion** [1] - 62:10
**faulted** [1] - 97:24
**fax** [1] - 99:25
**February** [16] - 8:22,
8:24, 12:24, 13:10,
16:6, 23:10, 23:12,
23:23, 25:1, 29:4,
42:23, 42:25, 110:10,
114:23, 119:20,
128:18
**FEESE** [1] - 1:5
**Feese** [46] - 2:6,
24:4, 34:22, 37:6,
37:10, 37:16, 38:17,
39:13, 40:18, 43:11,
44:4, 45:14, 46:3,
46:6, 50:4, 53:24,
54:23, 58:13, 58:15,
62:6, 62:13, 68:14,
68:22, 69:5, 69:8,
69:9, 69:20, 73:12,
73:25, 74:25, 75:4,
76:9, 78:9, 85:7,
91:23, 99:13, 100:1,
101:24, 102:11,
106:3, 106:21,
107:12, 109:17,
109:23, 110:2, 111:5
**Feese's** [1] - 44:9
**fell** [1] - 89:3
**fellow** [2] - 17:19,
128:7
**felt** [3] - 82:15,
83:18, 94:20
**female** [1] - 8:19
**Fetterhoff** [5] - 3:14,
35:7, 39:23, 90:3,
131:7
**FETTERHOFF** [23] -
2:18, 6:21, 8:7, 28:22,
35:9, 36:16, 39:21,
90:6, 93:9, 93:14,
94:16, 101:7, 106:20,
106:25, 107:19,
107:25, 108:10,
110:20, 110:25,
112:6, 112:10,
119:10, 131:8
**few** [5] - 23:9, 55:4,
55:12, 94:24, 127:25
**fifty** [2] - 99:8, 99:10

**figure** [2] - 44:22,
61:22
**file** [1] - 67:3
**filed** [1] - 26:8
**Fina** [16] - 115:7,
115:17, 117:2, 117:8,
120:1, 120:13,
120:15, 120:18,
120:24, 125:3,
125:21, 126:13,
126:25, 128:6, 129:8,
129:21
**Fina's** [1] - 129:1
**finally** [1] - 50:4
**finance** [2] - 30:23,
33:1
**Finance** [3] - 49:23,
50:5, 61:21
**findings** [1] - 47:5
**fine** [4] - 71:1, 72:25,
73:1, 88:10
**finish** [4] - 95:14,
107:18, 107:19, 108:8
**finished** [1] - 113:9
**Fiore** [2] - 46:25,
133:15
**first** [27] - 5:12, 6:5,
7:14, 11:21, 33:18,
34:13, 47:25, 54:10,
55:18, 67:6, 67:12,
90:7, 90:21, 90:24,
91:23, 93:11, 93:22,
95:3, 95:12, 95:16,
97:7, 99:19, 102:6,
102:22, 103:21,
103:22, 114:15
**five** [3] - 45:8, 45:9,
61:22
**flexible** [1] - 6:22
**FLICKINGER** [1] -
30:3
**Flickinger** [16] -
3:10, 29:23, 30:19,
30:20, 33:6, 40:8,
40:21, 42:22, 46:14,
47:10, 48:9, 49:17,
55:10, 58:12, 71:6,
90:7
**Flickinger's** [1] -
75:24
**floor** [3] - 7:6, 7:8,
41:14
**focus** [2] - 16:4,
110:12
**follow** [1] - 88:9
**followed** [1] - 129:1
**following** [3] - 5:1,
48:1, 113:23
**follows** [3] - 5:18,
30:5, 114:10

food [1] - 32:23
FOR [2] - 3:3, 4:3
forget [2] - 90:24, 93:17
form [1] - 72:6
formulate [1] - 68:1
FORTUNATO [1] - 2:10
Forum [1] - 41:19
foundation [4] - 36:18, 54:12, 54:21
four [3] - 45:8, 45:9, 90:19
frame [7] - 6:11, 7:9, 7:16, 8:25, 12:23, 31:8, 41:22
Frank [6] - 115:7, 115:17, 117:2, 119:25, 120:13, 125:3
Friday [4] - 15:1, 29:13, 116:22, 120:3
friendly [1] - 78:17
Friends [12] - 56:22, 57:16, 60:24, 61:3, 61:8, 61:25, 62:2, 88:3, 97:8, 97:14, 97:15, 97:20
friends [2] - 78:19, 78:20
front [5] - 43:16, 44:24, 47:11, 52:19, 111:22
full [1] - 86:23
full-time [1] - 86:23
fully [1] - 134:10
Fund [1] - 54:14
fund [2] - 46:9, 56:9
fundraiser [2] - 32:14, 49:4
fundraisers [2] - 31:5, 68:10
fundraising [2] - 71:19, 71:25
Funds [2] - 98:2, 98:6
FYI [1] - 101:20

## G

GARY [2] - 114:8, 114:17
Gary [2] - 3:16, 114:17
GC [1] - 57:22
GCR [58] - 33:7, 33:10, 33:18, 34:6, 34:14, 35:14, 35:22, 36:14, 38:3, 38:11, 38:15, 38:22, 39:2, 39:10, 51:21, 52:2,

52:8, 52:11, 57:21, 66:24, 67:11, 68:15, 69:6, 69:22, 70:8, 70:21, 71:6, 72:14, 72:18, 79:25, 80:3, 80:15, 80:18, 81:4, 81:9, 81:25, 82:8, 82:13, 83:1, 83:7, 83:12, 83:13, 84:25, 90:8, 90:10, 90:20, 91:1, 93:2, 93:22, 96:6, 97:9, 97:20, 98:6, 98:14, 98:18, 98:21, 99:1
gears [1] - 53:17
geez [1] - 76:23
Geez [1] - 76:25
general [10] - 73:10, 92:4, 92:5, 93:19, 96:2, 98:2, 98:3, 107:7, 107:20, 108:2
General [5] - 1:24, 12:25, 114:20, 115:7, 125:3
General's [1] - 121:3
generally [1] - 32:7
generic [2] - 81:11, 81:13
generically [1] - 32:7
generosity [3] - 59:11, 59:14, 59:24
gentleman [2] - 116:15, 116:24
gentlemen [6] - 77:24, 78:15, 117:4, 117:10, 118:2, 118:19
George [5] - 43:15, 44:19, 44:21, 44:23, 115:13
given [2] - 36:5, 56:22
glasses [1] - 40:2, 89:7
glaze [1] - 68:8
God [1] - 95:4
GOLDBERG [1] - 2:5
Goldberg [1] - 2:16
good-bye [1] - 127:18
GOP [1] - 48:16
gotcha [4] - 53:4, 54:18, 54:22, 126:16
Government [1] - 98:17
grant [1] - 115:18
grateful [2] - 6:23, 57:9
greatest [1] - 59:5
groundwork [1] - 36:21

group [6] - 39:7, 116:7, 117:10, 122:22, 131:14, 132:1
Group [1] - 64:7
guess [9] - 5:6, 27:15, 34:11, 44:14, 45:14, 46:15, 72:20, 99:9, 117:24
guy [1] - 16:9
guys [2] - 77:4, 127:10

## H

half [1] - 102:20
hand [3] - 16:4, 100:9, 101:13
handcart [2] - 24:12, 26:8
hands [1] - 37:11
hands-on [1] - 37:11
handwritten [3] - 65:24, 66:1, 72:5
Hanley [18] - 34:22, 35:18, 38:18, 38:23, 58:25, 59:4, 62:19, 64:5, 65:5, 65:9, 66:9, 66:13, 70:18, 71:22, 85:7, 91:22, 96:3, 99:15
hard [2] - 36:19, 103:21
Harrisburg [2] - 23:21, 92:15
HARRISBURG [1] - 1:21
head [3] - 40:17, 107:3, 112:19
headquarters [1] - 67:4
hear [5] - 5:23, 6:25, 34:13, 55:15, 65:13
heard [5] - 22:19, 35:12, 39:1, 89:16, 130:14
hearing [2] - 79:22, 134:11
HEARING [1] - 1:16
heat [1] - 100:14
held [7] - 27:10, 34:16, 77:13, 113:19, 114:22, 131:20, 133:17
hello [1] - 127:18
help [9] - 95:15, 101:14, 101:15, 110:11
helped [4] - 44:23, 82:16, 82:18, 82:19
hereby [1] - 134:9

Hi [3] - 15:25, 49:18, 79:20
hi [2] - 16:1, 49:17
hidden [6] - 117:3, 117:9, 125:23, 125:24, 126:19, 126:22
hide [1] - 28:7
Hill [8] - 33:15, 43:13, 43:17, 44:6, 44:16, 76:21, 84:4, 84:10
history [1] - 91:8
hmm [5] - 18:13, 49:9, 72:13, 110:24, 128:1
hold [2] - 45:14, 52:6, 118:5
home [2] - 32:15, 75:9, 75:12
honest [2] - 95:7, 103:13
honestly [2] - 72:24, 95:6
Honor [26] - 5:13, 15:19, 27:1, 27:4, 28:20, 28:23, 29:17, 36:22, 55:5, 60:8, 63:10, 75:21, 79:8, 79:14, 88:14, 90:1, 93:4, 112:14, 112:16, 112:25, 114:3, 127:15, 131:5, 131:6, 132:19, 133:5
HONORABLE [1] - 1:18
Hospice [1] - 110:10
host [1] - 32:14
hour [2] - 124:1, 132:6
hours [1] - 75:9
house [1] - 41:8
House [13] - 6:14, 21:17, 26:15, 30:22, 48:16, 52:21, 71:16, 73:16, 73:17, 73:18, 74:1, 89:18, 125:11
HRCC [108] - 12:16, 12:22, 14:8, 22:7, 22:12, 25:3, 25:19, 26:6, 26:13, 26:18, 27:24, 29:8, 30:22, 30:25, 31:4, 31:14, 31:17, 31:19, 33:3, 33:10, 33:18, 33:25, 34:7, 34:14, 34:16, 35:15, 36:1, 36:4, 37:7, 37:10, 38:3, 40:15, 40:17, 40:19, 41:2, 41:6, 41:25,

42:15, 43:2, 44:13, 46:21, 49:2, 49:23, 50:15, 50:17, 50:24, 51:9, 51:20, 52:1, 52:7, 52:16, 53:14, 56:8, 56:10, 56:22, 57:8, 57:17, 57:20, 57:23, 58:16, 58:25, 59:5, 59:11, 59:17, 59:18, 60:4, 60:17, 61:2, 61:9, 62:11, 65:1, 65:4, 66:24, 67:12, 69:6, 69:21, 70:22, 71:7, 71:13, 72:15, 73:6, 74:2, 74:4, 74:9, 75:9, 75:13, 75:23, 79:4, 80:15, 85:17, 85:20, 87:24, 88:1, 88:21, 88:25, 90:8, 90:10, 90:17, 91:1, 96:16, 95:22, 97:15, 97:16, 99:5, 102:13, 103:1, 105:14, 106:22
hundred [3] - 87:7, 99:10, 106:7

## I

iConstituents [1] - 41:20
idea [6] - 74:14, 84:4, 88:6, 99:2, 99:8, 106:1
identification [2] - 47:13, 48:11
IDENTIFIED [1] - 4:3
identified [4] - 39:17, 39:25, 73:7, 73:12
identify [2] - 75:22, 118:24
II [1] - 1:23
immediate [3] - 63:9, 63:23, 64:8
implemented [1] - 33:19
implication [1] - 67:19
importance [4] - 129:16, 129:18, 129:23, 130:8
important [2] - 9:23, 129:21
impression [2] - 94:25, 95:1
IN [1] - 1:1
in-kind [4] - 32:5, 32:8, 32:13, 33:2
inappropriate [1] - 113:4

include [5] - 31:3, 31:4, 31:13, 31:16, 117:18
included [3] - 65:22, 81:22, 109:17
includes [3] - 45:9, 48:5, 48:6
including [2] - 41:18, 47:23
income [1] - 31:17
increase [2] - 42:17, 96:12
increments [2] - 87:2, 87:3
indeed [4] - 58:24, 59:14, 61:5, 71:10
INDEX [2] - 3:1, 4:1
indicated [8] - 10:18, 25:12, 36:22, 84:16, 117:1, 117:4, 117:7, 117:14
indicating [2] - 15:13, 112:4
individual [3] - 64:24, 65:6, 118:16
individuals [5] - 47:2, 48:1, 73:13, 117:18, 122:4
indulgence [1] - 49:7
inferred [1] - 66:18
information [8] - 72:1, 81:16, 91:10, 115:18, 115:19, 123:2, 125:13
initial [2] - 13:19, 91:18
input [1] - 71:24
inquiring [1] - 74:25
inside [1] - 118:3
instance [1] - 64:23
instead [1] - 32:10
instructions [6] - 24:20, 61:6, 62:13, 62:17, 62:19, 62:23
insufficient [1] - 36:21
integrated [1] - 67:14
interest [1] - 112:22
International [2] - 40:10, 40:14
investigation [5] - 12:25, 22:18, 22:22, 82:12, 82:15
Investigation [1] - 114:21
invite [1] - 49:4
invoice [7] - 65:11, 70:16, 70:24, 81:10, 81:14, 81:19, 108:24

invoices [6] - 63:5, 66:7, 70:8, 70:13, 70:21, 81:8
involved [10] - 37:13, 65:5, 73:13, 90:15, 93:22, 99:14, 100:20, 102:11, 107:20, 107:23
irregularities [1] - 77:25
irrelevant [6] - 63:11, 63:13, 75:19, 78:2, 101:5, 106:19
Irvis [3] - 9:1, 9:4, 24:7
issue [3] - 16:4, 119:24, 120:11
issued [6] - 115:8, 119:20, 119:23, 120:4, 128:14, 128:15
issues [2] - 73:13, 78:22
items [9] - 9:17, 11:18, 16:20, 16:23, 17:12, 21:13, 37:17, 116:20, 125:5
itself [1] - 59:15

J

Jack [4] - 115:13, 117:11, 118:10, 125:1
jackets [1] - 5:9
January [1] - 23:18
Jason [6] - 9:13, 10:13, 10:23, 16:10, 16:12, 16:16
JILL [1] - 1:10
Jill [8] - 34:23, 38:17, 39:19, 103:16, 115:14, 119:6, 121:13, 125:2
job [9] - 14:17, 14:22, 31:3, 31:9, 31:10, 31:13, 31:16, 35:3
John [58] - 6:17, 8:1, 8:14, 8:16, 10:18, 13:14, 13:17, 13:23, 14:1, 14:10, 14:13, 14:17, 15:10, 16:2, 27:12, 34:22, 34:23, 34:24, 35:18, 38:17, 38:19, 38:23, 39:25, 43:21, 45:18, 45:21, 47:24, 49:3, 49:19, 50:13, 54:14, 55:19, 56:23, 57:17, 58:2, 60:24, 61:3, 61:8, 62:3, 62:19, 83:25,

88:3, 96:3, 97:9, 97:14, 97:15, 100:19, 103:4, 107:4, 107:5, 109:12, 109:15, 116:9, 118:20, 119:4
JOHN [1] - 1:7
john [2] - 1:13, 15:15
John's [2] - 14:9, 46:9
joking [1] - 42:12
JOSHUA [1] - 2:5
Joshua [2] - 24:3, 58:12
JR [1] - 2:10
Judge [5] - 15:12, 30:17, 32:12, 87:18, 118:24
Julie [3] - 17:15, 17:16, 17:18
jumbo [1] - 70:5
jump [1] - 42:22
justify [1] - 83:20

K

Karp [3] - 59:25, 60:4, 60:13
KATZMAN [1] - 2:5
keep [4] - 5:22, 28:1, 35:4, 67:3
keeps [1] - 25:10
Kelly [2] - 3:13, 87:17
KELLY [6] - 2:15, 27:3, 87:18, 87:22, 88:10, 127:24
KENNETH [1] - 1:23
kept [3] - 6:24, 10:8, 26:18
key [2] - 10:12, 18:5
kind [15] - 11:20, 22:18, 22:23, 32:5, 32:8, 32:13, 33:2, 37:25, 42:4, 56:17, 68:8, 83:7, 83:11, 84:22, 101:13
knowledge [9] - 36:12, 36:17, 36:23, 38:24, 80:1, 89:16, 128:10, 130:24, 132:16
known [3] - 57:2, 84:13, 84:14
knows [2] - 36:24
Krill [7] - 115:13, 117:1, 117:11, 118:10, 125:2, 128:6, 129:13

L

L-O-C-H-E-T-T-O [1] - 6:9
Labels [7] - 40:22, 41:2, 41:6, 41:11, 52:17, 52:18, 57:21
lack [3] - 51:5, 70:2, 70:4
laid [1] - 13:10
Landslide [3] - 46:16, 46:18, 47:1
language [1] - 68:5
large [6] - 13:12, 65:10, 105:15, 106:5, 106:6, 111:17
larger [2] - 104:7, 104:23
last [6] - 6:5, 23:4, 30:18, 42:23, 110:10, 114:15
late [1] - 97:20
law [2] - 31:20, 130:5
LAW [1] - 2:22
lawyer [2] - 128:9, 128:11
lawyers [2] - 128:6, 128:7
layout [1] - 13:7
lead [1] - 129:1
leadership [3] - 77:14, 77:16, 78:16
Leadership [1] - 98:21
leading [1] - 34:11
learn [1] - 74:6
learned [2] - 69:5, 69:11, 69:20, 69:21, 92:23
learning [1] - 10:15
least [3] - 31:9, 64:10, 68:15
leave [3] - 44:1, 46:12, 54:24
leaving [1] - 125:22
led [1] - 94:10
left [5] - 13:15, 23:17, 124:23, 127:11
legal [1] - 102:8
legislation [1] - 105:12
legislative [3] - 7:7, 86:19, 86:23
Legislature [10] - 13:1, 77:20, 83:8, 87:13, 89:9, 89:15, 104:11, 105:2, 105:18
less [3] - 84:2, 101:20, 103:19
letter [6] - 47:4, 47:7,

68:17, 68:21, 69:12, 69:17
letters [1] - 68:13
liaison [1] - 74:1
lie [2] - 28:10, 69:12
lieu [1] - 32:10
likewise [1] - 105:14
line [3] - 42:23, 47:25, 101:14
lines [1] - 102:8
list [7] - 32:17, 47:23, 49:2, 57:19, 86:2, 101:2, 101:19
listed [2] - 85:24, 98:25
listened [1] - 84:23
listing [3] - 37:21, 100:3, 100:8
lists [2] - 36:10, 91:11
Lists [7] - 40:23, 41:2, 41:6, 41:11, 52:17, 52:18, 57:21
literally [1] - 105:14
lived [1] - 123:21
lobby [3] - 123:18, 124:15, 124:17
located [2] - 7:20, 7:21
location [1] - 18:5
LOCHETTO [1] - 5:16
Lochetto [10] - 3:5, 5:14, 6:3, 6:6, 6:21, 15:25, 23:8, 24:3, 27:8, 29:3
LOCK [24] - 2:5, 24:2, 26:23, 58:11, 60:7, 60:12, 63:13, 63:18, 67:18, 68:4, 68:12, 69:11, 69:16, 75:21, 76:3, 77:4, 77:6, 77:9, 78:5, 79:7, 79:12, 112:16, 113:6, 127:18
Lock [10] - 3:7, 3:12, 24:3, 58:8, 58:12, 68:1, 89:9, 104:6, 113:8, 127:17
locked [3] - 10:10, 131:23, 132:8
log [1] - 25:9
look [12] - 61:11, 61:16, 65:18, 67:25, 70:12, 70:25, 82:12, 97:2, 105:23, 115:9, 122:14, 123:1
looked [5] - 43:20, 54:2, 105:3, 117:21, 123:24

**looking** [7] - 17:10, 88:19, 106:7, 116:1, 120:14, 129:17, 130:10
**looks** [1] - 69:1
**Lori** [3] - 3:5, 5:14, 6:6
**LORI** [2] - 5:16, 6:9
**lost** [1] - 27:12
**loudly** [1] - 30:9
**loyal** [1] - 103:12
**lunch** [3] - 133:6, 133:8, 133:10
**lying** [1] - 69:9

## M

**ma'am** [24] - 5:20, 24:5, 24:10, 24:20, 26:23, 26:25, 27:16, 30:7, 30:16, 49:6, 63:15, 66:25, 67:2, 68:5, 79:12, 87:23, 88:12, 93:15, 97:24, 98:23, 110:21, 112:3, 112:10, 113:11
**mail** [16] - 4:6, 42:5, 48:11, 48:13, 48:15, 48:16, 48:19, 48:25, 61:5, 61:19, 62:6, 99:25, 100:1, 100:17, 100:19, 101:24
**mailing** [1] - 52:24
**mailings** [3] - 91:2, 91:12
**mails** [1] - 101:4
**Main** [5] - 7:22, 8:13, 9:7, 12:7, 116:8
**main** [1] - 131:16
**maintain** [1] - 67:12
**maintenance** [1] - 81:15
**maintenance/ enhancements** [1] - 71:2
**man** [1] - 60:14
**management** [2] - 37:9, 46:19
**managing** [1] - 59:6
**manifest** [1] - 59:15
**manner** [1] - 72:16
**March** [1] - 110:14
**marked** [2] - 47:12, 48:10
**material** [23] - 9:22, 9:25, 10:15, 12:10, 12:16, 17:22, 18:18, 18:23, 24:9, 24:17, 27:16, 27:23, 28:4, 28:7, 28:11, 74:16, 115:20, 116:25, 122:16, 124:22, 128:22, 129:18
**materials** [14] - 11:13, 12:20, 21:21, 24:6, 24:22, 25:2, 26:4, 26:13, 115:25, 116:4, 116:17, 116:18, 116:19, 117:8
**Matt** [3] - 107:4, 109:12, 109:15
**matter** [4] - 55:11, 86:17, 107:14, 133:7
**matters** [3] - 58:22, 59:20, 64:11
**Matthews** [6] - 43:15, 44:19, 44:21, 45:1, 74:12, 74:19
**MAY** [1] - 1:19
**McClelland** [8] - 2:3, 3:12, 27:2, 79:19, 79:20, 87:15, 93:6, 127:23
**McClintock** [7] - 1:6, 2:8, 47:24, 88:20, 88:24, 89:1, 89:17
**McCormick** [1] - 7:14
**McHUGH** [1] - 2:10
**McMonagle** [19] - 2:9, 2:10, 3:6, 3:11, 3:17, 15:20, 15:24, 16:2, 23:3, 40:3, 49:16, 49:19, 55:2, 76:24, 77:2, 94:14, 119:16, 127:13, 129:7
**McMonagle's** [1] - 24:16
**MD** [10] - 1:4, 1:5, 1:6, 1:7, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13
**mean** [30] - 27:11, 29:8, 44:7, 44:8, 56:7, 69:18, 70:1, 70:4, 71:8, 72:22, 72:24, 76:24, 82:14, 82:19, 83:24, 83:25, 84:1, 85:1, 88:8, 90:12, 92:1, 94:18, 99:14, 99:16, 103:15, 104:2, 104:12, 111:20, 120:15, 121:13
**meaning** [1] - 44:13
**Meanix** [1] - 2:16
**means** [2] - 78:18, 102:12
**meet** [1] - 75:13
**meeting** [14] - 38:14, 39:6, 39:10, 51:12, 51:18, 51:19, 72:3, 72:24, 75:16, 76:4, 76:8, 92:3, 92:7, 95:25
**meetings** [12] - 34:16, 35:13, 35:19, 38:9, 71:7, 71:13, 71:23, 72:15, 73:6, 80:11, 82:5, 106:5
**mEGAN** [1] - 2:13
**member** [7] - 37:7, 73:16, 73:18, 104:10, 105:1, 105:12, 105:18
**members** [5] - 36:6, 50:11, 74:1, 77:15, 107:12
**membership** [1] - 74:2
**men** [2] - 77:19, 78:17
**mention** [1] - 53:8
**mentioned** [9] - 21:22, 52:5, 54:6, 89:10, 91:23, 118:10, 118:16, 119:6, 125:5
**mere** [1] - 78:17
**message** [1] - 74:19
**messenger** [5] - 21:2, 21:3, 25:5, 25:8, 25:10
**messengers** [6] - 12:19, 14:3, 14:15, 21:1, 24:25, 25:17
**met** [4] - 115:13, 116:9, 121:12, 121:14
**MICHAEL** [1] - 1:23
**Micromarketing** [1] - 48:7
**microphone** [4] - 5:21, 6:7, 6:22, 30:9
**mid-2002** [1] - 37:6
**middle** [1] - 87:5
**might** [3] - 5:8, 36:18, 133:5
**millions** [8] - 50:20, 50:21, 55:23, 55:24, 56:3, 56:7, 56:21
**mind** [2] - 57:1, 110:19
**mine** [2] - 48:23
**minimum** [3] - 67:19, 73:10, 78:3
**minute** [1] - 110:22
**minutes** [10] - 72:2, 72:6, 72:11, 72:19, 73:2, 73:4, 94:24, 116:14, 124:1, 132:6
**MISCHAK** [1] - 2:10
**mom** [1] - 110:9
**moment** [6] - 36:19, 49:7, 60:8, 61:6, 70:25, 79:7
**Monday** [3] - 16:8, 34:17, 92:14
**money** [25] - 33:21, 37:13, 38:1, 38:12, 39:3, 40:19, 41:9, 50:17, 50:23, 51:25, 55:20, 56:18, 57:10, 57:11, 61:1, 61:25, 64:17, 65:10, 74:4, 84:5, 88:21, 88:25, 101:12, 101:15, 102:14
**month** [18] - 33:20, 33:22, 33:24, 34:3, 34:12, 35:12, 36:14, 38:4, 42:9, 82:1, 82:2, 83:2, 91:19, 92:18, 93:1, 104:16, 104:17, 105:11
**monthly** [8] - 42:8, 70:13, 104:13, 104:21, 105:5, 105:8, 105:10, 108:23
**months** [1] - 103:25
**morning** [9] - 6:3, 26:25, 30:16, 34:17, 55:12, 56:14, 92:14, 119:17, 119:18
**most** [3] - 77:19, 104:5, 104:7
**mostly** [2] - 14:23, 14:25
**mother** [4] - 110:8, 110:13, 110:19, 111:11
**mouth** [1] - 28:1
**move** [1] - 9:17
**moved** [4] - 7:5, 27:12, 29:5, 29:8
**moving** [5] - 9:16, 16:19, 16:23, 17:19, 22:25
**Mozey** [1] - 8:18
**MR** [134] - 5:13, 6:2, 6:10, 6:21, 7:1, 8:7, 8:12, 15:6, 15:9, 15:18, 15:20, 15:24, 23:3, 23:7, 23:25, 24:2, 26:23, 26:25, 27:7, 28:19, 28:20, 28:22, 28:23, 29:2, 29:14, 29:17, 29:23, 30:15, 35:9, 35:10, 36:16, 36:22, 37:4, 39:16, 39:18, 39:21, 39:23, 39:24, 40:3, 40:5, 49:6, 49:13, 49:16, 55:2, 55:4, 55:9, 55:16, 55:17, 58:6, 58:11, 60:6, 60:7, 60:12, 63:10, 63:13, 63:18, 67:15, 67:18, 68:4, 68:12, 69:7, 69:11, 69:16, 75:19, 75:21, 76:3, 76:24, 77:2, 77:4, 77:6, 77:9, 78:2, 78:5, 79:5, 79:7, 79:12, 79:14, 87:22, 88:10, 88:15, 88:18, 89:13, 89:22, 89:25, 90:6, 93:4, 93:9, 93:14, 94:12, 94:14, 94:16, 101:5, 101:7, 106:19, 106:20, 106:25, 107:17, 107:19, 107:25, 108:7, 108:10, 110:20, 110:25, 112:6, 112:10, 112:12, 112:14, 112:16, 112:25, 113:6, 114:3, 114:5, 114:13, 118:4, 118:9, 118:25, 119:3, 119:10, 119:13, 119:16, 127:15, 127:18, 127:25, 128:4, 131:4, 131:6, 131:8, 131:9, 131:13, 132:17, 132:19, 133:4, 133:13, 133:15
**MS** [7] - 27:2, 27:3, 79:19, 87:15, 87:18, 127:23, 127:24
**Muellner** [1] - 64:7
**mumbo** [1] - 70:4
**Muth** [1] - 2:16

## N

**name** [18] - 6:4, 6:5, 8:17, 24:3, 30:17, 30:18, 41:24, 55:10, 58:12, 60:17, 86:2, 100:5, 108:17, 109:17, 114:14, 118:10, 119:6, 125:9
**named** [4] - 16:10, 17:16, 117:19, 118:16
**names** [6] - 41:18, 91:6, 91:7, 109:13, 114:15, 121:9
**nature** [1] - 24:17
**near** [1] - 93:8
**nearly** [2] - 83:19
**necessarily** [1] - 78:14
**necessary** [5] - 65:23, 67:19, 104:12, 104:14, 104:15

need [5] - 5:20, 35:7, 38:1, 82:9, 110:22
needed [12] - 25:23, 35:20, 37:21, 38:11, 39:8, 52:22, 83:13, 83:21, 96:6, 96:11, 96:18, 101:15
needs [1] - 31:22
negative [1] - 130:15
negatively [3] - 117:4, 117:15, 129:14
negotiated [1] - 85:9
negotiating [2] - 80:2, 80:5
never [15] - 28:1, 28:4, 28:7, 28:10, 28:16, 50:1, 56:5, 56:6, 72:21, 78:7, 78:25, 84:3, 84:15, 89:16, 109:16
new [1] - 74:2
news [3] - 13:4, 13:6, 22:19
newspaper [1] - 75:5
next [6] - 18:24, 29:23, 77:5, 114:4, 119:8, 133:14
nice [1] - 55:3
night [2] - 110:7, 123:22
NO [1] - 1:20
nobody [1] - 132:14
Noise [1] - 8:5
non [2] - 12:10, 75:9
non-campaign [1] - 12:10
non-work [1] - 75:9
none [2] - 56:19, 98:9
noon [1] - 133:3
normal [1] - 101:24
normally [1] - 101:18
note [3] - 65:24, 66:11, 66:12
notes [10] - 72:2, 72:5, 72:18, 125:18, 125:19, 126:7, 126:14, 126:17, 129:24, 134:11
nothing [11] - 22:25, 23:3, 26:12, 28:19, 67:22, 69:12, 79:13, 88:12, 89:25, 126:22, 131:4
notice [1] - 88:20
noticed [2] - 25:9, 85:23
notices [1] - 102:20
notion [1] - 113:6
notorious [1] - 57:8

novel [1] - 113:6
November [1] - 87:6
nowhere [1] - 93:8
number [2] - 24:14, 115:9
numbers [1] - 91:7

O

O'CONNOR [1] - 2:13
object [3] - 63:11, 93:5, 113:1
objection [10] - 36:16, 60:6, 67:15, 69:7, 75:19, 78:2, 79:5, 94:12, 101:5, 106:19
obstructed [1] - 14:13
obviously [3] - 19:6, 20:12, 50:12
occasion [1] - 9:1
occasionally [2] - 71:8, 71:10
occasions [2] - 59:11, 64:10
occur [2] - 100:10, 100:12
occurred [6] - 5:2, 51:13, 65:12, 91:17, 92:3, 113:23
October [1] - 100:15
OF [5] - 1:1, 1:1, 1:15, 2:22
office [38] - 7:21, 7:23, 8:21, 9:14, 11:9, 11:18, 11:24, 12:6, 13:7, 13:10, 13:13, 13:16, 13:17, 14:9, 17:9, 20:18, 24:23, 25:8, 26:3, 26:18, 27:11, 44:23, 44:24, 44:25, 75:18, 76:5, 76:9, 90:18, 110:12, 116:15, 117:25, 118:3, 123:23, 124:6, 124:7, 124:10, 124:12, 129:4
Office [5] - 1:24, 9:1, 114:19, 121:3, 121:8
OFFICE [1] - 2:22
offices [6] - 13:25, 115:16, 118:1, 123:10, 123:19, 124:8
Official [1] - 134:18
often [5] - 62:11, 62:18, 92:11, 100:10, 100:12
old [4] - 20:7, 77:5,

77:7, 77:8
older [1] - 76:15
once [6] - 53:2, 64:12, 76:12, 76:13, 76:14, 123:16
one [31] - 23:4, 25:14, 34:15, 35:19, 38:9, 42:11, 52:21, 54:20, 54:21, 56:1, 56:2, 70:11, 81:13, 82:1, 91:18, 91:25, 96:4, 96:14, 96:17, 98:5, 107:4, 109:5, 109:10, 109:25, 110:17, 118:21, 119:23, 133:3, 133:4, 133:11, 133:12
ones [2] - 14:8, 104:23
open [2] - 57:8, 124:8
opened [3] - 115:15, 116:14, 132:4
opens [1] - 124:6
operation [1] - 56:9
opportunity [2] - 112:23, 113:2
opposed [1] - 65:1
ordinary [3] - 47:20, 104:9, 108:22
ostensible [1] - 25:2
otherwise [1] - 66:16
outside [3] - 8:5, 132:1, 132:8
overall [2] - 99:6, 99:14
overarching [1] - 102:13
overly [1] - 111:20
overseeing [2] - 59:7, 105:23
own [1] - 62:25
owner [1] - 68:14

P

P.C [2] - 2:5, 2:10
p.m [2] - 116:22, 117:6
PA [1] - 98:20
pack [3] - 88:4, 88:6, 98:9
Pack [1] - 98:21
packs [1] - 98:24
paid [30] - 36:13, 37:18, 42:7, 42:8, 52:12, 52:20, 52:25, 53:5, 53:14, 57:24, 58:15, 58:21, 59:18, 61:1, 62:11, 81:19,

83:12, 83:13, 84:10, 84:11, 85:3, 85:17, 87:10, 93:7, 97:23, 99:22, 100:5, 104:8, 104:18, 105:1
paper [2] - 61:12, 65:18
parcel [1] - 47:21
part [7] - 9:4, 9:7, 47:21, 80:21, 82:4, 116:11, 123:21
participant [1] - 84:19
participants [1] - 59:6
participated [3] - 39:1, 84:8, 84:22
particular [8] - 37:17, 37:18, 47:1, 66:22, 68:17, 70:16, 71:14, 132:2
particularly [2] - 63:19, 111:4
party [3] - 62:8, 74:20, 78:13
past [1] - 14:1
pattern [1] - 56:3
PAUL [1] - 1:12
Paul [19] - 7:15, 7:19, 8:1, 8:14, 10:16, 10:18, 10:21, 11:10, 12:12, 13:16, 14:1, 15:5, 20:9, 20:11, 20:15, 22:1, 48:15, 118:20, 118:22
pause [5] - 8:10, 30:1, 49:11, 79:10, 118:7
pay [25] - 32:19, 32:23, 34:1, 34:2, 35:15, 37:22, 38:25, 51:9, 51:20, 52:2, 62:13, 67:11, 78:9, 82:9, 82:13, 83:4, 83:21, 85:2, 94:2, 96:19, 101:15, 101:25, 102:1, 107:10, 108:21
payable [1] - 37:20, 100:3
paying [18] - 35:20, 38:11, 38:15, 38:22, 40:19, 41:15, 52:7, 52:16, 78:12, 83:19, 85:20, 88:7, 94:3, 96:6, 97:9, 97:20, 99:17, 102:9
payment [13] - 58:16, 61:7, 61:22, 61:25, 63:9, 64:1, 66:19,

70:8, 78:6, 104:16, 105:19, 108:22, 108:24
payments [15] - 64:6, 65:11, 81:4, 81:25, 85:6, 85:25, 87:25, 88:1, 98:6, 98:13, 98:17, 98:21, 98:25, 105:15, 106:16
payroll [2] - 86:19, 87:7
PENNSYLVANIA [3] - 1:1, 1:2, 1:21
Pennsylvania [2] - 89:18, 114:19
people [20] - 34:19, 47:23, 58:21, 62:11, 62:12, 62:14, 62:17, 62:24, 75:13, 85:25, 90:17, 92:9, 95:25, 96:14, 101:1, 102:21, 110:16, 123:6, 130:9, 132:1
per [4] - 33:21, 34:3, 66:12, 97:3
percent [1] - 87:6, 87:7
performed [1] - 42:16
perhaps [1] - 72:7
period [16] - 23:12, 27:14, 31:11, 32:1, 34:21, 40:13, 40:25, 41:4, 42:14, 42:24, 55:21, 56:13, 110:2, 110:4, 110:8, 116:10
periodically [2] - 31:23, 37:20
permission [1] - 108:21
PERRI [2] - 2:10, 2:10
person [7] - 32:16, 37:11, 39:12, 39:25, 50:12, 62:18, 103:5
personally [1] - 26:9
Perzel [46] - 2:11, 6:17, 7:10, 7:17, 8:2, 8:14, 14:1, 14:10, 14:20, 16:3, 34:23, 34:24, 39:25, 43:21, 45:21, 47:24, 48:24, 49:20, 50:13, 50:16, 54:14, 55:19, 56:8, 56:23, 57:10, 57:17, 60:3, 60:19, 60:22, 60:24, 61:3, 61:8, 62:3, 77:17, 79:1, 85:7, 88:3, 92:10, 97:9, 97:14, 97:15,

98:10, 100:20, 107:5, 109:15

**PERZEL** [1] - 1:7

**Perzel's** [12] - 10:19, 13:17, 45:18, 56:17, 57:2, 57:14, 58:2, 59:10, 59:23, 60:23, 129:4

petty [1] - 111:20

Philadelphia [3] - 28:14, 60:1, 60:14

Phillips [3] - 16:13, 16:15, 16:17

phone [10] - 43:24, 45:15, 74:24, 86:11, 91:7, 102:5, 102:7, 109:20, 109:22, 123:19

phonetic [1] - 8:18

phoning [1] - 91:12

phrase [1] - 32:5

pick [1] - 25:18

piece [2] - 61:11, 65:11

pittance [1] - 67:23

**PLACE** [1] - 1:20

place [1] - 65:23

placed [1] - 21:23

plain [1] - 97:1

planned [1] - 133:2

**PLEAS** [1] - 1:1

point [32] - 11:8, 15:12, 16:5, 22:17, 23:13, 33:9, 37:5, 38:8, 42:10, 42:11, 43:5, 51:9, 52:16, 81:25, 93:4, 103:15, 107:4, 107:21, 108:14, 108:19, 108:25, 112:25, 116:21, 117:1, 117:5, 117:11, 121:12, 122:18, 123:17, 125:14, 126:24, 127:10

pointed [2] - 43:18, 43:19

points [1] - 45:2

political [4] - 24:17, 54:15, 54:17, 54:21

polling [6] - 52:23, 71:18, 91:3, 105:20, 105:24, 106:6

Polling [3] - 104:23, 105:16, 106:10

poor [1] - 123:22

Popp [1] - 8:18

portion [4] - 40:17, 45:23, 65:21, 66:1

position [4] - 7:5,

---

49:25, 77:14, 114:22

possession [1] - 117:22

possible [1] - 77:25

powerful [1] - 77:19

preface [1] - 5:6

**PRELIMINARY** [1] - 1:16

prepare [1] - 47:4

prepared [5] - 47:16, 47:19, 58:25, 71:22, 99:15

presence [2] - 121:22, 132:15

present [5] - 25:17, 36:21, 38:14, 82:5, 96:14

presented [1] - 61:12

president [1] - 68:15

Preski [11] - 2:14, 7:15, 23:8, 23:14, 34:24, 38:19, 40:6, 55:11, 57:1, 57:14, 58:1

**PRESKI** [1] - 1:8

pretty [4] - 18:10, 27:13, 73:23, 84:1

previously [1] - 103:3

price [3] - 42:6, 42:13, 93:24

primarily [3] - 65:5, 85:15, 105:22

primary [3] - 50:12, 73:24, 84:19

printed [1] - 21:17

private [1] - 13:25

Probable [1] - 67:21

problem [4] - 94:22, 101:11, 101:21, 102:6

problems [3] - 73:6, 73:11, 78:22

proceeded [3] - 115:11, 116:7, 116:8

**PROCEEDINGS** [1] - 1:15

proceedings [3] - 5:2, 113:23, 134:9

process [4] - 17:7, 99:25, 101:9, 108:12

product [1] - 35:22

production [1] - 63:7

program [5] - 35:25, 36:5, 36:11, 46:15, 46:19

progressed [1] - 6:20

progression [1] - 10:2

prominent [1] -

---

77:13

promotional [2] - 116:20, 125:5

promptly [1] - 104:8

proper [1] - 36:19

proposition [1] - 73:11

propriety [1] - 78:8

prosecution [1] - 92:17

protocol [1] - 73:21

provide [5] - 24:20, 33:14, 34:6, 42:4, 125:13

provided [12] - 32:9, 50:24, 52:1, 56:8, 61:14, 64:2, 67:25, 68:19, 83:20, 90:11, 96:10, 123:2

providing [2] - 62:19, 91:2

pull [2] - 5:20, 6:7

purchases [4] - 41:5, 41:7, 41:10, 57:20

purpose [4] - 9:10, 71:14, 115:4, 115:23

pursuant [4] - 31:20, 67:11, 81:18, 128:13

put [5] - 14:8, 25:5, 25:11, 45:15, 101:14

## Q

quarter [2] - 133:11, 133:12

questioned [1] - 78:11

questions [38] - 15:18, 16:3, 23:9, 23:11, 24:16, 26:24, 27:1, 27:2, 27:3, 28:20, 28:22, 44:3, 49:20, 51:4, 53:20, 55:4, 55:12, 59:9, 59:12, 78:7, 79:15, 87:16, 87:18, 88:14, 88:15, 93:19, 112:17, 112:24, 118:4, 126:25, 127:6, 127:8, 127:15, 127:19, 127:22, 127:23, 127:24, 131:6

quick [2] - 87:18, 87:19

quite [2] - 72:23, 89:9

## R

race [1] - 64:19

races [2] - 41:8,

---

64:17

radio [3] - 63:6, 63:8, 64:6

raise [9] - 38:1, 55:19, 56:3, 56:17, 57:10, 61:20, 74:4, 96:18, 101:15

raised [3] - 42:13, 50:16, 50:23, 52:1, 78:7

read [9] - 65:22, 68:21, 73:2, 73:5, 81:15, 120:12, 123:11, 128:19, 128:24

reading [1] - 67:6

ready [6] - 5:4, 5:11, 18:21, 49:4, 100:5, 114:2

realize [1] - 63:3

realized [1] - 104:1

really [16] - 16:4, 36:11, 37:2, 42:18, 42:19, 50:1, 72:8, 77:7, 77:8, 85:1, 85:6, 90:13, 99:20, 102:17, 109:5, 110:15

reason [2] - 52:24, 132:7

receive [7] - 61:7, 70:7, 72:11, 87:25, 88:21, 108:15, 125:13

received [6] - 43:7, 61:23, 63:3, 70:14, 74:13, 99:24

receiving [5] - 52:10, 63:5, 66:6, 104:9, 109:22

recently [3] - 69:5, 69:20, 84:3

reception [4] - 13:12, 117:25, 118:3, 124:18

receptionist [3] - 7:25, 8:16, 13:19

receptionist's [1] - 8:17

recess [3] - 113:17, 113:19, 133:17

Recess [1] - 113:21

recognize [5] - 44:9, 47:7, 47:13, 48:12, 48:19

recollect [1] - 92:1

recollection [14] - 65:12, 65:16, 66:3, 66:6, 68:18, 68:23, 92:4, 92:5, 96:2, 111:5, 125:21, 126:7, 126:9, 126:16

record [5] - 6:4,

---

30:17, 39:16, 52:10, 114:16

recorded [2] - 48:3, 125:17

recording [1] - 31:16

records [2] - 47:1, 47:18

**RECROSS** [1] - 3:3

red [1] - 15:15

redirect [3] - 29:16, 112:13, 132:18

**REDIRECT** [1] - 3:3

reelect [1] - 71:15

reelected [1] - 104:4

reelection [2] - 36:7, 73:18

reference [2] - 66:20, 75:5

references [1] - 87:24

referred [1] - 78:16

referring [1] - 64:23

refers [1] - 110:7

reflect [1] - 39:16

reflected [1] - 72:18

reflecting [1] - 130:22

Reform [1] - 98:17

refresh [2] - 65:16, 68:22

refreshes [1] - 68:18

regard [2] - 41:24, 79:25

regarding [3] - 13:1, 68:9, 110:16

regardless [1] - 24:14

regular [1] - 14:23

regularly [1] - 34:15

reimburse [4] - 61:2, 61:9, 93:2, 97:16

reimbursed [1] - 86:6

reimbursement [1] - 59:18

related [10] - 7:8, 12:1, 17:11, 21:14, 66:22, 76:1, 78:22, 86:9, 116:19, 120:14

relation [1] - 75:10

relations [1] - 103:8

relationship [2] - 57:14, 103:18

relationships [1] - 104:25

relatively [1] - 5:22, 18:9

relax [1] - 5:10

relevance [1] - 60:6

relevant [2] - 60:8,

130:9
relocate [1] - 18:22
remember [33] -
21:20, 35:19, 38:19,
42:12, 45:19, 51:18,
51:19, 52:2, 68:5,
68:7, 72:22, 72:23,
74:25, 75:4, 75:7,
75:8, 75:15, 75:16,
76:4, 76:8, 76:12,
81:3, 94:9, 94:18,
95:6, 95:13, 95:19,
95:20, 110:18,
120:23, 123:8, 129:11
remove [2] - 17:5,
25:1
removed [5] - 21:23,
116:15, 127:1,
128:18, 128:23
rendered [3] - 91:1,
93:3, 93:25
repeat [3] - 74:10,
79:23, 93:17
repeated [1] - 35:8
repetition [1] -
107:22
reply [1] - 130:15
report [11] - 4:5,
32:17, 32:25, 33:1,
33:3, 46:3, 46:23,
47:16, 50:7, 77:24,
117:14
reported [7] - 31:20,
31:22, 32:1, 32:22,
50:8, 50:9, 50:11
Reporter [1] - 134:18
reports [2] - 36:8,
97:22
represent [10] - 16:2,
23:8, 24:4, 49:19,
55:11, 58:13, 79:20,
112:21, 112:22
Representative [14] -
7:10, 7:17, 14:20,
16:13, 16:17, 59:10,
55:17, 76:5, 76:9,
77:13, 77:16, 79:1,
79:2
representative [4] -
16:15, 70:13, 100:21,
100:24
Representatives [3]
- 6:14, 26:15, 89:19
Republican [6] -
6:15, 30:22, 71:15,
77:14, 80:19
request [3] - 25:5,
25:7, 48:25
requested [2] -
52:20, 60:16

requests [3] - 60:19,
63:19, 122:9
require [1] - 14:22
required [3] - 63:8,
63:23, 93:8
reread [1] - 68:6
respect [5] - 25:13,
78:6, 78:15, 79:2,
129:8
responded [2] -
24:16, 102:23
response [3] - 61:23,
101:18, 126:21
responsibilities [1] -
31:3
responsibility [3] -
59:5, 73:24, 88:9
rest [1] - 101:8
restricted [1] - 107:1
retain [1] - 101:4
retainer [1] - 34:3
reviewed [3] - 62:11,
62:12, 105:17
Rigamer [2] - 68:14,
68:22
RMR [1] - 134:17
ROBERT [1] - 2:20
role [2] - 80:2, 80:4
room [27] - 7:22,
8:13, 9:16, 9:17, 9:18,
10:5, 10:6, 10:8,
10:14, 10:25, 13:21,
16:21, 17:7, 18:7,
18:8, 18:10, 18:14,
19:4, 30:8, 115:12,
131:16, 131:19,
131:23, 132:2, 132:8,
132:12, 132:15
Room [9] - 9:1, 10:3,
12:6, 13:8, 116:8,
117:23, 117:25,
122:19, 131:15
roughly [1] - 101:1
row [1] - 119:8
rule [4] - 27:13,
46:23, 63:7, 109:4
running [1] - 36:6
rush [3] - 25:11,
25:12, 25:16
RUTH [1] - 1:9
Ruth [4] - 2:17, 27:3,
47:24, 87:25
Ryan [3] - 107:4,
109:12, 109:15

**S**

S-P-E-A-K-S [1] -
114:17

sake [1] - 30:7
Sam [2] - 77:18,
107:6
sample [2] - 104:5,
104:7
sAMUEL [1] - 1:11
sat [6] - 13:14, 13:16,
84:23, 95:3, 103:2,
103:10
satisfy [1] - 122:15
saw [5] - 28:16, 35:3,
35:8, 47:8, 79:3
scan [1] - 101:7
scheduled [1] -
34:16
scheduler [1] - 14:19
schedules [1] -
31:25
SCHEIB [1] - 2:13
scope [5] - 63:12,
67:16, 75:20, 78:3,
101:6
scores [2] - 105:14,
105:15
sCOTT [1] - 2:7
screen [1] - 47:11
se [1] - 97:3
seal [2] - 21:17,
26:15
SEAMAN [1] - 1:10
Seaman [7] - 2:19,
34:23, 39:19, 72:2,
119:6, 121:17, 122:5
Seaman's [1] - 72:18
Seamans [3] -
115:14, 121:13, 125:2
search [4] - 75:1,
75:6, 116:3, 123:10
season [1] - 63:20
second [8] - 10:3,
13:20, 70:3, 95:17,
95:21, 96:1, 97:8,
111:22
secret [1] - 56:16,
56:20, 57:5
secretary [1] - 6:19
section [1] - 67:6
secure [1] - 10:8
see [26] - 10:25,
11:19, 11:21, 15:5,
19:3, 25:21, 39:13,
39:19, 40:1, 45:16,
47:10, 66:24, 67:1,
67:8, 68:2, 70:25,
77:22, 88:20, 89:6,
111:21, 111:23,
112:18, 118:21,
118:22, 119:7, 120:12
seldom [1] - 110:12
send [5] - 22:6,

22:12, 65:9, 66:8,
66:12
sent [6] - 26:13,
26:17, 48:20, 74:8,
74:16, 102:20
separate [5] - 41:8,
54:12, 54:19, 85:18,
88:4
September [1] -
100:15
series [1] - 112:17
service [5] - 25:10,
32:9, 67:11, 67:24,
85:15
services [14] - 25:6,
33:14, 33:16, 34:7,
42:4, 42:5, 83:20,
90:10, 90:13, 90:25,
93:2, 93:25, 94:4,
96:9
set [10] - 31:5, 31:25,
54:9, 54:11, 54:12,
64:15, 100:5, 105:10,
108:12, 108:13
several [9] - 24:11,
26:5, 41:7, 52:21,
77:15, 111:16,
111:17, 111:18
SFlick3116@aol.
com [1] - 48:17
Shaffer [1] - 134:17
shaking [1] - 112:18
Sheila [6] - 3:10,
29:23, 30:19, 44:7,
44:12, 77:7
SHEILA [1] - 30:3
shift [1] - 53:17
shipped [1] - 74:11
shirt [1] - 15:15
shopping [1] -
125:11
short [5] - 47:4,
78:25, 79:22
shortly [1] - 103:11
show [10] - 27:13,
37:23, 37:24, 61:5,
65:15, 67:8, 68:17,
70:10, 99:21, 100:4
showed [5] - 25:23,
70:16
showing [3] - 37:21,
48:9, 100:8
shred [3] - 24:21,
28:4, 74:16
shut [1] - 28:2
side [2] - 25:14
SIGMAN [8] - 2:7,
28:20, 88:15, 88:18,
89:13, 89:22, 89:25,
131:6

Sigman [1] - 3:13
sign [4] - 107:13,
107:24, 108:4, 130:16
signal [2] - 37:23,
37:25
signature [5] - 80:7,
106:13, 106:21,
107:1, 107:8
signatures [5] - 80:6,
109:6, 109:9, 109:10,
109:11
signed [3] - 81:1,
81:6, 109:5
significant [1] -
124:2
signing [1] - 107:14
similar [4] - 62:10,
70:3, 112:3, 120:5
simple [1] - 109:19
simply [3] - 107:23,
113:7, 119:25
simultaneously [1] -
96:5
single [3] - 105:17,
106:9, 106:12
slt [3] - 30:8, 95:2,
130:25
sitting [2] - 15:13,
43:16
situation [2] - 51:25,
53:21
six [2] - 101:2, 110:9
size [1] - 112:2
small [2] - 99:11,
104:5
smaller [1] - 45:12
Smith [4] - 77:18,
79:2, 100:21, 107:6
Smith's [3] - 75:17,
76:5, 76:9
sneaking [1] - 21:4
snow [1] - 124:4
so-called [1] - 24:21
someone [5] - 17:9,
32:14, 32:15, 105:4,
123:19
sometime [4] - 69:4,
90:21, 102:23, 117:5
sometimes [3] -
34:24, 92:11, 92:13
somewhere [2] -
21:23, 31:21
sorry [6] - 33:23,
57:23, 82:17, 124:16,
126:8, 133:13
sort [6] - 20:20, 21:3,
21:21, 26:1, 37:9,
91:4
sorted [5] - 11:24,
20:18, 20:24, 21:8,

22:2
 sorting [2] - 12:9, 21:10
 sorts [1] - 31:2
 source [1] - 39:4
 Southern [1] - 121:8
 Speaker [3] - 116:19, 125:9, 125:11
 Speaker's [8] - 45:22, 54:6, 54:8, 54:9, 54:10, 54:20, 125:15, 125:16
 speakership [1] - 27:12
 speaking [3] - 73:16, 126:4, 126:6
 Speaks [4] - 3:16, 114:6, 114:17, 131:14
 SPEAKS [1] - 114:8
 special [1] - 114:20
 specific [17] - 19:22, 24:12, 45:20, 63:8, 66:4, 66:10, 81:9, 92:7, 93:20, 95:24, 95:25, 104:10, 105:1, 105:11, 120:9, 125:7, 127:4
 specifically [8] - 8:22, 21:20, 26:7, 42:24, 50:8, 51:21, 93:23, 114:25
 speculation [1] - 69:8
 spell [3] - 6:4, 30:17, 114:15
 spending [3] - 37:13, 37:19, 64:16
 spent [4] - 50:24, 51:1, 64:18, 64:19
 spill [1] - 133:7
 Sprow [2] - 3:5, 3:16
 SPROW [17] - 1:23, 5:13, 6:2, 6:10, 7:1, 8:12, 15:9, 15:18, 29:17, 114:3, 114:5, 114:13, 118:4, 118:9, 119:3, 119:13, 132:19
 stack [1] - 11:6
 Staff [8] - 7:13, 7:17, 10:19, 27:9, 27:14, 57:2, 57:15, 58:2
 stamp [8] - 106:13, 106:17, 109:5, 109:7, 109:10, 109:13, 109:16
 stamped [3] - 108:3, 108:4, 109:6
 stand [1] - 79:21
 standard [2] - 111:14, 112:7

standing [2] - 73:18, 104:25
 start [5] - 35:20, 38:11, 38:22, 133:8, 133:12
 started [11] - 5:5, 6:19, 7:2, 33:16, 37:3, 81:2, 86:17, 86:22, 90:21, 95:19, 99:19
 state [4] - 30:16, 114:14, 116:12, 123:21
 State [5] - 31:23, 33:4, 46:24, 77:20, 115:1
 statement [2] - 81:12, 130:22
 statements [1] - 130:9
 stating [1] - 108:16
 stationery [27] - 11:7, 11:25, 19:19, 19:20, 19:24, 20:1, 20:7, 20:16, 21:13, 26:14, 26:17, 26:19, 43:21, 43:22, 45:19, 45:21, 46:9, 54:4, 54:11, 54:15, 54:16, 54:23, 74:8, 127:2, 127:7, 127:9
 stations [3] - 63:6, 63:8, 64:6
 stay [3] - 5:22, 30:10, 42:17
 stayed [3] - 118:2, 124:14, 124:17
 step [3] - 29:18, 112:15, 132:20
 Steve [4] - 34:23, 38:18, 105:22
 stick [1] - 38:2
 still [3] - 12:6, 13:9, 43:2
 stipulate [5] - 15:6, 89:11, 89:12, 118:25, 119:10
 stipulated [1] - 39:21
 stokes [1] - 79:15
 STOKES [1] - 1:11
 Stokes [1] - 2:2
 stop [2] - 10:2, 16:22
 storage [2] - 10:5, 115:15
 story [1] - 10:3
 strained [1] - 103:8
 Street [2] - 25:14, 90:18
 street [3] - 25:22, 26:6, 36:9
 stuff [6] - 18:21,

18:22, 22:6, 22:8, 45:3, 47:19
 style [1] - 37:9
 subject [7] - 38:21, 48:24, 71:6, 75:24, 93:19, 95:2, 101:14
 submit [1] - 25:7
 submitted [3] - 86:9, 86:11, 86:14
 subpoena [16] - 115:8, 115:23, 119:20, 120:9, 120:11, 120:12, 120:19, 120:21, 123:9, 123:12, 128:14, 128:16, 128:20, 128:22, 128:25
 subpoenas [3] - 119:23, 120:4, 120:5
 subsequently [2] - 115:14, 124:23
 substantial [3] - 60:4, 61:21, 64:6
 substantially [1] - 72:9
 suggested [1] - 123:7
 suggestion [2] - 12:3, 67:18
 sums [1] - 65:10
 supplied [2] - 52:8, 52:11
 supply [1] - 72:1
 support [1] - 67:20
 supporters [1] - 56:4
 suppose [1] - 101:17
 surprised [2] - 19:9, 27:21
 suspected [1] - 77:25
 suspicious [1] - 66:16
 Susquehanna [3] - 104:23, 105:16, 106:9
 sustained [2] - 78:4, 79:6
 sworn [3] - 5:17, 30:4, 114:9
 system [3] - 108:12, 108:25, 109:4

## T

table [3] - 86:20, 111:21, 111:22
 tall [1] - 15:16
 technical [1] - 70:4
 technology [4] - 51:10, 51:20, 52:12,

53:15
 tender [1] - 49:13
 tenure [1] - 37:5
 tenured [2] - 76:18, 76:21
 term [1] - 32:4
 terms [2] - 67:17, 85:4
 testified [20] - 5:17, 29:11, 30:4, 38:3, 91:21, 94:23, 94:24, 109:20, 109:22, 111:13, 114:9, 124:14, 124:17, 125:1, 128:5, 128:19, 128:24, 129:7, 131:2, 132:5
 testimony [11] - 49:22, 54:4, 55:3, 75:24, 90:22, 96:7, 102:10, 105:16, 106:8, 129:11, 131:3
 THE [75] - 1:1, 3:3, 4:3, 5:4, 5:20, 6:7, 6:9, 15:7, 15:8, 15:17, 15:21, 28:21, 29:15, 29:18, 30:7, 30:11, 35:7, 37:1, 37:2, 39:22, 40:4, 49:9, 55:6, 58:7, 60:10, 63:15, 63:17, 68:1, 68:11, 69:13, 69:14, 76:2, 76:25, 77:3, 77:5, 77:7, 78:4, 79:6, 79:16, 87:17, 89:11, 89:21, 90:2, 93:12, 94:15, 106:23, 106:24, 108:9, 110:5, 110:6, 110:23, 110:24, 112:3, 112:5, 112:13, 112:15, 113:8, 113:12, 113:16, 114:1, 114:4, 119:2, 119:11, 119:12, 127:14, 127:17, 127:20, 128:1, 131:7, 131:10, 132:18, 132:20, 132:22, 133:1, 133:10
 thereabouts [1] - 37:6
 therefore [2] - 67:5, 101:23
 thinking [1] - 95:3
 Third [2] - 25:14, 90:18
 third [3] - 62:8, 74:20, 78:13
 THOMAS [1] - 2:24
 thoroughly [1] -

57:15
 thousand [22] - 33:20, 33:24, 34:12, 35:11, 36:14, 38:4, 41:12, 41:13, 82:1, 82:2, 83:2, 83:22, 83:23, 91:18, 92:18, 93:1, 96:15, 96:17, 110:7
 thousands [2] - 57:22, 57:23
 three [6] - 53:2, 87:18, 90:19, 98:1, 117:18, 130:15
 throughout [1] - 31:23
 TIMOTHY [2] - 2:22, 2:22
 title [4] - 27:11, 31:3, 50:1, 50:6
 titles [1] - 31:9
 TO [2] - 3:1, 4:1
 today [9] - 5:8, 39:14, 39:20, 40:1, 98:23, 102:10, 105:17, 126:17, 130:25
 together [1] - 6:23
 Tom [1] - 7:14
 Tomaselli [1] - 27:8
 took [8] - 12:20, 25:21, 103:1, 103:11, 103:17, 103:24, 103:25, 110:9
 top [2] - 11:21, 61:11
 total [2] - 100:8, 110:12
 totally [1] - 54:15
 touch [2] - 44:1, 46:12
 toward [2] - 5:21, 6:22
 TOWHEY [1] - 1:12
 Towhey [39] - 2:23, 7:15, 7:19, 8:1, 8:14, 10:16, 10:18, 10:22, 10:24, 11:15, 13:16, 14:1, 15:5, 18:25, 19:2, 19:5, 19:6, 27:17, 28:13, 48:15, 48:25, 116:10, 116:25, 117:11, 118:20, 118:22, 118:25, 123:20, 124:3, 124:10, 125:2, 128:9, 129:13, 130:16, 130:21, 130:25, 132:9, 132:11, 132:13
 Towhey's [1] - 12:2

transaction [1] - 66:4

transcript [2] - 1:15, 134:12

transmittal [3] - 25:13, 68:13, 101:19

travel [1] - 86:14

treasurer [3] - 106:17, 107:8, 108:1

treasurers [1] - 107:2

tried [1] - 90:15

trouble [2] - 5:8, 79:22

troubling [1] - 77:23

true [18] - 27:24, 47:15, 52:6, 58:20, 58:24, 61:1, 64:13, 64:14, 65:7, 72:12, 77:12, 78:1, 128:11, 128:14, 129:5, 129:14, 129:17, 129:21

trust [2] - 68:7, 104:1

trusts [1] - 103:17

truth [2] - 69:10, 72:9

try [1] - 60:10

trying [2] - 76:19, 95:15

tUESDAY [1] - 1:19

Tuesday [2] - 5:1, 34:17

turn [1] - 31:7

turnaround [1] - 63:24

two [24] - 13:25, 28:24, 41:12, 41:13, 52:21, 53:2, 82:2, 83:22, 83:23, 90:25, 95:10, 96:15, 100:3, 102:12, 109:9, 109:10, 109:13, 111:13, 111:14, 111:17, 119:23, 121:2, 121:14, 128:6

type [4] - 41:9, 68:13, 125:8, 125:12

typed [7] - 26:21, 68:25, 69:1, 69:2, 69:11, 69:18, 72:6

types [2] - 63:19, 71:19

typical [1] - 99:4

## U

ultimate [1] - 7:9

ultimately [4] - 14:7, 106:21, 131:20, 132:3

um-hmm [5] - 18:13,

49:9, 72:13, 110:24, 128:1

unable [1] - 131:19

unaware [1] - 18:17

under [6] - 36:13, 36:15, 81:19, 82:11, 82:15, 94:6

understood [7] - 62:2, 69:3, 82:24, 84:1, 89:5, 89:8, 92:25

unless [1] - 36:17

unlock [1] - 123:23

unlocked [1] - 132:12

untoward [1] - 66:15

untrue [1] - 113:7

unused [1] - 46:10

unusual [2] - 63:21, 66:15

up [57] - 5:22, 6:20, 6:24, 11:18, 11:23, 12:5, 14:22, 18:12, 20:9, 20:18, 20:20, 20:24, 20:25, 21:3, 24:22, 25:18, 26:3, 31:5, 34:4, 34:11, 34:15, 35:4, 35:16, 35:17, 37:20, 38:15, 39:5, 39:6, 42:11, 53:18, 54:9, 54:11, 54:12, 55:14, 63:1, 64:15, 72:6, 77:11, 79:21, 82:22, 95:3, 96:6, 104:20, 108:13, 108:16, 109:19, 113:7, 116:7, 116:8, 116:14, 121:12, 121:14, 122:23, 123:13, 123:16, 129:4

update [1] - 67:12

updates [1] - 34:20

upstairs [3] - 21:7, 27:12, 123:7

usage [2] - 95:12, 95:16

utility [1] - 67:13

## V

vacation [1] - 15:4

vague [1] - 51:13

variety [2] - 59:15, 59:20

various [1] - 41:18

vary [1] - 105:5

vendor [8] - 33:7, 40:9, 40:11, 40:12, 40:22, 41:18, 99:6, 106:16

vendors [10] - 37:17, 37:18, 37:21, 51:5, 57:24, 97:16, 99:3, 99:4, 104:22, 107:10

versus [1] - 84:10

Victory [13] - 19:25, 26:13, 43:22, 45:21, 45:22, 46:9, 54:13, 54:14, 74:7, 98:1, 98:2, 98:5

victory [2] - 46:1, 54:14

view [1] - 14:13

virtually [1] - 63:23

virtue [1] - 101:12

voice [4] - 5:22, 6:24, 35:4, 44:10

vote [1] - 91:7

voter [3] - 67:14, 71:2, 91:5

voucher [4] - 108:12, 108:13, 108:16, 108:24

## W

wait [1] - 123:25

waited [3] - 116:10, 123:22, 132:1

waiting [2] - 132:8, 132:9

walk [1] - 120:16

walked [2] - 122:22, 122:23

wallets [1] - 125:8

wants [2] - 5:9, 108:9

warned [1] - 5:6

water [1] - 94:6

ways [2] - 36:3, 59:15

wealthy [2] - 60:1, 60:14

wearing [1] - 15:14

weather [1] - 123:22

Wednesday [3] - 29:6, 29:10, 48:12

week [10] - 8:24, 9:12, 12:23, 15:1, 28:13, 29:4, 42:23, 43:5, 100:3, 110:10

weekly [3] - 34:17, 34:20, 100:15

weeks [1] - 100:3

Weiser [6] - 9:13, 10:13, 16:10, 16:12, 16:16, 17:21

Weiss [1] - 48:6

well-earned [1] - 50:6

WENNER [1] - 1:18

white [2] - 45:7, 111:18

wide [1] - 59:20

wILLIAM [2] - 2:12, 2:18

WILLIAM [1] - 1:18

willingness [1] - 57:9

WINNING [9] - 2:12, 23:7, 23:25, 55:4, 55:9, 55:16, 55:17, 58:6, 127:15

Winning [3] - 3:6, 3:11, 55:10

winning [1] - 127:14

wise [1] - 133:2

witness [19] - 5:12, 5:17, 29:21, 30:4, 36:17, 36:20, 39:17, 61:14, 65:20, 68:2, 68:19, 108:8, 113:4, 113:9, 113:10, 113:14, 114:4, 114:9, 133:14

Witness [1] - 132:24

WITNESS [19] - 6:9, 15:7, 30:11, 37:2, 39:22, 40:4, 63:17, 69:14, 76:25, 77:5, 106:24, 110:6, 110:24, 112:5, 113:12, 119:12, 127:20, 128:1, 132:22

WITNESSES [1] - 3:1

wonder [1] - 42:12

WOODWARD [10] - 2:22, 2:22, 15:6, 27:7, 28:19, 88:14, 118:25, 127:25, 128:4, 131:4

Woodward [2] - 3:7, 3:17

words [4] - 54:1, 107:7, 120:16, 126:1

work-related [1] - 78:22

works [3] - 16:13, 16:14, 16:16

worry [1] - 61:24

worse [1] - 78:1

worth [2] - 32:18, 83:2

worthless [1] - 127:1

wrap [1] - 53:18

write [4] - 59:24, 108:16, 125:25, 130:15

writing [3] - 25:7, 126:3, 126:12

written [1] - 65:24

wrote [2] - 126:5,

126:6

## Y

year [1] - 31:24

years [7] - 51:14, 90:25, 95:10, 110:9, 121:14, 130:4, 130:6

yourself [3] - 8:14, 78:13, 122:15

## Z

ZIMMERMAN [1] - 1:13

Zimmerman [16] - 2:25, 8:1, 8:16, 13:14, 13:23, 15:10, 15:15, 116:9, 116:25, 117:12, 118:20, 119:4, 123:14, 125:2, 128:11, 129:13

Zimmerman's [2] - 14:13, 14:17

COMMONWEALTH OF PENNSYLVANIA    :   IN THE COURT OF COMMON PLEAS OF

            :   DAUPHIN COUNTY, PENNSYLVANIA

        V.                :

| | |
|---|---|
| ELMER L. BOWMAN | : No. 63 MD 2010 |
| BRETT O. FEESE | : No. 65 MD 2010 |
| DONALD H. McCLINTOCK | : No. 66 MD 2010 |
| JOHN M. PERZEL | : No. 64 MD 2010 |
| BRIAN J. PRESKI | : No. 62 MD 2010 |
| ERIC S. RUTH | : No. 69 MD 2010 |
| JILL A. SEAMAN | : No. 68 MD 2010 |
| SAMUEL C. "BUZZ" STOKES | : No. 67 MD 2010 |
| PAUL E. TOWHEY | : No. 70 MD 2010 |
| JOHN R. ZIMMERMAN | : No. 61 MD 2010 |

TRANSCRIPT OF PROCEEDINGS

PRELIMINARY HEARING

VOLUME II

BEFORE:    HONORABLE WILLIAM C. WENNER

DATE:    TUESDAY, MAY 25, 2010

PLACE:    COURTROOM NO. 1
           DAUPHIN COUNTY COURTHOUSE
           HARRISBURG, PENNSYLVANIA

```
 1  APPEARANCES:

 2

 3      DONNA J. McCLELLAND, ESQUIRE

 4          For - Defendant Bowman

 5      JOSHUA D. LOCK, ESQUIRE
        GOLDBERG KATZMAN, P.C.
 6
            For - Defendant Feese
 7
        SCOTT P. SIGMAN, ESQUIRE
 8
            For - Defendant McClintock
 9
        BRIAN J. McMONAGLE, ESQUIRE
10      FORTUNATO N. PERRI, JR., ESQUIRE
        McMONAGLE, PERRI, McHUGH & MISCHAK, P.C.
11
            For - Defendant Perzel
12
        WILLIAM J. WINNING, ESQUIRE
13      MEGAN S. SCHEIB, ESQUIRE
        COZEN O'CONNOR
14
            For - Defendant Preski
15
        EVAN J. KELLY, ESQUIRE
16
            For - Defendant Ruth
17
        WILLIAM FETTERHOFF, ESQUIRE
18
            For - Defendant Seaman
19
        ROBERT DONATONI, ESQUIRE
20
            For - Defendant Stokes
21
        TIMOTHY WOODWARD, ESQUIRE
22      LAW OFFICE OF TIMOTHY WOODWARD

23          For - Defendant Towhey

24      THOMAS A. BERGSTROM, ESQUIRE

25          For - Defendant Zimmerman
```

DAUPHIN COUNTY COURT REPORTERS

## INDEX TO WITNESSES

| COMMONWEALTH | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Anthony Fiore | | | | |
| By Mr. Brown | 6 | -- | -- | -- |
| By Mr. McMonagle | -- | 21 | -- | -- |
| By Mr. Winning | -- | 28 | -- | -- |
| By Mr. Lock | -- | 29 | -- | -- |
| By Ms. McClelland | -- | 31 | -- | -- |
| By Mr. Wood | -- | 32 | -- | -- |
| By Mr. Fetterhoff | | 36 | -- | -- |
| By Mr. Bergstrom | | 43 | -- | -- |
| | | | | |
| Robert Soop | 52 | -- | -- | -- |
| By Mr. Brown | -- | 64 | -- | -- |
| By Mr. Winning | -- | 67 | -- | -- |
| By Mr. Donatoni | -- | 72 | -- | -- |
| By Ms. McClelland | -- | 78 | -- | -- |
| By Mr. Kelly | -- | 79 | -- | -- |
| By Mr. Woodward | -- | 86 | -- | -- |
| By Mr. Sigman | -- | 87 | -- | -- |
| By Mr. Fetterhoff | | | | |
| | | | | |
| Michael Cranga | 94 | -- | -- | -- |
| By Mr. Brown | -- | 101 | -- | -- |
| By Mr. Lock | -- | 103 | -- | -- |
| By Ms. McClelland | -- | 105 | -- | -- |
| By Mr. Fetterhoff | | | | |

DAUPHIN COUNTY COURT REPORTERS

1                          INDEX TO EXHIBITS

2

3  COMMONWEALTH'S EXHIBIT NO.                        IDENTIFIED

4

5    35   3/3/2009 letter                               7

6    36   2/29/2009 subpoena                            9

7    37   Boxes in B2 chart                            11

8    38   4/12/2005 e-mail w/attachments               53

9    39   4/26/2005 e-mail w/attachments               39

10   40   FOJP/HRCC expenditure chart                  58

11   41   Travel expense vouchers November 2001       110

12   42   Travel expense vouchers December 2004       111

13   43   Travel expense vouchers Jan/Feb 2004        111
          Tony Painter
14
     44   Travel expense vouchers Jan/Feb 2004        111
15        Eric Ruth

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2           TUESDAY, MAY 25, 2010
 3                12:48 p.m.
 4
 5         MS. MCCLELLAND:  If I may, while
 6  everybody's waiting, my client has to leave by
 7  about ten to four to pick up his children.  He
 8  waives his presence if the hearing continues
 9  beyond that, if that's acceptable.
10         MR. BROWN:  Mr. Bowman, you understand
11  you have the right to be present for the entirety
12  of the preliminary hearing?
13         DEFENDANT BOWMAN:  Yes.
14         MR. BROWN:  And you've had the
15  opportunity to discuss your absence with your
16  attorney?
17         DEFENDANT BOWMAN:  Yes.
18         MR. BROWN:  You're satisfied with your
19  representation to this point?
20         DEFENDANT BOWMAN:  Yes.
21         MR. BROWN:  And no one has forced or
22  threatened you to leave the preliminary hearing
23  early?
24         DEFENDANT BOWMAN:  No, sir.
25         MR. BROWN:  It's a matter for the Court.
```

DAUPHIN COUNTY COURT REPORTERS

1          THE COURT:  Thank you.

2          MS. MCCLELLAND:  Thank you.

3          MR. BROWN:  Agent Fiore is next.

4

5                    ANTHONY FIORE,

6  called as a witness, being duly sworn, testified

7  as follows:

8                DIRECT EXAMINATION

9  BY MR. BROWN:

0     Q    Good afternoon, sir.  Would you state

1  your name for the record and spell your last

2  name, please?

3     A    My name is Anthony Fiore.  First name is

4  A-N-T-H-O-N-Y.  My last name is Fiore, F as in

5  Frank, I-O-R-E.

6     Q    And, Agent Fiore, you're one of the

7  agents assigned to the House Republican Caucus

8  investigation; is that correct?

9     A    That's correct.

0     Q    There are a couple different areas I want

1  to ask you about, Agent Fiore.  First, are you

2  familiar with someone by the name of Zain Kahn?

3     A    I am.

4     Q    And did --

5          MR. DONATONI:  What was the name?

1        THE WITNESS:  Zain Kahn, K-A-H-N is the
2  last name.  First name is ZAIN.
3  BY MR. BROWN:
4     Q    And Mr. Kahn is the head of variably
5  either Artist Forum, iConstituent, or
6  Constituents Direct, depending on the time frame
7  we're talking about?
8     A    That's correct.  He's the CEO of those
9  companies, yes.
0     Q    And was a request made to Mr. Kahn to
1  look into information regarding Greystone and
2  SKP?
3     A    It was.
4     Q    And did, in fact, the grand jury, through
5  the Office of Attorney General, receive a
6  response to that request?
7     A    It did.
8     Q    And was that a written response?
9     A    It was.
0     Q    To the best of your knowledge, Agent
1  Fiore, will Mr. Kahn be available to testify at
2  the trial of this matter?
3     A    He will, Your Honor.
4     Q    Agent Fiore, I'll show you what's been
5  marked as Commonwealth's Exhibit 35 for

1  identification.  Do you recognize that, if, in

2  fact, you can see it with the glare in here?

3      A   Yes, I do recognize that.

4      Q   And is that the written response from

5  Mr. Kahn?

6      A   It is.

7      Q   Can you actually read it from where you

8  are or would the paper copy be easier?

9      A   I'll try.

0      Q   And what does Mr. Kahn indicate regarding

1  whether or not his business Constituents Direct

2  has ever done any business with an entity known

3  as Greystone or SKP?

4      A   (Reading:)

5          Dear Agent Fiore, we have received

6       the subpoena to produce information

7       concerning Graystone/Greystone/SKP.

8       Please be advised that neither I

9       Constituent nor any of its related

0       companies have engaged in business

1       with Graystone, Greystone, or SKP.

2          Should you require any further

3       information, please feel free to

4       contact me directly at 310-696-2261.

5       We appreciate your time.  Thank you.

DAUPHIN COUNTY COURT REPORTERS

1        Sincerely, Zain Kahn, CEO,

2        iConstituent, LLC.

3    Q    And the reason Greystone is there twice

4 is one time it's spelled with an A one time it's

5 spelled with an E?

6    A    That's correct.

7    Q    Agent Fiore, I now want to move to a

8 different area.  And that relates to what I

9 believe Ms. -- either Ms. Flickinger or Lori

0 Lochetto this morning referred to either as the

1 night of the many boxes or the 4,000 boxes.

2 You're familiar with that?

3    A    I am.

4    Q    What I want to show you are -- or what I

5 want to ask you first is if you're familiar with

6 the forthwith subpoena that was issued on

7 February 29th of 2008 in regard to that

8 particular part of the case.

9    A    I am familiar with it.

0    Q    Agent Fiore, I'm showing you what's been

1 marked as Commonwealth Exhibit 36 for

2 identification.  Do you recognize that?

3    A    I do.

4    Q    And is this, in fact, true and correct

5 copy of the forthwith subpoena that is at issue

1 here?

2    A    It does appear to be so, yes, sir.

3    Q    Under number two it says, "You are

4 further ordered --" and what does it say after

5 that?

6    A    After that it says (reading:)

7        To appear and produce forthwith

8        any and all campaign documents or

9        materials removed from Room B02 in the

10       basement of the Irvis Office Building

11       on February 26th, 2008, or during the

12       60 days preceding.  You are further

13       ordered to disclose the location of

14       any and all other materials removed

15       from this location during the period

16       described.

17   Q    And this subpoena, was it actually served

18 on February 29th of 2008?

19   A    Yes, it was.

20   Q    On the flip side of Commonwealth

21 Exhibit 36 it indicates that Agent Robert

22 Drawbaugh served the subpoena on February 29th,

23 2008, at 2:30 p.m.  Is that correct?

24   A    That's correct.

25   Q    And does it indicate upon whom Agent

1  Drawbaugh served this subpoena?

2      A    It indicates that the subpoena was handed

3  to Jill -- Jill Seaman, HRC paralegal.

4      Q    Now, Agent Fiore, you've done some

5  investigation into the week of February 25th

6  through the 29th of 2008; is that right?

7      A    That's right.

8      Q    And some of the findings you've made to

9  date you've prepared in the exhibit form; is that

10 right?

11     A    That's correct.

12     Q    And would you recognize the exhibit you

13 prepared if you saw it again?

14     A    I certainly would.

15     Q    Agent Fiore, beginning with what I'm

16 showing you what was marked as Commonwealth

17 Exhibit 37 for identification, do you recognize

18 that?

19     A    Yes, I do.

20     Q    And is this a true and accurate depiction

21 of the chart that you've prepared?

22     A    It is.  Excuse me, Ken.  Do you have a

23 copy that I can look at or no?  A hard copy?

24     Q    Just for the lighting conditions it's

25 probably easier if you can actually see it up

1 here.

2    A    I apologize.  Thank you.

3    Q    Now, Agent Fiore, I want to start with
4 February 26th of 2008.  What does your
5 investigation indicate occurred on the 26th?

6    A    On Tuesday, February 26th?

7    Q    Yes.

8    A    On Tuesday, February 26th this document
9 reflects that my investigation learned that a
10 messenger had moved boxes from Room B2, and
11 that's in the Irvis Office Building, to Room 414,
12 which is in the main capitol, at the direction of
13 Lori Lochetto.

14         And also on the 26th of February, 2008,
15 this document reflects that my investigation
16 learned that John Zimmerman -- a call is made
17 from his desk phone which is located in Room 414.
18 And that desk phone makes a call to HRCC, that's
19 the House Republican Campaign Committee, at 4:30
20 p.m. on that date.

21    Q    And let me stop you there, Agent Fiore.

22    A    Sure.

23    Q    414 is, at the time we're talking about
24 here, John Perzel's office?

25    A    Yes.

1    Q    And phone records for Zimmerman's desk
2  indicate that there is a phone call made to HRCC
3  about 4:30 p.m. on the 27th?
4    A    That's right.
5    Q    Now, in that same box there's an
6  indication of a person by the name of George
7  Matthews.  Are you familiar with him?
8    A    I am.
9    Q    And to the best of your knowledge, will
10  Mr. Matthews be available to testify in the trial
11  of this matter?
12    A    He will.
13    Q    And what does Mr. Matthews say, if
14  anything, about this phone call or a phone call
15  that he receives around that time period --
16        MR. MCMONAGLE:  Objection, hearsay.
17        MR. BROWN:  Your Honor, this is a
18  preliminary hearing.  And under Commonwealth
19  versus -- I think particularly this would be --
20  Branch, evidence of -- or hearsay evidence is
21  allowed at a preliminary hearing.  There's
22  already been direct testimony from Sheila
23  Flickinger regarding this particular incident.
24  Based on that, this Agent Fiore's certainly
25  allowed to testify as to what Mr. Matthews told

1  him.

2        MR. MCMONAGLE:  Rick and Branch don't

3  have to do in this Court, have to do with items

4  such as lab reports, chemist's testimony and the

5  such where a representation is made and there has

6  been some type of memorialization of that kind of

7  evaluation.

8        Here we're talking about basic hearsay.

9  I have no objection to what Miss Flickinger told

10  the agents, and she has already testified and

11  been subject to cross-examination.  But beyond

12  that I do believe it exceeds the bounds of

13  permissible evidence at this level.

14        MR. BROWN:  Your Honor, under Branch at

15  *437 A.2d 748,* a Superior Court case from 1980,

16  any hearsay statement can be introduced at a

17  preliminary hearing if the -- if the witness is

18  available for trial.  This is certainly permitted

19  under the law.

20        MR. BERGSTROM:  Your Honor, I join the

21  objection, by the way, on behalf my client John

22  Zimmerman.

23        THE COURT:  Is it possible to limit

24  what's going to be questioned in regards to this

25  Matthews man?  I mean, clearly I think we all

1  know some limited hearsay obviously can be
2  accepted at the preliminary hearing.  And
3  obviously -- I think where it's obviously not
4  applicable if it's used merely to totally prove
5  an issue of prima facie in and of itself.
6        I don't believe Mr. -- I don't know.  I
7  mean, I think we need to limit to some degree --
8  I'm going to give you a little bit of latitude,
9  but I don't know how far we're going to go.
10        MR. BROWN:  Understood.
11        THE COURT:  Okay.
12  BY MR. BROWN:
13    Q  Agent Fiore, what did Mr. Matthews tell
14  you about the phone call that's depicted in the
15  box for February 26th, 2008, at 4:30 p.m.?
16    A  Specifically, Your Honor, Mr. Matthews
17  indicates that he received a phone call at that
18  time from someone, a male, who identified himself
19  as working for -- or calling from the Office of
20  John Perzel, and the male requested that HRCC
21  take delivery of some boxes and would that be
22  okay.
23    Q  Did Mr. Matthews recognize the male
24  voice, according to what he told you?
25    A  He did not.

1    Q    Was Mr. -- did Mr. Matthews indicate

2  whether he was familiar with the voice of

3  anyone -- of any male who worked in John Perzel's

4  414 office during that period of time?

5    A    He did.

6    Q    And what did he say?

7    A    Mr. Matthews indicated that he knew the

8  voice of and he knew personally Paul Towhey, and

9  that the phone call made at that -- on that date

10  and time was not Paul Towhey.  He also indicated

11  that he knew the voice of John Perzel, and that

12  that call was not made by John Perzel.

13    Q    Now, Agent Fiore, Commonwealth Exhibit 37

14  indicates one movement or more than one movement

15  of boxes involving Rooms B2 and 414?

16    A    That's correct -- I'm sorry.

17    Q    One or more than?

18    A    More than one.

19    Q    And if you can explain to the Judge,

20  based on Commonwealth's Exhibit 37, the movement

21  of the boxes?

22    A    Your Honor, on February 25th, my research

23  indicates that there was a movement of boxes by

24  House Republican Caucus messenger from B2 to 414,

25  again, at Lori Lochetti's direction.  There was

1  also one on the 26th as we discussed at 3 --

2  approximately 3:20 in the afternoon of that date,

3  again, from B2 to 414 at Lori Lochetti's

4  direction.  And also on the 27th of February,

5  2008, at approximately 11 a.m. there's

6  information that a messenger moved boxes from 414

7  in the main capitol to the offices of the House

8  Republican Campaign Committee, again at Lori

9  Lochetti's direction.

10      Q   I want to stick with February 27th at

11  this point, Agent Fiore.  The phone records that

12  you reviewed of John Zimmerman's desk phone, do

13  they indicate any calls that were made, let's

14  say, to the HRCC on February 27th of 2008?

15      A   Your Honor, there were three calls made

16  from that phone on the 27th of February, 2008,

17  three different times, 2:08 p.m., 2:31 p.m., and

18  then in a little later in the evening, 7:35 p.m.

19  again, from the desk phone assigned to John

20  Zimmerman.

21      Q   Now I want to move ahead, Agent Fiore, to

22  that Friday, February 29th of 2008.  The

23  subpoena, according to Commonwealth Exhibit 36,

24  was served at approximately 2:30 p.m. on that

25  day?

1      A    That's correct.

2      Q    Did you review any records -- and I'll

3  make it specific.  Did you review any phone

4  records regarding what happened on February 29th,

5  2008, after the forthwith subpoena was served on

6  Jill Seaman?

7      A    I did.  Your Honor, I reviewed both cell

8  phone records and land line phone records.

9      Q    And what did your review find?

10     A    Your Honor, I looked at Paul Towhey's

11 cell phone records for that day.  In particular,

12 around that time after 6 p.m. or 6:30, there was

13 a number of calls that are placed by Mr. Towhey's

14 cell phone.  And it's a state issued cell phone.

15 And the records indicate that there were four

16 calls between Mr. Towhey and Mr. Zimmerman after

17 6:30 p.m. on that date, the 29th of February.

18          There was also five calls to the phone

19 that is registered to the Law Offices of Brett

20 Feese.  There are six calls to the -- to John

21 Perzel, either his -- phones either listed to

22 his -- his cell phone -- I believe just his cell

23 phone, and then also Lori Lochetto, there were

24 five calls to or from Mr. Towhey and Miss

25 Lochetto during those hours as well.

1    Q   And I'm sorry, Agent Fiore, you might

2  have mentioned this and maybe I just didn't hear.

3  Approximately what time do all these calls going

4  back and forth actually start?

5    A   They start after 6:30 p.m.

6    Q   And you were here for Agent Speaks's

7  testimony?

8    A   Yes, I was.

9    Q   And that would be after Agent Speaks

10  testified that he and Mr. Fina entered the

11  capitol complex pursuant to at least

12  Commonwealth's Exhibit 36, the forthwith

13  subpoena?

14    A   That's my understanding, yes, sir.

15        MR. BROWN:  Court's indulgence for a

16  moment, please.  (Pause.)

17  BY MR. BROWN:

18    Q   Agent Fiore, I guess just for the record

19  purposes more than anything, the person that you

20  identified as Jill Seaman, you see her in the

21  courtroom today?

22    A   I do.

23    Q   Can you point her out for the Judge,

24  please?

25    A   Sure.  She's in the back row, Your Honor.

1    Q   The person that you identified as Paul
2 Towhey, do you see him in the courtroom today?
3         MR. WOODWARD:  Stipulate, Your Honor.
4         THE COURT:  Okay.  Thank you.
5 BY MR. BROWN:
6    Q   The person you've identified as John
7 Zimmerman, do you see him in the courtroom?
8    A   I do.  He's in the back row as well.
9    Q   Thank you.  Now, Agent Fiore, one or two
10 last questions about the phone calls.  Did you
11 perform any analysis to determine whether this
12 was a normal number of calls between these people
13 or an abnormal number of calls?
14        MR. WOODWARD:  I'm going to object to
15 that, Your Honor.  I don't know, he's an expert
16 in telephone calls?
17        MR. FETTERHOFF:  Right, we're not talking
18 about --
19        MR. LOCK:  I join in the objection.
20        MR. BROWN:  I'll ask it a different way,
21 Judge.
22        THE COURT:  Okay.
23 BY MR. BROWN:
24    Q   You reviewed the cell phone records and
25 the desk line records for that particular

DAUPHIN COUNTY COURT REPORTERS

```
 1  agreement, is that right, Agent Fiore?
 2      A    I did, yes.
 3      Q    And specifically for the people you've
 4  already mentioned?
 5      A    That's correct.
 6      Q    Did you also review cell phone records
 7  for those same people for a different period of
 8  time?
 9      A    I did.
10      Q    And what other different period of time
11  are we talking about?
12      A    Months prior and months after.
13      Q    And what did your analysis reveal?
14      A    Your Honor, it appeared to me that there
15  was an inordinate -- a higher -- significantly
16  higher number of calls during this day than there
17  were in looking at the other time periods.
18          MR. BROWN:  Thank you, Agent Fiore.
19  Tender for cross.
20                  CROSS EXAMINATION
21  BY MR. MCMONAGLE:
22      Q    Agent Fiore, good afternoon.
23      A    Good afternoon.
24      Q    Let me kind of work backwards from your
25  trained eye on these phone calls.
```

```
 1      A    Okay.

 2      Q    A deputy attorney general shows up at the

 3 capitol, correct?

 4      A    That's correct.

 5      Q    Is that -- that's Mr. Fina, correct?

 6      A    Yes.

 7      Q    With agents from the Attorney General's

 8 office, correct?

 9      A    That's correct.

10      Q    With subpoena, correct?

11      A    That's right.

12      Q    And not only shows up, but asks to go in

13 to a room to look at boxes, correct?

14      A    That's correct.

15      Q    And then goes upstairs, they have Mr. --

16 I think it's Mr. Towhey come in a snowstorm to

17 get back to the capitol to open up his office,

18 correct?

19      A    That's correct.

20      Q    That's pretty significant event?

21      A    Yes, sir.

22      Q    So you'd expect, I would assume,

23 Mr. Towhey, after he accommodated you, cooperated

24 with you, to call up Mr. Zimmerman, Mr. Feese,

25 Mr. Perzel, and Ms. Lochetto about what
```

1  transpired?  That's not unusual, is it at all,

2  right?

3      A    I'm not sure if it's unusual or not.  I

4  can say that it -- cell phone records are -- in

5  and of themselves may mean something, but in

6  conjunction with other events they may mean

7  something more.  In my looking at cell phone and

8  land line records --

9      Q    Yeah.

10     A    -- these -- these types of records

11  will -- may indicate a certain -- will indicate

12  association between individuals and they may

13  indicate interest or involvement between

14  individuals around -- around a significant --

15  around an event.

16     Q    Sure.  I mean, the event here was the

17  Attorney General's office coming to the capitol

18  with a subpoena?

19     A    That's right.

20     Q    That's a big event.  That's big ticket

21  item, right?

22     A    Absolutely.

23     Q    Anybody picked up the phone and said,

24  hey, I got the AG's office, I got -- Fina, does

25  he usually go out and serve subpoenas, by the

1  way, Deputy Fina?

2      A    I don't know.

3      Q    So there's absolutely nothing, would you

4  agree with me, that we can glean from that phone

5  call other than maybe the obvious, which is

6  Mr. Towhey saying we just got served a subpoena

7  by the Attorney General's office, correct?

8      A    That's correct.

9      Q    All right.  Now let's go to the

10 beginning.

11          I looked at this chart.  And who asked

12 you to prepare this chart?

13     A    It was a product of my own doing.  No one

14 asked me to prepare this chart.

15     Q    So you came up with it on your own?

16     A    Yes, sir.

17     Q    All right.  Let's go to the first block

18 on the chart, February 25th, 2:40 p.m. messenger

19 moves boxes from Room 4 -- B2 to Room 414 at Lori

20 Lochetto's direction.  Have I read that directly?

21     A    Yes, sir.

22     Q    Didn't something happen before then?

23 Well, let me be more clear.  Didn't Miss Lochetto

24 tell us under oath today that she got a phone

25 call from a Jason Weiser who was down there and

1  they were moving boxes because of construction.

2  Did you hear that testimony?

3      A    Yes, I did.

4      Q    And when they got down there, they went

5  into the room and they found that there was

6  campaign material.  Did I get that correct?

7      A    Yes, sir.

8      Q    Now, you didn't put that in the box?

9      A    I didn't put what, sir?  I don't

10 understand your question.

11     Q    You didn't put in the box what happened

12 before the messenger moved the boxes from B2 to

13 414 at Lori Lochetto's direction; is that fair,

14 you didn't put that in the box?

15     A    That's correct.  I did not depict that.

16     Q    But we certainly heard from Ms. Lochetto

17 today what inspired that move, is that fair?

18     A    Yes, sir.

19     Q    All right.  And Ms. Lochetto then told us

20 that after the messenger moved the boxes -- and

21 that looks like you've got 2:40 p.m.  Is that the

22 exact time that the boxes were moved?

23     A    That's the time that appears on the

24 messenger logs.

25     Q    Okay.  The next time that we have here

1  that's significant on the 25th is what time?

2      A    I'm not sure what you're referring or

3  asking me, sir.

4      Q    Well, I'm looking on the 25th.  It says

5  boxes containing campaign material witnessed in

6  Room B2 Irvis Office Building?

7      A    That's right.

8      Q    What does that refer to?

9      A    That refers to the incident that is again

10 referenced in the 28th of February, the box next

11 to it, the legislative employee approaches the

12 OAG with information on the presence of these

13 boxes with campaign content within B2.  So that

14 event occurs prior to and it occurs on the 25th.

15     Q    What occurs on the 25th?

16     A    The witnessing of these boxes.

17     Q    By who?

18     A    By this legislative employee, and I

19 assume others.

20     Q    Well, who's the legislative employee?

21     A    Her name is Julie Orris.

22     Q    Okay.  And the boxes that we're talking

23 about are the same boxes that Miss Lochetto moved

24 from B2 to 414, correct?

25     A    Yes.

1    Q    Okay.  And according to Miss Lochetto,

2  those boxes contained a variety of items,

3  correct?

4    A    Yes.

5    Q    And according to her, there was campaign

6  material in some of the boxes, correct?

7    A    That's my understanding.

8    Q    She made real clear that the campaign

9  material that she was referring to was stationery

10  and I think envelopes, correct?

11    A    That's correct.

12    Q    From 2004, correct?

13    A    Yes, sir.

14    Q    And that that material was ultimately

15  relocated to where ultimately they're taken to,

16  which is over in the HRCC, correct?

17    A    That's correct.

18    Q    So we're talking about this same thing

19  that Ms. Lochetto was talking about on this

20  chart, am I right?

21    A    That's right.

22    Q    So all of this, this chart, all that's

23  been prepared, the discussion we're talking about

24  is 2004 stationery and envelopes; is that

25  correct?

1     A    The material discussed is exactly that,

2  yes, sir.

3     Q    All right.  Now, were you present for the

4  execution of the subpoena?

5     A    No.

6     Q    Were you at the capitol that day?

7     A    No.

8          MR. MCMONAGLE:  Give me a brief moment,

9  Judge.  (Pause.)  Thank you.

10          THE COURT:  Mr. Winning.

11          MR. WINNING:  I just have a couple

12  questions, Your Honor.

13  BY MR. WINNING:

14     Q    Agent, referring to Government Exhibit 35

15  for one minute if you would, please, do you see

16  it, sir?  The second line there's a reference to

17  "neither iConstituent nor any of its related

18  companies."

19          Do you know what related companies are

20  being referenced here.

21     A    His companies, Mr. Kahn's company went

22  through various iterations.  To my knowledge it

23  was at one time known as Constituents Direct.  It

24  was known as Artists Forum.

25     Q    Artists Forum?

1    A    Artists Forum.

2    Q    Forum.

3    A    It was known as iConstituent, and there

4  was one other that I cannot recall except for the

5  name contained political something.

6    Q    So there were roughly four or five

7  related entities?

8    A    At least that I know.

9    Q    And the purpose of this letter, I take

10  it, is to say to you or to suggest to you that

11  none of these companies have done any business or

12  transacted any business with either Greystone or

13  SKP?

14    A    Yes.

15    Q    Okay.  And that would mean that none of

16  these entities have provided any data or

17  information or received any money at all from SKP

18  or Greystone?

19    A    That's my understanding, yes, sir.

20        MR. WINNING:  Thank you.  That's all I

21  have.

22        THE COURT:  Mr. Lock.

23  BY MR. LOCK:

24    Q    You weren't suggesting, were you, Agent

25  Fiore, when you indicated that because telephone

1   communications can suggest interest or

2   involvement of individuals around an event that

3   that event is necessarily criminal in nature?

4       A    No, I was not.

5       Q    And, indeed, you focused your analysis on

6   telephone calls placed by and to particular

7   individuals in whom you had an interest, which is

8   to say the individuals who were named on your

9   exhibit; is that right?

10      A    That's correct.

11      Q    There was a great deal of additional

12  telephone communication with other people

13  conducted by some of the named parties, people

14  with the Attorney General's office, and various

15  others, on, for example, February 29th; isn't

16  that right?

17      A    I don't have the records in front of me,

18  but certainly there were other calls.

19      Q    Did you review the universe of relevant

20  phone records for, for example, February 29th?

21      A    I'm not sure I know what you mean by

22  universe.

23      Q    All of them.

24      A    Again, I'm not sure what that means.  In

25  relation to the people mentioned here or listed

1 here, the answer is yes.

2    Q  Well, it means, for example, that without

3 even having gotten through all of these notes,

4 that Mr. Fina had communications, so I take that

5 to mean an interest or involvement -- an interest

6 in or involvement with individuals around the

7 event at various times between 2 p.m. starting at

8 2 p.m. and continuing at least until

9 approximately 10 p.m. on the 29th.  Does that

10 sound substantially accurate?

11    A  Yes.

12    Q  And then there were calls to HRC

13 attorneys or at HRC and they're not listed on

14 here, are they?

15    A  I'm not aware of those calls.  But if

16 they occurred, they certainly are not listed

17 here, yes, sir.

18       MR. LOCK:  Thank you, sir.  I have

19 nothing else.

20       MR. DONATONI:  Thank you, sir.  I have no

21 questions.

22 BY MS. MCCLELLAND:

23    Q  You agree, would you not, that Al Bowman

24 has nothing to do with Greystone or SKP; those

25 companies involve Mr. Preski, Mr. Perzel and --

1    A   I don't -- I don't think he does, no.  I
2   don't have that information.  I don't think he
3   does.

4    Q   You don't think he -- you think he has
5   nothing to do with those companies, correct?

6    A   As I sit here, I don't recall any
7   connection between Mr. Bowman and those
8   companies.

9        MS. MCCLELLAND:  Thank you.

10       MR. KELLY:  Afternoon, Agent.  I have no
11  questions.

12  BY MR. WOODWARD:

13   Q   Agent Fiore, this February 29th is a
14  Friday, is it not?

15   A   It is.

16   Q   And 6:30 is 6:30 on a Friday night.  Not
17  many people in the capitol that night, is there?

18   A   I'm not there, sir.  But I would imagine
19  no.

20   Q   It's like any other business, not many
21  people in at 6:30 on a Friday night, true?

22   A   Fair enough, yes, sir.

23   Q   Now, sir, you have no knowledge
24  whatsoever that Mr. Towhey knew of the existence
25  of the February 29th subpoena, do you?

1    A    I don't know when he becomes aware of
2 that. I certainly don't have interaction with
3 Mr. Towhey at that time.

4    Q    Now, you also don't know, sir,
5 researching these cell phone records,
6 Mr. Towhey's cell phone records, how many of
7 these calls to Mr. Feese, Ms. Lochetto,
8 Mr. Zimmerman, and Mr. Perzel went unanswered, do
9 you?

10    A    I don't.

11    Q    So of the 20 calls that you referenced on
12 your printout, you don't know how many of those
13 20 calls went unanswered, do you?

14    A    I don't recall. Again, I don't have the
15 records specifically, but as I do recall, most,
16 if not all, had some time associated with them,
17 because the length of the call is associate -- is
18 listed. But my understanding is that if a call
19 goes to voice mail it may list one minute, but
20 obviously a connection is not made between two
21 people, other than the voice mail.

22    Q    So if a call goes to voice mail, the
23 record's going to reflect a minute. You agree
24 with that?

25    A    Yes.

1    Q    So, for example, the five calls that

2  Mr. Feese, if I would have told you my

3  calculation of those five calls show a total of

4  nine minutes, many of which refer to one minute,

5  would you conclude that a number of the calls to

6  Mr. Feese alone went unanswered?

7    A    If that's the case, sir, that's a

8  possibility.

9    Q    Now, sir, you were asked a question

10  regarding your analyzing calls for a different

11  period of time for Mr. Towhey's phone.  Do you

12  remember that question?

13    A    No.

14    Q    You weren't --

15    A    I don't remember the question you're

16  referencing.

17    Q    Okay.  I believe Mr. Brown asked you

18  something, and correct me if I'm wrong, whether

19  or not you analyzed calls on Mr. Towhey's cell

20  phone for other periods of time to see if there

21  were the same number of calls to these five

22  individuals.

23    A    I do recall --

24    Q    Do you recall that?

25    A    I do recall that, yes, sir.

1      Q    Would you agree with me that those other

2  periods that you analyzed, the fourth in demand

3  for the Attorney General's office wasn't in

4  Mr. Perzel's office at the time, was he?

5      A    Not to my knowledge, no.

6      Q    Now, sir, you've -- I know you very well.

7  You and I know each other?

8      A    Yes, sir.

9      Q    Prior to this you worked for Cheltenham

10  Police Department, did you not?

11      A    I did.  I did.

12      Q    So you're certainly familiar with

13  paramilitary organization and the chain of

14  command that exists within those organizations,

15  true?

16      A    Yes, I am.

17      Q    And you knew at the time that Mr. Perzel

18  was Mr. Towhey's boss, true?

19      A    That's correct.

20      Q    So you don't find it unusual that

21  Mr. Towhey would be calling his boss on a Friday

22  night to alert his boss that the fourth in

23  command in the Attorney General's office was in

24  his office?

25      A    I don't find that unusual at all.

1    Q    And you wouldn't find it unusual for
2  Mr. Towhey to be calling Mr. Zimmerman who also
3  shares an office with Mr. Perzel?
4    A    I don't find that unusual.
5    Q    Or Miss Lochetto who also shares an
6  office with Mr. Perzel?
7    A    In and of itself I find that not unusual,
8  yes, sir.
9    Q    And Mr. Feese at the time, what was
10  Mr. Feese's position on February 29th of 2008?
11    A    I believe he was chief counsel for the
12  HRC.
13    Q    So would it be unusual for Mr. Towhey,
14  now knowing that the Attorney General is at
15  Mr. Perzel's office, for him to call the counsel,
16  alert the counsel to what was going on?
17    A    I wouldn't find that unusual.
18        MR. WOODWARD:  I have nothing further,
19  Agent Fiore.  Thank you.
20        THE WITNESS:  Thank you.
21        MR. SIGMAN:  No questions, Your Honor.
22  BY MR. FETTERHOFF:
23    Q    Agent Fiore, just to follow up on what --
24  Mr. Woodward is fortunate because he has these
25  records, his phone records in front of him and of

1  course you don't.

2       Do I assume that you reviewed these, the

3  exact records, and the Office of Attorney General

4  is in possession of those records?

5       A    That's correct, sir.

6       Q    But we have the chart and not the records

7  today; is that correct?

8       A    That's exactly true, sir, yes.

9       Q    So that being the case, I have to ask you

10 in that lower box on the lower right-hand corner

11 concerning Miss Seaman's, Mrs. Seaman's calls,

12 first of all, it says, "Show these contacts."

13 Contacts, C-O-N-T-A-C-T-S, is kind of an

14 ambiguous -- calls.  Does that mean calls

15 received or calls made or both?

16      A    Both.

17      Q    So, for instance, the reference to the 12

18 contacts with Mr. Feese, that might have been six

19 calls one way and six the other; or five one way,

20 seven the other, or whatever?

21      A    It may have been that, yes, sir.

22      Q    Do you remember offhand what?

23      A    I don't.

24      Q    Now, do you remember -- because just

25 based on this chart, not based on the actual

1   phone records, it might show even additional

2   calls made by some of these people to others,

3   right?

4       A   Sure.

5       Q   Do you recall how many times Mrs. Seaman

6   tried to get representative -- or then -- I'm

7   sorry, then-Chief Counsel Feese or Counsel Feese

8   tried to get Miss Seaman and could not get

9   through because of these other phone calls or

10  some other reason?

11      A   I don't have that information, sir.

12      Q   I mean, 12 calls are listed here just

13  between Mr. Feese and Mrs. Seaman.  Don't you

14  think it would have been relevant to indicate --

15  I mean, this is evidence going in here.  We don't

16  have the actual records.  Don't you think it

17  would have been fair to indicate how many of

18  these calls actually were successfully connected?

19  I mean, 12 seems like a high number, unless

20  they're not real calls.

21      A   I'm not sure that any of them were not

22  connected.  I counted 12 instances of contact

23  between one -- one direction or the other.

24  That's the number I placed on it.

25      Q   But you already explained --

1    A    Yes.

2    Q   -- that some of those calls may have gone

3 to voice mail, right?

4    A   It's very possible, yes, sir.

5    Q   Now, what happens, I don't even know, to

6 be honest, what happens if one cell phone calls

7 another, you don't even wait for a voice mail,

8 you just click it off?  Is there a charge for

9 that?  Is that one minute charge also?

10    A   I don't know.  I don't know, sir.

11    Q   If could be, right?

12    A   It's possible.  It could not be, too.

13    Q   Now, do you know, in fact, that

14 Mrs. Seaman -- the subpoena was served at 2:30 on

15 Mrs. Seaman personally, right?

16    A   That's my understanding, yes, sir.

17    Q   And that's what Exhibit 36 indicates?

18    A   Yes, sir.

19    Q   Now, by the time Mr. Fina and Mr. Speaks

20 and whoever else was with him show up at 6 p.m.,

21 right?

22    A   That's right.

23    Q   Now, are you aware of the number of calls

24 between Mr. Fina and Mr. Feese that were made in

25 an effort to set that time up and also just

1  discuss the whole problem?

2    A   I am not aware of those calls, no.

3    Q   Well, might that be on this chart, the

4  calls between Mr. Feese and Mr. Fina?  Mr. Fina

5  is a player and probably now a witness.

6    A   I don't understand your question, sir.

7    Q   Well, how many calls were made, or

8  contact as the chart says, between Mr. Fina and

9  Mr. Feese between 2:30 p.m. and 6 p.m. when

10 Mr. Fina physically appeared?

11   A   I do not know the answer to that.

12   Q   Now, you're aware that Mr. Fina was in

13 multiple -- had multiple phone calls with K&L

14 Gates, any number of attorneys that were there?

15   A   I'm not aware of that at all, sir.  I'm

16 not privy to that.  I wasn't aware of that.

17   Q   Well, those are phone calls that might be

18 on a chart, right?

19   A   I suspect that they could have been

20 included, yes, sir.

21   Q   Now, are you aware that many of the phone

22 calls -- that Mrs. Seaman had the cell phone

23 after 6 p.m. when Mr. Fina arrived in the company

24 of the agents, many of those phone calls that

25 Mrs. Seaman was making she was making right there

1  in the presence of Mr. Fina and the agents?  Are
2  you aware of that?

3      A    I'm not aware of that, sir.

4      Q    Did you interview Mr. Fina?  Did you take
5  a statement from him?

6      A    No.

7      Q    Now, were you aware that Lori Lochetto,
8  who testified here today, could not be reached to
9  ask her to come back to the office?

10     A    I -- I don't know that for sure, sir.
11 No, I don't.  I'm not aware of that.

12     Q    But you are aware from either reports
13 that she was not present at any point after
14 6 p.m. in the capitol?

15     A    I believe that's accurate.  She was not
16 present.

17     Q    All right.  So the arrangement was, since
18 Mr. Perzel was an elected representative and a
19 high official of the House of Representatives,
20 that the Attorney General's office was simply not
21 going to be permitted to enter that room unless
22 there was a representative of Mr. Perzel there,
23 right?

24     A    I'm not aware of that, sir.  I'm not
25 aware of the arrangement.

1    Q    Well, were you aware that
2  Mr. Zimmerman -- were you aware whether or not
3  any of these seven calls, assuming some of them
4  did go through, were made in an effort, first, to
5  locate Mr. Zimmerman and then to explain the time
6  and then to explain to him after the time had
7  been changed what time he was supposed to come
8  because Mrs. Lochetto couldn't come?
9    A    You're referring, sir, to the Seaman
10 calls?
11   Q    Yes.
12   A    My understanding, and I don't have the
13 records in front of me, but the seven calls
14 referenced next to Mr. Zimmerman's name were
15 calls, as I recollect, in one direction.  They go
16 from Mr. Zimmerman to Miss Seaman.
17   Q    Right.  He ultimately did come in at or
18 after 6 p.m., right?
19   A    Yes.
20   Q    He opened the door and let people in to
21 Mr. Perzel's office; is that right?
22   A    I wasn't there.  I don't -- I don't have
23 that information.
24   Q    Okay.  Do you think he showed up at
25 6 p.m. because he had a vision or do you think

1  somebody told him what time had been arranged

2  between Mr. Fina and everybody else?

3     A    I would imagine that someone notified

4  him.

5        MR. FETTERHOFF:  One minute.  (Pause.)

6  BY MR. FETTERHOFF:

7     Q    The attorney for K&L Gates, Jack Krill,

8  you're familiar with him?

9     A    Yes, sir.

10    Q    He at that time was the principal outside

11 counsel for the House Republican Caucus; is that

12 correct?

13    A    That's my understanding, yes, sir.

14    Q    Do you know how many times Mr. Krill that

15 evening after 6 p.m. borrowed Mrs. Seaman's phone

16 in order to call Chief Counsel Feese or vice

17 versa?

18    A    I have no idea if that's -- if that

19 occurred.  And I don't know how many times if it,

20 in fact, did occur.

21        MR. FETTERHOFF:  That's all.  Thank you.

22        THE WITNESS:  You're welcome.

23        THE COURT:  Mr. Bergstrom.

24 BY MR. BERGSTROM:

25    Q    Good afternoon, Agent Fiore.  I'd like

1  you to look again, sir, if you would, at the
2  subpoena at issue about which you've testified.
3  Do you have that in front of you, sir?
4      A   No, I don't.
5          MR. BROWN:  We'll put it up.
6  BY MR. BERGSTROM:
7      Q   This is the subpoena that you -- that
8  somebody served on February 29th, correct?
9      A   Yes, that's correct.
10     Q   At about 2:30 in the afternoon?
11     A   That's my understanding, yes, sir.
12     Q   Okay.  And it requires someone to appear,
13  does it not, before the grand jury on March
14  the 4th, correct?
15     A   It does, yes, sir.
16     Q   And does it also require that somebody to
17  bring with him or her the records that are set
18  forth in Subparagraph 2?
19     A   I'm not sure what that means, sir.
20     Q   You don't know?
21     A   I don't.
22     Q   Okay.  But it could very well mean that
23  the person, whoever is the custodian of the
24  records, would be required to appear on
25  March 4th, as per the subpoena, and to bring with

1  him or her the records that appear in

2  Subparagraph 2?

3      A    I suspect that's true.  My understanding

4  of a forthwith subpoena is that they are to be

5  produced at that time.

6      Q    February 29th was the last day of the

7  month?

8      A    Yes, sir.

9      Q    It was after 6 p.m. on a Friday night?

10     A    Right.

11     Q    And do you know why the date March 4th is

12 inserted in there, sir?

13     A    I have no idea, sir.

14     Q    Do you know who put that date in there?

15     A    I have no idea.

16     Q    And do you know whether or not they meant

17 that these records would be produced on the

18 fourth?

19     A    I don't know what they meant.

20     Q    Okay.  Other than serving the subpoena on

21 the custodian of records, I believe the back of

22 the subpoena would reflect it was served on HRC

23 paralegal Jill Seaman?

24     A    Yes, sir.

25     Q    Are you aware, sir, whether anyone else

1 actually saw this subpoena?

2    A    I am not aware of who saw this subpoena.

3    Q    So you don't know?

4    A    I don't know.

5    Q    So as far as you know, the only person

6 that saw this subpoena was Miss Seaman, if she,

7 in fact, saw it and reviewed it?

8    A    That's correct.

9    Q    The telephone records that you have

10 reviewed of Mr. Towhey --

11    A    Yes, sir.

12    Q    -- for the 29th, I think you said, of

13 February?

14    A    Yes, sir.

15    Q    And you have those in front of you, sir?

16    A    I do not have the cell phone records.  I

17 have the Exhibit 37.

18    Q    Which is -- which is which exhibits, sir,

19 the chart?

20    A    The chart, yes, sir.

21    Q    Okay.  I've got the chart.  Your exhibit

22 shows that there were four calls to

23 Mr. Zimmerman?

24    A    There were four contacts between

25 Mr. Towhey and Mr. Zimmerman.  The direction I

1 don't know from looking at this chart.  The
2 actual records would reflect the direction of the
3 calls.
4    Q    Did you actually review the records, sir?
5    A    I did.
6    Q    Okay.  So that I've got -- I've got the
7 Verizon records for Mr. Towhey in my hand right
8 now.  Could I show them to you?
9    A    Yes, sir.
10   Q    Will you be able to recognize them if I
11 show them to you?
12   A    I think I would.
13   Q    Okay.  (Pause.)
14        MR. BERGSTROM:  May I question from here
15 for the moment?
16        THE COURT:  Sure.
17 BY MR. BERGSTROM:
18   Q    Agent Fiore, let me show you Mr. Towhey's
19 Verizon wireless bill.  And I would direct your
20 attention to February 29th at 6:31 p.m. and 6:41
21 p.m.  Do you see those entries?
22   A    Yes, sir.
23   Q    And does that appear to be a phone record
24 from Mr. Towhey's phone to Mr. Zimmerman's phone?
25   A    I don't have Mr. Zimmerman's phone

1  number, and I don't recall it.  But I see that

2  there's two calls to the same number at that

3  time.  But I don't know if -- I just don't

4  know -- I don't have his --

5      Q    I'll tell you that it is.

6      A    Okay.

7      Q    Okay.  So there's two on the 29th at 6:31

8  p.m. and there's another one at 6:41 p.m.

9      A    Okay.

10     Q    And then let me go over to the next page

11 and show you.  There are two other calls on here,

12 and I would direct your attention to the call at

13 8:17 p.m., and then there's another call at 8:36

14 p.m.  Do you agree with me, sir?

15     A    Yes, sir.

16     Q    Okay.  The 8:17 call I think is two

17 minutes and then the 8:36 minutes is actually

18 only one minute, right?

19     A    I didn't take notice, but I'll take your

20 word for it.

21     Q    Okay.  Let me show it to you.

22     A    Okay, sir.  Yes, sir.

23     Q    Two minutes and one minute.

24     A    Yes, sir.

25     Q    Now, the timing of these telephone calls

1  are all after 6 p.m., are they not?

2      A    Yes, sir.

3      Q    And do you -- were you here this morning

4  when Agent Speaks testified?

5      A    I was.

6      Q    And you remember Agent Speaks testifying

7  that from around 6 p.m. on that day he, along

8  with two lawyers, a Mr. Krill and a Mr. Bibikos,

9  along with himself and a police officer were all

10 together in this group of people that evening,

11 correct?

12     A    I'm not sure of his testimony.  And if

13 it's reflected accurately in your description,

14 sir, I don't know.

15     Q    Well, were you in the courtroom this

16 morning when he testified?

17     A    I was.  I absolutely was.

18     Q    You were?

19     A    Yes, sir.

20     Q    And you remember him saying that from --

21 from roughly 6 p.m. on until sometime near 10:00

22 this group was Mr. Zimmerman; Mr. Krill, a

23 lawyer; Mr. Bibikos, a lawyer; himself, an agent,

24 a special agent?

25     A    Yes, sir.

1    Q    And I think there was a police officer in
2  that group as well?

3    A    I don't remember anything about a police
4  officer, sir.  And I don't know which time these
5  individuals were there, if they were all there
6  together from beginning to end or if there was
7  movement and someone left.  I'm not sure.  But
8  I -- as I recall, sir, there was no mention of a
9  police officer, that I can recall.

10    Q    Okay.  But it's pretty clear, is it not,
11  sir, that on the basis of Special Agent Speaks's
12  testimony that he was there that evening and he
13  was there for a purpose, was he not?

14    A    Yes, he was.

15    Q    And he was there with a Deputy Attorney
16  General Mr. Fina, correct?

17    A    That's correct.

18    Q    And then Mr. Zimmerman was in that group
19  and that the other two lawyers were in that
20  group?

21    A    That's my understanding, yes, sir.

22    Q    And if these phone calls are coming in
23  from Mr. Towhey while all of these people are
24  together, right?

25         MR. BROWN:  Your Honor, at this point I'm

1  going to object.   I think that actually

2  mischaracterizes Agent Speaks' testimony.

3       THE COURT:   Mr. Bergstrom, can we move

4  this along, please?

5       MR. BERGSTROM:   Yes, sir.

6  BY MR. BERGSTROM:

7     Q    The chart that you've identified, Agent

8  Fiore, and the top part of the chart there says a

9  Zimmerman desk phone contact.

10    A    Yes, sir.

11    Q    And according to your testimony earlier,

12  Mr. George Matthews says he spoke to a male,

13  correct?

14    A    That's correct.

15    Q    Could not identify who that male was?

16    A    That's correct.

17    Q    The male did not identify himself?

18    A    That's correct.

19    Q    And Matthews himself doesn't know who it

20  was?

21    A    That's correct.

22    Q    And the call is made apparently on

23  February 26th at 4:30 p.m., correct?

24    A    That's right.

25    Q    Which is a full two days plus two hours

1  before the subpoena is served, correct?

2     A    Yes, sir, roughly, three days.

3          MR. BROWN:  I'm sorry.  What was the last

4  part?

5          THE WITNESS:  That was three days before.

6          MR. BERGSTROM:  Thank you.  I have

7  nothing further.

8          THE COURT:  Anything?

9          MR. BROWN:  No, Your Honor.

10         THE COURT:  You may step down.  Thank you

11  very much.

12         MR. BROWN:  Agent Soop is next.

13

14                   ROBERT SOOP,

15  called as a witness, being duly sworn, testified

16  as follows:

17                DIRECT EXAMINATION

18  BY MR. BROWN:

19    Q    Good afternoon.  Would you state your

20  name and how you are employed, please?

21    A    Yes.  My name is Robert Soop, S-O-O-P,

22  and I'm a employed as a supervisor special agent

23  for the Office of Attorney General.

24    Q    And, Special Agent Soop, you've

25  participated in the grand jury investigation

1  involving the House Republican Caucus; is that

2  right?

3      A    That's correct.

4      Q    And in that regard you've reviewed

5  certainly e-mails as well as certain campaign

6  finance expenditures; is that right?

7      A    That's correct.

8      Q    And would you recognize those e-mails if

9  you saw them again?

10     A    Yes.

11     Q    Agent Soop, I'm going to first show you

12  what's been marked as Commonwealth Exhibit 38 for

13  identification, an e-mail dated April 12th, 2005.

14  Do you recognize that?

15     A    Yes, I do.

16     Q    And the e-mail is from whom and to whom?

17     A    It was from Paul Towhey and it is to

18  Kevin Curtin and Eric Ruth.

19     Q    And this is -- and this particular

20  e-mail, according to -- according to the e-mail,

21  April 12th was a Tuesday; is that right?

22     A    That's correct.

23     Q    Now, Paul Towhey, do you see him in the

24  courtroom today?

25          MR. WOODWARD:  I'll stipulate he's right

1  here.

2  BY MR. BROWN:

3      Q    Thank you.  Eric Ruth, do you see him in

4  the courtroom?

5          MR. KELLY:  Same stipulation, right here.

6          MR. BROWN:  Thank you.

7  BY MR. BROWN:

8      Q    Now, one of the people that this e-mail

9  Towhey sends to is Kevin Curtin.  Who's that?

10     A    He's an employee of the House Republican

11 Caucus in the information technology section.

12     Q    And the subject is Blue Card idea.  And

13 there is an attachment, "My Blue Card dream come

14 true."  Is that right?

15     A    That's correct.

16     Q    And the attachment is actually a printout

17 of the PowerPoint presentation for purposes of

18 this particular exhibit?

19     A    That's correct.

20     Q    And what does Towhey say essentially in

21 this cover e-mail?

22     A    It's saying (reading:)

23              Please see attached PowerPoint for

24          what I think will work best in the

25          131st.  Since this is a campaign and

1          not legislative, I think the data

2          should be the targeted voters as

3          well as -- I'm sorry -- as will we

4          have on the Corsa sheets.  Hanley

5          should have this data ready.  Please

6          let me know what you think.  Paul.

7     Q    And 131, that refers to the House

8 District 131 special election that occurred in

9 July of that year?

10    A    That's correct.

11         MR. DONATONI:  I'm sorry, Mr. Brown.  You

12 said that election was in July of that year, '05?

13         MR. BROWN:  I believe that's what he just

14 said.

15 BY MR. BROWN:

16    Q    Agent Soop, I'm now going to show you an

17 e-mail marked as Commonwealth Exhibit 39.  Do you

18 recognize that?

19    A    Yes, I do.

20    Q    And this is an e-mail from a Brian Kadunc

21 and at least at the top it's to -- looks like

22 he's e-mailing it to himself.  Is that right?

23    A    That's correct.

24    Q    And then the e-mail that he sent to

25 himself appears immediately below that.  Is that

DAUPHIN COUNTY COURT REPORTERS

1  right?

2      A    That's correct.

3      Q    And the e-mail that he's sending to

4  himself is from who?

5      A    Paul Towhey.

6      Q    And, again, according to this,

7  April 26th, 2005, was a Tuesday; is that right?

8      A    That's correct.

9      Q    And the topic of this particular e-mail

10  is what?

11     A    Blue Card output PDF, the subject in

12  below e-mail where it was sent directly from

13  Towhey would be Blue Card.

14     Q    And then there's a -- I believe it's an

15  88-page attachment to this e-mail; is that right?

16     A    That's correct.

17     Q    Now, I'm not going to go through each and

18  every page with you, Agent Soop, but I'm going to

19  put up one page as a representative sample.

20     A    Okay.

21     Q    Now, just for example, Page 15, at the

22  top of that particular page is captioned what?

23     A    Blue Card web dash candidate walking

24  list, and it also has a specific ward number and

25  precinct number as well.

1    Q    And then there looks to be on the left

2  side some basically biographical information --

3  name, age, party affiliation, phone number.  And

4  then on the right side there's F, A, U, R, Met,

5  YS, and Abs; is that right?

6    A    That's correct.

7    Q    The stuff to the right of the line, about

8  two-thirds of the way over on the page, the F, A,

9  U, R, Met, YS, and Abs, is that campaign -- are

10  those indications of campaign work?

11    A    Yes, it is.

12    Q    And the F, A, U, R is favorable, against,

13  unregistered, or refused?

14    A    That's correct.

15    Q    And again, for example, the YS would be

16  if they would agree to a yard sign or not?

17    A    That's correct.

18    Q    Now, Agent Soop, you also had the

19  opportunity to review various campaign finance

20  reports; is that right?

21    A    That's correct.

22    Q    And a summary of at least some of your

23  findings has been included in a chart; is that

24  right?

25    A    That's correct.

1    Q    I show you what's been marked as

2  Commonwealth Exhibit 40 for identification.

3        Now, Agent Soop, this indicates various

4  campaign or other entities and the amounts that

5  they paid particular vendors; is that right?

6    A    That's correct.

7    Q    And specifically you focused on certain

8  companies; is that right?

9    A    That's correct.  I focused on GCR and

10 Associates, and Aristotle International.

11   Q    The first -- the first time GCR is

12 mentioned under a header Friends of John Perzel,

13 parenthesis FOJP close parenthesis, campaign

14 finance expenditure.  And it indicates a payment

15 to GCR in the amount of how much money?

16   A    $37,315.31.  And that would cover the

17 time frame between 10/2 of '06 and 12/6 of '06.

18   Q    And for Aristotle International, again

19 for the Friends of John Perzel, it indicates that

20 the Friends paid how much money directly to

21 Aristotle International?

22   A    They paid nothing.

23   Q    Now, there is a note of a Paul Towhey

24 payment to Aristotle.  What time frame are we

25 talking about there and why isn't that in this

1 chart?

2     A    Paul Towhey actually made payments to

3 Aristotle International totalling $10,000 from

4 the time period of 4/16/07 and 2/4 of '09.  These

5 payments were made essentially out of his own

6 pocket, American Express payments, and were made

7 under his name, not the name of Friends of John.

8     Q    And at the same time there were also

9 payments from Friends of John to Paul Towhey?

10     A    Yes.

11     Q    Moving down to the next category, House

12 Republican Campaign Committee, HRCC expenditures,

13 this indicates that the HRCC paid GCR how much

14 money and over what period of time?

15     A    That would have been $73,000 and that

16 would have been between 2003 and 2006.

17     Q    Same question for HRCC and Aristotle

18 International?

19     A    No payments were made from HRCC to

20 Aristotle International.

21     Q    Turning to Page 2 of that particular

22 exhibit, what does the review indicate regarding

23 payments to GCR from House Republican Caucus?

24     A    It indicates that payments were made that

25 totalled $9,286,980 and these payments were made

1  between the time periods of March 5th, 2002, and

2  December 10th, 2007.

3      Q    And how about Aristotle International?

4      A    Aristotle International was paid by HRC a

5  total of $6,200,000 from the time period of

6  6/26/03 to 11/19 of '07?

7      Q    Now, also, Agent Soop, just so the

8  record, I guess, is clear, you were also prepared

9  to testify regarding personnel file of Sue

10  Cornell; is that right?

11     A    That's correct.

12         MR. BROWN:  And for record purposes, Your

13  Honor, all counsel involved in that particular

14  charge -- that would be counsel for Perzel,

15  Preski, and Stokes -- have previously received

16  copies of the Stokes and Cornell personnel

17  records.  They've agreed that they will go in by

18  stipulation and there will be argument on that,

19  but no actual testimony in that regard.  Is that

20  a fair summary.

21         MR. MCMONAGLE:  That is accurate, Your

22  Honor.

23         MR. WINNING:  Yes, sir.

24         MR. DONATONI:  On behalf of Stokes,

25  that's accurate, Your Honor.

1           MR. BROWN:  Court's indulgence, Your

2   Honor.

3   BY MR. BROWN:

4       Q    Now, Agent Soop, are you familiar with

5   someone by the name of Jay Pelegrin?

6       A    Yes, I am.

7       Q    P-E-L-E-G-R-I-N?

8       A    Yes, I am.

9       Q    And Mr. Pelegrin is whom?

10      A    He's employed by GCR and Associates,

11  which is housed in New Orleans.

12      Q    And to the best of your knowledge,

13  Mr. Pelegrin will be available to testify at

14  trial in this matter; is that right?

15      A    I spoke to him this morning and confirmed

16  that fact.

17      Q    Did Mr. Pelegrin tell you about a trip he

18  made to a basement in Philadelphia?

19      A    Yes, he did.  In an interview and further

20  contacts, Mr. Pelegrin had recalled a visit to a

21  basement in Philadelphia.  And he specifically

22  recalled it because they don't have basements in

23  New Orleans, so it kind of stuck out in his head.

24           And what he recalled is that he had

25  travelled to Philadelphia.  It was kind of like a

1 regular neighborhood, and he recalled going to

2 the basement for a meeting.  This meeting

3 involved Al Bowman and Paul Towhey.  They were

4 both present there.  He met with them.  The

5 meeting lasted several hours.  And the total

6 topic of the meeting was Candidate Connect and

7 campaign related activity.

8     Q    The person that you referred to as Al

9 Bowman, do you see him in the courtroom today?

10     A    Yes, I do.

11     Q    Could you point him out, please?

12     A    Yes.  Mr. Bowman's second table back.

13         MS. MCCLELLAND:  We'll stipulate.

14         MR. BROWN:  Thank you.

15         THE COURT:  Thank you.

16         MS. MCCLELLAND:  Just to be clear, we're

17 not stipulating that Mr. Pelegrin can identify.

18 Certainly we'll stipulate Mr. Soop can.

19         THE COURT:  Okay.  Thank you.

20         MR. BROWN:  Sure.

21 BY MR. BROWN:

22     Q    The person by the name of Paul Towhey, do

23 you see him in the courtroom today?

24         MR. WOODWARD:  I'll stipulate that he's

25 in the courtroom for this witness and any other

1  witness, too, that testifies.

2          MR. BROWN:  Thank you.

3          MR. WOODWARD:  With the exception of

4  Mr. Pelegrin.

5          MR. BROWN:  Fair enough.  Thank you.

6  Tender for cross.

7          MR. DONATONI:  Before we do that, can I

8  have a word regarding the stipulation with

9  Mr. Brown, Your Honor?  (Pause.)

10          Your Honor, I'm sorry.  I apologize for

11  interrupting.  My confusion was, and my confusion

12  has been allayed, that was in being provided with

13  the Susan Cornell personnel file, I thought I

14  misapprehended the charges against my client and

15  I was somehow charged with whatever other

16  allegations there are other defendants face

17  regarding Miss Cornell.  And I'm advised that I

18  was initially right, that I am not charged --

19  that Mr. Stokes is not charged; is that correct,

20  Mr. Brown?

21          MR. BROWN:  That's correct.  The Cornell

22  personnel file would not, as I understand it, go

23  to any issue regarding Mr. Stokes.  It was

24  provided to him out of an abundance of caution

25  because they're mentioned in the same counts in

1  the complaints.

2        MR. DONATONI:  Thank you, sir.  Thank

3  you, Mr. Brown.

4        MR. MCMONAGLE:  No questions.

5        THE COURT:  Mr. Winning.

6                 CROSS EXAMINATION

7  BY MR. WINNING:

8    Q    Agent, I represent Brian Preski and I

9  have a couple of questions of you regarding this

10 chart you apparently put together.

11       Would you look at the second page that is

12 entitled House Republican Caucus, in parens, HRC,

13 expenditures?

14   A    Give me one moment, sir.

15   Q    Take your time.

16   A    If they can put that up for me.

17   Q    Take your time.

18   A    Yes, sir.

19   Q    Okay.  Did you, as part of your

20 investigative activities, did you examine the

21 checks that went to these entities that are set

22 forth on your chart here?

23   A    Again, my evaluation would have involved

24 GCR and Aristotle.  And for those purposes,

25 myself and/or other members of our agent staff,

1  there were checks involved in the review.

2  Specifically for GCR, for Aristotle, I know we at

3  least have TUCR reports, which are reports from

4  treasury reflecting that payments were made by --

5      Q    I'm not questioning whether the payments

6  were made.

7      A    Okay.

8      Q    I'm just asking you whether or not you

9  had the opportunity to look at the checks, the

10  actual checks that were made payable to these

11  entities?

12      A    I do recall seeing checks.

13      Q    Okay.  Did you see the GCR checks?

14      A    I do recall seeing some of the GCR.

15      Q    Did you see the Aristotle checks?

16      A    I'm pretty sure I did as well, sir.

17      Q    Did you see any checks that were signed

18  by Brian Preski?

19      A    No, sir.

20      Q    With regard to Labels & Lists and

21  Constituents Direct and Weiss Micromarketing, did

22  you see any of those checks?

23      A    Again, that wasn't involved in my

24  evaluation, sir.

25      Q    Okay.  Did anybody tell you, as part of

1   your investigative team here, that they saw

2   checks that were signed by Brian Preski?

3       A    No one told me that.  No, sir.

4       Q    Now, did you examine any of the invoices

5   that were submitted by GCR or Aristotle

6   International?

7       A    Yes, I did.

8       Q    Okay.  Did you see any invoices in that

9   group that were signed off on or approved by

10  Brian Preski?

11      A    Again, off the top of my head I cannot

12  recall any, no.

13      Q    Not one single one, can you?

14      A    I cannot recall, after review, each

15  invoice.

16      Q    Okay.  You're testifying today under

17  oath, right?

18      A    Yeah.

19      Q    Can you recall any check that was signed

20  by Brian Preski?

21      A    Out of fairness, I can't recall.  But two

22  of these checks came out of special leadership

23  funding as well.  I -- I did not see any with

24  Brian Preski's name on it.

25      Q    And did you see any invoices that were

1  approved or signed off on by Brian Preski?

2    A   I did not personally see any.

3        MR. WINNING:  That's all I have.

4        THE COURT:  Mr. Lock?

5        MR. LOCK:  I have no questions.

6        MR. DONATONI:  I have a couple, Your

7  Honor.

8  BY MR. DONATONI:

9    Q   Good afternoon, Agent Soop.  Sir, I think

10 we've introduced ourselves, or I have.  My name's

11 Rob Donatoni.  I represent Mr. Stokes and I

12 should be, hopefully, brief here.

13   A   Okay.

14   Q   Sir, with respect to your Exhibit C-40 --

15 may be up on the screen, it may not be -- but you

16 know the one I'm talking about, correct?

17   A   Yeah, the spreadsheet.

18   Q   That is a summary of data that you

19 examined, correct?

20   A   That's correct.

21   Q   I mean the spreadsheet, the two-page

22 analysis, so to speak, is your work product,

23 correct?

24   A   Part of it is my work product, correct.

25   Q   What part isn't?

1    A    GCR and Aristotle.

2    Q    Okay.  Well, when I say your work

3  product, maybe I'm confusing both of us.  Did you

4  have other documents, other records to use to

5  pull out and extract the information that then

6  became part of C-40?

7    A    Absolutely.

8    Q    Okay.  When you say part of it's yours

9  and part of it's GCR and Aristotle --

10    A    Yes.

11    Q    -- it would it be fair to say that some

12  of the documents that you relied upon to extract

13  from were the Aristotle and GCR documents?

14    A    Absolutely.

15    Q    Okay.  So this is your work product,

16  extracting from other documentation that aren't

17  in this record yet?

18    A    That's correct.

19    Q    Okay.  Those records are somewhere for

20  some later time, correct?

21    A    That's correct.

22    Q    All right.  And with respect to the

23  documents that you extracted information from in

24  order to generate C-40, and I may have missed

25  your direct examination, were you looking at

1  payments and/or were you looking at contracts?

2      A    Contracts, invoices, and payments.

3      Q    Okay, the whole deal?

4      A    From various sources, yes.

5      Q    Okay.  With respect to the sources or

6  companies or programs in C-40, and I'll ask a

7  generic kind of question and maybe we can live

8  with that, is that with respect to any

9  contract -- that with respect to -- let's leave

10 it at any contract, Sam Stokes, Mr. Stokes, was

11 not a signatory to any of those, correct?

12     A    To the contracts?

13     Q    Yes.

14     A    No.

15     Q    Was he a signatory on any payment?

16     A    No.

17     Q    In other words -- and let me be clear.

18 Was he a signatory on any payment out from any

19 account, and in this case I guess it's either

20 HRCC or FOJP, to any of the line items identified

21 on C-40?

22     A    Again, I only -- my only involvement was

23 those two vendors.

24     Q    Okay.

25     A    Someone else will testify about the other

1  two, as far as any payouts.

2      Q    Did he sign any checks that you're aware

3  of?

4      A    I did not see any such checks.

5      Q    But whatever data you analyzed is still

6  somewhere for us to review, any of the defense

7  lawyers independently at some point in time?

8      A    That's correct.

9      Q    Now, with respect to C-38 -- I'm sorry.

10 38 is the e-mail dated April 12th, 2005?

11     A    Yes, sir.

12     Q    The PowerPoint.

13     A    Yes.

14     Q    And I think it's C-39 that was a larger

15 packet of material that Mr. Brown walked you

16 through, and in particular Page 15 as an example,

17 right?

18     A    Yes.

19     Q    Okay.  You're aware -- you're one of the,

20 if not the, case agent, an agent involved in this

21 investigation, correct?

22     A    I am not case agent.  I'm a supervisor.

23     Q    Your were involved in this investigation?

24     A    I'm a supervisor of the section that did

25 this investigation.

1    Q   Okay.  You're a supervisor?

2    A   Yes.

3    Q   You understand, and correct me if I'm

4 wrong, that a part -- a significant part, or a

5 part of this presentment of this criminal

6 complaint is the application of the Blue Card

7 program, correct?

8    A   A portion of it is, yes.

9    Q   And as to whether or not it had

10 legislative or constituent service elements to

11 it, correct?

12    A   That's correct.

13    Q   All right.  And I've made it clear to you

14 or I've told you, and I didn't mean to be

15 pejorative, that I represent Mr. Stokes, correct?

16    A   Yes.

17    Q   The e-mails that you've been asked to

18 identify, the C-38 from April 12th of 2005 and

19 C-39 from April 26, 2005, both refer to Blue

20 Card, correct?

21    A   That's correct.

22    Q   But without trespassing in other areas,

23 it is presented because of campaign implications,

24 correct?

25    A   Yes.

1    Q    And not legislative, correct?

2    A    That's correct.

3    Q    But it's presented -- I'm sorry.  C-38

4 does not contain any reference, either by origin

5 of the e-mail or recipient of the e-mail or

6 forwarding of the e-mail, to Samuel Stokes,

7 correct?

8    A    That's correct.

9    Q    And the same would be true, if I asked

10 the same question -- origin, copying, or

11 forwarding -- of C-39 and its attachment,

12 correct?

13    A    That's correct.

14        MR. DONATONI:  Thank you very much.

15 That's all I have, Your Honor.

16        THE COURT:  Ms. McClelland.

17 BY MS. MCCLELLAND:

18    Q    Agent Soop, with this analysis that you

19 performed of the expenditures, did you see any

20 indication at all that Al Bowman signed off on

21 any of the contracts?

22    A    Not that he signed off on any, no.

23    Q    Did you see any indications that he

24 signed off on any of the invoices?

25    A    Not to my recollection, no.

1    Q    And did he sign off on any of the
2  payments that were made?
3    A    Not to my recollection.
4    Q    Moving on to this meeting with
5  Mr. Pelegrin, Mr. Pelegrin is an employee of GCR;
6  is that correct?
7    A    That's correct.
8    Q    Did he tell you what the purpose -- and
9  he came to Pennsylvania, is that my correct
10 understanding?
11   A    Yes, he was here in Pennsylvania.
12   Q    Did he tell you what the purpose was for
13 him coming to Pennsylvania?
14   A    He was working in his capacity with the
15 contract with the HRC.  He was working for
16 Pennsylvania as he described it.
17   Q    Did he tell you what specific project he
18 was working on when he came to Pennsylvania?
19   A    Candidate Connect.
20   Q    Did he have other reasons for coming to
21 Pennsylvania or was it strictly for Candidate
22 Connect?
23   A    It would depend on the trip.  He made
24 numerous trips.
25   Q    Would that particular trip --

1    A    On that particular trip, I don't know the
2   sole purpose of the trip itself.  I just knew the
3   sole purpose of the trip to Philadelphia was
4   candidate related and it, of course, involved Al
5   Bowman because he was pretty much the creator of
6   Candidate Connect as far as making it happen.
7    Q    Correct.  There's no dispute about that.
8   Do you know whether or not Mr. Pelegrin is
9   accurate with recalling in Philadelphia?  Could
10  it have been a meeting at Bloomsburg at the
11  Mallard campaign offices?
12   A    He seemed very distinct in his
13  recollection that it was Philadelphia.
14   Q    Did he say how long he had been in the
15  Commonwealth at the time that meeting took place?
16   A    I do not recall.
17   Q    Could he have come to or did he say that
18  he came to Pennsylvania for other reasons and
19  this was a meeting that was included in his
20  Pennsylvania trip, one among many?
21       MR. BROWN:  Objection, asked and
22  answered.
23       MS. MCCLELLAND:  Well, I don't know if he
24  answered that specific question.
25       THE COURT:  Go ahead.

1           THE WITNESS:  I don't recall the purpose
2  of his trip to Pennsylvania.  I recall him
3  describing this very specifically as far as the
4  trip to Philly.  I don't know why he was there,
5  whether it was totally for Candidate Connect or
6  it was for some other aspect.
7  BY MS. MCCLELLAND:

8     Q   Did he say whether or not this trip --
9  and we'll call it to Philadelphia for the time
10  being or at least for the purposes of this
11  hearing -- this trip that he recalls meeting with
12  Al Bowman and Paul Towhey about Candidate
13  Connect, did he say whether or not that was paid
14  for, the expenses of travel, was paid for by the
15  campaign committee or the caucus?

16     A   He looked at the Pennsylvania contracts
17  as just he's working for Pennsylvania.  He was
18  not involved in the invoicing.  He -- he never
19  had to report back as far as, oh, hey, so much
20  was spent on the campaign side, so much was spent
21  on the political side.  When he went to
22  Pennsylvania, it was working for the Pennsylvania
23  job.

24     Q   All right.  So from what he told you or
25  from all you know, that whole trip to

1  Philadelphia, for the time being, could have been

2  charged to the campaign committee and not the

3  caucus?

4      A    It could have been.

5      Q    You don't have any evidence to say that

6  it wasn't, do you?

7      A    I have -- I have numerous invoices from

8  GCR which reflect his specific meetings with your

9  client, Al Bowman, where they were charged.  It's

10 very -- very specific detail as far as campaign

11 related functions being billed to the House

12 Republican Caucus.

13      This particular one I don't recall off

14 the top of my head if it's in those many, many

15 invoices.  But I recall seeing your client's name

16 numerous times in those invoices.

17     Q    Okay.  But since you're testifying about

18 this particular incident, let's restrict your

19 answer to this incident, since you really haven't

20 offered evidence on the other meetings, if that's

21 acceptable, or even if it's not.

22      Your testimony was about Mr. Pelegrin.

23 And from what I understand, please correct me if

24 I'm wrong, this meeting with Mr. Pelegrin and Al

25 Bowman, you have no evidence one way or the other

1  as to whether this was properly charged off to

2  the campaign committee or improperly charged off

3  to the taxpayers, do you?

4      A    I don't have a specific invoice in front

5  of me for that particular meeting, that's

6  correct.

7      Q    All right.  So we have to assume, then,

8  that the meeting was properly charged, don't we?

9          MR. BROWN:  Objection.

10         THE WITNESS:  No, no.

11         THE COURT:  Sustained.

12 BY MS. MCCLELLAND:

13     Q    Did Mr. Pelegrin tell you whether or not

14 he had discussed with Al Bowman how that meeting

15 was going to be charged?

16     A    Again, Mr. Pelegrin's recollection of his

17 constant contact with Pennsylvania, he didn't

18 know -- it was a Pennsylvania job.  He didn't

19 differentiate.  He didn't have to go back and

20 report to their financial people as far as who

21 was creating bills, oh, well, 20 percent of the

22 trip was allocated towards the campaign side,

23 80 percent was -- or vice versa.  He had no --

24 there was no recordkeeping like that.  It was

25 just you're working in Pennsylvania here.  That's

1  what you're doing.

2      Q    Well, you're not suggesting that it's Al

3  Bowman's decision to tell him to charge all trips

4  to Pennsylvania one way or the other?  He had --

5  Al Bowman, you would agree, had nothing to do

6  with what Mr. Pelegrin went back and told his

7  company how to charge this trip.  You'd agree

8  with that, wouldn't you?

9      A    I would agree with that portion, correct.

10         MS. MCCLELLAND:  Okay.  I have no other

11  questions.

12         THE COURT:  Mr. Kelly.

13         MR. KELLY:  Thank you, Judge.  I'll be

14  very quick.

15  BY MR. KELLY:

16     Q    Agent, how have you been?

17     A    Pretty good.

18     Q    Good to see you.  Do you have a response

19  to C-38, be the Paul Towhey e-mail that was sent

20  to Eric Ruth?

21     A    I do not have one here specifically.  I

22  mean, there's -- there's thousands and thousands

23  of e-mails.

24     Q    I understand that.  That's not my

25  question, though.  Do you have a response to this

1 e-mail, C-38?

2     A   No, I do not.

3     Q   So for all you know, when Eric -- Eric

4 didn't even open up this e-mail, for all you

5 know?

6     A   All I know is that e-mail's in front us,

7 and that's what we have.

8     Q   I know.  And my question, once again, is

9 you -- I'm not trying to be difficult, but for

10 all you know, Mr. Ruth never opened up this

11 e-mail?

12     A   I wasn't in the room when he received

13 that e-mail and don't know that he actually

14 clicked on it and opened it up and read it, no.

15         MR. KELLY:  Thank you, sir.  That's all I

16 have.

17 BY MR. WOODWARD:

18     Q   Agent, are you aware in reference to

19 Exhibit 38 and 39, strike that.

20         Do you know, with respect to Exhibit 38,

21 39, whether or not Mr. Towhey was on the Friends

22 of John Perzel payroll at the time.

23     A   As I stand in front of you right now at

24 this particular time looking at that date and

25 time, no, I can't say.

1    Q    Let me draw your attention, sir, to
2    Exhibit 39.  Anywhere in that e-mail does it
3    reference a campaign?

4    A    The word campaign does not appear in that
5    particular e-mail.

6    Q    Do you know who George is that's referred
7    to in 39?

8    A    I'm thinking that's referring to a
9    candidate, but I'm not sure.

10    Q    George Kenny, would that sound familiar?

11    A    That could be.

12    Q    Are you aware, sir, that on August 26th
13    of 2005, the date of this e-mail, George Kenny
14    was not running for election?

15    A    Actually, it's April 26th.

16    Q    April I meant to say, strike that.  Are
17    you aware that on April 26th, 2005, George Kenny,
18    Representative Kenny, was not running for
19    election?

20    A    And, again, I -- I don't know.  And when
21    I said George, Kenny could be a possibility.  It
22    could be another candidate named George, too.

23    Q    Sir, you agree with me that at least the
24    primary purpose of the legislature is to service
25    the people in his district, true?

1     A    Again, we get into varying perspectives

2  here what the purpose is and what crosses the

3  line.  I guess it's all in perspective.

4     Q    Sure.  Well, in furtherance of that goal,

5  wouldn't it be wise for the elected

6  representative to know the names, addresses, and

7  telephone numbers of the people within his

8  district?

9     A    Of all the people in his district, that's

10  correct; not just the ones that vote.

11     Q    Right.  And doesn't C-39 refer to all the

12  people in this fellow's district -- democrat,

13  republican, and otherwise?

14     A    Again, I'm not familiar with the

15  population.  I don't know.  I don't live there.

16  You know, I don't know who all is on the list, if

17  it's a full --

18     Q    I'm sorry?

19     A    I don't know if it's a full evaluation of

20  every resident there.

21     Q    Well, it looks pretty representative,

22  does it not?  It's 88 pages long.

23     A    That's kind of mild to a lot of

24  spreadsheets we've seen.

25     Q    Do you have -- do you have this, Agent?

1        A    I don't have the whole thing here, sir.

2        Q    Sir, I'm going to show you, it says Page

3    13 of Exhibit 39.   You see there's ascending

4    numerical numbers in the left-hand column?

5        A    Yes.

6        Q    Next to that a name?

7        A    Yes.

8        Q    Then a spot for the person's age?

9        A    Yes.

10        Q    What's the next column?

11        A    Party, party, political affiliation.

12        Q    And would you agree with me that R stands

13    for republican; D stands for democrat?

14        A    Yes, sir.

15        Q    So you would agree with me, sir, that

16    this is -- appears to be a representative list of

17    all the people in Mr. Kenny's legislative

18    district, both their address, telephone number,

19    party affiliation?

20        A    Of all registered voters.

21        Q    Registered voters?

22        A    Because I'm not seeing any blanks there

23    on the page that you pointed out to me.

24        Q    Fair enough.

25        A    Are there any blanks there that would

1 show someone that's not --

2    Q    I'm not going to look at all 88 pages,
3 but from what I see, no.

4    A    Okay.  So they would all be registered
5 voters, which means that's the list he would have
6 obtained would have been all registered voters,
7 not all residents of the area that he serves.

8    Q    Okay.

9    A    So based on your question, that would
10 mean that he's -- he's more concerned with the
11 voters instead of all residents.

12    Q    Do you know any legislators not more ·
13 concerned with the voters?

14    A    I don't know a whole lot of legislators.
15 I know the purpose of -- in my mind of what a
16 legislature should do.

17    Q    Right.

18    A    Should represent us all.

19    Q    Okay.  Would you agree with me, sir, that
20 everything in that left-hand column could be and
21 probably is constituent based information?

22    A    With the exception of party affiliation.
23 If you're representing all your constituents,
24 their party shouldn't matter if you're trying to
25 speak for all your constituents.

1    Q    Let's -- we got to get real here now.

2    A    I'm real.

3    Q    Party affiliation is everything.

4    A    I'm in York County and I'm not a

5    politician.

6    Q    I'm not either.  But could -- couldn't

7    this not be constituent-based information?

8         MR. BROWN:  Objection.  Asked and

9    answered.  We've been over this.

10        THE COURT:  Can we move on?

11   BY MR. WOODWARD:

12   Q    Sir, let me ask you this, this fellow

13   Pelegrin, New Orleans, do you have any idea

14   whether he knows a basement in Philadelphia and a

15   basement in Bloomsburg?

16   A    I don't know.  He seemed really

17   fascinated with the whole basement concept.

18   Q    He should be a little bit more fascinated

19   with Bloomsburg.  The campaign office, basement

20   office of Representative Mallard, isn't that

21   where that meeting took place, by the way?

22   A    I don't know.

23   Q    By the way, do you know whether or not

24   Mr. Towhey was on split payroll at that time?

25   A    I don't have his personnel record in

1 front of me, no.

2     Q   Did Mr. Pelegrin tell you when that

3 meeting occurred with Mr. Bowman and Mr. Towhey?

4     A   As I recall, he stated it would have

5 started right around the time the Candidate

6 Connect had started up.

7     Q   Which was?

8     A   And, again, I don't know off the top of

9 my head. I'd have to refer to records.

10     MR. WOODWARD: Thank you, sir. Oh, one

11 more question. May I?

12     MR. SIGMAN: Sure.

13 BY MR. WOODWARD:

14     Q   With respect to 39, you testified that

15 Mr. Towhey's credit card was used for Blue Card

16 payments?

17     A   That's correct.

18     Q   Those reimbursements weren't made

19 directly to Mr. Towhey, were they?

20     A   The reimbursement from whom, sir? I'm

21 sorry.

22     Q   The Friends. They were made directly to

23 American Express, were they not?

24     A   Not having the records in front of me,

25 you may be correct there.

1      MR. WOODWARD:   Thank you, sir.

2      MR. SIGMAN:   One moment, Your Honor.

3  BY MR. WOODWARD:

4      Q   What time of day was that meeting in the

5  basement?  The basement meeting?  Did he tell

6  you?

7      A   I recall him saying during daylight

8  times.

9      MR. WOODWARD:   Thank you, sir.

10  BY MR. SIGMAN:

11     Q   A few brief questions, sir.  You remember

12  when Mr. Donatoni asked you some questions?

13     A   Yes.

14     Q   My questions are very, very similar to

15  his.

16     A   Okay.

17     Q   The question is Don McClintock's on none

18  of these e-mails you brought today, Exhibit 38,

19  39, 40, not on any of the e-mails, right?  Not

20  cc'd; not bcc; not to, right?

21     A   That's correct.

22     Q   Okay.  Don McClintock not signing any

23  checks involving any of these companies --

24  Aristotle, GCR, whatever you may have mentioned

25  here today -- right, not signed any checks,

1  right?

2      A    That's correct.

3      Q    Not sign any invoices, right?

4      A    That's correct.

5      Q    None of the invoices go to Don

6  McClintock; isn't that correct, sir?

7      A    I don't know that is correct, but he

8  didn't sign any.

9      Q    He didn't sign any.

10     A    That's correct.

11          MR. SIGMAN:  I have nothing further.

12          THE COURT:  Mr. Fetterhoff.

13  BY MR. FETTERHOFF:

14     Q    Mr. Soop, Exhibit 40, you still have that

15  in front you?

16     A    I'm sure Mark will help me out here.

17          MR. ECKHART:  What page?

18  BY MR. FETTERHOFF:

19     Q    Well, it's only two pages.  Page 1,

20  please.

21     A    Yes, sir.

22     Q    Can you see that on the screen there in

23  front of you?

24     A    Yes, I can.

25     Q    Now, just the top half of that, which

1  would have been the expenditures by the Friends
2  of John Perzel, first of all, you prepared this
3  chart yourself, right?

4      A    I prepared the GCR and Aristotle aspects
5  of it.

6      Q    And somebody else prepared the rest of
7  it, just looking at the top half of the Page 1?

8      A    I'm just looking at the GCR and Aristotle
9  entries on each one of these categories.

10     Q    All right.  Let's just limit ourselves to
11 those two for the moment.

12     A    Okay.

13     Q    Did you get that information off the
14 campaign finance report filed at different times
15 by the Friends of John Perzel?

16     A    That was one of the sources, correct.

17     Q    Well, is there some other source?  The
18 $37,315.31 is taking for the period of time shown
19 there directly from campaign finance report,
20 right?

21     A    Campaign finance and also independent
22 verification from the vendor.

23     Q    Okay.  And was that true for Aristotle?

24     A    I'm sorry.  Was that true for Aristotle
25 as well?

1      Q    Yes.

2      A    Aristotle, as I recall, would have been

3  the campaign finance as well as evaluation of

4  invoices -- invoices, I'm sorry.

5      Q    All right.  And the $2,918,039

6  contributed by the Friends of John Perzel to

7  HRCC, that was the same figure on Friends'

8  finance report as it was on the HRCC receipts,

9  right?

10     A    Again, HRCC I did not evaluate.  I'm

11  sorry.  Are you referring to the GCR entry?

12     Q    No, the HRCC.

13     A    Right there, no, I did not complete that.

14  That would have been another agent who will come

15  in later.

16     Q    But you're content to tell the Court that

17  that's accurate?

18          MR. BROWN:   Objection.  That's not what

19  he said.

20  BY MR. FETTERHOFF:

21     Q    Are you content to the tell the Court if

22  it's accurate or not?  I mean, if it's not

23  accurate I'm going to start to object to the

24  exhibit.

25     A    I'm testifying that I prepared Aristotle

1  and GCR and that I know personally that those are

2  accurate because I personally prepared them.

3      Q   Did you supervise the people who prepared

4  the rest of Page 40?

5      A   I do supervise.

6      Q   Well, did you request -- I mean, here we

7  have an exhibit in Court today.  Did you request

8  somebody to affirm the accuracy of these numbers

9  before you're offering it to Judge --

10         MR. BROWN:  Mr. Fetterhoff, maybe this

11  will help.  The next witness takes care of the

12  rest of the chart.

13         MR. FETTERHOFF:  All right.

14  BY MR. FETTERHOFF:

15      Q   Now let me ask you this.  In general,

16  then, are you aware from whatever review of the

17  Friends of John Perzel campaign finance report

18  that you did conduct that the Friends paid

19  vendors other than those shown on this chart?

20      A   I would believe that to be accurate, yes.

21      Q   And you're also aware that besides the

22  Friends of John Perzel there were several other

23  political action committees in which Mr. Perzel

24  was interested; is that fair?

25      A   That is fair.

1    Q    And in addition to the almost $3 million
2    contributed by Friends to HRCC, were you aware
3    that the various Victory funds -- 2004, 2005, and
4    2006 -- contributed over $2 million to the HRCC?
5    A    Again, my evaluation was the top two.
6    Q    Did you ever look at the Victory funds'
7    filings?
8    A    I personally did not, but we had
9    personnel that did.
10    Q    Did you ever look at the 1776 Committee
11    filings?
12    A    That was looked at actually today, yes.
13    Q    And the PA leadership?
14    A    That was actually looked at today as
15    well.
16    Q    And the Citizens For Government Reform?
17    A    Same thing.
18    Q    All right. So it may be, or have you
19    already confirmed that all of those other
20    political action committees also made
21    contributions to HRCC?
22    A    I didn't do --
23        MR. BROWN: Your Honor, at this point I'm
24    going to object. That's beyond the scope of
25    direct here.

1          THE COURT:  Sustained.

2  BY MR. FETTERHOFF:

3      Q    Well, is it fair -- I'm going to ask you

4  then directly about this chart, Exhibit 40.  Is

5  it fair to say that this is not a comprehensive

6  or completely accurate view of everything

7  contributed by political action committees in

8  which Mr. Perzel was interested to HRCC?

9          MR. BROWN:  Your Honor, again, at this

10  point I'm going to object.  There's been no

11  testimony that remotely relates to that question.

12          THE COURT:  Sustained.

13          MR. FETTERHOFF:  Well, I'm going to

14  object to the exhibit at this point, then,

15  because I think it's incomplete, inaccurate, and

16  misleading, since the other political action

17  committees to which I alluded, particularly the

18  Victory funds which contributed over $2 million,

19  gives the Court a misleading idea about the flow

20  of funds, the amount of funds, the payment of

21  other vendors.

22          Mrs. Seaman is charged with knowledge

23  here and even the Attorney General's office until

24  this morning had no such knowledge.  I ask that

25  the exhibit be stricken.  I have nothing else.

 1         MR. BROWN:  Your Honor, just for record
 2  purposes, obviously the chart for the most part
 3  speaks for itself and addresses specific vendors
 4  that were charged in the police criminal
 5  complaint and affidavit.
 6         Some of Mr. Fetterhoff's issues -- I
 7  mean, I'll save other objections for a later
 8  point, but a lot of these issues will be dealt
 9  with if the charges are returned, but they're not
10  relevant here.
11         THE COURT:  For now the exhibit will stay
12  in and I assume there will be additional
13  testimony concerning these other areas of this
14  particular exhibit.
15         MR. BROWN:  That's correct, Your Honor.
16         THE COURT:  Correct?  All right.
17  Mr. Bergstrom.
18         MR. BERGSTROM:  No, sir.
19         THE COURT:  All right.
20         MS. MCCELLAND:  If I may, I have one
21  question.  I promise it's short.
22  BY MS. MCCLELLAND:
23     Q    Do you know whether or not Al Bowman was
24  on payroll for the legislature at the time he met
25  with Mr. Pelegrin?

```
 1        MR. BROWN:  Your Honor, again, I'm going
 2  to object.  No bouncing back and forth here.
 3        THE COURT:  I agree.  This witness is
 4  finished.  You can step down.
 5        THE WITNESS:  Thank you, Judge.
 6        THE COURT:  Let's take a break until ten
 7  of, please.
 8        (A recess was taken.)
 9        MR. BROWN:  Agent Michael Cranga is next.
10
11              MICHAEL CRANGA,
12  called as a witness, being duly sworn, testified
13  as follows:
14              DIRECT EXAMINATION
15  BY MR. BROWN:
16     Q    Good afternoon.  Could you state your
17  name for the record and spell your last name,
18  please?
19     A    Michael Cranga, last name spelled
20  C-R-A-N-G-A.
21     Q    And, Agent Cranga, you're one of the
22  agents assigned to the investigation involving
23  the House Republican Caucus; is that right?
24     A    Yes, that's correct.
25     Q    And part of your job duties involved
```

1 reviewing campaign finance expenditures for

2 various entities; is that correct?

3     A    Yes.

4     Q    A summary of your findings was included

5 in a printout or report; is that right?

6     A    Yes.

7     Q    And would you recognize those -- that

8 printout if you saw it again?

9     A    Yes, I would.

10    Q    I'm showing you what's been marked

11 Commonwealth Exhibit 40 for identification.  You

12 can see that from where you are?

13    A    Yes.

14    Q    Now, there's also been testimony about

15 the GCR and Aristotle International for each of

16 those particular entities.  I want to ask

17 specifically about the other entities on the

18 list, specifically Labels & Lists, Constituents

19 Direct, Weiss Micromarketing, and then for

20 various other money shifting back and forth

21 involving the caucus, the HRCC, and the Friends

22 of John Perzel.

23    A    Okay.

24    Q    The portions that do not include GCR and

25 Aristotle, those were parts that you worked on;

1  is that right?

2      A    Yes.

3      Q    Now, Agent Cranga, starting at the top

4  half of Commonwealth Exhibit 40, for Labels &

5  Lists, what do the Friends of John Perzel

6  campaign finance expenditures indicate how much

7  they paid Labels & Lists?

8      A    A total there is $489.83.

9      Q    And for what time frame?

10     A    2004.

11     Q    What do the campaign finance expenditures

12 for the Friends of John Perzel indicate that the

13 Friends paid Constituents Direct?

14     A    Zero dollars.

15     Q    Same question for Weiss Micromarketing?

16     A    Zero once again.

17     Q    Reimbursements that the Friends made to

18 the House Republican Caucus for the time period

19 2002 to 2008?

20     A    The total there $9,482.60.

21     Q    And contributions by the Friends of John

22 Perzel to the House Republican Campaign Committee

23 2000 to 2009?

24     A    That total was $2,918,039.

25     Q    Did you also see the House Republican

1    Campaign Committee expenditures for some of those

2    same vendors -- Labels & Lists, Constituents

3    Direct?

4        A    Yes, that's correct.

5        Q    Regarding the HRCC expenditures, what

6    does it indicate the HRCC paid to Labels & Lists

7    between 2003 and 2005?

8        A    $1,725.10.

9        Q    Now for Constituents Direct, there are

10   two different entries.  One is for the HRCC

11   Landslide report and the other is invoices

12   provided by Zain Kahn?

13       A    Yes, that's correct.

14       Q    Zain Kahn is, I guess, the CEO or the

15   owner of Constituents Direct; is that right?

16       A    Yes.  That's my understanding he is.

17       Q    What do the HRCC Landslide reports

18   indicate that the HRCC paid Constituents Direct

19   between 2002 and 2008?

20       A    Landslide reports that were provided to

21   me total $150,523.08.

22       Q    And then there's a slightly lower number

23   between 2004 and 2008 for the invoices that were

24   provided by Zain Kahn?

25       A    Yes, that's correct, totally $105,861.50.

1    Q    And, again, we're talking about a
2  slightly smaller time frame for invoices?
3    A    Yes, a few years difference in time
4  frame.
5    Q    What do the HRCC expenditures indicate
6  Weiss Micro -- they paid Weiss Micromarketing?
7    A    Zero dollars, or no expenditures.
8    Q    What do the HRCC expenditures reports
9  indicate that they paid or reimbursed the House
10 Republican Caucus?
11   A    It was also zero dollars.
12   Q    Turning to Page 2 of Commonwealth
13 Exhibit 40, these are expenditures made by the
14 House Republican Caucus; is that right?
15   A    That's correct.
16   Q    For Labels & Lists, again, we have two
17 different entries with different but overlapping
18 time frames.
19   A    Yes.
20   Q    The first is Labels & Lists, apparently
21 you reviewed invoices from the company itself.
22 Is that right?
23   A    Correct.  They were provided by Labels &
24 Lists.
25   Q    And for what time frame do we have

1  invoices for Labels & Lists?

2      A    July of '04 through March of 2007.

3      Q    And according to that, how much did the

4  caucus expend to Labels & Lists?

5      A    Total on those invoices was $499,351.66.

6      Q    Now, there's another indication there,

7  treasury expenditure report, and those are

8  commonly called, I guess, TUCR reports, correct?

9      A    Correct, they're referred to as TUCR

10  reports.

11      Q    And the TUCR reports are received from

12  where?

13      A    They're sent to us by the treasury, by --

14  they originally were subpoenaed and they were

15  received through treasury.

16      Q    So that's actually from the government as

17  opposed to the invoice?

18      A    Correct, that's correct.

19      Q    And what do the TUCR reports indicate the

20  caucus paid Labels & Lists and for what time

21  period?

22      A    The TUCR reports the total was

23  $481,473.68.

24      Q    And for what time period?

25      A    The time frame there was, looks like,

1  March of -- or excuse me, April of '03 through
2  November of 2007.
3      Q    Regarding Constituents Direct, again, we
4  have, I guess, invoices provided by the vendor
5  and then invoices provided by the caucus or some
6  other governmental entity.
7      A    Yes.
8      Q    Regarding the invoices provided by the
9  vendor, what, according to the vendor invoice,
10 how much did the caucus pay Constituents Direct
11 from 2002 to 2008?
12     A    $5,299,008.52.
13     Q    And for the same time period, the amount
14 according to the invoices provided by the
15 legislature by the comptroller?
16     A    $5,235,129.32.
17     Q    And similarly, we have two entries for
18 Michael Weiss, the first is Weiss Micromarketing,
19 payments I guess directly from the treasury or
20 out of a TUCR report, right?
21     A    Yes.
22     Q    And what amount is that?
23     A    Zero dollars.
24     Q    And then we have also at least some
25 information from the -- what's called the Special

1  R, the Special Republican Leadership Account,

2  right?

3      A    Correct.

4      Q    And the -- you have the opportunity to

5  review at least a portion of the Special R

6  account for payments to Weiss Micromarketing; is

7  that right?

8      A    Yes.

9      Q    Between the years 2004 and 2007,

10 according to the information provided to the

11 Office of Attorney General on behalf of the grand

12 jury, how much money was paid from the Special

13 Republican Leadership Account to Weiss

14 Micromarketing?

15     A    $407,159.

16         MR. BROWN:  Thank you, Agent Cranga.

17 Court's indulgence for a moment please.  (Pause.)

18 Thank you.  Tender for cross.

19         MR. PERRI:  No questions.

20         THE COURT:  Thank you.

21         MR. WINNING:  No questions.

22         THE COURT:  Mr. Lock.

23                 CROSS EXAMINATION

24 BY MR. LOCK:

25     Q    Agent Cranga, to prepare that portion of

1  Exhibit 40 to which you contributed, I assume it
2  was necessary for you to review the invoices from
3  the various vendors that are listed; is that
4  right?
5     A    Yes, sir.  Invoices were subpoenaed and I
6  reviewed those invoices, the ones that were
7  provided.
8     Q    To whom were those invoices sent?
9     A    I -- they were sent to our office.
10    Q    No, no, no, no.
11    A    I'm not sure what you --
12    Q    I didn't mean in response.  I assume that
13  the invoices that you reviewed were copies of
14  originals sent to somebody?
15    A    To the various entities that were
16  involved in the relationship with whomever.
17    Q    Well, do you know to whom they were sent?
18    A    I don't have a copy of the invoice in
19  front of me.  But if the invoice was -- it had
20  the individual's name or company or whatever that
21  was on it, whoever the contractual relationship
22  was with at the time.
23    Q    Did one person on this side of the
24  courtroom receive a single invoice that you
25  reviewed to make your contribution to

1  Exhibit 40 to which you contributed, I assume it

2  was necessary for you to review the invoices from

3  the various vendors that are listed; is that

4  right?

5      A   Yes, sir.  Invoices were subpoenaed and I

6  reviewed those invoices, the ones that were

7  provided.

8      Q   To whom were those invoices sent?

9      A   I -- they were sent to our office.

10     Q   No, no, no, no.

11     A   I'm not sure what you --

12     Q   I didn't mean in response.  I assume that

13 the invoices that you reviewed were copies of

14 originals sent to somebody?

15     A   To the various entities that were

16 involved in the relationship with whomever.

17     Q   Well, do you know to whom they were sent?

18     A   I don't have a copy of the invoice in

19 front of me.  But if the invoice was -- it had

20 the individual's name or company or whatever that

21 was on it, whoever the contractual relationship

22 was with at the time.

23     Q   Did one person on this side of the

24 courtroom receive a single invoice that you

25 reviewed to make your contribution to

1 Commonwealth's Exhibit 40?

2      A      Individuals?

3      Q      Yeah.

4      A      I don't recall.

5      Q      That's actual -- well, do you know if --

6 if you're unaware whether anyone on this side of

7 the courtroom received a copy of the invoice, do

8 you have any information that leads you to

9 believe that anybody seated on this side of the

10 courtroom so much as saw an invoice that you

11 reviewed to make your contribution to

12 Commonwealth's Exhibit 40?

13      A      That I don't know, sir.

14          MR. LOCK:  Thank you, sir.  Those are the

15 only questions that I have.

16          MR. DONATONI:  Thank you, sir.  No

17 questions.

18 BY MS. MCCLELLAND:

19      Q      Can I just ask you, do you break down how

20 much of these expenditures were legislative?

21      A      For which ones, ma'am?

22      Q      For Labels & Lists, for instance, how

23 much of that was legislative?

24      A      I would have to look at the invoices.  I

25 don't have that in front of me as I sit here.

1    Q    So your evidence then is that all of it
2  could have been legislative?
3    A    I wouldn't say that, no.
4    Q    But you don't have any evidence to the
5  contrary?
6    A    But I can't give you exact figures as I
7  sit here right now.
8    Q    What about the same question for
9  Constituents Direct?
10   A    Same answer.  I -- I don't have the
11 invoices in front of me.  The invoices had
12 various things on them.  They were for various --
13 various data.  I can't sit here and answer
14 exactly how all of it was used.
15   Q    So you have no evidence that any of these
16 expenditures were campaign related, at least not
17 with you today?
18   A    I don't.  As I sit here today, no, ma'am.
19        MS. MCCLELLAND:  Okay.  I have no other
20 questions.
21        MR. KELLY:  Nothing for me, Judge.
22        THE COURT:  Thank you.
23        MR. WOODWARD:  No questions, Your Honor.
24        MR. SIGMAN:  No questions.
25        THE COURT:  Thank you.

1  BY MR. FETTERHOFF:

2     Q    Mr. Cranga, when you were preparing the

3  top part of Page 1 on Exhibit 40, which is the

4  expenditures of the Friends of John Perzel to

5  certain vendors --

6     A    Yes.

7     Q    -- am I correct that although the

8  expenditures listed here are directly related to

9  some of the claims in this case, that Friends of

10  John Perzel paid other vendors directly as well?

11  Susquehanna Polling, for instance, Corsa

12  Communications, Cherry Communications, do those

13  sound familiar?

14     A    I -- that information has been reviewed.

15  I don't have that information here in front of me

16  for those vendors.

17     Q    Well, your recollection, I'm asking you

18  for your recollection now.  In order to prepare

19  this chart, Exhibit 40, it was necessary for you

20  at least to review the campaign finance reports

21  filed by Friends of John Perzel, right?

22     A    That's correct.

23     Q    So the vendors listed here is just a

24  snapshot of other vendors --

25     A    Yes.

1    Q    -- the Friends of John Perzel paid?

2    A    Right.   There were other vendors that

3 were paid.

4    Q    Now, similarly, the $2,918,039

5 contributed by Friends of John Perzel to HRCC,

6 that, likewise, is only a portion of the funds

7 contributed to HRCC by other political action

8 committees in which Mr. Perzel had an interest;

9 is that right?

10   A    That's possible, yes.   It's possible

11 there could have been others.

12   Q    Prior to today did you or anyone at the

13 Office of Attorney General have occasion to

14 review the campaign finance reports or the

15 political action committee finance reports for

16 the Victory funds -- Victory 2004, Victory 2005

17 or Victory 2006?

18        MR. BROWN:   Your Honor, at this point I'm

19 going to object.   Again, Commonwealth Exhibit 40

20 and the testimony on direct examination related

21 to those particular vendors.   Going into other

22 political action committees of whatever stripe is

23 beyond the scope of direct and it's irrelevant to

24 the particular charges at issue here.

25        MR. FETTERHOFF:   Well, let me just ask

1  this.  I'll simplify it.

2         THE COURT:  Thank you.

3  BY MR. FETTERHOFF:

4      Q   Prior to today did you or anyone at the

5  Office of Attorney General have occasion to

6  review the filings of the Victory funds?

7         MR. BROWN:  Same objection.

8         MR. FETTERHOFF:  I'm just going to -- I'm

9  not going to ask about numbers.  I'm just going

10 to go through the list.

11        THE COURT:  You can answer the question.

12        THE WITNESS:  Sir, I couldn't comment on

13 that.  I know that that stuff is being looked at.

14 I can't sit here today with what I brought with

15 me.  I can tell you about the ones that I've

16 reviewed.

17 BY MR. FETTERHOFF:

18     Q   All I'm asking at this point is whether

19 you --

20     A   I'm sure that it has by some agent

21 somewhere.  I'm sure that that's something that's

22 being looked at.  Today I --

23     Q   What I'm asking you -- I'm going to --

24 I'm trying to make it simple and quick.  All I'm

25 asking you is that prior to today do you know

1  whether any agent at the Office of Attorney

2  General is looking into the receipts or

3  expenditures of the Victory fund?

4      A    I can't tell you who but I'm sure it's

5  being looked at, yes.  I mean, I'll -- we're not

6  going to obviously not look at that.  But I can't

7  comment on that here today, sir.  I've got what's

8  in front of me.  I'm trying to answer your

9  question.

10     Q    No, no -- when you say I'm sure it's been

11 done, are you assuming that or you know for a

12 fact?

13     A    I'm assuming that's certainly something

14 that's going to be looked at.

15     Q    No.  Really what I'm asking you is

16 whether you know --

17          MR. BROWN:  Objection.

18 BY MR. FETTERHOFF:

19     Q    -- as a matter of fact?

20     A    Then I can't tell you that, sir.  I don't

21 know as I sit here right now.  I don't know.

22     Q    How many -- how about the other

23 committees, the 1776 Committee, the Citizens For

24 Government Reform, or the PA Leadership?

25          MR. BROWN:  Same objection.

1          MR. FETTERHOFF:  I'm summarizing them all
2     together to get it done.
3          MR. BROWN:  And I'm going to object to
4     them all together.
5          THE COURT:  And I expect I know his
6     answer but --
7          THE WITNESS:  Same answer, sir.  I know
8     they -- I know they exist.  But I could not tell
9     you any totals or any numbers.  I know they
10    exist.
11    BY MR. FETTERHOFF:
12      Q    All I'm -- I didn't even ask that.  What
13    I'm asking is whether you or any other agent at
14    the Office of Attorney General to your knowledge
15    looked into those political action committees
16    prior to today, prior to today?
17      A    No, prior to today I have not personally.
18         MR. FETTERHOFF:  Thank you.
19         THE COURT:  Mr. Bergstrom.
20         MR. BERGSTROM:  Nothing, sir.
21         THE COURT:  You can step down.  Thank you
22    very much.
23         MR. BROWN:  Agent Carlson is next.  And
24    actually, Judge, before he comes up, let me take
25    two minutes to talk to some of the attorneys.

```
 1  Maybe we can shorten this.
 2           Let's take five minutes, Judge.  Maybe we
 3  can shortcut this.
 4           THE COURT:  Ten minutes.
 5           (A recess was taken.)
 6           MR. BROWN:  Thank you, Your Honor.  May
 7  it please the Court, after off-the-record
 8  discussions with all counsel, I'm sure we'll put
 9  this on the record after we're done, all counsel
10  have agreed to stipulations as to the following,
11  regarding Commonwealth Exhibit 41, which would be
12  a packet containing the following items, travel
13  expense voucher for J. Anthony Painter, to the
14  Comdex seminar in Las Vegas, Nevada, from
15  November 10th to the 17th, 2001; another packet
16  with a cover memo, January 23rd, 2002, regarding
17  Gregory Harbold; travel expense voucher for Brian
18  Preski to the Comdex conference in Las Vegas,
19  Nevada, November 13th to the 16th, 2001; next, a
20  packet to the Comdex Computer Expo in Las Vegas,
21  Nevada, November 10th to the 17th, 2001, for
22  Samuel Stokes; November 10th to the 17th, 2001,
23  to Las Vegas, William Tomaselli, another travel
24  expense voucher; and Eric Ruth, November 10th to
25  November 17th, 2001, Comdex Computer Seminar, Las
```

1 Vegas, Nevada.

2          Commonwealth Exhibit 42 --

3          MR. DONATONI: That's 41?

4          MR. BROWN: That's 41 cumulative.

5 Commonwealth Exhibit 42, travel expense voucher

6 for Elmer Al Bowman, December 15th to

7 December 18th, 2004. It's listed as destination

8 itinerary is travelling with Bill Tomaselli to

9 meet with GCR for development of a communications

10 outreach project, New Orleans, Louisiana.

11          Commonwealth Exhibit 43, travel expense

12 voucher packet for Tony Painter, January 30th to

13 February 2nd, 2004, destination itinerary,

14 Houston, Texas, to meet with HP and Compaq.

15          Commonwealth Exhibit 44, travel expense

16 voucher packet for Eric Ruth, January 30th to

17 February 2nd, 2004, destination itinerary

18 Houston, Texas, to meet with HP and Compaq.

19          This is, in fact, Judge, the same

20 stipulation regarding the Stokes and Cornell

21 personnel files. They're to be admitted into

22 evidence without having the records custodian or

23 an agent actually testify to them, the contents

24 of which are available for argument on both

25 sides. So stipulated?

1      MR. MCMONAGLE:  So stipulated.

2      MS. MCCLELLAND:  Stipulated.

3      MR. LOCK:  Stipulated.

4      MR. BROWN:  Is there any objection to the

5  stipulation?  I see no response to that.  And,

6  Your Honor, with that, with exception of the

7  minor matter that Mr. Bergstrom and I talked

8  about at sidebar, that concludes the testimony

9  for today.

10      THE COURT:  All right.  Have you thought

11  about a start time with respect to your potential

12  witnesses for tomorrow?  Is 9:00 good?  Should we

13  be here at 8:30?

14      MR. BROWN:  Your Honor, based on the some

15  of the stipulations we've entered into today, and

16  the remaining Commonwealth witnesses, at least

17  for tomorrow, I feel confident that a 9:00 start

18  time is appropriate.  Based on the way things go

19  tomorrow, that may change for Thursday.

20      MS. MCCLELLAND:  Do we have a witness

21  list for tomorrow?

22      MR. BROWN:  It will start off with John

23  Hanley.

24      MS. MCCLELLAND:  Who's after that?

25      MR. BROWN:  And again, with Hanley, that

1 may go long or short, depending.  And then Tony

2 Painter may be tomorrow.  He may be some time on

3 Thursday.

4       MR. DONATONI:  Is it fair to assume that

5 these guys will be ready to go back-to-back?  In

6 other words, so that we may be out of here sooner

7 rather than later on Thursday, depending on

8 how -- the length of the witness?

9       MR. BROWN:  At this point I'm waiting for

10 a call back to confirm Painter's availability for

11 tomorrow.  Frankly, because this went a little

12 faster.  The idea is to just, if we have time, we

13 bring him in and we run him in and get him done.

14       THE COURT:  I mean, to me, worst case

15 scenario, Thursday has got what I would like

16 to -- and if we're done sooner, but for the

17 Commonwealth to rest Thursday morning, come back

18 prepared for closing arguments right after lunch.

19 We're going to try to limit you guys to ten or

20 15 minutes, so we're done Thursday.  I have no

21 courtroom Friday and beyond, so.

22       MR. MCMONAGLE:  Fine, sir.

23       MR. DONATONI:  I understand there may be

24 a chance -- maybe I'm too optimistic, that if

25 Mr. Painter's available the way we're going we

1  may get through some of this, depending on how
2  cross goes, a lot of it by the end of tomorrow or
3  into Thursday morning.
4          MR. BROWN: That's certainly the plan.
5  If we can get things done and be ready to argue
6  maybe even starting mid morning or earlier
7  Thursday, I think everybody should be prepared
8  for that so we can finish this up.
9          THE COURT: The sooner the better. All
10 right. We'll recess until tomorrow morning 9:00.
11         (A recess was taken.)
12         MR. BROWN: Your Honor, we have one brief
13 stipulation before we entertain -- or before you
14 entertain argument.
15         If called to testimony, Special Agent
16 Shaffer, S-H-A-F-F-E-R, would testify that he's
17 employed with the Office of Attorney General,
18 that he reviewed the leave records for various
19 defendants in this case, including defendant John
20 Zimmerman who he can identify. Regarding the
21 week of February 25th through 29th, 2008, Special
22 Agent Shaffer would testify that he reviewed John
23 Zimmerman's leave records, that John Zimmerman
24 was on leave on February 28th, which was Thursday
25 of that week, and that he was not on leave,

1 according to the record, the remainder of that

2 week.  So stipulated?

3      MR. BERGSTROM:  It is.  It is so

4 stipulated.

5      And with that, I guess, I assume, I think

6 I'm correct here, with that the Commonwealth

7 would rest their case as respects John Zimmerman.

8      MR. BROWN:  That's correct, Your Honor.

9      MR. BERGSTROM:  So it would be -- in that

10 event, Your Honor, I would like to move for

11 dismissal of these charges against Mr. Zimmerman

12 for a number of, I think, compelling reasons.

13      First of all, obviously there is no

14 factual support for the legal allegations that

15 are contained in the arrest warrant.  And let me

16 begin by identifying, at least as I understand

17 it, specifically what the allegations are in this

18 case against Mr. Zimmerman.

19      And it's simply a charge of hindering

20 apprehension and obstructing administration of

21 law, and then two conspiracies which essentially

22 allege the same thing.

23      But the key language in all of those

24 charges is as follows:  By having boxes which

25 were the subject of at least one statewide

1  investigating grand jury subpoena moved from
2  their original location to the speaker emeritus's
3  office in the state capitol, then having those
4  boxes moved to the House Republican Campaign
5  Committee.

6        That's the key language in the
7  allegation, and that allegation runs through all
8  four of these charges, the two substantive
9  charges and the two conspiracy charges.  The key
10  language in that is by having boxes which were
11  the subject of at least one statewide
12  investigating grand jury moved.

13        Well, first of all, there isn't any
14  evidence in this record that Mr. Zimmerman ever
15  saw or was aware of a grand jury subpoena.  None.
16  Zero.  No testimony whatsoever.  The closest that
17  we come to the testimony with respect to a grand
18  jury subpoena is obviously Agent Fiore.

19        Agent Fiore says there was a grand jury
20  subpoena that was delivered at 2:30 p.m. on
21  February the 29th.  But there's no evidence
22  whatsoever that other than Jill Seaman that
23  anybody knew of its existence, and certainly
24  Mr. Zimmerman didn't know of its existence and
25  Mr. Zimmerman never saw it.  So Mr. Zimmerman

1  doesn't know the very basic point of the

2  allegation deals with that subpoena.

3          Aside from the fact that the -- the

4  movement of these boxes -- and I'm certainly not

5  conceding for a moment that Mr. Zimmerman knew of

6  the movement of the boxes, because, again, there

7  isn't any evidence that he did -- but the

8  movement of the boxes precedes the service of the

9  grand jury subpoena so that, you know, there's a

10 disconnect between the movement and the subpoena.

11 And there's no evidence that Mr. Zimmerman knew

12 what was in the boxes or that the boxes were

13 moved or that there had been a subpoena issued

14 with respect to those boxes or any boxes, so that

15 there is just a complete lack of evidence.

16          But if you look -- if you look at the

17 charge of hindering, which is the first charge,

18 it's an interesting -- it's an interesting

19 allegation and it doesn't fit this case.  The

20 reason I say that is because if you read the

21 language of 5105, what it says is, "A person

22 commits an offense if with intent to hinder the

23 apprehension, prosecution, conviction, or

24 punishment of another."

25          And I think we have to read that statute

1 as it is written, and that is that there must be
2 a hindrance of apprehension; there must be a
3 hindrance of prosecution, conviction, or
4 punishment.
5        Well, obviously the language of the
6 statute does not include hindering an
7 investigation.  It simply isn't there.  So that
8 let's assume for the sake of discussion that
9 there was some evidence, which of course there
10 isn't, but let's assume for discussion that there
11 was some evidence that there was a hindering of
12 this investigation, 5105 would not be the vehicle
13 to prosecute that case, because it's pretty clear
14 that 5105 applies only to apprehension,
15 prosecution, conviction, or punishment, none of
16 which is involved in this case.  Period.
17        We have a grand jury subpoena issued on
18 the 29th of February, period.  That's it.
19 That's -- it's an investigative stage.  There's
20 no question about it.  It's not a prosecution and
21 it certainly isn't punishment or anything that's
22 covered by that particular statute.
23        So I guess my point is two-fold.  Number
24 one, the law here -- the law here doesn't cover
25 the conduct that is the subject of the testimony.

1   Secondly, the subject of the testimony doesn't

2   even come close to covering what the law is.

3        If you move on to the charge of

4   obstructing the administration of justice, again,

5   that involves intentionally obstructs, impairs,

6   or perverts of the administration of law or other

7   governmental function by force, violence,

8   physical interference, or obstacle, breach of

9   official duty, or any other unlawful act.

10       I don't know what that means.  And I

11  don't know what the other unlawful act would be

12  here.  Because if you don't know that there's a

13  subpoena out there, if you don't know that the

14  boxes have been moved, if you don't know what's

15  in the boxes, then you haven't done anything

16  wrong.  And you certainly haven't violated 5101

17  because you haven't interfered or obstructed or

18  breached an official duty or any other unlawful

19  act.  So that, you know, factually, legally, they

20  simply don't make out their case.

21       And, you know, it really is terribly

22  important, because, you know, we've sat here.

23  And that's okay.  We've listened to the evidence,

24  as you have.  But it just doesn't exist as to

25  John Zimmerman.  And in my view it would not be

1  consistent with either the facts or the law of

2  this case to hold him over for a trial when that

3  is really it.

4          I mean, it's not going to get any better

5  than that.  It's never going to get any better.

6  Okay.  That's all there is.  That's all there

7  ever will be.  And it doesn't make it.  So that,

8  you know, it's really that simple.

9          He didn't know about the subpoena.  He

10 didn't know what was in the boxes.  He didn't

11 know the boxes were moved.  And he didn't know

12 that they were in any way responsive to the

13 subpoena.

14         The Commonwealth may argue that Agent

15 Fiore's chart shows that there was a phone call

16 made from John Zimmerman's desk.  No one, not

17 Matthews, not Fiore, not any other witness will

18 ever be able to come into a courtroom, raise his

19 or her hand and swear that John Zimmerman made

20 that phone call.  Nobody knows who made that

21 phone call.  Let me tell you, if John Zimmerman

22 made that phone call, Lori Lochetto would have

23 said so.  And she didn't.  She said she's the one

24 that initiated the movement of those boxes.  Not

25 John Zimmerman.

1    So I don't care who picked up John
2   Zimmerman's phone that day and made that call,
3   but there is not a shred of evidence that it was
4   John Zimmerman.  That's all I have to say.  So I
5   ask that you grant my motion and dismiss these
6   charges.
7        THE COURT:  Mr. Brown, you may respond.
8        MR. BROWN:  Thank you, Your Honor.  May
9   it please the Court, Counsel, I think it's
10   important first off, Judge, to make sure that we
11   not lose sight of exactly what's going on here.
12   And I'll start by reiterating what I'm sure the
13   Court already knows, so I'm going to be brief on
14   that, which is the standard here is prima facie.
15   And the Commonwealth isn't required to put on
16   every bit of evidence that we have for any of the
17   charges.  It's simply is there enough evidence to
18   get this case in front of a jury, essentially.
19        And for these particular crimes regarding
20   John Zimmerman, the Commonwealth has met that
21   burden, and here's why.  It's important to look
22   not at a piece here or a piece there, as
23   Mr. Bergstrom related to you in his argument.
24   It's important to look at how all these things
25   come together in context.  And when you look at

1  everything in context, there's enough for the
2  jury to find the defendant guilty, or certainly
3  for prima facie, and I, frankly, would submit to
4  you, Judge, beyond a reasonable doubt.

5         Because here's what we have.  We have
6  boxes that contain campaign material.  And
7  they're moved up to -- from B2 in the basement to
8  Room 414 where John Zimmerman works.  John --
9  where John Zimmerman works at a job that,
10  according to Lori Lochetto, he's rarely if ever
11  not at his desk.  And his desk has an
12  unobstructed view, according to Lori Lochetto, of
13  where these boxes go and where these boxes sit
14  until they're scurried out of the capitol by some
15  phone calls and by the messengers.  The
16  messengers are at Lori Lochetto's direction, and
17  they end up over at the HRCC.

18         So, again, we have John Zimmerman sitting
19  at a desk where he can see all this stuff going
20  on, because he's only on leave on the Thursday
21  after the boxes are already out of there.  For
22  the three earlier days that week, the 25th, 26th,
23  and 27th, he's there when all these boxes are
24  moving back and forth and when the boxes
25  ultimately go over to the HRCC.

1          Now let's add to that.  We have John
2   Zimmerman sitting at his desk seeing all these
3   boxes going back and forth and that we have
4   someone using John Zimmerman's desk phone at 4:30
5   on the 26th making a phone call over to HRCC to
6   arrange to have the boxes over there.  Is there
7   going to be somebody over there to accept receipt
8   of these boxes when they go over the next day,
9   when they go over on the 27th?
10          What else did Lori Lochetto say about the
11   people in John Perzel's office?  There are three
12   men that work there at the time.  There's John
13   Perzel, whose voice George Matthews knows and
14   it's not John Perzel making the phone call from
15   Zimmerman's desk on where he sits.  It's not Paul
16   Towhey, who also works up there, because George
17   Matthews, according to the testimony, also knows
18   Paul Towhey's voice and knows that it's not Paul
19   Towhey.
20          So when you have John Zimmerman being
21   able to see all these boxes and a call from a
22   male making a call over to the HRCC about the
23   boxes, you have John Zimmerman, at least their
24   prima facie level, Judge, because we've
25   eliminated all the other males that work in

1  Perzel's office.  And John Zimmerman's working

2  that day.

3          So we have John Zimmerman participating

4  in getting the boxes that contain campaign

5  material out of the capitol over to the HRCC.

6  Then the next day the boxes are moved over.  And

7  I'm not sure if you have a copy of Commonwealth

8  37.  I'm happy to hand it up after the argument

9  if you need it.

10         According to Agent Fiore's testimony and

11 the chart, the boxes, the boxes get moved over to

12 the HRCC at 11:00 on the 27th, the day after

13 Zimmerman or some other unknown male that somehow

14 sneaks into John Perzel's office and makes this

15 phone call from John Zimmerman's desk while John

16 Zimmerman's working.  At 11:00 the boxes get

17 moved over.

18         There are then three calls, again from

19 John Zimmerman's desk phone on a day when he's

20 working at a job where he doesn't necessary -- he

21 doesn't really go anywhere -- according to Lori

22 Lochetto, he sits at his desk -- at 2:08, 2:31

23 and 7:35 p.m.  It's reasonable for the Court to

24 infer, and frankly, it would be reasonable for

25 the jury to infer, Hey, this is John, did the

1  boxes get over there?  We need to get them out of

2  here.  Remember, I called you yesterday?

3          Now, again, we don't have to put on every

4  bit of evidence we have for these calls.  The

5  issue is is it enough.  And, Judge, in addition

6  to all that stuff leading up to the forthwith

7  subpoena -- and let's not forget there's another

8  subpoena floating out there for earlier in the

9  week, there was also testimony as to that -- but

10  then you get to the 29th where Agent Speaks and

11  Chief Deputy Attorney General Fina go over with,

12  in hand, a forthwith grand jury subpoena that

13  says any and all campaign documents, materials

14  removed from B2 on February 26th, 2008, or the

15  60 days preceding.

16          And what does John Zimmerman do and,

17  frankly, what does Paul Towhey do when they get

18  there?  Do they talk about all these boxes that

19  are being moved in and out during the days

20  preceding?  Do they say, hey, you know, I'm not

21  that sure it was in but we have messengers

22  running cartloads of boxes in and cartloads of

23  boxes out; and John Zimmerman says, Yeah, I made

24  phone calls over there?  No, none of that.

25          Do they -- do they even just stay silent

1 and don't say anything?   No.   They both say I
2 don't know what you're talking about; I don't
3 know anything about any boxes; I've never seen
4 any boxes and I don't know if they contain
5 campaign material.   I don't know anything about
6 any boxes.
7        When you add that to everything that goes
8 before and then when you add in that Zimmerman,
9 according to the Krill phone records is
10 interlocked with other people that know what the
11 stuff is, Zimmerman, Feese, Lochetto and all
12 these calls between John Zimmerman and Jill
13 Seaman, who the subpoena was served on by the
14 way, and there was much ado made by various
15 defense attorneys about, well, this is a big deal
16 and we're -- you know, we need to know what's
17 going on and, you know, won't this be something
18 that would be talked about.   Of course, it would
19 be talked about.
20        And Jill Seaman, in some of the seven
21 phone calls to Zimmerman or the four calls to
22 Towhey, it's reasonable, based on all the facts
23 and circumstances that we've adduced, for the
24 jury to infer that Zimmerman was absolutely told
25 what was in the subpoena.   And even if he wasn't

1  told by another coconspirator or another

2  defendant what was in the subpoena, they were

3  told by Speaks and Fina what they were looking

4  for.  And they actively misled the prosecution

5  and investigation of this case.

6        And what they did, Judge -- again, we're

7  talking at a prima facie level, because we

8  haven't put on all the evidence we have.  But at

9  a prima facie level, what John Zimmerman did when

10 you look at it in context is he obstructed the

11 administration of justice by an unlawful act of

12 lying to the Office of Attorney General there on

13 behalf of the grand jury.

14        And in addition to that, he interfered

15 with and clearly by lying about what he knew or

16 what he claimed not to know and by withholding

17 all this information, he also hindered the

18 apprehension or prosecution of other people that

19 he had reason to know were involved here.

20        Judge, this is a prima facie case.  And

21 the issue is whether the Commonwealth has met all

22 of these elements at a prima facie level.  When

23 you look at everything in context, there's no

24 doubt that we have.  And I ask that the charges

25 be returned on that basis.

1          MR. BERGSTROM:  Can I say just a few

2    things?  That's not what he's charged with.  I

3    mean, what I just heard is a brand new theory,

4    brand new theory being that somehow John

5    Zimmerman lied to the AG's office.  And I don't

6    know when that might be, but I suppose it might

7    be on the evening of the 29th, and that's what

8    obstructed and that's what hindered.

9          Well, guess what.  That's not what this

10    charge says.  It doesn't say that at all.  It

11    doesn't say John Zimmerman lied.  What it says in

12    the charge is that he hindered and that he

13    obstructed by having boxes which were the subject

14    of the subpoena moved, not that he lied.  So

15    that, you know, it's really not right to now,

16    when we're all done here, now to come in and say

17    that John Zimmerman lied and that's the basis

18    upon which you should hold this case for trial.

19          MR. BROWN:  Well, let me stop you there

20    because I want to be clear about this.  This is

21    not a new theory that the Commonwealth has come

22    up with.  The lying is part and parcel of exactly

23    what's charged there.

24          MR. BERGSTROM:  I don't care if it's a

25    new theory or an old theory or anybody's theory.

1  The fact of the matter is it's not part of the

2  allegation that I'm here to defend against and

3  we've been here to defend against for these --

4  these days, these whatever that -- whatever

5  they've been.  But more importantly, there's a

6  complete misstatement of what was said that

7  night.  And the witnesses didn't testify that

8  John Zimmerman said he didn't know anything about

9  boxes and didn't know anything about it.

10        What the witnesses testified in response

11 to Agent Speaks' inquiry or Frank Fina's inquiry

12 was has any material been removed or hidden.  And

13 the response that came not only from Zimmerman

14 but came from everybody else that was down in

15 that area that night was no.  We did not remove

16 anything and we did not hide anything.

17        That was what was said, okay.  And again,

18 that has nothing to do with it.  Again, what's --

19 what's alleged -- but let me just wrap it up by

20 saying this.  What I think you have to do, and I

21 know you know this, but what you have to do is

22 you've got to look back and say, on the basis of

23 this evidence, what is it that John Zimmerman

24 knew?  What did he know?  And what is the

25 evidence of what he knew?

1        Lori Lochetto, the best she could do, the
2   very best she could do in this courtroom under
3   oath was to say, John Zimmerman's office, from
4   his office he had a view of what would have
5   passed in front of his office.  She never
6   testified that he was in his office.  She never
7   testified that he saw what passed in front of his
8   office.  She never testified that he knew what
9   was in those boxes.  I mean, there could have
10  been a half a dozen chocolate eclairs in those
11  boxes; he wouldn't know that.
12        There isn't any evidence of what he knew.
13  He didn't know about the subpoena.  So that at
14  the risk of being presumptuous, I think this is a
15  simple case and I think the evidence does simply
16  not existent as to John Zimmerman.  And I ask you
17  to grant the motion.
18        MR. BROWN:  Two last points, Judge.  How
19  is not -- how is saying I don't know anything
20  about any boxes, when the evidence shows the
21  boxes were removed or hidden, first from --
22  removed and hidden from B2, and next removed or
23  hidden from 414, and not telling the Office of
24  Attorney General about it when you're
25  specifically asked not obstruction of justice?

1        Removed or hidden, when he participates

2   in it with this phone call on the 26th and then

3   when he either adds to or compounds the crimes

4   he's already committed by furthering the

5   conspiracy and furthering his crimes by lying

6   about it, the jury deserves to hear this evidence

7   because we presented enough for them to hear it.

8        THE COURT:  All right.  With respect to

9   the charges against Mr. Zimmerman, I'm going to

10   hold the list of charges for the Court of Common

11   Pleas.  I believe the Commonwealth has met a

12   prima facie burden.

13        (Proceedings concluded at 3:59 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2          I hereby certify that the proceedings and

3    evidence are contained fully and accurately in

4    the notes taken by me on the hearing of the above

5    cause, and that this is a correct transcript of

6    the same.

7

8

9

10

11   June 8, 2010
     Date                      Heather L. Artz, RMR, CRR
12                             Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

$1,725.10 [1] - 97:8
$10,000 [1] - 59:3
$105,861.50 [1] -
97:25
$150,523.08 [1] -
97:21
$2,918,039 [3] - 89:5,
96:24, 106:4
$37,315.31 [2] - 58:16,
88:18
$407,159 [1] - 101:15
$481,473.68 [1] -
99:23
$489.83 [1] - 96:8
$499,351.66 [1] - 99:5
$5,235,129.32 [1] -
100:16
$5,299,008.52 [1] -
100:12
$6,200,000 [1] - 60:5
$73,000 [1] - 59:15
$9,286,980 [1] - 59:25
$9,482.60 [1] - 96:20

**'**

'03 [1] - 100:1
'04 [1] - 99:2
'05 [1] - 55:12
'06 [2] - 58:17
'07 [1] - 60:6
'09 [1] - 59:4

**1**

1 [3] - 87:19, 88:7,
105:3
10 [1] - 31:9
10/2 [1] - 58:17
10:00 [1] - 49:21
10th [5] - 60:2, 110:15,
110:21, 110:22,
110:24
11 [1] - 17:5
11/19 [1] - 60:6
11:00 [2] - 124:12,
124:16
12 [4] - 37:17, 38:12,
38:19, 38:22
12/6 [1] - 58:17
12th [4] - 53:13, 53:21,
70:10, 71:18
13 [1] - 82:3
131 [2] - 55:7, 55:8
131st [1] - 54:25
13th [1] - 110:19
15 [3] - 56:21, 70:16,
113:20

15th [1] - 111:6
16th [1] - 110:19
1776 [2] - 91:10,
108:23
17th [4] - 110:15,
110:21, 110:22,
110:25
18th [1] - 111:7
1980 [1] - 14:15

**2**

2 [8] - 31:7, 31:8,
44:18, 45:2, 59:21,
91:4, 92:18, 98:12
2/4 [1] - 59:4
20 [3] - 33:11, 33:13,
77:21
2000 [1] - 96:23
2001 [5] - 110:15,
110:19, 110:21,
110:22, 110:25
2002 [5] - 60:1, 96:19,
97:19, 100:11,
110:16
2003 [2] - 59:16, 97:7
2004 [10] - 27:12,
27:24, 91:3, 96:10,
97:23, 101:9,
106:16, 111:7,
111:13, 111:17
2005 [10] - 53:13, 56:7,
70:10, 71:18, 71:19,
80:13, 80:17, 91:3,
97:7, 106:16
2006 [3] - 59:16, 91:4,
106:17
2007 [4] - 60:2, 99:2,
100:2, 101:9
2008 [20] - 9:17, 10:11,
10:18, 10:23, 11:6,
12:4, 12:14, 15:15,
17:5, 17:14, 17:16,
17:22, 18:5, 36:10,
96:19, 97:19, 97:23,
100:11, 114:21,
125:14
2009 [1] - 96:23
23rd [1] - 110:16
25th [9] - 11:5, 16:22,
24:18, 26:1, 26:4,
26:14, 26:15,
114:21, 122:22
26 [1] - 71:19
26th [17] - 10:11, 12:4,
12:5, 12:6, 12:8,
12:14, 15:15, 17:1,
51:23, 56:7, 80:12,
80:15, 80:17,
122:22, 123:5,

125:14, 131:2
27th [8] - 13:3, 17:4,
17:10, 17:14, 17:16,
122:23, 123:9,
124:12
28th [2] - 26:10,
114:24
29th [3] - 9:17, 10:18,
10:22, 11:6, 17:22,
18:4, 18:17, 30:15,
30:20, 31:9, 32:13,
32:25, 36:10, 44:8,
45:6, 46:12, 47:20,
48:7, 114:21,
116:21, 118:18,
125:10, 128:7
2:08 [2] - 17:17,
124:22
2:30 [6] - 10:23, 17:24,
39:14, 40:9, 44:10,
116:20
2:31 [2] - 17:17,
124:22
2:40 [2] - 24:18, 25:21
2nd [2] - 111:13,
111:17

**3**

3 [2] - 17:1, 91:1
30th [2] - 111:12,
111:16
310-696-2261 [1] -
8:24
35 [2] - 7:25, 28:14
36 [5] - 9:21, 10:21,
17:23, 19:12, 39:17
37 [5] - 11:17, 16:13,
16:20, 46:17, 124:8
38 [5] - 53:12, 70:10,
79:19, 79:20, 86:18
39 [6] - 55:17, 79:19,
79:21, 80:2, 80:7,
82:3, 85:14, 86:19
3:20 [1] - 17:2
3:59 [1] - 131:13

**4**

4 [1] - 24:19
4,000 [1] - 9:11
4/16/07 [1] - 59:4
40 [14] - 58:2, 86:19,
87:14, 90:4, 92:4,
95:11, 96:4, 98:13,
102:1, 103:1,
103:12, 105:3,
105:19, 106:19
41 [3] - 110:11, 111:3,
111:4
414 [2] - 12:11, 12:17,

12:23, 16:4, 16:15,
16:24, 17:3, 17:6,
24:19, 25:13, 26:24,
122:8, 130:23
42 [2] - 111:2, 111:5
43 [1] - 111:11
437 [1] - 14:15
44 [1] - 111:5
4:30 [5] - 12:19, 13:3,
15:15, 51:23, 123:4
4th [3] - 44:14, 44:25,
45:11

**5**

5101 [1] - 119:16
5105 [3] - 117:21,
118:12, 118:14
5th [1] - 60:1

**6**

6 [12] - 18:12, 39:20,
40:9, 40:23, 41:14,
42:18, 42:25, 43:15,
45:9, 49:1, 49:7,
49:21
6/26/03 [1] - 60:6
60 [2] - 10:12, 125:15
6:30 [6] - 18:12, 18:17,
19:5, 32:16, 32:21
6:31 [2] - 47:20, 48:7
6:41 [2] - 47:20, 48:8

**7**

748 [1] - 14:15
7:35 [2] - 17:18,
124:23

**8**

80 [1] - 77:23
88 [2] - 81:22, 83:2
88-page [1] - 56:15
8:17 [2] - 48:13, 48:16
8:30 [1] - 112:13
8:36 [2] - 48:13, 48:17

**9**

9:00 [3] - 112:12,
112:17, 114:10

**A**

A-N-T-H-O-N-Y [1] -
6:14
A.2d [1] - 14:15
a.m [1] - 17:5
able [3] - 47:10,
120:18, 123:21

abnormal [1] - 20:13
Abs [2] - 57:5, 57:9
absolutely [6] - 23:22,
24:3, 49:17, 68:7,
68:14, 126:24
abundance [1] - 63:24
accept [1] - 123:7
acceptable [1] - 76:21
accepted [1] - 15:2
accommodated [1] -
22:23
according [19] -
15:24, 17:23, 27:1,
27:5, 51:11, 53:20,
56:6, 99:3, 100:9,
100:14, 101:10,
115:1, 122:10,
122:12, 123:17,
124:10, 124:21,
126:9
account [2] - 69:19,
101:6
Account [2] - 101:1,
101:13
accuracy [1] - 90:8
accurate [12] - 11:20,
31:10, 41:15, 60:21,
60:25, 74:9, 89:17,
89:22, 89:23, 90:2,
90:20, 92:6
accurately [1] - 49:13
act [4] - 119:9, 119:11,
119:19, 127:11
action [8] - 90:23,
91:20, 92:7, 92:16,
106:7, 106:15,
106:22, 109:15
actively [1] - 127:4
activities [1] - 64:20
activity [1] - 62:7
actual [6] - 37:25,
38:16, 47:2, 60:19,
65:10, 103:5
add [3] - 123:1, 126:7,
126:8
addition [3] - 91:1,
125:5, 127:14
additional [3] - 30:11,
38:1, 93:12
address [1] - 82:18
addresses [2] - 81:6,
93:3
adds [1] - 131:3
adduced [1] - 126:23
administration [4] -
115:20, 119:4,
119:6, 127:11
admitted [1] - 111:21
ado [1] - 126:14
advised [2] - 8:18,

63:17
**affidavit** [1] - 93:5
**affiliation** [5] - 57:3, 82:11, 82:19, 83:22, 84:3
**affirm** [1] - 90:8
**afternoon** [10] - 6:10, 17:2, 21:22, 21:23, 32:10, 43:25, 44:10, 52:19, 67:9, 94:16
**AG's** [2] - 23:24, 128:5
**age** [2] - 57:3, 82:8
**agent** [17] - 6:3, 7:24, 9:7, 9:20, 11:15, 49:23, 49:24, 52:22, 64:25, 70:20, 70:22, 89:14, 107:20, 108:1, 109:13, 111:23
**Agent** [64] - 6:16, 6:21, 7:20, 8:15, 10:21, 10:25, 11:4, 12:3, 12:21, 13:24, 15:13, 16:13, 17:11, 17:21, 19:1, 19:6, 19:9, 19:18, 20:9, 21:1, 21:18, 21:22, 28:14, 29:24, 32:10, 32:13, 36:19, 36:23, 43:25, 47:18, 49:4, 49:6, 50:11, 51:2, 51:7, 52:12, 52:24, 53:11, 55:16, 56:18, 57:18, 58:3, 60:7, 61:4, 64:8, 67:9, 72:18, 78:16, 79:18, 81:25, 94:9, 94:21, 96:3, 101:16, 101:25, 109:23, 114:15, 114:22, 116:18, 116:19, 120:14, 124:10, 125:10, 129:11
**agents** [6] - 6:17, 14:10, 22:7, 40:24, 41:1, 94:22
**agree** [14] - 24:4, 31:23, 33:23, 35:1, 48:14, 57:16, 78:5, 78:7, 78:9, 80:23, 82:12, 82:15, 83:19, 94:3
**agreed** [2] - 60:17, 110:10
**agreement** [1] - 21:1
**ahead** [2] - 17:21, 74:25
**Al** [13] - 31:23, 62:3, 62:8, 72:20, 74:4, 75:12, 76:9, 76:24,

77:14, 78:2, 78:5, 93:23, 111:6
**alert** [2] - 35:22, 36:16
**allayed** [1] - 63:12
**allegation** [5] - 116:7, 117:2, 117:19, 129:2
**allegations** [3] - 63:16, 115:14, 115:17
**allege** [1] - 115:22
**alleged** [1] - 129:2
**allocated** [1] - 77:22
**allowed** [2] - 13:21, 13:25
**alluded** [1] - 92:17
**almost** [1] - 91:1
**alone** [1] - 34:6
**ambiguous** [1] - 37:14
**American** [2] - 59:6, 85:23
**amount** [4] - 58:15, 92:20, 100:13, 100:22
**amounts** [1] - 58:4
**analysis** [5] - 20:11, 21:13, 30:5, 67:22, 72:18
**analyzed** [3] - 34:19, 35:2, 70:5
**analyzing** [1] - 34:10
**answer** [9] - 31:1, 40:11, 76:19, 104:10, 104:13, 107:11, 108:8, 109:6, 109:7
**answered** [3] - 74:22, 74:24, 84:9
**ANTHONY** [1] - 6:5
**Anthony** [2] - 6:13, 110:13
**apologize** [2] - 12:2, 63:10
**appear** [7] - 10:2, 10:7, 44:12, 44:24, 45:1, 47:23, 80:4
**appeared** [2] - 21:14, 40:10
**applicable** [1] - 15:4
**application** [1] - 71:6
**applies** [1] - 118:14
**appreciate** [1] - 8:25
**apprehension** [5] - 115:20, 117:23, 118:2, 118:14, 127:18
**approaches** [1] - 26:11
**appropriate** [1] - 112:18
**approved** [2] - 66:9,

67:1
**April** [10] - 53:13, 53:21, 56:7, 70:10, 71:18, 71:19, 80:15, 80:16, 80:17, 100:1
**area** [3] - 9:8, 83:7, 129:15
**areas** [3] - 6:20, 71:22, 93:13
**argue** [2] - 114:5, 120:14
**argument** [5] - 60:18, 111:24, 114:14, 121:23, 124:8
**arguments** [1] - 113:18
**Aristotle** [25] - 58:10, 58:18, 58:21, 58:24, 59:3, 59:17, 59:20, 60:3, 60:4, 64:24, 65:2, 65:15, 66:5, 68:1, 68:9, 68:13, 86:24, 88:4, 88:8, 88:23, 88:24, 89:2, 89:25, 95:15, 95:25
**arrange** [1] - 123:6
**arranged** [1] - 43:1
**arrangement** [2] - 41:17, 41:25
**arrest** [1] - 115:15
**arrived** [1] - 40:23
**Artist** [1] - 7:5
**Artists** [2] - 28:24, 29:1
**artists** [1] - 28:25
**ascending** [1] - 82:3
**aside** [1] - 117:3
**aspect** [1] - 75:6
**aspects** [1] - 88:4
**assigned** [3] - 6:17, 17:19, 94:22
**associate** [1] - 33:17
**associated** [1] - 33:16
**Associates** [2] - 58:10, 61:10
**association** [1] - 23:12
**assume** [11] - 22:22, 26:19, 37:2, 77:7, 93:12, 102:1, 102:12, 113:4, 115:5, 118:8, 118:10
**assuming** [3] - 42:3, 108:11, 108:13
**attached** [1] - 54:23
**attachment** [4] - 54:13, 54:16, 56:15, 72:11
**attention** [3] - 47:20, 48:12, 80:1

**attorney** [2] - 22:2, 43:7
**Attorney** [22] - 7:15, 22:7, 23:17, 24:7, 30:14, 35:3, 35:23, 36:14, 37:3, 41:20, 50:15, 52:23, 92:23, 101:11, 106:13, 107:5, 108:1, 109:14, 114:17, 125:11, 127:12, 130:24
**attorneys** [4] - 31:13, 40:14, 109:25, 126:15
**August** [1] - 80:12
**availability** [1] - 113:10
**available** [6] - 7:21, 13:10, 14:18, 61:13, 111:24, 113:25
**aware** [28] - 31:15, 33:1, 39:23, 40:2, 40:12, 40:15, 40:16, 40:21, 41:2, 41:3, 41:7, 41:11, 41:12, 41:24, 41:25, 42:1, 42:2, 45:25, 46:2, 70:2, 70:19, 79:18, 80:12, 80:17, 90:16, 90:21, 91:2, 116:15

### B

**B02** [1] - 10:9
**B2** [12] - 12:10, 16:15, 16:24, 17:3, 24:19, 25:12, 26:6, 26:13, 26:24, 122:7, 125:14, 130:22
**back-to-back** [1] - 113:5
**backwards** [1] - 21:24
**based** [10] - 13:24, 16:20, 37:25, 83:9, 83:21, 84:7, 112:14, 112:18, 126:22
**basement** [10] - 10:10, 61:18, 61:21, 62:2, 84:14, 84:15, 84:17, 84:19, 86:5, 122:7
**basements** [1] - 61:22
**basic** [2] - 14:8, 117:1
**basis** [4] - 50:11, 127:25, 128:17, 129:22
**bcc** [1] - 86:20
**became** [1] - 68:6
**becomes** [1] - 33:1
**begin** [1] - 115:16

**beginning** [3] - 11:15, 24:10, 50:6
**behalf** [4] - 14:21, 60:24, 101:11, 127:13
**below** [2] - 55:25, 56:12
**Bergstrom** [6] - 43:23, 51:3, 93:17, 109:19, 112:7, 121:23
**BERGSTROM** [14] - 14:20, 43:24, 44:6, 47:14, 47:17, 51:5, 51:6, 52:6, 93:18, 109:20, 115:3, 115:9, 128:1, 128:24
**best** [6] - 7:20, 13:9, 54:24, 61:12, 130:1, 130:2
**better** [3] - 114:9, 120:4, 120:5
**between** [24] - 18:16, 20:12, 23:12, 23:13, 31:7, 32:7, 33:20, 38:13, 38:23, 39:24, 40:4, 40:8, 40:9, 43:2, 46:24, 58:17, 59:16, 60:1, 97:7, 97:19, 97:23, 101:9, 117:10, 126:12
**beyond** [5] - 14:11, 91:24, 106:23, 113:21, 122:4
**Bibikos** [2] - 49:8, 49:23
**big** [3] - 23:20, 126:15
**Bill** [1] - 111:8
**bill** [1] - 47:19
**billed** [1] - 76:11
**bills** [1] - 77:21
**biographical** [1] - 57:2
**bit** [4] - 15:8, 84:18, 121:16, 125:4
**blanks** [2] - 82:22, 82:25
**block** [1] - 24:17
**Bloomsburg** [3] - 74:10, 84:15, 84:19
**Blue** [8] - 54:12, 54:13, 56:11, 56:13, 56:23, 71:6, 71:19, 85:15
**borrowed** [1] - 43:15
**boss** [3] - 35:18, 35:21, 35:22
**bouncing** [1] - 94:2
**bounds** [1] - 14:12
**Bowman** [14] - 31:23, 32:7, 62:3, 62:9, 72:20, 74:5, 75:12,

76:9, 76:25, 77:14,
78:5, 85:3, 93:23,
111:6
**Bowman's** [2] - 62:12,
78:3
**box** [7] - 13:5, 15:15,
25:8, 25:11, 25:14,
26:10, 37:10
**boxes** [65] - 9:11,
12:10, 15:21, 16:15,
16:21, 16:23, 17:6,
22:13, 24:19, 25:1,
25:12, 25:20, 25:22,
26:5, 26:13, 26:16,
26:22, 26:23, 27:2,
27:6, 115:24, 116:4,
116:10, 117:4,
117:6, 117:8,
117:12, 117:14,
119:14, 119:15,
120:10, 120:11,
120:24, 122:6,
122:13, 122:21,
122:23, 122:24,
123:3, 123:6, 123:8,
123:21, 123:23,
124:4, 124:6,
124:11, 124:16,
125:1, 125:18,
125:22, 125:23,
126:3, 126:4, 126:6,
128:13, 129:9,
130:9, 130:11,
130:20, 130:21
**Branch** [3] - 13:20,
14:2, 14:14
**brand** [2] - 128:3,
128:4
**breach** [1] - 119:8
**breached** [1] - 119:18
**break** [2] - 94:6,
103:19
**Brett** [1] - 18:19
**Brian** [9] - 55:20, 64:8,
65:18, 66:2, 66:10,
66:20, 66:24, 67:1,
110:17
**brief** [5] - 28:8, 67:12,
86:11, 114:12,
121:13
**bring** [3] - 44:17,
44:25, 113:13
**brought** [2] - 86:18,
107:14
**Brown** [7] - 34:17,
55:11, 63:9, 63:20,
64:3, 70:15, 121:7
**BROWN** [65] - 6:3,
6:9, 7:3, 13:17,
14:14, 15:10, 15:12,

19:15, 19:17, 20:5,
20:20, 20:23, 21:18,
44:5, 50:25, 52:3,
52:9, 52:12, 52:18,
54:2, 54:6, 54:7,
55:13, 55:15, 60:12,
61:1, 61:3, 62:14,
62:20, 62:21, 63:2,
63:5, 63:21, 74:21,
77:9, 84:8, 89:18,
90:10, 91:23, 92:9,
93:1, 93:15, 94:1,
94:9, 94:15, 101:16,
106:18, 107:7,
108:17, 108:25,
109:3, 109:23,
110:6, 111:4, 112:4,
112:14, 112:22,
112:25, 113:9,
114:4, 114:12,
115:8, 121:8,
128:19, 130:18
**Building** [3] - 10:10,
12:11, 26:6
**burden** [2] - 121:21,
131:12
**business** [6] - 8:11,
8:12, 8:20, 29:11,
29:12, 32:20
**BY** [48] - 6:9, 7:3,
15:12, 19:17, 20:5,
20:23, 21:21, 28:13,
29:23, 31:22, 32:12,
36:22, 43:6, 43:24,
44:6, 47:17, 51:6,
52:18, 54:2, 54:7,
55:15, 61:3, 62:21,
64:7, 67:8, 72:17,
75:7, 77:12, 78:15,
79:17, 84:11, 85:13,
86:3, 86:10, 87:13,
87:18, 89:20, 90:14,
92:2, 93:22, 94:15,
101:24, 103:18,
105:1, 107:3,
107:17, 108:18,
109:11

## C

**C-38** [5] - 70:9, 71:18,
72:3, 78:19, 79:1
**C-39** [4] - 70:14,
71:19, 72:11, 81:11
**C-40** [5] - 67:14, 68:6,
68:24, 69:6, 69:21
**C-R-A-N-G-A** [1] -
94:20
**calculation** [1] - 34:3
**Campaign** [6] - 12:19,
17:8, 59:12, 96:22,

97:1, 116:4
**campaign** [40] - 10:8,
25:6, 26:5, 26:13,
27:5, 27:8, 53:5,
54:25, 57:9, 57:10,
57:19, 58:4, 58:13,
62:7, 71:23, 74:11,
75:15, 75:20, 76:2,
76:10, 77:2, 77:22,
80:3, 80:4, 84:19,
88:14, 88:19, 88:21,
89:3, 90:17, 95:1,
96:6, 96:11, 104:16,
105:20, 106:14,
122:6, 124:4,
125:13, 126:5
**Candidate** [6] - 62:6,
73:21, 74:6, 75:5,
75:12, 85:5
**candidate** [5] - 56:23,
73:19, 74:4, 80:9,
80:22
**cannot** [3] - 29:4,
66:11, 66:14
**capacity** [1] - 73:14
**capitol** [12] - 12:12,
17:7, 19:11, 22:3,
22:17, 23:17, 28:6,
32:17, 41:14, 116:3,
122:14, 124:5
**captioned** [1] - 56:22
**card** [1] - 85:15
**Card** [8] - 54:12,
54:13, 56:11, 56:13,
56:23, 71:6, 71:20,
85:15
**care** [3] - 90:11, 121:1,
128:24
**Carlson** [1] - 109:23
**cartloads** [2] - 125:22
**case** [22] - 9:18, 14:15,
34:7, 37:9, 69:19,
70:20, 70:22, 105:9,
113:14, 114:19,
115:7, 115:18,
117:19, 118:13,
118:16, 119:20,
120:2, 121:18,
127:5, 127:20,
128:18, 130:15
**categories** [1] - 88:9
**category** [1] - 59:11
**Caucus** [2] - 6:17,
16:24, 43:11, 53:1,
54:11, 59:23, 64:12,
76:12, 94:23, 96:18,
98:10, 98:14
**caucus** [7] - 75:15,
76:3, 95:21, 99:4,
99:20, 100:5, 100:10

**caution** [1] - 63:24
**cc'd** [1] - 86:20
**cell** [16] - 18:7, 18:11,
18:14, 18:22, 20:24,
21:6, 23:4, 23:7,
33:5, 33:6, 34:19,
39:6, 40:22, 46:16
**CEO** [3] - 7:8, 9:1,
97:14
**certain** [4] - 23:11,
53:5, 58:7, 105:5
**certainly** [17] - 11:14,
13:24, 14:18, 25:16,
30:18, 31:16, 33:2,
35:12, 53:5, 62:18,
108:13, 114:4,
116:23, 117:4,
118:21, 119:16,
122:2
**chain** [1] - 35:13
**chance** [1] - 113:24
**change** [1] - 112:19
**changed** [1] - 42:7
**charge** [11] - 39:8,
39:9, 60:14, 78:3,
78:7, 115:19,
117:17, 119:3,
128:10, 128:12
**charged** [13] - 63:15,
63:18, 63:19, 76:2,
76:9, 77:1, 77:2,
77:8, 77:15, 92:22,
93:4, 128:2, 128:23
**charges** [13] - 63:14,
93:9, 106:24,
115:11, 115:24,
116:8, 116:9, 121:6,
121:17, 127:24,
131:9, 131:10
**chart** [30] - 11:21,
24:11, 24:12, 24:14,
24:18, 27:20, 27:22,
37:6, 37:25, 40:3,
40:8, 40:18, 46:19,
46:20, 46:21, 47:1,
51:7, 51:8, 57:23,
59:1, 64:10, 64:22,
88:3, 90:12, 90:19,
92:4, 93:2, 105:19,
120:15, 124:11
**check** [1] - 66:19
**checks** [15] - 64:21,
65:1, 65:9, 65:10,
65:12, 65:13, 65:15,
65:17, 65:22, 66:2,
66:22, 70:2, 70:4,
86:23, 86:25
**Cheltenham** [1] - 35:9
**chemist's** [1] - 14:4
**Cherry** [1] - 105:12

**chief** [1] - 36:11
**Chief** [3] - 38:7, 43:16,
125:11
**chocolate** [1] - 130:10
**circumstances** [1] -
126:23
**Citizens** [2] - 91:16,
108:23
**claimed** [1] - 127:16
**claims** [1] - 105:9
**clear** [9] - 24:23, 27:8,
50:10, 60:8, 62:16,
69:17, 71:13,
118:13, 128:20
**clearly** [2] - 14:25,
127:15
**click** [1] - 39:8
**clicked** [1] - 79:14
**client** [3] - 14:21,
63:14, 76:9
**client's** [1] - 76:15
**close** [2] - 58:13,
119:2
**closest** [1] - 116:16
**closing** [1] - 113:18
**coconspirator** [1] -
127:1
**column** [4] - 82:4,
82:10, 83:20
**Comdex** [4] - 110:14,
110:18, 110:20,
110:25
**coming** [4] - 23:17,
50:22, 73:13, 73:20
**command** [2] - 35:14,
35:23
**comment** [2] - 107:12,
108:7
**commits** [1] - 117:22
**committed** [1] - 131:4
**committee** [4] - 75:15,
76:2, 77:2, 106:15
**Committee** [9] -
12:19, 17:8, 59:12,
91:10, 96:22, 97:1,
108:23, 116:5
**committees** [8] -
90:23, 91:20, 92:7,
92:17, 106:8,
106:22, 108:23,
109:15
**Common** [1] - 131:10
**commonly** [1] - 99:8
**Commonwealth** [29] -
9:21, 10:20, 11:16,
13:18, 16:13, 17:23,
53:12, 55:17, 58:2,
74:15, 95:11, 96:4,
98:12, 106:19,
110:11, 111:2,

111:5, 111:11,
111:15, 112:16,
113:17, 115:6,
120:14, 121:15,
121:20, 124:7,
127:21, 128:21,
131:11
**Commonwealth's** [5]
- 7:25, 16:20, 19:12,
103:1, 103:12
**communication** [1] -
30:12
**Communications** [2] -
105:12
**communications** [3] -
30:1, 31:4, 111:9
**companies** [12] - 7:9,
8:20, 28:18, 28:19,
28:21, 29:11, 31:25,
32:5, 32:8, 58:8,
69:6, 86:23
**company** [5] - 28:21,
40:23, 78:7, 98:21,
102:20
**Compaq** [2] - 111:14,
111:18
**compelling** [1] -
115:12
**complaint** [2] - 71:6,
93:5
**complaints** [1] - 64:1
**complete** [3] - 89:13,
117:15, 129:6
**completely** [1] - 92:6
**complex** [1] - 19:11
**compounds** [1] -
131:3
**comprehensive** [1] -
92:5
**comptroller** [1] -
100:15
**Computer** [2] -
110:20, 110:25
**conceding** [1] - 117:5
**concept** [1] - 84:17
**concerned** [2] - 83:10,
83:13
**concerning** [3] - 8:17,
37:11, 93:13
**conclude** [1] - 34:5
**concluded** [1] -
131:13
**concludes** [1] - 112:8
**conditions** [1] - 11:24
**conduct** [2] - 90:18,
118:25
**conducted** [1] - 30:13
**conference** [1] -
110:18
**confident** [1] - 112:17

**confirm** [1] - 113:10
**confirmed** [2] - 61:15,
91:19
**confusing** [1] - 68:3
**confusion** [2] - 63:11
**conjunction** [1] - 23:6
**Connect** [7] - 62:6,
73:19, 73:22, 74:6,
75:5, 75:13, 85:6
**connected** [2] - 38:18,
38:22
**connection** [2] - 32:7,
33:20
**consistent** [1] - 120:1
**conspiracies** [1] -
115:21
**conspiracy** [2] -
116:9, 131:5
**constant** [1] - 77:17
**Constituent** [1] - 8:19
**constituent** [3] -
71:10, 83:21, 84:7
**constituent-based** [1]
- 84:7
**Constituents** [13] -
7:6, 8:11, 28:23,
65:21, 95:18, 96:13,
97:2, 97:9, 97:15,
97:18, 100:3,
100:10, 104:9
**constituents** [2] -
83:23, 83:25
**construction** [1] -
25:1
**contact** [5] - 8:24,
38:22, 40:8, 51:9,
77:17
**contacts** [5] - 37:12,
37:13, 37:18, 46:24,
61:20
**CONTACTS** [1] -
37:13
**contain** [4] - 72:4,
122:6, 124:4, 126:4
**contained** [3] - 27:2,
29:5, 115:15
**containing** [2] - 26:5,
110:12
**content** [3] - 26:13,
89:16, 89:21
**contents** [1] - 111:23
**context** [4] - 121:25,
122:1, 127:10,
127:23
**continuing** [1] - 31:8
**contract** [2] - 69:9,
69:10, 73:15
**contracts** [5] - 69:1,
69:2, 69:12, 72:21,
75:16

**contractual** [1] -
102:21
**contrary** [1] - 104:5
**contributed** [8] - 89:6,
91:2, 91:4, 92:7,
92:18, 102:1, 106:5,
106:7
**contribution** [2] -
102:25, 103:11
**contributions** [2] -
91:21, 96:21
**conviction** [3] -
117:23, 118:3,
118:15
**cooperated** [1] - 22:23
**copies** [2] - 60:16,
102:13
**copy** [7] - 8:8, 9:25,
11:23, 102:18,
103:7, 124:7
**copying** [1] - 72:10
**Cornell** [6] - 60:10,
60:16, 63:13, 63:17,
63:21, 111:20
**corner** [1] - 37:10
**correct** [135] - 6:18,
6:19, 7:8, 9:6, 9:24,
10:23, 10:24, 11:11,
16:16, 18:1, 21:5,
22:3, 22:4, 22:5,
22:8, 22:9, 22:10,
22:13, 22:14, 22:18,
22:19, 24:7, 24:8,
25:6, 25:15, 26:24,
27:3, 27:6, 27:10,
27:11, 27:12, 27:16,
27:17, 27:25, 30:10,
32:5, 34:18, 35:19,
37:5, 37:7, 43:12,
44:8, 44:9, 44:14,
46:8, 49:11, 50:16,
50:17, 51:13, 51:14,
51:16, 51:18, 51:21,
51:23, 52:1, 53:3,
53:7, 53:22, 54:15,
54:19, 55:10, 55:23,
56:2, 56:8, 56:16,
57:6, 57:14, 57:17,
57:21, 57:25, 58:6,
58:9, 60:11, 63:19,
63:21, 67:16, 67:19,
67:20, 67:23, 67:24,
68:18, 68:20, 68:21,
69:11, 70:8, 70:21,
71:3, 71:7, 71:11,
71:12, 71:15, 71:20,
71:21, 71:24, 72:1,
72:2, 72:7, 72:8,
72:12, 72:13, 73:6,
73:7, 73:9, 74:7,

76:23, 77:6, 78:9,
81:10, 85:17, 85:25,
86:21, 87:2, 87:4,
87:6, 87:7, 87:10,
88:16, 93:15, 93:16,
94:24, 95:2, 97:4,
97:13, 97:25, 98:15,
98:23, 99:8, 99:9,
99:18, 101:3, 105:7,
105:22, 115:6, 115:8
**Corsa** [2] - 55:4,
105:11
**Counsel** [4] - 38:7,
43:16, 121:9
**counsel** [8] - 36:11,
36:15, 36:16, 43:11,
60:13, 60:14, 110:8,
110:9
**counted** [1] - 38:22
**counts** [1] - 63:25
**County** [1] - 84:4
**couple** [4] - 6:20,
28:11, 64:9, 67:6
**course** [4] - 37:1,
74:4, 118:9, 126:18
**Court** [1] - 14:3,
14:15, 89:16, 89:21,
90:7, 92:19, 110:7,
121:9, 121:13,
124:23, 131:10
**COURT** [44] - 6:1,
14:23, 15:11, 20:4,
20:22, 28:10, 29:22,
43:23, 47:16, 51:3,
52:8, 52:10, 62:15,
62:19, 64:5, 67:4,
72:16, 74:25, 77:11,
78:12, 84:10, 87:12,
92:1, 92:12, 93:11,
93:16, 93:19, 94:3,
94:6, 101:20,
101:22, 104:22,
104:25, 107:2,
107:11, 109:5,
109:19, 109:21,
110:4, 112:10,
113:14, 114:9,
121:7, 131:8
**Court's** [3] - 19:15,
61:1, 101:17
**courtroom** [15] -
19:21, 20:2, 20:7,
49:15, 53:24, 54:4,
62:9, 62:23, 62:25,
102:24, 103:7,
103:10, 113:21,
120:18, 130:2
**cover** [4] - 54:21,
58:16, 110:16,
118:24

**covered** [1] - 118:22
**covering** [1] - 119:2
**Cranga** [7] - 94:9,
94:19, 94:21, 96:3,
101:16, 101:25,
105:2
**CRANGA** [1] - 94:11
**creating** [1] - 77:21
**creator** [1] - 74:5
**credit** [1] - 85:15
**crimes** [3] - 121:19,
131:3, 131:5
**criminal** [3] - 30:3,
71:5, 93:4
**CROSS** [3] - 21:20,
64:6, 101:23
**cross** [5] - 14:11,
21:19, 63:6, 101:18,
114:2
**cross-examination** [1]
- 14:11
**crosses** [1] - 81:2
**cumulative** [1] - 111:4
**Curtin** [2] - 53:18,
54:9
**custodian** [3] - 44:23,
45:21, 111:22

---

## D

**dash** [1] - 56:23
**data** [6] - 29:16, 55:1,
55:5, 67:18, 70:5,
104:13
**date** [9] - 11:9, 12:20,
16:9, 17:2, 18:17,
45:11, 45:14, 79:24,
80:13
**dated** [2] - 53:13,
70:10
**daylight** [1] - 86:7
**days** [8] - 10:12,
51:25, 52:2, 52:5,
122:22, 125:15,
125:19, 129:4
**deal** [3] - 30:11, 69:3,
126:15
**deals** [1] - 117:2
**dealt** [1] - 93:8
**Dear** [1] - 8:15
**December** [3] - 60:2,
111:6, 111:7
**decision** [1] - 78:3
**defend** [2] - 129:2,
129:3
**defendant** [3] -
114:19, 122:2, 127:2
**defendants** [2] -
63:16, 114:19
**defense** [2] - 70:6,

126:15
degree [1] - 15:7
delivered [1] - 116:20
delivery [1] - 15:21
demand [1] - 35:2
democrat [2] - 81:12, 82:13
Department [1] - 35:10
depict [1] - 25:15
depicted [1] - 15:14
depiction [1] - 11:20
Deputy [3] - 24:1, 50:15, 125:11
deputy [1] - 22:2
described [2] - 10:16, 73:16
describing [1] - 75:3
description [1] - 49:13
deserves [1] - 131:6
desk [17] - 12:17, 12:18, 13:1, 17:12, 17:19, 20:25, 51:9, 120:16, 122:11, 122:19, 123:2, 123:4, 123:15, 124:15, 124:19, 124:22
destination [3] - 111:7, 111:13, 111:17
detail [1] - 76:10
determine [1] - 20:11
development [1] - 111:9
difference [1] - 98:3
different [11] - 6:20, 9:8, 17:17, 20:20, 21:7, 21:10, 34:10, 88:14, 97:10, 98:17
differentiate [1] - 77:19
difficult [1] - 79:9
direct [7] - 13:22, 47:19, 48:12, 68:25, 91:25, 106:20, 106:23
DIRECT [3] - 6:8, 52:17, 94:14
Direct [13] - 7:6, 8:11, 28:23, 65:21, 95:19, 96:13, 97:3, 97:9, 97:15, 97:18, 100:3, 100:10, 104:9
direction [11] - 12:12, 16:25, 17:4, 17:9, 24:20, 25:13, 38:23, 42:15, 46:25, 47:2, 122:16
directly [11] - 8:24,

24:20, 56:12, 58:20, 85:19, 85:22, 88:19, 92:4, 100:19, 105:8, 105:10
disclose [1] - 10:13
disconnect [1] - 117:10
discuss [1] - 40:1
discussed [3] - 17:1, 28:1, 77:14
discussion [3] - 27:23, 118:8, 118:10
discussions [1] - 110:8
dismiss [1] - 121:5
dismissal [1] - 115:11
dispute [1] - 74:7
distinct [1] - 74:12
district [5] - 80:25, 81:8, 81:9, 81:12, 82:18
District [1] - 55:8
document [2] - 12:8, 12:15
documentation [1] - 68:16
documents [6] - 10:8, 68:4, 68:12, 68:13, 68:23, 125:13
dollars [4] - 96:14, 98:7, 98:11, 100:23
Don [2] - 86:17, 87:5
don [1] - 86:22
Donatoni [2] - 67:11, 86:12
DONATONI [13] - 6:25, 31:20, 55:11, 60:24, 63:7, 64:2, 67:6, 67:8, 72:14, 103:16, 111:3, 113:4, 113:23
done [12] - 8:12, 11:4, 29:11, 108:11, 109:2, 110:9, 113:13, 113:16, 113:20, 114:5, 119:15, 128:16
door [1] - 42:20
doubt [2] - 122:4, 127:24
down [8] - 24:25, 25:4, 52:10, 59:11, 94:4, 103:19, 109:21, 129:14
dozen [1] - 130:10
draw [1] - 80:1
Drawbaugh [2] - 10:22, 11:1
dream [1] - 54:13
duly [3] - 6:6, 52:15,

94:12
during [7] - 10:11, 10:15, 16:4, 18:25, 21:16, 86:7, 125:19
duties [1] - 94:25
duty [2] - 119:9, 119:18

E

e-mail [25] - 53:13, 53:16, 53:20, 54:8, 54:21, 55:17, 55:20, 55:24, 56:3, 56:9, 56:12, 56:15, 70:10, 72:5, 72:6, 78:19, 79:1, 79:4, 79:11, 79:13, 80:2, 80:5, 80:13
e-mail's [1] - 79:6
e-mailing [1] - 55:22
e-mails [6] - 53:5, 53:8, 71:17, 78:23, 86:18, 86:19
easier [2] - 8:8, 11:25
ECKHART [1] - 87:17
eclairs [1] - 130:10
effort [2] - 39:25, 42:4
either [12] - 7:5, 9:9, 9:10, 18:21, 29:12, 41:12, 69:19, 72:4, 84:6, 120:1, 131:3
elected [2] - 41:18, 81:5
election [4] - 55:8, 55:12, 80:14, 80:19
elements [2] - 71:10, 127:22
eliminated [1] - 123:25
Elmer [1] - 111:6
emeritus's [1] - 116:2
employed [4] - 52:20, 52:22, 61:10, 114:17
employee [5] - 26:11, 26:18, 26:20, 54:10, 73:5
end [3] - 50:6, 114:2, 122:17
engaged [1] - 8:20
enter [1] - 41:21
entered [2] - 19:10, 112:15
entertain [2] - 114:13, 114:14
entities [9] - 29:7, 29:16, 58:4, 64:21, 65:11, 95:2, 95:16, 95:17, 102:15
entitled [1] - 64:12

entity [2] - 8:12, 100:6
entries [5] - 47:21, 88:9, 97:10, 98:17, 100:17
entry [1] - 89:11
envelopes [2] - 27:10, 27:24
Eric [7] - 53:18, 54:3, 78:20, 79:3, 110:24, 111:16
essentially [4] - 54:20, 59:5, 115:21, 121:18
evaluate [1] - 89:10
evaluation [6] - 14:7, 64:23, 65:24, 81:19, 89:3, 91:5
evening [5] - 17:18, 43:15, 49:10, 50:12, 128:7
event [9] - 22:20, 23:15, 23:16, 23:20, 26:14, 30:2, 30:3, 31:7, 115:10
events [1] - 23:6
evidence [30] - 13:20, 14:13, 38:15, 76:5, 76:20, 76:25, 104:1, 104:4, 104:15, 111:22, 116:14, 116:21, 117:7, 117:11, 117:15, 118:9, 118:11, 119:23, 121:3, 121:16, 121:17, 125:4, 127:8, 129:23, 129:25, 130:12, 130:15, 130:20, 131:6
exact [3] - 25:22, 37:3, 104:6
exactly [5] - 28:1, 37:8, 104:14, 121:11, 128:22
examination [3] - 14:11, 68:25, 106:20
EXAMINATION [6] - 6:8, 21:20, 52:17, 64:6, 94:14, 101:23
examine [2] - 64:20, 66:4
examined [1] - 67:19
example [7] - 30:15, 30:20, 31:2, 34:1, 56:21, 57:15, 70:16
exceeds [1] - 14:12
except [1] - 29:4
exception [3] - 63:3, 83:22, 112:6
excuse [2] - 11:22, 100:1

execution [1] - 28:4
Exhibit [36] - 7:25, 9:21, 10:21, 11:17, 16:13, 16:20, 17:23, 19:12, 28:14, 39:17, 46:17, 53:12, 55:17, 58:2, 67:14, 79:19, 79:20, 80:2, 82:3, 86:18, 87:14, 92:4, 95:11, 96:4, 98:13, 102:1, 103:1, 103:12, 105:3, 105:19, 106:19, 110:11, 111:2, 111:5, 111:11, 111:15
exhibit [12] - 11:9, 11:12, 30:9, 46:21, 54:18, 59:22, 89:24, 90:7, 92:14, 92:25, 93:11, 93:14
exhibits [1] - 46:18
exist [3] - 109:8, 109:10, 119:24
existence [3] - 32:24, 116:23, 116:24
existent [1] - 130:16
exists [1] - 35:14
expect [2] - 22:22, 109:5
expend [1] - 99:4
expenditure [2] - 58:14, 99:7
expenditures [19] - 53:6, 59:12, 64:13, 72:19, 88:1, 95:1, 96:6, 96:11, 97:1, 97:5, 98:5, 98:7, 98:8, 98:13, 103:20, 104:16, 105:4, 105:8, 108:3
expense [6] - 110:13, 110:17, 110:24, 111:5, 111:11, 111:15
expenses [1] - 75:14
expert [1] - 20:15
explain [3] - 16:19, 42:5, 42:6
explained [1] - 38:25
Expo [1] - 110:20
Express [2] - 59:6, 85:23
extract [2] - 68:5, 68:12
extracted [1] - 68:23
extracting [1] - 68:16
eye [1] - 21:25

## F

**face** [1] - 63:16
**facie** [9] - 15:5,
121:14, 122:3,
123:24, 127:7,
127:9, 127:20,
127:22, 131:12
**fact** [12] - 7:14, 8:2,
9:24, 39:13, 43:20,
46:7, 61:16, 108:12,
108:19, 111:19,
117:3, 129:1
**facts** [2] - 120:1,
126:22
**factual** [1] - 115:14
**factually** [1] - 119:19
**fair** [13] - 25:13, 25:17,
32:22, 38:17, 60:20,
63:5, 68:11, 82:24,
90:24, 90:25, 92:3,
92:5, 113:4
**fairness** [1] - 66:21
**familiar** [12] - 6:22,
9:12, 9:15, 9:19,
13:7, 16:2, 35:12,
43:8, 61:4, 80:10,
81:14, 105:13
**far** [8] - 15:9, 46:5,
70:1, 74:6, 75:3,
75:19, 76:10, 77:20
**fascinated** [2] - 84:17,
84:18
**faster** [1] - 113:12
**favorable** [1] - 57:12
**February** [37] - 9:17,
10:11, 10:18, 10:22,
11:5, 12:4, 12:6,
12:8, 12:14, 15:15,
16:22, 17:4, 17:10,
17:14, 17:16, 17:22,
18:4, 18:17, 24:18,
26:10, 30:15, 30:20,
32:13, 32:25, 36:10,
44:8, 45:6, 46:13,
47:20, 51:23,
111:13, 111:17,
114:21, 114:24,
116:21, 118:18,
125:14
**Feese** [15] - 18:20,
22:24, 33:7, 34:2,
34:6, 36:9, 37:18,
38:7, 38:13, 39:24,
40:4, 40:9, 43:16,
126:11
**Feese's** [1] - 36:10
**fellow** [1] - 84:12
**fellow's** [1] - 81:12
**FETTERHOFF** [21] -

20:17, 36:22, 43:5,
43:6, 43:21, 87:13,
87:18, 89:20, 90:13,
90:14, 92:2, 92:13,
105:1, 106:25,
107:3, 107:8,
107:17, 108:18,
109:1, 109:11,
109:18
**Fetterhoff** [2] - 87:12,
90:10
**Fetterhoff's** [1] - 93:6
**few** [3] - 86:11, 98:3,
128:1
**figure** [1] - 89:7
**figures** [1] - 104:6
**file** [3] - 60:9, 63:13,
63:22
**filed** [2] - 88:14,
105:21
**files** [1] - 111:21
**filings** [3] - 91:7,
91:11, 107:6
**Fina** [19] - 19:10, 22:5,
23:24, 24:1, 31:4,
39:19, 39:24, 40:4,
40:8, 40:10, 40:12,
40:23, 41:1, 41:4,
43:2, 50:16, 125:11,
127:3
**Fina's** [1] - 129:11
**finance** [15] - 53:6,
57:19, 58:14, 88:14,
88:19, 88:21, 89:3,
89:8, 90:17, 95:1,
96:6, 96:11, 105:20,
106:14, 106:15
**financial** [1] - 77:20
**findings** [3] - 11:8,
57:23, 95:4
**fine** [1] - 113:22
**finish** [1] - 114:8
**finished** [1] - 94:4
**Fiore** [34] - 6:3, 6:13,
6:14, 6:16, 6:21,
7:21, 7:24, 8:15, 9:7,
9:20, 11:4, 11:15,
12:3, 12:21, 15:13,
16:13, 17:11, 17:21,
19:1, 19:18, 20:9,
21:1, 21:18, 21:22,
29:25, 32:13, 36:19,
36:23, 43:25, 47:18,
51:8, 116:18,
116:19, 120:17
**FIORE** [1] - 6:5
**Fiore's** [3] - 13:24,
120:15, 124:10
**first** [18] - 6:13, 6:21,
7:2, 9:15, 24:17,

37:12, 42:4, 53:11,
58:11, 88:2, 98:20,
100:18, 115:13,
116:13, 117:17,
121:10, 130:21
**fit** [1] - 117:19
**five** [8] - 18:18, 18:24,
29:6, 34:1, 34:3,
34:21, 37:19, 110:2
**Flickinger** [3] - 9:9,
13:23, 14:9
**flip** [1] - 10:20
**floating** [1] - 125:8
**flow** [1] - 92:19
**focused** [3] - 30:5,
58:7, 58:9
**FOJP** [2] - 58:13,
69:20
**fold** [1] - 118:23
**follow** [1] - 36:23
**following** [2] - 110:10,
110:12
**follows** [4] - 6:7,
52:16, 94:13, 115:24
**force** [1] - 119:7
**forget** [1] - 125:7
**form** [1] - 11:9
**forth** [7] - 19:4, 44:18,
64:22, 94:2, 95:20,
122:24, 123:3
**forthwith** [8] - 9:16,
9:25, 10:7, 18:5,
19:12, 45:4, 125:6,
125:12
**fortunate** [1] - 36:24
**Forum** [4] - 7:5, 28:24,
28:25, 29:1
**forum** [1] - 29:2
**forwarding** [2] - 72:6,
72:11
**four** [6] - 18:15, 29:6,
46:22, 46:24, 116:8,
126:21
**fourth** [3] - 35:2,
35:22, 45:18
**frame** [8] - 7:6, 58:17,
58:24, 96:9, 98:2,
98:4, 98:25, 99:25
**frames** [1] - 98:18
**Frank** [2] - 6:15,
129:11
**frankly** [4] - 113:11,
122:3, 124:24,
125:17
**free** [1] - 8:23
**Friday** [7] - 17:22,
32:14, 32:16, 32:21,
35:21, 45:9, 113:21
**Friends** [25] - 58:12,
58:19, 58:20, 59:7,

59:9, 79:21, 85:22,
88:1, 88:15, 89:6,
90:17, 90:18, 90:22,
91:2, 95:21, 96:5,
96:12, 96:13, 96:17,
96:21, 105:4, 105:9,
105:21, 106:1, 106:5
**Friends'** [1] - 89:7
**front** [20] - 30:17,
36:25, 42:13, 44:3,
46:15, 77:4, 79:6,
79:23, 85:1, 85:24,
87:15, 87:23,
102:19, 103:25,
104:11, 105:15,
108:8, 121:18,
130:5, 130:7
**full** [3] - 51:25, 81:17,
81:19
**function** [1] - 119:7
**functions** [1] - 76:11
**fund** [1] - 108:3
**funding** [1] - 66:23
**funds** [7] - 91:3,
92:18, 92:20, 106:6,
106:16, 107:6
**funds'** [1] - 91:6
**furtherance** [1] - 81:4
**furthering** [2] - 131:4,
131:5

## G

**Gates** [2] - 40:14, 43:7
**GCR** [24] - 58:9, 58:11,
58:15, 59:13, 59:23,
61:10, 64:24, 65:2,
65:13, 65:14, 66:5,
68:1, 68:9, 68:13,
73:5, 76:8, 86:24,
88:4, 88:8, 89:11,
90:1, 95:15, 95:24,
111:9
**General** [14] - 7:15,
36:14, 37:3, 50:16,
52:23, 101:11,
106:13, 107:5,
108:2, 109:14,
114:17, 125:11,
127:12, 130:24
**general** [2] - 22:2,
90:15
**General's** [8] - 22:7,
23:17, 24:7, 30:14,
35:3, 35:23, 41:20,
92:23
**generate** [1] - 68:24
**generic** [1] - 69:7
**George** [10] - 13:6,
51:12, 80:6, 80:10,

80:13, 80:17, 80:21,
80:22, 123:13,
123:16
**glare** [1] - 8:2
**glean** [1] - 24:4
**goal** [1] - 81:4
**Government** [3] -
28:14, 91:16, 108:24
**government** [1] -
99:16
**governmental** [2] -
100:6, 119:7
**grand** [13] - 7:14,
44:13, 52:25,
101:11, 116:1,
116:12, 116:15,
116:17, 116:19,
117:9, 118:17,
125:12, 127:13
**grant** [2] - 121:5,
130:17
**Graystone** [1] - 8:21
**Graystone/**
**Greystone/SKP** [1] -
8:17
**great** [1] - 30:11
**Gregory** [1] - 110:17
**Greystone** [7] - 7:11,
8:13, 8:21, 9:3,
29:12, 29:18, 31:24
**group** [6] - 49:10,
49:22, 50:2, 50:18,
50:20, 66:9
**guess** [11] - 19:18,
60:8, 69:19, 81:3,
97:14, 99:8, 100:4,
100:19, 115:5,
118:23, 128:9
**guilty** [1] - 122:2
**guys** [2] - 113:5,
113:19

## H

**half** [4] - 87:25, 88:7,
96:4, 130:10
**hand** [7] - 37:10, 47:7,
82:4, 83:20, 120:19,
124:8, 125:12
**handed** [1] - 11:2
**Hanley** [3] - 55:4,
112:23, 112:25
**happy** [1] - 124:8
**Harbold** [1] - 110:17
**hard** [1] - 11:23
**head** [5] - 7:4, 61:23,
66:11, 76:14, 85:9
**header** [1] - 58:12
**hear** [4] - 19:2, 25:2,
131:6, 131:7

heard [2] - 25:16, 128:3
hearing [5] - 13:18, 13:21, 14:17, 15:2, 75:11
hearsay [5] - 13:16, 13:20, 14:8, 14:16, 15:1
help [2] - 87:16, 90:11
hidden [5] - 129:12, 130:21, 130:22, 130:23, 131:1
hide [1] - 129:16
high [2] - 38:19, 41:19
higher [2] - 21:15, 21:16
himself [8] - 15:18, 49:9, 49:23, 51:17, 51:19, 55:22, 55:25, 56:4
hinder [1] - 117:22
hindered [3] - 127:17, 128:8, 128:12
hindering [4] - 115:19, 117:17, 118:6, 118:11
hindrance [2] - 118:2, 118:3
hold [3] - 120:2, 128:18, 131:10
honest [1] - 39:6
Honor [40] - 7:23, 13:17, 14:14, 14:20, 15:16, 16:22, 17:15, 18:7, 18:10, 19:25, 20:3, 20:15, 21:14, 28:12, 36:21, 50:25, 52:9, 60:13, 60:22, 60:25, 61:2, 63:9, 63:10, 67:7, 72:15, 86:2, 91:23, 92:9, 93:1, 93:15, 94:1, 104:23, 106:18, 110:6, 112:6, 112:14, 114:12, 115:8, 115:10, 121:8
hopefully [1] - 67:12
hours [3] - 18:25, 51:25, 62:5
House [20] - 6:17, 12:19, 16:24, 17:7, 41:19, 43:11, 53:1, 54:10, 55:7, 59:11, 59:23, 64:12, 76:11, 94:23, 96:18, 96:22, 96:25, 98:9, 98:14, 116:4
housed [1] - 61:11
Houston [2] - 111:14, 111:18

HP [2] - 111:14, 111:18
HRC [8] - 11:3, 31:12, 31:13, 36:12, 45:22, 60:4, 64:12, 73:15
HRCC [34] - 12:18, 13:2, 15:20, 17:14, 27:16, 59:12, 59:13, 59:17, 59:19, 69:20, 89:7, 89:8, 89:10, 89:12, 91:2, 91:4, 91:21, 92:8, 95:21, 97:5, 97:6, 97:10, 97:17, 97:18, 98:5, 98:8, 106:5, 106:7, 122:17, 122:25, 123:5, 123:22, 124:5, 124:12

**I**

I-O-R-E [1] - 6:15
iConstituent [4] - 7:5, 9:2, 28:17, 29:3
idea [7] - 43:18, 45:13, 45:15, 54:12, 84:13, 92:19, 113:12
identification [6] - 8:1, 9:22, 11:17, 53:13, 58:2, 95:11
identified [6] - 15:18, 19:20, 20:1, 20:6, 51:7, 69:20
identify [5] - 51:15, 51:17, 62:17, 71:18, 114:20
identifying [1] - 115:16
imagine [2] - 32:18, 43:3
immediately [1] - 55:25
impairs [1] - 119:5
implications [1] - 71:23
important [4] - 119:22, 121:10, 121:21, 121:24
importantly [1] - 129:5
improperly [1] - 77:2
inaccurate [1] - 92:15
incident [4] - 13:23, 26:9, 76:18, 76:19
include [2] - 95:24, 118:6
included [4] - 40:20, 57:23, 74:19, 95:4
including [1] - 114:19
incomplete [1] - 92:15
indeed [1] - 30:5

independent [1] - 88:21
independently [1] - 70:7
indicate [20] - 8:10, 10:25, 12:5, 13:2, 16:1, 17:13, 18:15, 23:11, 23:13, 38:14, 38:17, 59:22, 96:6, 96:12, 97:6, 97:18, 98:5, 98:9, 99:19
indicated [3] - 16:7, 16:10, 29:25
indicates [11] - 10:21, 11:2, 15:17, 16:14, 16:23, 39:17, 58:3, 58:14, 58:19, 59:13, 59:24
indication [3] - 13:6, 72:20, 99:6
indications [2] - 57:10, 72:23
individual's [1] - 102:20
individuals [9] - 23:12, 23:14, 30:2, 30:7, 30:8, 31:6, 34:22, 50:5, 103:2
indulgence [3] - 19:15, 61:1, 101:17
infer [3] - 124:24, 124:25, 126:24
information [22] - 7:11, 8:16, 8:23, 17:6, 26:12, 29:17, 32:2, 38:11, 42:23, 54:11, 57:2, 68:5, 68:23, 83:21, 84:7, 88:13, 100:25, 101:10, 103:8, 105:14, 105:15, 127:17
initiated [1] - 120:24
inordinate [1] - 21:15
inquiry [2] - 129:11
inserted [1] - 45:12
inspired [1] - 25:17
instance [3] - 37:17, 103:22, 105:11
instances [1] - 38:22
instead [1] - 83:11
intent [1] - 117:22
intentionally [1] - 119:5
interaction [1] - 33:2
interest [6] - 23:13, 30:1, 30:7, 31:5, 106:8
interested [2] - 90:24, 92:8

interesting [2] - 117:18
interfered [2] - 119:17, 127:14
interference [1] - 119:8
interlocked [1] - 126:10
Intemational [10] - 58:10, 58:18, 58:21, 59:3, 59:18, 59:20, 60:3, 60:4, 66:6, 95:15
interrupting [1] - 63:11
interview [2] - 41:4, 61:19
introduced [2] - 14:16, 67:10
investigating [2] - 116:1, 116:12
investigation [13] - 6:18, 11:5, 12:5, 12:9, 12:15, 52:25, 70:21, 70:23, 70:25, 94:22, 118:7, 118:12, 127:5
investigative [3] - 64:20, 66:1, 118:19
invoice [9] - 66:15, 77:4, 99:17, 100:9, 102:18, 102:19, 102:24, 103:7, 103:10
invoices [30] - 66:4, 66:8, 66:25, 69:2, 72:24, 76:7, 76:15, 76:16, 87:3, 87:5, 89:4, 97:11, 97:23, 98:2, 98:21, 99:1, 99:5, 100:4, 100:5, 100:8, 100:14, 102:2, 102:5, 102:6, 102:8, 102:13, 103:24, 104:11
invoicing [1] - 75:18
involve [1] - 31:25
involved [13] - 60:13, 62:3, 64:23, 65:1, 65:23, 70:20, 70:23, 74:4, 75:18, 94:25, 102:16, 118:16, 127:19
involvement [5] - 23:13, 30:2, 31:5, 31:6, 69:22
involves [1] - 119:5
involving [5] - 16:15, 53:1, 86:23, 94:22, 95:21

irrelevant [1] - 106:23
Irvis [3] - 10:10, 12:11, 26:6
issue [7] - 9:25, 15:5, 44:2, 63:23, 106:24, 125:5, 127:21
issued [4] - 9:16, 18:14, 117:13, 118:17
issues [2] - 93:6, 93:8
item [1] - 23:21
items [4] - 14:3, 27:2, 69:20, 110:12
iterations [1] - 28:22
itinerary [3] - 111:8, 111:13, 111:17
itself [5] - 15:5, 36:7, 74:2, 93:3, 98:21

**J**

Jack [1] - 43:7
January [3] - 110:16, 111:12, 111:16
Jason [1] - 24:25
Jay [1] - 61:5
Jill [8] - 11:3, 18:6, 19:20, 45:23, 116:22, 126:12, 126:20
job [5] - 75:23, 77:18, 94:25, 122:9, 124:20
John [72] - 12:16, 12:24, 14:21, 15:20, 16:3, 16:11, 16:12, 17:12, 17:19, 18:20, 20:6, 58:12, 58:19, 59:7, 59:9, 79:22, 88:2, 88:15, 89:6, 90:17, 90:22, 95:22, 96:5, 96:12, 96:21, 105:4, 105:10, 105:21, 106:1, 106:5, 112:22, 114:19, 114:22, 114:23, 115:7, 119:25, 120:16, 120:19, 120:21, 120:25, 121:1, 121:4, 121:20, 122:8, 122:9, 122:18, 123:1, 123:4, 123:11, 123:12, 123:14, 123:20, 123:23, 124:1, 124:3, 124:14, 124:15, 124:19, 124:25, 125:16, 125:23, 126:12, 127:9,

128:4, 128:11, 128:17, 129:8, 129:23, 130:3, 130:16
**join** [2] - 14:20, 20:19
**Judge** [17] - 16:19, 19:23, 20:21, 28:9, 78:13, 90:9, 94:5, 104:21, 109:24, 110:2, 111:19, 121:10, 122:4, 123:24, 125:5, 127:6, 130:18
**judge** [1] - 127:20
**Julie** [1] - 26:21
**July** [3] - 55:9, 55:12, 99:2
**jury** [18] - 7:14, 44:13, 52:25, 101:12, 116:1, 116:12, 116:15, 116:18, 116:19, 117:9, 118:17, 121:18, 122:2, 124:25, 125:12, 126:24, 127:13, 131:6
**justice** [3] - 119:4, 127:11, 130:25

K

**K&L** [2] - 40:13, 43:7
**Kadunc** [1] - 55:20
**Kahn** [11] - 6:22, 7:1, 7:4, 7:10, 7:21, 8:5, 8:10, 9:1, 97:12, 97:14, 97:24
**KAHN** [1] - 7:1
**Kahn's** [1] - 28:21
**KELLY** [6] - 32:10, 54:5, 78:13, 78:15, 79:15, 104:21
**Kelly** [1] - 78:12
**Ken** [1] - 11:22
**Kenny** [5] - 80:10, 80:13, 80:17, 80:18, 80:21
**Kenny's** [1] - 82:17
**Kevin** [2] - 53:18, 54:9
**key** [3] - 115:23, 116:6, 116:9
**kind** [7] - 14:6, 21:24, 37:13, 61:23, 61:25, 69:7, 81:23
**knowing** [1] - 36:14
**knowledge** [9] - 7:20, 13:9, 28:22, 32:23, 35:5, 61:12, 92:22, 92:24, 109:14
**known** [4] - 8:12, 28:23, 28:24, 29:3
**knows** [6] - 84:14, 120:20, 121:13, 123:13, 123:17, 123:18
**Krill** [5] - 43:7, 43:14, 49:8, 49:22, 126:9

L

**lab** [1] - 14:4
**Labels** [13] - 65:20, 95:18, 96:4, 96:7, 97:2, 97:6, 98:16, 98:20, 98:23, 99:1, 99:4, 99:20, 103:22
**lack** [1] - 117:15
**land** [2] - 18:8, 23:8
**Landslide** [2] - 97:11, 97:17
**landslide** [1] - 97:20
**language** [5] - 115:23, 116:6, 116:10, 117:21, 118:5
**larger** [1] - 70:14
**Las** [5] - 110:14, 110:18, 110:20, 110:23, 110:25
**last** [9] - 6:11, 6:14, 7:2, 20:10, 45:6, 52:3, 94:17, 94:19, 130:18
**lasted** [1] - 62:5
**latitude** [1] - 15:8
**Law** [1] - 18:19
**law** [7] - 14:19, 115:21, 118:24, 119:2, 119:6, 120:1
**lawyer** [2] - 49:23
**lawyers** [3] - 49:8, 50:19, 70:7
**Leadership** [3] - 101:1, 101:13, 108:24
**leadership** [2] - 66:22, 91:13
**leading** [1] - 125:6
**leads** [1] - 103:8
**learned** [2] - 12:9, 12:16
**least** [17] - 19:11, 29:8, 31:8, 55:21, 57:22, 65:3, 75:10, 80:23, 100:24, 101:5, 104:16, 105:20, 112:16, 115:16, 115:25, 116:11, 123:23
**leave** [6] - 69:9, 114:18, 114:23, 114:24, 114:25, 122:20
**left** [4] - 50:7, 57:1, 82:4, 83:20
**left-hand** [2] - 82:4, 83:20
**legal** [1] - 115:14
**legally** [1] - 119:19
**legislative** [10] - 26:11, 26:18, 26:20, 55:1, 71:10, 72:1, 82:17, 103:20, 103:23, 104:2
**legislators** [2] - 83:12, 83:14
**legislature** [4] - 80:24, 83:16, 93:24, 100:15
**length** [2] - 33:17, 113:8
**letter** [1] - 29:9
**level** [5] - 14:13, 123:24, 127:7, 127:9, 127:22
**lied** [4] - 128:5, 128:11, 128:14, 128:17
**lighting** [1] - 11:24
**likewise** [1] - 106:6
**limit** [4] - 14:23, 15:7, 88:10, 113:19
**limited** [1] - 15:1
**line** [7] - 18:8, 20:25, 23:8, 28:16, 57:7, 69:20, 81:3
**list** [9] - 33:19, 56:24, 81:16, 82:16, 83:5, 95:18, 107:10, 112:21, 131:10
**listed** [10] - 18:21, 30:25, 31:13, 31:16, 33:18, 38:12, 102:3, 105:8, 105:23, 111:7
**listened** [1] - 119:23
**Lists** [13] - 65:20, 95:18, 96:5, 96:7, 97:2, 97:6, 98:16, 98:20, 98:24, 99:1, 99:4, 99:20, 103:22
**live** [2] - 69:7, 81:15
**LLC** [1] - 9:2
**locate** [1] - 42:5
**located** [1] - 12:17
**location** [3] - 10:13, 10:15, 116:2
**Lochetti's** [3] - 16:25, 17:3, 17:9
**Lochetto** [22] - 9:10, 12:13, 18:23, 18:25, 22:25, 24:23, 25:16, 25:19, 26:23, 27:1, 27:19, 33:7, 36:5, 41:7, 42:8, 120:22, 122:10, 122:12, 123:10, 124:22, 126:11, 130:1
**Lochetto's** [3] - 24:20, 25:13, 122:16
**Lock** [2] - 29:22, 101:22
**lock** [1] - 67:4
**LOCK** [7] - 20:19, 29:23, 31:18, 67:5, 101:24, 103:14, 112:3
**logs** [1] - 25:24
**look** [19] - 7:11, 11:23, 22:13, 44:1, 64:11, 65:9, 83:2, 91:6, 91:10, 103:24, 108:6, 117:16, 121:21, 121:24, 121:25, 127:10, 127:23, 129:22
**looked** [10] - 18:10, 24:11, 75:16, 91:12, 91:14, 107:13, 107:22, 108:5, 108:14, 109:15
**looking** [11] - 21:17, 23:7, 26:4, 47:1, 68:25, 69:1, 79:24, 88:7, 88:8, 108:2, 127:3
**looks** [5] - 25:21, 55:21, 57:1, 81:21, 99:25
**Lori** [16] - 9:9, 12:13, 16:25, 17:3, 17:8, 18:23, 24:19, 25:13, 41:7, 120:22, 122:10, 122:12, 122:16, 123:10, 124:21, 130:1
**lose** [1] - 121:11
**Louisiana** [1] - 111:10
**lower** [3] - 37:10, 97:22
**lunch** [1] - 113:18
**lying** [4] - 127:12, 127:15, 128:22, 131:5

M

**ma'am** [2] - 103:21, 104:18
**mail** [30] - 33:19, 33:21, 33:22, 39:3, 39:7, 53:13, 53:16, 53:20, 54:8, 54:21, 55:17, 55:20, 55:24, 56:3, 56:9, 56:12, 56:15, 70:10, 72:5, 72:6, 78:19, 79:1, 79:4, 79:11, 79:13, 80:2, 80:5, 80:13
**mail's** [1] - 79:6
**mailing** [1] - 55:22
**mails** [6] - 53:5, 53:8, 71:17, 78:23, 86:18, 86:19
**main** [2] - 12:12, 17:7
**male** [9] - 15:18, 15:20, 15:23, 16:3, 51:12, 51:15, 51:17, 123:22, 124:13
**males** [1] - 123:25
**Mallard** [2] - 74:11, 84:20
**man** [1] - 14:25
**March** [6] - 44:13, 44:25, 45:11, 60:1, 99:2, 100:1
**Mark** [1] - 87:16
**marked** [7] - 7:25, 9:21, 11:16, 53:12, 55:17, 58:1, 95:10
**material** [11] - 25:6, 26:5, 27:6, 27:9, 27:14, 28:1, 70:15, 122:6, 124:5, 126:5, 129:12
**materials** [3] - 10:9, 10:14, 125:13
**matter** [7] - 7:22, 13:11, 61:14, 83:24, 108:19, 112:7, 129:1
**Matthews** [15] - 13:7, 13:10, 13:13, 13:25, 14:25, 15:13, 15:16, 15:23, 16:1, 16:7, 51:12, 51:19, 120:17, 123:13, 123:17
**MCCELLAND** [1] - 93:20
**MCCLELLAND** [16] - 6:2, 31:22, 32:9, 62:13, 62:16, 72:17, 74:23, 75:7, 77:12, 78:10, 93:22, 103:18, 104:19, 112:2, 112:20, 112:24
**McClelland** [1] - 72:16
**McClintock** [2] - 86:22, 87:6
**McClintock's** [1] - 86:17
**MCMONAGLE** [8] -

13:16, 14:2, 21:21, 28:8, 60:21, 64:4, 112:1, 113:22
**mean** [26] - 14:25, 15:7, 23:5, 23:6, 23:16, 29:15, 30:21, 31:5, 37:14, 38:12, 38:15, 38:19, 44:22, 67:21, 71:14, 78:22, 83:10, 89:22, 90:6, 93:7, 102:12, 108:5, 113:14, 120:4, 128:3, 130:9
**means** [5] - 30:24, 31:2, 44:19, 83:5, 119:10
**meant** [3] - 45:16, 45:19, 80:16
**meet** [3] - 111:9, 111:14, 111:18
**meeting** [17] - 62:2, 62:5, 62:6, 73:4, 74:10, 74:15, 74:19, 75:11, 76:24, 77:5, 77:8, 77:14, 84:21, 85:3, 86:4, 86:5
**meetings** [2] - 76:8, 76:20
**members** [1] - 64:25
**memo** [1] - 110:16
**memorialization** [1] - 14:6
**men** [1] - 123:12
**mention** [1] - 50:8
**mentioned** [6] - 19:2, 21:4, 30:25, 58:12, 63:25, 86:24
**merely** [1] - 15:4
**messenger** [7] - 12:10, 16:24, 17:6, 24:18, 25:12, 25:20, 25:24
**messengers** [3] - 122:15, 122:16, 125:21
**met** [5] - 62:4, 93:24, 121:20, 127:21, 131:11
**Met** [2] - 57:4, 57:9
**Michael** [3] - 94:9, 94:19, 100:18
**MICHAEL** [1] - 94:11
**Micro** [1] - 98:6
**Micromarketing** [7] - 65:21, 95:19, 96:15, 98:6, 100:18, 101:6, 101:14
**mid** [1] - 114:6
**might** [7] - 19:1, 37:18, 38:1, 40:3, 40:17, 128:6
**mild** [1] - 81:23
**million** [3] - 91:1, 91:4, 92:18
**mind** [1] - 83:15
**minor** [1] - 112:7
**minute** [8] - 28:15, 33:19, 33:23, 34:4, 39:9, 43:5, 48:18, 48:23
**minutes** [8] - 34:4, 48:17, 48:23, 109:25, 110:2, 110:4, 113:20
**misapprehended** [1] - 63:14
**mischaracterizes** [1] - 51:2
**misleading** [2] - 92:16, 92:19
**misled** [1] - 127:4
**Miss** [11] - 14:9, 18:24, 24:23, 26:23, 27:1, 36:5, 37:11, 38:8, 42:16, 46:6, 63:17
**missed** [1] - 68:24
**misstatement** [1] - 129:6
**moment** [8] - 19:16, 28:8, 47:15, 64:14, 86:2, 88:11, 101:17, 117:5
**money** [6] - 29:17, 58:15, 58:20, 59:14, 95:20, 101:12
**month** [1] - 45:7
**months** [2] - 21:12
**morning** [9] - 9:10, 49:3, 49:16, 61:15, 92:24, 113:17, 114:3, 114:6, 114:10
**most** [2] - 33:15, 93:2
**motion** [2] - 121:5, 130:17
**move** [7] - 9:7, 17:21, 25:17, 51:3, 84:10, 115:10, 119:3
**moved** [18] - 12:10, 17:6, 25:12, 25:20, 25:22, 26:23, 116:1, 116:4, 116:12, 117:13, 119:14, 120:11, 122:7, 124:6, 124:11, 124:17, 125:19, 128:14
**movement** [10] - 16:14, 16:20, 16:23, 50:7, 117:4, 117:6, 117:8, 117:10, 120:24
**moves** [1] - 24:19
**moving** [4] - 25:1, 59:11, 73:4, 122:24
**MR** [164] - 6:3, 6:9, 6:25, 7:3, 13:16, 13:17, 14:2, 14:14, 14:20, 15:10, 15:12, 19:15, 19:17, 20:3, 20:5, 20:14, 20:17, 20:19, 20:20, 20:23, 21:18, 21:21, 28:8, 28:11, 28:13, 29:20, 29:23, 31:18, 31:20, 32:10, 32:12, 36:18, 36:21, 36:22, 43:5, 43:6, 43:21, 43:24, 44:5, 44:6, 47:14, 47:17, 50:25, 51:5, 51:6, 52:3, 52:6, 52:9, 52:12, 52:18, 53:25, 54:2, 54:5, 54:6, 54:7, 55:11, 55:13, 55:15, 60:12, 60:21, 60:23, 60:24, 61:1, 61:3, 62:14, 62:20, 62:21, 62:24, 63:2, 63:3, 63:5, 63:7, 63:21, 64:2, 64:4, 64:7, 67:3, 67:5, 67:6, 67:8, 72:14, 74:21, 77:9, 78:13, 78:15, 79:15, 79:17, 84:8, 84:11, 85:10, 85:12, 85:13, 86:1, 86:2, 86:3, 86:9, 86:10, 87:11, 87:13, 87:17, 87:18, 89:18, 89:20, 90:10, 90:13, 90:14, 91:23, 92:2, 92:9, 92:13, 93:1, 93:15, 93:18, 94:1, 94:9, 94:15, 101:16, 101:19, 101:21, 101:24, 103:14, 103:16, 104:21, 104:23, 104:24, 105:1, 106:18, 106:25, 107:3, 107:7, 107:8, 107:17, 108:17, 108:18, 108:25, 109:1, 109:3, 109:11, 109:18, 109:20, 109:23, 110:6, 111:3, 111:4, 112:1, 112:3, 112:4, 112:14, 112:22, 112:25, 113:4, 113:9, 113:22, 113:23, 114:4, 114:12, 115:3, 115:8, 115:9, 121:8, 128:1, 128:19, 128:24, 130:18
**MS** [17] - 6:2, 31:22, 32:9, 62:13, 62:16, 72:17, 74:23, 75:7, 77:12, 78:10, 93:20, 93:22, 103:18, 104:19, 112:2, 112:20, 112:24
**multiple** [2] - 40:13
**must** [2] - 118:1, 118:2

## N

**name** [27] - 6:11, 6:12, 6:13, 6:14, 6:22, 6:25, 7:2, 13:6, 26:21, 29:5, 42:14, 52:20, 52:21, 57:3, 59:7, 61:5, 62:22, 66:24, 76:15, 82:6, 94:17, 94:19, 102:20
**name's** [1] - 67:10
**named** [3] - 30:8, 30:13, 80:22
**names** [1] - 81:6
**nature** [1] - 30:3
**near** [1] - 49:21
**necessarily** [1] - 30:3
**necessary** [3] - 102:2, 105:19, 124:20
**need** [4] - 15:7, 124:9, 125:1, 126:16
**neighborhood** [1] - 62:1
**Nevada** [4] - 110:14, 110:19, 110:21, 111:1
**never** [8] - 75:18, 79:10, 116:25, 120:5, 126:3, 130:5, 130:6, 130:8
**new** [4] - 128:3, 128:4, 128:21, 128:25
**New** [4] - 61:11, 61:23, 84:13, 111:10
**next** [16] - 6:3, 25:25, 26:10, 42:14, 48:10, 52:12, 59:11, 82:6, 82:10, 90:11, 94:9, 109:23, 110:19, 123:8, 124:6, 130:22
**night** [8] - 9:11, 32:16, 32:17, 32:21, 35:22, 45:9, 129:7, 129:15
**nine** [1] - 34:4
**nobody** [1] - 120:20
**none** [7] - 29:11, 29:15, 86:17, 87:5, 116:15, 118:15, 125:24
**normal** [1] - 20:12
**note** [1] - 58:23
**notes** [1] - 31:3
**nothing** [13] - 24:3, 31:19, 31:24, 32:5, 36:18, 52:7, 58:22, 78:5, 87:11, 92:25, 104:21, 109:20, 129:18
**notice** [1] - 48:19
**notified** [1] - 43:3
**November** [7] - 100:2, 110:15, 110:19, 110:21, 110:22, 110:24, 110:25
**number** [20] - 10:3, 18:13, 20:12, 20:13, 21:16, 34:5, 34:21, 38:19, 38:24, 39:23, 40:14, 48:1, 48:2, 56:24, 56:25, 57:3, 82:18, 97:22, 115:12, 118:23
**numbers** [5] - 81:7, 82:4, 90:8, 107:9, 109:9
**numerical** [1] - 82:4
**numerous** [3] - 73:24, 76:7, 76:16

## O

**OAG** [1] - 26:12
**oath** [3] - 24:24, 66:17, 130:3
**object** [9] - 20:14, 51:1, 89:23, 91:24, 92:10, 92:14, 94:2, 106:19, 109:3
**objection** [12] - 13:16, 14:9, 14:21, 20:19, 74:21, 77:9, 84:8, 89:18, 107:7, 108:17, 108:25, 112:4
**objections** [1] - 93:7
**obstacle** [1] - 119:8
**obstructed** [4] - 119:17, 127:10, 128:8, 128:13
**obstructing** [2] - 115:20, 119:4
**obstruction** [1] - 130:25
**obstructs** [1] - 119:5
**obtained** [1] - 83:6


obvious [1] - 24:5
obviously [9] - 15:1,
15:3, 33:20, 93:2,
108:6, 115:13,
116:18, 118:5
occasion [2] - 106:13,
107:5
occur [1] - 43:20
occurred [5] - 12:5,
31:16, 43:19, 55:8,
85:3
occurs [3] - 26:14,
26:15
off-the-record [1] -
110:7
offense [1] - 117:22
offered [1] - 76:20
offering [1] - 90:9
offhand - 37:22
Office [15] - 7:15,
10:10, 12:11, 15:19,
26:6, 37:3, 52:23,
101:11, 106:13,
107:5, 108:1,
109:14, 114:17,
127:12, 130:23
office [32] - 12:24,
16:4, 22:8, 22:17,
23:17, 23:24, 24:7,
30:14, 35:3, 35:4,
35:23, 35:24, 36:3,
36:6, 36:15, 41:9,
41:20, 42:21, 84:19,
84:20, 92:23, 102:9,
116:3, 123:11,
124:1, 124:14,
128:5, 130:3, 130:4,
130:5, 130:6, 130:8
officer [4] - 49:9, 50:1,
50:4, 50:9
offices [2] - 17:7,
74:11
Offices [1] - 18:19
official [3] - 41:19,
119:9, 119:18
old [1] - 128:25
once [2] - 79:8, 96:16
one [53] - 6:16, 9:4,
16:14, 16:17, 16:18,
17:1, 20:9, 24:13,
28:15, 28:23, 29:4,
33:19, 34:4, 37:19,
38:23, 39:6, 39:9,
42:15, 43:5, 48:8,
48:18, 48:23, 54:8,
56:19, 64:14, 66:3,
66:13, 67:16, 70:19,
74:20, 76:13, 76:25,
78:4, 78:21, 85:10,
86:2, 88:9, 88:16,

93:20, 94:21, 97:10,
102:23, 114:12,
115:25, 116:11,
118:24, 120:16,
120:23
ones [4] - 81:10,
102:6, 103:21,
107:15
open [2] - 22:17, 79:4
opened [3] - 42:20,
79:10, 79:14
opportunity [3] -
57:19, 65:9, 101:4
opposed [1] - 99:17
optimistic [1] - 113:24
order [3] - 43:16,
68:24, 105:18
ordered [2] - 10:4,
10:13
organization [1] -
35:13
organizations [1] -
35:14
origin [2] - 72:4, 72:10
original [1] - 116:2
originally [1] - 99:14
originals [1] - 102:14
Orleans [1] - 61:11,
61:23, 84:13, 111:10
Orris [1] - 26:21
otherwise [1] - 81:13
ourselves [2] - 67:10,
88:10
output [1] - 56:11
outreach [1] - 111:10
outside [1] - 43:10
overlapping [1] -
98:17
own [3] - 24:13, 24:15,
59:5
owner [1] - 97:15

**P**

p.m [38] - 10:23,
12:20, 13:3, 15:15,
17:17, 17:18, 17:24,
18:12, 18:17, 19:5,
24:18, 25:21, 31:7,
31:8, 31:9, 39:20,
40:9, 40:23, 41:14,
42:18, 42:25, 43:15,
45:9, 47:20, 47:21,
48:8, 48:13, 48:14,
49:1, 49:7, 49:21,
51:23, 116:20,
124:23, 131:13
PA [2] - 91:13, 108:24
packet [6] - 70:15,
110:12, 110:15,

110:20, 111:12,
111:16
page [10] - 48:10,
56:18, 56:19, 56:22,
57:8, 64:11, 67:21,
82:23, 87:17, 87:19
Page [8] - 56:21,
59:21, 70:16, 82:2,
88:7, 90:4, 98:12,
105:3
pages [3] - 81:22,
83:2, 87:19
paid [5] - 52:20,
58:22, 59:13, 60:4,
75:13, 75:14, 90:18,
96:7, 96:13, 97:6,
97:18, 98:6, 98:9,
99:20, 101:12,
105:10, 106:1, 106:3
Painter [3] - 110:13,
111:12, 113:2
Painter's [2] - 113:10,
113:25
paper [1] - 8:8
paralegal [2] - 11:3,
45:23
paramilitary [1] -
35:13
parcel [1] - 128:22
parens [1] - 64:12
parenthesis [2] -
58:13
part [18] - 9:18, 51:8,
52:4, 64:19, 65:25,
67:24, 67:25, 68:6,
68:8, 68:9, 71:4,
71:5, 93:2, 94:25,
105:3, 128:22, 129:1
participated [1] -
52:25
participates [1] -
131:1
participating [1] -
124:3
particular [26] - 9:18,
13:23, 18:11, 20:25,
30:6, 53:19, 54:18,
56:9, 56:22, 58:5,
59:21, 60:13, 70:16,
73:25, 74:1, 76:13,
76:18, 77:5, 79:24,
80:5, 93:14, 95:16,
106:21, 106:24,
118:22, 121:19
particularly [2] -
13:19, 92:17
parties [1] - 30:13
parts [1] - 95:25
party [7] - 57:3, 82:11,
82:19, 83:22, 83:24,

84:3
passed [2] - 130:5,
130:7
Paul [19] - 16:8, 16:10,
18:10, 20:1, 53:17,
53:23, 55:6, 56:5,
58:23, 59:2, 59:9,
62:3, 62:22, 75:12,
78:19, 123:15,
123:18, 125:17
pause [6] - 19:16,
28:9, 43:5, 47:13,
63:9, 101:17
pay [1] - 100:10
payable [1] - 65:10
payment [5] - 58:14,
58:24, 69:15, 69:18,
92:20
payments [16] - 59:2,
59:5, 59:6, 59:9,
59:19, 59:23, 59:24,
59:25, 65:4, 65:5,
69:1, 69:2, 73:2,
85:16, 100:19, 101:6
payouts [1] - 70:1
payroll [3] - 79:22,
84:24, 93:24
PDF [1] - 56:11
pejorative [1] - 71:15
Pelegrin [17] - 61:5,
61:9, 61:13, 61:17,
61:20, 62:17, 63:4,
73:5, 74:8, 76:22,
76:24, 77:13, 78:6,
84:13, 85:2, 93:25
PELEGRIN [1] - 61:7
Pelegrin's [1] - 77:16
Pennsylvania [17] -
73:9, 73:11, 73:13,
73:16, 73:18, 73:21,
74:18, 74:20, 75:2,
75:16, 75:17, 75:22,
77:17, 77:18, 77:25,
78:4
people [24] - 20:12,
21:3, 21:7, 30:12,
30:13, 30:25, 32:17,
32:21, 33:21, 38:2,
42:20, 49:10, 50:23,
54:8, 77:20, 80:25,
81:7, 81:9, 81:12,
82:17, 90:3, 123:11,
126:10, 127:18
per [1] - 44:25
percent [2] - 77:21,
77:23
perform [1] - 20:11
performed [1] - 72:19
period [16] - 10:15,
13:15, 16:4, 21:7,

21:10, 34:11, 59:4,
59:14, 60:5, 88:18,
96:18, 99:21, 99:24,
100:13, 118:16,
118:18
periods [4] - 21:17,
34:20, 35:2, 60:1
permissible [1] -
14:13
permitted [2] - 14:18,
41:21
PERRI [1] - 101:19
person [10] - 13:6,
19:19, 20:1, 20:6,
44:23, 46:5, 62:8,
62:22, 102:23,
117:21
person's [1] - 82:8
personally [7] - 16:8,
39:15, 67:2, 90:1,
90:2, 91:8, 109:17
personnel [7] - 60:9,
60:16, 63:13, 63:22,
84:25, 91:9, 111:21
perspective [1] - 81:3
perspectives [1] -
81:1
perverts [1] - 119:6
Perzel [35] - 15:20,
16:11, 16:12, 18:21,
22:25, 31:25, 33:8,
35:17, 36:3, 36:6,
41:18, 41:22, 58:12,
58:19, 60:14, 79:22,
88:2, 88:15, 89:6,
90:17, 90:22, 90:23,
92:8, 95:22, 96:5,
96:12, 96:22, 105:4,
105:10, 105:21,
106:1, 106:5, 106:8,
123:13, 123:14
Perzel's [8] - 12:24,
16:3, 35:4, 36:15,
42:21, 123:11,
124:1, 124:14
Philadelphia [9] -
61:18, 61:21, 61:25,
74:3, 74:9, 74:13,
75:9, 76:1, 84:14
Philly [1] - 75:4
phone [69] - 12:17,
12:18, 13:1, 13:2,
13:14, 15:14, 15:17,
16:9, 17:11, 17:12,
17:16, 17:19, 18:3,
18:8, 18:11, 18:14,
18:18, 18:22, 18:23,
20:10, 20:24, 21:6,
21:25, 23:4, 23:7,
23:23, 24:4, 24:24,

30:20, 33:5, 33:6,
34:11, 34:20, 36:25,
38:1, 38:9, 39:6,
40:13, 40:17, 40:21,
40:22, 40:24, 43:15,
46:16, 47:23, 47:24,
47:25, 50:22, 51:9,
57:3, 120:15,
120:20, 120:21,
120:22, 121:2,
122:15, 123:4,
123:5, 123:14,
124:15, 124:19,
125:24, 126:9,
126:21, 131:2
**phones** [1] - 18:21
**physical** [1] - 119:8
**physically** [1] - 40:10
**picked** [2] - 23:23,
121:1
**piece** [2] - 121:22
**place** [2] - 74:15,
84:21
**placed** [3] - 18:13,
30:6, 38:24
**plan** [1] - 114:4
**player** [1] - 40:5
**Pleas** [1] - 131:11
**plus** [1] - 51:25
**pocket** [1] - 59:6
**point** [15] - 17:11,
19:23, 41:13, 50:25,
62:11, 70:7, 91:23,
92:10, 92:14, 93:8,
106:18, 107:18,
113:9, 117:1, 118:23
**pointed** [1] - 82:23
**points** [1] - 130:18
**Police** [1] - 35:10
**police** [5] - 49:9, 50:1,
50:3, 50:9, 93:4
**political** [11] - 29:5,
75:21, 82:11, 90:23,
91:20, 92:7, 92:16,
106:7, 106:15,
106:22, 109:15
**politician** [1] - 84:5
**Polling** [1] - 105:11
**population** [1] - 81:15
**portion** [5] - 71:8,
78:9, 101:5, 101:25,
106:6
**portions** [1] - 95:24
**position** [1] - 36:10
**possession** [1] - 37:4
**possibility** [2] - 34:8,
80:21
**possible** [5] - 14:23,
39:4, 39:12, 106:10
**potential** [1] - 112:11

**PowerPoint** [3] -
54:17, 54:23, 70:12
**precedes** [1] - 117:8
**preceding** [3] - 10:12,
125:15, 125:20
**precinct** [1] - 56:25
**preliminary** [4] -
13:18, 13:21, 14:17,
15:2
**prepare** [4] - 24:12,
24:14, 101:25,
105:18
**prepared** [13] - 11:9,
11:13, 11:21, 27:23,
60:8, 88:2, 88:4,
88:6, 89:25, 90:2,
90:3, 113:18, 114:7
**preparing** [1] - 105:2
**presence** [2] - 26:12,
41:1
**present** [4] - 28:3,
41:13, 41:16, 62:4
**presentation** [1] -
54:17
**presented** [3] - 71:23,
72:3, 131:7
**presentment** [1] - 71:5
**Preski** [9] - 31:25,
60:15, 64:8, 65:18,
66:2, 66:10, 66:20,
67:1, 110:18
**Preski's** [1] - 66:24
**presumptuous** [1] -
130:14
**pretty** [7] - 22:20,
50:10, 65:16, 74:5,
78:17, 81:21, 118:13
**previously** [1] - 60:15
**prima** [9] - 15:5,
121:14, 122:3,
123:24, 127:7,
127:9, 127:20,
127:22, 131:12
**primary** [1] - 80:24
**principal** [1] - 43:10
**printout** [4] - 33:12,
54:16, 95:5, 95:8
**privy** [1] - 40:16
**problem** [1] - 40:1
**Proceedings** [1] -
131:13
**produce** [2] - 8:16,
10:7
**produced** [2] - 45:5,
45:17
**product** [5] - 24:13,
67:22, 67:24, 68:3,
68:15
**program** [1] - 71:7
**programs** [1] - 69:6

**project** [2] - 73:17,
111:10
**promise** [1] - 93:21
**properly** [2] - 77:1,
77:8
**prosecute** [1] - 118:13
**prosecution** [6] -
117:23, 118:3,
118:15, 118:20,
127:4, 127:18
**prove** [1] - 15:4
**provided** [13] - 29:16,
63:12, 63:24, 97:12,
97:20, 97:24, 98:23,
100:4, 100:5, 100:8,
100:14, 101:10,
102:7
**pull** [1] - 68:5
**punishment** [4] -
117:24, 118:4,
118:15, 118:21
**purpose** [10] - 29:9,
50:13, 73:8, 73:12,
74:2, 74:3, 75:1,
80:24, 81:2, 83:15
**purposes** [6] - 19:19,
54:17, 60:12, 64:24,
75:10, 93:2
**pursuant** [1] - 19:11
**put** [13] - 25:8, 25:9,
25:11, 25:14, 44:5,
45:14, 56:19, 64:10,
64:16, 110:8,
121:15, 125:3, 127:8

## Q

**questioned** [1] - 14:24
**questioning** [1] - 65:5
**questions** [19] - 20:10,
28:12, 31:21, 32:11,
36:21, 64:4, 64:9,
67:5, 78:11, 86:11,
86:12, 86:14,
101:19, 101:21,
103:15, 103:17,
104:20, 104:23,
104:24
**quick** [2] - 78:14,
107:24

## R

**raise** [1] - 120:18
**rarely** [1] - 122:10
**rather** [1] - 113:7
**reached** [1] - 41:8
**read** [5] - 8:7, 24:20,
79:14, 117:20,
117:25
**reading** [3] - 8:14,

10:6, 54:22
**ready** [3] - 55:5, 113:5,
114:5
**real** [4] - 27:8, 38:20,
84:1, 84:2
**really** [8] - 76:19,
84:16, 108:15,
119:21, 120:3,
120:8, 124:21,
128:15
**reason** [4] - 9:3,
38:10, 117:20,
127:19
**reasonable** [4] -
122:4, 124:23,
124:24, 126:22
**reasons** [3] - 73:20,
74:18, 115:12
**recalled** [4] - 61:20,
61:22, 61:24, 62:1
**recalling** [1] - 74:9
**receipt** [1] - 123:7
**receipts** [2] - 89:8,
108:2
**receive** [2] - 7:15,
102:24
**received** [9] - 8:15,
15:17, 29:17, 37:15,
60:15, 79:12, 99:11,
99:15, 103:7
**receives** [1] - 13:15
**recess** [4] - 94:8,
110:5, 114:10,
114:11
**recipient** [1] - 72:5
**recognize** [11] - 8:1,
8:3, 9:22, 11:12,
11:17, 15:23, 47:10,
53:8, 53:14, 55:18,
95:7
**recollect** [1] - 42:15
**recollection** [6] -
72:25, 73:3, 74:13,
77:16, 105:17,
105:18
**record** [13] - 6:11,
19:18, 47:23, 60:8,
60:12, 68:17, 84:25,
93:1, 94:17, 110:7,
110:9, 115:1, 116:14
**record's** [1] - 33:23
**recordkeeping** [1] -
77:24
**records** [46] - 13:1,
17:11, 18:2, 18:4,
18:8, 18:11, 18:15,
20:24, 20:25, 21:6,
23:4, 23:8, 23:10,
30:17, 30:20, 33:5,
33:6, 33:15, 36:25,

37:3, 37:4, 37:6,
38:1, 38:16, 42:13,
44:17, 44:24, 45:1,
45:17, 45:21, 46:9,
46:16, 47:2, 47:4,
47:7, 60:17, 68:4,
68:19, 85:9, 85:24,
111:22, 114:18,
114:23, 126:9
**refer** [5] - 26:8, 34:4,
71:19, 81:11, 85:9
**reference** [5] - 28:16,
37:17, 72:4, 79:18,
80:3
**referenced** [4] - 26:10,
28:20, 33:11, 42:14
**referencing** [1] - 34:16
**referred** [4] - 9:10,
62:8, 80:6, 99:9
**referring** [6] - 26:2,
27:9, 28:14, 42:9,
80:8, 89:11
**refers** [2] - 26:9, 55:7
**reflect** [4] - 33:23,
45:22, 47:2, 76:8
**reflected** [1] - 49:13
**reflecting** [1] - 65:4
**reflects** [2] - 12:9,
12:15
**Reform** [2] - 91:16,
108:24
**refused** [1] - 57:13
**regard** [4] - 9:17, 53:4,
60:19, 65:20
**regarding** [19] - 7:11,
8:10, 13:23, 18:4,
34:10, 59:22, 60:9,
63:8, 63:17, 63:23,
64:9, 97:5, 100:3,
100:8, 110:11,
110:16, 111:20,
114:20, 121:19
**regards** [1] - 14:24
**registered** [5] - 18:19,
82:20, 82:21, 83:4,
83:6
**regular** [1] - 62:1
**reimbursed** [1] - 98:9
**reimbursement** [1] -
85:20
**reimbursements** [2] -
85:18, 96:17
**reiterating** [1] - 121:12
**related** [11] - 8:19,
28:17, 28:19, 29:7,
62:7, 74:4, 76:11,
104:16, 105:8,
106:20, 121:23
**relates** [2] - 9:8, 92:11
**relation** [1] - 30:25

relationship [2] - 102:16, 102:21
relevant [3] - 30:19, 38:14, 93:10
relied [1] - 68:12
relocated [1] - 27:15
remainder [1] - 115:1
remaining [1] - 112:16
remember [9] - 34:12, 34:15, 37:22, 37:24, 49:6, 49:20, 50:3, 86:11, 125:2
remotely [1] - 92:11
remove [1] - 129:15
removed [8] - 10:9, 10:14, 125:14, 129:12, 130:21, 130:22, 131:1
report [10] - 75:19, 77:20, 88:14, 88:19, 89:8, 90:17, 95:5, 97:11, 99:7, 100:20
reports [16] - 14:4, 41:12, 57:20, 65:3, 97:17, 97:20, 98:8, 99:8, 99:10, 99:11, 99:19, 99:22, 105:20, 106:14, 106:15
represent [4] - 64:8, 67:11, 71:15, 83:18
representation [1] - 14:5
Representative [2] - 80:18, 84:20
representative [7] - 38:6, 41:18, 41:22, 56:19, 81:6, 81:21, 82:16
Representatives [1] - 41:19
representing [1] - 83:23
Republican [20] - 6:17, 12:19, 16:24, 17:8, 43:11, 53:1, 54:10, 59:12, 59:23, 64:12, 76:12, 94:23, 96:18, 96:22, 96:25, 98:10, 98:14, 101:1, 101:13, 116:4
republican [2] - 81:13, 82:13
request [4] - 7:10, 7:16, 90:6, 90:7
requested [1] - 15:20
require [2] - 8:22, 44:16
required [2] - 44:24, 121:15

requires [1] - 44:12
research [1] - 16:22
researching [1] - 33:5
resident [1] - 81:20
residents [2] - 83:7, 83:11
respect [12] - 67:14, 68:22, 69:5, 69:8, 69:9, 70:9, 79:20, 85:14, 112:11, 116:17, 117:14, 131:8
respects [1] - 115:7
respond [1] - 121:7
response [9] - 7:16, 7:18, 8:4, 78:18, 78:25, 102:12, 112:5, 129:10, 129:13
responsive [1] - 120:12
rest [5] - 88:6, 90:4, 90:12, 113:17, 115:7
restrict [1] - 76:18
returned [2] - 93:9, 127:25
reveal [1] - 21:13
review [17] - 18:2, 18:3, 18:9, 21:6, 30:19, 47:4, 57:19, 59:22, 65:1, 66:14, 70:6, 90:16, 101:5, 102:2, 105:20, 106:14, 107:6
reviewed [16] - 17:12, 18:7, 20:24, 37:2, 46:7, 46:10, 53:4, 98:21, 102:6, 102:13, 102:25, 103:11, 105:14, 107:16, 114:18, 114:22
reviewing [1] - 95:1
Rick [1] - 14:2
right-hand [1] - 37:10
risk [1] - 130:14
Rob [1] - 67:11
ROBERT [1] - 52:14
Robert [2] - 10:21, 52:21
room [4] - 22:13, 25:5, 41:21, 79:12
Room [8] - 10:9, 12:10, 12:11, 12:17, 24:19, 26:6, 122:8
Rooms [1] - 16:15
roughly [3] - 29:6, 49:21, 52:2
row [2] - 19:25, 20:8
run [1] - 113:13

running [3] - 80:14, 80:18, 125:22
runs [1] - 116:7
Ruth [6] - 53:18, 54:3, 78:20, 79:10, 110:24, 111:16

## S

sake [1] - 118:8
Sam [1] - 69:10
sample [1] - 56:19
Samuel [2] - 72:6, 110:22
sat [1] - 119:22
save [1] - 93:7
saw [12] - 11:13, 46:1, 46:2, 46:6, 46:7, 53:9, 66:1, 95:8, 103:10, 116:15, 116:25, 130:7
scenario [1] - 113:15
scope [2] - 91:24, 106:23
screen [2] - 67:15, 87:22
scurried [1] - 122:14
Seaman [18] - 11:3, 18:6, 19:20, 38:5, 38:8, 38:13, 39:14, 39:15, 40:22, 40:25, 42:9, 42:16, 45:23, 46:6, 92:22, 116:22, 126:13, 126:20
Seaman's [3] - 37:11, 43:15
seated [1] - 103:9
second [3] - 28:16, 62:12, 64:11
secondly [1] - 119:1
section [2] - 54:11, 70:24
see [34] - 8:2, 11:25, 19:20, 20:2, 20:7, 28:15, 34:20, 47:21, 48:1, 53:23, 54:3, 54:23, 62:9, 62:23, 65:13, 65:15, 65:17, 65:22, 66:8, 66:23, 66:25, 67:2, 70:4, 72:19, 72:23, 78:18, 82:3, 83:3, 87:22, 95:12, 96:25, 112:5, 122:19, 123:21
seeing [2] - 65:12, 65:14, 76:15, 82:22, 123:2
seminar [1] - 110:14
Seminar [1] - 110:25
sending [1] - 56:3

sends [1] - 54:9
sent [8] - 55:24, 56:12, 78:19, 99:13, 102:8, 102:9, 102:14, 102:17
serve [1] - 23:25
served [9] - 10:17, 10:22, 11:1, 17:24, 18:5, 24:6, 39:14, 44:8, 45:22, 52:1, 126:13
serves [1] - 83:7
service [3] - 71:10, 80:24, 117:8
serving [1] - 45:20
set [3] - 39:25, 44:17, 64:21
seven [4] - 37:20, 42:3, 42:13, 126:20
several [2] - 62:5, 90:22
Shaffer [2] - 114:16, 114:22
SHAFFER [1] - 114:16
shares [2] - 36:3, 36:5
sheets [1] - 55:4
Sheila [1] - 13:22
shifting [1] - 95:20
short [2] - 93:21, 113:1
shortcut [1] - 110:3
shorten [1] - 110:1
show [15] - 7:24, 9:14, 34:3, 38:1, 39:20, 47:8, 47:11, 47:18, 48:11, 48:21, 53:11, 55:16, 58:1, 82:2, 83:1
Show [1] - 37:12
showed [1] - 42:24
showing [3] - 9:20, 11:16, 95:10
shown [2] - 88:18, 90:19
shows [5] - 22:2, 22:12, 46:22, 120:15, 130:20
shred [1] - 121:3
side [9] - 10:20, 57:2, 57:4, 75:20, 75:21, 77:22, 102:23, 103:6, 103:9
sidebar [1] - 112:8
sides [1] - 111:25
sight [1] - 121:11
SIGMAN [6] - 36:21, 85:12, 86:2, 86:10, 87:11, 104:24
sign [6] - 57:16, 70:2, 73:1, 87:3, 87:8,

87:9
signatory [3] - 69:11, 69:15, 69:18
signed [9] - 65:17, 66:2, 66:9, 66:19, 67:1, 72:20, 72:22, 72:24, 86:25
significant [4] - 22:20, 23:14, 26:1, 71:4
significantly [1] - 21:15
signing [1] - 86:22
silent [1] - 125:25
similar [1] - 86:14
similarly [2] - 100:17, 106:4
simple [1] - 107:24, 120:8, 130:15
simplify [1] - 107:1
simply [6] - 41:20, 115:19, 118:7, 119:20, 121:17, 130:15
sincerely [1] - 9:1
single [2] - 66:13, 102:24
sit [8] - 32:6, 103:25, 104:7, 104:13, 104:18, 107:14, 108:21, 122:13
sits [2] - 123:15, 124:22
sitting [2] - 122:18, 123:2
six [3] - 18:20, 37:18, 37:19
SKP [6] - 7:12, 8:13, 8:21, 29:13, 29:17, 31:24
slightly [2] - 97:22, 98:2
smaller [1] - 98:2
snapshot [1] - 105:24
sneaks [1] - 124:14
snowstorm [1] - 22:16
sole [2] - 74:2, 74:3
someone [9] - 6:22, 15:18, 43:3, 44:12, 50:7, 61:5, 69:25, 83:1, 123:4
sometime [1] - 49:21
somewhere [3] - 68:19, 70:6, 107:21
sooner [3] - 113:6, 113:16, 114:9
SOOP [2] - 52:14, 52:21
Soop [14] - 52:12, 52:21, 52:24, 53:11, 55:16, 56:18, 57:18,

58:3, 60:7, 61:4, 62:18, 67:9, 72:18, 87:14

**sorry** [14] - 16:16, 19:1, 38:7, 52:3, 55:3, 55:11, 63:10, 70:9, 72:3, 81:18, 85:21, 88:24, 89:4, 89:11

**sound** [3] - 31:10, 80:10, 105:13

**source** [1] - 88:17

**sources** [3] - 69:4, 69:5, 88:16

**speaker** [1] - 116:2

**Speaks** [5] - 19:9, 49:4, 49:6, 125:10, 127:3

**speaks** [2] - 39:19, 93:3

**Speaks'** [2] - 51:2, 129:11

**Speaks's** [2] - 19:6, 50:11

**special** [4] - 49:24, 52:22, 55:8, 66:22

**Special** [8] - 50:11, 52:24, 100:25, 101:1, 101:5, 101:12, 114:15, 114:21

**specific** [8] - 18:3, 56:24, 73:17, 74:24, 76:8, 76:10, 77:4, 93:3

**specifically** [12] - 15:16, 21:3, 33:15, 58:7, 61:21, 65:2, 75:3, 78:21, 95:17, 95:18, 115:17, 130:25

**spell** [2] - 6:11, 94:17

**spelled** [3] - 9:4, 9:5, 94:19

**spent** [2] - 75:20

**split** [1] - 84:24

**spot** [1] - 82:8

**spreadsheet** [2] - 67:17, 67:21

**spreadsheets** [1] - 81:24

**staff** [1] - 64:25

**stage** [1] - 118:19

**stand** [1] - 79:23

**standard** [1] - 121:14

**stands** [2] - 82:12, 82:13

**start** [8] - 12:3, 19:4, 19:5, 89:23, 112:11, 112:17, 112:22,

121:12

**started** [2] - 85:5, 85:6

**starting** [3] - 31:7, 96:3, 114:6

**state** [5] - 6:10, 18:14, 52:19, 94:16, 116:3

**statement** [2] - 14:16, 41:5

**statewide** [2] - 115:25, 116:11

**stationery** [2] - 27:9, 27:24

**statute** [3] - 117:25, 118:6, 118:22

**stay** [2] - 93:11, 125:25

**step** [3] - 52:10, 94:4, 109:21

**stick** [1] - 17:10

**still** [2] - 70:5, 87:14

**stipulate** [5] - 20:3, 53:25, 62:13, 62:18, 62:24

**stipulated** [6] - 111:25, 112:1, 112:2, 112:3, 115:2, 115:4

**stipulating** [1] - 62:17

**stipulation** [6] - 54:5, 60:18, 63:8, 111:20, 112:5, 114:13

**stipulations** [2] - 110:10, 112:15

**Stokes** [5] - 60:15, 60:16, 60:24, 63:19, 67:11, 69:10, 71:15, 72:6, 110:22, 111:20

**stokes** [1] - 63:23

**stop** [2] - 12:21, 128:19

**stricken** [1] - 92:25

**strictly** [1] - 73:21

**strike** [2] - 79:19, 80:16

**stripe** [1] - 106:22

**stuck** [1] - 61:23

**stuff** [5] - 57:7, 107:13, 122:19, 125:6, 126:11

**subject** [8] - 14:11, 54:12, 56:11, 115:25, 116:11, 118:25, 119:1, 128:13

**submit** [1] - 122:3

**submitted** [1] - 66:5

**Subparagraph** [2] - 44:18, 45:2

**subpoena** [46] - 8:16, 9:16, 9:25, 10:17,

10:22, 11:1, 11:2, 17:23, 18:5, 19:13, 22:10, 23:18, 24:6, 28:4, 32:25, 39:14, 44:2, 44:7, 44:25, 45:4, 45:20, 45:22, 46:1, 46:2, 46:6, 52:1, 116:1, 116:15, 116:18, 116:20, 117:2, 117:9, 117:10, 117:13, 118:17, 119:13, 120:9, 120:13, 125:7, 125:8, 125:12, 126:13, 126:25, 127:2, 128:14, 130:13

**subpoenaed** [2] - 99:14, 102:5

**subpoenas** [1] - 23:25

**substantially** [1] - 31:10

**substantive** [1] - 116:8

**successfully** [1] - 38:18

**Sue** [1] - 60:9

**suggest** [2] - 29:10, 30:1

**suggesting** [2] - 29:24, 78:2

**summarizing** [1] - 109:1

**summary** [4] - 57:22, 60:20, 67:18, 95:4

**Superior** [1] - 14:15

**supervise** [2] - 90:3, 90:5

**supervisor** [4] - 52:22, 70:22, 70:24, 71:1

**support** [1] - 115:14

**suppose** [1] - 128:6

**supposed** [1] - 42:7

**Susan** [1] - 63:13

**suspect** [2] - 40:19, 45:3

**Susquehanna** [1] - 105:11

**sustained** [3] - 77:11, 92:1, 92:12

**swear** [1] - 120:19

**sworn** [3] - 6:6, 52:15, 94:12

---

# T

**table** [1] - 62:12

**targeted** [1] - 55:2

**taxpayers** [1] - 77:3

**team** [1] - 66:1

**technology** [1] - 54:11

**telephone** [8] - 20:16, 29:25, 30:6, 30:12, 46:9, 48:25, 81:7, 82:18

**ten** [3] - 94:6, 110:4, 113:19

**tender** [3] - 21:19, 63:6, 101:18

**terribly** [1] - 119:21

**testified** [14] - 6:6, 14:10, 19:10, 41:8, 44:2, 49:4, 49:16, 52:15, 85:14, 94:12, 129:10, 130:6, 130:7, 130:8

**testifies** [1] - 63:1

**testify** [10] - 7:21, 13:10, 13:25, 60:9, 61:13, 69:25, 111:23, 114:16, 114:22, 129:7

**testifying** [4] - 49:6, 66:16, 76:17, 89:25

**testimony** [23] - 13:22, 14:4, 19:7, 25:2, 49:12, 50:12, 51:2, 51:11, 60:19, 76:22, 92:11, 93:13, 95:14, 106:20, 112:8, 114:15, 116:16, 116:17, 118:25, 119:1, 123:17, 124:10, 125:9

**Texas** [2] - 111:14, 111:18

**THE** [53] - 6:1, 7:1, 14:23, 15:11, 20:4, 20:22, 28:10, 29:22, 36:20, 43:22, 43:23, 47:16, 51:3, 52:5, 52:8, 52:10, 62:15, 62:19, 64:5, 67:4, 72:16, 74:25, 75:1, 77:10, 77:11, 78:12, 84:10, 87:12, 92:1, 92:12, 93:11, 93:16, 93:19, 94:3, 94:5, 94:6, 101:20, 101:22, 104:22, 104:25, 107:2, 107:11, 107:12, 109:5, 109:7, 109:19, 109:21, 110:4, 112:10, 113:14, 114:9, 121:7, 131:8

**themselves** [1] - 23:5

**then-Chief** [1] - 38:7

**theory** [6] - 128:3,

128:4, 128:21, 128:25

**they've** [2] - 60:17, 129:5

**thinking** [1] - 80:8

**thirds** [1] - 57:8

**thousands** [1] - 78:22

**three** [7] - 17:15, 17:17, 52:2, 52:5, 122:22, 123:11, 124:18

**Thursday** [10] - 112:19, 113:3, 113:12, 113:15, 113:17, 113:20, 114:3, 114:7, 114:24, 122:20

**ticket** [1] - 23:20

**timing** [1] - 48:25

**today** [28] - 19:21, 20:2, 24:24, 25:17, 37:7, 41:8, 53:24, 62:9, 62:23, 66:16, 86:18, 86:25, 90:7, 91:12, 91:14, 104:17, 104:18, 106:12, 107:4, 107:14, 107:22, 107:25, 108:7, 109:16, 109:17, 112:9, 112:15

**together** [7] - 49:10, 50:6, 50:24, 64:10, 109:2, 109:4, 121:25

**Tomaselli** [2] - 110:23, 111:8

**tomorrow** [8] - 112:12, 112:17, 112:19, 112:21, 113:2, 113:11, 114:2, 114:10

**Tony** [2] - 111:12, 113:1

**took** [2] - 74:15, 84:21

**top** [11] - 51:8, 55:21, 56:22, 66:11, 76:14, 85:8, 87:25, 88:7, 91:5, 96:3, 105:3

**topic** [2] - 56:9, 62:6

**total** [9] - 34:3, 60:5, 62:5, 96:8, 96:20, 96:24, 97:21, 99:5, 99:22

**totalled** [1] - 59:25

**totalling** [1] - 59:3

**totally** [3] - 15:4, 75:5, 97:25

**totals** [1] - 109:9

**towards** [1] - 77:22

**Towhey** [38] - 16:8,

16:10, 18:16, 18:24, 20:2, 22:16, 22:23, 24:6, 32:24, 33:3, 35:21, 36:2, 36:13, 46:10, 46:25, 47:7, 50:23, 53:17, 53:23, 54:9, 54:20, 56:5, 56:13, 58:23, 59:2, 59:9, 62:3, 62:22, 75:12, 78:19, 79:21, 84:24, 85:3, 85:19, 123:16, 123:19, 125:17, 126:22

**Towhey's** [10] - 18:10, 18:13, 33:6, 34:11, 34:19, 35:18, 47:18, 47:24, 85:15, 123:18
**trained** [1] - 21:25
**transacted** [1] - 29:12
**transpired** [1] - 23:1
**travel** [7] - 75:14, 110:12, 110:17, 110:23, 111:5, 111:11, 111:15
**travelled** [1] - 61:25
**travelling** [1] - 111:8
**treasury** [5] - 65:4, 99:7, 99:13, 99:15, 100:19
**trespassing** [1] - 71:22
**trial** [6] - 7:22, 13:10, 14:18, 61:14, 120:2, 128:18
**tried** [2] - 38:6, 38:8
**trip** [14] - 61:17, 73:23, 73:25, 74:1, 74:2, 74:3, 74:20, 75:2, 75:4, 75:8, 75:11, 75:25, 77:22, 78:7
**trips** [2] - 73:24, 78:3
**true** [12] - 9:24, 11:20, 32:21, 35:15, 35:18, 37:8, 45:3, 54:14, 72:9, 80:25, 88:23, 88:24
**try** [2] - 8:9, 113:19
**trying** [4] - 79:9, 83:24, 107:24, 108:8
**TUCR** [7] - 65:3, 99:8, 99:9, 99:11, 99:19, 99:22, 100:20
**Tuesday** [4] - 12:6, 12:8, 53:21, 56:7
**turning** [2] - 59:21, 98:12
**twice** [1] - 9:3
**two** [29] - 10:3, 20:9, 33:20, 48:2, 48:7, 48:11, 48:16, 48:23,

49:8, 50:19, 51:25, 57:8, 66:21, 67:21, 69:23, 70:1, 87:19, 88:11, 91:5, 97:10, 98:16, 100:17, 109:25, 115:21, 116:8, 116:9, 118:23, 130:18
**two-fold** [1] - 118:23
**two-page** [1] - 67:21
**two-thirds** [1] - 57:8
**type** [1] - 14:6
**types** [1] - 23:10

## U

**ultimately** [4] - 27:14, 27:15, 42:17, 122:25
**unanswered** [3] - 33:8, 33:13, 34:6
**unaware** [1] - 103:6
**under** [9] - 10:3, 13:18, 14:14, 14:19, 24:24, 58:12, 59:7, 66:16, 130:2
**understood** [1] - 15:10
**universe** [2] - 30:19, 30:22
**unknown** [1] - 124:13
**unlawful** [4] - 119:9, 119:11, 119:18, 127:11
**unless** [2] - 38:19, 41:21
**unobstructed** [1] - 122:12
**unregistered** [1] - 57:13
**unusual** [23] - 23:1, 23:3, 35:20, 35:25, 36:1, 36:4, 36:7, 36:13, 36:17
**up** [29] - 11:25, 22:2, 22:12, 22:17, 22:24, 22:23, 24:15, 36:23, 39:20, 39:25, 42:24, 44:5, 56:19, 64:16, 67:15, 79:4, 79:10, 79:14, 85:6, 109:24, 114:8, 121:1, 122:7, 122:17, 123:16, 124:8, 125:6, 128:22, 129:19
**upstairs** [1] - 22:15

## V

**variably** [1] - 7:4
**variety** [1] - 27:2
**various** [16] - 28:22,

30:14, 31:7, 57:19, 58:3, 69:4, 91:3, 95:2, 95:20, 102:3, 102:15, 104:12, 104:13, 114:18, 126:14
**varying** [1] - 81:1
**Vegas** [5] - 110:14, 110:18, 110:20, 110:23, 111:1
**vehicle** [1] - 118:12
**vendor** [4] - 88:22, 100:4, 100:9
**vendors** [14] - 58:5, 69:23, 90:19, 92:21, 93:3, 97:2, 102:3, 105:5, 105:10, 105:16, 105:23, 105:24, 106:2, 106:21
**verification** [1] - 88:22
**Verizon** [2] - 47:7, 47:19
**versa** [2] - 43:17, 77:23
**versus** [1] - 13:19
**vice** [2] - 43:16, 77:23
**Victory** [9] - 91:3, 91:6, 92:18, 106:16, 106:17, 107:6, 108:3
**view** [4] - 92:6, 119:25, 122:12, 130:4
**violated** [1] - 119:16
**violence** [1] - 119:7
**vision** [1] - 42:25
**visit** [1] - 61:20
**voice** [11] - 15:24, 16:2, 16:8, 16:11, 33:19, 33:21, 33:22, 39:3, 39:7, 123:13, 123:18
**vote** [1] - 81:10
**voters** [15] - 55:2, 82:20, 82:21, 83:5, 83:6, 83:11, 83:13
**voucher** [6] - 110:13, 110:17, 110:24, 111:5, 111:12, 111:16

## W

**wait** [1] - 39:7
**waiting** [1] - 113:9
**walked** [1] - 70:15
**walking** [1] - 56:23
**ward** [1] - 56:24
**warrant** [1] - 115:15
**web** [1] - 56:23

**week** [6] - 11:5, 114:21, 114:25, 115:2, 122:22, 125:9
**Weiser** [1] - 24:25
**Weiss** [9] - 65:21, 95:19, 96:15, 98:6, 100:18, 101:6, 101:13
**welcome** [1] - 43:22
**whatsoever** [3] - 32:24, 116:16, 116:22
**whole** [6] - 40:1, 69:3, 75:25, 82:1, 83:14, 84:17
**William** [1] - 110:23
**Winning** [1] - 28:10
**winning** [1] - 64:5
**WINNING** [7] - 28:11, 28:13, 29:20, 60:23, 64:7, 67:3, 101:21
**wireless** [1] - 47:19
**wise** [1] - 81:5
**withholding** [1] - 127:16
**witness** [12] - 6:6, 14:17, 40:5, 52:15, 62:25, 63:1, 90:11, 94:3, 94:12, 112:20, 113:8, 120:17
**WITNESS** [9] - 7:1, 36:20, 43:22, 52:5, 75:1, 77:10, 94:5, 107:12, 109:7
**witnessed** [1] - 26:5
**witnesses** [4] - 112:12, 112:16, 129:7, 129:10
**witnessing** [1] - 26:16
**Woodward** [1] - 36:24
**WOODWARD** [15] - 20:3, 20:14, 32:12, 36:18, 53:25, 62:24, 63:3, 79:17, 84:11, 85:10, 85:13, 86:1, 86:3, 86:9, 104:23
**word** [3] - 48:20, 63:8, 80:4
**words** [2] - 69:17, 113:6
**works** [3] - 122:8, 122:9, 123:16
**worst** [1] - 113:14
**wrap** [1] - 129:19
**written** [3] - 7:18, 8:4, 118:1

## Y

**yard** [1] - 57:16

**year** [2] - 55:9, 55:12
**years** [2] - 98:3, 101:9
**yesterday** [1] - 125:2
**York** [1] - 84:4
**yourself** [1] - 88:3
**YS** [3] - 57:5, 57:9, 57:15

## Z

**Zain** [6] - 6:22, 7:1, 9:1, 97:12, 97:14, 97:24
**ZAIN** [1] - 7:2
**zero** [6] - 96:14, 96:16, 98:7, 98:11, 100:23, 116:16
**Zimmerman** [57] - 12:16, 14:22, 17:20, 18:16, 20:7, 22:24, 33:8, 36:2, 42:2, 42:5, 42:16, 46:23, 46:25, 49:22, 50:18, 51:9, 114:20, 114:23, 115:7, 115:11, 115:18, 116:14, 116:24, 116:25, 117:5, 117:11, 119:25, 120:19, 120:21, 120:25, 121:4, 121:20, 122:8, 122:9, 122:18, 123:2, 123:20, 123:23, 124:3, 124:13, 125:16, 125:23, 126:8, 126:11, 126:12, 126:21, 126:24, 127:9, 128:5, 128:11, 128:17, 129:8, 129:13, 129:23, 130:16, 131:9
**Zimmerman's** [15] - 13:1, 17:12, 42:14, 47:24, 47:25, 114:23, 120:16, 121:2, 123:4, 123:15, 124:1, 124:15, 124:16, 124:19, 130:3

ATTACHMENT B

**COURT OF COMMON PLEAS**
**DAUPHIN COUNTY, PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA    :

       vs.             :      CRIMINAL NO.: 2524-2010

JOHN R. ZIMMERMAN

**OMNIBUS PRETRIAL MOTION**

RECEIVED

JUL 2 7 2010

COURT ADMINISTRATOR'S
OFFICE
DAUPHIN COUNTY

I.    MOTION TO QUASH INFORMATION

    A.  HISTORY

        1.    On November 13, 2009, John Zimmerman was arrested on a warrant alleging

violations of 18 Pa. C..S. § 5105 (Hindering Apprehension or Prosecution), 18 Pa. C. S. § 5101

(obstructing Administration of Law) And 18 Pa. C. S. § 903 (Criminal Conspiracy).

        2.    A preliminary hearing was held before the Honorable William C. Wenner on April

21 - 23 and May 25 - 27, 2010, for defendant John Zimmerman and nine (9) other defendants [1]

all charged with various offenses under Title 18 Pennsylvania Statute.

        3.    The only day during which any testimony was taken relative to defendant John

Zimmerman was May 25, 2010.  On May 25, 2010, following argument, Judge Wenner held

defendant Zimmerman for trial on the above referenced charges.

        4.    On or about July 8, 2010, the Commonwealth filed Informations against all

defendants; defendant Zimmerman is charged with those same violations set forth in paragraph 1

above.  A copy of the Information is attached as exhibit A.

    B.  ARGUMENT

        5.    Title 18 Pa. C. S. § 5105 and § 5101 state in pertinent part:

---

[1]The nine (9) other defendants are Elmer Bowman, Brett Feese, Donald McClintock, John
Perzel, Brian Preski, Eric Ruth, Jill Seaman, Samuel Stokes and Paul Towhey.

7/27/10

§ 5105: "A person commits an offense if, with intent to hinder the . . . prosecution . . . of another for crime . . . he (3) conceals or destroys evidence of the crime . . .

§ 5101: "A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function

6.  The essence of the charges under all 3 statutory provisions (including conspiracy) is that defendant intentionally hindered prosecution and intentionally obstructed, impaired or perverted the administration of law, "by having boxes which were the <u>subject of at least one statewide investigating grand jury subpoena</u> moved from their original location to the Speaker Emeritus office area in the State Capitol, then having those boxes moved to the House Republican Campaign Committee (HRCC) offices or otherwise hidden from discovery by the grand jury . . ."

7.  The movement of these boxes is significant according to the Commonwealth because one or more of them allegedly contained campaign material.

8.  The evidence developed at the preliminary hearing failed as a matter of law to establish a prima facie case warranting holding defendant Zimmerman for trial in the Court of Common Pleas.

9.  Specifically, the preliminary hearing evidence failed to establish that defendant Zimmerman:

| | |
|---|---|
| i | knew of the existence of one or more statewide investigating grand jury subpoenas at the time any boxes were moved; |
| ii | knew the contents/commands of the subpoenas; |
| iii | knew the contents of any subject box |
| iv | was involved in the movement of any box. |

2

10.     As aforesaid, the only evidence presented relative to defendant Zimmerman during the preliminary hearing occurred on May 25, 2010.  A summary of that testimony follows:

Lori Lochetto testified that from 1995 - 2008 she was employed by the House of Representatives, Republican Caucus, and worked for John Perzel.  She also worked for Brian Preski and Paul Towhey. Her office was in Room 414, Main Capitol, an office she shared with John Perzel, Paul Towhey, John Zimmerman and a receptionist (TR. P. 7-8).  She was advised by Jason Weiser of the existence of certain boxes in Room B-2 of the Irvis Office Building that contained campaign material.  She advised Paul Towhey of her conversation with Jason Weiser; Towhey asked her to go and find out exactly what was there. Ms. Lochetto testified she discovered campaign stationary in the boxes and so advised Paul Towhey. She was instructed by Towhey to bring the boxes to Room 414, sort them and remove the campaign material and have the campaign material taken to HRCC, which she did (TR. pp.10-12).   Lori Lochetto did not testify that she had a single conversation with John Zimmerman relative to the boxes, their content, or the movement of same; that John Zimmerman knew of the existence of the boxes or the campaign material; that he had any discussion with her or Paul Towhey; she failed to testify that John Zimmerman was even in the office when these boxes were sorted and moved.  In short, she provided no evidence to support the charges against John Zimmerman.

Sheila Flickinger testified she is the finance director for HRCC and that sometime between February 25 - 29, 2008, she received a telephone call from Brett Feese, Esquire inquiring as to whether there had been a delivery to HRCC from "The Hill."  She discovered that some boxes had been delivered, some of which contained campaign stationary of John Perzel. She reported this to Brett Feese who advised her to leave the boxes there, "don't touch them, just

3

leave them where they are . . . " (TR. pp. 43-46). Ms. Flickinger offered no testimony relative to defendant John Zimmerman.

Gary Speaks, Special Agent, Bureau of Criminal Investigations for the Attorney General, testified that on the evening of February 29, 2008, he went to the State Capitol building accompanied by Chief Deputy Attorney General Frank Fina. They were acting in furtherance of a subpoena issued that day. They examined 35 boxes in Room B-2 in the presence of Jack Krill, Esq., George Bibikos, Esq., and Jill Seaman; there was no campaign material contained in these boxes. This group then proceeded to Room 414 in the Main Capitol building where they were met by John Zimmerman. The time was now approximately 9:00 p.m. (TR. 115-116). The group waited for 45 minutes for Paul Towhey to arrive from Philadelphia. Once Mr. Towhey arrived he unlocked the room where the boxes were located and Agent Speaks and Deputy A.G. Fina examined 14 boxes of materials.[2] Prior to Mr. Towhey's arrival, no one in the group, including Mr. Zimmerman had entered the room in Agent Speaks' presence. (TR. p. 131). Mr. Fina inquired of the group whether any materials had been taken out or hidden. Messrs. Krill, Towhey and Zimmerman all responded negatively (TR. p. 117).

Lastly, Agent Anthony Fiore testified he was familiar with a forthwith subpoena served on Jill Seaman, House Republican Caucus (HRC) paralegal at 2:30 p.m.on February 29, 2008 (TR. pp. 10 -11). Fiore's investigation revealed that a messenger moved boxes from Room B-2 of the Irvis Office Building to Room 414 in the Main Capitol at the direction of Lori Lochetto.

---

[2]None of these boxes contained campaign material.

4

Further, that a call was made from John Zimmerman's desk phone in Room 414[3] to HRCC at 4:30 p.m. on February 26, 2008. According to Agent Fiore a Mr. George Matthews who worked for HRCC received a call from an unknown male at 4:30 p.m. February 26. 2008[4] requesting HRCC take delivery of some boxes; Matthews did not recognize the male's voice. Agent Fiore also testified that boxes were moved on February 25, 26, 27, 2008, all at Lori Lochetto's directions (TR. pp. 16-17) and that three (3) calls were made from John Zimmerman's desk phone at 2:08 p.m., 2:31 p.m. and 7:35 p.m on February 27. Again the caller was unknown and unidentified.

The above represents the totality of relevant evidence against John Zimmerman.

Given that the allegation in all three (3) charges contained in the Information involves, "having boxes which were subject of at least one statewide investigating grand jury subpoena moved . . . ," you would expect to find prima facie evidence that (1) John Zimmerman knew of or was aware of the boxes and the movement and (2) more importantly that he knew of and was aware of the subpoena and that the boxes were the subject of the subpoena. Not a single witness testified that Mr. Zimmerman was aware of the movement of boxes or the contents of any one box; not a single witness testified that John Zimmerman was aware of the subpoena(s)[5] or the contents of same. The record is void of any evidence establishing a crime, prima facie.

The offense of hindering apprehension or prosecution is defined in 18 Pa. C.S.A. § 5105

---

[3]Room 414 is John Perzel's office, which he shares with Lochetto, Towhey, Zimmerman and a receptionist. There also is a large conference room in the office.

[4]This call was three (3) days before the February 29, 2008 forthwith subpoena (TR. pp. 51-52).

[5]The February 26, 2008 subpoena was not even moved into evidence.

which states in pertinent part: "A person commits an offense if, with intent to hinder apprehension, prosecution, conviction or punishment of another for crime . . . (3) conceals or destroys evidence of the crime . . . "

The Information here charges that defendant Zimmerman violated this statute by hindering prosecution, by having boxes moved or hidden from discovery by the grand jury. It is abundantly clear from the context of this case that no "prosecution" was hindered. The language of the statute must be given its plain meaning - prosecution means prosecution - not a grand jury investigation. Clearly, the statute at issue does not contemplate hindering a grand jury investigation, only apprehension, prosecution, conviction or punishment. To complete the analysis, the hindering of prosecution must be "of another" (presumably an identifiable person) for crime. Again, that is not this case. The Information falls short both factually and legally respecting § 5105.

The Information also charges a violation of 18 Pa. C.S.A. § 5101 in that defendant, "intentionally obstructed, impaired or perverted the administration of law," again by having boxes moved or otherwise hidden from discovery by the grand jury. The Information does not state an offense under § 5101. In order to obstruct, impair or pervert the administration of law it must be accomplished via "force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act . . . " Without any factual knowledge of the existence of a grand jury investigation or the issuance of a subpoena, the simple movement of boxes (assuming arguendo that defendant knew the boxes were moved) does not violate this section. It too falls short both factually and legally.

6

II.    MOTION FOR SEVERANCE

1.    Defendant Zimmerman is charged in 4 counts only with Hindering Prosecution (Count 1), Obstructing Administration of Law (Count 2), and Conspiracy to commit both offenses (Counts 3-4).

2.    The Commonwealth has filed a Notice of Joinder - Trial of Separate Informations pursuant to Rule 582 (B)(1), Pennsylvania Rules of Criminal Procedure, noticing its intent to try together 10 defendants named in 10 separate informations.  A copy of the Notice is attached hereto as exhibit B.

3.    A joinder of defendants and informations here violates the provisions of Rule 582 (A)(1) and (2).

4.    The Court should deny the Commonwealth"s request for joinder or in the alternative order separate trials of defendants/offenses pursuant to Rule 583, Pennsylvania Rules of Criminal Procedure.

A.  Argument:

5.    Rule 582 provides in pertinent part:

> (A) Standards
> (1) Offenses charged in separate indictments or informations may be tried together if:
>     (a)  The evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
>     (b)  The offenses charged are based on the same act or transaction.
> (2)  Defendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or

7

transactions constituting an offense or offenses.

6.    A simple review of the other nine (9) Informations charging the remaining

defendants reveals a joinder here clearly violates both subsections 1 and 2 of Rule 582.

7.    The other Informations charge the various defendants (excluding defendant

Zimmerman) with multiple offenses involving conflict of interest, theft and conspiracy to violate

those offenses.  Defendant Zimmerman is not charged with those offenses.  For example,

defendants Jill Seaman and Samuel Stokes are charged with seven (7) counts of Conflict of

Interest and thirty-five (35) counts of Theft/Conspiracy; Paul Towhey is charged with four (4)

counts of Conflict of Interest, twenty (20) counts of Theft/Conspiracy and two (2) counts of

Hindering Prosecution and Obstruction.  Defendant Brett Feese is charged with nine (9) counts of

Conflict of Interest, thirty-six (36) Theft counts, two (2) counts of Hindering Prosecution and two

(2) counts of Obstruction.  Defendant Brian Preski is charged with seventy two (72) counts of

Conflict of Interest, Theft and Conspiracy.  It is believed that defendant Perzel, and the others

face charges similar to those of defendants Seaman, Stokes, Feese and Preski.  Defendant

Zimmerman stands alone, in that he is the only defendant charged only with Hindering

Prosecution and Obstruction.

8.    Evidence of conflict of interest and theft violations by other defendants would not be

admissible at a separate trial of defendant Zimmerman.  See Rule 582 (1)(a).

9.    The offenses charged generally are not at all based on the "same act or transaction."

See Rule 582 (1)(b).

10.    All 10 defendants charged are not "alleged to have participated in the same act or

transaction or in the same series of acts or transactions constituting an offense or offenses." id. at (2).

11.    Rule 583 Pennsylvania Rules of Criminal Procedure permits the Court to order separate trials of defendants or offenses, "if it appears that any party may be prejudiced. . ."

12.    A joinder here of defendants and offenses for trial would most certainly prejudice defendant John Zimmerman.

Wherefore, defendant prays an appropriate Order be entered.

Respectfully submitted,

Thomas A. Bergstrom, Esq.
138 Davis Road
Malvern, PA 19355
(610)251-9260
Atty.ID 21131

Dated: July 21, 2010

9

COMMONWEALTH OF PENNSYLVANIA   :   IN THE COURT OF COMMON
                                           :   PLEAS OF DAUPHIN COUNTY,
                                           :   PENNSYLVANIA
        v.                            :   CRIMINAL DIVISION
                                           :
                                         :   NO.    CP-22-CR-0002524-2010
JOHN R. ZIMMERMAN,            :   OTN:   K788095-0
               DEFENDANT.    :

## INFORMATION

The Attorney General of the Commonwealth of Pennsylvania, by and through this Information, hereby charges that on or about the dates listed below in the location or locations in the Commonwealth of Pennsylvania listed below, John R. Zimmerman (referred to in this information as Defendant), did commit the following offenses:

**COUNT 1: HINDERING APPREHENSION OR PROSECUTION**
       **(18 Pa.C.S. § 5105 – (Felony of the third degree))**
       **MAXIMUM SENTENCE:  7 YEARS INCARCERATION, $15,000 FINE.**
    A person commits an offense if, with intent to hinder the apprehension, prosecution, conviction or punishment of another for crime he provides or aids in other means of avoiding apprehension or conceals or destroys evidence of the crime, or tampers with a witness, informant, document or other source of information, regardless of its admissibility in evidence or warns the other of impending discovery or provides false information to a law enforcement officer.

    TO WIT:
    On or about diverse dates between February 25-29, 2008, in Dauphin County, Pennsylvania, the above named defendant, while employed by the Commonwealth of Pennsylvania, intentionally hindered prosecution by concealing or destroying evidence of a crime by participating in a scheme to have boxes which were the subject of at least one statewide investigating grand jury subpoena moved from their original location to his Speaker Emeritus office area in the State Capitol, then moved to the House Republican Campaign Committee offices or otherwise hidden from discovery by the grand jury, thereby committing the offense of Hindering apprehension or prosecution.

**COUNT 2:  OBSTRUCTING ADMINISTRATION OF LAW OR OTHER**
          **GOVERNMENTAL FUNCTION**
          **(18 Pa.C.S. § 5101 – (Misdemeanor of the second degree))**
          **MAXIMUM SENTENCE:  2 YEARS INCARCERATION, $5,000 FINE.**
    A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

1

*Exhibit A*

TO WIT:

On or about diverse dates between February 25-29, 2008, in Dauphin County, Pennsylvania, the above named defendant, while employed by the Commonwealth of Pennsylvania, intentionally obstructed, impaired or perverted the administration of law by participating in a scheme to have boxes which were the subject of at least one statewide investigating grand jury subpoena moved from their original location to his Speaker Emeritus office area in the State Capitol, then moved to the House Republican Campaign Committee offices or otherwise hidden from discovery by the grand jury, thereby committing the offense of Obstructing administration of law or other governmental function.

## COUNT 3: CRIMINAL CONSPIRACY (HINDERING APPREHENSION OR PROSECUTION)
### (18 Pa.C.S. § 903 – (Felony of the third degree))
### MAXIMUM SENTENCE: 7 YEARS INCARCERATION, $15,000 FINE.

A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime or agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime, and at least one person commits an overt act in furtherance of the conspiracy.

TO WIT:  On or about diverse dates between February 25-29, 2008, in Dauphin County, Pennsylvania, the above named defendant agreed with Brett O. Feese and/or John M. Perzel and/or Paul E. Towhey and/or other individuals to intentionally hinder prosecution by concealing or destroying evidence of a crime by participating in a scheme to have boxes which were the subject of at least one statewide investigating grand jury subpoena moved from their original location to his Speaker Emeritus office area in the State Capitol, then moved to the House Republican Campaign Committee offices or otherwise hidden from discovery by the grand jury, thereby committing the offense of Criminal conspiracy.

## COUNT 4: CRIMINAL CONSPIRACY (OBSTRUCING ADMINISTRATION OF LAW OR OTHER GOVERNMENTAL FUNCTION)
### (18 Pa.C.S. § 903 – (Misdemeanor of the second degree))
### MAXIMUM SENTENCE: 2 YEARS INCARCERATION, $5,000 FINE.

A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime or agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime, and at least one person commits an overt act in furtherance of the conspiracy.

TO WIT:  On or about diverse dates between February 25-29, 2008, in Dauphin County, Pennsylvania, the above named defendant agreed with Brett O. Feese and/or John M. Perzel and/or Paul E. Towhey and/or other individuals to intentionally obstruct the administration of law by concealing or destroying evidence of a crime by participating in a scheme to have boxes which were the subject of at least one statewide investigating grand

jury subpoena moved from their original location to his Speaker Emeritus office area in the State Capitol, then moved to the House Republican Campaign Committee offices or otherwise hidden from discovery by the grand jury, thereby committing the offense of Criminal conspiracy.

All of which is against the Act of Assembly and the peace and dignity of the Commonwealth of Pennsylvania.

THOMAS W. CORBETT, JR.
Attorney General

By:   *[signature]*

**RICHARD A. SHEETZ, JR.**
Executive Deputy Attorney General
Criminal Law Division

*pL ,*

# IN THE COURT OF COMMON PLEAS OF DAUPHIN COUNTY, PENNSYLVANIA
## C R I M I N A L

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | |
| | : | |
| vs. | : | No. CP-22-CR-0002524-2010 |
| | : | |
| JOHN R. ZIMMERMAN | : | |

## NOTICE OF JOINDER – TRIAL OF SEPARATE INFORMATIONS

The Commonwealth of Pennsylvania, through the Pennsylvania Office of Attorney General (Criminal Prosecutions Section), hereby gives notice pursuant to Rule 582(B)(1) of the Pennsylvania Rules of Criminal Procedure of its intent to try together the following informations and defendants:

| | |
|---|---|
| Elmer L. "Al" Bowman | No. CP-22-CR-00002590-2010 |
| Brett O. Feese | No. CP-22-CR-00002585-2010 |
| Donald H. McClintock | No. CP-22-CR-00002587-2010 |
| John M. Perzel | No. CP-22-CR-00002589-2010 |
| Brian J. Preski | No. CP-22-CR-00002583-2010 |
| Eric S. Ruth | No. CP-22-CR-00002591-2010 |
| Jill A. Seaman | No. CP-22-CR-00002586-2010 |
| Samuel C. "Buzz" Stokes | No. CP-22-CR-00002584-2010 |
| Paul E. Towhey | No. CP-22-CR-00002588-2010 |
| John R. Zimmerman | No. CP-22-CR-00002524-2010 |

Respectfully submitted,
OFFICE OF ATTORNEY GENERAL

DATE: June 28, 2010

**K. KENNETH BROWN, II**
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
Criminal Law Division
Criminal Prosecutions Section
16th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-6346; (717) 705-7246 (fax)
Pa. Supreme Ct. I.D. #77042

*Exhibit B*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served on the persons listed below on the date indicated by first class mail.

Frank G. Fina, Esq.
Chief Deputy Attorney General
Office of Attorney General
Strawberry Square, 16th Floor
Harrisburg, PA 17120

K. Kenneth Brown, II, Esq.
Senior Deputy Attorney General
Office of Attorney General
Strawberry Square, 16th Floor
Harrisburg, PA 17120

Joshua D. Lock,. Esq.
Goldberg, Katzman, P.C.
320 Market Street, Box 1268
Harrisburg, PA 17108-1268

Brian J. McMonagle, Esq.
McMonagle, Perr, McHugh & Mischak
30 South 15th Street, Suite 701
Philadelphia, PA 19102

William J. Winning, Esq.
Cozen O'Connor
200 Four Falls Corporate Center, Suite 400
West Conshohocken, PA 19482-2958

Robert Donatoni, Esq.
Donatoni & Noone
200 North High Street, Suite 301
West Chester, PA 19380

Scot Sigman, Esq.
Sigman & Rochlin, LLC
1515 Market Street, Suite 1410
Philadelphia, PA 19102

Evan Kelly, Esq.
Goldberg, Meanix & Muth
213 West Miner Street
West Chester, PA 19382

Timothy Woodward, Esq.
The Palladian
509 Swede Street
Norristown, PA 19401

William A. Fetterhoff, Esq.
Fetterhoff and Zilli
218 Pine Street
Harrisburg, PA 17101

Thomas A. Bergstrom, Esq.
138 Davis Road
Malvern, PA 19355
Phone: (610) 251 - 9260
Fax: (610) 251 - 9630

Dated: July 21, 2010

11

# ATTACHMENT C

**RECEIVED**

MAR 2 5 2011

**Office of Attorney General**
Prosecutions Section - Hbg.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE COURT OF COMMON PLEAS |
| | : | DAUPHIN COUNTY, PENNSYLVANIA |
| | : | |
| VS. | : | |
| | : | |
| | : | |
| JOHN R. ZIMMERMAN | : | NO. 2524 CR 2010 |
| BRIAN J. PRESKI | : | NO. 2583 CR 2010 |
| SAMUEL C. "BUZZ" STOKES | : | NO. 2584 CR 2010 |
| BRETT O. FEESE | : | NO. 2585 CR 2010 |
| JILL A. SEAMAN | : | NO. 2586 CR 2010 |
| PAUL E. TOWHEY | : | NO. 2588 CR 2010 |
| JOHN M. PERZEL | : | NO. 2589 CR 2010 |
| ELMER L. "AL" BOWMAN | : | NO. 2590 CR 2010 |
| ERIC S. RUTH | : | NO. 2591 CR 2010 |

## ORDER

AND NOW, this 23rd day of March, 2011, following review of the Omnibus Pre-trial Motions filed by the above captioned defendants, together with the various memoranda filed by counsel for the defendants; and following review of the responses of the Commonwealth to said motions, as well as a review of the notes of testimony of the preliminary hearing held before Magisterial District Judge William Wenner; and following extensive argument on said motions, IT IS HEREBY ORDERED as follows:

1

## Commonwealth v. John R. Zimmerman
## 2524 CR 2010

The Petition for Writ of Habeas Corpus (styled as a Motion To Quash) filed on behalf of Defendant Zimmerman is hereby DENIED.

Defendant's Motion For Severance requesting a separate trial of defendants/offenses pertaining to charges of Hindering Apprehension, Obstructing Administration of Law and Criminal Conspiracy is GRANTED.

## Commonwealth v. Brian Preski
## 2584 CR 2010

The Petition for Writ of Habeas Corpus filed by Defendant Preski is hereby DENIED.  From a review of the transcript of the preliminary hearing before Magisterial District Judge William Wenner, this court is satisfied that the Commonwealth established a prima facie case.

Defendant Preski's Motion to Quash All Conspiracy Counts is DENIED.

All other motions joined in by this defendant are hereby DENIED.

## Commonwealth v. Samuel C. Stokes, Jr.
## 2584 CR 2010

The Petition for Writ of Habeas Corpus filed by Defendant Stokes is hereby DENIED.  Following a review of the transcript of the preliminary hearing before

Magisterial District Judge William Wenner, this court is satisfied that the Commonwealth established a prima facie case.

Defendant Stokes' Motion to Dismiss Counts 36 Through 42 Inclusive or In The Alternative, To Order The Prosecution To Elect One Count Of Conspiracy Among The Various Counts Charged is hereby DENIED.

Defendant's Motion to Dismiss involving various theft counts as well as counts alleging a conspiracy to violate 18 Pa.C.S.A. §§ 3921(a) and 3922(a)(1) is DENIED.

All other motions joined in by this defendant are DENIED.

### Commonwealth v. Brett Feese
### 2585 CR 2010

The Petition for Writ of Habeas Corpus Counts 9, 18, 27, 36, 45 and 56, is hereby DENIED. This Court is satisfied following a review of the preliminary hearing transcript that the Commonwealth made out a prima facie case as to these charges. Additionally, the Motion To Dismiss and the Motion In Limine with respect to these counts are also DENIED.

The Petition for Writ of Habeas Corpus Counts 46, 47, 57, and 58 is hereby GRANTED. Following a reading of the transcript of the preliminary hearing, this Court finds that a prima facie case was not established as to Counts 46, 47, 57, and 58.

3

Based on this court's ruling on the Habeas Corpus petition with respect to Counts 46, 47, 57, and 58, it is not necessary to rule on the Motion to Dismiss (DeMinimus) and the Motion in Limine with respect to these counts.

All other motions filed or joined in by this defendant are hereby DENIED.

## Commonwealth v. Jill A. Seaman
## 2586 CR 2010

The Motion for Severance filed by Defendant Seaman is DENIED.

The Motion To Dismiss Conspiracy Counts Or To Require Election Of A Single Conspiracy Count is DENIED.

The Motion To Dismiss Conflict Of Interest Counts For Vagueness is DENIED.

The Motion In Limine To Exclude Evidence Of De Minimus Infractions is DENIED.

The Motion In Limine To Exclude Evidence That Non-Legislative Activities Occurred During A Prosecution Defined "Normal Workday" is DENIED.

The Motion To Dismiss Certain Theft Counts is DENIED.

All other Motions joined in by this Defendant are DENIED.

4

### Commonwealth v. Paul E. Towhey, Jr.
### 2588 CR 2010

The Motion To Dismiss Or Petition For Writ Of Habeas Corpus filed on behalf of Defendant Towhey is hereby DENIED.

All other motions joined in by this defendant are hereby DENIED, except with respect to the Motion For Severance filed on behalf of John R. Zimmerman requesting severance of defendants/offenses pertaining to certain charges of Obstructing Administration of Law, Criminal Conspiracy and Hindering Apprehension. Accordingly, based on Defendant Towhey's Motion To Adopt And Join In Motions Of All Co-Defendants, Counts 21, 22, 27, 28 of Defendant Towhey's information are hereby severed to be consolidated with the counts charging Defendant Bowman with the same offenses.

### Commonwealth v. John M. Perzel
### 2589 CR 2010

The Petition For Writ of Habeas Corpus filed by Defendant Perzel is GRANTED in part and DENIED in part.

Following a review of the notes of testimony from the preliminary hearing before Magisterial District Judge William Wenner, this court finds that a prima facie case was not presented with respect to Counts 81 (Conspiracy/Hindering Apprehension) and

5

82 (Conspiracy/Obstructing Administration of Law), and as such the Petition For Writ of Habeas Corpus is GRANTED as to Counts 81 and 82 only.

With respect to Counts 1 through 80, the Petition For Writ of Habeas Corpus is hereby DENIED.

All other motions joined in by this defendant are hereby DENIED.

### Commonwealth v. Elmer Leroy Bowman
### 2590 CR 2010

Any and all motions joined in by this defendant are hereby DENIED.

### Commonwealth v. Eric S. Ruth
### 2591 CR 2010

The Defendant's Motion For Writ Of Habeas Corpus and Motion To Dismiss Charges Of Conflict Of Interest, Theft, Theft Of Services, Theft By Deception, Theft By Failure To Make Required Disposition Of Funds Received and Criminal Conspiracy are hereby DENIED.

All other motions joined in by this defendant are hereby DENIED.

*********************************************************************

Certain motions filed on behalf of one or more of the defendants captioned above have already been addressed by this court. To the extent that prior rulings may not have been directed to all defendants, this court rules as follows:

6

The Motion To Dismiss Conflict Of Interest Counts As Void For Vagueness, and joined in by all defendants, is DENIED.

The Motion To Dismiss Conspiracy Counts Or To Require Election Of A Single Conspiracy Count, and joined in by all Defendants, is hereby DENIED.

The Motion To Dismiss relative to certain theft counts (Theft of Services, Theft by Deception, Theft by Unlawful Taking) as inapposite to charged misconduct (statutory offenses excludes Commonwealth as victim) and joined in by all defendants is DENIED.

The Motion In Limine To Exclude Evidence That Non-Legislative Activities Occurred During Prosecution Defined "Normal Work Day" As A Violation Of Separation Of Powers Doctri9ne, and joined in by all defendants, is hereby DENIED.

The Motion To Dismiss The Information, Disqualify Office Of Attorney General, Appoint A Special Prosecutor And Stay All Proceedings is hereby DENIED.

_____
Richard A. Lewis, Judge

2011 MAR 23  PM 4: 04
DAUPHIN CO.
PENNA
RECEIVED OFFICE OF CLERK OF COURTS

Distribution:

Frank G. Fina, Esq., Chief Deputy Attorney General, Office of Attorney General, Strawberry Square, 16th Floor, Hbg., PA 17120

K. Kenneth Brown, II, Esq., Senior Deputy Attorney General, Office of Attorney General, Strawberry Square, 16th Floor, Hbg., PA 17120

Christopher D. Carusone, Esq., Chief Deputy Attorney General, Office of Attorney General, Strawberry Square, 16th Floor, Hbg., PA 17120

Patrick Blessington, Esq., Senior Deputy Attorney General, Office of Attorney General, 1000 Madison Avenue, Norristown, PA 19403

Donna J. McClelland, Esq., 329 W. Otterman Rd., Greensburg, PA 15601-2978; (412) 391-7343; mcclellandlaw@comcast.net

Joshua D. Lock, Esq., GOLDBERG KATZMAN, P.C., 320 Market St., P.O. Box 1268, Harrisburg, PA, 17108-1268; (717) 234-4161; jdl@goldbergkatzman.com; jdw@goldbergkatzman.com

Brian J. McMonagle, Esq., McMONAGLE, PERRI, McHUGH & MISCHAK, P.C., 30 S. 15th St., Ste 701, Philadelphia, PA 19102; (215) 981-0999; bmcmonagle@mpmpc.com

Fortunato N. Perri, Esq., McMONAGLE, PERRI, McHUGH & MISCHAK, P.C., 30 S. 15th St., Ste 701, Philadelphia, PA 19102; (215) 981-0999; fperri@mpmpc.com

Willam J. Winning, Esq., COZEN O'CONNOR, 200 Four Falls Corporate Ctr. # 400, West Conshohocken, PA 19482-2958; (610) 832-7463; wwinning@cozen.com

Megan Scheib, Esq., COZEN O'CONNOR, 1900 Market Street, Philadelphia, PA 19382, (215) 665-5592; mscheib@cozen.com

Evan Kelly, Esq., 215-215 West Miner St., Westchester, PA 19382; (610) 436-6220; ekelly@mmlaw.net

William Fetterhof, Esq., FETTERHOFF & ZILLI, 218 Pine St., Harrisburg, PA 17101; (717) 232-7722; (717) 233-4965 (fax); wfetterhoff@live.com

Robert Donatoni, Esq., 200 N. High St., Ste. 301, Westchester, PA 19380; (610) 719-0500; donatoni111@aol.com

Timothy Woodward, Esq., 509 Swede St., Norristown, PA 19401; (610) 279-1101; tw@timwoodwardlaw.com

Thomas A. Bergstrom, Esq., 138 David Rd., Mavern, PA 19355; (610) 251-9260; (610) 251-9630 (fax); tabergstrom1@verizon.net; tabergstrom@verizon.net