Westlaw

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Edward BENKOSKI and Theodore Carl, Plaintiffs,
v.
Bonnie WASILEWSKI, Clerk, Pennsylvania State
Police and Member, Bear Creek Township Board of
Supervisors, in her official and individual
capacities, et al., Defendants.

Civil Action No. 3:07-CV-0197.

Sept. 7, 2007.

Ralph E. Kates, III, Wilkes-Barre, PA, for
Plaintiffs.

Angela Januski, Cynthia E. Banks, Robin B. Snyder
, Marshall Dennehey Warner Coleman & Goggin,
Scranton, PA, Amy C. Foerster, Pennsylvania
Office of Attorney General, Harrisburg, PA, for
Defendants.

***MEMORANDUM***
A. RICHARD CAPUTO, United States District
Judge.

*1 Presently before the Court are three (3)
separate motions to dismiss Plaintiffs Edward
Benkoski and Theodore Carl's Amended Complaint
(Doc. 14), filed by Defendants Bonnie Wasilewski
and Paulette Yenchik (Doc. 17), Jerry Butala and
Jerry Kincel (Doc. 18), and Francis J. Hacken (Doc.
33). Because the Younger Doctrine does not apply;
Defendants Butala, Kinel, and Hacken are entitled
to sovereign immunity from state law claims only
to the extent they were sued in their official
capacities; Defendants Wasilewski and Yenchik are
not immune under the Tort Claims Act; Defendant
Yenchik is entitled to qualified immunity from
Plaintiffs' federal claims but Defendant Wasilewski
is not; Plaintiffs have stated claims upon which
relief can be granted for all counts except (a) the
First Amendment claim against Defendant Yenchik,

(b) the Fourteenth Amendment claim against all
Defendants, and (c) the claims for monetary
damages under the Pennsylvania Constitution; and
punitive damages under federal and state law are
not foreclosed, the Court will grant these motions
in part and deny them in part. The Court has
jurisdiction over this matter pursuant to 28 U.S.C.
§§ 1331 and 1367.

**BACKGROUND**
On April 2, 2007, Plaintiffs filed their
Amended Complaint. (Doc. 14.) Therein, they
allege as follows. In October of 2005, Plaintiff Carl
organized a local political watchdog organization in
Bear Creek Township known as the Residents of
Bear Creek Township for Good Government and
was later appointed auditor of the township. (Am.
Compl., Doc. 14 ¶¶ 12-13.) The newly elected Bear
Creek Township Board of Supervisors then chose
Defendant Wasilewski as chairperson and
Defendant Yenchik as secretary/treasurer and
administrative assistant. (*Id.* ¶ 14.)

In January through March of 2006, Plaintiffs
Carl and Benkoski requested that Defendant
Wasilewski provide copies of receipts,
disbursements, and employee time cards for the
township, along with information on the positions
the Supervisors were performing as paid township
employees. (*Id.* ¶¶ 15-17.) Defendant Wasilewski
refused to provide these records. (*Id.*)

In May of 2006, after Plaintiff Benkoski filed a
civil action in the Luzerne County Court of
Common Pleas to compel production of the records,
Defendant Wasilewski and Bear Creek Township
agreed to make the requested records available by
June 15, 2006. (*Id.* ¶¶ 18-19.) On June 16, 2006,
Plaintiffs went to the Bear Creek Township
municipal building to review records, which were
not provided, and Plaintiff Carl openly and without
objection started a tape recorder to document the
discovery process. (*Id.* ¶ 19.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

Later that week, the county court ordered that the Defendants make the requested documents available to Plaintiffs by June 30, 2006. (*Id.* ¶¶ 20-21.) On June 30, 2006, Plaintiffs returned to the municipal building and again, Plaintiff Carl openly and without objection started a tape recorder to make a record of the events that day. (*Id.* ¶¶ 22-23.) Defendant Yenchik refused to release the records absent Defendant Wasilewski's authorization, and Defendant Wasilewski did not provide authorization. (*Id.* ¶ 22.)

**\*2** In July of 2006, the Residents of Bear Creek Township for Good Government published a newsletter in which Defendant Wasilewski was accused of issuing payments without proper verification, including payments to herself, as well as refusing to provide access to public records. (*Id.* ¶ 24.) On July 20, 2006, Plaintiffs instituted a petition, opposed by Defendant Wasilewski, to increase the size of the Board of Supervisors from three (3) to five (5) members. (*Id.* ¶¶ 25-26.) The next day, Plaintiff Benkoski filed a contempt petition against Defendant Wasilewski in the county court based on her failure to provide the requested public records. (*Id .* ¶ 27.) Also, on July 24, 2006, Plaintiff Carl sent a letter to the Pennsylvania Ethics Commission requesting a ruling as to the propriety of Defendant Wasilewski's conduct. (*Id.* ¶ 28.)

Beginning on June 16, 2006, Defendants Wasilewski and Yenchik initiated a plan to file a false criminal complaint against Plaintiffs. (*Id.* ¶ 29.) This plan was discussed with Defendant Hacken, who agreed to meet with and direct Defendants Butala and Kincel to assist in investigating Plaintiffs even though Defendants knew that Plaintiffs had not committed a crime. (*Id.* )

In the third week of July of 2006, Defendant Butala telephoned Plaintiff Carl's home, spoke with his wife, and asked her if Plaintiff Carl was a friend of Plaintiff Benkoski (*Id.* ¶ 32.) Defendant Butala also stated that he wanted to interview Plaintiff Carl

about an incident that occurred at the municipal building on June 16, 2006. (*Id.*) On July 29, 2006, Defendants Butala and Kincel went to Plaintiff Carl's home, read him his Miranda rights, and questioned him regarding his open and unobjected to tape recordings of his effort to obtain public records on June 16 and June 30 of 2006. (*Id.* ¶ 33.)

On August 11, 2006, Defendant Butala went to Plaintiff Benkoski's home, read him his Miranda rights, and questioned him regarding the open and unobjected to tape recordings made on June 16 and June 30 of 2006. (*Id.* ¶ 34.) Defendant Butala informed Plaintiff Benkoski that he and Plaintiff Carl were being investigated for a felony and that the investigation was being conducted at the behest of Defendant Wasilewski. (*Id.* ¶¶ 35-36.) Defendant Butala stated that Plaintiff Benkoski was not under arrest at that time, but that Butala was proceeding immediately to the Luzerne County District Attorney's Office to discuss a possible felony prosecution. (*Id.* ¶ 36-37.)

Defendants never consulted with the Luzerne County District Attorney's Office regarding the possible prosecution of Plaintiffs. (*Id.* ¶ 39.) Defendants never even intended to do so. (*Id.* ¶ 40.) All of Defendants' actions were taken with the knowledge that no crime was committed by Plaintiffs. (*Id.* ¶ 38.)

As a result of the investigation conducted by Defendants, Plaintiffs were required to retain criminal defense counsel. (*Id.* ¶ 41.) When their counsel contacted Defendant Kincel concerning the investigation, Kincel stated that no felony charges would be filed against Plaintiffs so long as they "ma[d]e nice" with Defendant Wasilewski. (*Id.* ¶ 42.)

**\*3** Plaintiffs desire to continue to engage in political activity to achieve a fiscally sound Bear Creek Township government and a responsible Board of Supervisors. (*Id.* ¶ 44.) Defendants, however, have retained the option of instituting false felony charges against Plaintiffs if they do not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

cease their political opposition to Defendant Wasilewski. (*Id.* ¶ 43.)

On November 7, 2006, the voters of Bear Creek Township changed the municipal form of government from a three (3) person Board of Supervisors to a five (5) person Board. (*Id.* ¶ 45.) Plaintiff Benkoski, a former member of the Board of Supervisors, is a likely Democratic candidate for one of the newly created seats. (*Id.* ¶ 46.) Plaintiff Carl is a likely Republican candidate for one of the newly created seats. (*Id.* ¶ 47.) Plaintiffs fear being barred from serving on the Board of Supervisors, pursuant to the Pennsylvania Constitution, as a result of being convicted of the baseless felony charges with which they have been, and continue to be, threatened by Defendants. (*Id.* ¶¶ 48, 50.)

On November 20, 2006, an unidentified state trooper went to Plaintiff Carl's house and spoke with his wife, supposedly to investigate the activation of a burglar alarm, although no alarm had been activated. (*Id.* ¶ 49.)

Plaintiffs claim that their First and Fourteenth Amendment rights were violated and seek redress pursuant to 42 U.S.C. § 1983 (*Id.* ¶¶ 51-57.), the federal statute that provides a remedy for persons who have been deprived of their federal constitutional rights by a person acting under color of state law. Plaintiffs also allege that their rights to free speech, political association, and assembly under the Pennsylvania Constitution were violated. (*Id.* ¶¶ 58-59.) Finally, Plaintiffs assert that Defendants committed the state law tort of intrusion upon seclusion. (*Id.* ¶¶ 60-63.) Plaintiffs seek monetary and equitable relief.

On April 23, 2007, Defendants Wasilewski and Yenchik filed a Motion to Dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and on the grounds that Defendants Wasilewski and Yenchik are entitled to qualified immunity and governmental immunity, and that Plaintiffs' claims are barred by the *Younger* doctrine. (Mot. to Dismiss by Defs. Wasilewski &

Yenchik, Doc. 17.) On April 25, 2007, Defendants Butala and Kincel filed their motion to dismiss Plaintiffs' state law claims in Counts II and III pursuant to Rule 12(b)(1) on the grounds that they are barred by sovereign immunity, and to dismiss Counts I and III of Plaintiff's Amended Complaint pursuant to Rule 12(b)(6). (Mot. of Defs. Butala & Kincel to Dismiss Pls.' Am. Compl., Doc. 18.) Defendant Hacken filed a similar motion on May 18, 2007. (Mot. of Def. Hacken to Dismiss Pls.' Am. Compl., Doc. 33.) Defendants filed supporting briefs. (Docs.29, 34.) Plaintiffs filed briefs in opposition on May 17, 2007 (Doc. 32) and June 5, 2007 (Doc. 38). Defendants filed reply briefs on June 1, 2007 (Doc. 36) and June 22, 2007 (Doc. 41). As such, Defendants' motions are fully briefed and now ripe for disposition.

## LEGAL STANDARD

**\*4** Rule 12(b) (6) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Dismissal is appropriate only if, accepting as true all of the facts alleged in the complaint, Plaintiff has not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. ----, 127 S.Ct. 1955, 1960, 167 L.Ed.2d 929 (2007) (abrogating "no set of facts" language found in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). As a result of the *Twombly* holding, Plaintiffs must now nudge their claims "across the line from conceivable to plausible" to avoid dismissal thereof. *Id.* The Supreme Court noted just two weeks later in *Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam), that *Twombly* is not inconsistent with the language of Federal Rule of Civil Procedure 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Id.* (citing *Twombly,* 127 S.Ct. at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

1959 (quoting *Conley,* 355 U.S. at 47)).

There has been some recent guidance from the Courts of Appeals about the apparently conflicting signals of *Twombly* and *Erickson.* The Second Circuit Court of Appeals reasoned that "the [Supreme] Court is not requiring [in *Twombly* ] a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible." Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis in original). Similarly, the Seventh Circuit Court of Appeals stated that "[t]aking *Erickson* and *Twombly* together, we understand the Court to be saying only that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC,* ---F.3d ----, 2007 WL 2406859, at *4 (7th Cir. Aug.24, 2007).

Until further guidance, this Court will follow the guidance of the Second and Seventh Circuit Courts of Appeals, and apply a flexible "plausibility" standard, on a case-by-case basis, in those contexts in which it is deemed appropriate that the pleader be obliged to amplify a claim with sufficient factual allegations.

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994). The Court may also consider "undisputedly authentic" documents where the plaintiff's claims are based on the documents and the defendant has attached a copy of the document to the motion to dismiss. *Id.* The Court need not assume that the plaintiff can prove facts that were not alleged in the complaint, *see City of*

*Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir.1998), nor credit a complaint's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997).

**\*5** When considering a Rule 12(b)(6) motion, the Court's role is limited to determining whether the plaintiff is entitled to offer evidence in support of the claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court does not consider whether the plaintiff will ultimately prevail. *See id.* In order to survive a motion to dismiss, the plaintiff must set forth information from which each element of a claim may be inferred. *See Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim upon which relief can be granted. *See Gould Elecs. v. United States,* 220 F.3d 169, 178 (3d Cir.2000).

Unlike dismissal under Federal Rule of Civil Procedure Rule 12(b) (6), dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction is not a judgment on the merits of the plaintiff's case, but only a determination that the court lacks the authority to hear the case. *Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). A Rule 12(b)(1) motion may be treated either as a facial or a factual challenge to the court's subject matter jurisdiction. *Gould,* 220 F.3d at 178 (3d Cir.2000). If the motion is treated as a facial attack, the court may consider only the allegations contained in the complaint and the exhibits attached to the complaint, matters of public record such as court records, letter decisions of government agencies and published reports of administrative bodies, and "undisputably authentic" documents which the plaintiff has identified as a basis of his claims and which the defendant has attached as exhibits to his motion to dismiss. *See generally Pension Benefit Guar. Corp.,* 998 F.2d at 1196-97.

On the other hand, if the defendant submits and the court considers evidence that controverts the plaintiff's allegations, the court must treat the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

motion as a factual challenge under Rule 12(b) (1). *Gould,* 220 F.3d at 178. In such cases, "the trial court is free to weigh evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen,* 549 F.2d at 891. No presumption of truthfulness attaches to the allegations in the plaintiff's complaint, and the burden of proof is on the plaintiff to show that the court possesses jurisdiction. *Id.* However, the plaintiff must be permitted to respond to the defendant's evidence with evidence supporting jurisdiction. *Id.* In the present matter, Defendants have submitted no evidence controverting the allegations contained in Plaintiffs' Amended Complaint. Therefore, the Court will consider only the allegations in the Plaintiffs' Amended Complaint, treating the Defendants' motions to dismiss as a facial attack on subject matter jurisdiction pursuant to Rule 12(b) (1) to the extent that they raise the issue of sovereign immunity.

### DISCUSSION
### I. Younger and Rooker-Feldman Doctrines

Defendants Wasilewski and Yenchik contend, in their motion to dismiss, that Counts I and II are precluded by the *Rooker-Feldman* doctrine (Mot. to Dismiss by Defs. Wasilewski & Yenchik, Doc. 17 ¶ 12.), under which federal district courts lack subject matter jurisdiction to review the final decisions of state courts or constitutional claims that are "inextricably intertwined" with a state court's decision. *FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 840 (3d Cir.1996) (internal quotation marks omitted; replacement in original). The Defendants, however, did not include arguments about the applicability of the *Rooker-Feldman* doctrine in their briefs and did not identify any state court proceedings as inextricably intertwined with the instant case. The Court therefore will deny Defendants' motion to the extent it relies on this doctrine.

**\*6** The Defendants' brief does argue that, under the *Younger* doctrine, this Court should not exercise jurisdiction over Plaintiffs' claims, to avoid interfering with a pending state court proceeding. (Br. in Supp. of Mot. of Defs. Wasilewski & Yenchik to Dismiss Pls.' Am. Compl., Doc. 29, at 8-9.) Under the *Younger* doctrine, a district court may abstain from asserting jurisdiction if "(1) there [is] an ongoing state judicial proceeding to which the federal plaintiff is a party and with which the federal proceedings will interfere, (2) the state proceedings ... implicate important state interests, and (3) the state proceedings ... afford an adequate opportunity to raise the constitutional claims." *FOCUS,* 75 F.3d, at 843. Defendants aver that there are ongoing state court proceedings in this matter, while Plaintiffs assert that no such proceedings exist. The only state court proceedings of which this Court has been made aware are those in the Luzerne County Court of Common Pleas through which Plaintiff Benkoski sought to compel Defendant Wasilewski to produce public records. ( *See* Am. Compl., Doc. 14 ¶¶ 20-21, 27.) Though the existence of those proceedings is part of the factual basis for the complaint, their relevance to this case stops there. Because Defendants' briefs do not cite to any ongoing state court proceedings and present no arguments that any such proceedings meet the three requirements for a *Younger* abstention outlined above, the Court will not abstain from exercising jurisdiction.

### II. Sovereign Immunity for Defendants Butala, Kincel, and Hacken

Defendants Butala, Kincel, and Hacken, all employees of the Pennsylvania State Police who have been sued in their official and individual capacities, move to dismiss Counts II and III as to themselves for lack of subject matter jurisdiction on the ground that the claims are barred by sovereign immunity. (Br. in Supp. of Mot. of Defs. Butala, Kincel, & Hacken to Dismiss Pls.' Am. Compl., Doc. 34, at 10-11.)

Officials and employees of the Commonwealth of Pennsylvania acting in the scope of their duties are immune from all suits for state law claims, including state constitutional claims, except nine

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

categories of negligence actions for which the state has expressly waived sovereign immunity. 1 Pa. Cons.Stat. Ann. § 2310; 42 Pa. Cons.Stat. Ann. §§ 8521(b), 8522(b); *Marsh v. Ladd,* No. 03-5977, 2004 WL 2441088, at *8 (E.D.Pa. Oct.27, 2004); *Faust v. Dep't of Revenue,* 140 Pa.Cmwlth. 389, 592 A.2d 835, 839 (Pa.Commw.Ct.1991), *appeal denied,* 530 Pa. 647, 607 A.2d 257 (Pa.1992).

Plaintiffs do not dispute that none of the statutory exceptions apply to their claims, but they argue that their claims are not barred by sovereign immunity to the extent that they seek declaratory and injunctive relief. The applicability of sovereign immunity from Pennsylvania state law claims depends on the type of declaratory and injunctive relief sought. "Suits which seek to compel *affirmative action on the part of state officials* or to obtain money damages or to recover property from the Commonwealth are within the rule of immunity; suits which simply seek to restrain state officials from performing affirmative acts are not within the rule of immunity." *Fawber v. Cohen,* 516 A.2d 429, 433-34 (Pa.1987) (emphasis deleted). Plaintiffs' request that the Court enjoin Defendants from future actions that violate their speech, association, and civil rights; intrude upon their seclusion; or retaliate against them for exercise of their rights is the type of injunctive relief that seeks "to restrain state officials from performing affirmative acts," and does not fall within the rule of sovereign immunity. *See id.* at 433-34. Declaratory relief, which Plaintiffs also seek, is not considered to compel an affirmative act and does not fall within the rule of immunity. *Id* . at 434.

**\*7** With regard to Plaintiffs' request for damages, Defendants enjoy sovereign immunity from suit in their official capacities. But Plaintiffs argue that sovereign immunity is unavailable to Defendants, to the extent that they were sued in their individual capacities, because their alleged actions were not within the scope of their duties. For purposes of sovereign immunity in

Pennsylvania, conduct is within the scope of employment if and only if

> (a) it is of the kind [the state employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) if force is intentionally used by the servant against another, the use of force is not unexpected by the master.

*St. Germain v. Pa. Liquor Control Bd.,* No. CIV. A. 98-5437, 2000 WL 39065, at *3 (E.D.Pa. Jan.19, 2000). Plaintiffs argue that they have sufficiently alleged that the officers acted outside the scope of their duties, creating a factual question that renders dismissal on sovereign immunity inappropriate at this time. The Court agrees. Despite the factual nature of this inquiry, sovereign immunity has been granted to defendants when it was clear on the pleadings that no individual capacity claims could be raised. *See Stackhouse v. Pa. State Police,* 892 A.2d 54, 60 (Pa.Commw.Ct.2006) (holding that the factual allegations in the complaint, in which plaintiffs claimed a defendant's motivation was personal but alleged only a failure to exercise an *official* duty, belied the plaintiffs' claim that defendants were acting outside the scope of their employment). In this case, however, Plaintiffs allege that Defendants Hacken, Butala, and Kinel participated in a plan initiated by Defendants Wasilewski and Yenchik to "write a false criminal complaint against Ed Benkoski and Ted Carl" and to investigate Plaintiffs "even though all defendants knew that no crime had been committed." (Am. Compl., Doc 14 ¶¶ 29-31.) Plaintiffs also allege that Trooper Kincel told them no charges would be filed if they would "make nice" with Defendant Wasilewski. (*Id.* ¶ 43.) Viewing these allegations in the light most favorable to plaintiffs, it cannot be said that Defendants' actions fall entirely within the scope of their duties. *See, e.g., Robus v. Pa. Dep't of Corr.,* No. CIV. A. 04-2175, 2006 WL 2060615, at *8 (E.D.Pa. July 20, 2006) ("Because it can be

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

reasonably inferred from the amended complaint that personal concerns alone motivated Raymond Knauer's actions, the amended complaint adequately alleges that Raymond Knauer acted outside the scope of his duty.").

For the reasons set forth above, Defendant officers' motion to dismiss Counts II and III as to them on the ground of sovereign immunity will be denied, except that it will be granted to the extent that the Defendants were sued in their official capacities for damages.

### III. Governmental Immunity from State Law Claims for Defendants Wasilewski and Yenchik

**\*8** Defendants Wasilewski and Yenchik claim immunity from Plaintiffs' state law claim in Count III under Pennsylvania's Tort Claims Act, 42 Pa. Con. Stat. Ann. §§ 8541-42. This claim of immunity applies only to Count III, not to Count II, because the Act does not provide any immunity from claims based in the Pennsylvania Constitution. *Coffman v. Wilson Police Dep't,* 739 F.Supp. 257, 266 (E.D.Pa.1990). The Tort Claims Act provides immunity to municipalities and municipal employees sued in their official capacities. *Renk v. City of Pittsburgh,* 537 Pa. 68, 641 A.2d 289, 292 (Pa.1994). It does not, however, provide immunity to an employee who is sued for actions that are "crimes, actual fraud, actual malice, or willful misconduct." *Jones v. City of Philadelphia,* 73 Pa. D. & C. 246, 255 (Pa.Ct.Com.Pl. May 19, 2005). Plaintiffs have alleged that Defendants Wasilewski and Yenchik committed the tort of Intrusion on Seclusion by engaging in willful misconduct. (Am. Compl., Doc. 14 ¶¶ 29-30, 36, 38, 63.). Therefore, immunity under the Tort Claims Act is not applicable, and Defendants' motion to dismiss on the basis of governmental immunity will be denied.

### IV. Qualified Immunity for Defendants Wasilewski and Yenchik

In response to Plaintiffs' federal claims in Count I, Defendants Wasilewski and Yenchik assert the defense of qualified immunity. Qualified immunity involves a two-step inquiry. The Court

must first determine whether the Plaintiffs' factual allegations amount to a violation of a constitutional right. If they do, the Court must then determine whether the right was clearly established such that a reasonable official would have known the conduct was unlawful. *A.W. v. Jersey City Pub. Schs.,* 486 F.3d 791, 794 (3d Cir.2007).

### A. First Amendment Retaliation

### 1. Have Plaintiffs Alleged a Constitutional Violation?

"The First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out." *Hartman v. Moore,* 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). A First Amendment retaliation claim has three elements: (1) that plaintiff engaged in conduct or speech protected by the First Amendment; (2) that the government responded with retaliatory action sufficient to deter a person of ordinary firmness from exercising his First Amendment rights; and (3) that the protected activity caused the retaliation. *Thomas v. Independence Township,* 463 F.3d 285, 296 (3d Cir.2006).

