COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
 : DAUPHIN COUNTY, PENNSYLVANIA
           :

     v.      :
 : NO. 338 MDA 2012
BRETT O. FEESE     : (NO. 2585 CR 2010)
 : (NO. 1927 CR 2011)

## MEMORANDUM OPINION

Appellant, Brett O. Feese, appeals his conviction of the following charges at docket number 2585 CR 2010: six (6) counts of Conflict of Interest,[1] six (6) counts of Theft by Unlawful Taking or Disposition,[2] six (6) counts of Theft of Services,[3] six (6) counts of Theft by Deception,[4] six (6) counts of Theft by Failure to Make Required Disposition of Funds Received,[5] and six (6) counts of Criminal Conspiracy.[6] Defendant also appeals his conviction of a single count each of the following charges at docket number 1927 CR 2011: Hindering Apprehension or Prosecution,[7] Obstructing Administration of Law or Other Governmental Function,[8] and two (2) counts of Criminal Conspiracy.[9]

Appellant raises seven issues on appeal. Appellant's Statement of Matters Complained of on Appeal include: 1) whether the destruction by the Office of Attorney General (OAG) of pre-trial interview notes, proffer notes or summaries of witness interviews which deprived Defendant of any opportunity to review such notes or to effectively cross-examine such witnesses at trial concerning such prior statements, constituted a violation of the United States Constitution as interpreted by the United States Supreme Court in *Brady v. Maryland*, 373 U.S.

---

[1] 65 Pa.C.S. § 1103(a).
[2] 18 Pa.C.S. § 3921(a).
[3] 18 Pa.C.S. § 3926(a).
[4] 18 Pa.C.S. § 3922(a)(1).
[5] 18 Pa.C.S. § 3927(a).
[6] 18 Pa.C.S. § 903.
[7] 18 Pa.C.S. § 5105.
[8] 18 Pa.C.S. § 5101.
[9] 18 Pa.C.S. § 903.

83, 83 S.Ct. 1194 (1983), *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763 (1972), *Smith v.*

*Cain*, 565 U.S. ___, 132 S.Ct. 627 (2012), and numerous other federal and state judicial

decisions; the Constitution of the Commonwealth of Pennsylvania, the Pennsylvania Crimes

Code, the Pennsylvania Rules of Civil Procedure, the Pennsylvania Rules of Professional

Conduct, and clear, written policy of the Office of Attorney General;  2) whether the

Pennsylvania House of Representatives has the constitutional and statutory right to regulate the

working hours of its own employees;  3) whether it was error for the trial Court to permit the

OAG to present evidence through multiple witnesses that elected members or employees of the

Pennsylvania House Republican Caucus (HRC) committed the crimes of Conflict of Interest,

Theft, and/or Conspiracy if they authorized or engaged in political or campaign activities during

a "normal workday" as defined by "regular" daily hours, rather than by reference to the official

HRC work schedule of 37.5 hours per week;  4) whether there was sufficient evidence presented

by the prosecution at trial to prove beyond d a reasonable doubt that the Defendant authorized or

directed any employee of the HRC to devote less than 37.5 hours per week to Legislative duties;

5) whether the Conflict of Interest provisions of the Public Employees Ethics Act, 65 Pa.C.S.A.

§§1102 and 1103(a), are unconstitutionally vague and overbroad, or vague and overbroad as

applied, under the United States and Pennsylvania Constitutions;  6) whether the trial Court erred

in permitting prosecution witnesses to testify that the Defendant "had to know" about specific

decisions, conversations, actions, contracts, or other matters of fact constituting material

evidence of crimes charged;  and, 7) whether sufficient evidence was presented by the

prosecution at trial to prove beyond a reasonable doubt that the Defendant was guilty of any

count of the Information charging Obstructing Administration of Law, Hindering Apprehension,

or Conspiracy.

This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

## FACTUAL BACKGROUND

Based on a criminal complaint filed on November 4, 2009, Appellant was charged with sixty-two (62) counts of Conflict of Interest, Theft, Obstructing the Administration of Law, Hindering Apprehension or Prosecution, and Conspiracy. Appellant was initially charged with nine (9) co-defendants[10] whose cases were disposed of prior to and during trial by way of guilty pleas. Appellant proceeded to trial on forty (40) of the initial sixty-two criminal charges along with co-defendant Jill Seaman. A jury trial was held for twenty-three (23) days spanning from September 19, 2011 through November 8, 2011. The jury convicted Appellant of all forty (40) charges.

The instant Appeal follows a lengthy jury trial during which a voluminous amount of evidence was presented and Defendant, Brett O. Feese (Feese/Appellant), was ultimately convicted of the crimes listed above. The convictions stem from the use of public funds to pay for the development of computer programs for use in campaign-related activities, the use of government staff, equipment and facilities to assist in the development of such programs, and the use of government staff to perform campaign-related activities during their HRC workday, by Appellant and the other named Defendants. The public funds were used to pay for contracts entered into by the HRC with GCR and Associates (GCR), Aristotle International (Aristotle), Labels and Lists for the development of the computer systems and databases which were fed data

---

[10] John M. Perzel, Docket No. 2589 CR 2010; Brian J. Preski, Docket No. 2583 CR 2010; Eric S. Ruth, Docket No. 2591 CR 2010; Elmer Bowman, 2590 CR 2010; Samuel Stokes, Docket No. 2584 CR 2010; Paul E. Towey, Docket No. 2588 CR 2010; Donald H. McClintock, Docket No. 2587 CR 2010; John R. Zimmerman, Docket No. 2524 CR 2010; Jill Seaman, Docket No. 2586 CR 2010.

that had been obtained by public funds ostensibly for legislative purposes. Trial evidence established that HRC District Office (DO) staff as well as the Republican Information Technology Staff (RITS) staff and equipment were used to further the development of the campaign-related technology and assist in political campaigns. Such campaign-related work whether it was work on particular political races, work with HRC contractors GCR, Aristotle or Labels and Lists, or fundraising activities was often conducted during the workday when HRC employees were to have been carrying out the legislative duties for which they were being paid with public funds. The value of the services paid for with public funds was worth several million dollars.

