# Appendix A

IN THE COURT OF COMMON PLEAS
DAUPHIN COUNTY, PENNSYLVANIA

IN RE:

THE TWENTIETH STATEWIDE

INVESTIGATING GRAND JURY

: SUPREME COURT OF PENNSYLVANIA
: 277 M.D. MISC. DKT. 2002
:
: DAUPHIN COUNTY COMMON PLEAS
: NO. 15 M.D. 2003
:
: NOTICE 16

OPINION

Procedural History

Before the Court is a request by the Commonwealth of Pennsylvania, Office of Attorney

General (AG), through a specially appointed Special Prosecutor, to hold James Kolojejchick a

former Narcotics Agent with the AG in contempt for violation of a Grand Jury Secrecy Oath he

took in 2003.

Kolojejchick was the lead case agent involving a Grand Jury investigation into public

corruption at the Lackawanna County Prison. The circumstances involving the allegation that

Kolojejchick violated his secrecy oath arose out of the testimony of two witnesses that were

called to testify before the 20th Statewide Investigating Grand Jury (SWIGJ) which was presided

over by the Honorable Isaac Garb.[1] These witnesses were former Lackawanna County

Commissioner Joseph Corcoran and Randall Castellani. The story headlined in the Scranton

Times and The Tribune as "Dems Stonewall Grand Jury".[2]

---

[1] The term of the 20th SWIGJ expired on September 16, 2004. Judge Garb who would have retained jurisdiction over administrative matters that arose out of the 20th SWIGJ reached mandatory retirement on December 30, 2004. On January 17, 2005, Chief Justice Cappy appointed me as Administrative Judge of this and several other Grand juries whose prior Judge's were retired or deceased.

[2] A copy of the articles which were published on January 12, 2004, are attached to this opinion.

A1

The articles and subsequent events, which identified witnesses before the Grand Jury who initially chose not to identify themselves, and matters and information that transpired in the jury room concerning the grand jury, formed the basis for the contempt proceeding. It also resulted in a lawsuit by the former commissioners that is still pending in the Lackawanna County Court of Common Pleas.[3]

In addition, criminal charges arose out of the Grand Jury investigation into public corruption at the Lackawanna County Prison. Said charges were presided over by the Honorable Vito P. Geroulo of the Lackawanna County Court of Common Pleas. Such were recently resolved by pleas of guilty.[4] This court in its capacity as administrative Judge of the 20th SWIGJ and Judges Mazzoni and Geroulo have had to address a variety of motions/petitions arising in part out of a recent revelation involving an affidavit provided by Kolojejchick to the Editor of the Scranton Newspapers. Said revelation and affidavit[5] as well as other acts of commission/omission related to his deception and lying about his actions involving meetings with the Editor and the execution of the affidavit, resulted in Kolojejchick being discharged from his position with the OAG.[6] The principle allegations were that he violated his secrecy oath, and

---

[3] Former Commissioners Castellani and Corcoran are represented by Richard Sprague, Esquire, Thomas Sprague, Esquire, Stephen Kurens, Esquire and Lawrence J. Moran, Esquire. The presiding Judge is Honorable Robert Mazzoni. Discovery is still pending on the defamation case and on June 3, 2005 Judge Mazzoni entered a comprehensive order/opinion that directed that the unnamed source of the articles be revealed to counsel. The Superior Court in its decision released on January 3, 2007, noted that while they were mindful and sympathetic to the concerns of the learned trial court regarding possible criminal violations of the grand jury process vis-à-vis the Shield Law Privilige; given the narrow posture of the civil defamation case, such an exception to the Shield Law was under the present circumstances improper, and the trial court was reversed. (emphasis added)

[4] On September 14, former Lackawanna County Prison Warden Thomas Gilhooley was sentenced by Judge Geroulo on a felony count of ethics/restricted activities-conflict of interest. Former Lackawanna County Prison Deputy Warden Robert Hilborn was sentenced for the same offense on October 18, 2006.

[6] From a review of some of the exhibits admitted in this case it appears Kolojejchick has challenged his discharge and/or eligibility for certain benefits. I am uncertain about the nature, extent and/or outcome of any of those proceedings.

A2

such is the principle basis for this contempt proceeding. Whether Kolojejchick also withheld information and lied to Special Agent Kelly about whether he disclosed any information about the investigation to anyone from the newspaper or anyone outside the law enforcement community is ancillary, but not dispositive to the contempt proceedings.

In any event, subsequent to Kolojejchick's recent revelation and affidavit that raised concerns that he violated his secrecy oath, I appointed Terrance P. Houck Special Prosecutor to investigate and make recommendations whether _any_ persons subject to secrecy before the 20th SWIGJ had unlawfully violated the secrecy oath[7] relative to Notice 16 (which involved the investigation into public corruption at the Lackawanna County Prison). (emphasis added)

Mr. Houck, who is currently the Chief Deputy District Attorney in Lehigh County, was initially appointed by Judge Garb to investigate whether any member of the OAG or other persons subject to the grand jury secrecy oath violated the oath, relevant to the January 12, 2004, articles in the Scranton Newspapers. Judge Garb concluded that investigation with no findings as to any violations by the members of the Grand Jury or AG staff. Subsequently, as a result of the recent revelation by Kolojejchick, the investigation was reopened by me by Order of Court in September 2005. Special Prosecutor Houck filed his Investigative Report #2 on February 23, 2006, and recommended Mr. Kolojejchick be prosecuted for contempt for violation of his oath of secrecy. On May 19, 2006, an "open" contempt hearing was held with Terence Houck acting as Special Prosecutor, while Kolojejchick was represented by Douglas R. Goldhaber, Esquire. At that time, four witnesses testified and various exhibits were made part of the record. At the conclusion of the hearing (which would usually result in an adjudication by the Court contemporaneous thereto), Mr. Goldhaber requested an opportunity to file a brief due to the