For the purposes of this motion, Defendants do not dispute that Plaintiffs engaged in protected activity. (*See* Br. in Supp. of Mot. of Defs. Wasilewski & Yenchik to Dismiss Pls.' Am. Compl., Doc. 29, at 6.) Further, the Plaintiffs' complaint sufficiently alleges that their protected activity caused the alleged retaliation. (*See* Am. Compl., Doc. 14 ¶¶ 30, 32-34, 42.) The key question is whether the retaliatory actions that Defendants Wasilewski and Yenchik allegedly took were sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. Despite Defendants' contention that Plaintiffs were not deterred because they both intend to become candidates for Supervisor in upcoming elections (*see* Defs. Reply Br. in Supp. of Mot. to Dismiss, Doc. 36, at 6-7), guidance from other circuits clarifies that plaintiffs need not claim

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

that they were in fact deterred, but only that the Defendant's alleged actions "were capable of deterring a person of ordinary firmness." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro,* 477 F.3d 807, 821 (6th Cir.2007).

**\*9** A recent case from the Third Circuit Court of Appeals is on point. In *Thomas v. Independence Township,* a plaintiff successfully stated a claim for First Amendment retaliation when he alleged that, in response to his attempt to transfer a liquor license to his deli and his petitioning of the state court when his application was denied, the township and members of its board of supervisors "engaged in a campaign of harassment and intimidation" against him, including having police officers under their supervision enter the plaintiffs' business without probable cause, accusing one plaintiff of violating the law, misrepresenting the laws, conducting surveillance of plaintiffs and their business from across the street, conducting unlawful searches and seizures, and "threatening and/or causing unwarranted investigations of the Plaintiffs by other governmental agencies." 463 F.3d 285, 289-90, 296 (3d Cir.2006) (internal quotation marks omitted).

Additionally, Plaintiffs assert they have been subjected to the continuing threat of future false felony charges, and the Court of Appeals in this Circuit has recognized a pattern of threats and harassment as sufficient to state a claim for First Amendment retaliation. *See Suppan v. Dadonna,* 203 F.3d 228, 234-35 (3d Cir.2000).

(a) Defendant Wasilewski

The alleged actions of Defendant Wasilewski in this case are similar to the conduct at issue in *Thomas.* Defendant Wasilewski, a co-worker of the police defendants, is alleged to have pressured Defendant Lieutenant Hacken to assure that he and the other troopers pursued felony charges against the Plaintiffs, and Defendant Butala did indeed inform the Plaintiffs that they were being investigated for a felony. (Am. Compl., Doc 14 ¶¶ 35-36.) One important distinction is that

Defendants Wasilewski and Yenchik are not alleged to have direct supervisory authority over the Defendant troopers in this case, but the allegations of pressure from Defendant Wasilewski is consistent with an inference that she exerted some control over the troopers. The degree of control over the troopers actions presents a factual question.

Also similar to *Thomas* is the threat of unwarranted investigations. Here, pressure from Defendant Wasilewski is alleged to have caused the troopers to threaten, without basis or intent to follow through, to consult with the District Attorney concerning felony prosecution, and that pressure also allegedly caused the troopers to imply that no felony charges would be filed if the Plaintiffs "ma[d]e nice" with Defendant Wasilewski. (*Id.* ¶¶ 37-43.)

The occasional officer visits and phone calls to the Plaintiffs' homes in this case were perhaps less serious than the surveillance alleged in *Thomas,* and no unlawful searches or seizures are alleged here, but nonetheless, because "it is generally a question of fact whether a retaliatory campaign of harassment has reached the threshold of actionability under § 1983," *Suppan,* 203 F.3d at 233, and because the alleged conduct in this case is substantially similar to the allegations that were held to constitute a constitutional violation in *Thomas,* this Court concludes that Plaintiffs have alleged a constitutional violation by Defendant Wasilewski.

(b) Defendant Yenchik

**\*10** The only retaliatory conduct that Defendant Yenchik allegedly committed, on the other hand, is that she acted in collusion with the other defendants and that she and her direct supervisor Defendant Wasilewski initiated a plan to write a false criminal complaint against the Plaintiffs (Am. Compl., Doc. 14 ¶ 11, 29.) Plaintiffs do not allege that this complaint was ever written, or that prosecution was initiated; their claim rests on a retaliatory pattern of harassment and threats

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

which appear, from the complaint, to have been carried out by troopers at the behest of Defendant Wasilewski. Therefore, Plaintiffs have not alleged that Defendant Yenchik committed a constitutional violation, and qualified immunity will be granted as to her on the First Amendment claim in Count I.

**2. Were the Plaintiffs' Rights Clearly Established?**

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). There need not be precedent involving "the very act in question," but "in light of pre-existing law the unlawfulness must be apparent." *Id.* Rights can be clearly established by "cases of controlling authority in [this] jurisdiction at time of the incident[s]" or by "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne,* 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Although Defendants cite older caselaw to the contrary, it is now understood in this Circuit that "the burden of pleading qualified immunity rests with the defendant, not the plaintiff.... [A] plaintiff has no obligation to plead a violation of clearly established law in order to avoid dismissal on qualified immunity grounds." *Thomas,* 463 F.3d at 293.

The three-part test for First Amendment retaliation outside the public employment context is clearly established in this Circuit, as well as others. *E.g., id.* at 296; *see also, e.g., Ctr. for Bio-Ethical Reform,* 477 F.3d at 821 (Sixth Circuit case); *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir.2000). Defendant Wasilewski does not argue that it was not clearly established that the Plaintiffs' conduct was constitutionally protected activity, but does argue that even if her actions are found to be retaliatory, and "assuming the facts alleged by Plaintiffs are true, [she] would not have understood that [she was] violating Plaintiff's constitutional

rights by acting in conjunction with the Pennsylvania State Police regarding the felony investigation of Plaintiffs." (Br. in Supp. of Defs.' Wasilewski & Yenchik's Mot. to Dismiss, Doc. 29, at 10.) If the facts alleged by Plaintiffs are true, then Defendant Wasilewski retaliated against Plaintiffs *because* of their exercise of constitutional rights, (Am.Compl., Doc. 14, ¶ 30.), which is clearly established as the third element of a retaliation claim. *Cf. Ctr. for Bio-Ethical Reform,* 477 F.3d at 823 ("[A] reasonable officer, when faced with the circumstances of this case [in which the sufficiency of the deterrence was already established] would have known that detaining Plaintiffs *because* of their speech would violate their clearly established First Amendment rights.").

**\*11** Finally, it was clearly established at the time this case arose that Defendant Wasilewski's alleged conduct would deter a person of ordinary firmness from exercising constitutional rights. Although the factually similar *Thomas* case was not decided until after the actions giving rise to this complaint took place, other cases provide sufficient guidance. To begin, the Supreme Court has stated that "even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights" may be actionable retaliation. *Rutan v. Republican Party* 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). And the Third Circuit Court of Appeals recently stated that "[a] First Amendment retaliation claim will lie for any individual act which meets this 'deterrence threshold' and that threshold is very low: as we said in *Suppan,* a cause of action is supplied by all but truly de minimis violations." *O'Connor v. City of Newark,* 440 F.3d 125, 128 (3d Cir.2006).

The Third Circuit Court of Appeals did acknowledge that "[i]n *Suppan* [*v. Dadonna,* 203 F.3d 228 (3d Cir.2000) ] ... we gave little guidance as to what the threshold of actionability is in retaliatory harassment cases. Instead, we merely held that such a claim existed." *McKee v. Hart,* 436

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

F.3d 165, 172 (3d Cir.2006). And it has noted that there is a "dearth of precedent of sufficient specificity ... regarding [an individual's] First Amendment right to be free from retaliatory harassment." *McKee,* 436 F.3d at 173.

Nonetheless, guidance from other circuits clearly establishes that the police surveillance and threats of false felony charges that Plaintiffs allege were clearly established as sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. An oft-cited case from the Seventh Circuit held that an injury allegedly caused by retaliation "need not be great in order to be actionable" and held that an alleged "campaign of petty harassments" was sufficiently deterring to be actionable. *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982). Other cases suggest that the line between lawful and unlawful retaliation is the line between mere speech and conduct that goes a step further. For example, the Fourth Circuit Court of Appeals held that a claim for First Amendment retaliation does not exist when the "alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 687 (4th Cir.2000).

Additionally, Plaintiffs cite a case from the Eighth Circuit with facts quite similar to those alleged here. In *Garcia v. City of Trenton,* the Court of Appeals held that a jury could find that issuing two relatively inexpensive parking tickets, in a period of two months, to a plaintiff who had complained to city officials about bikers illegally riding on the sidewalk in front of her shop, was sufficient to deter a person of ordinary firmness from exercising her rights. 348 F.3d 726, 727-29 (8th Cir.2003). The court distinguished past cases, noting that in *Garcia,* "defendant's conduct went beyond mere speech, however offensive." *Id.* at 729. The defendants in *Garcia,* the mayor and chief of police, allegedly "engaged the punitive machinery of government in order to punish [the

plaintiff] for speaking out." *Id.* Defendant Wasilewski is alleged to have taken substantially similar action, and in light of clearly established precedent in the Third Circuit and others, she is not entitled to qualified immunity from the First Amendment claims in Count I.

**B. Fourteenth Amendment Claim**

**1. Have Plaintiffs Alleged a Constitutional Violation?**

**\*12** Plaintiffs' complaint and their brief in opposition to Defendants Wasilewski and Yenchik's motion to dismiss, the motion under which qualified immunity is raised, does not illuminate the reasoning that underlies their claim that their rights under the Fourteenth Amendment have been violated. In their response to Defendants Butala, Kinel, and Hacken's motion to dismiss, however, Plaintiffs allege a substantive due process violation, but they argue only that the police defendants have taken actions which "shock the conscience," and make no mention of Defendants Wasilewski or Yenchik. Therefore, Plaintiffs have failed to allege a Fourteenth Amendment violation against Defendants Wasilewski and Yenchik. These defendants are therefore entitled to qualified immunity from the Fourteenth Amendment claims in Count I.

**V. Federal Claims**

**A. First Amendment Retaliation**

No First Amendment retaliation claim remains against Defendant Yenchik. *See* Part IV(A)(1)(b), *supra.* And, as discussed above, Plaintiffs have stated a valid claim for First Amendment retaliation against Defendant Wasilewski. *See* Part IV(A)(1) (a), *supra.* Therefore, Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) will be denied as to Defendant Wasilewski.

The alleged conduct of Defendants Butala, Kincel, and Hacken, performed in collusion with

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

Defendant Wasilewski to retaliate against Plaintiffs for their exercise of protected First Amendment rights, meets the three-part test for a First Amendment retaliation claim. As they are alleged to have carried out the retaliatory actions and participated in the planning, their conduct is not separable from Defendant Wasilewski's for purposes of this motion. Their motion to dismiss Count I of the complaint pursuant to Federal Rule of Procedure 12(b)(6) will therefore be denied.

**B. Fourteenth Amendment**

Defendants Wasilewski and Yenchik were granted qualified immunity as to the Fourteenth Amendment claim of Count I because, in the first step of the qualified immunity analysis, Plaintiffs failed to state a claim that those defendants violated their Fourteenth Amendment rights. *See* Part IV(B), *supra.* Likewise, Plaintiffs have failed to state a claim that the other defendants violated their rights under the substantive component of the Due Process Clause of the Fourteenth Amendment. Plaintiffs argue that they have stated a valid claim because the Defendants engaged in a police effort to control the political life of a township; this conduct, the Plaintiffs aver, "is so fundamentally anti-democratic as to be breathtaking. It shocks the conscience." (Pls.' Br. in Opp'n to Mot. to Dismiss of Defs. Hacken, Butala & Kincel, Doc. 38, at 9.) The Plaintiffs' claims, however, are based on the Defendants' retaliation for the exercise of their First Amendment rights. As such, the "shocks the conscience" test does not apply.

"After the Supreme Court's decision in *Graham,* we held in a number of cases that the 'shocks the conscience' test applied *only* to claims that could not be traced to an explicit constitutional guarantee." *Bell v. Johnson,* 308 F.3d 594, 610 (6th Cir.2002) (holding the shocks the conscience test is the inappropriate standard for First Amendment retaliation claims). *Graham,* in which the Supreme Court held that claims for excessive force must be brought only under the Fourth Amendment, rather than under the "shocks the conscience" test, 490

U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), was based on "the idea that, where available, explicit constitutional guarantees ... offer a more concrete, and therefore superior, guide to judges than intuitive standards such as 'behavior that shocks the conscience.' " *Bradley v. City of Pontiac,* 906 F.2d 220, 226 (6th Cir.1990). Because the more concrete guide of First Amendment retaliation jurisprudence applies to Plaintiffs' claims, they have no separate claim under the Fourteenth Amendment. Defendant's motion to dismiss the Fourteenth Amendment claims under Count I will be granted.

**VI. State Claims**

**A. Pennsylvania Constitution**

**\*13** There is no private cause of action for damages arising from violations of the Pennsylvania Constitution. *See Jones v. City of Philadelphia,* 890 A.2d 1188, 1215-16 (Pa.Commw.Ct.2006) (discussing the lack of a cause of action for damages under the Pennsylvania Constitution and declining, "without the benefit of legislative action," to create such a cause of action for violations of the state constitution's prohibition against the use of excessive force). Therefore, Defendants' motions to dismiss Count II of the Plaintiffs' Amended Complaint pursuant to Federal Rule of Procedure 12(b)(6) will be granted to the extent that Plaintiffs seek monetary relief.

Although monetary relief is unavailable, "other remedies, such as declaratory or injunctive relief ... are ... remedies under the Pennsylvania Constitution." *Id.* at 1216. For example, in *Uniontown Newspapers, Inc. v. Roberts,* in which plaintiff newspaper sought declaratory relief, the Supreme Court of Pennsylvania held that allegations of "an improper act of retaliation against perceived critics and an attempt to chill the exercise of Plaintiff's rights under the First Amendment of the United States Constitution *and Article I, Section 7 of the Pennsylvania Constitution* ... aver a theory of law from which relief may be

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

granted" and that the lower court "erred by not considering [plaintiffs'] claims under Article I, § 7 of the Pennsylvania Constitution." 839 A.2d 185, 192-93 (Pa.2003) (emphasis added).

With regard to the remaining claims for declaratory and injunctive relief under Count II (*see* Am. Compl., Doc. 14 ¶ 59(A)-(C).), Defendants Butala, Kincel, and Hacken do not argue or aver that Plaintiffs failed to state a claim under the Pennsylvania Constitution. Although their motions themselves do not specify on which grounds they seek to dismiss which counts, (*see* Mot. of Defs. Butala & Kincel to Dismiss Pls.' Am. Compl., Doc 18, at 1; Mot. of Def. Hacken to Dismiss Pls.' Am. Compl., Doc. 33, at 1.), their briefs' only arguments in response to Count II are based on sovereign immunity. The Court will therefore not dismiss the claims in Count II against Defendants Butala, Kincel, and Hacken for declaratory and injunctive relief.

With regard to the remaining claims for declaratory and injunctive relief in Count II against Defendants Wasilewski and Yenchik, their motion and headings in their briefs aver that Plaintiffs failed to state a cause of action for violation of free speech, political association and assembly rights under the Pennsylvania Constitution. (Mot. of Defs. Wasilewski & Yenchik, Doc 17 ¶ 13; Br. in Supp. of Defs.' Wasilewski & Yenchik's Mot. to Dismiss Pls.' Am. Compl., Doc 29, at 3-4.) But their arguments are based only on the United States Constitution and make no mention to Pennsylvania constitutional law. (*See* Br. in Supp. of Defs.' Wasilewski & Yenchik's Mot. to Dismiss Pls.' Am. Compl., Doc 29, at 4-8.) Because they have presented no arguments that Plaintiffs failed to state a claim under the Pennsylvania Constitution, their motion to dismiss the remaining declaratory and injunctive relief claims in Count II pursuant to Federal Rule of Civil Procedure 12(b) (6) will be denied.

**B. Intrusion upon Seclusion**
*14 All Defendants move to dismiss Count III

of Plaintiffs' Amended Complaint, alleging the tort of Intrusion on Seclusion. The tort is committed when one "intentionally intrudes, physically or otherwise, on the solitude or seclusion of another person, or the person's private affairs or concerns ... [that] would be highly offensive to [a] reasonable person." *DeBlasio v. Pignoli,* 918 A.2d 822, 824-25 (Pa.Commw.Ct.2007) (quoting Pennsylvania jury instructions).

Pennsylvania applies the Restatement (Second) of Torts in Intrusion on Seclusion cases. *E.g., Harris by Harris v. Easton Publg. Co.,* 335 Pa.Super. 141, 483 A.2d 1377, 1383 (Pa.Super.Ct.1984). Under the Restatement, the act of intrusion, which can take the form of "physical intrusion, ... use of the defendant's senses ... to oversee or overhear the plaintiff's private affairs, ... or some other form of investigation or examination into plaintiff's private concerns." RESTATEMENT (SECOND) OF TORTS § 652B cmt. b. Plaintiffs have alleged that defendants, either personally or by conspiracy, twice entered their homes by false pretenses, sent market police cars and uniformed officers their homes, phoned Plaintiff Carl's home, and informed them they were being investigated. (Am. Compl., Doc. 14 ¶¶ 32-40, 49, 61.) Plaintiffs have alleged acts of intrusion into the privacy of their homes.

Defendants contend that the acts of intrusion in the Plaintiff's complaint could not be highly offensive to a reasonable person. (Reply Br. in Supp. of Mot. to Dismiss by Defs. Wasilewski & Yenchik, Doc 36, at 8-9; Br. in Supp. of Mot. of Defs. Butala, Kincel & Hacken to Dismiss Pls.' Am. Compl., Doc 34, at 11-12.) Indeed, comment (d) of the Restatement, which is not binding here but may provide guidance, provides that "there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff ... that his privacy

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

is invaded."

Plaintiffs contend, in response, that the intrusion alleged was "direct and personal" and more offensive and intrusive because it was carried out by police rather than private parties. (Pls.' Br. in Opp'n to Mot. to Dismiss of Defs. Hacken, Butala & Kincel, at 13.) They further allege in their Amended Complaint, that Defendants have indicated that, unless they cease their political opposition to Defendant Wasilewski, the felony investigation will continue. Although the requirement that alleged acts of intrusion would be highly offensive to a reasonable person presents a high bar, the law is not well developed enough in the factual scenario that Plaintiffs allege to conclude that a jury could not find that the alleged intrusion would be highly offensive to a reasonable person. Defendants' motions to dismiss this count therefore will be denied.

### VII. Punitive Damages

*15 Defendants Wasilewski and Yenchik move to dismiss Plaintiffs' request for punitive damages arising out of both their federal and state law claims. In suits brought pursuant to 42 U.S.C. § 1983, punitive damages may be recovered from individual officers but not from government entities, if the officers "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). As Defendants have all been sued in their individual capacities, not only their official capacities, and as Plaintiffs have alleged that Defendants engaged in intentional conduct, aimed at retaliating against Plaintiffs for their exercise of their federally protected rights, punitive damages are not inappropriate on the face of the Amended Complaint.

Regarding Plaintiffs' state law claims, under Pennsylvania law, "punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to

demonstrate willful, wanton, or reckless conduct." *Hutchison ex rel. Hutchison v. Luddy,* 582 Pa. 114, 870 A.2d 766, 770 (Pa.2005). In determining whether punitive damages are warranted in a particular case, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *Id.* As the Plaintiffs' state constitutional and tort claims are based on allegations of intentional conduct, punitive damages are likewise not inappropriate on the face of the Amended Complaint.

### CONCLUSION

For the reasons stated above, the Court will dismiss Plaintiffs' First Amendment retaliation claim against Defendant Yenchik, the Fourteenth Amendment claims against all Defendants, the state constitutional claims for damages against all Defendants, and the state law claims for damages against Defendants Butala, Kinel, and Hacken to the extent they were sued in their official capacities. The remaining claims in this case are (1) the First Amendment claim in Count I against Defendants Wasilewski, Butala, Kincel, and Hacken, in their official and individual capacities; (2) the state constitutional claims in Count II for declaratory and injunctive relief against all defendants, in their official and individual capacities; (3) the state tort claims for declaratory and injunctive relief in Count III against all Defendants, in their official and individual capacities; and (4) the state tort claims for damages against Defendants Wasilewski and Yenhik in their official and individual capacities and against Defendants Butala, Kinel, and Hacken in their individual capacities only.

An appropriate Order follows.

### *ORDER*

**NOW,** this *7th* day of September, 2007, **IT IS HEREBY ORDERED** that Defendants' motions to dismiss are **GRANTED** in part and **DENIED** in part, as follows:

(1) In Count I, the First Amendment claim

Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)
**(Cite as: 2007 WL 2670265 (M.D.Pa.))**

against Defendant Yenchik and the Fourteenth Amendment claim against all Defendants are hereby **DISMISSED.**

**\*16** (2) In Count II, the Pennsylvania constitutional claim for monetary damages against all Defendants is hereby **DISMISSED.**

(3) In Count III, the state tort claims for damages against Defendants Butala, Kincel, and Hacken in their official capacities are hereby **DISMISSED.**

(4) Defendants' motions to dismiss all other claims in Counts I, II, and III are hereby **DENIED.**

M.D.Pa.,2007.
Benkoski v. Wasilewski
Not Reported in F.Supp.2d, 2007 WL 2670265 (M.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

H

Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Patrick BROWN, Plaintiff,
v.
Francis CHARDO, Defendant.

Civil Action No. 1:11–CV–0638.
March 22, 2012.

Jeffrey Philip Paul, Law Offices of Jeffrey Philip Paul, Lancaster, PA, Teri B. Himebaugh, Schwenksville, PA, for Plaintiff.

Frank J. Lavery, Jr., Gary H. Dadamo, Lavery Faherty Patterson, Harrisburg, PA, for Defendant.

*MEMORANDUM*
CHRISTOPHER C. CONNER, District Judge.

**\*1** This is a civil rights action filed by Patrick Brown ("Brown") against Francis Chardo ("Chardo"). Brown alleges that Chardo, a Dauphin County Assistant District Attorney, violated his Fourth, Sixth and Fourteenth Amendment rights under the United States Constitution and his rights under the Pennsylvania Constitution and Pennsylvania tort law by failing to disclose the results of a DNA report during Brown's post conviction relief proceedings on a burglary conviction. Presently before the court is the motion (Doc. 10) to dismiss filed by Chardo. For the reasons that follow, the court will grant the motion in part and deny it in part.

**I. Background**[FN1]

> **FN1.** In accordance with the standard of review for a motion to dismiss pursuant to Rule 12(b)(6), the court will present the facts as alleged in the complaint. *See infra* Part II. However, those portions of the complaint which consist of no more than

legal conclusions or a formulaic recitation of the elements of a cause of action have been disregarded. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Santiago v. Warminster Twp.,* 629 F.3d 121, 130–31 (3d Cir.2010).