With respect to the timeframe that pertains to the instant case, Appellant held the following positions as a public employee: an elected member of the Pennsylvania House of Representative who held various leadership positions with the HRC, Director of the House Republican Campaign Committee (HRCC) and Chief Counsel for the HRC.

## PROCEDURAL HISTORY

On July 9, 2010, the OAG filed a criminal Information charging Appellant with nine (9) counts of Conflict of Interest, nine (9) counts of Theft by Unlawful Taking or Disposition, nine (9) counts of Theft by Deception, nine (9) counts of Theft of Services, nine (9) counts of Theft by Failure to Make Required Disposition of Funds Received, one (1) count of Hindering Apprehension or Prosecution, one (1) count of Obstructing Administration of Law or Other Governmental Function, and eleven (11) counts of Criminal Conspiracy, for a total of sixty-two (62) criminal charges[11]. Additionally, the OAG filed a criminal information on May 11, 2011 charging Appellant with a single count each of the offense of Hindering Apprehension or

---

[11] These charges are found at Dauphin County Docket Number 2010 C.R. 2585 and relate to the years 2001-2007.

Prosecution, Obstructing Administration of Law or Other Governmental Function, and two (2) counts of Criminal Conspiracy[12].

The OAG did not move to trial on twenty-two (22) counts that had been presented in the criminal information. Consequently, at the time of sentencing, the OAG moved to *nol pros* three (3) counts of conflict of interest, three (3) counts of Theft by Unlawful Taking or Disposition, three (3) counts of Theft of Services, three (3) counts of Theft by Deception, three (3) counts of Theft by Failure to Make Required Disposition of Funds Received, one (1) count of Hindering Apprehension or Prosecution, one (1) count of Obstructing Administration of Law or Other Governmental Function, three (3) counts of Criminal Conspiracy (Conflict of Interest/Theft), one (1) count of Criminal Conspiracy (Hindering Apprehension or Prosecution), and one (1) count of Criminal Conspiracy (Obstructing Administration of Law or Other Governmental Function). (Notes of Testimony Sentencing[13] at 5).

Appellant was sentenced to an aggregate of not less than four (4) years nor more than fourteen (14) years incarceration in a state correctional institution followed by state probation and was also ordered to pay restitution in the amount of one million dollars ($1,000,000.00) along with court costs and fines.

On February 13, 2012, Appellant filed a Notice of Appeal to the Pennsylvania Superior Court, and on February 17, 2012, this Court entered an Order which directed Appellant to file a statement of matters complained of on appeal within twenty one (21) days from the date of the Order. Additionally, the Order directed the appellant to provide a brief within twenty one (21) days of the filing of the statement of matters and thereafter, the Commonwealth was directed to

---

[12] These charges are found at Dauphin County Docket Number 2011 C.R. 1927 and relate to the years 2007-2009.
[13] Hereinafter N.T.S.

file a response within twenty one (21) days. The appellant filed a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b) on March 8, 2012. On March 27, 2012, Appellant filed a Brief in Support of Statement of Matters Complained of on Appeal. On April 11, 2012, the Commonwealth filed a Brief in Response to Defendant's Brief in Support of Statement of Matters Complained of on Appeal. On April 13, 2012, Appellant filed a supplemental Brief in Support of Matters Complained of on Appeal.

## DISCUSSION

In his first issue on appeal, appellant contends that the destruction of witness interview notes, proffer notes or summary notes of witness interviews deprived appellant the opportunity to review the notes and thus, effectively cross-examine trial witnesses concerning prior inconsistent statements. Appellant argues that the action by the OAG in destroying the notes contravenes the United States Constitution, the Commonwealth of Pennsylvania's Constitution, the Pennsylvania Crimes Code, Rules of Criminal Procedure, Rules of Professional Conduct and the written policy of the OAG. Specifically, Appellant states that the OAG Report of Investigation (ROI) in this matter included partial summaries of interviews with 89 witnesses but does not include any summary of any interview of 94 other witnesses who testified before the grand jury, or the proffer statements or interview statements for the 89 witnesses whose statements were summarized in the ROI. Appellant also states that in a June 22, 2010 letter the OAG provided a list of 85 potential Commonwealth trial witnesses, but of the 85 possible witnesses listed, the ROI did not have a summary of any interview with 64 of them.

Appellant argues that the destruction of the notes of interview for the 94 individuals who testified before the grand jury violated Pennsylvania Rule of Criminal Procedure 573, the OAG's

6

own policy set forth in OAG Chief Memorandum 2001-02, Pennsylvania law and the due

process principles espoused by the United States Supreme Court in *Brady v. Maryland*, 373 U.S.

83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

Pennsylvania Rule of Criminal Procedure 573 governs Pretrial Discovery and Inspection

in criminal cases.[14]  In its Supplemental Brief in Support of Matters Complained of on Appeal,

Appellant argues that Pa.R.Crim.P. 573(B)(2)(a) is the provision which is applicable to the issue

raised on appeal concerning the destruction of notes by the Commonwealth.  Rule 573(B)(2)(a)

provides:

> (B) Disclosure by the Commonwealth.
>
> (2) *Discretionary With the Court.*
>
> (a) In all court cases, except as otherwise provided in Rule 230
> (Disclosure of Testimony Before Investigating Grand Jury), if the
> defendant files a motion for pretrial discovery, the court may order
> the Commonwealth to allow the defendant's attorney to inspect and copy
> or photograph any of the following requested items, upon a showing that
> they are material to the preparation of the defense, and that the
> request is reasonable:
>
> (i) the names and addresses of eyewitnesses;
>
> (ii) all written or recorded statements, and substantially verbatim
> oral statements, of eyewitnesses the Commonwealth intends to call at
> trial;
>
> (iii) all written and recorded statements, and substantially verbatim
> oral statements, made by co-defendants, and by co-conspirators or
> accomplices, whether such individuals have been charged or not; and
>
> (iv) any other evidence specifically identified by the defendant,
> provided the defendant can additionally establish that its disclosure
> would be in the interests of justice.