---

[7] _See_ 42 Pa.C.S.A. § 4549(b) and Pa.R.Crim.P. 231(c)

A3

alleged novel issue presented, and the limited or nonexistent case law addressing same. I received Mr. Goldhaber's brief in the later part of September 2006, and the brief of Special Prosecutor Houck was received on or about November 9, 2006.[8]

## Findings of Fact

James Kolojejchick is a former Narcotics Agent employed by the Office of Attorney General (AG). On March 27, 2003, Kolojejchick executed a grand jury secrecy oath for the twentieth Statewide Investigating Grand Jury. The secrecy oath provided:

> I, James Kolojejchick, Narcotics Agent, Bureau of Narcotics Investigation and Drug Control, do solemnly swear that I will keep secret all that transpires in the jury room, all matters occurring before the grand jury, and all matters and information concerning this grand jury obtained in the course of my official duties or otherwise, except when authorized by law or permitted by the court.

Exhibit C-1. The secrecy oath was notarized by Robin Mancinelli, Notary Public.

Kolojejchick served as the lead investigator into the grand jury's investigation into certain activities at the Lackawanna County Prison. N.T. (5/19/06) at 23-24. County Commissioners Randall A. Castellani and Joseph J. Corcoran were called as witnesses before the grand jury. Shortly thereafter, lead prosecutor Senior Deputy Attorney General Janice Martino-Gotshall briefed Kolojejchick and the other agents assigned to the case about the Commissioners' testimony. Id. at 25, 29. See also Exhibit C-4.

On January 9, 2004, a meeting was held at the AG's Wilkes-Barre's office between the AG and The Scranton Times. N.T. (5/19/06) at 35-36. Representing the AG were Regional Director Frank Noonan, Supervisory Special Agent Bill Fox, and Kolojejchick. Id at 36. Exhibit

---

[8] See my Order of Court dated March 21, 2006, which is characterized as Limited Findings and Order. Such sets forth the parameters of the contempt proceedings, provides notice to Kolojejchick of the allegations/findings of the Special Prosecutor in support of his recommendation that Kolojejchick be prosecuted for contempt; that the burden of proof is beyond a reasonable doubt, and outlines the right of appeal of any adverse finding. The Order also addressed a variety of issues raised by counsel for Gilhooley and Hilborn to dismiss the Presentments against the defendants, for certain discovery, and to stay the criminal proceedings pending in Lackawanna County. All of the aforesaid were denied.

A4

C-5 at 10. Representing the newspaper were Editor John Murphy and reporter Jennifer Henn. *Id.* According to Kolojejchick, the purpose of the meeting was to obtain information from the newspaper about their sources in order to advance the investigation. Exhibit C-5 at 8-11. During the meeting, the newspaper questioned Noonan about the investigation. N.T. (5/19/06) at 36-37. In particular, the newspaper questioned Noonan about whether Castellani and Corcoran had testified before the grand jury. Noonan replied that the AG's Office could not furnish them with any information concerning the case. *Id.* Kolojejchick was in Noonan's presence when Noonan made this statement. *Id.;* Exhibit C-5 at 14.

On January 11, 2004, Kolojejchick had a telephone conversation with Henn about the case. Exhibit C-5 at 24. The conversation concerned Henn's sources and whether they would be willing to cooperate in the AG's investigation. *Id.*

On January 12, 2004, two articles appeared in The Scranton Times and The Tribune indicating that Castellani and Corcoran were "vague" and "evasive" in their grand jury testimony, and that this conduct "irritated the jurors." Exhibit C-7. The articles attributed the information to a "source close to the investigation." *Id.*

On January 13, 2004, Martino-Gotshall sent an email to Kolojejchick and others regarding the newspaper articles stating: *"Although it seems a bit trite, please let me stress, in light of recent developments, the need for complete confidence and discretion in all matters relating to this investigation."* Exhibit C-2 (emphasis added)[9]

On February 3, 2004, at the first day of the next session following the "leak", Kolojejchick appeared before Supervising Judge Isaac S. Garb to address the newspaper articles. Judge Garb explained that there was a leak, and that he was talking to all the agents involved in

---

[9] Gotshall's memo was an attempt to state the obvious, that at a minimum the provisions as to secrecy would apply to AG investigative personnel.

A5

the investigation from the Scranton region in order to "reaffirm the understanding that nothing should come out of that grand jury room." The proceedings in chambers which were recorded reflected the following:

(proceedings in chambers)

MS. ZAPP: Your honor, we're in here this morning in chambers to address a continuing concern for the Court with respect to the publication of the article in the Scranton Times in the investigation under Notice No. 16.

Agent Kolojejchick who is present here today is one of the agents assigned to that matter. And I know the Court was addressing those involved yesterday and reminding them with respect to their obligation as having sworn secrecy oaths.

JUDGE GARB: I presume you're familiar with that article that appeared.

MR. KOLOJEJCHICK: Yes, Your Honor.

JUDGE GARB: Somebody fed some information to that court reporter that came right out of the grand jury room that shouldn't have come out. I am convinced that it wasn't a grand juror. We don't have any grand jurors from anywhere near the northeast corner.

So obviously it came from somewhere else. Now I have no idea where it came from. And I want you to understand that I'm talking to everybody from up in that region; the agents who were involved, to all of them.