In 2001, plaintiff Patrick Brown was convicted in the Court of Common Pleas of Dauphin County of burglary, criminal conspiracy, robbery and persons not to possess firearms. (Doc. 1 ¶ 6). The court sentenced Brown to 22 to 70 years incarceration. (*Id.*) The case, prosecuted by Assistant District Attorney Chardo, rested solely upon the eyewitness account of the victim, who identified Brown as one of two burglars and the suspect who wore the blue bandana. (*Id.* ¶ 7). At the time of trial the jury knew that the DNA recovered from the blue bandana and a glove left at the scene of the crime *did not* match Brown. (*Id.* ¶ 8). In fact, no forensic evidence linked Brown to the crime. (*Id.* ¶ 9). Brown's fingerprints were not on any of the guns, and fingerprints and footprints at the scene were too smudged or insufficiently clear to produce impressions for comparison. (*Id.*) Moreover, the second suspect was never identified. (*Id.* ¶ 10). Brown appealed his conviction, but his appeals were denied. (*Id.* ¶ 11).

In 2006, Brown filed a *pro se* Post Conviction Relief Act ("PCRA") Petition. (*Id.* ¶ 24). Chardo represented the Commonwealth in those proceedings. (*Id.*) In early June 2006, Chardo received a preliminary DNA analysis report implicating an individual, R.R., in the burglary/ robbery for which Brown was convicted. (*Id.* ¶¶ 17, 20). The report indicated that the DNA on the blue bandana matched R.R. and that R.R. could not be excluded as a contributor to the DNA on the glove. (*Id.* ¶ 19). Chardo claims that he mailed a copy of the DNA report to Brown, but Brown contends that he never received it and had no knowledge of its existence. (*Id.* ¶¶ 18, 23). When Chardo received

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

the DNA report in June of 2006, he sent a detective to interview R.R., who was incarcerated at the time. (*Id.* ¶ 20). The detective produced an investigative report, which was not provided to Brown. (*Id.* ¶ 21).

According to the complaint, Chardo failed to advise the PCRA court of the DNA evidence implicating R.R. (*Id.* ¶ 25). In addition, Brown allegedly encountered Chardo at the courthouse approximately two months after Chardo had received the DNA report. (*Id.* ¶ 26). Brown reasserted his innocence to Chardo and inquired on the status of his case. (*Id.*) Chardo purportedly responded that the case was closed. (*Id.* ¶ 26).

**\*2** During the pendency of Brown's PCRA petition, Brown had an altercation with two correctional officers. (*Id.* ¶ 28). As a result, Chardo charged Brown with two counts of aggravated assault. (*Id.* ¶ 29). One of the officers supposedly informed Brown that he was pressing charges against Brown because Chardo encouraged it. (*Id.* ¶ 28). Brown contends that Chardo induced him to plead guilty to the aggravated assault charges by suggesting a strong likelihood of a significant sentence because Brown was a convicted felon. (*Id.* ¶ 31). On August 16, 2006, Brown pled guilty and was sentenced to 36 to 120 months imprisonment, to run concurrently with his burglary/robbery sentence. (*Id.* ¶ 32).

In the summer of 2009, while incarcerated at SCI Fayette, an inmate informed Brown that he overheard a conversation in the prison yard between "Dutt" and another unidentified prisoner. (*Id.* ¶ 12). "Dutt" purportedly informed the unidentified prisoner about a 2007 conversation between "Dutt" and another inmate named "Trizz." (*Id.* ¶ 13). During this conversation between "Dutt" and "Trizz," "Trizz" allegedly stated that he and an individual named "Scar" robbed and assaulted an individual named "Conehead" and that someone else was convicted of the crime. (*Id.*) "Trizz" told "Dutt" that as he and "Scar" exited the residence, "Conehead" fired at them, and that in the course of

his retreat, "Trizz" dropped his blue bandana and a glove. (*Id.*)

Counsel for Brown investigated the story, obtained a sworn statement from "Dutt" attesting to "Trizz's" confession and identified "Trizz" as R.R. (*Id.* ¶ 14). Counsel discovered that R.R. lived near the victim, had numerous drug and gun convictions, and was not incarcerated at the time of the crime for which Brown was convicted. (*Id.*) Thereafter, counsel for Brown filed a PCRA petition pursuant to 42 PA CONS. STAT. § 9545(b)(1) (ii), alleging new exculpatory evidence. (*Id.* ¶ 15). Brown also sought DNA testing of R.R., the newly identified suspect. (*Id* . ¶ 16). Chardo, who prosecuted Brown in 2001 for the burglary and represented the Commonwealth in Brown's first PCRA petition, also represented the Commonwealth in the newly filed petition. (*Id.* ¶¶ 6, 15, 24).

On April 9, 2010, Chardo advised Brown's counsel that he submitted a CODIS [FN2] request for R.R.'s profile and received from the laboratory a copy of the June 8, 2006, preliminary DNA analysis report. (*Id.* ¶ 17). Chardo subsequently claimed that he forgot that he received the DNA report in June of 2006 and had previously dispatched a detective to interview R.R. (*Id.* ¶ 20) . [FN3] Chardo also asserted that he mailed a copy of the DNA report to Brown in 2006. (*Id.* ¶ 23).

> FN2. CODIS stands for Combined DNA Index System.

> FN3. Brown asserts that he did not receive the detective's investigative report until April 9, 2010. (*Id.* ¶ 21).

After receipt of the DNA evidence, Brown filed an amended PCRA petition. (*Id.* at 35). Chardo was unable to put forth any physical evidence that he mailed the DNA report to Brown. Consequently, the Commonwealth stipulated to the timeliness of the newly discovered DNA evidence at the PCRA hearing. (*Id.* ¶ 23). The PCRA court held a hearing in June of 2010, during which it

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

received the DNA evidence, as well as confirmation from the Department of Corrections that the conversation between "Dutt" and "Trizz" *could* have occurred when and where the witness reported it to have happened. (*Id.* ¶ 36). Chardo then agreed that Brown was entitled to a new trial and moved to *nolle pros* the charges. (*Id.*) The Honorable Lawrence Clark of the Court of Common Pleas for Dauphin County entered an order vacating the conviction and *nolle prossing* the charges. (*Id.* ¶ 37). However, Brown remained incarcerated on the 2006 assault conviction. (*Id.* ¶ 40).

**\*3** Brown subsequently filed a *pro se* PCRA petition alleging that the DNA evidence was newly discovered evidence with respect to his guilty plea on the 2006 aggravated assault charge, and that his plea was not knowing and voluntary. (*Id.* ¶ 38). The PCRA court has issued a notice of intent to dismiss the petition as untimely or otherwise procedurally defaulted. (*Id.* ¶ 39).

On April 6, 2011, Brown filed the instant civil rights action. (Doc. 1). In Count I, Brown asserts a claim of false imprisonment under the Fourth and Fourteenth Amendments of the U.S. Constitution, the Pennsylvania Constitution, and Pennsylvania tort law. (*Id.* ¶¶ 46–51). In Count II, Brown asserts a malicious abuse of process claim under the U.S. and Pennsylvania Constitutions and Pennsylvania tort law. (*Id.* ¶¶ 52–56). Finally, in Count III, Brown asserts a claim for intentional infliction of emotional distress under Pennsylvania law. (*Id.* ¶¶ 57–60). Brown avers that as a result of Chardo's conduct, Brown has been denied the comfort and companionship of his family and has been forced to endure the hardships of prison life. (*Id.* ¶¶ 41, 42). Brown claims that as a further result of Chardo's conduct he suffers from severe emotional distress, depression, paranoia, suicidal ideation, nightmares, anxiety, and socialization and communication problems, as well as the physical injuries of weight loss, headaches, chest pains, diminished hearing and vision, rashes and insomnia. (*Id.* ¶¶ 43, 44). Brown seeks compensatory and punitive damages, plus attorney's fees on all counts.

On June 13, 2011, Chardo filed a motion to dismiss the complaint. (Doc. 10). Chardo contends that Brown's claims against him are barred by absolute prosecutorial immunity. (*Id.* ¶ 21). Chardo also asserts that Brown's challenge to the lawfulness of his guilty plea on the aggravated assault charges are barred by *Heck v. Humphrey,* 512 U.S. 447 (1994). (*Id.* ¶ 22). Alternatively, Chardo argues that Brown fails to state a cognizable malicious abuse of process claim, and fails to assert any cognizable claim for monetary damages under the Pennsylvania Constitution. (*Id.* ¶¶ 23, 24). Finally, Chardo asserts that Brown's state law claims are barred by the application of immunity afforded to high public officials under Pennsylvania law. (*Id.* ¶ 25). Brown filed an opposition brief on June 13, 2011, (Doc. 13) and Chardo filed a reply on June 27, 2011. (Doc. 16). The motion has been fully briefed and is ripe for disposition.

## II. *Standard of Review*

Rule 12(b) (6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Gelman v. State Farm Mut. Auto. Ins. Co.,* 583 F.3d 187, 190 (3d Cir.2009) (quoting *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008)); *see also Kanter v. Barella,* 489 F.3d 170, 177 (3d Cir.2007) (quoting *Evancho v. Fisher,* 423 F.3d 347, 350 (3d Cir.2005)). Although the court is generally limited in its review to the facts contained in the complaint, it "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

1384 n. 2 (3d Cir.1994); *see also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997).

**\*4** Federal notice and pleading rules require the complaint to provide "the defendant notice of what the ... claim is and the grounds upon which it rests." *Phillips,* 515 F.3d at 232 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To test the sufficiency of the complaint in the face of a Rule 12(b)(6) motion, the court must conduct a three-step inquiry. *See Santiago v. Warminster Twp.,* 629 F.3d 121, 130–31 (3d Cir.2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' " *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1947, 173 L.Ed.2d 868 (2009)). Next, the factual and legal elements of a claim should be separated; well-pleaded facts must be accepted as true, while mere legal conclusions may be disregarded. *Id.; see also Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009). Once the well-pleaded factual allegations have been isolated, the court must determine whether they are sufficient to show a "plausible claim for relief." *Ashcroft v. Iqbal,* 556U.S. 662, 129 S.Ct. at 1950 (citing *Twombly,* 550 U.S. at 556); *Twombly,* 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level"). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868. When the complaint fails to present a *prima facie* case of liability, however, courts should generally grant leave to amend before dismissing a complaint. *See Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002); *Shane v. Fauver,* 213 F.3d 113, 116–17 (3d Cir.2000).

## III. *Discussion*

### A. *Prosecutorial Immunity*

The court begins its analysis with Chardo's assertion of absolute prosecutorial immunity. "A prosecutor bears the 'heavy burden' of establishing entitlement to absolute immunity." *Odd v. Malone,* 538 F.3d 202, 207 (3d Cir.2008) (citing *Light v. Haws,* 472 F.3d 74, 80–81 (3d Cir.2007) (quoting *Forsyth v. Kleindienst,* 599 F.2d 1203, 1212 (3d Cir.1979))); *see also Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). Indeed, the Third Circuit instructs the court to start with the presumption that qualified, not absolute, immunity is appropriate. *Odd,* 538 F.3d at 207–08.

The defendant's status as a prosecutor does not in and of itself entitle him to prosecutorial immunity. The court must focus upon the nature of the function performed by the prosecutor, not the identity of the actor. *See Kalina v. Fletcher,* 522 U.S. 118, 127, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). A prosecutor is entitled to absolute immunity when he is functioning as the state's advocate in performing the questioned actions. *Yarris v. County of Delaware,* 465 F.3d 129, 136 (3d Cir.2006). That is, prosecutors are absolutely immune for actions performed in a judicial or quasi-judicial role. *Odd,* 538 F.3d at 208; *Yarris,* 465 F.3d at 135; *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Prosecutorial immunity extends to "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Allegations that the prosecutor acted willfully or in bad faith, knowing his conduct to be unauthorized, will not strip the prosecutor of absolute immunity unless a reasonable prosecutor would recognize the conduct as 'clearly outside his jurisdiction' in representing the state. *See Ernst v. Child and Youth Servs. Of Chester Cnty.,* 108 F.3d 486, 502 (3d Cir.1997) (subjective state of mind irrelevant to absolute immunity and allegations of bad faith will not strip a prosecutor of absolute immunity) (quoting *Bauers v. Heisel,* 361 F.2d 581, 591 (3d Cir.1966)); *Imbler,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

424 U.S. at 427 (admitting that prosecutorial immunity leaves wronged defendant without civil remedy for a prosecutor's "malicious and dishonest" acts).

**\*5** Absolute immunity, however, does not cover administrative duties or investigatory functions of the prosecutor not related to initiating or conducting judicial proceedings. *See Odd,* 538 F.3d at 208. When the behavior of the prosecutor 'falls completely outside the prosecutorial role,' for example, a prosecutor's deliberate destruction of exculpatory evidence, absolute immunity is unavailable. *Giuffre v. Bissell,* 31 F.3d 1241, 1251 (3d Cir.1994) (quoting *Kulwicki v. Dawson,* 969 F.2d 1454, 1463 (3d Cir.1992)); *Odd,* 538 F.3d at 211; *Yarris,* 465 F.3d at 137 (finding prosecutors absolutely immune for withholding exculpatory evidence but not absolutely immune for the deliberate destruction of exculpatory evidence, and stating that "while deciding not to furnish the prosecution's evidence to the defense may be an act of advocacy, throwing the evidence away is not such an act" (internal citations and quotations omitted)).

Thus, the court's task in determining whether Chardo is entitled to absolute immunity is twofold: first, the court must determine exactly what conduct forms the basis of Brown's cause of action against Chardo, and thereafter the court must determine what function Chardo's conduct served, i.e. prosecutorial, advocative, investigative, or administrative. *Schneyder v. Smith,* 653 F.3d 313, 332 (3d Cir.2011). If the conduct was advocative or prosecutorial, Chardo is entitled to absolute immunity. If the act was administrative or investigative, Chardo's conduct will not be cloaked in absolute immunity. The prosecutorial immunity inquiry is principally fact-based and there are no bright line rules for when absolute immunity applies. *See Odd,* 538 F.3d at 210 ("Following the Supreme Court's guidance, our prosecutorial immunity analysis focuses on the unique facts of each case and requires careful dissection of the prosecutor's actions.").

**1. *The Conduct***

The act giving rise to the instant litigation is Chardo's purported withholding of the 2006 preliminary DNA analysis report from both Brown and the PCRA court. According to the complaint, in June of 2006, Brown's *pro se* PCRA petition was pending before the court, when Chardo received a laboratory report identifying R.R. as the source of DNA on the bandana worn by one of the burglars. Upon reviewing the DNA report, Chardo sent a detective to interview R.R., which occurred on July 19, 2006, and resulted in an investigative report. The DNA report itself was not inconsistent with the jury's finding of guilt against Brown. The jury knew that the DNA on the blue bandana did not match Brown, and convicted him nonetheless on the strength of the eyewitness testimony of the victim. Chardo purportedly did not provide the DNA report to Brown and made no mention of it to the PCRA court or during plea negotiations on Brown's 2006 assault charges.

**2. *The Function of the Conduct***

The complaint states that Chardo received the DNA report in 2006 while representing the Commonwealth in Brown's pending PCRA petition. Thus, Chardo argues that his conduct of purportedly withholding the report occurred within the scope of his advocative role in representing the Commonwealth in adversarial proceedings. Brown contends however that Chardo's conduct was investigatory and not entitled to absolute immunity. (Doc. 13, at 8).

**\*6** According to the Third Circuit, "[i]t is well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence, so long as they did so while functioning in their prosecutorial capacity." *Yarris,* 465 F.3d at 137; *see also Imbler v. Pachtman,* 424 U.S. 409, 431 n. 34, 96 S.Ct. 984, 47 L.Ed.2d 128 (explaining that the "deliberate withholding of exculpatory information" is included within the "legitimate exercise of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

prosecutorial discretion"); *Smith v. Holtz,* 210 F.3d 186, 199 n. 18 (3d Cir.2000) (prosecutor who made decision to withhold exculpatory evidence has absolute immunity in § 1983 action so long as decision made while functioning in his prosecutorial capacity); *Douris v. Schweiker,* 229 F.Supp.2d 391, 411 (E.D.Pa.2002) (stating that "withholding exculpatory evidence is a quasi-judicial act protected by absolute immunity"). This includes withholding evidence post-trial and on appeal. *Yarris,* 465 F.3d at 137.

In response to this well settled law, Brown notes that the cases granting absolute prosecutorial immunity involve trial conduct or conduct of the prosecutor during *direct* appeals. Brown contends that because Chardo's act of withholding the DNA report from him and the PCRA court occurred during collateral proceedings, and not during trial or during post conviction appeals, Chardo's conduct is not protected by absolute immunity. (Doc. 13, at 9.) The court cannot agree. Neither the Supreme Court nor the Third Circuit has ever drawn a clear distinction between direct appeals and collateral proceedings in the analysis of prosecutorial immunity. To the contrary, the Third Circuit has squarely held that certain pre-indictment and post trial actions are properly characterized as advocate, sufficient to trigger absolute prosecutorial immunity. *See Odd,* 538 F.3d at 211 n. 3; *Yarris,* 465 F.3d at 137 (stating agreement with other courts of appeal that '[a]bsolute immunity applies to the adversarial acts of prosecutors during post-conviction proceedings ... where the prosecutor is personally involved ... and continues his role as an advocate,' but that 'where the role as advocate has not yet begun ... or where it has concluded, absolute immunity does not apply' (internal citations and quotations omitted)). In *Yarris,* the Third Circuit opined

> After a conviction is obtained, the challenged action must be shown by the prosecutor to be part of the prosecutor's continuing personal involvement as the state's advocate in adversarial

post-conviction proceedings to be encompassed within that prosecutor's absolute immunity from suit.

*Yarris,* 465 F.3d at 137.

In the instant matter, it is undisputed that Chardo continued as the Commonwealth's advocate in the PCRA proceedings. *See Odd,* 538 F.3d at 210 (stating that timing and location of prosecutor's action are not dispositive but are relevant "to the extent they bear upon the nature of the function the prosecutor is performing"). Thus, absolute immunity properly applies to Chardo's prosecutorial functions and all of his conduct associated with defending the Commonwealth's position in Brown's PCRA proceedings. *See Washam v. Stesis,* 321 Fed. App'x 104, 106 & n. 1 (3d Cir.2009) (affirming dismissal of § 1983 action against prosecutor on basis that prosecutor had absolute immunity for performance of typical prosecutorial functions and activities, and noting that prosecutor named as defendant represented Commonwealth in plaintiff's PCRA proceedings); *see also Wallace v. Green,* Civ. A. No. 08–CV–3239, 2010 WL 1303446, at *6 (E.D.Pa. Mar.31, 2010) (granting summary judgment on grounds of prosecutorial immunity to prosecutor who opposed, on behalf of the Commonwealth, plaintiff's PCRA petition). PCRA proceedings are adversarial and Chardo's conduct is shielded by absolute immunity to the extent it falls within the ambit of his prosecutorial or advocative functions.

**\*7** In the instant matter, there is simply insufficient information at this stage to determine whether Chardo's conduct was prosecutorial, advocative, investigative or administrative. At the motion to dismiss stage, the court may look only to the complaint and documents attached to the complaint as well as matters of public record. *See Oshiver,* 38 F.3d at 1384 n. 2; *see also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426. The fact that Brown's PCRA petition was pending at the time Chardo received the DNA report does not in and of itself establish that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

Chardo's conduct was advocative or prosecutorial. That fact, however, coupled with the fact that Chardo sent an investigator to interview R.R. after receiving the DNA report, are the only facts (as alleged by the complaint) that the court has at this stage regarding the nature and circumstances of Chardo's conduct.

The burden is on Chardo to establish his entitlement to absolute immunity. *See Odd,* 538 F.3d at 207. Chardo cannot meet that burden based solely on the averments in the complaint. Therefore, the motion to dismiss on grounds of absolute prosecutorial immunity is denied. The defense may be reasserted on a full summary judgment record from which the court can adequately assess the facts and circumstances surrounding Chardo's purported conduct.

**B. *The Heck v. Humphrey Bar***

Chardo next argues that Brown's claim challenging the lawfulness of his guilty plea to the 2006 aggravated assault charges is barred by the United States Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), because Brown's sentence has not been reversed or otherwise declared invalid. Brown counters that he is not seeking to challenge the validity of or overturn the conviction. He argues that his claims of false imprisonment, malicious abuse of process and intentional infliction of emotional distress, if successful, would not imply the invalidity of his 2006 conviction, and are therefore not barred by *Heck.*

In *Heck,* the Supreme Court held that:

in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question

by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

*Id.* at 486–87 (footnote omitted; emphasis in original). Thus, to determine whether the bar applies, the district court must consider whether a judgment for the plaintiff in the § 1983 action would necessarily imply the invalidity of the plaintiff's conviction or sentence. *Id.* at 487. If so, the court must dismiss the claim or claims unless the plaintiff can show the conviction or sentence has been invalidated. *Id.* In the Third Circuit, district courts must conduct a fact-based inquiry to determine whether a claim "necessarily implies" the invalidity of the underlying conviction. *Gibson v. Superintendent, N.J. Dep't of Law and Public Safety,* 411 F.3d 427, 450 (3d Cir.2005) *overruled on other grounds by Dique v. New Jersey State Police,* 603 F.3d 181, 188 (3d Cir.2010).

**\*8** The court notes that the averments in Count I, the false imprisonment claim appear to concern only the 2001 burglary conviction, the averments in Count II, the malicious abuse of process claim concern only the 2006 aggravated assault conviction, and the averments in Count III, the intentional infliction of emotional distress claim involve both convictions. (*See* Doc. 1 ¶¶ 46–60). Thus, the question with respect to the *Heck* doctrine is whether a judgment in Brown's favor on the § 1983 malicious abuse of process claim necessarily imply the invalidity of his 2006 conviction.

The court finds that a judgment in favor of Brown on the malicious abuse of process count will not necessarily imply the invalidity of Brown's 2006 conviction. A malicious abuse of process claim brought pursuant to § 1983 "lies where 'prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law.' " *Napier v. City of New Castle,* 407 Fed. App'x 578, 582 (3d Cir.2010) (citations omitted). Under Pennsylvania law, a plaintiff asserting an

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

abuse of process claim must establish that "the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." *Rosen v. Am. Bank of Rolla,* 426 Pa.Super. 376, 627 A.2d 190, 192 (1993). Neither of these claims, if successful, would *necessarily* imply the invalidity of Brown's 2006 aggravated assault conviction.[FN4] Thus, *Heck* does not bar the claim, and Chardo's motion to dismiss on this ground will be denied.

> FN4. The court also rejects Chardo's alternative assertion that the *Younger* abstention doctrine bars Brown's claims in Count II of the complaint. Pursuant to *Younger v. Harris,* 401 U.S. 37 (1971), federal courts must abstain from exercising jurisdiction over claims "when (1) there are ongoing state proceedings that are judicial in nature; (2) the state proceedings implicate important state interests; and (3) the state proceedings afford an adequate opportunity to raise federal claims." *Miller v. Mitchell,* 598 F.3d 139, 146 (3d Cir.2010). Brown avers that his *pro se* PCRA petition with respect to the 2006 conviction has been denied, (*see* Doc. 13, at 11), thereby rendering the *Younger* abstention doctrine inapplicable.