Both parties cite to the case of *Commonwealth v. Appel*, for the proposition that pretrial

statements of witnesses are discoverable which: (1) have been reduced to writing; (2) relate to

---

[14] Pa.R.Crim.P. 573.

the witness' testimony at trial, and (3) are signed, adopted or otherwise shown to be substantially

verbatim statements of that witness. See *Appel*, 689 A.2d 891, 907 (Pa. 1997) *citing*

*Commonwealth v. Brinkley*, 505 Pa. 442, 480 A.2d 980 (1984). The Commonwealth

acknowledges its obligations under Rule 573, as a general proposition, and under *Brady* and its

progeny, by stating that *"Brady"* material must always be disclosed to the defendant.

(Commonwealth's Brief in Response to Def. Brief in Support of Matters, p. 3, fn.1). However,

the Commonwealth argues that the notes at issue on appeal were never of a nature that they

would constitute proper discovery material. The OAG contends that the discussions with the

witnesses referred to by Appellant took place in the presence of counsel and were part of

negotiations with respect to the disposition of any possible criminal liability in their particular

individual circumstances. The OAG argues that the discussions at issue were not formal

interviews which would be recorded in an investigatory report, and any notes made were not

intended as "an accurate and comprehensive memorialization of the contents of those

discussions."

In arguing its position that the documents at issue were discoverable, Appellant attempts

to apply a ruling by the Hon. Barry F. Feudale[15] issued on November 4, 2009, in the case of

*Commonwealth v. Michael Veon*, Dauphin County No. 4656-2008 which was implemented by

this Honorable Court on November 12, 2009. Judge Feudale's Opinion and Order addressed the

discoverability of "proffer statements" and/or "proffer interview notes," or other notes and/or

summaries of witness interviews. Judge Feudale's ruling in *Veon* ordered that the OAG provide

to counsel for the Defendant "copies of all written or recorded statements, and substantially

verbatim oral statements, of all witnesses the Office of Attorney General intends to call at trial.

---

[15] Presiding Judge of the 28th Statewide Investigating Grand Jury.

Such statements shall include the so-called "proffer statements" or "proffer interview notes."[16] Appellant argues that the OAG was required to disclose such documents in the instant matter as they are discoverable under Rule 573. Appellant further claims that by failing to do so, and by destroying certain documents, the OAG committed prosecutorial misconduct and violated Due Process. However, this Court fails to see how the consideration of a specific discovery request by counsel for an entirely different defendant, in an entirely different criminal prosecution that was based on a distinct factual scenario, can be applied and binding on this Court in this case.

As pointed out by this Court in its Memorandum Order dated July 29, 2011, which addressed a Joint Motion to Dismiss Due to Prosecutorial Misconduct, little good would be served, and much confusion and administrative difficulty would be created, by a rule requiring preservation and disclosure of both the investigative report and the rough notes which underlie it. Further, compelling disclosure under Rule 573(B)(2)(a), which Defendant referred to in his Supplemental Brief in Support of Statement of Matters Complained of on Appeal, is discretionary with the Court.

Additionally, Appellant contends that the OAG intentionally destroyed written proffer statements and/or notes of proffer interviews after the rulings were made in *Veon* to conceal and destroy evidence favorable to the Defendant which actions resulted in gross prosecutorial misconduct. However, as the Commonwealth posits, and this Court agrees, the Commonwealth acted in accordance with its own internal policy as established in OAG Chief Memorandum 2001-02 which was effective August 1, 2001. That policy prescribes that "[a]ny details within original handwritten notes will be transposed into [an] investigative report. When an

---

[16] *Commonwealth v. Michael Veon*, Dauphin County Docket No. 2008 C.R. 4656, Nov. 12, 2009.

investigative report is approved...the original investigative notes will be destroyed."[17] Whether

the procedures in Memorandum 2001-02 were not followed by individuals involved in the *Yeon*

prosecution thereby resulting in the existence of proffer notes is of no moment in the present

matter.

Next, we will address whether Appellant was entitled to the documents at issue pursuant

*Brady v.Maryland,* 373 U.S. 83 (1963) and *Giglio v.United States,* 405 U.S. 150 (1972). In

Pennsylvania, when a claim has been made that the prosecution has withheld evidence for which

it had an obligation to disclose, the claim is examined in accordance with the three-prong test

established by *Brady* and its progeny: (1) whether the evidence at issue was favorable to the

accused, either because it is exculpatory or because it impeaches; (2) whether the evidence was

suppressed by the prosecution, either willfully or inadvertently; and (3) whether prejudice ensued

to the defendant. *Commonwealth v. Paddy,* 15 A.3d 431, 450 (Pa. 2011). The Supreme Court of

Pennsylvania surveyed the Commonwealth's caselaw interpreting *Brady* and explained:

> The law governing alleged Brady violations is well-settled. In Brady, the
> United States Supreme Court held that the suppression by the prosecution of
> evidence favorable to an accused upon request violates due process where the
> evidence is material either to guilt or to punishment, irrespective of the good
> faith or bad faith of the prosecution. The Supreme Court subsequently held
> that the duty to disclose such evidence is applicable even if there has been no
> request by the accused and that the duty may encompass impeachment
> evidence as well as directly exculpatory evidence.

*Commonwealth v. Lambert,* 884 A.2d 848, 853-854 (Pa. 2005)(internal citations and quotations

omitted). The *Lambert* court continued:

> On the question of materiality, the [Supreme Court of the United States] has
> noted that evidence is material if there is a reasonable probability that, had the

---

[17] *See,* Defendant's Brief in Support of Matters Complained of on Appeal, p.7.

evidence been disclosed to the defense, the result of the proceeding would have been different. The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Thus, there are three necessary components that demonstrate a violation of the Brady strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued. *Id.* (internal citations and quotations omitted).