I'm not accusing anyone of anything. I'm certainly not accusing you of being the leak. What I do want to do, however, is I want to reaffirm the understanding that nothing should come out of that grand jury room. There should be no talking. There should be no leaking. And I know you understand that.

But just in view of the fact that that appeared, it seems to me that I have to reinforce that with all parties. And so that's what I'm doing now.

MR. KOLOJEJCHICK: I understand that.

JUDGE GARB: Agent Kolojejchick, you are not on the carpet.

MR. KOLOJEJCHICK: I understand that.

JUDGE GARB: Okay.

MS. ZAPP: Thank you, Your Honor.

A6

MR. KOLOJEJCHICK: Thank you, Sir.

MS. ZAPP: We're done.

Transcript of Proceedings of Grand Jury dated Friday, 3, 2004, 9 a.m

On June 16, 2005, Special Agent Edward Kelly of the AG's Internal Affairs Unit interviewed Kolojejchick about the leak. N.T. (5/19/06) at 50. Kolojejchick admitted to signing the secrecy oath. *Id* at 52 (referring to Exhibit C-1). Kolojejchick also denied disclosing any information about the investigation to anyone from the newspaper or anyone outside the law enforcement community. *Id.* at 53, 68.

On June 23, 2005, Kolojejchick was deposed in connection with the defamation lawsuit filed by Castellani and Corcoran against The Scranton Times arising from the two newspaper articles in question. Exhibit C-5. During the deposition, Kolojejchick testified that he had two phone conversations with John Murphy of The Scranton Times in December of 2004 that resulted in a meeting between them in January of 2005. *Id.* at 32-33. The meeting was scheduled, and occurred at a coffee shop in Scranton approximately 25 to 30 minutes from the regional BNI office. *Id.* at 99. Murphy allegedly told Kolojejchick that there was a problem with the articles because they only had confirmation from one source. *Id.* at 34. Murphy asked Kolojejchick if he thought S.D.A.G. Martino-Gotshall would talk to Murphy about this matter. *Id.* at 96. Kolojejchick testified in his deposition that he responded: *"Nobody in our office is going to talk to you."* Id. Murphy then asked Kolojejchick if he had ever heard comments like the ones published in the articles. *Id.* ▓▓▓▓▓▓▓▓▓▓▓ Kolojejchick also told Murphy that he would be available to testify at a civil hearing if the paper was sued. *Id.* at 34-35. Within a day or two of the coffee shop meeting, Kolojejchick agreed to prepare an affidavit

A7

for the newspaper in the event that he was unavailable to testify for the newspaper. *Id* at 60

Kolojejchick's affidavit stated as follows;



Exhibit C-4.

In his deposition, Kolojejchick admitted that he never told anyone, not his co-workers, supervisors, "family, friends, close acquaintances," or even his wife, about the affidavit and his contacts and conversations with Murphy. *Id.* at 78-79, 98-99.

On July 6, 2006, Special Agent Kelly of Internal Affairs re-interviewed Kolojejchick. N.T. (5/19/06) at 54. During this interview, Kolojejchick admitted to providing the affidavit to Mr. Murphy of The Scranton Times. *Id.*

On October 1, 2005, Kolojejchick testified at an unemployment compensation hearing. Exhibit C-6. Kolojejchick testified that on or around December of 2004, he met with Mr. Murphy and was asked to confirm whether he (Kolojejchick), heard the Commissioners were "evasive and vague in their testimony." *Id.* at 30. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 30.

A8

## Discussion

In order to find Mr. Kolojejchick in contempt, the Commonwealth must prove beyond a reasonable doubt that former Special Agent James Kolojejchick violated his grand jury secrecy oath. Kolojejchick's secrecy oath states:

> I, James Kolojejchick, Narcotics Agent, Bureau of Narcotics Investigation and Drug Control, do solemnly swear that I will keep secret all that transpires in the jury room, all matters occurring before the grand jury, and all matters and information concerning this grand jury obtained in the course of my official duties or otherwise, except when authorized by law or permitted by the Court.

Contrary to his secrecy oath, Kolojejchick revealed grand jury information that he solemnly swore to keep secret. He provided information and an affidavit to Mr. Murphy of The Scranton Times involving matters or information that transpired in the Grand Jury room. That information was obtained in the course of his official duties or otherwise by describing (and despite admonitions from SDAG Gotshall and Judge Garb) what he learned about the appearance of County Commissioners Randall A. Castellani and Joseph J. Corcoran before the grand jury.

This disclosure can also be viewed as intentional, given that Kolojejchick, an experienced investigator, involved in many Grand Jury proceedings, had to be aware and/or was repeatedly reminded about his secrecy obligations. Such occurred by the example of Regional Director Frank Noonan on January 9, 2004, Senior Deputy Attorney General Janice Martino-Gotshall's memo on January 13, 2004, and Supervising Judge Isaac Garb's admonition on February 3, 2004. I also note that Kolojejchick's disclosures have impacted not only the civil defamation proceedings, but it also complicated the criminal action in which he was the lead investigator. In the criminal matter, both defendants requested this Court, as Administrative Judge of a Grand Jury no longer in session, to dismiss the charges that were pending before Lackawanna County Judge Vito Geroulo. While we concur that in extreme circumstances suppression of Grand Jury

A9

evidence, and/or the dismissal of the criminal information may be suitable remedies for unlawful disclosure of certain Grand Jury proceedings, or other prosecutorial misconduct, such clearly was not warranted in this case. After review of the applicable Grand Jury proceedings, I could find no actual prejudice to the defendants that impacted the Grand Jury's ability to exercise its independent judgment. Also, such an extreme remedy related to Kolojejchick's unauthorized disclosures was not warranted, when a finding of contempt could serve the purpose of addressing Kolojejchick's actions. The dominant purpose of the standard of secrecy and penalty of contempt is to benefit the public, and vindicate an act of the legislature involving a Court supervised law enforcement proceeding.