## C. *Malicious Abuse of Process Claim*

Alternatively, Chardo contends that Brown fails to state a cognizable state or federal claim for malicious abuse of process. An abuse of process claim involves the perversion of the legal process after process has been initiated to accomplish a purpose for which the process was not designed. *See Shiner v. Moriarty,* 706 A.2d 1228, 1236 (Pa.Super.Ct.1998); *Gen. Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 304 (3d Cir.2003); *Marable v. West Pottsgrove Tp.,* 176 Fed. App'x 275, 281–82 (3d Cir.2006). As discussed above, a malicious abuse of process claim brought pursuant to § 1983 "lies where

'prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law.' " *Napier v. City of New Castle,* 407 Fed. App'x 578, 582 (3d Cir.2010) (citations omitted). Under Pennsylvania law, an abuse of process claim lies where "the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." *Rosen v. Am. Bank of Rolla,* 426 Pa.Super. 376, 627 A.2d 190, 192 (1993). Thus, to prevail, a plaintiff must prove "some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process." *Id.* (internal citations and quotations omitted). When the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions, the defendant is not liable. *Napier,* 407 Fed. App'x at 582.

**\*9** In Count II of the complaint Brown alleges that Chardo improperly used his discretion to charge Brown with aggravated assault in order to ensure Brown's continued incarceration and to cover up or limit potential damages resulting from the discovery of the DNA evidence. (Doc. 1 ¶¶ 53–54). Brown avers that Chardo used the legal process to coerce a plea upon information Chardo knew to be no longer valid. (*Id.* ¶ 55). Chardo reads these averments as referring to the 2006 prosecution on the aggravated assault charges, and argues that he carried out the process to its authorized conclusion rendering his motives irrelevant. (*See* Doc. 11, at 23). However, in response to Chardo's motion to dismiss Count II, Brown discusses the 2001 robbery conviction as the process legitimately initiated and thereafter perverted. (Doc. 13, at 12).

To the extent Brown asserts a claim for malicious abuse of process for the 2006 conviction, the court finds that Brown fails to state a claim. Chardo initiated charges, engaged in plea negotiations with Brown and Brown pled guilty. Chardo carried out the process to its authorized

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

conclusion. Averments that Chardo improperly used his discretion to *initiate* aggravated assault charges do not establish an abuse of process, as they concern the illegitimate initiation of charges, whereas an abuse of process claim involves a *legitimately initiated* prosecution thereafter used for an improper purpose. *See Napier,* 407 Fed. App'x at 582.

To the extent Brown is attempting to assert a claim for malicious prosecution stemming from the 2001 conviction, the court finds that the complaint fails to sufficiently set forth averments to state a claim. All the averments of Count II refer to the 2006 conviction. (*See* Doc. 1 ¶¶ 52–56). Therefore, the court will grant Chardo's motion to dismiss Count II for failure to state a claim. The court will grant Brown leave to file an amended complaint with respect to Count II, subject to the limitation discussed in Part III .E *infra. See Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002); *Shane v. Fauver,* 213 F.3d 113, 116–17 (3d Cir.2000).

**D.** *Damages under the Pennsylvania Constitution*
Chardo next asserts that Brown fails to state a cognizable claim for money damages for violations of the Pennsylvania Constitution because neither statute nor case law authorizes an award of money damages. Brown counters that the Pennsylvania Supreme Court has not addressed the issue of the availability of money damages for violations of the Pennsylvania Constitution and asserts that the Pennsylvania and federal court cases indicating there is no private cause of action relate to different constitutional provisions, not the one applicable here: Article I, Section 11.

The Pennsylvania Supreme Court has yet to decide the issue, however, the Pennsylvania Commonwealth Court does not recognize a private right of action for money damages for violations of the Pennsylvania Constitution. *See R.H.S. v. Allegheny Cnty. Dept. of Human Servs.,* 936 A.2d 1218, 1226 (Pa.Commw.Ct.2007) (stating that 'neither statutory authority, nor appellate case law

has authorized the award of monetary damages for a violation of the Pennsylvania Constitution' (quoting *Jones v. City of Phila.,* 890 A.2d 1188, 1208 (Pa.Commw.Ct.2006))). Similarly, the federal courts in this circuit have conclude no such right exists under the Pennsylvania Constitution. *See Ryan v. Gen. Mach. Prods.,* 277 F.Supp.2d 585, 595 (E.D.Pa.2003); *see also Becker v. Godboldte,* 2011 WL 2015213, at *10 (M.D.Pa. May 24, 2011). None of these cases indicate that there is an exception for violations of the provision referenced by Brown, and Brown cites no authority to support his position that Article I, Section 11 is somehow different or exempted. Therefore, Brown's claims for money damages for violations of the Pennsylvania Constitution will be dismissed.

**E.** *High Public Official Immunity*
**\*10** Finally, Chardo contends that Brown's state law claims are barred by the application of the immunity afforded to high public officials under Pennsylvania law. Brown counters that Chardo is not entitled to high public official immunity because his position does not qualify him as a high public official and his conduct was not in the "good faith" performance of his job.

High public official immunity under Pennsylvania common law protects high public officials from suits for damages for actions taken or statements made in the course of their official duties. *Durham v. McElynn,* 565 Pa. 163, 772 A.2d 68, 69 (Pa.2001); *Matson v. Margiotti,* 371 Pa. 188, 88 A.2d 892, 895 (1952). The immunity goes so far as to cover statements or actions motivated by malice when they are made or taken within the scope of the official's duties or authority. *Matson,* 88 A.2d at 895.[FN5] Pennsylvania courts have extended immunity for high public officials to district attorneys and assistant district attorneys. *McCormick v. Specter,* 220 Pa.Super. 19, 275 A.2d 688 (Pa.Super.Ct.1971); *see also Durham,* 772 A.2d at 70. Unlike the absolute prosecutorial immunity discussed *supra,* Pennsylvania high public official immunity does not distinguish

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

among prosecutorial, advocative, investigative or administrative conduct by the assistant district attorney. High public immunity applies to all conduct and statements within the course of the official's duties. *Matson,* 88 A.2d at 895.

> FN5. The doctrine of high public official immunity existed prior to Pennsylvania's enactment of the Political Subdivision Tort Claims Act, 42 Pa. Cons.Stat. § 8541 *et seq.,* and was not abrogated by it. *See Durham,* 772 A.2d at 69 (citing *Lindler v. Mollan,* 544 Pa. 487, 677 A.2d 1194, 1196 (Pa.1996)).

Brown contends that Chardo, despite his title as chief deputy district attorney, is not entitled to high public official immunity because Chardo has no legislative or policy making powers and was not elected and therefore not accountable to the voting public. (Doc. 13, at 15). However, the Pennsylvania Supreme Court extended high public immunity to assistant district attorneys in *Durham v. McElynn,* despite the fact that the assistant district attorneys served at the will of their employer and were not policy-making officials. *Durham,* 772 A.2d at 70. As the *Durham* court explained:

> The fact that assistant district attorneys, unlike their principal, the district attorney, are not known for policy-making functions.... [T]he "high public official" umbrella of immunity has in many instances been extended to a wide range of public officials whose policy-making roles were not salient. While it is often the case that "high public officials" have policy-making functions, that is not the sole overriding factor in determining the scope of immunity. Rather, it is the public interest in seeing that the official not be impeded in the performance of important duties that is pivotal. That interest dictates that assistant district attorneys be immune from suit.

*Id.* Moreover, federal judges in this district have extended high public official immunity to

assistant district attorneys, including Chardo, in other cases. *See Njie v. Livingston,* Civ. No. 3:CV–08–2263, 2010 WL 569551, at *6 (M.D.Pa. Feb.9, 2010) (citing *Jaslar v. Zavada,* No. 3:CV–05–2080, 2009 WL 82553 (M.D.Pa. Jan.12, 2009)).

**\*11** In the instant matter, in purportedly failing to provide the DNA report to Brown during the pendency of Brown's PCRA petition proceedings and in conducting plea negotiations on the assault charges, Chardo was acting within the course and scope of his duties as assistant district attorney. Chardo is therefore entitled to high public official immunity on all of Brown's state law claims, regardless of whether his actions were in good faith or alternatively motivated by malice. *See Matson,* 88 A.2d at 895. The court will therefore grant Chardo's motion to dismiss with respect to the state law claims.

### IV. *Conclusion*

For the above-stated reasons, the court will grant the motion to dismiss in part and deny the motion in part. An appropriate order follows.

### *ORDER*

AND NOW, this 22nd day of March, 2012, upon consideration of the motion (Doc. 10) to dismiss, filed by Francis Chardo, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion to dismiss is GRANTED in part and DENIED in part as follows:

a. The motion is GRANTED with respect to Count II, all claims for money damages under the Pennsylvania Constitution, and the state law claims of false imprisonment, malicious abuse of process and intentional infliction of emotional distress.

b. The motion is DENIED in all other respects.

2. Plaintiff is GRANTED leave to file, within twenty (20) days of this order, an amended

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)
**(Cite as: 2012 WL 983553 (M.D.Pa.))**

complaint with respect to Count II.

3. A revised pretrial and trial schedule shall issue by future order of the court.

M.D.Pa.,2012.
Brown v. Chardo
Not Reported in F.Supp.2d, 2012 WL 983553 (M.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.)))**

**H**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Third Circuit LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)

United States Court of Appeals,
Third Circuit.
Donnelly J. LEBLANC, Appellant
v.
Craig STEDMAN; Brian E. Chudzik; Thomas B. Zell; Dean Morgan; George Pappas; John Doe, Chief of Police; County of Lancaster.

No. 11–4624.
Submitted for Possible Dismissal Pursuant to 28 U.S.C. § 1915(e)(2)(B) or Summary Action Pursuant to Third Circuit LAR 27.4 and I.O.P. 10.6
April 26, 2012.
Opinion Filed: May 2, 2012.

**Background:** Arrestee brought pro se § 1983 action against prosecutors, police officers, and county, alleging false arrest, false imprisonment, conspiracy, and malicious prosecution. The United States District Court for the Eastern District of Pennsylvania, Timothy J. Savage, J., 2011 WL 2621538, dismissed claims against prosecutors and county, thereafter, 2011 WL 2650182, granted summary judgment for police officer who signed criminal complaint, then, 2011 WL 2983080, 2011 WL 2983611, dismissed conspiracy claim and claim against police chief, and, finally, 2011 WL 6181129, 2011 WL 6180144, granted summary judgment for investigating officer. Arrestee appealed.

**Holdings:** The Court of Appeals held that:
(1) prosecutors were immune from suit under § 1983;

(2) arrestee did not state claim for municipal liability against county;
(3) arrestee failed to state claim against police chief;
(4) arrestee failed to state claim for conspiracy under § 1983;
(5) limitations period on claim for false arrest or false imprisonment began to run when arrestee waived arraignment;
(6) arrest was supported by probable cause; and
(7) denial of motions to compel discovery was not abuse of discretion.

Affirmed.

West Headnotes

**[1] District and Prosecuting Attorneys 131 🔑 10**

131 District and Prosecuting Attorneys
    131k10 k. Liabilities for official acts, negligence, or misconduct. Most Cited Cases
    Prosecutor who allegedly failed to verify information that he received from investigating officer before agreeing that charges should be brought against arrestee, and two other prosecutors who allegedly failed to come forward with evidence that arrestee, charged with criminal conspiracy and insurance fraud, did not file insurance claim, were immune from suit under § 1983. 42 U.S.C.A. § 1983; 18 Pa.C.S.A. §§ 903(a), 4117(a)(2).

**[2] Civil Rights 78 🔑 1395(5)**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(4) Criminal Law Enforcement; Police and Prosecutors
                    78k1395(5) k. In general. Most Cited Cases
    Arrestee's bald statement that county had policy of accepting criminal charges and

483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.)))**

prosecuting without verifying the truth of the charges did not state claim for municipal liability against county under § 1983. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78 ⊂⊐1358**

78 Civil Rights
   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee, who did not allege facts to demonstrate police chief's personal involvement with his arrest, imprisonment, or prosecution, failed to state claim against police chief in § 1983 action for false arrest, false imprisonment, conspiracy, and malicious prosecution. U.S.C.A.Const.Amend. 4; 42 U.S.C.A. § 1983.

**[4] Conspiracy 91 ⊂⊐18**

91 Conspiracy
   91I Civil Liability
      91I(B) Actions
         91k18 k. Pleading. Most Cited Cases

Allegations that prosecutors and police officers "acted in concert to falsely arrest and imprison" arrestee did not suggest requisite illicit agreement, and thus failed to state claim for conspiracy under § 1983. U.S.C.A.Const.Amend. 4; 42 U.S.C.A. § 1983.

**[5] Limitation of Actions 241 ⊂⊐58(1)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(A) Accrual of Right of Action or Defense
      241k58 Liabilities Created by Statute
         241k58(1) k. In general. Most Cited Cases

Two-year statute of limitations applicable under Pennsylvania law to arrestee's § 1983 claim against police officer for false arrest or false imprisonment began to run when arrestee waived arraignment. U.S.C.A.Const.Amend. 4; 42 U.S.C.A. § 1983; 42 Pa.C.S.A. § 5524(1).

**[6] Criminal Law 110 ⊂⊐211(4)**

110 Criminal Law
   110XII Pretrial Proceedings
      110k208 Preliminary Complaint or Affidavit
        110k211 Requisites and Sufficiency
           110k211(4) k. Charging particular offenses. Most Cited Cases

Information within investigating officer's knowledge would warrant reasonable person to believe that arrestee had committed insurance fraud or conspiracy under Pennsylvania law, and therefore arrest was supported by probable cause, where insurance agents conveyed to officer their belief that arrestee had submitted insurance claim, insurance record reflected that arrestee had indicated that he had struck tree while driving vehicle on one road and that arrestee's wife, in inquiring about status of claim, reported that arrestee hit tree on different road, and officer included such information in warrant affidavit and also noted his domestic disturbance investigation, which revealed that car was damaged and required towing after arrestee drove his truck into it, as well as insurance investigator's comment that arrestee was pushing for quick settlement. U.S.C.A.Const.Amend. 4; 18 Pa.C.S.A. §§ 903(a), 4117(a)(2).

**[7] Federal Civil Procedure 170A ⊂⊐1272.1**

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(A) In General
      170Ak1272 Scope
         170Ak1272.1 k. In general. Most Cited Cases

Denial of pro se plaintiff's motions to compel discovery in § 1983 action was not abuse of discretion where evidence sought was immaterial to controlling question of whether probable cause existed for plaintiff's arrest. U.S.C.A.Const.Amend. 4; 42 U.S.C.A. § 1983.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.)))**

**\*667** On Appeal from the United States District Court for the Eastern District of Pennsylvania, (D.C. Civil No. 10–05215), District Judge: Honorable Timothy J. Savage.Donnelly J. LeBlanc, Huntingdon, PA, pro se.

Christine E. Munion, Esq., William J. Ferren & Associates, Blue Bell, PA, for Defendant–Appellee.

Daniel S. Altschuler, Esq., Robert J. Balch, Esq., Karyn Dobroskey Rienzi, Esq., Post & Schell, Philadelphia, PA, Andrew B. Adair, Esq., Christine D. Steere, Esq., Deasey, Mahoney, Valentini & North, Media, PA, for Defendant–Appellee.

Before: FUENTES, GREENAWAY, JR. and NYGAARD, Circuit Judges.

**\*668** OPINION

PER CURIAM.

**\*\*1** Donnelly J. LeBlanc appeals, pro se, from a District Court judgment in favor of defendants in his civil rights action. For the reasons that follow, we will summarily affirm the District Court's judgment.

I. *Background*

The record reflects that on October 7, 2007, during a dispute with his wife, LeBlanc drove his pick-up truck into his wife's Mercury Sable, pushing the Sable into their porch. LeBlanc said he purposefully damaged the Sable because he wanted his wife to get a new car and he did not want to invest the time and money to fix it. After the incident, LeBlanc and his wife drove to a nearby friend's house.

Detective Pappas responded to a report of a domestic disturbance and encountered LeBlanc and his wife at their friend's house. Pappas interviewed the LeBlancs and arrested LeBlanc for simple assault and recklessly endangering another person. Pappas photographed the damage to the automobile, had it towed to a garage, and stopped by LeBlanc's house to survey the damage to the porch.

Pappas warned State Farm, the insurer of the LeBlancs' cars and home, that LeBlanc might attempt to file a false insurance claim. On October 10, 2007, LeBlanc contacted his insurance agent, requesting reimbursement for the $95 towing bill he paid as a result of the October 7, 2007 incident. In making this request, LeBlanc misrepresented the events leading to the towing of the Sable.[FN1] LeBlanc's insurance agent believed that he was submitting a claim for the towing expense and assigned a claim number to the request.[FN2] While State Farm was reviewing LeBlanc's reimbursement request, LeBlanc's wife contacted the insurance agent's office and gave a slightly different version of the events that led to the towing of the Sable.

> FN1. According to the State Farm insurance agent's office, LeBlanc said he had hit a tree on Route 322 after a tire blew out. LeBlanc claimed that this was not the story he told State Farm, but he admitted that he made up a story about why the Sable needed to be towed.

> FN2. LeBlanc asserts that reimbursement for towing was not a part of his insurance policy, but was a courtesy service offered by his agent.

In December 2007, State Farm investigators contacted Pappas, and they later faxed him their report regarding LeBlanc's reimbursement request, including LeBlanc's and his wife's description of the incident that led to the towing of the Sable. The report also indicated that LeBlanc was seeking a quick settlement. After reviewing State Farm's report, Pappas described the events to Assistant District Attorney Dean Morgan. Pappas then prepared an affidavit of probable cause and criminal complaint against LeBlanc, charging him with criminal conspiracy and insurance fraud. The complaint was signed by Chief Thomas Zell of the Akron Borough Police Department. District Justice Willwerth issued a warrant for LeBlanc's arrest on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.)))**

January 8, 2008, and LeBlanc was arrested. However, in February 2010, the charges were nolle prossed, and the case was dismissed.FN3

> FN3. The Assistant District Attorney assigned to prosecute the criminal action was Brian E. Chudzik.

In October 2010, LeBlanc initiated a civil rights action under 42 U.S.C. § 1983 against Assistant District Attorney Craig Stedman, Chudzik, Zell, Morgan, Pappas, John Doe (Chief of Police), and the County of Lancaster. He presented claims of false arrest, false imprisonment, conspiracy,**669 and malicious prosecution. Defendants filed motions to dismiss. The District Court dismissed the claims against Stedman, Chudzik, Morgan, Doe, and Lancaster County, as well as the conspiracy claim. The District Court converted Zell's motion into a motion for summary judgment and granted the motion.FN4 After discovery, Pappas filed a motion for summary judgment, which the District Court granted. LeBlanc timely appeals and requests a temporary preliminary injunction and restraining order.

> FN4. After LeBlanc filed the complaint, he filed multiple motions for appointment of counsel and to compel discovery. The District Court denied all the requests.

II. *Jurisdiction and Standard of Review*
    **\*\*2** We have jurisdiction pursuant to 28 U.S.C. § 1291. "We review district court decisions regarding both summary judgment and dismissal for failure to state a claim under the same de novo standard of review." *Barefoot Architect, Inc. v. Bunge,* 632 F.3d 822, 826 (3d Cir.2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotations omitted). Summary judgment is granted when, viewing the evidence in the light most favorable to the nonmoving party, there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Beers–Capitol v. Whetzel,* 256 F.3d 120, 130 n. 6 (3d Cir.2001). We review the District Court's orders regarding discovery matters and appointment of counsel for abuse of discretion. *See Anderson v. Wachovia Mortg. Corp.,* 621 F.3d 261, 281 (3d Cir.2010); *Tabron v. Grace,* 6 F.3d 147, 155 n. 4 (3d Cir.1993). We may affirm on any basis supported by the record. *United States v. Agnew,* 407 F.3d 193, 196 (3d Cir.2005).

III. *Discussion*

A. *Motions to Dismiss*

1. Stedman, Chudzik, Morgan
    [1] LeBlanc's claims against Assistant District Attorneys Stedman, Chudzik, and Morgan revolve around the charging documents. LeBlanc alleged that Morgan failed to verify the information that he received from Pappas before agreeing that charges should be brought, and that Chudzik and Stedman failed to come forward with evidence that he did not file an insurance claim. Prosecutors, however, are immune from suit under § 1983 when "act[ing] within the scope of [their] duties in initiating and pursuing a criminal prosecution." *Imbler v. Pachtman,* 424 U.S. 409, 410, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). This protection encompasses prosecutors' activities in connection with preparing and filing charging documents, such as the information and arrest warrant. *Kalina v. Fletcher,* 522 U.S. 118, 129, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Consequently, Stedman, Chudzik, and Morgan were immune from suit, and the District Court properly dismissed the claims against them.

2. Lancaster County
    [2] To state a § 1983 claim against Lancaster County, LeBlanc must identify a county policy or custom that caused the his injury. *Monell v. N.Y. City Dep't of Soc. Servs.,* 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A policy or custom must be established by "showing that a governmental policymaker is responsible by action

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.)))**

or acquiescence for the policy or custom." **\*670** *Jiminez v. All Am. Rathskeller, Inc.,* 503 F.3d 247, 250 (3d Cir.2007). LeBlanc baldly stated that Lancaster County had a policy of accepting criminal charges and prosecuting without verifying the truth to the charges. This was insufficient to state a claim against Lancaster County. *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

### 3. John Doe, Chief of Police

[3] LeBlanc's claim against the Chief of Police also fails, as he did not allege facts to demonstrate the Chief of Police's personal involvement with his arrest, imprisonment, or prosecution. As the District Court recognized, a civil rights claim "cannot be predicated solely on the operation of respondeat superior." *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988).

### 4. Conspiracy Claim

**\*\*3** [4] To demonstrate the existence of a conspiracy under § 1983, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under color of law." *Parkway Garage, Inc. v. City of Phila.,* 5 F.3d 685, 700 (3d Cir.1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392 (3d Cir.2003). LeBlanc did not allege facts suggesting an illicit agreement. He simply stated that defendants "acted in concert to falsely arrest and imprison [him]." Therefore, his allegations failed. *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

### B. *Summary Judgment*

#### 1. Zell

[5] LeBlanc's claims against Zell for false arrest or false imprisonment are barred by the two-year statute of limitations. *See* 42 Pa. Cons.Stat. § 5524(1); *Garvin v. City of Phila.,* 354 F.3d 215, 220 (3d Cir.2003). The statute of limitations for a claim of false arrest or false imprisonment begins to run "at the time the claimant becomes detained pursuant to legal process." *See Wallace v. Kato,* 549 U.S. 384, 397, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). The statute of limitations thus

commenced when LeBlanc waived arraignment in March 2008. *See id.* at 391, 127 S.Ct. 1091. LeBlanc's § 1983 action was filed in October 2010, beyond the expiration of the limitations period.[FN5] Zell was therefore entitled to judgment as a matter of law.[FN6]

> FN5. We do not decide LeBlanc's claims of false arrest and false imprisonment against Pappas on the basis of the statute of limitations. He filed a § 1983 action against Pappas raising these claims in 2009, *see* E.D. Pa. No. 09–1685, and reinstated them after the insurance fraud and conspiracy charges were nolle prossed. *See Wallace,* 549 U.S. at 393–94, 127 S.Ct. 1091.