However, the prosecution's duty under *Brady* and its progeny is not without limit. As the Pennsylvania Supreme Court noted:

[B]*rady* does not grant a criminal defendant unfettered access to the Commonwealth's files. *See, Commonwealth v. Edmiston*, 578 Pa. 284, 851 A.2d 883, 887 n.3 (Pa. 2004) (defendant has no general right under the Constitution or Brady to search Commonwealth files); *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167, 1176 (Pa. 1999) ("The Commonwealth is, in the first instance, the judge of what information must be disclosed. ... 'Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.'") (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S. Ct. 989, 1002, 94 L. Ed. 2d 40 (1987)); *Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284, 297 (Pa. 1998), cert. denied, 528 U.S. 836, 120 S. Ct. 97, 145 L. Ed. 2d 82 (1999) (Brady is not a general rule of discovery in criminal cases).

Appellant relies on the act of destroying the notes at issue as the basis for his allegation that a *Brady* violation has been committed by the OAG. Appellant argues that the destroyed notes may have included exculpatory or impeachment evidence which defense counsel was not given that could have provided information on which to cross-examine trial witnesses. Appellant presents examples of inconsistent statements by witnesses which it uncovered in the transcripts of those particular witnesses' Grand Jury testimony to assert the position that such exculpatory or impeachment evidence would have appeared in the proffer notes or notes of interviews.[18] Appellant argues that Pennsylvania Rule of Evidence 613 envisions the ability to cross examine

---

[18] *See* Defendant's Brief in Support of Matters Complained of on Appeal pp. 10-12.

11

a witness regarding prior inconsistent statements and this right to cross examine in this manner was thwarted by the destruction of the documents at issue. Further, Appellant contends that no legitimate law enforcement purpose was served by the destruction of the notes. Appellant points to recent Federal caselaw, Pennsylvania criminal statutes, and a Pennsylvania Rule of Professional responsibility to argue how the actions of the OAG were intentional subversion of *Brady* such that Appellant was denied a fair trial.

The Commonwealth argues that Appellant's claim fails the three-prong *Brady* test. The Commonwealth states that it discharged its duty under Pa.R.Crim.P. 573, *Brady* and its progeny. The Commonwealth argues that Appellant bore the burden of establishing a *Brady* violation and a right to relief thereunder. The Commonwealth contends that Appellant has failed to specifically identify *Brady* materials which have been suppressed, rather, it argues that Appellant is speculating about what might have been in the destroyed notes. The Commonwealth points out that Appellant's examples of witnesses making inconsistent statements which would be material to use for impeachment purposes were gleaned from Grand Jury transcript testimony that was provided by the OAG.

The Appellant was provided with the Grand Jury transcripts of 94 witnesses which included witnesses who testified at trial. Defense counsel had ample opportunities to cross-examine witnesses based on inconsistent statements made before the Grand Jury and counsel exercised those opportunities. This Court finds that the materials disclosed to the defense were sufficient to survive a claim of a *Brady* violation.

Finally, with respect to this issue on appeal, Appellant also argues that the denial of an evidentiary hearing on the Joint Motion to Dismiss Due to Prosecutorial Misconduct (Joint

12

Motion) which raised the issue of the destruction of notes prior to trial was improper as a hearing was necessary to resolve the issue of the extent of the prosecutorial misconduct.

In disposing of the Joint Motion, this Court heard oral argument, reviewed the authority submitted by the parties, and reviewed the case record. This Court determined that a *per se* *Brady* violation had not occurred as the notes had been destroyed in accordance with OAG internal policy. Additionally, the evidence of record did not indicate that *Brady* material had been lost or suppressed. The Order stated that the defense would be afforded broad latitude on cross-examination during the trial and was afforded such latitude. Therefore, this Court finds that it appropriately determined that an evidentiary had not been warranted in disposition of the Joint Motion.

Appellant also supports his argument by citing to Federal cases.[19] A review of the cases reveals that they are factually distinguishable to the instant matter and not controlling law in Pennsylvania.

In *Cain* and *Kohring*, the respective Courts determined that evidence which should have been discoverable under *Brady* had been suppressed by the prosecuting authority. In *Cain*, the State of Louisiana did not dispute that type-written investigative notes of interviews with the prosecution's only eyewitness were favorable to the defendant and that they had not been disclosed to the defense counsel. *Cain*, 181 L.Ed.2d at 574. Also in *Cain*, the State of Louisiana obtained its conviction on the testimony of a single eyewitness who the U.S. Supreme Court determined that the witness had given statements to the police which were contradictory to his trial testimony and that the impeachment evidence would have established a reasonable

---

[19] *Smith v. Cain*, 565 U.S. ____, 132 S.Ct. 627 (2012); *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011); *United States v. Stevens*, (Crim. Case No. 08-231 (D.D.C)).

probability of a different verdict. In the present case, the vast amount of testimonial and documentary evidence presented by the OAG in prosecution of Appellant is in significant contrast to the case against the defendant in _Cain_. In the instant case, the evidence presented to the jury was comprised of numerous testifying witnesses as well as a voluminous amount of documents, as compared to the single eyewitness in _Cain_. In _Kohring_, the 9th Circuit Appellate Court also determined that _Brady_ materials in the nature of thousands of pages of documents including handwritten notes, "FBI 302 reports," emails, memoranda and police reports had been suppressed by the prosecuting authority. The Court extensively evaluated the newly-disclosed documents to determine which of the suppressed materials would have been admissible, and, if admissible, would have been favorable to the defendant and material to the outcome of the trial. However, as previously expressed in this opinion, the evidence of record here did not indicate that _Brady_ materials had been lost or suppressed. The defense was supplied with the OAG's ROI along with the Grand Jury transcripts of the testimony of 94 witnesses that included the transcript of each trial witness.