Kolojejchick argues that he was not constrained by the grand jury secrecy laws from disclosing what he had learned about the grand jury testimony of Corcoran and Castellani to the Scranton Times. More specifically, Kolojejchick maintains – despite having access to matters occurring before the grand jury, by virtue of his participation as lead investigator on the investigative team, and despite having executed a secrecy oath –he was permitted to freely disclose what he had learned about the grand jury testimony to the newspaper.[10] This argument is without merit.

The Investigative Grand Jury Act, in relevant part, provides:

> (b) **Disclosure of proceedings by participants other than witnesses:** — Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorney's for the Commonwealth for use in the performance of their duties. The attorneys for the Commonwealth may with the approval of the supervising judge disclose matters occurring before the investigating grand jury including transcripts of testimony to local, State, other state or Federal law enforcement or investigating agencies to assist them in investigating crimes under their investigative jurisdiction. Otherwise a juror,

---

[10] The inference that a lead investigator of a Grand Jury proceeding has a first amendment right to disseminate information about matters that occurred before the Grand Jury to a third party (the editor) who due to his position has certain first amendment protections and is arguably not bound by Grand Jury secrecy, is absurd. In any event, such does not vitiate his own secrecy oath and the statute in question.

A 10

> attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the Court. *All such persons shall be sworn to secrecy, and shall be in contempt of court if they reveal any information which they are sworn to keep secret.*

42 Pa.C.S. § 4549(b) (emphasis supplied)

Admittedly, 42 Pa.C.S.A. § 5459(b) does not define what falls within the ambit of disclosure of "matters occurring before the Grand Jury". However, such would clearly encompass not only the nature of the evidence submitted to the Grand Jury, but also the views expressed by members of the Grand Jury or anything else that actually occurred before the Grand Jury. Obviously, protecting individuals (whether the subject of the inquiry or witnesses) from undue publicity is necessary to the role of the Grand Jury.

Kolojejchick argues that the term "such persons" in the last sentence of section 4549(b) refers only to the individuals listed in the preceding sentence, namely, "juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony. . . ." *Id.* However, this section must be read in conjunction with Rule 224 (Administering Oath to Court Personnel), which provides:

> All court personnel who are to be present during any portion of the grand jury proceedings, *and all others who assist in the proceedings*, shall be sworn to secrecy by the court prior to their participation.

Pa.R.Crim.P. 224 (emphasis supplied). Read together, the phrase "such persons" is intended to include not only a "juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony," but also "local, State, other federal law enforcement or investigating agencies" who have been granted access to grand jury information and "all others who assist in the proceedings," regardless of whether they are physically in the grand jury courtroom. 42 Pa.C.S. § 4549(b); Pa.R.Crim.P. 224. *See also In re Investigating*

A 11

*Grand Jury of Philadelphia County (Appeal of Philadelphia Rust Proof Company, Inc.)*, 437 A.2d 1128, 1132 (Pa. 1981) ("Respondent will also be obliged to reveal all disclosures which have been made to any party that does not come within one of the two groups to which it may validly disclose grand jury evidence: agencies investigating crimes that are both authorized and judicially approved pursuant to 42 Pa.C.S. § 4549 (b), and *parties who are sworn to secrecy by the court and receive judicial approval to learn of grand jury evidence in their capacity as agents of the prosecutor for the exclusive purpose of assisting in the investigation before the grand jury*) (emphasis supplied); David N. Savitt and Brian P. Gottlieb, *Pennsylvania Grand Jury Practice*, § 17.03, pp65-66 (Banks-Baldwin Publishing Co. 1983) ("In order to convey the necessity and obligation of maintaining secrecy, the act and the procedural rules require secrecy oaths for all persons with access to grand jury information") (citing 8 Pa.Bull. 1523(1978)).

Moreover, acceptance of Kolojejchick's interpretation of the Investigative Grand Jury Act would lead to an absurd result that the General Assembly could not have intended. *See* 1 Pa.C.S. § 1922(1). The purpose of grand jury secrecy required by section 4549(b) of the Act, 42 Pa.C.S. § 4549(b), are well established:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*In re Investigating Grand Jury of Philadelphia County (Appeal of Rust Proof Company, Inc.)*, 437 A.2d at 1130. To interpret the Act to exempt law enforcement officers from grand jury secrecy rules would clearly undermine these purposes. Indeed, it is not difficult to imagine how

A12

allowing law enforcement officers to freely disclose grand jury information that they obtain in the course of their duties would chill grand jury proceedings and damage the reputation of witnesses or persons under investigation who may later be exonerated.