> FN6. The District Court did not address the malicious prosecution claim against Zell, which is not barred by the statute of limitations. *See Heck v. Humphrey,* 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). This failure is harmless error, as there is no set of facts on which LeBlanc may recover on his malicious prosecution claim against Zell. *See Hancock Indus. v. Schaeffer,* 811 F.2d 225, 229 (3d Cir.1987), *infra* § III.B.2.

#### 2. Pappas

The District Court properly granted summary judgment in favor of Pappas. To prove false arrest or false imprisonment, a plaintiff must demonstrate that the police lacked proper cause to arrest him. *Groman v. Twp. of Manalapan,* 47 F.3d 628, 634–36 (3d Cir.1995). Generally, the existence of probable cause is a question of fact. *Groman,* 47 F.3d at 635. However, a district court may conclude "that probable cause exists as a matter of **\*671** law if the evidence, viewed most favorably to [the p]laintiff, reasonably would not support a contrary factual finding." *Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 788–89 (3d Cir.2000).

"[P]robable cause to arrest exists when the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.)))**

facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that the offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police,* 71 F.3d 480, 483 (3d Cir.1995). Where an arrest is made pursuant to a warrant, establishing a lack of probable cause requires a plaintiff to show "by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson v. Russo,* 212 F.3d 781, 786–87 (3d Cir.2000).

[6] LeBlanc argues that probable cause did not exist because Pappas never proved that LeBlanc submitted an insurance claim for the Mercury Sable. While it is disputed whether LeBlanc's towing reimbursement request was an insurance claim or simply a courtesy request, *see supra* n. 2, this discrepancy is immaterial. "[W]e are concerned here only with the question of probable cause, not [LeBlanc's] guilt or innocence." *Wright v. City of Phila.,* 409 F.3d 595, 603 (3d Cir.2005). State Farm insurance agents believed that LeBlanc had submitted an insurance claim, and this belief was relayed to Pappas. Pappas noted this belief in the affidavit of probable cause, along with State Farm's record that on October 10, 2007, LeBlanc had represented to State Farm that he had struck a tree along Route 322 while operating the Sable, and that on November 2, 2007, LeBlanc's wife contacted State Farm, inquiring about the status of claim and reporting that LeBlanc had struck a tree on a different road. Pappas contrasted these representations with his October 2007 domestic disturbance investigation, which revealed that the Sable was damaged and required towing after LeBlanc drove his truck into it. The affidavit also noted that the insurance investigator commented that LeBlanc was pushing for a quick settlement. These statements in the probable cause affidavit

were all supported by police reports and State Farm's auto claim service and investigation report. Moreover, LeBlanc failed to show that Pappas had reason to doubt any of the evidence. *Cf. Baker v. McCollan,* 443 U.S. 137, 145–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (sheriff executing an arrest warrant not required to investigate independent every claim of innocence). We therefore agree that the police had probable cause to arrest LeBlanc, as the information within Pappas' knowledge would warrant a reasonable person to believe that LeBlanc had committed insurance fraud or conspiracy.[FN7] Similarly, because probable cause existed as to the charges, LeBlanc's malicious **\*672** prosecution claim must fail.[FN8] *See McKenna v. City of Phila.,* 582 F.3d 447, 461 (3d Cir.2009) (to prevail on malicious prosecution claim, plaintiff must show the criminal proceeding was initiated without probable cause). Simply put, summary judgment was proper because the evidence, viewed most favorably to LeBlanc, simply would not support a finding that probable cause did not exist. *See Merkle,* 211 F.3d at 788–89.

> FN7. A person commits insurance fraud if he "[k]nowingly and with the intent to defraud any insurer ... presents or causes to be presented to any insurer ... any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim." 18 Pa. Cons.Stat. § 4117(a)(2).

> "A person is guilty of conspiracy with another person ... to commit a crime if with the intent of promoting or facilitating its commission he: (1) agrees with such other person ... that they or one or more of them will engage in conduct which constitutes such crime ...; or (2) agrees to aid such other person ... in the planning or commission of such crime." 18 Pa. Cons.Stat. § 903(a).

> FN8. LeBlanc also argues that it was "fatal

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.)))**

error" that Pappas did not produce all the documentation he received from State Farm insurance in his motion for summary judgment, as one of Pappas' reports indicates he received 23 pages of claim information from State Farm. But the applicable rule places no requirement on a summary judgment movant to produce all evidence it obtained during discovery. *See* Fed.R.Civ.P. 56(c). LeBlanc additionally contends that the evidence of State Farm's claim service and investigation report is forged because "no prudent person would believe ... [that] a 1993 Mercury Sable would be financed by Capitol One Auto ... [or] covered by collision [insurance], especially not by a lower income family." LeBlanc, however, failed to support this bald assertion with any evidence, meaning it could not defeat summary judgment. *See Doe v. Luzerne Cnty.,* 660 F.3d 169, 175 (3d Cir.2011).

B. *Motions to Compel Discovery and Motions for Appointment of Counsel*
**\*\*4** [7] LeBlanc argues that the District Court abused its discretion in denying his multiple motions to compel discovery and appoint counsel. He contends that the denials prevented him from submitting evidence that the towing reimbursement he requested from State Farm was not part of his insurance policy. As discussed above, whether LeBlanc's towing reimbursement request was an insurance claim or simply a courtesy request was immaterial. LeBlanc's claims of false arrest, false imprisonment, and malicious prosecution turned on the question of probable cause, not LeBlanc's guilt or innocence. *See Wright,* 409 F.3d at 603. Accordingly, the District Court did not abuse its discretion by denying his motions to compel discovery. *See In re Fine Paper Antitrust Litig.,* 685 F.2d 810, 818 (3d Cir.1982). Similarly, the District Court did not abuse its discretion in denying LeBlanc's motions for appointment for counsel. *See Tabron,* 6 F.3d at 156–58.

For the foregoing reasons, we will affirm the District Court's judgment. LeBlanc's motion for a temporary preliminary injunction and restraining order is denied. *See NutraSweet Co. v. Vit–Mar Enters., Inc.,* 176 F.3d 151, 153 (3d Cir.1999).

C.A.3 (Pa.),2012.
LeBlanc v. Stedman
483 Fed.Appx. 666, 2012 WL 1528562 (C.A.3 (Pa.))

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1983 WL 1351 (W.D.Pa.), Fed. Sec. L. Rep. P 99,440
**(Cite as: 1983 WL 1351 (W.D.Pa.))**

H

United States District Court; W.D. Pennsylvania.
**Lellock**
v.
**Paine, Webber, Jackson & Curtis, Incorporated.**

Civil Action No. 81-2104
June 29, 1983

BLOCH, District Judge.

**\*1** Plaintiff, Michael L. Lellock, brings this action against defendant, Paine, Webber, Jackson & Curtis, Inc., pursuant to the Federal Securities Exchange Act of 1934, 15 U.S.C. § 78a *et. seq.* Plaintiff's complaint contains four counts, with Counts One and Four alleging violations of 15 U.S.C. § 78g and § 78o(c)(1), respectively, of the Securities Exchange Act and Counts Two and Three alleging violations of the rules of fair practice of the National Association of Securities Dealers. Pursuant to defendant's motion and by Opinion and Order of this Court dated October 14, 1982 (*Lellock v. Paine, Webber, Jackson & Curtis, Inc.,* C.A. 81-2104 (docket entry No. 8)), Counts Two and Three were stayed pending arbitration, leaving only Counts One and Four pending before this Court.

In Count One, plaintiff alleges that he was a customer of defendant and transacted business with defendant through defendant's agents at defendant's Wichita, Kansas office. Plaintiff contends that defendant erroneously credited $6,500 to his account in June of 1981 and that he (plaintiff) informed defendant of the error and requested that defendant's agent correct the account. Count One asserts that prior to correcting the error, the defendant relied on plaintiff's account balance to purchase calls for him in September of 1981. The plaintiff then contends that after purchasing the calls for plaintiff, the defendant removed the $6,500 from plaintiff's account, thereby destroying

plaintiff's protection and resulting in the sale of plaintiff's collateral shares of stock. Accordingly, plaintiff claims that defendant's purchase of the calls under these circumstances violated the margin[FN1] provision of 15 U.S.C. § 78g and the regulations promulgated thereunder, namely 12 C.F.R. § 220 *et. seq.*

> FN1 "The 'margin' device permits a broker to extend credit to his customer to finance the customer's transactions, with the broker holding a security interest in the securities purchased as collateral for the loan. The customer pays an agreed percentage of the purchase price by depositing cash or other securities, and the broker holds the stock purchased as collateral for the balance. The broker in turn often finances the purchase by using the securities purchased as collateral for a bank loan." *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 780 n.2 (3d Cir. 1982). The Federal Reserve Board is authorized to regulate the margin rate pursuant to § 7 of the Federal Securities Exchange Act, 15 U.S.C. § 78g. The margin rate has varied from 40% to 100% since the enactment of § 7, and "[w]hen the Federal Reserve Board desires to stimulate the market, it reduces the margin requirements, and when it determines that stock market activity has been unduly stimulated by easy credit, it raises the margin requirements." *Pabst Brewing Co. v. Kalmanovitz,* 551 F.Supp. 882, 888 (D. Del. 1982).

Count Four asserts that through the aforementioned transaction, defendant transferred and converted plaintiff's securities into margin accounts for the purchase of options in violation of 15 U.S.C. § 78o(c)(1) and 17 C.F.R. § 240.15c2-5. Specifically, plaintiff contends that defendant's failure to deliver a written statement to him

Not Reported in F.Supp., 1983 WL 1351 (W.D.Pa.), Fed. Sec. L. Rep. P 99,440
**(Cite as: 1983 WL 1351 (W.D.Pa.))**

regarding his obligations under the margin account arrangement and to obtain information from him regarding his financial situation constitutes fraudulent, deceptive, or manipulative acts within the meaning of 15 U.S.C. § 78o(c)(1).

**\*2** Three motions, other than the aforementioned motion for stay, have been filed and are presently pending in this case. The defendant has filed a motion for judgment on the pleadings and a motion for summary judgment, both of which are based upon the same legal argument. The plaintiff has filed a motion for leave to amend his complaint. For the reasons set forth below, the Court grants defendant's motion for judgment on the pleadings and denies plaintiff's motion for leave to amend. The foregoing rulings moot defendant's motion for summary judgment. The Court first discusses defendant's motion for judgment on the pleadings and then turns to plaintiff's motion for leave to amend.

Defendant's motion for judgment on the pleadings is filed pursuant to Fed. R. Civ. P. 12(c). FN2 When confronted by a motion for judgment on the pleadings, the Court must "assume the truth of all material allegations of the complaint" ( *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 780 (3d Cir. 1982)), and judgment on the pleadings may be granted only if taking the allegations of the pleadings as true, the moving party is clearly entitled to judgment. 2A MOORE'S FEDERAL PRACTICE P 12.15, p. 2344. With these thoughts in mind, the Court focuses its attention on the merits of defendant's motion for judgment on the pleadings.

FN2 Fed. R. Civ. P. 12(c) provides as follows: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and

disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

In support of its motion as to Count One, defendant directs the Court to the recent Third Circuit case of *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778 (3d Cir. 1982). In that case, the plaintiff was a customer of a brokerage firm, which, in turn, was a member of the defendant. The brokerage firm began to aggressively promote the purchase of certain common stock, recommending to plaintiff and other customers that they utilize the full amount of available margin purchasing power FN3 to purchase the common stock. The brokerage firm sold numerous shares of the common stock over a two-year period. Over time, the price of the stock began a steady decline, thereby causing a number of the brokerage firm's accounts to become under-margined. In turn, the brokerage firm requested additional margin deposits of numerous customers, but several customers, including plaintiff, failed to meet the call. The brokerage firm continued to send margin calls to its customers, but did not liquidate any of the accounts holding the common stock but not able to meet the call.

FN3 See footnote 1, *supra.*

**\*3** The market for the common stock continued to decline, and the brokerage firm was ultimately forced to sell the stock at a substantial loss. The brokerage firm credited its customers with the proceeds of the sale, but an aggregate debt in excess of $500,000 remained, and the brokerage firm thereafter attempted to collect the deficiencies from its customers.

Plaintiff first filed an action against the brokerage firm, alleging, inter alia, violations of the Securities Exchange Act. Before the case came to trial, the brokerage firm petitioned for bankruptcy, and the case was stayed pursuant to the bankruptcy proceeding. Plaintiff then commenced an action against defendant, alleging, inter alia, violation of §

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1983 WL 1351 (W.D.Pa.), Fed. Sec. L. Rep. P 99,440
**(Cite as: 1983 WL 1351 (W.D.Pa.))**

7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g, for failing to enforce Regulation T, FN4 12 C.F.R. § 220 *et.seq.* –the same provisions that the plaintiff in this case relies on in Count One.

> FN4 Title 12 C.F.R. § 220 *et. seq.,* otherwise known as Regulation T, was promulgated under authority of § 7 and generally sets the margin rates for securities as established by the Federal Reserve Board. *See Walck,* 687 F.2d at 788 n.14.

The district court entered judgment on the pleadings, and on appeal the Third Circuit addressed plaintiff's contention under § 7 and Regulation T. The Third Circuit held that § 7 does not authorize a private action to enforce § 7 or Regulation T. The Third Circuit based its decision on four grounds. First, the Third Circuit stated that § 7 was not enacted for the benefit of investors, but rather to protect the overall economy from excessive speculation. Second, the legislative history does not express a congressional intent to create a remedy. Third, the Court found no reason to hold that private enforcement is necessary to achieve Congress' goal of protecting the overall economy. Finally, the Court found that a 1970 amendment FN5 to § 7 is probative of Congress' intent to deny investors a damages remedy for their brokers' violations. *Walck,* 687 F.2d at 788-789.

> FN5 The 1970 amendment is § 7(f)(1), 15 U.S.C. § 78g(f)(1), which provides as follows: "It is unlawful for any United States person, or any foreign person controlled by a United States person or acting on behalf of or in conjunction with such person, to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender (without regard to whether the lender's office or place of business is in a State or the transaction occurred in whole or in part within a State) for the purpose of (A) purchasing or carrying United States

securities, or (B) purchasing or carrying within the United States of any other securities, if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited or would be prohibited if it has been made or the transaction had otherwise occurred in a lender's office or other place of business in a State."

**\*4** The Court finds that *Walck* necessitates judgment on the pleadings on Count One of the complaint. Count One asserts a violation of § 7 (15 U.S.C. § 78g) and Regulation T (12 C.F.R. § 220 *et. seq.*) as a basis for plaintiff's damage claim. *Walck* clearly states that these provisions do not create a basis for a private remedy. Although *Walck* differs from this case in that it involved a stock exchange rather than a broker, the Court believes that it controls here, FN6 especially in light of the Court's reasoning for the decision (e.g. that § 7, by its terms, does not create a private remedy and that the legislative history does not reveal any intent to create such a remedy). Moreover, although *Walck* was decided after the filing of this complaint, FN7 it is presently the law and must be applied to the pending motion. Thus, even taking the allegations in Count One as true, they do not state a claim.

> FN6 The Court emphasizes the *Walck* Court's language on page 789 of the opinion, which discusses the 1970 amendment to § 7 and which states as follows: "Subsequent decisions have found the amendment probative of congressional intent to deny investors a damages remedy for the *brokers'* violations." (Emphasis added).

> FN7 The complaint was filed on November 25, 1981, and *Walck* was decided on September 1, 1982.

In connection with Count Four, the defendant directs the Court's attention to § 15(c)(1) of the Securities Exchange Act, 15 U. S. C. § 78o(c)(1),

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1983 WL 1351 (W.D.Pa.), Fed. Sec. L. Rep. P 99,440

**(Cite as: 1983 WL 1351 (W.D.Pa.))**

FN8 and Rule 15c2-5, 17 C.F.R. § 240.15c2-5, of the Rules promulgated under § 15(c)(1). Section 15(c)(1) prohibits a broker or dealer from using the mail or any other means of interstate commerce for the purpose of effecting any transaction in, or to induce the purchase of, any security by means of any manipulative, deceptive, or fraudulent device. That section authorizes the Securities and Exchange Commission to promulgate rules and regulations for the purposes of defining terms and insuring compliance with the provisions of § 78o. Pursuant to its authority under § 78o, the Commission has enacted Rule 15c2-5, 12 C.F.R. § 240.15c2-5, the very rule which plaintiff relies upon in Count Four. That rule provides in pertinent part as follows:

FN8 Title 15 U.S.C. § 78o(c)(1) provides as follows: "No broker or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange of which it is a member by means of any manipulative, deceptive, or other fraudulent device or contrivance, and no municipal securities dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any municipal security by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this paragraph, by rules and regulations define such devices or contrivance as are manipulative, deceptive, or otherwise fraudulent."

**\*5** (b) This section shall not apply to any credit extended or any loan arranged by any broker or dealer subject to the provisions of Regulation T (12

C.F.R. 220) if such credit is extended or such loan is arranged, in compliance with the requirements of such regulation, only for the purpose of purchasing or carrying the security offered or sold . . ..

The Court now reviews Count Four in light of this regulation.

As stated, plaintiff relies upon § 15(c)(1) and Rule 15c2-5 as the basis for Count Four. FN9 However, Count Four also incorporates the allegations of Count One and relies upon the transaction set forth in Count One as a basis for the claim contained in Count Four. Complaint, P 27-28 (docket entry No. 1). The essence of plaintiff's claim in Count Four, via Count One, is a Regulation T violation, and as the pertinent provision of Rule 15c2-5 above provides, the Rule upon which plaintiff relies as a basis for his claim does not apply to credit extended or loans arranged subject to Regulation T. FN10 Accordingly, the Court finds that neither § 15(c)(1) nor Rule 15c2-5 provide a basis for the claim asserted in Count Four.

FN9 Count Four asserts that defendant engaged in fraudulent, deceptive, or manipulative act or practice in that defendant offered and sold securities to plaintiff on margin without delivering to plaintiff a written statement setting forth the exact nature and extent of plaintiff's obligations under the margin account arrangement and without obtaining from plaintiff any information concerning his financial situation and needs.

FN10 In fact, the defendant's brief cites the Court to a 1962 Securities Exchange Commission Release, which indicates that the Rule was "not intended to reach the traditional margin transaction made by a broker-dealer subject to Regulation T." Commission Release No. 34-6851 (June 17, 1962), CCH Sec. L.Rep. P 76,852, p. 81, 164. Moreover, the Rule itself suggests that it is aimed at transactions involving

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1983 WL 1351 (W.D.Pa.), Fed. Sec. L. Rep. P 99,440
**(Cite as: 1983 WL 1351 (W.D.Pa.))**

the extension of or arrangement for credit by a broker or dealer in a special insurance premium funding account. 12 C.F.R. § 240.15c2-5(b).

Plaintiff has filed a response to defendant's motion for judgment on the pleadings, which includes a motion for leave to amend the complaint after discovery. In the motion for leave to amend, plaintiff acknowledges that the *Walck* case indicates that he has no cause of action under § 7. FN11 Motion for leave to amend complaint after discovery, P 3 (docket entry No. 14). Moreover, plaintiff's motion states that he can assert other causes of action under the Securities Exchange Act that arise out of the same facts asserted in the complaint. Motion for leave to amend complaint after discovery, P 4-5 (docket entry No. 14). It should be noted that plaintiff's brief in support of his motion for leave to amend does suggest that he may be able to assert a cause of action, based on the same facts, under § 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b); however, the motion does not attach a proposed amended complaint asserting any such cause of action. The motion, and brief in support thereof, recommend that plaintiff be given additonal time for discovery before being required to file an amended complaint.

> FN11 It should also be noted that neither plaintiff's response to defendant's motion for judgment on the pleadings, nor plaintiff's motion for leave to amend, nor plaintiff's briefs filed in support thereof address the propriety of the claim under Count Four.

**\*6** Motions for leave to file amended pleadings are governed by Fed. R. Civ. P. 15(a), which provides as follows:

A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been place upon the trial calender, he

may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

Since defendants have filed a responsive pleading, FN12 leave of Court is necessary.

> FN12 The defendant filed an answer on December 13, 1982, and plaintiff's motion for leave to amend was filed on December 22, 1982.

In *Foman v. Davis,* 371 U.S. 178 (1962), the United States Supreme Court interpreted Rule 15(a) by stating:

If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason–such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.–the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the district court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the federal rules.

*Id.* at 182. This Court has also interpreted Rule 15(a) by stating that the right to amend a pleading is addressed to the discretion of the district court, and great liberality in allowance of amendments is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1983 WL 1351 (W.D.Pa.), Fed. Sec. L. Rep. P 99,440
**(Cite as: 1983 WL 1351 (W.D.Pa.))**

desired where it is necessary to bring about a furtherance of justice. *Hirschhorn v. Mine Safety Appliances Co.,* 101 F.Supp. 549, 552 (W.D. Pa. 1951), *aff'd.,* 193 F.2d 489 (3d Cir. 1952), *cert. denied,* 346 U.S. 866 (1953). However, the prescription of a liberal policy toward amendment of pleadings does not mean the absence of all restraint. *Garrison v. Baltimore & Ohio Railroad Co.,* 20 F.R.D. 190, 194 (W.D. Pa. 1957). Thus, the Court must exercise its discretion in light of the circumstances presented by the case at hand.

It must be further noted that practice under Rule 15(a) requires that a motion set forth, with particularity, the order requested and the grounds supporting the application. Wright and Miller, Federal Practice and Procedure § 1485, p. 422. In order to satisfy this requirement, the moving party should attach a proposed amended pleading to the motion in order to apprise the Court, and the opposing party, of the exact nature of the claim. *Williams v. Wilkerson,* 90 F.R.D. 168, 170 (E.D. Va. 1981); Wright and Miller, Federal Practice and Procedure § 1485, p. 422; MOORE'S FEDERAL PRACTICE § 15.12, p. 15-152–15-153. In sum, the opposing party must be put on notice of the nature of the proposed amendment so that he is given ample opportunity to present specific objections. *See* Wright and Miller, Federal Practice and Procedure § 455, p. 422.

**\*7** The plaintiff in this case has not complied with the pleading and practice requirements of Rule 15(a). Plaintiff's motion and brief essentially state that he believes that he has a claim under the Securities Exchange Act, and, if given time, he will figure out what that claim is. This is not a permissible approach to obtaining leave to amend. As stated, the moving party in a Rule 15(a) situation must apprise the Court and the opposing party of the precise nature of the proposed amendment, and because plaintiff has failed to do this, his motion must fail.

In sum, the Court grants defendant's motion for judgment on the pleadings on Counts One and Four

of the complaint and denies plaintiff's motion for leave to amend the complaint. These rulings serve to moot plaintiff's motion for summary judgment. However, it must be remembered that this Court stayed all legal proceedings on Counts Two and Three of this action and retains jurisdiction over those two counts pending arbitration. Thus, although Counts One and Four are dispensed with through this Opinion and supplementing Order, Counts Two and Three remain open on this Court's docket.