Next, Appellant presents the issue of whether Pennsylvania House of Representatives has the constitutional and statutory right and authority to regulate the working hours of its own employees. Appellant argues that the trial court erred by permitting the OAG to present evidence through multiple witnesses that elected members or employees of the HRC committed the crimes of Conflict of Interest, Theft and/or conspiracy if they authorized or engaged in political or campaign activity during a "normal workday" as defined by "regular" daily hours, rather than by reference to the official HRC work schedule of 37.5 hours per week. Appellant contends that the Pennsylvania House has independent constitutional and statutory authority to regulate its own affairs, including the working hours of employees, which authority cannot be

14

**14a**

superseded by the judiciary or the OAG. The Appellant addressed both of these arguments together in his brief; therefore we shall address them together, also.

With respect to the authority of the House of Representatives to regulate the working hours of its employees, Appellant cites to Article III, Section 17 and Article II, Section 11 of the Pennsylvania Constitution, along with a Pennsylvania statute which creates two Legislative Management Committees under which each House caucus may hire and regulate its staff.[20] Appellant contends that based upon this constitutional and statutory authority the Republican Caucus Employee Policy Handbook (Employee Handbook) was promulgated and that it establishes HRC personnel policies and procedures. Based upon the language of the Employee Policy, Appellant asserts that it is clear that HRC employees were required to work "a minimum work week of 37.5 hours" not a specific set of hours such as 9:00 A.M. to 4:30 P.M. Appellant argues that this Court erred by allowing evidence of "normal work day" hours when specific hours were not anticipated by the policy handbook and therefore, it was improper for such evidence to be considered when determining if a crime had been committed when non-legislative work was done during a legislative employee's workday.

As an initial consideration we must bear in mind that "[a] trial court's ruling regarding the admissibility of evidence will not be disturbed unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous." *Commonwealth v. Owens*, 929 A.2d 1187, 1190 (Pa. Super. 2007) (internal citations omitted). In its brief, the Appellant asserts that the OAG's position that the introduction of workday evidence is a fact which gives context to the case is unsupportable because it is an

---

[20] 46 P.S. §42.121c.

attempt to impose as law or policy a "normal workday" schedule on the HRC without statutory authority in contravention of the Separation of Powers Doctrine.

The authority presented by Appellant for the proposition that the Pennsylvania House of Representatives has the constitutional and statutory authority to regulate the working hours of its employees does not specifically speak to "working hours." However, it is clear that pursuant to 46 P.S. §42.121c, the respective caucuses of the House are required to establish a "Legislative Management Committee" who selects a staff administrator who, while supervised by the Committee, "shall...administer the fiscal and personnel affairs of the caucus." Appellant contends that based on this authority and the House's constitutional powers, the Employee Handbook was promulgated and administered. Appellant claims that the constitutional and statutory law upon which he relies provides the legal authority by which the HRC promulgated and administered the Employee Handbook during the relevant time frame of 2000 through 2007.[21]

As referenced in Appellant's brief, the Employee Handbook states that the "Regular Work Week Schedule" consists of a "minimum work week of 37.5 hours." (*See* Appellant's Brief In Support of Matters, p. 20). Appellant argues that the Employee Handbook sets "no daily starting time and no daily ending time" so a policy of workday flexibility was adopted by the HRC. However, witnesses testified that when hired they were told that the HRC working hours were 9:00 A.M. to 4:30 P.M. (Notes of Trial Testimony[22] 10/7/11 at 74-76; 10/14/11 at 14-15; 75; 10/17/11 at 5, 70, 88; 10/21/11 at 27). The HRC Director of Human Resources from 2004-2009 also stated that when she interviewed a potential caucus employee she told the person that

---

[21] This Court has not been asked to address the question of whether the authority is valid or invalid. The Employee Handbook was admitted as evidence at trial.
[22] Hereinafter "N.T."

the working hours were 9:00 A.M. – 4:30 P.M. (N.T. 10/25/11 at 24). Additionally, the section

of the Employee Handbook to which Appellant cites in his brief, states a policy for a "Half-Day

Schedule" which "constitutes leaving for the day at 12:45 or arriving for the day at 12:45(no

lunch hour is included)." (*Id.*) The specific hour designation for the half-day schedule, coupled

with the definite understanding of multiple HRC employees of the required hours at which they

were to be present at work runs counter to the Appellant's position that there was an inherent

policy of flexibility regarding when an employee's legislative-related work duties were to be

performed.

Additionally, Appellant argues that the OAG has breached the Separation of Powers in

that the General Assembly has the "exclusive authority to prescribe the number, duties,

compensation, and conditions of employment of its employees." (*See* Appellant's Brief, p. 21

*citing* Art. II (*sic*), Sec. 17). Appellant argues that the OAG, by introducing evidence regarding

daily work schedules of employees, has attempted to impermissibly mandate the working hours

of another branch of government. We cannot agree. The constitutional provision cited by

Appellant does not include the word "conditions."[23] Therefore, this Court disagrees with

Appellant's contention that evidence admitted of an employee working condition such as work

hours implicates a constitutional violation in the nature of the separation of powers. This Court

fails to understand how the evidence presented amounts to a mandate of HRC employee work

hours by the OAG. Also, as noted previously in our discussion of the Employee Handbook and

the testimony of various HRC employees, there was some understanding by HRC employees and

management of the expected work hours independent of any motive on the part of the OAG, as

perceived by Appellant, in introducing "workday" evidence.

---

[23] *See* Pa. Const. Art. III, § 17.

It was well within this Court's sound discretion to admit this evidence. This Court is satisfied that no separation of powers violation has been committed.

Next, Appellant argues that sufficient evidence was not presented at trial to prove that Appellant authorized or directed any employee of the HRC to devote less than 37.5 hours per week to legislative work or that any employee in fact worked less than 37.5 hours per week.