Kolojejchick also argues that he did not disclose grand jury information, but only confirmed the accuracy of grand jury information that was already in the public domain. This is a distinction without a difference, and still constitutes an unlawful disclosure of grand jury information.[11] There is no once disclosed exemption to the secrecy provision. Such may go to any penalty, but it is not a justification defense. Grand jury information may only be disclosed when authorized by law or permitted by the Court. Neither section 4549(b) of the Grand Jury Act, nor the secrecy oath contain an additional exception permitting disclosure of grand jury information to confirm what was previously leaked to the press and now in the public domain. Moreover, Kolojejchick was not vested with a First Amendment right to disclose grand jury information once that information became part of the public domain because of prior unlawful disclosure. *See United States v. Smith*, 123 F.3d 140 (3d. Cir. 1997) (holding any improper disclosure of grand jury materials that occurred when government publicly released sentencing memorandum did not deprive grand jury materials, even those that were disclosed, of protection of grand jury secrecy rule, and did not give rise to First Amendment right of access; also holding that although the court could not prevent the newspapers from publishing the sentencing memorandum once they came into possession of it, the court properly prevented further government disclosures of the putative grand jury secrets contained in the sentencing memorandum to additional parties). Also, Kolojejchick's argument is more than a little

---

[11] Such is particularly true where the alleged contemnor is the very person who (if not the first to disclose) was the first to unlawfully and publicly confirm the alleged observations of the Grand Jurors about the witnesses in question.

A13

disingenuous, considering that the evidence presented at the hearing suggests that he may have been Henn's only source for the original newspaper articles.

Kolojejchick also argues that he did not disclose actual testimony, but rather SDAG Martino-Gotshall's characterization of the testimony. He further argues that he was not present in the grand jury room when Castellani and Corcoran testified. These are additional distinctions without a difference. Kolojejchick's secrecy oath encompassed "all that transpires in the jury room, all matters occurring before the grand jury, and all matters and information concerning this grand jury obtained in the course of my official duties or otherwise." Clearly, the oath is not limited to grand jury information obtained by Kolojejchick while present in the grand jury room. Such would limit the ability of the person authorized to be in the Grand Jury room from communicating with other properly authorized persons involved in the investigation. Moreover, Kolojejchick's statement in his affidavit that ██████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████ is clearly describing events that transpired in the grand jury room.

Kolojejchick's assertions, in their various forms, that he did not believe this information was covered by grand jury secrecy rules is simply belied by his own recitation of the facts surrounding its disclosure. As previously detailed, he made significant efforts to avoid disclosure of his contacts and conversations with Murphy that resulted in the issuance of the affidavit. The meetings with Murphy, and the transmission of the information in the affidavit,

---

[12] Other quotes from the "source" in the paper describing the Commissioners testimony reflected:

"their testimony really irritated the jurors. They were ready to throw both of them out," the source said. "After months of hearing all kinds of detailed, specific information and testimony, they just had no tolerance for that kind of crap. "They were ready to take out the big hook and yank each of them out of the witness chair."

A14

were arranged and executed in secret.  Indeed, Kolojejchick maintained this secret until his

sworn deposition in June of 2005.  None of his actions in disclosing the information to Murphy,

measured individually or as a whole, are consistent with his hollow claims that he believed he

was free to reveal this information.

Finally, Kolojejchick argues that the fact that this contempt proceeding was open to the

public is proof that Kolojejchick's disclosure was not unlawful.  This argument is also without

merit.  The Grand Jury Act does not address the question of whether other proceedings related to

the Grand Jury inquiry (i.e. such as the contempt hearing in this case) must be held in secret.

Thus the need for secrecy must be determined by the particular circumstances that exist at the

time.  Herein, the Court endeavored to proceed in a circumspect manner while affording the

alleged contemnor all his due process rights.  The Investigating Grand Jury Act states, in

pertinent part, "Disclosure of maters occurring before the grand jury other than its deliberations

and the vote of any juror may be made to the attorney's for the Commonwealth for use in the

performance of their duties." 42 Pa.C.S. § 4549(b).  Obviously, the prosecution of crimes, such

as contempt, is one of the fundamental duties of an attorney for the Commonwealth.  The

assertion that the secrecy requirements applicable to Pennsylvania Grand Juries could somehow

prevent the public disclosure of grand jury evidence in criminal prosecutions is baseless and

absurd.  Additionally, it should be noted that caution was still exercised by the Court and

Commonwealth (for example the limited testimony of SDAG Gotshall) in this matter.  While

Kolojejchick's affidavit was admitted as an exhibit during the hearing, the contents of the

affidavit were not described by the witnesses in their public testimony.  Moreover, the grand jury

testimony of Corcoran and Castellani were not admitted as exhibits or revealed during public

A15

testimony. Therefore, there is no inconsistency between this Court's decision to hold a public hearing and Kolojejchick's prosecution for criminal contempt.

<u>Conclusion</u>

Mr. Kolojejchick knowingly and intentionally disclosed information concerning matters that transpired/occurred in the jury room, and such was obtained in the course of his official duties as lead investigator in a public corruption case (Notice 16) before the 20th Statewide Investigating Grand Jury. The disclosures were not authorized by law or permitted by the Court.

Clearly, neither Judge Garb authorized such disclosures nor did Kolojejchick seek guidance from anyone in the Attorney General's Office or the Court (nor the subsequent administrative judge) about what fell within the ambit of secrecy. Also, had Kolojejchick made such a request (i.e. perhaps arguably because he wanted to assist a source-or an editor/newspaper- who admittedly violated their own second source rule) such obviously would not have been allowed.

I find that Kolojejchick's statement to editor Murphy that: 1) "nobody in our office is going to talk to you" 2) his secreting from his co-workers, supervisors, family, friends and close acquaintances his unlawful discussions with editor Murphy, 3) the execution of the affidavit (subsequent to Regional Director Noonan's refusal to talk to Henn and Murphy in Kolojejchick's presence and 4) the admonitions from SDAG Gotshall and Judge Garb are all either expressed or implied admissions against interest and/or circumstantial evidence that he violated his secrecy oath.