Appropriate Orders will be issued.

W.D.Pa. 1983.
Lellock v. Paine, Webber, Jackson & Curtis, Inc.
Not Reported in F.Supp., 1983 WL 1351 (W.D.Pa.), Fed. Sec. L. Rep. P 99,440

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
**(Cite as: 2011 WL 5320738 (M.D.Pa.))**

**c**

Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Kelly L. STONE, Plaintiff,
v.
Derek E. FELSMAN, and Mark E. Shutkufski,
Defendants.

Civil Action No. 3:10–0442.
Nov. 1, 2011.

Michael D. Collins, Law Office of Michael D.
Collins, Shawnee-on-Delaware, PA, for Plaintiff.

Patrick S. Cawley, Pennsylvania Office of Attorney
General, Harrisburg, PA, for Defendants.

*MEMORANDUM AND ORDER*[FN1]

> FN1. For the convenience of the reader of
> this document in electronic format,
> hyperlinks to the Court's record and to
> authority cited herein have been inserted.
> No endorsement of any provider of
> electronic resources is intended by the
> Court's practice of using hyperlinks.

MALACHY E. MANNION, United States
Magistrate Judge.

**\*1** Pending before the court is defendants'
motion for partial summary judgment. (Doc. No. *29*
). For the reasons set forth below, the motion will
be **GRANTED** in part and **DENIED** in part.

**I. FACTS AND PROCEDURAL
BACKGROUND**[FN2]

> FN2. In accordance with the standard of
> review for a motion for summary
> judgment, the court will present the facts
> in the light most favorable to the plaintiff,
> the nonmoving party.

On March 1, 2008, at approximately 1:15 p.m.,
an anonymous caller reported that there were three
black males and a female arguing inside and
outside of a tan or gold colored vehicle in the area
of 100 Main Street in Delaware Water Gap,
Pennsylvania. *Id.* Trial Tr. 3:24–4:3 April 14, 2008.
This call was placed to Monroe County Control
Center who then relayed the call to the
Pennsylvania State Police. *Id.* at 7:23–8:3. Based
on that information, defendants Felsman and
Shutkufski were dispatched to the scene. *Id.* at
3:21–4:5.

When defendants Felsman and Shutkufski
arrived at the 100 block of Main Street, they
observed a black male and a white female standing
on the sidewalk outside of a car, and two black
males sitting inside of a car, who appeared to be
engaged in conversation. *Id.* at 6:25–7:16,
11:22–12:6. Consequently, the defendants
approached those individuals as they believed they
matched the description provided by the dispatcher.
*Id.* at 12:9–17.

Defendant Felsman began speaking to the black
male and white female who were standing on the
sidewalk near the car. *Id.* at 12:18–13:7. While
defendant Felsman was speaking with the black
male and white female who were on the sidewalk,
defendant Shutkufski approached the passenger
side of the vehicle. *Id.* at 17:14–18:6. The plaintiff,
Kelly Stone, was seated in the front passenger seat,
and was engaged in a conversation on his cell
phone. *Id.* at 46:9–22. As such, defendant
Shutkufski knocked on the front passenger window,
in a aggressive manner, in order to speak with the
plaintiff. *Id.* at 46:24–47:4, 54:21–25. Startled, the
plaintiff told defendant Shutkufski that he had not
done anything wrong, and according to the
defendant, the plaintiff also used some profanity.
*Id.* at 48, 82:5–83:2. Defendant Shutkufski
subsequently directed the plaintiff to get off of his
cell phone, get out of the vehicle and to produce his
license. *Id.* at 61:19–62:25. The plaintiff ultimately

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
**(Cite as: 2011 WL 5320738 (M.D.Pa.))**

complied with the commands to exit the vehicle and to produce his license. *Id.* However, the plaintiff remained on the phone, although he did not have his phone up to his ear when he exited the vehicle. *Id.* at 23:21–22; 96:13–97:1.

After Stone exited the vehicle, he attempted to explain to defendant Shutkufski that he was not involved in the argument which was nothing more than two friends arguing, and that the argument had ended. *Id.* at 80:23–83–2. Defendant Shutkufski continued to talk to Stone in a aggressive, overtly hostile, loud voice, spiced with profanities. *Id.* at 80:8–87:25. As such, plaintiff continued to request that defendant Shutkufski speak to him in a respectful tone. *Id.* at 83:4–13. Defendant Shutkufski then ordered the plaintiff to "get the fuck off the fucking phone." *Id.* at 83:13–14. The plaintiff then briefly removed the phone from his ear, but then brought the phone back to his ear in order to resume his conversation. *Id.* at 83:15–22.

**\*2** At that point, defendant Shutkufski struck the cell phone out of plaintiff's hand. *Id.* at 84:2–3. As a result, the phone broke when it hit the ground. *Id.* Plaintiff then said "did you see that, they broke my fucking phone." *Id.* at 84:5–7.

The plaintiff was then arrested, thrown to the ground, and knocked unconscious. *Id.* at 84:7–17. When plaintiff woke up, he was face down on the ground with handcuffs on. *Id.* at 87:5–7. He was then picked up off the ground, and, at that point, plaintiff called out to his friend, requesting for him to call his father. *Id.* at 87:9–16. Plaintiff also told defendant Shutkufski that what they did to him was "fucked up." *Id.* at 87:14–20. Defendant Shutkufski replied that he should call Al Sharpton. *Id.* at 87:20–21.

Plaintiff was then taken to the Swiftwater barracks where he was interrogated about drug dealers and gangs. *Id.* at 98:7–10. He was subsequently issued a citation for disorderly conduct. *Id.* at 110:25. Plaintiff plead not guilty, and was acquitted of the disorderly conduct charge.

*Id.* at 110:5–6.

Based on the foregoing, the plaintiff commenced this action by filing a complaint on February 27, 2010. (Doc. No. *1* ). Plaintiff brings claims against defendants Felsman and Shutkufski for violating his First, Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983, as well as claims under 42 U.S.C. §§ 1981 and 1985(3). *Id.* In addition, the plaintiff brings claims for assault, battery, false arrest, false imprisonment and malicious prosecution under Pennsylvania state law. *Id.*

On September 23, 2011, the defendants filed a motion for summary judgment that was accompanied by a statement of facts and a brief in support. (Doc. No.'s *29, 30,* & *31* ). Accordingly, on October 11, 2011, the plaintiff filed a brief in opposition that was accompanied by a statement of facts. (Doc. No.'s *32* & *33* ), and on October 17, 2011, the defendants filed a reply brief. (Doc. No. *34* ).

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Turner v. Schering–Plough Corp., 901 F.2d 335, 340 (3d Cir.1990).* A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F.Supp. 836, 838 (M.D.Pa.1995).* At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
**(Cite as: 2011 WL 5320738 (M.D.Pa.))**

trial." *Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir.2004)* (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir.2007).*

**\*3** To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex, 477 U.S. at 323–24.* The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman, 327 F.3d 229, 238 (3d Cir.2003); see also Celotex, 477 U.S. at 325.* If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir.1998* ) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)*). However, if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the nonmovant] will bear the burden of proof at trial," *Rule 56* mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp., 477 U.S. at 322–23; Jakimas v. Hoffman–La Roche, Inc., 485 F.3d 770, 777 (3d Cir.2007).* [FN3]

> **FN3.** If the nonmoving party has the burden of proof at trial, the party moving for summary judgment is not required to "support its motion with affidavits or other similar material *negating* the opponent's claim," *Celotex, 477 U.S. at 323,* in order to discharge this "initial responsibility." In

this situation, the movant " 'show[s]'—that is, point [s] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## IV. LEGAL ANALYSIS

Defendants have raised various arguments as to why they are entitled to summary judgment. The court will consider these arguments below.

### A. Fourth Amendment

Unreasonable searches and seizures are prohibited by the Fourth Amendment. *U.S. CONST. amend. IV.* "The Fourth Amendment's requirement that searches and seizures be founded upon objective justification, governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Mendenhall, 446 U.S. 544, 551, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)* (internal quotation marks omitted). Where the encounter between the police and the person questioned is consensual in nature, i.e., a mere encounter, no Fourth Amendment claim arises. *Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).* Law enforcement officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in public places," putting questions to those "willing to listen," and "ask[ing] for identification" even absent any "basis for suspecting a particular individual." *United States v. Drayton, 536 U.S. 194, 200, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002).* Rather, the protections of the Fourth Amendment are triggered when an encounter loses its consensual nature. In other words, a Fourth Amendment seizure has occurred if an individual is "restrained" by an officer's use of "physical force or show of authority." *United States v. Smith, 575 F.3d 308, 312 (3d Cir. July 30, 2009)* (quoting *Bostick,* 501 U.S. at 434). "To be clear, a seizure 'requires *either* physical force ... *or,* where that is absent, *submission* to the assertion of authority.' " *Id.* at 313 (citing *California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)* ).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
**(Cite as: 2011 WL 5320738 (M.D.Pa.))**

"[T]he test for [the] existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D., 499 U.S. at 628; see also Commonwealth v. Wood, 833 A.2d 740, 745 (Pa.Super.2003)* ("[I]t is axiomatic that our courts discern whether a person has been seized by determining whether, under all the circumstances surrounding the incident at issue, a reasonable person would believe he was free to leave.") (internal quotation marks omitted).

**\*4** In reaching a determination as to whether an encounter is a search or seizure for Fourth Amendment purposes, one is "require[d] to consider [ ] ... all the circumstances surrounding the encounter." *Smith, 575 F.3d at 312* (quoting *Bostick, 501 U.S. at 439, —— S.Ct. at —— ).* Our case law looks to a variety of factors indicative of a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id. at 313* (quoting *Mendenhall, 446 U.S. at 554* ). Furthermore, "[a]ny inquiry into an alleged seizure *must* begin by determining when the seizure occurred." *Id. at 312* (citing *United States v. Torres, 534 F.3d 207, 210 (3d Cir.2008)* ).

Even if an individual is subject to an investigatory detention or seizure, *Terry,* and cases which follow it, make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Ubiles, 224 F.3d 213, 217 (3d Cir.2000)* (quoting *Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)*). As such, an officer's detention of an individual must have been based on something more substantial than an "inchoate and unparticularized suspicion or 'hunch.' " *Johnson,*

*332 F.3d at 206* (citing *Terry,* 392 U.S. at 27). Accordingly, officers must be able to point to some objective manifestation that an individual was, or was about to be, engaged in criminal activity. *See id.* (quoting *United States v. Cortez, 449 U.S. 411, 417 1981, 101 S.Ct. 690, 66 L.Ed.2d 621)* ).

Moreover, whether or not an officer has an articulable suspicion is an objective test:

> Because reasonable suspicion is an objective test, we examine the facts within the knowledge of [the police officer] to determine the presence or nonexistence of reasonable suspicion; we do not examine the subjective beliefs of [the police officer] to determine whether he thought that the facts constituted reasonable suspicion. Additionally, it must be noted that, because the *Terry* reasonable suspicion standard is a commonsensical proposition, courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.

*United States v. Foreman, 369 F.3d 776, 781–82 (4th Cir.2004)* (brackets and citations omitted). *See also Gibson v. Superintendent of N.J. Dep't of Law and Pub. Safety, 411 F.3d 427, 440–41 (3d Cir.2005)* (the defendant officer's subjective motivation or purpose is not central to the Fourth Amendment inquiry). Furthermore, this objective test is one of reasonableness given the totality of the circumstances which can include an individual's location, a history of crime in the area, an individual's nervous behavior and evasiveness, and an officer's commonsense judgments and inferences about human behavior. *Johnson, 332 F.3d at 206* (quoting *Illinois v. Wardlow, 528 U.S. 119, 124–25, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)*) (internal quotation marks omitted). Consequently, the ultimate question is whether a reasonable, trained officer standing in that officer's shoes could articulate specific reasons justifying the detention of that individual. *See id.*

**\*5** As discussed above, "[a]ny inquiry into an

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
**(Cite as: 2011 WL 5320738 (M.D.Pa.))**

alleged seizure *must* begin by determining when the seizure occurred." *Smith, 575 F.3d at 312* (citing *United States v. Torres, 534 F.3d 207, 210 (3d Cir.2008)* ). As an initial matter, the court notes the parties do not appear to dispute the fact that the plaintiff was detained prior to his arrest, namely that the defendants conducted an investigatory stop when they arrived at the scene.[FN4 FN5]

[FN4.] Nevertheless, the plaintiff contends that he was seized when defendant Shutkufski ordered that he produce identification, and that he get out of the vehicle. The record indicates that while plaintiff was seated in the passenger side of the car, defendant Shutkufski knocked aggressively on the window and then stated, "Let me see your fucking license" and then directed the plaintiff to "Get out of the car." Trial Tr. 82:5–17. In addition, the plaintiff asserts that throughout the course of the incident, defendant Shutkufski spoke to him in an aggressive, overly hostile, loud voice, spiced with profanities. Moreover, in defendants' reply brief, they concede that during the investigatory stop the plaintiff's identification was *demanded.* (Doc. No. *34* at 8.) As such, the court finds that the plaintiff has adduced evidence that due to the asserted tone of defendant Shutkufski's voice, a reasonable person would not have found that he was free to walk away. *See United States v. Smith, 575 F.3d 308 (3d Cir.2009)* (A request for identification may constitute a seizure where the officer or officers: had physical contact with the person, or used direct language indicating that a failure to comply with the request would lead to an arrest, or *used a threatening tone,* or displayed their weapons in a way which is novel or unusual for police officers in non-emergency situations.).

[FN5.] The court notes that defendant Shutkufski testified that the plaintiff was not free to walk away until he was identified. Trial Tr. 60:9–17.

Consequently, the court must now determine if the seizure of the plaintiff was constitutionally sound. The defendants argue that the seizure of plaintiff was justified because the plaintiff and the individuals he was with matched the description provided in the anonymous tip.

The court cannot agree that the detention of the plaintiff was justified solely on the basis that the individuals appeared to match the description of the individuals given via the anonymous tip. Both the Supreme Court, and the Third Circuit have explained:

an anonymous tip ... without additional corroboration, "lack[s] the 'indicia of reliability' needed to justify a stop under the reasonable suspicion standard." *Virginia v. Harris,* —— U.S. ——, ——, 130 S.Ct. 10, 10, 175 L.Ed.2d 322 (2009); *Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *United States v. Brown,* 448 F.3d 239, 249 (3d Cir.2006). An anonymous tip can only be the basis for reasonable suspicion if accompanied by specific indicia of reliability. *J.L.,* 529 U.S. at 270. We consider five factors to assess whether a tip is reliable:

(1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.

(2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.

(3) The content of the tip is not information that would be available to any observer ...

(4) The person providing the information has

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
**(Cite as: 2011 WL 5320738 (M.D.Pa.))**

recently witnessed the alleged criminal activity.

(5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility[.]

*United States v. Torres,* 534 F.3d 207, 211 (3d Cir.2008). We have also recognized other facts which serve to bolster an insufficient tip, including: (1) presence of the suspect in a high-crime area; (2) presence of the suspect on the street at a late hour; (3) a suspect's nervous or evasive behavior; and (4) any behavior by the suspect that conforms to an officer's specialized knowledge of criminal activity. *Id.*

*See United States v. Coleman,* 383 Fed. Appx. 180, 184–85 (3d Cir.2010). In this case, the court cannot find that the tip implicates any of the factors outlined in *Torres.* As indicated above, the tip was given from an anonymous individual via a phone call. As such, the tip was clearly not given face-to-face and the person who provided the tip cannot be held responsible. Additionally, anyone could have observed the reported argument. Moreover, there is no indication that the individual who provided the anonymous tip actually witnessed any criminal activity, as the individual had observed an argument that occurred on the street. Furthermore, the tip did not predict any future activity, nor were the individuals described to have been located in a high crime area or present on the street at a late hour. In addition, the defendants have not identified any behavior by the plaintiff that conforms to an officer's specialized knowledge of criminal activity. To the contrary, the record indicates that the plaintiff was sitting in the passenger side of a parked car, talking on his cell phone, in the middle of the day. To the extent the defendants have asserted that the plaintiff was on his cell phone during the incident, upon construing the facts in a light most favorable to the plaintiff, it does not appear that the plaintiff was evasive as he ultimately complied with the officer's requests to exit the vehicle, and to provide identification.[FN6] Finally, the court notes that even if the anonymous

tip was reliable in identifying the individuals who were arguing, "[t]he reasonable suspicion ... requires that a tip be reliable in its assertion of illegality, not just its tendency to identify a determinate person." *J.L., 529 U.S. at 272*. In sum, the court cannot find that the unknown caller's tip "possessed sufficient indicia of reliability, when considering the totality of the circumstances, for us to conclude that the officers possessed an objectively reasonable suspicion sufficient to justify a *Terry* stop." *See Brown, 448 F.3d at 250*.

> FN6. Moreover, the plaintiff appears to have been seized beginning when his identification was demanded, and, therefore, plaintiff's asserted demeanor with regards to his cell phone was not yet known to the defendants. In any event, as indicated above, it does not appear that plaintiff's use of his cell phone bolstered the reliability of the anonymous tip.

**\*6** Consequently, the defendants' motion for summary judgment on plaintiff's Fourth Amendment claim will be denied.

**B. Fourteenth Amendment Claims**

Defendants argue that they are entitled to summary judgment on plaintiff's Fourteenth Amendment due process claims regarding the asserted unlawful seizures and use of force. The court agrees. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)* (quoting *Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)*) (quotation marks omitted). Because plaintiff's Fourth Amendment claims are identical to his Fourteenth Amendment claims, he must bring his claims pursuant to the Fourth Amendment, the more explicit constitutional amendment. *See Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
**(Cite as: 2011 WL 5320738 (M.D.Pa.))**

*1865, 104 L.Ed.2d 443 (1989)* ("all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"); *Fagan v. City of Vineland, 22 F.3d 1296, 1305 n. 5 (3d Cir.1994)* (excessive force claims against the police are actionable under the Fourth Amendment rather than the substantive component of the Due Process Clause of the Fourteenth Amendment); *Tolan v. Fedorchak,* No. 07–3870, 2009 U.S. Dist. LEXIS 89907, at *15–16, 2009 WL 3128431 (M.D.Pa. Sept. 28, 2009) ("Here, a specific Constitutional provision, the Fourth Amendment, 'provides [Plaintiff with] an explicit textual source of constitutional protection' against unlawful seizures. *Albright, 510 U.S. at 271.* This Court, therefore, need not separately address Tolan's Fourteenth Amendment due process claim.").

**C. First Amendment Retaliation**[FN7]

    [FN7.] Although not addressed by the parties, the court notes that plaintiff's complaint alleges "a violation of his constitutional rights under the First and Fourteenth Amendments to the United States Constitution to be free from retaliation for engaging in protected speech and conduct." (Doc. No. *1* at 8). However, in light of the fact that, "the First Amendment ... provides an explicit textual source of constitutional protection to Plaintiff ... any reliance on the substantive component of the Due Process Clause is misplaced." *See Albright v. Oliver, 510 U.S. at 273* (quoting *Graham, 490 U.S. at 395* ) (quotation marks omitted). Accordingly, plaintiff's retaliation claims based on his right to free speech are properly brought under the First Amendment, and not the Fourteenth Amendment. *See Savokinas v. Borough of Avoca,* No. 07–2311, 2010 U.S. Dist.

LEXIS 3734, at *13–15, 2010 WL 235132 (M.D.Pa. Jan. 19, 2010).

    "The First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out." *McCoy v. Edwards,* No. 06–1142, 2009 U.S. Dist. LEXIS 53071, at *24, 2009 WL 1794749 (M.D. Pa. June 23, 2009) (quoting *Hartman v. Moore, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006)* ). A claim for First Amendment retaliation has three elements (1) that plaintiff engaged in conduct or speech protected by the First Amendment; (2) that the government responded with retaliatory action sufficient to deter a person of ordinary firmness from exercising his First Amendment rights; and (3) that the protected activity caused the retaliation. *Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir.2006).* As relevant here, there is an additional component of a First Amendment retaliation claim when a plaintiff's First Amendment claim is for retaliatory prosecution. Specifically, the plaintiff must also plead and prove an absence of probable cause. *Hartman v. Moore, 547 U.S. 250, 265–66, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006); Miller v. Mitchell, 598 F.3d 139, 154 (3d Cir.2010)* (probable cause element applies even where the same individual acted as both investigator and prosecutor).

    **\*7** Here, the dispute appears to center around the first element, and what constitutes protected speech under the First Amendment. "Except for certain narrow categories deemed unworthy of full First Amendment protection—such as obscenity, 'fighting words' and libel—all speech is protected by the First Amendment." *Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282–83 (3d Cir.2004). See also Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)* ("First Amendment protection does not extend to the lewd and obscene, the profane, the libelous, and the insulting or fighting word."). "Fighting words are those words which by their very utterance inflict injury or tend to incite an immediate breach of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
**(Cite as: 2011 WL 5320738 (M.D.Pa.))**

peace. To be punishable, words must do more than bother the listener, they must be nothing less than 'an invitation to exchange fisticuffs.' " *McCoy,* 2009 U.S. Dist. LEXIS 53071, at \*24–25, 2009 WL 1794749. Accordingly, the Third Circuit has explained:

> This is equally true when the words are spoken in the presence of police officers. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill,* 482 U.S. 451, 462–63, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (holding that ordinance making it unlawful to interrupt a policeman in the execution of his duty was overbroad). Indeed, the Supreme Court has suggested that the "fighting words" exception "might require a narrower application in cases involving words addressed to a police officer, because 'a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to 'fighting words.' " *Id.* at 462 (quoting *Lewis v. City of New Orleans,* 415 U.S. 130, 135, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974).

On the specific subject of "profane" words, the Supreme Court has held that even those words alone, unaccompanied by any evidence of violent arousal, are not "fighting words," and are therefore protected speech. *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) ... The [Supreme] Court emphasized that even offensive and distasteful words must be protected, for "one man's vulgarity is another's lyric," and courts cannot make principled distinctions on matters of taste and style. *Id.* at 25. It is the function of words to convey "not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well." *Id.* at 26. The emotive function of an expletive "may often be the more important

element of the overall message sought to be communicated," *id.;* so long as one does not incite violence, one should not be forced to express one's anger or disapproval in measured terms.

*Johnson v. Campbell, 332 F.3d 199, 212–14 (3d Cir.2003)* (finding that swearing words spoken to a police are not "fighting words"). *See also Hill, 428 U.S. 451, 261, 462–63 (1987)* (the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers and includes the ability to oppose and challenge police action.).

**\*8** The defendants urge the court to find that they are entitled to summary judgment on plaintiff's First Amendment retaliation claim because the plaintiff cannot establish that he engaged in any conduct or protected speech by the First Amendment. More specifically, the defendants argue that the plaintiff's speech did not relate to a matter of public concern, and, therefore, the plaintiff's speech was not protected by the First Amendment.