When reviewing a case where the sufficiency of the evidence produced is contested, the test is whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime of which he has been convicted. *Commonwealth v. Johnson*, 727 A.2d 1089, 1092 (Pa. 1999). It is well established that circumstantial evidence and inferences to be drawn therefrom can be sufficient to convict a defendant of a crime under the more stringent standard of proof beyond a reasonable doubt. *Commonwealth v. Breakiron*, 571 A.2d 1035 (Pa. 1990) *cert. denied*, 111 S. Ct. 224 (1990); *Commonwealth v. Aguado*, 760 A.2d 1181, 1184-85 (Pa. Super. 2000) citing *Commonwealth v. Harper*, 403 A.2d 536, 538 (Pa. 1979). Furthermore, in *Commonwealth v. Seibert*, the Superior Court set forth the following:

> "The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances."

*Seibert*, 622 A.2d at 363 (Pa. Super. 1993).

A voluminous amount of testimony and other evidence was presented during the course of the instant trial. Many witnesses who were working as HRC employees as part of Appellant's

18

staff for which he was responsible to supervise testified to performing campaign related work while being paid with taxpayer funds, including the amount of time in percentage form that was spent on non-legislative activities. (*See* N.T. 10/13/11 at 95-96; 132-135; 139-141; 173; 10/14/11at 10, 11-14; 16-17; 10/19/11 at 148-155; 10/20/11 at 127-129). It is not unreasonable for a jury to infer that employees who Appellant supervised were acting with direction. Further, evidence was presented to show that Appellant was specifically aware of non-legislative work, such as political fundraising, being performed by state employees under his supervision, in his office, during the workday. (N.T. 10/17/11 at 7-13; 24; 20-24; 67-74; 76-78; 85-87). This Court finds that sufficient evidence was presented to enable the jury to make inferences, evaluate witness credibility and draw conclusions.

Appellant also contends on appeal that the Conflict of Interest provisions of the Public Employees Ethics Act, 65 Pa.C.S.A. §§ 1102 and 1103(a), are unconstitutionally vague, or unconstitutionally vague as applied to this case.

When challenging the validity of a statute on the basis of vagueness, at the outset of analysis one must bear in mind that there is a strong presumption that legislation is constitutional. *Commonwealth v. Thur*, 906 A.2d 552, 561 (Pa. Super. 2006) *citing Pennsylvanians Against Gambling Expansion Fund, Inc. et al. v. Commonwealth of Pennsylvania*, 877 A.2d 383, 393 (Pa. 2005). Due process requires that a statute not be vague. *Thur*, 906 A.2d at 737 *citing Commonwealth v. Mayfield*, 832 A.2d 418, 422 (Pa. 2003). A penal statute is vague if it fails to give people of ordinary intelligence fair notice as to what conduct is forbidden, or if they cannot gauge their future, contemplated conduct, or if it encourages arbitrary or discriminatory enforcement. *Commonwealth v. Habay*, 934 A.2d 732, 738 *citing Commonwealth v. McCoy*, 895 A.2d 18, 30 (Pa. Super. 2006).

A statute may be challenged as vague in two ways: "(1) the statute is vague on its face, measured against hypothetical conduct that the language could arguably embrace (facial vagueness) or (2) the language is vague regarding the particular conduct of the of the individual challenging the statue (vague-as-applied). *Commonwealth v. Nesbit*, 575 A.2d 633, 635 (Pa. Super. 1990) *citing Oppenheim v. Commonwealth*, 459 A.2d 1308 (Pa. Commw. 1983). Absent the assertion of a First Amendment infringement the specificity of a statute is analyzed as a vagueness-as-applied challenge. *Nesbit*, 575 A.2d at 292-293 *citing Commonwealth v. Heinbaugh*, 354 A.2d 144 (Pa. 1976). A review of Defendant's Brief in Support of Statement of Matters Complained of on Appeal does not reveal an assertion of a First Amendment infringement. Therefore, the court will review Defendant's argument as a vagueness-as-applied challenge.

Appellant argues that the Ethics Act Conflict of Interest provisions subject a party to civil and criminal enforcement and that the terms of the statute are not definite enough to adequately inform a person as to what conduct could expose him to criminal prosecution. The Pennsylvania Superior Court has reviewed Pennsylvania's Conflict of Interest Statute in the context of a challenge asserting that the statute is void for vagueness and overbreadth both facially and as applied. *See Commonwealth v. Habay*, 943 A.2d 732. The Court in *Habay* found that the "straightforward language of the statute at hand …sets forth the crime of conflict of interest with sufficient definiteness that Appellant, and indeed any ordinary person, could understand and predict what conduct is prohibited. *Id. at 738*. Defendant asserts that doubt has been cast upon the holding in *Habay* by the United States Supreme Court Case in *Skilling v. United States*,561 U.S. ___, 130 S.Ct. 2896 (2010), in which the Court held that the "Honest Services Fraud

Statute"[24] was unconstitutionally vague as applied to a criminal theory of honest services wire fraud. The *Skilling* Court analyzed the statute by applying the principles that a penal statute must define a crime with sufficient definiteness to inform the ordinary person regarding what conduct is prohibited and in a way that does not encourage arbitrary and discriminatory enforcement. *Skilling*, 130 S.Ct. 2896 at 2927. To preserve the statute, the Court limited the application of the statute to the violation of fiduciary duty in the context of bribery and kickbacks. *Id.* at 2931. However, *Skilling* interprets federal law only and Appellant has not shown this Court that *Habay* is invalid state law.

Appellant argues that the "great weight of the criminal charges" did not pertain to any private pecuniary benefit to Appellant "unless the trivial number of fundraising letters issued from his office is deemed a criminal benefit"[25] so the rule in *Habay* should not apply. However, the facts of the case and the applicable law were presented to the jury who weighed the evidence and rendered a guilty verdict on all charges. Clearly, based upon the verdict rendered, the jury did not determine that Appellant's individual actions or his actions in relation to his co-conspirators were trivial.