It is noteworthy that the meeting between Kolojejchick and Murphy was not for the purpose of gathering news. By Murphy's own indirect admission the meeting was to mitigate the newspapers exposure in the lawsuit filed by the former commissioners and Murphy's concern

A16

about losing his job. In effect, the paper violated its two source rule, and printed information about two witnesses who testified before the Grand Jury (that based on a review of the transcript of their testimony was simply untrue).

It is also both odd and ironic that Editor Murphy was obviously at some point (within the ambit of the defamation lawsuit-albeit with Kolojejchick's consent) going to disclose Kolojejchick's identity as a belated "second source"; but he and the newspapers have heretofore failed to disclose the identity of the alleged first source. While such is ancillary and irrelevant to my independent determination that Kolojejchick violated his secrecy oath; one could infer that Kolojejchick was the sole source. Again, the circumstantial evidence points to such.

It is not disputed that Kolojejchick had contact with Henn on January 11, 2004, and the next day (January 12, 2004), the articles about the Commissioners were published, with the paper noting the information came from "a source close to the investigation". Absent evidence to the contrary, it is not unreasonable to infer that source was lead investigator Kolojejchick.

It is hard to envision that an experienced investigator such as Kolojejchick (who claims he does not know the identity of the alleged first source) would agree to be a second source without eliciting from Murphy information about the identity of who he was corroborating as a second source. Arguably, a fair inference could be drawn that Murphy, who was concerned about his job, (Henn had already left the paper) might have indicated he was going to have to out Kolojejchick at some point, and the unlawful discussion, meeting, and affidavit, were an attempt to ameliorate both of their predicaments.

I would also acknowledge another reasonable inference is that Kolojejchick was simply trying to assist Henn who may have provided information helpful to the investigation (although his allegiance to Murphy is less understandable) and he was simply engaging in a quid pro quo.

A17

However, there is no "nice guy exception" to the rule regarding grand jury secrecy. It is also possible that another source "close" to the investigation and/or to reporter Henn may have been the first source. In addition to the involvement of the Office of the Attorney General one or more members of the Lackawanna County District Attorney's Office were involved in a collateral investigation. In fact, Judge Terry Nealon who was the Presiding Judge of a local Grand Jury empanelled in Lackawanna County, appointed former U.S. Attorney James West to conduct an investigation into concerns about leaks that may have arose out of the Lackawanna County Grand Jury's contemporaneous investigation into public corruption in Lackawanna County. In any event, and despite the recent appellate court(s) ruling reversing Judge Mazzoni's order compelling The Scranton Times and Tribune to reveal the alleged first source of the articles in question in the lawsuit by former Commissioners Castellani and Corcoran; the speculation about the source is "the proverbial riddle wrapped in a mystery inside an enigma".

Notwithstanding all of the foregoing, I find it equally ironic and regrettable that Kolojejchick was more willing to keep secret his conversations with editor Murphy and the execution of the affidavit, then what he was allegedly told by SDAG Gotshall about what allegedly transpired in the Grand Jury room. As an aside, I found SDAG Gotshall's use of the word "trite" in her January 13, 2004 admonition to Kolojejchick and others ("although it seems a bit trite, please let me stress in light of recent developments, the need for complete confidence and discretion in all matters relating to the investigation") to be an interesting choice of words that seem to belie Kolojejchick's assertions about his being untrained or unaware about the nature and extent of the secrecy oath. Webster's defines trite as: a hackneyed or threadbare phrase that lacks freshness,, an idea that is spoiled from long familiarity, a phrase worn out by overuse so as to become dull, and applies to a term, phrase or idea, (*i.e.* the sine qua non related

A18

to Grand Jury Investigations-SECRECY) that has been used until its possibilities of interest have been totally exhausted. Gottshall's opening language in her admonition was suggestive of a concept (secrecy) that was both patent and the raison dètre for the oaths of secrecy involving Grand Jury Investigations by Law Enforcement and others. While the testifying witness, as stated in the colloquy, "may at any time discuss your testimony with your lawyer and, except for cause shown before the Court, you may disclose your testimony to whomever you choose, if you choose." Kolojejchick was obviously not a witness.

Also, despite Kolojejchick's assertions about lack of training about what fell within the ambit of the secrecy oath he so blithely ignored, is the contemporaneous and relevant modeling (perhaps the term on the job training would also be appropriate, although Kolojejchick was an experienced, as compared to novice investigator, who had been with the Attorney General's Office for almost 15 years) is the response of Regional Director Noonan, when he in the company of Kolojejchick, was questioned by Murphy and Henn. When he was questioned on January 9, 2004, about the investigation and about whether the Commissioners had testified before the Grand Jury, Noonan replied the Attorney General's Office could not furnish them with any information concerning the case. Kolojejchick's later admissions against interest in speaking to Murphy (all subsequent to the modeling behavior of Noonan, and the admonitions from SDAG Gottshall and Judge Garb) that "nobody in this office is going to talk to you," reflects knowledge, and his discussions with Murphy, and the execution of the affidavit, are clear indications of his intent to violate his secrecy oath.

In conclusion despite his assertions[13] about his lack of intent to violate his secrecy oath, facts do not cease to exist because they are ignored. Kolojejchick's assertions and legal memorandum subsequent to the contempt hearing, strain credulity, and the legal analysis of his

---

[13] Kolojejchick, as was his right, chose not to testify at the contempt hearing.