The court finds that the defendants' argument is misplaced. It appears that the defendants are relying on the standard applicable to a plaintiff, who is a *public employee,* bringing a First Amendment retaliation claim. Under that circumstance, a public employee's speech is protected activity if "the statement involved a matter of public concern." *See Hill v. Borough of Kutztown, 455 F.3d 225, 241–42 (3d Cir.2006)*. However, when a First Amendment retaliation claim is brought by a private citizen, the individual's speech need not be on a matter of public concern in order to constitute protected activity. *See Williams v. Town of Greenburgh, 535 F.3d 71, 77 (2d Cir.2008)* ("Because Williams was not a public employee when he criticized Bland, his speech need not have been on a matter of public concern for it to fall within the protection of the First Amendment for the purposes of this action."). Thus, as explained above, a private citizen's speech is entitled to First Amendment protection unless it

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
(Cite as: 2011 WL 5320738 (M.D.Pa.))

falls into one of the "narrow categories deemed unworthy of full First Amendment protection." *Eichenlaub, 385 F.3d at 282–83.*

Consequently, the court must determine what the relevant speech is in order to determine if it is entitled to First Amendment protection. According to the plaintiff, the relevant speech was his ongoing cell phone conversation regarding personal matters, and his subsequent exchange with defendant SHUTKUFSKI after his cell phone broke. More specifically, plaintiff indicates that after defendant Shutkufski knocked the cell phone out of his hand, he stated "why did you hit me" and "they broke my fucking phone."

With respect to plaintiff's comments "why did you hit me" and "they broke my fucking phone," the court finds that the plaintiff's speech is entitled to First Amendment protection. *Johnson, 332 F.3d at 212–14* (finding that swearing words spoken to a police are not "fighting words"). However, with respect to plaintiff's alleged protected activity for speaking on his cell phone, the court is unable to find that this warrants First Amendment protection. Specifically, the plaintiff has failed to come forward with any credible evidence which indicates what the substance of the conversation was, or that the defendants knew what the plaintiff was talking about on the phone. Without any such evidence, the court cannot find that plaintiff's cell phone conversation amounted to protected speech.

In sum, to the extent plaintiff claims that his speech directed at the defendants, which involved swearing, was protected by the First Amendment, the court agrees. However, as explained above, the court cannot find that plaintiff's cell phone conversation, itself, was protected speech as there is no indication in the record as to what the substance of his conversation regarded.

**\*9** As defendants have failed to advance any alternative arguments as to why they are entitled to summary judgment on plaintiff's First Amendment retaliation claim, the defendants motion for

summary judgment on this claim will be denied.

**D. Claims under 42 U.S.C. § 1981**

Section 1981 requires that all persons in the United States have "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." *42 U.S.C. § 1981(a).* "[I]n order to succeed on a claim under § 1981, a plaintiff must generally demonstrate: (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981 ... [ ]." *Schultz v. Wilson, 304 Fed. Appx. 116, 119 (3d Cir.2008)* (quoting *Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 569 (3d Cir.2002)* ). "Because those with racist intentions do not always verbalize their pernicious motives, a plaintiff may prove discriminatory intent based on the totality of the circumstances." *See Warren v. Twp. of Derry,* No. 04–2798, 2007 U.S. Dist. LEXIS 19537, at \*37–38, 2007 WL 870115 (M.D.Pa. Mar. 20, 2007) (citation and quotations marks omitted).

The defendants argue that they are entitled to summary judgment on plaintiff's Section 1981 claim because the record establishes that plaintiff's race did not play any role in the incident involving the defendants, and as such, there is no evidence of intentional discrimination. However, by way of response, the plaintiff urges the court to find that the defendants' actions demonstrated a discriminatory animus because (1) the defendants had singled out the plaintiff solely because of his skin color, (2) after the plaintiff was arrested defendant Shutkufski told him, if he had a complaint, to call Al Sharpton, and (3) after the plaintiff was brought back to the Swiftwater barracks, he was questioned about gang bangers and drugs. In addition, the plaintiff asserts that defendant Shutkufski continually interjected racial overtones into the incident by stating that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
(Cite as: 2011 WL 5320738 (M.D.Pa.))

plaintiff call him a "nigger." (Doc. No. *32* at 25–26).

Based on the evidence that plaintiff has adduced, the court finds that summary judgment is only appropriate with respect to defendant Felsman. First, the court does not find that plaintiff was singled out due to his race. The record indicates that the defendants were dispatched to an argument involving black males. As such, this appears to be different from a situation where the defendants had no reason to consider approaching the plaintiff, and the other males, he was with. Second, the court does not agree that the fact that plaintiff was questioned about gang bangers and drugs at the Swiftwater barracks supports a finding that the defendants purposefully discriminated against him. More specifically, the record indicates that the plaintiff was questioned by an investigator at the Swiftwater barracks, and not the defendants. Third, the court finds that defendant Shutkufski's comment regarding Al Sharpton could be interpreted to contain some evidence of a discriminatory animus as the remark does not appear to be race-neutral. FN8 *See Wichard v. Cheltenham Twp.,* No. 95–3969, 1996 U.S. Dist. LEXIS 12660, at *27 (E.D.Pa. Aug. 29, 1996) (permitting Section 1981 claim to survive summary judgment where an arresting officer yelled a racial epithet at the plaintiff). Since the plaintiff has come forth with some evidence of a discriminatory animus with respect to defendant Shutkufski, the court finds that defendant Shutkufski's motion for summary judgment on this claim should be denied, however, defendant Felsman's shall be granted.

> FN8. In addition, there appears to be a genuine dispute of fact as to whether the plaintiff ever called defendant Shutkufski a "nigger." *See* Trial Tr. 49:2–12; 80:14–15.

## E. Claims under 42 U.S.C. § 1985(3)

*10 Section 1985(3) provides a cause of action against a person who conspires "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *42 U.S.C. § 1985(3).* In order to successfully bring an action under § 1985(3), a plaintiff must prove that: "(1) defendants engaged in a conspiracy, (2) the conspiracy's purpose was to deprive either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws, (3) defendants committed an act in furtherance of the conspiracy, and (4) defendants' actions resulted in an injury to the plaintiff's person or property or a deprivation of the plaintiff's rights or privileges as a United States citizen." *Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir.2006).* In addition, a § 1985(3) claimant must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action in order to state a § 1985(3) claim." *Id. at 135* (citation and quotation marks omitted).

As discussed above, the only evidence from which one might find that either defendant acted with a discriminatory racial animus involves defendant Shutkufski. Accordingly, the court finds that the defendants are entitled to summary judgment on plaintiff's claims brought under Section 1985. *See Jackson v. Mills,* No. 96–3751, 1997 U.S. Dist. LEXIS 14467, at *29–30, 1997 WL 570905 (E.D.Pa. Sept. 4, 1997) ("The only evidence from which one might find that any defendant acted with discriminatory racial animus involves Officer Moors. There is no evidence that any other defendant with whom Officer Moors collaborated or could have conspired made a racial remark or acted with a discriminatory purpose. Plaintiff has not sustained a § 1985 claim."). *See also Warren v. Twp. of Derry,* No. 04–2798, 2007 U.S. Dist. LEXIS 19537, at *34, 2007 WL 870115 (M.D.Pa. Mar. 20, 2007) (noting that a civil conspiracy requires at least two actors).

## F. State Law Claims

The plaintiff brings claims for assault, battery, false arrest, false imprisonment and malicious prosecution FN9 under Pennsylvania law.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
**(Cite as: 2011 WL 5320738 (M.D.Pa.))**

Defendants argue that plaintiff's state law claims are barred by sovereign immunity. The doctrine of sovereign immunity bars damage claims for state law torts against "the Commonwealth, and its officials and employees acting within the scope of their duties." 1 Pa. Const. Stat. Ann. § 2310. The statute further provides that such parties "shall continue to enjoy sovereign immunity and official immunity ... unless the General Assembly shall specifically waive immunity," except for several narrow enumerated exceptions. 1 Pa. Const. Stat. Ann. § 2310; *McGrath v. Johnson, 67 F.Supp.2d 499, 511 (E.D.Pa.1999).* The Pennsylvania General Assembly has only made sovereign immunity inapplicable in certain prescribed circumstances. See 42 Pa. Const. Stat. Ann. § 8522(b). The nine exceptions set forth in 42 Pa. Const. Stat. Ann. § 8522 relate to: (1) Vehicle liability; (2) Medical-professional liability; (3) Care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) Potholes and other dangerous conditions; (6) Care, custody or control of animals; (7) Liquor store sales; (8) National Guard activities; and (9) Toxoids and vaccines. These nine exceptions to the rule of immunity provided for in the Code must arise out of negligent acts. *Id.* Thus, when an employee of a Commonwealth agency is acting within the scope of his or her duties, the Commonwealth employee is protected by sovereign immunity from the imposition of liability for intentional torts. *See Story v. Mechling, 214 Fed. Appx. 161,163 (3d Cir.2007)* (citing *La Frankie v. Miklich, 152 Pa.Cmwlth. 163, 618 A.2d 1145, 1148 (Pa.Commw.Ct.1992)).*

> FN9. The court notes that in plaintiff's brief in opposition, he appears to indicate that he has also brought a federal malicious prosecution claim under Section 1983. The court disagrees. A review of the complaint does not indicate that plaintiff brought a separate claim for malicious prosecution under Section 1983. Accordingly, to the extent the plaintiff is attempting to expand

upon the original allegations through argument in his brief, the court finds this to be impermissible. *See DeWees v. Haste, 620 F.Supp.2d 625, 635 (M.D.Pa.2009).* Federal pleading standards do not allow a party "to raise new claims at the summary judgment stage.... Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of the facts set forth in the complaint." *Id.* at n. 7 (citing *Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314–15 (11th Cir.2004); see also Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir.1996)* ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment") (citation omitted); *Speziale v. Bethlehem Area Sch. Dist., 266 F.Supp.2d 366, 371 n. 3 (E.D.Pa.2003)* ("Plaintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in the [summary judgment] responsive papers")). As such, the court finds that the plaintiff has only brought a malicious prosecution claim under Pennsylvania state law.

**\*11** Nevertheless, the plaintiff urges the court to find summary judgment on plaintiff's state law claims is inappropriate as "defendants have failed to establish on undisputed fact that no reasonable juror could conclude that their conduct in arresting plaintiff, striking him with a baton and then prosecuting him for disorderly conduct amounted to intentional, willful misconduct so as to ... remove the veil of sovereign immunity." (Doc. No. *32* at 27). The court finds that plaintiff's argument lacks merit. As defendants are employees of the Commonwealth of Pennsylvania, "[w]illful misconduct does not vitiate a Commonwealth employee's immunity because sovereign immunity protects a Commonwealth employee acting within the scope of his or her employment from liability

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)
**(Cite as: 2011 WL 5320738 (M.D.Pa.))**

even for intentional torts ....". *See Spencer v. Proce, No. 07–1021, 2010 U.S. Dist. LEXIS 69609, at *6–7, 2010 WL 2766568 (M.D.Pa. July 13, 2010)* (quoting *Holt v. Northwest Pennsylvania Training P'ship Consortium, Inc., 694 A.2d 1134, 1140 (Pa.Commw.Ct.1997). See also Mitchell v. Luckenbill, 680 F.Supp.2d 672, 682 (M.D.Pa.2010)*. Consequently, the court finds that defendants are entitled to summary judgment on plaintiff's state law claims, namely for assault, battery, false arrest, false imprisonment and malicious prosecution. *See Becker v. Godboldte,* No. 10–2066, 2011 U.S. Dist. LEXIS 55167, at *27–33, 2011 WL 2015213 (M.D.Pa. May 24, 2011) (finding Pennsylvania state law claim of malicious prosecution is barred sovereign immunity); *Spencer,* 2010 U.S. Dist. LEXIS 69609, at *6–7, 2010 WL 2766568 (finding Pennsylvania state law claims of assault and battery are barred by sovereign immunity); *Merring v. Bozym,* 07–0848, 2008 U.S. Dist. LEXIS 103187, at *19–21, 2008 WL 5378280 (M.D.Pa. Dec. 22, 2008) (finding Pennsylvania state law claim of false arrest is barred by sovereign immunity); *Ginter v. Skahill,* No. 04–2444, 2006 U.S. Dist. LEXIS 77038, at *39, 2006 WL 3043083 (E.D.Pa. Oct. 17, 2006) (finding Pennsylvania state law claim of false imprisonment was barred by sovereign immunity).

**IV. CONCLUSION**

For the reasons set forth above, **IT IS HEREBY ORDERED THAT,** defendants' motion for partial summary judgment, (Doc. No. *29* ), is **GRANTED** in part and **DENIED** in part. Specifically, defendants' motion for partial summary judgment is **GRANTED** as to plaintiff's Fourteenth Amendment claims under 42 U.S.C. § 1983, plaintiff's claim against defendant Felsman under 42 U.S.C. § 1981, plaintiff's conspiracy claim under 42 U.S.C. § 1985(3), and plaintiff's state law claims for assault, battery, false arrest, false imprisonment and malicious prosecution. In addition, defendants' motion for partial summary judgment is **DENIED** as to plaintiff's First Amendment retaliation claim and Fourth Amendment claims under 42 U.S.C. § 1983, and

plaintiff's claims against defendant Shutfkuski under 42 U.S.C. § 1981.

M.D.Pa.,2011.
Stone v. Felsman
Not Reported in F.Supp.2d, 2011 WL 5320738 (M.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3098025 (M.D.Pa.)
**(Cite as: 2006 WL 3098025 (M.D.Pa.))**

H
Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Matthew VELYKIS, Plaintiff
v.
Robert SHANNON, et al., Defendants.

Civil No. 1:CV-06-0124.
Oct. 30, 2006.

Matthew Velykis, Frackville, PA, pro se.

Theron R. Perez, Department of Corrections, Office of Chief Counsel, Camp Hill, PA, for Defendants.

*MEMORANDUM*
WILLIAM W. CALDWELL, District Judge.
I. *Introduction.*

**\*1** The pro se plaintiff, Matthew Velykis, an inmate at SCI-Frackville, filed this civil-rights action against defendants, Robert Shannon, Frackville's superintendent; M. Barnes, captain of the guards; officer Allen, sergeant of the guards; and correctional officer Price. The case is based on defendant Allen's alleged intentional act of slamming a van door on Plaintiff's head. Pendent state-law claims are also asserted. The defendants are sued in their official and individual capacities.

Defendants have filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6). The motion makes the following arguments. First, Plaintiff has failed to allege any personal involvement of defendants Shannon and Barnes in the conduct causing him injury. Second, the claims against the defendants in their official capacities are barred by the Eleventh Amendment. Third, the state-law claims are barred by sovereign immunity.

II. *Standard of Review.*

In considering the defendants' motion to dismiss, we must accept as true the factual allegations in the complaint and construe any inferences to be drawn from them in Plaintiff's favor. *See Mariana v. Fisher,* 338 F.3d 189, 195 (3d Cir.2003). We may dismiss a complaint under Fed.R.Civ.P. 12(b)(6) only if it is clear that no relief could be granted to Plaintiff under "any set of facts that could be proven consistent with the allegations." *Ramadan v. Chase Manhattan Corp.,* 229 F.3d 194, 195 (3d Cir.2000). Additionally, " 'however inartfully pleaded,' the 'allegations of [a] pro se complaint [are held] to less stringent standards than formal pleadings drafted by lawyers.' " *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003)(quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652, 654 (1972) ) (brackets in *Mitchell* ).

III. *Background.*

Plaintiff alleges the following. On August 10, 2005, defendants Allen and Price transported Plaintiff from SCI-Frackville to SCI-Mahanoy to receive medical treatment. (Doc. 11, Am.Compl. ¶ 9 .) Handcuffed and shackled, he was ordered to exit the transportation van. (*Id.* ¶ 10.) Without assistance, Plaintiff "attempted" to do so "without falling over." (*Id.* ¶ 10.) "While bent over exiting the van head first, defendant Allen, without forewarning to Plaintiff, slammed the van door shut on Plaintiff's head." (*Id.* ¶ 12.) Allen did so "purposely." (*Id.* ¶ 21.) While Plaintiff was resting on the van's running board, Allen stated to Price, "Well, at least we know he can take a shot." (*Id.* ¶ 14.) Plaintiff was taken to SCI-Mahanoy's medical department, and three stitches were used on the wound. (*Id* . ¶ 16.) An unknown Mahanoy lieutenant asked why Plaintiff was bleeding, and Allen joked, "We had to shoot him on the way over." (*Id.* ¶ 15.) The three correctional officers laughed. (*Id.*)

Velykis alleges the following as to each defendant's liability. Allen's conduct violated the Eighth and Fourteenth Amendments and was also a battery under state law. (*Id.* ¶ 21.) Defendant Price's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3098025 (M.D.Pa.)
**(Cite as: 2006 WL 3098025 (M.D.Pa.))**

"actions and/or inactions ... in failing to assist Plaintiff in exiting the van thereby exposing him to harm" violated his Eighth and Fourteenth Amendment rights and was also a battery under state law. (*Id.* ¶ 22.) Defendant Barnes's conduct in failing to adequately monitor or train Price and Allen, and by failing to investigate or remedy the abuse inflicted by Allen and Price on Plaintiff violated Plaintiff's Eighth and Fourteenth Amendment rights. (*Id.* ¶ 23.) Similarly, Superintendent Shannon's failure to properly train, supervise and monitor Price and Allen, as well as his failure to implement policies to prevent the abuse alleged in Velykis's complaint violated Plaintiff's Eighth and Fourteenth Amendment rights. (*Id.* ¶ 24.) Finally, Velykis avers that the actions/inactions of Barnes and Superintendent Shannon constituted state-law claims of willful neglect, negligence, misfeasance and nonfeasance. (*Id.* ¶¶ 23 and 24.) All defendants are alleged to have acted "within the course and scope of their employment .... and under color of state law." (*Id.* ¶ 8).

IV. *Discussion.*

A. *The Federal Claims Against Defendants Barnes and Shannon Are Dismissed for Failure to Allege Personal Involvement.*

**\*2** In moving to dismiss the federal claims against Barnes and Shannon, Defendants argue that Plaintiff had to demonstrate their "personal involvement in the alleged wrongs," *Rode v. Dellaciprete,* 845 F.2d 1195, 1207 (3d Cir.1988), some form of "personal direction" or "actual knowledge and acquiescence," *id.,* but has not made the necessary averments. They point out that it is not enough to allege a mere failure to train, supervise or discipline. *See Chinchello v. Fenton,* 805 F.2d 126, 133-34 (3d Cir.1986).

Plaintiff does not contest this argument, conceding that the federal claims against these defendants are properly dismissed for lack of personal involvement. Plaintiff does request that

the dismissal be without prejudice to reasserting the claims if, during discovery, evidence becomes available to support an action against Barnes and Shannon. If discovery does reveal civil-rights claims against these defendants plaintiff is free to reassert them.

B. *The Claims Against All Defendants in Their Official Capacities Are Barred by the Eleventh Amendment.*

Defendants assert that the Eleventh Amendment bars the claims against them in their official capacities. Suits brought against state officials in their official capacities are treated as suits against the state. *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L. Ed 2d 301, 309 (1991). Unless the state consents, the Eleventh Amendment bars suits against a state in federal court either for damages or injunctive relief. ( *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100-01, 104 S.Ct. 900, 908-09, 79 L.Ed.2d 67, 78-79 (1984). This is true whether suit is brought under federal law, *see Seminole Tribe v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252, 265 (1996), or state law. *Pennhurst, supra,* 465 U.S. at 117, 104 S.Ct. at 917, 79 L.Ed.2d at 89. We thus agree with Defendants that the Eleventh Amendment bars all the claims against them in their official capacities.

Plaintiff has argued against Eleventh Amendment immunity by relying on certain waivers of sovereign immunity in state law for state-law claims. *See* 42 Pa.C.S. § 8522. However, these waivers are irrelevant to the Eleventh Amendment issue, and Pennsylvania has in fact refused to waive its immunity under the Eleventh Amendment. *Id.,* § 8521(b). Plaintiff also asserts the Department of Corrections waived Eleventh Amendment immunity by allowing prisoners to claim damages as part of the administrative-remedy process in DC-ADM 804. We disagree. Waiver of Eleventh Amendment immunity generally requires a " 'clear declaration' " to that effect. *A.W. v. Jersey City Public Schools,* 341 F.3d 234, 240 (3d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3098025 (M.D.Pa.)
**(Cite as: 2006 WL 3098025 (M.D.Pa.))**

Cir.2003)(quoted case omitted).

The claims against all the defendants in their official capacities will therefore be dismissed.

C. *All Defendants Except Allen Have Sovereign Immunity for the State-Law Claims.*

The commonwealth has sovereign immunity from suit and has extended that immunity to its employees acting within the scope of their employment, 1 Pa.C.S. § 2310, except for claims set forth in 42 Pa.C.S. § 8522(b). In pertinent part, section 8522(a) waives the sovereign immunity of "Commonwealth parties" for negligence claims arising from the nine circumstances set forth in section 8522(b). A "Commonwealth party" is defined as a "Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment." 42 Ps.C.S. § 8501. The first circumstance listed in section 8522(b) as being waived is "[t]he operation of any motor vehicle in the possession or control of a Commonwealth party." *Id.,* § 8522(b)(1).[FN1]

> FN1. The remaining circumstances are: (2) Medical-professional liability; (3) Care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) Potholes and other dangerous conditions; (6) Care, custody or control of animals; (7) Liquor store sales; (8) National Guard activities; and (9) Toxoids and vaccines. 42 Pa.C.S. § 8522(b)(2) through 8522(b)(9).

**\*3** In moving to dismiss the state-law claims, Defendants argue that they are all immune because none of Plaintiff's claims come within the nine statutory exceptions to sovereign immunity. Additionally, Plaintiff has not alleged that Defendants were acting outside the scope of their employment. In fact, Allen and Price were acting within the scope of their employment as corrections officers in transporting Plaintiff to SCI-Mahanoy, and so were Barnes and Shannon in responding to grievances and supervising subordinates.

Defendants also point out that the effect of sections 2310 and 8522 is to immunize commonwealth parties from intentional torts. *See LaFrankie v. Miklich,* 152 Pa. Commw. 163, 171, 618 A.2d 1145, 1149 (1992)(en banc).

In opposition, Plaintiff makes three arguments. First, the "vehicle liability" exception to sovereign immunity applies since his injury was "directly caused by movement of part (door) of a vehicle owned and operated by the Commonwealth." (Doc. 16, Pl.'s Opp'n Br. p. 5). Second, willful misconduct is not protected by sovereign immunity, citing *Freedman v. City of Allentown,* 128 Pa. Commw. 126, 562 A.2d 1012 (1989). Third, Allen was acting outside the scope of his employment when he deliberately slammed the van door on Plaintiff's head.

We begin our analysis by rejecting Plaintiff's contention that commonwealth parties are not immunized from their intentional torts. *Freedman* was overruled by *LaFrankie* on this point. *See LaFrankie, supra,* 152 Pa. Commw. at 171, 618 A.2d at 1149. Instead, to determine if a commonwealth employee is immune we must:

> consider whether the Commonwealth employee was acting within the scope of his or her employment; whether the alleged act which causes injury was negligent and damages would be recoverable but for the availability of the immunity defense; and whether the act fits within one of the nine exceptions to sovereign immunity.

> *Id.,* 618 A.2d at 1149.