Appellant also argues that it was error for the trial court to permit multiple prosecution witnesses to testify that the Defendant "had to know" about specific conversations, decisions, actions, contracts, or other matters of fact constituting material evidence of the crimes charged.

Appellant's position on this issue is that witnesses were permitted to testify that Appellant "had to know" about decisions, conversations, actions, contracts, sources of payments and other matters without testifying to what Appellant actually knew and this was error on the

---

[24] 18 U.S.C. § 1346.
[25] Appellant's Brief in Support of Matters Complained of on Appeal, p. 35.

part of the trial Court.   Appellant goes on to argue that the testimony constituted lay opinion testimony on facts that were already before the jury regarding an ultimate issue of fact in the case and that the testimony's prejudicial nature outweighed any probative value.  Appellant contends that the lay opinion testimony essentially told the jury what result they should reach.

Once again, as stated above, "[a] trial court's ruling regarding the admissibility of evidence will not be disturbed unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous." *Commonwealth v. Owens*, *supra*.  Evidentiary rulings made by the trial court are reviewed under an abuse of discretion standard and the trial judge enjoys broad discretion in determining whether lay opinion based on personal knowledge may be helpful to the jury and whether admission of the evidence will result in prejudice. *Lewis v. Mellor*, 393 A.2d 941(Pa. Super. 1978).

Opinion evidence can be offered, in certain instances, by either a lay witness or an expert witness.  Opinion testimony by lay witnesses even on an ultimate issue to be determined by the trier of fact is permissible in Pennsylvania, within certain parameters.  Pa.R.E. 701 and 704.  Lay witness testimony "...in the form of opinions or inferences is limited to those opinions or inferences which are rationally based on the perception of the witness, helpful to a clear understanding of the witness' testimony or the determination of a fact in issue...." *See* Pa.R.E. 701.  A lay witness may express an opinion if it is based upon his own perceptions and helpful to a clear understanding of his testimony or the determination of a fact in issue. *Lewis v. Mellor*, 393 A.2d at 946 (Pa. Super. 1978).

In his brief, Appellant does not specify for the court the witnesses and testimony he deems erroneously admitted.  Rather, he argues in a broader fashion by stating that the

Commonwealth was permitted to question "multiple witnesses" about "decisions, conversations, actions, contracts, sources of payments, or other matters..." that Appellant "had to know." (*See* Appellant's Brief in Support of Matters Complained Of on Appeal, p. 26). Without more specific guidance, this Court points to a few examples of when lay opinion testimony was admitted based on the trial Judge's sound discretion and in compliance with law.

Anthony Painter, Director of RITS during the timeframe relevant to this case, testified that Appellant was aware that legislative resources were being used to pay for campaign activities. (N.T. 10/6/11 P.M. at 29-33). Mr. Painter testified to support his opinion that it was based on his personal observations of Appellant's activities, including campaign activities, while he was the Director of RITS, his contacts with Appellant over email, and his contacts with other caucus personnel having contacts with Appellant. (*Id.*) Additionally, another witness, Eric Ruth, who worked in the RITS Office from 2003 until 2007, supported the opinion he rendered during the trial that Appellant knew that campaign-related work was being paid for with Commonwealth funds by describing an incident when he went to Appellant to discuss an invoice submitted by GCR which detailed such campaign work being done under the contract with the HRC. (N.T. 10/11/11 at 18-23). The invoices from GCR usually only stated "professional services." (N.T. 10/11/11 at 18-20). The invoice had been sent to the bipartisan purchasing department for payment processing. (*Id.*) Mr. Ruth testified that he and Mr. Painter went to Appellant's office with the invoice and showed it to him which resulted in Appellant making a phone call to Brian Preski to determine what should be done and providing direction on how to remedy the situation. (*Id.* at 20-21). Mr. Ruth stated that he "felt comfortable" going to Appellant with the problem, and the invoice scenario was not "news" to him because Appellant knew that GCR was being paid state money and not doing legislative work. (*Id.* at 21-22; *See*

*also* N.T. 10/6/11 A.M. at 44-50). These examples are clearly based on the witnesses' personal observations, interactions with Appellant, and the perceptions formed by those observations. This Court disagrees that it abused its discretion and committed an error by admitting lay opinion testimony.

Finally, Appellant claims that sufficient evidence was not presented by the prosecution at trial to prove beyond a reasonable doubt that the Defendant was guilty of any count of the Information charging Obstructing Administration of Law or Other Governmental Function, Hindering Apprehension or Conspiracy.

The charges were filed by the OAG based on handwritten documents including meeting notes taken by Appellant and/or Jill Seaman and provided to the OAG pursuant to subpoena that were alleged to have been falsified. Witnesses were presented who testified that they recalled saying or hearing certain statements in the recorded notes, but that others were false. After considering the voluminous amount of evidence presented at trial, the jury found Appellant guilty of committing these offenses.

Appellant makes two arguments to support his claim on appeal. First, he asserts that the notes provided to the OAG were not false. To support his argument, Appellant points to a specific entry in meeting notes presented at trial wherein Appellant was purported to have said that continued use of a particular computer program developed by GCR known as The Edge would be an ongoing crime as an example of one of the "falsehoods" asserted by the OAG. Appellant argues that one witness testified regarding the document that Appellant never made the statement but another witness testified that the statement was made at a different meeting.

24

Therefore, the Appellant contends that the "falsehood" in the notes was merely a lapse of memory or a contradiction of the witnesses' testimony concerning the accuracy of the notes.

The Appellant's first argument appears to go to the weight of the evidence rather than the sufficiency of the evidence. Appellant was provided the opportunity to cross examine the witnesses at trial wherein any contradiction in a witness's testimony or appearance of a memory lapse could have been elicited. The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Champney*, 574 Pa. 435, 443-444 (Pa. 2003) (internal citations omitted).