A/9

counsel[14] is unpersuasive.  Therefore based on his knowing and intentional acts of commission and omission in violating his secrecy oath, I regretfully enter the following order as to a former agent of the Office of Attorney General.

cc:   T. Houck, Esquire, Special Prosecutor
      D. Goldhaber, Esquire, Counsel for James Kolojejchick
      C. Carusone, SDAG in charge of Grand Juries

---

[14] Counsel for Kolojejchick was correct about the dearth of cases relevant to the issue(s).  However, *See Lucy Ware Morgan v. State of Florida*, 325 So. 2d. 40 (1975).Therein, the Florida appellate court found inter alia: (1) a sanction of 90 days imprisonment by a lower court which held a newswoman in contempt for refusing to answer questions propounded by a grand jury that was investigating 'leaks' of grand jury deliberations (admittedly a more serious violation of Grand Jury Secrecy) was severe but valid, (2) the court was empowered to assist the Grand Jury, an arm of the court, in the exercise of its proper functions, including the investigation of matters which impeded the grand jury's integrity or right to secrecy, (3) the newswoman's privilege not to reveal sources was required to give way to the grand jury's right of secrecy.  Finally, I note that had a Grand Juror in this case (or any case over which I preside as a grand Jury Judge) been the one to violate their oath of secrecy by providing the information Kolojejchick did to the media, I would of immediately discharged the grand juror in question (a remedy that neither Judge Garb or I would have as to Kolojejchick).  In addition, depending on the circumstances, I would also consider whether to assist the Grand Jury (and although not required such would first be put to the Grand Jury for a vote) in initiating contempt proceedings against a newspaper person who facilitated or refused to cooperate in compelling circumstances involving the integrity of Grand Jury proceedings.  In my view the violation of the oath of secrecy or other substantive violations that affects the integrity of a special investigative body whose primary role is the exposure and prosecution of organized crime and public corruption, is a serious offense.  In fact, a review of the legislation that codified the Grand Jury act, noted that the maintenance of secrecy was so important to the sponsors that abuse of secrecy could result in changes in the law.  *See "Grand Jury Promises a Hot Winter in Pa."* (analysis of Investigating Grand Jury Act of 1978 by Honorable Arlen Specter, former Philadelphia District Attorney, now United States Senator from Pennsylvania.  *See also*, the recent case of *Castellani and Corcoran v. The Scranton Times and the Tribune, and Jennifer Henn*, No. 1111 MDA 2005, filed January 3, 2007, wherein Judge Todd noted that in certain cases involving a criminal prosecution of a grand jury leak, a reporters evidence about the source of that leak, the Shield Law may have to yield.

A20

IN THE COURT OF COMMON PLEAS
DAUPHIN COUNTY, PENNSYLVANIA

IN RE:

THE TWENTIETH STATEWIDE

INVESTIGATING GRAND JURY

: SUPREME COURT OF PENNSYLVANIA
: 277 M.D. MISC. DKT. 2002

: DAUPHIN COUNTY COMMON PLEAS
: NO. 15 M.D. 2003
:
: NOTICE 16

## ORDER

AND NOW this 11ᵗʰ day of January 2007, after review of the record proceeding, exhibits,

and briefs of counsel, James K. Kolojejchick is adjudicated in contempt of court for violations of

his secrecy oath.  It is ordered and directed that sentencing shall occur on Friday, March 2, 2007

at 1:30 p.m. and that James Kolojejchick shall appear for sentencing at the same courtroom

where the contempt proceedings were held (Honorable G. Thomas Gates Memorial Grand Jury

Courtroom, 8ᵗʰ Floor, Verizon Tower, Harrisburg, Pa) and he shall bring with him documentation

reflecting his current income and financial circumstances.

BY THE COURT:

BARRY F. FEUDALE
Supervising Judge

A21

# The Scranton Times

FINAL

GOD BLESS AMERI

NORTHEASTERN PENNSYLVANIA'S LARGEST NEWS TEAM

HOME DELIVERY
NEWSSTAN

## Dems Stonewall

### Source: Corcoran, Castellani Vague Before Grand Jury

BY JENNIFER L. HENN
THE SCRANTON TIMES



**BEHIND THE BARS**

Lackawanna County's former majority commissioners Joseph J. Corcoran and Randy A. Castellani recently testified before a statewide grand jury investigating the county prison and were less than candid, The Times-Tribune has learned.

The two were "considerably less than cooperative" and were ready to throw both of them out," the source said. "After months of hearing all

kinds of detailed, specific information and testimony, they just had no tolerance for that kind of crap.

"They were ready to take out the big hook and yank each of them out of the witness chair."

Mr. Castellani at first denied to a reporter that he was ever subpoenaed, let alone that he testified last month. During a brief interview Jan. 5 in the presence of his new solicitor, John O'Boyle, the commissioner

shrugged when asked about it.

"You got the wrong guy," he said. "I don't know what to tell you. You got the wrong guy."

Questioned again days later after the newspapers had confirmed his appearance, Mr. Castellani again refused to comment on "anything dealing with the grand jury investigation," including why he previously indicated he had



CASTELLANI
CORCORA

Although grand jury proceedings are closed to the public and prosecutors are forbidden by law to disc

Please see DEMS, Page 7

spending with vague, evasive answers including, "I don't recall" and "not that I am aware of," a source close to the investigation told the newspapers.

"Their testimony really irritated the jurors. They

---

## Aftermath of Tragedy

MON. P.M. JAN. 12, '04







## Dean Defende Record On

# DEMS: Corcoran, Castellani Vague Before Jury, Source Says

FROM PAGE 1

them, witnesses are free to speak about their testimony if they so choose.