Here, Plaintiff cannot meet the last two criteria. He is not alleging that Allen acted negligently, conversely that he acted deliberately, and Allen's act does not fit any of the exceptions to sovereign immunity. The "vehicle liability" exception cannot be invoked here because the van was completely stopped when the battery allegedly happened. *See Pena v. Pennsylvania,* 1999 WL 552775 at *3

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3098025 (M.D.Pa.)
**(Cite as: 2006 WL 3098025 (M.D.Pa.))**

(E.D.Pa.) (closing of a door on Plaintiff's leg, fracturing it, as he was getting into a patrol car was not the operation of a vehicle within the meaning of section 8522(b)(1) because it was "the equivalent of loading the vehicle, not operating the vehicle")(citing *Love v. City of Philadelphia,* 518 Pa. 570, 543 A.2d 531 (1988)).

However, it does appear that Plaintiff has successfully alleged that Allen was not acting within the scope of his employment at the time, a requirement for sovereign immunity. *See* 42 Pa.C.S. §§ 2310 and 8501.

Conduct of an employee is within the scope of employment if it is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated, at least in part, by a purpose to serve the employer; and if force is intentionally used by the employee against another; it is not unexpected by the employer. *Fitzgerald v. McCutcheon,* 270 Pa. Superior Ct. 102, 410 A.2d 1270 (1979).

**\*4** *Natt v. Labar,* 117 Pa. Commw. 207, 213-14, 543 A.2d 223, 225 (1988). The conduct that Allen is alleged to have performed here does not satisfy any of these criteria. The intentional use of force alleged here is not of a kind and nature Allen was employed to perform, it does not appear to have been intended to serve any purpose of the Department of Corrections, and while the Department would expect that force might be used at some point against an inmate, it would not expect the deliberate and unjustified use of force, apparently totally divorced from any need of the officer to exert control over the prisoner. Hence it appears that Allen is not entitled to sovereign immunity at the pleading stage. *See Miller v. Hogeland,* 2000 WL 987864 at *3-4 (E.D.Pa.) (district justice's alleged act of deliberately flinging a phone at the plaintiff may not come within his scope of employment and hence sovereign immunity was unavailable at the pleading stage). He can still assert this defense, but it appears that it

must be decided by the fact finder. *See Johnson v. Knorr,* 2005 WL 3027401, at *1 (E.D.Pa.)(using the state-law test for scope of employment, the jury must resolve state parole agent's defense of sovereign immunity when he is alleged to have committed unprovoked assault on plaintiff, along with false arrest and fabrication of evidence).[FN2]

> [FN2]. We recognize that Plaintiff pled that Allen was acting within the scope of his employment, but we look past this allegation because of Plaintiff's pro se status, the specific factual contention that Allen had acted deliberately and because the allegation appears to have been made to satisfy the color-of-state-law requirement of the federal claim.

We have concluded that Allen is not entitled to sovereign immunity at the motion-to-dismiss stage. However, the remaining defendants are. None of their actions come within the enumerated circumstances in section 8522(b). Additionally, none of their actions were outside the scope of their employment. Price committed no affirmative act; he is alleged merely not to have assisted Plaintiff to exit the van. (Am.Compl.¶ 22). Barnes and Shannon were also acting within the scope of their employment in monitoring, training and supervising Allen and Barnes.

**V.** *Conclusion.*

Defendants have not moved to dismiss the Eighth Amendment claims against Allen and Price so the case continues against them in their individual capacities on these federal claims.[FN3] The state-law claim for battery also proceeds against Allen. All claims against Barnes and Shannon will be dismissed.

> [FN3]. However, the basis of Price's Eighth Amendment liability is difficult to discern. "[A] corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3098025 (M.D.Pa.)
**(Cite as: 2006 WL 3098025 (M.D.Pa.))**

officer had a reasonable opportunity to intervene and simply refused to do so." *Smith v. Mensinger* 293 F.3d 641, 650 (3d Cir.2002). Here, it does not appear from the pleadings that Price had an opportunity to intervene, and in fact the only specific allegation against him is not that he failed to intervene but that he failed to assist Plaintiff out of the van.

We will issue an appropriate order.

### *ORDER*

AND NOW, this 30th day of October, 2006, it is ordered that:

1. Defendants' motion (doc. 12) to dismiss is granted in part and denied in part.

2. All claims against defendants Barnes and Shannon are dismissed, and these defendants are dismissed from the action.

3. The state-law claim for battery against defendant Price is hereby dismissed.

4. In all other respects, the motion is denied.

M.D.Pa.,2006.
Velykis v. Shannon
Not Reported in F.Supp.2d, 2006 WL 3098025 (M.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.)))**

**C**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Third Circuit LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)

United States Court of Appeals,
Third Circuit.
Curtis KNIGHT, Appellant
v.
Deborah T. PORITZ; Peter Verniero, Former Attorney Generals, individually and in their official capacity; the Office of Attorney General of New Jersey, in its official capacity; The Office of the Essex County Prosecutor, in its official capacity; the City of Newark, Municipality, individually and in its official capacity; Newark Police Department, individually and in its official capacity; the Office of the Middlesex County Prosecutor's Office, in its official capacity; The East Brunswick, Municipality, individually and in its official capacity; East Brunswick Police Department, in its official capacity; Herbert H. Tate, Jr., Essex County Prosecutor, individually and in his official capacity; Clifford Minor, Jr., Essex County Prosecutor, individually and in his official capacity; Norman Menz, asst. pros. individually and in his official capacity; Leslie Mann, asst. pros. individually and in his official capacity; John Redden, asst. pros. individually and in his official capacity; Stephen J. Taylor, asst. pros. individually and in his official capacity; Stephen Margolis, asst. pros. individually and in his official capacity; Andrew Fried, asst. pros. individually and in his official capacity; Alan A. Rockoff, Middlesex County Prosecutor, individually and in his official capacity; Felix A. Martino, Superior Court Judge, individually and in his official capacity; John Murray, (estate) individually and in his official capacity; Ruben Contreras, individually and in his official capacity; William Thomas, individu-

ally and in his official capacity; Mark Wilson, individually and in his official capacity; Rashid Sabur, individually and in his official capacity; Steve B. Scott, individually and in his official capacity; M. Jackson, Sgt., individually and in his official capacity; Louis E. Greenleaf, individually and in his official capacity; Michael Stigilano, individually and in his official capacity; Keith Wilkerson, individually and in his official capacity; Geraldine Brandon, individually and in her official capacity; James P. Marinucci, individually and in his official capacity; Marie Robinson, individual estate; Eugene Codey, Superior Court Judge, individually and in his official capacity.

No. 05-1350.
Submitted Under Third Circuit L.A.R. 34.1(a) Sept. 7, 2005.
Decided Nov. 3, 2005.

**Background:** Former suspect brought pro se action against state and county defendants after indictment charging him with murder was dismissed after two separate trials, convictions, and reversals, alleging violations of his constitutional rights, malicious prosecution, and violations of Racketeer Influenced and Corrupt Organizations Act (RICO). The United States District Court for the District of New Jersey, William J. Martini, J., dismissed certain defendants and dismissed complaint for failure to prosecute. Former suspect appealed.

**Holdings:** The Court of Appeals held that:
(1) dismissal for failure to prosecute was abuse of discretion;
(2) absolute immunity applied to shield prosecutors from liability; and
(3) absolute immunity applied to investigator who presented testimony to grand jury as complaining witness.

Affirmed in part and reversed in part.

See also 145 N.J. 233, 678 A.2d 642.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.)))**

West Headnotes

**[1] Federal Civil Procedure 170A ☞1762**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)2 Grounds in General
            170Ak1758 Failure to Prosecute
               170Ak1762 k. Excuses in General.
Most Cited Cases

The record did not support finding that pro se plaintiff's conduct in failing to comply with order setting discovery deadlines was willful or in bad faith, and therefore such factor weighed against dismissal of complaint for failure to prosecute, given that plaintiff had, independently of order setting deadlines, requested 90-day extension of discovery period and denial of his renewed request for extension left him with seven days to complete discovery which he had just indicated would take 90 days, and that plaintiff relied on erroneously mailed, but believably valid, order which appeared to extend discovery for six months. Fed.Rules Civ.Proc.Rule 41(b), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☞1758.1**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)2 Grounds in General
            170Ak1758 Failure to Prosecute
               170Ak1758.1 k. In General. Most Cited Cases

Dismissal for failure to prosecute of former murder suspect's action against state and county defendants for alleged violations of his constitutional rights, malicious prosecution, and violations of Racketeer Influenced and Corrupt Organizations Act (RICO) was abuse of discretion, given that the record did not support finding that former suspect's failure to comply with order setting discovery deadlines was willful or in bad faith, and given both that former suspect was proceeding pro se and suffered 10 years of incarceration resulting from two trials

tainted by numerous errors. 18 U.S.C.A. § 1961 et seq.

**[3] District and Prosecuting Attorneys 131 ☞10**

131 District and Prosecuting Attorneys
   131k10 k. Liabilities for Official Acts, Negligence, or Misconduct. Most Cited Cases

Absolute immunity applied to shield prosecutors from liability to former murder suspect, against whom indictment was dismissed after two separate trials, convictions, and reversals on appeal, in former suspect's action alleging violations of his constitutional rights, malicious prosecution, and violations of Racketeer Influenced and Corrupt Organizations Act (RICO), inasmuch as acts of bringing indictment, initiating prosecution even for suspect reasons, knowingly introducing fraudulent evidence into judicial proceeding, and failing to disclose material evidence were all within traditional functions of advocate. 18 U.S.C.A. § 1961 et seq.

**[4] Criminal Law 110 ☞42.4**

110 Criminal Law
   110II Defenses in General
      110k42 Immunity to One Furnishing Information or Evidence
         110k42.4 k. Grounds or Justification for Grant of Immunity. Most Cited Cases
     (Formerly 110k42)

Absolute immunity applied to investigator who presented testimony to grand jury as complaining witness, shielding investigator from liability in pro se action by former murder suspect, against whom indictment was dismissed after two separate trials, convictions, and reversals on appeal, alleging violations of former suspect's constitutional rights, malicious prosecution, and violations of Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1961 et seq.

**\*483** On Appeal from the United States District Court for the District of New Jersey. (D.C.Civ. No.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.)))**

02-cv-00191). District Judge: Honorable William J. Martini.Curtis Knight, Livingston, NJ, for Appellant.

Randall B. Weaver, Trenton, NJ, Gary S. Lipshutz, Newark, NJ, Hoagland, Longo, Moran, Dunst & Doukas, New Brunswick, NJ, Susan K. O'Connor, for Appellee.

Before ROTH, MCKEE and ALDISERT, Circuit Judges.

OPINION

PER CURIAM

**\*\*1** This appeal arises from the dismissal of Appellant Curtis Knight's complaint as a sanction for failure to prosecute. He also appeals from the dismissal of his malicious prosecution claims against Defendants Tate, Menz, Contreras, Murray, Taylor, Margolis, and Minor. For the reasons that follow, we will reverse the District Court's dismissal of Knight's complaint for failure to prosecute. We will affirm the **\*484** District Court's order dismissing the above named Defendants.

I.

Knight spent nearly ten years in custody for the September 1988 murder of Glenn Brown. Following two separate trials, convictions, and subsequent reversals, the Essex County Prosecutor's Office dismissed the indictment on October 17, 2001. *See State v. Knight,* No. A-1370-97T4, slip op. (N.J.Super.Ct.App.Div. Apr. 2, 2001) (reversing Knight's second conviction) *review denied State v. Knight,* 170 N.J. 205, 785 A.2d 434 (2001) (table); *State v. Knight,* 283 N.J.Super. 98, 661 A.2d 298 (1995) (reversing Knight's first conviction) *aff'd State v. Knight,* 145 N.J. 233, 678 A.2d 642 (1996). Three months after the dismissal, Knight filed a pro se complaint against multiple State and County defendants alleging numerous constitutional violations, malicious prosecution, and violations under the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1962-1964. He requests

equitable and monetary relief in the aggregate amount of six million dollars.

On April 24, 2003, the District Court granted a motion to dismiss a majority of the Defendants with the exception of Essex County assistant prosecutor Leslie Mann and homicide investigator Michael Stigilano, both of whom allegedly fabricated and planted evidence. FN1 The Magistrate Judge then issued an order scheduling the close of discovery for July 6, 2004. Knight appeared for a scheduled deposition on April 14, but refused to be deposed because the Defense would not pay for his travel expenses. On June 28, 2004, the Magistrate Judge issued a letter-order directing Knight to answer all outstanding interrogatories within ten days and appear for a deposition within one month. Prior to receiving the order, Knight filed a motion to extend the close of discovery. Defendants filed objections to the request. Knight responded on July 15, claiming that the Defendants' attorney

> FN1. On July 1, 2003, the District Court dismissed the claims against Defendants East Brunswick Police Department, Township of East Brunswick, Keith Wilkerson, and Geraldine Brandon. These Defendants filed a motion for leave to dismiss parties and to be excused from filing a brief pursuant to L.A.R. 31.2. Knight does not appeal the dismissal of the above Defendants, nor does he contest the motion. The Defendants' motion is granted.

has decided without my input how, when and where discovery would proceed.... I take exception to the fact that as a Pro'se [sic] plaintiff I'm being put in a position of having to adhere to a discovery plan, or face sanctions, which were never discussed with or agreed upon by me.... I'm requesting that the Court grant my request for a 90-day extension, and I further request that the Court schedule a conference between all parties as soon as possible.

The Magistrate Judge denied the motion on Ju-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.)))**

ly 16, 2004, and reaffirmed the dates specified in the June 28 order. Knight received the order denying his extension request on July 20, the same day he was scheduled to appear for a second deposition, for which he failed to attend. Discovery officially closed on July 27, 2004. Knight failed to satisfy the order by that date. On July 30, the District Court docketed and mailed an order originally written on January 6, 2004, stating that discovery should commence immediately and shall close at the end of six months. Knight received the order and argues that he believed the District Court changed its mind and granted the extension. When Knight did not comply with the June 28 order, the Appellees filed a motion to dismiss for failure to prosecute. Knight never **\*485** received a copy of the motion. On November 4, 2004, adopting a Magistrate Judge's report and recommendation, the District Court granted the Defendants' motion and dismissed the complaint. Knight filed a motion to reconsider, which the District Court denied. Knight appeals.

II.

**\*\*2** We have jurisdiction under 28 U.S.C. § 1291 and review the dismissal of a complaint under Federal Rule of Civil Procedure 41(b) for abuse of discretion. *Poulis v. State Farm Fire & Cas. Co.,* 747 F.2d 863, 868 (3d Cir.1984); *see also Brown v. Phila. Hous. Auth.,* 350 F.3d 338, 342 (3d Cir.2003) (applying the same standard to the denial of a motion to vacate judgment). Although we defer to the District Court's discretion, dismissal is appropriate only in "limited circumstances...." *Emerson v. Thiel College,* 296 F.3d 184, 190 (3d Cir.2002). In conducting our review, "we will be guided by the manner in which the court balanced the *Poulis* factors and whether the record supports its finding." *Ali v. Sims,* 788 F.2d 954, 957 (3d Cir.1986). The factors are:

(1) the extent of the party's personal *responsibility;* (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney

was *willful* or in *bad faith;* (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative sanctions;* and (6) the *meritoriousness* of the claim or defense.

*Poulis,* 747 F.2d at 868.

We agree with the District Court's analysis with respect to factors one, two and five, each favoring dismissal. With respect to the third factor, the District Court found that the record shows only a "limited history of noncompliance," but did not identify whether this finding supports or opposes dismissal. R. & R. at 2. However, the Appellees concede that this limited history "weighs less in favor of dismissal." Appellees' Br. at 18. We agree.

[1] We do not agree, however, that the record supports a finding that Knight's conduct was willful or in bad faith. The District Court conclusively states that it is "evident that [Knight] ... is responsible for willfully refusing to comply with the June 28, 2004 order." Letter Op., Jan 4.2005, at 3. Conduct is willful if it exhibits signs of "intentional," "strategic or self-serving," behavior. *Adams v. Tr. of N.J. Brewery Employees' Pension Trust Fund,* 29 F.3d 863, 875 (3d Cir.1994). When drawing an inference that conduct is willful, we generally require more than " 'failure to move with the dispatch' reasonably expected of a party prosecuting a case." *Id.* at 876 (citing *Donnelly v. Johns-Manville Sales Corp.,* 677 F.2d 339, 342 (3d Cir.1982)); *see also Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (finding willful the failure to address opposing parties' discovery requests after seventeen months of eleventh-hour extensions); *C. T. Bedwell & Sons, Inc. v. Int'l Fid. Ins. Co.,* 843 F.2d 683, 695 (3d Cir.1988) (holding willful plaintiff's failure to comply with three court orders, multiple discovery requests, and in part lying with regard to the reasons).

**\*\*3** The District Court did not specifically explain why it considered Knight's conduct willful, but it discussed at length his failure to adhere to the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.)))**

June 28, 2004 order. Knight argued before the District Court that prior to the close of discovery on July 6, he filed a motion to extend that date by ninety days because he was unable to timely comply with the Appellees' discovery requests. The District Court correctly **\*486** held that the motion for an extension of time was not in response to the June 28 order, but then illogically concluded that the request "had nothing to do with the" order. The June 28 order and Knight's request for an extension both relate to the exact same issue, the completion of discovery, which includes the taking of depositions and answering interrogatories. That Knight's initial request was not a direct response to the June 28 order is not relevant to his need for an additional ninety days to complete discovery. Further, on July 15, Knight did respond to the June 28 order, requesting a scheduling conference and renewing his request for a ninety-day extension. Knight then waited for the Court to rule on his motion. When the motion was denied, Knight had only seven days to complete discovery in order to comply with the June 28 order, a tall task for someone who just reported the task would take ninety days. Although Knight's failure to complete discovery by July 27 violated a court order, the record does not support a finding of willfulness or bad faith.

The District Court also found Knight's reliance on the erroneous July 30, 2004 order "unbelievable" for two reasons. "First, discovery commenced in January 2004 and was set to close in July 2004. If this had not been the case, it would have made little sense for plaintiff to file a motion to extend the close of discovery." Letter Op., Jan. 4, 2005 at 2. We are at a loss to understand how the existence of a first discovery period lasting six months would preclude a belief that the District Court would grant an extension period of equal length. Second, the District Court reasoned that because the order is dated January 6 and refers to a scheduling order that was not attached, Knight should have recognized the error. Knight argues that he checked the docket, which confirmed that the order was entered on July 30, not January 6.

Further, in a letter dated August 12, 2004, Knight responded to the July 30 order exhibiting an obvious belief in its correctness. Proceeding on a believably valid court order does not support an inference that Knight intentionally disobeyed the Court. Thus, the record fails to support the District Court's finding that Knight's conduct was willful. This factor weighs against dismissal.

[2] Finally, we agree with the District Court that Knight's complaint asserts meritorious claims. This factor is neutral and not dispositive, *see Emerson v. Thiel College,* 296 F.3d at 191, but we cannot ignore that Knight proceeds pro se and has suffered from ten years of incarceration resulting from two trials tainted by numerous errors. *See Knight,* No. A-1370-97T4, slip op. at 58. Although "each factor need not be satisfied for the trial court to dismiss a claim," there exist here only three factors which the District Court could reasonably conclude weigh in favor of dismissal. *Ware v. Rodale Press, Inc.* 322 F.3d 218, 221 (3d Cir.2003). Applying each factor equally and abiding by the established presumption that "doubts should be resolved in favor of reaching a decision on the merits," *see Scarborough v. Eubanks,* 747 F.2d 871, 878 (3d Cir.1984), the District Court abused its discretion in dismissing Knight's complaint for failure to prosecute.[FN2] We now turn to whether the District **\*487** Court properly dismissed the named Defendants.

> FN2. We further note that we find extremely troubling Knight's failure to receive notice that his case was facing possible dismissal. Specifically, we point to the District Court's failure to resend the report and recommendation after the initial mailing was returned. We have long held "that as a general practice a [specific] sanction should not be imposed by a court without prior notice and some occasion to respond." *Gagliardi v. McWilliams,* 834 F.2d 81, 83 (3d Cir.1987).

III.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.)))**

**\*\*4** [3] We exercise plenary review over the dismissal of a complaint based on absolute and qualified immunity grounds. *See State Farm Mut. Auto. Ins. Co. v. Coviello,* 233 F.3d 710, 713 (3d Cir.2000). With respect to prosecutors Tate, Menz, Margolis, Taylor, and Minor, each is entitled to absolute immunity. *See Imbler v. Pachtman,* 424 U.S. 409, 430-31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The act of bringing an indictment, initiating prosecution even for suspect reasons, knowingly introducing fraudulent evidence into a judicial proceeding, and failing to disclose material evidence are all within the "traditional functions of an advocate" and receive absolute protection. *See Kalina v. Fletcher,* 522 U.S. 118, 127-31, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997) (indictment and prosecution); *Davis v. Grusemeyer,* 996 F.2d 617, 630 n. 28 (3d Cir.1993) (introduction of fraudulent evidence) *abrogated on other grounds by Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644 (3d Cir.1998); *Smith v. Holtz,* 210 F.3d 186, 199 n. 18 (3d Cir.2000) (failure to disclose); *Kulwicki v. Dawson,* 969 F.2d 1454, 1464 (3d Cir.1992) (initiating prosecution "even without a good faith belief that wrongdoing has occurred"). We also agree with the District Court that Knight failed to allege a constitutional violation against investigator Contreras.

[4] We last turn to the dismissal of investigator Murray. Knight argues that when Murray presented testimony to the grand jury he was doing so as a complaining witness, which under *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), does not entitle him to the protection of absolute immunity.[FN3] In *Kulwicki,* we expressly rejected the argument that *Malley* carved out an exception to the general rule announced in *Briscoe v. LaHue,* 460 U.S. 325, 329, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), that government witnesses are afforded absolute immunity for statements made while testifying. *Kulwicki,* 969 F.2d at 1467 n. 16. The District Court did not err in dismissing the claims against the above named Defendants.

FN3. The Appellees argue that Knight

waived this argument because he failed to raise it in District Court. The Appellees misconstrue the waiver doctrine. Knight argued in his amended complaint that Murray, while serving as a complaining witness, presented false testimony to the grand jury. On the same day, he filed a brief in opposition to the previous motion to dismiss arguing that none of the Defendants are immune from liability. The Appellees then filed a motion to dismiss the amended complaint arguing the same affirmative defenses. Knight did not respond to this motion. However, Knight's earlier pleadings raised the argument that Murray presented perjured testimony while serving as a complaining witness and rejected the premise that Murray is immune. Thus, the issue is preserved despite Knight's failure to expressly counter the defense in the second motion to dismiss. Regardless, Murray is entitled to absolute immunity.

IV.

For the foregoing reasons, the District Court abused its discretion in dismissing Knight's complaint for failure to prosecute. The District Court's order will be reversed and the matter remanded for further proceedings. The District Court's order dismissing Tate, Menz, Murray, Taylor, Margolis, and Minor is affirmed.

C.A.3 (N.J.),2005.
Knight v. Poritz
157 Fed.Appx. 481, 2005 WL 2891271 (C.A.3 (N.J.))

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.