Next, Appellant asserts that even if it is assumed that the notes are false, he never provided the handwritten notes that formed the basis of the charges to the OAG or asked K&L Gates, counsel to the HRC, to provide them. He argues that the handwritten notes were obtained from his private counsel, Jane Penny, without his knowledge or consent, and given to K&L Gates who subsequently submitted them to the OAG pursuant to a subpoena. Therefore, Appellant claims that he did not commit an "affirmative act" to "provide" false information to law enforcement to qualify as an offense under the Obstruction of Administration of Law statute or Hindering Apprehension statute.

As stated above, when reviewing a case where the sufficiency of the evidence produced is contested, the test is whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime of which he has been convicted. *Commonwealth v. Johnson*, 727 A.2d at 1092 (Pa. 1999). Circumstantial

25

evidence and inferences to be drawn therefrom can be sufficient to convict a defendant of a crime under the more stringent standard of proof beyond a reasonable doubt and *Commonwealth v. Breakiron*, 571 A.2d 1035 (Pa. 1990) *cert. denied*, 111 S. Ct. 224 (1990); *Commonwealth v. Aguado*, 760 A.2d at 1184-85 (Pa. Super. 2000) and "[t]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Seibert*, 622 A.2d at 363 (Pa. Super. 1993).

During the course of the investigation by the OAG, which took place over years, several subpoenas were issued and served on the HRC requesting that broad categories of documents be produced to the OAG and the Grand Jury. A specific request for the handwritten notes was made by the OAG by way of a March 30, 2009 email to attorneys for the law firm of K&L Gates, counsel to the HRC, and subsequently referred to James Mann, senior legal counsel for the HRC for response. The March 30, 2009 email in which the OAG requested the documents specifically stated that "this should not require a new subpoena since it falls within the ambit of existing subpoenas." (N.T. 10/25/11 at 43). Nothing in the record indicates that any party's counsel disputed the fact that the handwritten notes that were requested were within the ambit of existing subpoenas. Attorneys for K&L Gates responded to the March 30, 2009 email request and Mr. Mann acted to comply with the request. (N.T. 10/21/11 at 85-87; N.T. 10/25/11 at 43-47).

Mr. Mann testified to reviewing subpoenas that had been served on the HRC during Appellant's tenure as the individual responsible for subpoena compliance for the HRC while the OAG investigation was in progress. (N.T. 10/21/11 at 81-84). Examples of documents requested in subpoenas in 2008, prior to Mr. Mann's employment with the HRC, include any

26

**26a**

documents or records whether electronic or any other form starting January 1, 2002 for any

campaign work performed regarding an extensive list of HRC employees; documents regarding

the Edge[26]; and documentation, whether or not electronically stored, referencing Aristotle and

certain named Aristotle employees, from January 1, 2003 to the present. (*Id.*)   The fact that

subpoenas were already in place that requested the documents sought in the March 30, 2009

email is supported by the March 31, 2009 email response by K&L Gates that they "have the

originals of the previously produced handwritten notes." (N.T. 10/25/11 at 43, 48-49; emphasis

added).  Further, testimony presented by Mark Rush, Esquire, an attorney for K&L Gates,

revealed that handwritten documents that were "not intact," or were a subset of a whole, had

been delivered in November 2008 by Jill Seaman, and that the delivery of the documents was not

in satisfaction of any particular request. (N.T. 10/25/11 at 49-51).  It was at this time that counsel

for HRC realized that the documents that had been delivered were subject to existing subpoenas.

(*Id.*)

Appellant was Chief Counsel to the HRC and in charge of compliance with subpoena

requests prior to December 19, 2008, when Mr. Mann was hired and directed to assume

subpoena compliance duties. (N.T. 10/21/11 at 77-79; N.T. 10/25/11 at 51).   Mr. Mann testified

that while carrying out his duties he would report subpoena compliance activity with Appellant

and Jill Seaman. (N.T. 10/21/11 at 87-88).  When Mr. Mann was acting to comply with the

March 30, 2009 document request, he discovered that he could not find photocopies of certain

originals which fell within the purview of the OAG's document request. (N.T. 10/21/11 at 85-

86).  Mr. Mann was told by Jill Seaman that the missing originals were in the possession of Jane

Penny, Esquire, Appellant's personal attorney at the time. (N.T. 10/21/11at 86-87).  This

---

[26] The Edge was a GCR campaign-related program developed pursuant to an HRC contract.

selective set of handwritten notes were clearly within a grouping of documents which should have been produced much earlier than the March 2009 request, at a time when Appellant was charged with subpoena compliance. The selective set of handwritten notes, without explanation in the record, ended up in possession of his personal attorney. (N.T. 10/21/11 at 85-87; N.T. 10/25/11 at 48). Additionally, Mr. Rush testified that he did not consult with Jill Seaman regarding the missing notes because they were the property of the HRC. (N.T. 10/25/11 at 48).

Without resistance, counsel for the HRC produced the handwritten notes that the OAG requested under the auspices of existing subpoenas that had been served and partially responded to as far back as November 2008. The valid subpoenas requested documents that should have been produced much earlier than the March 2009 OAG request, specifically during a timeframe when Appellant was the responsible individual for complying with subpoenas for the HRC pursuant to the OAG's investigation. Missing handwritten notes that should have been produced at an earlier date were found in the possession of Appellant's personal attorney, without explanation as to how that came about. Testimonial evidence was presented that the notes which were produced were not accurate and/or false. The evidence presented was sufficient to permit a jury to draw inferences regarding the intentional action by Appellant to conceal and/or alter the handwritten notes to provide false information to law enforcement.

After a thorough review of the record and the issues presented, this Court finds that the judgment of sentence should not be vacated.

Memorandum Opinion dated: _____June 20, 2012_____

RICHARD A. LEWIS, JUDGE

28