When reminded that he was free to discuss his testimony Mr. Castellani still refused to talk about it, saying repeatedly that he would not discuss anything connected with the grand jury investigation.

Mr. Corcoran could not be reached for comment.

The attorney general's office has been investigating the Lackawanna County Prison since May when it received information on a drug trafficking case. It assigned a grand jury as the probe

branched out into questions of unhappiness with inmate labor, drug-for-sex schemes, financial mismanagement, and improper political activity.

As many commissioners, Mr. Castellani and Mr. Corcoran were largely responsible for running the county prison. At the time, the county's Prison Board acted in an advisory capacity, deferring all action to the commissioners.

The Prison Board is comprised of the three county commissioners, district attorney, sheriff, controller and president judge.

In addition to more witnesses, including those owned privately by guards and staff,

municipal records, County officials were told to send a complete list of all vehicles owned or operated by the prison since 1995. They were also ordered to send Jan. 4, he said.

Previously, the grand jury subpoenaed detailed account information on the prison's current fund and the inmates' individual accounts dating back to 1998.

The Times-Tribune, which has been conducting its own investigation into prison operations for the last several months, found at one time the prison administration was running a virtual auto body shop at the jail, using inmate labor to work on vehicles,

Interim Warden James Wynder handled the latest subpoena, gathered the information and sent it in time to make the grand jury's assigned deadline of

In the course of its investigation, The Times-Tribune testified that inmates, including felons convicted of charges such as embezzlement and fraud, were helping to administer the canteen and prison inmate accounts.

**Contact the writer:**
jhenn@timesshamrock.com

P.M. Times. 1/12/04

A23

# The Tribune

**NORTHEASTERN PENNSYLVANIA'S LARGEST NEWS TEAM**

Windy, flurries, high 37.
Details on C10.

MONDAY, JANUARY 12,

NEWSSTAND 60¢   FINAL   HOME DELIVERY 3



## Eagles edge Pack in nail-biter, 20-17.

Brian Dawkins' interception set up David Akers' 31-yard field goal Sunday, giving Philadelphia a 20-17 win over Green Bay and handing NFC title game's third straight tiebreaker. The Eagles will play host next week to Carolina for the right to advance to the Super Bowl. B1

**Manning, Colts cruise past Chiefs**

## Dems stonewall grand jury

### Corcoran, Castellani evasiveness infuriates jurors, source claims

By Jennifer L. Henn
TRIBUNE STAFF WRITER

Lackawanna County's former majority commissioners Joseph J. Corcoran and Randy A. Castellani recently testified before a statewide grand jury investigating the county prison, and were


CASTELLANI


CORCORAN

**BEHIND THE BARS**

## Area families bid troops farewell

### 103rd Armor leaving today



## State toll in Iraq ranks 3rd

Only California and Texas have lost more



A24

## PRISON: Jury frustrated

FROM PAGE A1

Questioned again days later after the newspapers had confirmed his appearance, Mr. Castellani, again in the presence of Mr. O'Boyle, refused to comment on "anything dealing with the grand jury investigation," including why he previously indicated his wish that prosecutors had informed his lawyer earlier.

Although grand jury proceedings are closed to the public and prosecutors are forbidden by law to discuss them, witnesses are free, if they so choose.

When reminded that he was free to discuss his testimony, Mr. Castellani still refused.

"I refused to say anything about it, saying that's that's my thing," he said.

Mr. Corcoran could not, likewise, be reached for comment.

The attorneys investigating the Lackawanna County prison since May...



```
M
 O
UNIVERSE
 O
M
```

**What is?**

Answer to puzzle on Page A1

### Corrections

*It is our policy to correct errors promptly on this page of the paper in which they occur. We're sorry for the errors that occur. To report errors, please...*

**Move up in the world.**

Contact the writer
jhein@timesshamrock.com

### Big kiss-off

ROBERTO CANOA/ASSOCIATED PRESS PHOTOGRAPHER

More than 4,000 couples participate Sunday in a mass kissing session sponsored by a toothpaste brand in Santiago, Chile.

### Raging fire in Manila forces 22,000 to flee

MANILA, Philippines — A huge fire that swept through a shanty town in the Philippine capital early today, destroying three-story buildings and leaving about 22,000 residents homeless.

### Pakistan arrests 9 in assassination plot

ISLAMABAD, Pakistan — Pakistan said it arrested nine people who had links to the assassination attempt against President Gen. Pervez Musharraf, a security official said Sunday.

— COMPILED FROM ASSOCIATED PRESS

### Mountain lion improves in...

MISSION, Colo. — The senator injured...

### Lottery numbers

**PENNSYLVANIA**

DAILY (14M) — 6-1-2
Drawn Sunday
DAILY (7) — 5-4-8
Drawn Sunday
CASH 5 — 7-10-13-38-37
Drawn Sunday
BIG FOUR (1349) — 2-7-0-7
Drawn Sunday
SUPER SIX
14-21-42-46-58-61
Drawn Friday

**NEW JERSEY**

POWERBALL
2-13-19-27-50-5
Drawn Saturday
PICK 3 — 6-3-1
PICK 4
Drawn Sunday
PICK 6
67-13-24-58-31
Drawn Thursday

### The Tribune

(ISSN 1092-8444)

An independent newspaper published daily.

### How to reach us

Operator/information .......... 346-9100
To Order The Tribune ......... 346-8190
Subscription Billing ........... 346-8190
Classified Ads ................. 346-8100
Retail Ads ..................... 346-8190

### Almanac

Today is the 12th day of 2004 and the 22nd day of winter.

Today's History: In 1879, the Brit...